JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (*pro hac vice* pending)
Carl E. Black (*pro hac vice* pending)
Thomas A. Wilson (*pro hac vice* pending)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>Project Thunder Run, <u>et al.</u>,<br><br><div align="right">Debtors.</div> | Chapter 11<br><br>Case No. 15-_____ (___)<br><br>(Joint Administration Requested) |

## DECLARATION OF KEVIN S. CRUTCHFIELD, CHIEF EXECUTIVE OFFICER AND CHAIRMAN OF THE BOARD OF DIRECTORS OF DEBTOR ALPHA NATURAL RESOURCES, INC., IN SUPPORT OF <u>FIRST DAY PLEADINGS OF DEBTORS AND DEBTORS IN POSSESSION</u>

I, Kevin S. Crutchfield, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer and Chairman of the Board of Directors
of Alpha Natural Resources, Inc. ("ANR"), one of the debtors and debtors in possession in the
above-captioned chapter 11 cases (collectively, the "Debtors").  I have held these positions at
ANR since July 31, 2009 and May 17, 2012, respectively.  Prior to holding my current positions,
I served as (a) ANR's president from January 2007 until July 31, 2009; (b) ANR's executive vice
president from November 2004 until January 2007; (c) executive vice president of Alpha Natural
Resources, LLC beginning in March 2003; and (d) executive vice president of ANR Holdings,
LLC from November 2003 until ANR Holdings, LLC was merged with another of ANR's
subsidiaries in December 2005.  Additionally, I am currently a director and/or officer of 12 of
ANR's subsidiary Debtors.  As part of my employment and service in these capacities, I am
generally familiar with the Debtors' history, day-to-day operations, business and financial affairs,
and books and records, as well as the Debtors' restructuring efforts.  I have been employed in the
coal industry since the early 1980s.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed
voluntary petitions for relief under chapter 11 of title 11 of the United States Code
(the "Bankruptcy Code").

3.      To minimize the potential adverse effects of filing for chapter 11
protection and to enhance their ability to consummate a successful restructuring and confirm a
chapter 11 plan, the Debtors have filed a number of pleadings requesting various kinds of "first
day" relief (collectively, the "First Day Pleadings") concurrently with the filing of this
declaration (this "Declaration").  I am familiar with the contents of each First Day Pleading
(including the exhibits and other attachments to such motions) and, to the best of my knowledge,
insofar as I have been able to ascertain after reasonable inquiry, believe the relief sought in each

First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruptions; (b) is important to the Debtors' achievement of a successful restructuring; and (c) best serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals identified above.

4.    I submit this Declaration in support of the 150 Debtors' petitions for relief under chapter 11 of the Bankruptcy Code.  Except as otherwise indicated, all statements set forth in this Declaration are based upon:  (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration.

5.    Part I of this Declaration provides a brief overview of the history of Debtor ANR through its merger with Massey Energy Company and certain of its affiliates (collectively, "Massey").  Part II describes the industry-wide pressures that have led the Debtors (and many of their competitors) to seek chapter 11 relief.  Part III describes the Debtors' current operations.  Finally, Part IV describes the Debtors' ultimate decision to seek chapter 11 relief and their strategy for using these chapter 11 cases to restructure their operations and maximize value for all stakeholders.[1]

---

[1]    The Declaration of Philip J. Cavatoni, Executive Vice President and Chief Financial and Strategy Officer of Debtor Alpha Natural Resources, Inc., in Support of First Day Pleadings of Debtors and Debtors in Possession, filed contemporaneously with this Declaration, contains, among other things, detailed descriptions of (a) the Debtors' capital structure (including their long term debt and other material obligations), (b) the Debtors' declining financial performance (including declining sales, revenues and liquidity) in light of the macroeconomic and regulatory pressures weighing on the domestic coal industry and (c) the Debtors' efforts to right-size their business and maximize profitability in an extraordinarily challenging environment for coal producers.

## PART I

### OVERVIEW OF THE DEBTORS' BUSINESSES
### & THE HISTORY OF ANR THROUGH THE MASSEY MERGER

A.    Organizational Structure

6.     In addition to Debtor ANR, the Debtors consist of 149 entities, all of

which are direct or indirect subsidiaries of Debtor ANR, a Delaware corporation.[2]  The Debtors'

corporate headquarters are located in Bristol, Virginia, and 13 of the Debtors are incorporated or

otherwise formed in Virginia.  Many of the Debtors are effectively single-purpose entities,

comprising specific operations tied to specific geographical locations within the Debtors' overall

organizational structure.

B.    A Decade of Success

7.     The enterprise that now comprises the Debtors and their global,

multi-platform energy businesses began in 2002 with just seven employees. Slightly over two

years later, Alpha Natural Resources, Inc. (a prior entity formed in 2004 and legally distinct from

Debtor ANR) ("Former Alpha") became publicly traded, operated in five states, had

approximately $1.27 billion in annual revenues and employed approximately 2,600 people.

8.     Less than half a decade later, on July 31, 2009, Former Alpha – by then a

$2.5 billion company with more than 3,750 employees following a series of thoughtful and

well-timed accretive acquisitions – merged with Foundation Coal Holdings, Inc. (collectively

with its then-affiliates, "Foundation").  At the time of the merger, Foundation was a major

---

[2]     All wholly owned domestic direct and indirect subsidiaries of ANR have commenced chapter 11 cases
except for ANR Second Receivables Funding, LLC, a special purpose, bankruptcy-remote indirect
subsidiary of ANR that is party to the Credit and Security Agreement (the "A/R Facility") with General
Electric Capital Corporation ("GECC"), as administrative agent and a lender, swing line lender and
LC Lender (as defined in the A/R Facility) and Webster Business Credit Corporation, as a lender and
LC Lender.  In addition to ANR Second Receivables Funding, LLC, the Debtors have 12 other non-Debtor
domestic and foreign affiliates and related entities.

domestic producer of thermal (or "steam") coal for utilities and industrial plants and had

operations in Pennsylvania, West Virginia and Wyoming.  Following the merger:  (a) Foundation

was left as the surviving entity and renamed "Alpha Natural Resources, Inc." (i.e., the same

entity as current Debtor ANR); (b) the renamed Foundation's common stock replaced the

common stock of Former Alpha on the New York Stock Exchange (the "NYSE");[3] and (c) the

combined company had pro forma 2009 revenues of approximately $4.0 billion, employed

6,400 people and was the nation's largest exporter of metallurgical (or "met") coal, i.e., a very

high quality coal primarily used to make coke, an essential component in the steelmaking

process.  In 2010, the combined Company sold approximately 84.8 million tons of coal at a

margin of $11 per ton, generating net income of $95.6 million and free cash flow of

$384.7 million.

9.    With a stock price at approximately $45 per share, on June 1, 2011, ANR

completed its acquisition by merger (the "Massey Acquisition") of Massey for approximately

$6.7 billion, funding the acquisition primarily with its common stock.  At the time of the Massey

Acquisition, Massey was one of the nation's largest coal producers, with approximately

---

[3]    Prior to July 17, 2015, ANR's common stock traded publicly on the NYSE under the ticker "ANR".  On
July 16, 2015, ANR received notice (the "Delisting Notice") from the NYSE that the staff of NYSE
Regulation, Inc. ("NYSE Regulation") had determined to commence proceedings to de-list ANR's common
stock, and the trading thereof was suspended at the market open on the same day.  NYSE Regulation
determined that ANR was no longer suitable for listing on the NYSE pursuant to Section 802.01D of the
NYSE Listed Company Manual, based on a finding that the trading price of the Company's common stock
was "abnormally low."  NYSE Regulation's application to the United States Securities and Exchange
Commission to de-list ANR's common stock is pending.  ANR's common stock resumed trading on the
OTC Pink market under the ticker symbol ANRZ on July 17, 2015 and, as of the Petition Date, there were
approximately 5,000 registered holders thereof.

Prior to ANR's receipt of the Delisting Notice, on April 16, 2015, ANR was notified by the NYSE that the
average closing price of ANR's common stock had fallen below $1.00 per share over a period of
30 consecutive trading days, which is the minimum average share price required by the NYSE under
Section 802.01C of the NYSE Listed Company Manual ("Section 802.01C").  Under Section 802.01C, the
Company has six months following receipt of the notification to regain compliance with the minimum
share price requirement.  If ANR does not regain compliance with Section 802.01C by October 15, 2015,
its shares will be subject to suspension and de-listing by the NYSE.

2.4 billion tons of proven and probable reserves, 84 operating mines and associated processing

and loading facilities in Central Appalachia.  Following the Massey Acquisition, the combined

Company (a) was the second-largest producer of coal in the United States, (b) possessed one of

the world's largest and highest quality reserves, and had further solidified its position as the

nation's leading supplier, of met coal, (c) generated approximately $7 billion in revenue,

(d) operated 145 mines and 35 coal preparation plants, (e) had approximately 14,500 employees

and (f) supplied approximately 10% of the nation's aggregate electricity demand.

## PART II
### THE UNPRECEDENTED MARKET CHALLENGES FACING THE COAL INDUSTRY

10.     Shortly after the Massey Acquisition, the coal industry began to face

unprecedented market challenges, leading to a historic decline.  During the past several years,

American coal producers have encountered a confluence of macroeconomic headwinds,

competitive pressures and regulatory obstacles that, collectively, have distressed the domestic

coal industry.  These adverse trends have included:  (a) rapidly falling coal prices due to, among

other things, the substantially expanded ability of North American energy companies to produce

vast quantities of natural gas; (b) weak demand and significant oversupply for both thermal and

metallurgical coal due to slower than expected economic growth in both the United States and

overseas markets (such as Europe, where the Debtors are the largest exporter of U.S. coal, and

China, the largest user of thermal and met coal in the world); (c) the increasing use and

government subsidization of renewable energy technologies, both in the United States and

abroad; and (d) the imposition of restrictive federal and state regulations on coal producers and

operators of coal-fired power plants, which regulations (i) constrain the use of coal to make

electricity, (ii) have precipitously reduced domestic demand for thermal coal and (iii) have

sharply increased the costs of maintaining regulatory compliance.  Although the coal industry

historically has been subject to cyclical trends, and the Debtors anticipate that coal prices and global demand for coal will eventually recover, the current situation is structural and will take the Debtors and the entire industry time to reorient.

   11. <u>Plummeting Coal Prices and Weak Demand</u>.  Global coal prices generally correlate to the overall economic condition of the world's leading industrial and developing economies.  As the United States has struggled to recover from the Great Recession and many other leading coal-consuming countries have suffered economic downturns or constrained growth in recent years, coal prices have not come close to reaching pre-recession levels.  After briefly spiking in 2011 (immediately after the Japanese Fukushima nuclear disaster and multiple typhoons striking Australia), global coal prices have been mired in a trend of steady decline. Even as the United States has enjoyed modest annual gross domestic product growth during the past five years, demand for coal along with coal prices have fallen sharply over the past four years, reaching a 10-year low during the summer of 2015.  As set forth on the following charts, (a) prices for met coal and thermal coal have respectively fallen by approximately 72% and 44% since 2011 and (b) central appalachian coal production has declined by approximately 50% since 2008 and by approximately 37% since 2011.









12.    A variety of factors have contributed to the recent decline of coal prices,

including slowing economic growth in China, the world's leading coal consumer.[4]  The recent

development of new technologies enabling the production of large quantities of domestic natural

gas also has driven coal prices lower (e.g., between 2008 and 2013, domestic shale gas

production more than quadrupled).  As a result, natural gas prices have fallen approximately 75%

from their peak in 2008 and are now well below historical averages.  The availability of cheap

natural gas has caused the annual share of total domestic electricity generation attributable to

---

[4]    Timothy Puko & Chuin-Wei Yap, Falling Chinese Coal Consumption and Output Undermine Global Market, The Wall Street Journal (Feb. 26, 2015, 11:27 p.m.), http://www.wsj.com/articles/chinas-coal-consumption-and-output-fell-last-year-1424956878.  Moreover, China – historically, a significant net importer of coal – has in recent years both introduced an import tariff on coal and removed export tariffs. Fayen Wong, China to Again Levy Coal Import Tariffs After Nearly a Decade, Reuters (Oct. 9, 2014; 7:03 a.m.), http://www.reuters.com/article/2014/10/09/china-coal-idUSL3N0S41QP20141009; China Revamps Commodity Tariffs to Balance Supply Amid Slowdown, BloombergBusiness (December 17, 2014; 2:23 a.m.), http://www.bloomberg.com/news/articles/2014-12-17/china-revamps-commodity-tariffs-to-balance-supply-amid-slowdown.

coal to drop from 47% in 2010 to 39% in 2014.[5]  In April 2015, domestic electricity generation

powered by natural gas overtook that powered by coal on a monthly basis for the first time in

American history:  31% for natural gas (a 21% increase from April 2014) and 30% for coal (a

19% decrease from April 2014).[6]  Accordingly, although domestic electricity generation

powered by coal is projected to provide 37.2 percent of U.S. electricity in 2015 and 36.6 percent

in 2016 (and the Debtors expect to remain leaders in a downsized industry going forward),[7] the

market environment remains challenging.

        13.    <u>Tightening Regulatory Standards and Subsidization of Competing Forms</u>

<u>of Energy</u>.  The macroeconomic challenges facing American coal producers in recent years have

been compounded by the promulgation of new environmental regulations, and stricter

enforcement of existing federal and state regulations, affecting the coal and electrical power

industries.  For example:

- in 2014, the United States Supreme Court upheld the "Cross State Air
  Pollution Rule" recently promulgated by the United States Environmental
  Protection Agency (the "<u>EPA</u>") that sharply limits allowable emissions of
  sulfur dioxide and nitrogen oxides from coal-fired power plants in 28 states;[8]

---

[5]     U.S. Energy Information Administration, <u>Coal's Share of Total U.S. Electricity Generation Falls Below</u>
<u>40% in November and December</u> (Mar. 9, 2012), http://www.eia.gov/todayinenergy/detail.cfm?id=5331#;
U.S. Energy Information Administration, <u>What Is U.S. Electricity Generation By Energy Source?</u>
(Mar. 31, 2015), http://www.eia.gov/tools/faqs/faq.cfm?id=427&t=3.

[6]     Tom Murphy, <u>Natural Gas Surpasses Coal as Biggest U.S. Electricity Source</u>, Associated Press
(July 13, 2015), http://www.wvgazette.com/apps/pbcs.dll/article?AID=/20150713/GZ01/150719762
/1102&template=.printart.

[7]     American Coalition for Clean Coal Electricity, <u>Coal Facts</u>, March 20, 2015, at 1.

[8]     U.S. Environmental Protection Agency, <u>Cross-State Air Pollution Rule</u> (CSAPR),
http://www.epa.gov/airtransport/CSAPR/index.html; <u>see</u> <u>EPA v. EME Homer City Generation, L.P.</u>,
134 S. Ct. 1584 (2014).

- the EPA also recently issued new rules, known as the Mercury and Air Toxics Standards ("MATS"), limiting mercury emissions from power plants nationwide;[9]

- the EPA (at the direction of President Barack Obama) has proposed new rules to reduce carbon dioxide emissions from new and existing power plants, including a strict new carbon emissions rule – the Clean Power Plan – that would force operators of coal-fired power plants to either install costly emission-control technology or close such plants altogether.[10]  Moreover, any new coal-fired plant must employ carbon capture and storage technology (CCS), a perhaps prohibitively expensive and as-yet unproven technology.

These new regulations (MATS, in particular) have already contributed to the retirement of approximately 400 coal-fired electricity generating units and the loss of over 62,000 megawatts (or approximately 20%) of electric generating capacity.[11]  Moreover, it is expected that these new rules and regulations will (a) force the closure of approximately 468 additional existing coal-fired units with approximately 73,000 megawatts of electric generating capacity, (b) disincentivize utilities from constructing new coal-fired plants and (c) further reduce domestic demand for thermal coal, thereby putting increasing economic pressure on coal producers such as the Debtors.[12]

---

[9]    U.S. Environmental Protection Agency, Fact Sheet:  Mercury and Air Toxics Standards for Power Plants, http://www.epa.gov/mats/pdfs/20111221MATSsummaryfs.pdf.  I am informed that, on June 29, 2015, the United States Supreme Court ruled that the EPA improperly failed to consider the cost to power companies when it promulgated MATS, reversed a decision upholding MATS and required further consideration of certain challenges thereto. It is my understanding that MATS will remain in effect pending such further consideration, however, and that the EPA likely will continue to implement MATS to the extent permissible under applicable law.  See Janet McCabe, Acting Assistant Administrator for the Office of Air and Radiation, In Perspective: The Supreme Court's Mercury and Air Toxics Rule Decision, EPA Connect: The Official Blog of the EPA Leadership (June 30, 2015), https://blog.epa.gov/blog/2015/06/in-perspective-the-supreme-courts-mercury-and-air-toxics-rule-decision/.

[10]    Barack Obama, Presidential Memorandum:  Power Sector Carbon Pollution Standards (June 25, 2013), https://www.whitehouse.gov/the-press-office/2013/06/25/presidential-memorandum-power-sector-carbon-pollution-standards.

[11]    American Coalition for Clean Coal Electricity, Status of Major EPA Regulations Affecting Coal-Fired Electricity Generation, January 25, 2015, at 1-2; American Coalition for Clean Coal Electricity, Coal Unit Shutdowns, June 18, 2015, at 1.

[12]    See, e.g., Coral Davenport, Court Gives Obama a Climate Change Win, The New York Times (June 9, 2015), http://www.nytimes.com/2015/06/10/us/coal-epa-clean-power-plan.html ("If enacted, the

14.     In recent years, the federal government and many state governments also have enacted new laws designed to subsidize and promote the development and use of alternative energy sources in place of traditional fossil fuels such as coal.  The federal American Recovery and Reinvestment Act of 2009, for example, provided $90 billion for "clean energy" programs, a substantial portion of which was earmarked for the development of renewable energy technologies.  President Obama's administration has signaled its intention to continue subsidizing and promoting the growth of the alternative energy sector, while removing economic benefits currently available to coal and other fossil fuel producers.  President Obama's 2016 budget, for example, proposes to eliminate certain tax deductions for coal, oil and natural gas producers – totaling approximately $50 billion over the next decade – and allocates billions of dollars to various alternative energy programs.[13]  In addition, most states have implemented regulatory mandates known as "renewable portfolio standards," which generally require that a certain percentage of the electricity produced in the state must be generated from one or more renewable energy sources.  These efforts place coal producers such as the Debtors under increasing economic pressures and at competitive disadvantages relative to heavily subsidized alternative energy industries.

---

(continued…)

[Clean Power Plan] could shutter hundreds of [coal-fired power] plants, freeze construction of future plants and slow demand for coal production in the United States."); American Coalition for Clean Coal Electricity, Coal Unit Shutdowns, June 18, 2015, at 1.

[13]     Fiscal Year 2016 Budget of the U.S. Government, https://www.whitehouse.gov/sites/default/files/omb/budget/fy2016/assets/budget.pdf; Amy Harder, Obama Budget Would Pour Funds Into Climate, Renewable Energy, The Wall Street Journal (Feb. 3, 2015, 7:43 a.m.), http://www.wsj.com/articles/obama-budget-would-pour-billions-into-climate-renewable-energy-1422903421.

15.    <u>Intensity of Competition Within Coal Industry</u>.  In addition to the external

challenges facing the coal industry from declining demand, alternative energy sources and a

difficult regulatory environment, the Debtors are further subject to intense competition *within* the

coal industry.  With respect to their domestic customers, the Debtors compete with numerous

coal producers based in the Appalachian region and Illinois basin and with a significant number

of western coal producers.  Moreover, the recent strength of the U.S. dollar has made domestic

coal more expensive relative to foreign coal production from Australia, Indonesia, South Africa

and Columbia.[14]  Long-expected consolidation in the coal industry has yet to materialize,

resulting in excess production capacity and, thus, depressed prices for the Debtors' coal.

## PART III
### THE DEBTORS' CURRENT BUSINESSES & OPERATIONS

16.    <u>The Debtors Today</u>.  As of the Petition Date, the Debtors are the among

the largest domestic producers of coal by volume in the United States, with (a) total assets and

liabilities of $10.1 billion and $7.1 billion, respectively, and (b) consolidated 2014 revenues of

$4.3 billion ($3.7 billion of which are attributable to coal sales).  They remain the nation's

leading supplier and exporter – and one of the world's largest suppliers – of met coal for steel

producers and a major supplier of steam coal to electric utilities and manufacturing industries

across the country.

17.    The Debtors currently employ slightly fewer than 8,000 full-time

employees (down approximately 45% from their post-merger peak).  Of the Debtors' full-time

employees, approximately (a) 5,700 are paid hourly, (b) 2,300 are salaried and (c) 88% are

---

[14]    Clifford Krauss, <u>Coal Miners Struggle to Survive in an Industry Battered by Layoffs and Bankruptcy</u>, The
New York Times (July 18, 2015), http://www.nytimes.com/2015/07/18/business/energy-environment/coal-
miners-struggle-to-survive-in-an-industry-battered-by-layoffs-and-bankruptcy.html?_r=0.

directly engaged in mining operations.  As of the Petition Date, approximately 1,000 of the

Debtors' employees (or 12.5%) are represented by the United Mine Workers of America

(the "UMWA").  The Debtors' unionized workforce is located in Virginia, West Virginia and

Pennsylvania, and 13% of the Debtors' 2014 coal production came from mines operated by

UMWA-represented employees.



18.     The Debtors sell coal to domestic and foreign electric utilities, steel

producers and industrial users, and maintain solid long-term relationships with numerous power

plants operated by a diverse group of domestic electricity generators.  The Debtors' (a) status as

the only coal producer with mines and reserves in both Northern Appalachia and the Powder

River Basin and (b) access to international shipping points on the east and gulf coasts of the United States allow them to maximize flexibility in response to customer demand and facilitate the most economical means of product transportation, providing them with a significant strategic advantage over their competitors.  Approximately 39% of the Debtors' total revenue for 2014 was derived from sales made to customers outside the United States.

19.    Measured by volume, steam coal accounted for 78% of the Debtors' 2014 coal sales (approximately 66 million tons), with met coal accounting for nearly the entirety of the remaining 22% of coal sales (approximately 18.6 million tons). Measured by revenue, met coal accounted for approximately 43% of the Debtors' 2014 coal sales (as met coal sells at a premium due to its higher quality) and steam coal accounted for approximately 57%.  The Debtors produce and process approximately 98.7% of the coal they sell,[15] and are a recognized leader in safety and environmental performance within the coal industry.

---

[15]    Approximately 1.1% of the coal sold by the Debtors is purchased from third parties and either (a) processed by the Debtors, (b) blended with the Debtors' coal to produce precise product mixtures desired by customers or (c) shipped directly to customers.



20.     As of the Petition Date, the Debtors (a) operated in three major coal

producing basins:  Northern Appalachia and Central Appalachia (i.e., southwestern

Pennsylvania; West Virginia; eastern Kentucky; and western Virginia) and Wyoming's Powder

River Basin and (b) own or control approximately 2.35 billion tons of proven coal reserves and

another 1.20 billion tons of probable reserves.[16]  The Debtors' operations include 22 coal

preparation plants, each of which receives, blends, processes and ships coal produced at one or

more of the Debtors' 54 active mines.  The Debtors' coal extraction operations generally employ

---

[16]     According to guidelines promulgated by the United States Securities and Exchange Commission, "proven"
coal reserves are reserves for which (a) the quantity of potential coal is computed from dimensions revealed
in outcrops, trenches, workings or drill holes; (b) the grade and/or quality of potential coal are computed
from the results of detailed sampling; and (c) the sites for inspection, sampling and measurement are spaced
so closely, and the geologic character so well-defined, that size, shape, depth and mineral content of
reserves are well-established.  "Probable" coal reserves are reserves for which quantity and grade and/or
quality are computed from information similar to that used for proven reserves, but the sites for inspection,
sampling and measurement are farther apart or are otherwise less adequately spaced.

five different mining techniques:  (a) longwall mining; (b) room-and-pillar mining;

(c) truck-and-shovel mining; (d) front-end loader mining; and (e) highwall mining.

21.    <u>North Appalachian Operations</u>.  The Debtors' Northern Appalachia

("<u>NAPP</u>") operations (a) consist of their Cumberland and Emerald mining complexes and two

preparation plants and (b) encompass approximately 709.7 million tons of reserves (55.8 million

of which are currently assigned to active mines).  In 2014, the Debtors shipped approximately

11 million tons of coal from their NAPP operations (7.6 million from Cumberland and

3.4 million from Emerald).  Steam coal comprised approximately 86% of this total (shipped

primarily to utilities located in the eastern United States) and met coal comprised the remaining

14% (primarily marketed to export customers).  As of the Petition Date, there were

approximately 1,080 salaried and hourly employees at the Debtors' NAPP operations, with the

entire hourly workforce (<u>i.e.</u>, 825 employees) being represented by the UMWA.  During 2014,

the Emerald operation neared the completion of its life-of-mine plan, and the Debtors currently

expect Emerald to cease mining activities during 2015.

22.    <u>Central Appalachian Operations</u>.  The Debtors' Central Appalachian

operations ("<u>CAPP</u>") consist of 50 underground and surface mines and 20 preparation plants and

encompass approximately 2.5 billion tons of proven and probable reserves (approximately

1.16 billion of which are currently assigned to active mines).  Collectively, the Debtors' CAPP

operations (a) shipped approximately 34.1 million tons of coal in 2014, primarily to eastern

utilities (steam coal) and steel companies (met coal), and (b) employ approximately 6,000

salaried and hourly workers, with 130 hourly employees being represented by the UMWA.

23.    <u>Western Coal Operations</u>.  The Debtors' western coal operations located in

the Powder River Basin consist of their Belle Ayr and Eagle Butte surface mining operations,

which collectively shipped approximately 36.5 million tons of steam coal (15.8 million tons from

Belle Ayr; 20.7 million from Eagle Butte) in 2014, primarily to utility companies located

throughout the western, midwestern and southern United States.  The Debtors' western

operations (a) control approximately 700.1 million tons of coal reserves, all of which are

currently assigned to active mines, and (b) employ approximately 580 salaried and hourly

workers (none of whom are union-represented).



Coal Reserves and Coal Shipments (in Tons) by Operation for 2014

     24.     <u>Natural Gas Operations</u>.  The Debtors further control – through Debtor

Pennsylvania Land Resources Holding Company, LLC ("<u>PLR</u>") – approximately 25,000 acres in

the Marcellus Shale natural gas field of Southwestern Pennsylvania, and are currently engaged in

efforts to prove and develop natural gas resources within such acreage.  Debtor Pennsylvania

Services Corporation's ("PSC") recent acquisition, on July 1, 2015, of the 50% of PLR not

previously owned by PSC allowed the Debtors to take sole control of their operations within the

most profitable and productive region of one of the largest and most concentrated natural gas

fields in the United States.  In addition, through PLR, the Debtors further control rights to

develop natural gas resources located at other depths, including the deep Utica Shale, on certain

of the leased acreage and adjoining properties.

    25. Other Operations.  The Debtors engage in a limited amount of operations

outside of their core coal production, processing and sales operations, including:  (a) mining

equipment sales and repair conducted by Debtor Maxxim Rebuild Company, LLC; (b) a 41%

interest in Dominion Terminal Associates, a 20 million ton annual capacity coal export terminal

located in Newport News, Virginia and unique deep water port; and (c) certain other

miscellaneous activities.

    26. Idled Operations.  Since July of 2011, the Debtors have idled or closed

more than 80 mines, impacting the livelihood of approximately 7,000 employees and their

families, primarily in CAPP.  These idled mines impose substantial annual costs upon the

Debtors of approximately $175 million, including costs related to reclamation obligations,

employee-related legacy obligations and maintenance and legal costs.

    27. Based on its mining footprint, the Debtors generally report financial

results from two segments:  (a) Eastern Coal Operations (consisting of the Debtors' Appalachian

mines and certain coal brokerage activities) and (b) Western Coal Operations (consisting of its

two Powder River Basin mines).  The Debtors also report financial results from certain ancillary

segments of their business under the category of "All Other" (e.g., an idled underground coal

mine in Illinois; expenses associated with closed mines; revenues and royalties from the sale of

natural gas; mineral leasing rights; general corporate overhead).  For the year ended

December 31, 2014, the Debtors incurred a loss from operations of $875 million.

### PART IV

#### THE DECISION TO SEEK CHAPTER 11 RELIEF
#### & THE DEBTORS' STRATEGY GOING FORWARD

28.     The unprecedented changes facing the coal industry run deep and are

occurring at a frenetic and unpredictable pace.  Coal, at its peak, represented roughly 52% of the

nation's electricity output.  In April of 2015, the market share had decreased to about 30%, a

major shift over a relatively short period of time, especially given the relatively high fixed cost

nature of the business and intensive sustaining capital requirements.  The U.S. coal industry as

currently structured is unsustainable.  Multiple major producers (as well as more than 20 smaller

coal companies) have been, and will continue to be, driven to the brink of insolvency by, among

other factors, (a) precipitous declines in demand and pricing resulting from a progressively

burdensome regulatory environment that severely constrains the use of coal,

(b) transformationally cheap and abundant natural gas, (c) a plethora of legacy retirement,

pension and restoration costs (e.g., black lung and workers' compensation liabilities),

(d) substantial environmental and restoration obligations that only accelerate as the industry

contracts and mine closures proliferate and (e) reclamation bonding demands from state

regulators that constrain available liquidity.  Since the collapse in coal pricing began in 2012,

several major coal producers have sought bankruptcy protection, including (a) Patriot Coal

Company, first in 2012 (annual revenues at the time of $2.33 billion) and again in May 2015

(annual revenues of $1.46 billion); (b) Walter Energy, Inc. (annual revenues of $1.4 billion);

(c) Edison Mission Energy (annual revenues of $1.29 billion); and (d) James River Coal

Company (annual revenues of $660 million).

29.     Because of the pressures placed on the Debtors' profitability by steadily

falling coal prices and demand, and the substantial negative cash flow resulting therefrom, it is

the business judgment of the Debtors that commencement of these chapter 11 cases is the best

course to preserve and maximize value for their stakeholders.  It is the Debtors' belief that the

relief provided by chapter 11 will enable them to continue to restructure their operations and

balance sheet while weathering the storm that has beset the coal industry.

30.     As described above, the malaise experienced in the coal industry over the

past few years has only worsened.  The fall has been precipitous and the effect on the Debtors

has been extreme – more so than anyone could have anticipated even a year ago.  But there can

be no question that coal will remain a critical commodity in the United States and abroad and

that, while the industry may currently suffer from economic and political forces that have

resulted in significant oversupply and concomitantly plummeting prices, the metrics necessary

for profitable coal mining and production will ultimately materialize.  The global steel industry,

of which almost 70% depends on coal, has limited alternatives to the use of coke – and thus to

the use of met coal – in its steel manufacturing processes; and, even with the gradual shift of

utilities to renewable and natural gas energy sources, thermal coal-fired plants are still expected

to supply 30% to 40% of domestic demand for electricity for the foreseeable future.  Following

the adaptation to necessary structural changes within the industry, there will be survivors once

pricing again turns favorable, and our management is confident that the Debtors will be among

them.

31.     The Debtors enjoy substantial structural advantages over many of their

competitors.  They are the nation's leading supplier – and one of the world's largest suppliers – of

premium met coal.  They have geographically dispersed operations, and the performance of their

NAPP Cumberland and Powder River Basin operations have been largely successful, even in the current environment. They own significant percentages of critical industry infrastructure assets – e.g., the coal export terminal owned by Dominion Terminal Associates – that provide them with material cost efficiencies. They have an experienced and dedicated management team committed to maximizing the Debtors' long term enterprise value. And, finally but importantly, they have begun to diversify their energy portfolio, expanding into natural gas with substantial holdings in the Marcellus Shale and actively seeking further opportunities. The Debtors and the coal industry – like their coal miners – are resilient. The Debtors believe that, with an appropriately de-leveraged balance sheet, their valuable core operations will position them to participate – *profitably* – in the coal and broader energy industries going forward, providing thousands of jobs for their employees and necessary natural resources to their customers to help them provide electricity to homes and businesses and steel for building infrastructures. These chapter 11 cases – during which the Debtors seek to implement a new business plan, currently in development, suitable for downsized and profitable operations – are the first step in that process, a process that has the support of the Debtors' prepetition secured lenders (as evidenced by the Debtors' proposed debtor-in-possession financing).

I, Kevin S. Crutchfield, the undersigned Chief Executive Officer and

Chairman of the Board of Directors of ANR, declare under penalty of perjury that the foregoing

is true and correct.


Dated:  August 3, 2015

/s/  Kevin S. Crutchfield
Kevin S. Crutchfield
Chief Executive Officer and Chairman of the Board
of Directors of Alpha Natural Resources, Inc.