JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (*pro hac vice* pending)
Carl E. Black (*pro hac vice* pending)
Thomas A. Wilson (*pro hac vice* pending)

*Proposed Attorneys for Debtors
and Debtors in Possession*

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Project Thunder Run, <u>et al.</u>, | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF PHILIP J. CAVATONI, EXECUTIVE
## VICE PRESIDENT & CHIEF FINANCIAL AND STRATEGY OFFICER
## OF DEBTOR ALPHA NATURAL RESOURCES, INC., IN SUPPORT OF
## <u>FIRST DAY PLEADINGS OF DEBTORS AND DEBTORS IN POSSESSION</u>

I, Philip J. Cavatoni, hereby declare under penalty of perjury:

1.        I am the Executive Vice President & Chief Financial and Strategy Officer of Alpha Natural Resources, Inc. ("ANR"), one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").  I have held these positions at ANR since March 2015.  Prior to assuming my current position, I served ANR as executive vice president and chief strategy officer of ANR (from August 2009 through February 2015) and treasurer and executive vice president, finance and strategy (from February 2009 through July 2009).  Additionally, I am a director and/or officer of each of the other Debtors.  As part of my employment and service in these capacities, I am generally familiar with the Debtors' history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' restructuring efforts.

2.        On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.        To minimize the adverse effects of filing for chapter 11 protection and to enhance their ability to consummate a successful restructuring and confirm a chapter 11 plan, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings") concurrently with the filing of this declaration (this "Declaration").  I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, believe the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruptions; (b) is important to the Debtors' achievement of a successful restructuring; and (c) best serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief

sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals

identified above.

4.      I submit this Declaration in support of:  (a) the 150 Debtors' petitions for

relief under chapter 11 of the Bankruptcy Code; and (b) the First Day Pleadings.  Except as

otherwise indicated, all statements set forth in this Declaration are based upon:  (a) my personal

knowledge; (b) information supplied to me by other members of the Debtors' management or the

Debtors' professionals; (c) my review of relevant documents; or (d) my opinion based upon my

experience and knowledge of the Debtors' operations and financial conditions.  If called upon to

testify, I could and would testify to the facts set forth in this Declaration.  I am authorized by the

Debtors to submit this Declaration.

5.      Part I of this Declaration provides a summary overview of the Debtors'

structure, history and operations (as more comprehensively described in the Crutchfield

Declaration (as such term is defined below)).[1]  Part II contains a detailed description of the

Debtors' capital structure (including their long-term debt and other material obligations).  Part III

describes (a) the Debtors' declining financial performance (including declining sales, revenues

and liquidity) in light of the macroeconomic and regulatory pressures described in the

Crutchfield Declaration and (b) the Debtors' efforts to right-size their business and maximize

---

[1]      The Declaration of Kevin S. Crutchfield, Chief Executive Officer and Chairman of the Board of Directors
of Debtor Alpha Natural Resources, Inc., in Support of First Day Pleadings of Debtors and Debtors in
Possession (the "Crutchfield Declaration"), filed contemporaneously with this Declaration, contains, among
other things, (a) a brief overview of the history of Debtor ANR through its merger with Massey Energy
Company ("Massey") and certain of its affiliates (the "Massey Acquisition"), (b) a comprehensive overview
of the industry-wide pressures that have led the Debtors (and many of their competitors) to seek chapter 11
relief, (c) a description of the Debtors' current operations and (d) details regarding the Debtors' ultimate
decision to seek chapter 11 relief and their strategy for using these chapter 11 cases to restructure their
operations and maximize value for all stakeholders.

profitability in an extraordinarily challenging environment for coal producers.  Part IV sets forth

relevant facts in support of the First Day Pleadings.

# PART I

## THE DEBTORS' STRUCTURE, HISTORY AND OPERATIONS

6.     As set forth in further detail in the Crutchfield Declaration, the Debtors

consist of 150 entities, all of which are wholly owned direct or indirect subsidiaries of Debtor

ANR, a Delaware corporation.[2]  The Debtors' corporate headquarters are located in Bristol,

Virginia, and 13 of the Debtors are incorporated or otherwise formed in Virginia.[3]  The

enterprise that now comprises the Debtors began in 2002 with just seven employees and, through

organic growth and a series of mergers and acquisitions over the ensuing decade (including with

Foundation Coal Holdings, Inc. ("Foundation") and Massey), became one of the largest

publicly-traded suppliers of coal in the United States.

7.     On a consolidated basis, the Debtors (a) have total assets and liabilities of

$10.1 billion and $7.1 billion, respectively, as of the Petition Date; (b) employ slightly fewer

than 8,000 employees (approximately 12.5% of whom are represented by the UMWA); and

(c) had consolidated 2014 revenues of $4.3 billion ($3.7 billion of which are attributable to coal

sales).  They are the nation's leading supplier and exporter – and one of the world's largest

---

[2]     All wholly owned domestic direct and indirect subsidiaries of ANR have commenced chapter 11 cases
except for ANR Second Receivables Funding, LLC, a special purpose, bankruptcy-remote indirect
subsidiary of ANR that is party to the A/R Facility, as defined and described in further detail below.

[3]     The Debtor entities which are currently domiciled in Virginia are as follows:  (a) Alpha European Sales,
Inc. (formed on November 26, 1996); (b) Appalachia Coal Sales Company, Inc. (formed on June 12, 1981);
(c) Appalachia Holding Company (formed on July 10, 1920); (d) Black Mountain Cumberland Resources,
Inc. (formed on March 29, 2010); (e) Buchanan Energy Company, LLC (formed on March 15, 1974);
(f) Harlan Reclamation Services LLC (formed on October 9, 1998); (g) Knox Creek Coal Corporation
(formed on December 10, 1986); (h) Mill Branch Coal Corporation (formed on September 4, 1996);
(i) Neweagle Industries, Inc. (formed on September 30, 1993); (j) North Fork Coal Corporation (formed on
June 16, 1993); (k) Pigeon Creek Processing Corporation (formed on January 31, 1990); (l) Resources
Development LLC (formed on January 20, 1998); and (m) Resource Land Company LLC (formed on
August 12, 1998).

suppliers – of metallurgical (or "met") coal and a major supplier of thermal (or "steam") coal to electric utilities and manufacturing industries across the country.  As of the Petition Date, the Debtors operated in three major coal producing basins:  Northern and Central Appalachia (i.e., southwestern Pennsylvania; West Virginia; eastern Kentucky; and western Virginia) and Wyoming's Powder River Basin, and own or control approximately 2.35 billion tons of proven coal reserves and another 1.20 billion tons of probable reserves.

8.    The Debtors further control – through Debtor Pennsylvania Land Resources Holding Company, LLC ("PLR") – approximately 25,000 acres in the Marcellus Shale natural gas field of southwestern Pennsylvania, the most profitable and productive region of one of the largest and most concentrated natural gas fields in the United States.  The Debtors further engage in a limited amount of operations outside of their core coal production, processing and sales operations, including:  (a) mining equipment sales and repair conducted by Debtor Maxxim Rebuild Company, LLC; (b) a 41% interest in non-Debtor Dominion Terminal Associates, a 20 million ton annual capacity coal export terminal located in Newport News, Virginia; and (c) certain other miscellaneous activities.

## PART II

### THE DEBTORS' CAPITAL STRUCTURE

A.    Long-Term Institutional Debt Obligations[4]

9.    As of the Petition Date, the Debtors had approximately:

- $1.96 billion in secured indebtedness, consisting of:

  o $611 million in principal amount (the "Secured Term Loan") outstanding under the Term Loan B Facility (as such term is defined below) under the Fifth Amended and Restated Credit Agreement, dated as of September 24, 2014

---

[4]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

(the "Credit Agreement"), by and between (a) ANR, as borrower, (b) certain of ANR's subsidiary Debtors, as guarantors (collectively, the "Credit Agreement Guarantors"), (c) the lenders party thereto (collectively, the "Credit Agreement Lenders") and (d) Citicorp North America, Inc., as administrative agent and collateral agent (the "Credit Agreement Agent");

- o $445 million outstanding under the secured revolving credit facility (the "Revolving Facility") under the Credit Agreement;

- o $191.2 million in letters of credit issued and outstanding under the Revolving Facility under the Credit Agreement;[5] and

- o $714 million in principal amount of 7.50% senior secured second lien notes issued in 2014 and 2015 by ANR and due 2020 (the "Second Lien Notes").

- $2.10 billion in primary institutional unsecured indebtedness, consisting of approximately:

  - o $263 million in principal amount of 3.75% convertible senior notes issued in May 2013 by ANR, due in 2017 (the "2017 Notes");

  - o $393 million in principal amount of 9.75% senior notes issued in October 2012 by ANR, due in 2018 (the "2018 Notes");

  - o $577 million in principal amount of 6.0% senior notes issued in June 2011 by ANR, due in 2019 (the "2019 Notes");

  - o $277 million in principal amount of 4.875% convertible senior notes issued in December 2013 by ANR, due in 2020 (the "2020 Notes"); and

  - o $585 million in principal amount of 6.25% senior notes issued in June 2011 by ANR, due in 2021 (the "2021 Notes").

- $109 million in principal amount of 3.25% secured convertible senior notes issued in August 2008 by Massey Energy Company, due in 2015 (the "2015 Notes"). As discussed further in paragraph 16 below, the 2015 Notes are secured, on an equal and ratable basis with the Credit Agreement Lenders, by certain Principal Properties (as such term is defined below), the value of which is highly uncertain, and a payment upon the 2015 Notes due on August 1, 2015 was not made.[6]

---

[5]    The letters of credit outstanding under the Revolving Facility (together with letters of credit outstanding under the A/R Facility, as such term is defined below) serve as collateral for workers' compensation bonds, reclamation surety bonds, secured UMWA retiree health care obligations, secured workers' compensation obligations and other miscellaneous obligations.

[6]    Although the maturity date for the 2015 Notes was August 1, 2015 pursuant to the terms of the 2015 Notes Indenture (as such term is defined below), the payment date was August 3, 2015.

10.     For ease of reference, a one-page table summarizing the foregoing is attached hereto as Annex A.[7]

*The Credit Agreement*

11.     The Credit Agreement is generally comprised of two sub-facilities: (a) a senior secured term loan facility (the "Term Loan B Facility") in the aggregate principal amount of up to $625 million; and (b) a secured revolving credit facility (the "Revolving Facility").  All obligations under the Credit Agreement are:  (a) secured (subject to certain exceptions, thresholds and limitations set forth in the Credit Agreement) by substantially all of the assets of ANR and the Credit Agreement Guarantors; (b) unconditionally guaranteed by the Credit Agreement Guarantors; and (c) prepayable, in whole or in part, without penalty or premium upon proper notice and in certain minimum amounts.  The Credit Agreement generally contains customary affirmative covenants, representations and warranties and events of default.

12.     Assets excepted from the collateral package securing the Debtors' obligations under the Credit Agreement (and the Second Lien Notes, which are secured by a junior lien on all or substantially all of the same collateral package) include:  (a) the assets of

---

[7]     On September 19, 2014, non-Debtor affiliate ANR Second Receivables Funding, LLC ("ANR SRF"), a special purpose indirect subsidiary of ANR, as borrower, entered into a Credit and Security Agreement (the "A/R Facility") with General Electric Capital Corporation ("GECC"), as administrative agent and a lender, swing line lender and LC Lender (as defined in the A/R Facility) and Webster Business Credit Corporation, as a lender and LC Lender.  Under the A/R Facility, ANR SRF may borrow cash or cause the LC Lenders to issue letters of credit, on a revolving basis, in an amount up to $200 million, subject to certain limitations set forth therein.  ANR has guaranteed the performance of its subsidiaries (other than ANR Second Receivables Funding) under the A/R Facility and agreements related thereto.  As of the Petition Date, under the A/R Facility, approximately $102.8 million of letters of credit were outstanding. The obligations of the lenders to make cash advances and of the LC Lenders to issue letters of credit pursuant to the A/R Facility are secured by certain trade receivables owned by ANR SRF.  Pursuant to a support agreement related to the A/R Facility, ANR has issued an unsecured performance guaranty in favor of GECC of certain obligations of certain Debtor subsidiaries arising under documents related to the A/R Facility, but this guaranty does not extend to ANR SRF as borrower.  As described below, the A/R Facility will be effectively taken out by the proposed DIP Financing.

PLR; (b) the Debtors' minority interest (through holdings of approximately 4.0 million shares of publicly traded common stock) in Rice Energy, Inc., valued at approximately $72.5 million as of the Petition Date; and (c) the Debtors' unassigned accounts receivable, most currently valued at approximately $8 million as of June 30, 2015.

13.     On May 23, 2013, the Credit Agreement Lenders funded the Secured Term Loan in the full amount of their respective commitments under the Term Loan B Facility (i.e., $625 million in the aggregate).  The proceeds of the Secured Term Loan were used (a) to repay $525 million in principal outstanding under a term loan "A facility" under a prior amended version of the Credit Agreement, (b) to pay fees and expenses and (c) for general corporate purposes.  The Secured Term Loan matures on May 22, 2020.  At ANR's election, the Secured Term Loan bears interest at an annual rate equal to the Adjusted LIBO Rate (as defined in the Credit Agreement) plus 2.75%.  Repayments of 0.25% of the initial principal owing on the Secured Term Loan are due at the end of each calendar quarter.

14.     On June 26, 2015, ANR delivered a borrowing request to the Credit Agreement Agent, pursuant to Section 2.03 of the Credit Agreement, seeking a borrowing under the Revolving Facility in the amount of $445 million.  On June 30, 2015, the Credit Agreement Lenders funded the requested loans in the full amount.  As of the Petition Date, (a) this $445 million represented all outstanding borrowings under the Revolving Facility; and (b) letters of credit outstanding under the Revolving Facility totaled approximately $191.2 million. Commitments of the Credit Agreement Lenders under the Revolving Facility totaling $276 million expire on June 30, 2016, with the remaining $618 million in commitments expiring on September 30, 2017.  The Credit Agreement imposes a fee, payable quarterly and calculated by reference to the Debtors' consolidated leverage ratio, of 0.375% to 0.50% for any available

unused commitment under the Revolving Facility.  Amounts outstanding under the Revolving

Facility bear interest at the rates set forth in the Credit Agreement for "ABR Borrowings" (as

such term is defined therein).

### *Second Lien Notes*

15.     On May 20, 2014, (a) ANR, as issuer, (b) the Credit Agreement

Guarantors, as guarantors, and (c) Wilmington Trust, National Association ("Wilmington Trust"),

as trustee and collateral agent, entered into an indenture (the "Second Lien Notes Indenture")

governing certain of the Second Lien Notes, pursuant to which ANR issued $500 million in

aggregate principal amount of Second Lien Notes.  On March 23, 2015, (a) ANR, as issuer,

(b) the Credit Agreement Guarantors, as guarantors, and (c) Wilmington Trust, as trustee and

Series B collateral agent, entered into an indenture (the "Second Lien Notes Indenture

(Series B)") governing additional Second Lien Notes (Series B), pursuant to which ANR issued

an additional $214 million in aggregate principal amount of Second Lien Notes.  The Second

Lien Notes pay interest semiannually in arrears on February 1 and August 1 of each year, at a

rate of 7.50% per year, and will mature on August 1, 2020.  The Second Lien Notes are secured

by a second priority lien on all or substantially all those assets securing ANR's obligations under

the Credit Agreement.

### *2015 Notes*

16.     As a result of the Massey Acquisition, ANR became a guarantor of the

2015 Notes, issued by Massey (now known as Debtor Alpha Appalachia Holdings, Inc.).

Pursuant to the indenture governing the 2015 Notes (the "2015 Notes Indenture"), a final

payment of $109 million of all outstanding principal and accrued and unpaid interest was due on

August 1, 2015 upon the maturity of the 2015 Notes, which payment was not made.[8]

Section 1004 of the 2015 Notes Indenture provides that the Debtors may only provide another

entity with a lien on certain "Principal Property"[9] if holders of the 2015 Notes are equally and

ratably secured by such lien.  In connection with the execution of the fifth amendment to the

Credit Agreement, dated September 24, 2014, the Credit Agreement Lenders were granted a lien

on the Principal Property, thus triggering the "equal and ratable" provision of the 2015 Notes

Indenture and rendering the 2015 Notes secured to the extent of the value of the noteholders'

interest in the Principal Property.  No agreed or standard methodology exists for calculating the

market value of the Principal Property and, thus, such value is difficult to ascertain and is

presently uncertain. The 2015 Notes are guaranteed by certain former Massey subsidiaries

(which are among the Debtors).

*2017 Notes/2020 Notes*

17.     On June 1, 2011, (a) ANR, as issuer, (b) certain of ANR's subsidiary

Debtors (the "2017/2020 Notes Guarantors"), as guarantors, and (c) Union Bank of California

("Union Bank"), as trustee, entered into an indenture (as it may have been amended or

supplemented, the "2017/2020 Notes Indenture") governing (x) the 2017 Notes and (y) the

2020 Notes.  The 2017 Notes and the 2020 Notes are senior unsecured obligations of ANR that

rank *pari passu* with ANR's other senior unsecured obligations, and are guaranteed by the

2017/2020 Notes Guarantors.  The proceeds of the 2017 Notes and the 2020 Notes, together with

cash on hand, were used to repurchase approximately (a) $402.9 million of then-outstanding

---

[8]     Although the maturity date for the 2015 Notes was August 1, 2015 pursuant to the terms of the 2015 Notes Indenture, the payment date was August 3, 2015.

[9]     Section 1004 of the 2015 Notes Indenture defines "Principal Property" as "any single office building, manufacturing or processing plant, warehouse or other similar facility owned by [the Debtors], the book value of the property, plant and equipment of which, net of depreciation, is not less than 2% of the Company's Consolidated Net Tangible Assets ....".

2015 Notes and (b) $218.2 million of other then-outstanding unsecured debt.  As of the Petition

Date, the principal amount outstanding under the 2017 Notes was $263 million and the principal

amount outstanding under the 2020 Notes was $277 million.

18.     The 2017 Notes bear interest at a rate of 3.75% per year (with an effective

rate of 8.49% owing to deferred loan costs and discount), payable semi-annually in arrears on

June 15 and December 15 of each year, and are scheduled to mature on December 15, 2017.

The 2020 Notes bear interest at a rate of 4.875% per year (with an effective rate of 9.48% owing

to deferred loan costs and discount), payable semi-annually in arrears on June 15 and

December 15 of each year, and are scheduled to mature on December 15, 2020.

*2019 Notes/2021 Notes*

19.     On June 1, 2011, (a) ANR, as issuer, (b) the 2017/2020 Notes Guarantors,

and (c) Union Bank, N.A., as trustee, entered into an indenture and a first supplemental indenture

(together, the "2019/2021 Notes Indenture") governing the 2019 Notes and the 2021 Notes.  Also

on June 1, 2011, in connection with the Massey Acquisition, ANR, the 2017/2020 Notes

Guarantors, Massey, certain of Massey's wholly owned subsidiaries and Union Bank, N.A., as

trustee, entered into a second supplement to the 2019/2021 Notes Indenture, pursuant to which

Massey and certain wholly owned subsidiaries of Massey agreed to become additional

guarantors of the 2019 Notes and the 2021 Notes.

20.     The 2019 Notes bear interest at a rate of 6.00% per annum, payable

semi-annually on June 1 and December 1 of each year, beginning on December 1, 2011, and are

scheduled to mature on June 1, 2019.  The 2021 Notes bear interest at a rate of 6.25% per annum,

payable semi-annually on June 1 and December 1 of each year, beginning on December 1, 2011,

and are scheduled to mature on June 1, 2021.  As of the Petition Date, the principal amounts

outstanding under the 2019 Notes and the 2021 Notes were $577 million and $585 million, respectively.

    *2018 Notes*

    21.    On October 11, 2011, (a) ANR, as issuer, (b) the 2017/2020 Notes Guarantors, as guarantors, and (c) Union Bank, N.A., as trustee, entered into a third supplement to the 2019/2021 Notes Indenture (the "Third Supplemental Indenture") governing the 2018 Notes.  The 2018 Notes bear interest at a rate of 9.75% per annum, payable semi-annually on April 15 and October 15 of each year, beginning on April 15, 2013, and are scheduled to mature on April 15, 2018.  As of the Petition Date, the principal amount outstanding under the 2018 Notes was $393 million.

B.    Trade Debt

    22.    The Debtors' trade debt consists of, among other things, amounts owed to utilities and suppliers of, among other goods and services:  (a) maintenance and repair parts and services (including equipment rebuilds); (b) certain commodities (e.g., fuel; coal); (c) mine roof control and support items; (d) explosives; (e) tires; (f) conveyance structures; (g) ventilation supplies; and (h) lubricants.  The Debtors further rely heavily on suppliers and service providers for (a) construction and reclamation activities, (b) transportation and storage services and (c) information technology services.  The majority of the Debtors' vendors are paid on negotiated terms, which have historically ranged from as few as one to two days (due to the Debtors' desire to take advantage of term-related pricing discounts) to as many as 60 days.  As of the Petition Date, the Debtors estimate that approximately $200 million is outstanding to their trade vendors, of which amount approximately $41 million relates to goods provided to the Debtors within 20 days of the Petition Date.

C.    <u>Non-Capital Lease Obligations</u>

23.    The great majority of the Debtors' Appalachian coal reserves are subject to leases from third-party landowners.  These leases generally convey mining rights to the Debtors in exchange for a percentage of gross sales in the form of a royalty payment to the lessor, subject to minimum payments.  As of December 31, 2014, approximately 2.57 billion tons of the Debtors' total 3.22 billion tons of Appalachian coal reserve holdings were leased and require minimum royalty and/or per-ton payments.

24.    The Debtors' active Wyoming mines are subject to federal coal leases administered by the U.S. Department of Interior under the Federal Coal Leasing Amendment Act of 1976.  The Debtors must diligently develop each such federal lease within ten years of the lease award, with a required coal extraction of 1.0% of the reserves within that ten-year period and a requirement of continuous mining thereafter.  The Debtors pay the federal government an annual rent of $3.00 per acre and production royalties of 12.5% of gross proceeds on surface mined coal.  As of December 31, 2014, approximately 681.3 million tons of the Debtors' total 700.1 million tons of Wyoming coal reserve holdings were leased and subject to the foregoing terms.

25.    The Debtors' obligations with respect to non-capital leases for calendar year 2014 was approximately $204 million (of which $187 million was attributable to their mining leases).

D.    <u>Capital Lease Obligations</u>

26.    As of the Petition Date, ANR's liability related to capital lease obligations (<u>e.g.</u>, leases of certain property; plant and mining equipment) totaled approximately $56 million, with $15.7 million reported as a current portion of long term debt as of December 31, 2014.

Undiscounted cash interest payable on such obligations, with interest rates between 2.13% and

13.86%, would be approximately $3.6 million in 2015, $8.7 million in 2016, $8.0 million in the

aggregate for 2018 to 2019 and $29.6 million after 2019.

E.      Reclamation Obligations

        27.     ANR's asset retirement (or "reclamation") obligations arise pursuant to the

federal Surface Mining Control and Reclamation Act of 1977 and similar state statutes, which

generally require that property upon which mining operations have been conducted be restored in

accordance with specified standards and an approved reclamation plan.  Standards for mine

reclamation have been established by various state and federal regulatory agencies and dictate

the reclamation requirements at ANR's mining properties.  ANR's reclamation obligations

consist principally of costs necessary to (a) reclaim refuse and slurry ponds, (b) reclaim the pit

and support acreage at surface mines, (c) seal portals at deep mines and (d) treat water used in

mining operations.

        28.     As of the Petition Date, the Debtors' aggregate accrued reclamation

obligations – based on a variety of assumptions tied to the Debtors' existing operations and mine

plans that may change in light of actual events – are approximately $683 million, with

approximately $99 million of that total coming due within one year.  The Debtors are currently

self-bonded for approximately (a) 96% of their reclamation obligations in Wyoming and

(b) approximately 77% of such obligations in West Virginia, subject to periodic evaluation of its

financial position by the applicable state.

        29.     Federal and state laws require the Debtors to obtain surety bonds –

typically renewable annually – to secure payment of certain long-term obligations (e.g., mine

closure or reclamation costs; water treatment; federal and state workers' compensation costs;

obligations under federal coal leases; and other miscellaneous obligations).  As of the Petition

Date, the Debtors had outstanding bonds issued by commercial sureties with a total face amount

of approximately $367 million to secure various potential obligations and commitments, with the

overwhelming majority related to bonds securing the Debtors' reclamation obligations, and

relatively small percentages related to financial guarantees and workers' compensation and other

employee obligations.  The Debtors have posted approximately $115 million in letters of credit

under the Credit Agreement and the A/R Facility to secure their obligations to the commercial

sureties.

       30.     Pursuant to a letter to Debtor Alpha Coal West, Inc. ("ACW") dated

May 26, 2015 (the "Wyoming Collateral Demand"), the Wyoming Department of Environmental

Quality (the "WDEQ") (a) notified ACW that it and Debtor ANR no longer qualified under the

state's self-bonding program with respect to the Debtors' Wyoming reclamation obligations and

(b) required ACW to substitute, within 90 days of the Debtors' receipt of notice (such period,

the "Posting Period"), "either corporate sureties …, cash, governmental securities, federally

insured certificates of deposit, or irrevocable letters of credit" valued at more than $400 million.

       31.     The Debtors disagreed with the WDEQ's determination, and believed that

they fully satisfied all requirements for self bonding under applicable state regulations for the

period in question.  Accordingly, by letter dated June 2, 2015 (the "June 2 Letter"), the Debtors

requested an informal conference with the WDEQ as permitted under applicable law.  On

June 26, 2015, ACW and ANR exercised their statutory right under Wyoming law to seek

judicial review of the WDEQ's revocation of the Debtors' self-bond by filing an appeal

(the "Appeal") thereof in the Sixth Judicial District Court of Campbell County, Wyoming

(the "Wyoming Court").  On July 9, 2015, the WDEQ responded to the June 2 Letter indicating

its willingness to participate in an informal conference.  Pursuant to a motion filed with the

Wyoming Court on July 23, 2015, the Powder River Basin Resource Council, a private,

third-party conservation organization, sought to intervene in the Appeal.  On July 24, 2015,

ACW and ANR filed an unopposed motion with the Wyoming Court seeking to (a) stay the

Appeal pending the informal conference and (b) stay the deadline for the Debtors to comply with

the Wyoming Collateral Demand.

> 32.      If the Debtors have not complied with the Wyoming Collateral Demand

prior to the expiration of the Posting Period (i.e., August 24, 2015), (a) a temporary permit block

will automatically go into effect, prohibiting the WDEQ from issuing any new permits to the

Debtors or allowing the renewal or transfer of existing permits; and (b) Wyoming may take a

variety of enforcement actions, including (i) seeking to impose a permanent permit block upon

the Debtors, (ii) revoking the Debtors' existing Wyoming permits and licenses and (iii) initiating

procedures for the enforcement of self-bonding guarantees and/or indemnity provided by the

Debtors.

> 33.      While the Debtors remain hopeful that a resolution with Wyoming can be

achieved that will help preserve their contributions to the coal industry and, thus, a critical

portion of that state's revenue, the Debtors further believe that simply posting or causing to be

posted $400 million in replacement bonds (which will carry their own substantial collateral

requirements) will be detrimental to their restructuring efforts and, therefore, detrimental to their

creditors and stakeholders without promoting the health of the environment (as the Debtors are,

and intend to remain, in compliance with applicable environmental and reclamation regulations).

Accordingly, these cases were commenced, in part, to provide a forum in which the Wyoming

Collateral Demand can be addressed in a manner that is fair and equitable to all of the Debtors' creditors and stakeholders.

34.     Further, pursuant to a letter to ANR dated July 24, 2015, the West Virginia Department of Environmental Protection, Division of Mining and Reclamation (the "<u>WVDMR</u>") informed ANR that it intended to transition the assurance of the Debtors' reclamation obligations in West Virginia away from self-bonding to other acceptable forms of bond.  The Debtors and the WVDMR currently are engaged in open dialogue as to how best to achieve, and the scope of, any such transition.

F.     <u>Pension Obligations</u>

35.     The Debtors maintain three qualified, non-contributory defined benefit pension plans (collectively, the "<u>Qualified Plans</u>") covering certain salaried and non-union hourly employees.  Benefits under each of the Qualified Plans have been frozen.  Benefits payable under the Qualified Plans are paid from the assets held within the applicable benefit plan trust.  As of December 31, 2014 (the most recent actuarial determination by the Debtors), ANR's accumulated unfunded obligation to the Qualified Plans is approximately $219.7 million.

36.     In addition to the Qualified Plans, ANR also has (a) the Alpha Natural Resources, Inc. and Subsidiaries Deferred Compensation Plan, as Amended and Restated Effective August 1, 2012; (b) the Alpha Natural Resources, Inc. Non-Employee Directors Deferred Compensation Plan, as Initially Adopted Effective January 1, 2010; (c) the Foundation Coal Supplemental Executive Retirement Plan, Effective July 30, 2004, as Amended on March 16, 2007, December 11, 2008, July 27, 2009 and January 23, 2014; and (d) the A.T. Massey Coal Company, Inc. Executive Deferred Compensation Plan, Amended and Restated as of January 1, 2009 (collectively, the "<u>SERP Plans</u>").  Benefits under these non-qualified plans

are completely unfunded.  ANR's obligations with respect to the SERP Plans are (a) $1.6 million

in 2015, (b) $3.1 million in the aggregate for 2016 and 2017, (c) $3.1 million in the aggregate for

2018 and 2019 and (d) $30.4 million thereafter.  Certain funding for the SERP Plans is held in a

"rabbi trust," which is subject to the claims of the Debtors' creditors.

G.     Other Post-Employment Benefit Obligations

37.     ANR has short- and long-term liabilities for post-employment medical and

life insurance benefits to certain eligible employees under various plans, which liabilities are

unfunded.[10]  As of December 31, 2014 (the most recent actuarial determination by the Debtors),

ANR had total post-employment medical benefit obligations of approximately $1.06 billion,

including amounts reported as current liabilities.

H.     Regulatory Compliance Costs

38.     The coal industry is heavily regulated by federal, state and local

authorities with respect to, among other things:  (a) permitting and licensing requirements; (b) air

and water emissions; (c) property reclamation; (d) remediation of contaminated soil;

(e) protection of surface and groundwater; and (f) surface subsidence from underground mining.

During 2014, the Debtors incurred capital expenditures of approximately $13.7 million in

connection with regulatory compliance.

39.     Although the Debtors work to conduct their mining and other operations

in compliance with applicable laws and regulations – and the Debtors are industry leaders in

safety and environmental compliance – violations inevitably occur from time to time.  In 2014,

---

[10]     A comprehensive description of such plans and benefits is contained in the Motion of Debtors, Pursuant to
Sections 105(a), 363, 507(a)(4), 507(a)(5), 541(b)(7) and 541(d) of the Bankruptcy Code, for Interim and
Final Orders Authorizing Them to:  (A) Pay Prepetition Employee Compensation and Business Expenses;
(B) Pay and Honor Employee Medical and Other Benefits; (C) Make Employee Payroll Deductions and
Pay Payroll Taxes; (D) Continue Employee Wage and Benefits Programs; and (E) Pay All Costs and
Expenses Incident to Any of the Foregoing, filed contemporaneously herewith.

the Debtors entered into a consent decree (the "Consent Decree") with the United States

Environmental Protection Agency, the U.S. Department of Justice, Kentucky, Pennsylvania and

West Virginia regarding claims brought against the Debtors under the Clean Water Act, alleging

that certain of the Debtors' mining affiliates in various states exceeded certain water discharge

permit limits during the period 2006 to 2013.  As part of the Consent Decree, the Debtors agreed

to (a) implement an integrated environmental management system and an expanded

auditing/reporting protocol, (b) install selenium and osmotic pressure treatment facilities at

specific locations and (c) take certain other measures.  The Debtors are obligated under the

Consent Decree to make capital expenditures of approximately $163.4 million over the course of

the period from 2015 through 2018 to achieve water quality compliance under certain water

discharge permits issued by the state agencies covered by the Consent Decree.

I.      Black Lung Benefit Obligations

40.      ANR is required by federal and state statutes to provide benefits to

employees for awards related to pneumoconiosis (or "black lung").  In addition, as a result of the

Massey Acquisition and the Foundation merger, ANR assumed certain black lung benefit

obligations to certain employees.  ANR's subsidiaries are insured for black lung obligations by a

third-party insurance provider, with the exception of (a) certain subsidiaries with respect to

which ANR is a qualified self-insurer and (b) certain subsidiaries that are self-insured and may

fund benefit payments through a Section 501(c)(21) tax-exempt trust fund.  As of

December 31, 2014 (the most recent actuarial determination by the Debtors), the Debtors'

accrued obligation for black lung benefits totaled approximately $158.6 million.

J.      MEPP Obligations

41.      Certain of the Debtors are required by collective bargaining agreements

with the UMWA to participate in, and make contributions to, the United Mine Workers of

America 1974 Pension Plan (the "MEPP").  The MEPP is a multi-employer pension plan

administered by a board of trustees appointed by the UMWA and the Bituminous Coal

Operators' Association.  For the years ended December 31, 2014, 2013 and 2012, the Debtors

incurred expenses related to the MEPP of approximately $19 million, $21 million and

$23 million, respectively.[11]  As of June 30, 2015, the estimated withdrawal liability should the

Debtors withdraw from the MEPP was approximately $607 million.

## PART III

### RECENT FINANCIAL PERFORMANCE AND EVENTS
### LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

A.      The Debtors' Declining Financial Performance.

42.      As set forth in the Crutchfield Declaration, over the past several years,

American coal producers have encountered a variety of macroeconomic headwinds and

regulatory obstacles that collectively have distressed most of the domestic coal industry.  These

negative trends have included:  (a) rapidly falling coal prices due to, among other things, the

substantially expanded ability of North American energy companies to produce vast quantities of

natural gas; (b) weak demand and significant oversupply for both thermal and metallurgical coal

---

[11]      The MEPP's funded status is reviewed annually by a certifying actuary.  In October 2014, the Debtors
received notice that the MEPP was considered to be in "critical" status for the plan year beginning
July 1, 2014 (which means that the actuary had determined that the MEPP's funding ratio was less
than 65%), and the MEPP was projected to have an accumulated funding deficiency for the 2018 plan year.
Pursuant to the Pension Protection Act of 2006, which requires a minimum funding ratio of 80%,
employers participating in the MEPP were assessed a 5% surcharge on their contractual contribution rate.
The plan is also subject to a funding improvement plan (the "Funding Improvement Plan").  The goals of
the Funding Improvement Plan are to improve the funded status and to avoid an accumulated funding
deficiency for all plan years in the applicable period.  The Funding Improvement Plan provides increased
contribution rates beginning in 2017, which may be substantial.

due to slower than expected economic growth in the United States and overseas markets (such as China, where coal remains the primary source of energy); (c) the increasing use and government subsidization of renewable energy technologies, both in the United States and abroad; and (d) the continual tightening of federal and state regulation of coal producers and operators of coal-fired power plants, which has further reduced domestic demand for thermal coal and increased the costs of maintaining regulatory compliance.  The coal industry historically has been subject to cyclical trends, and the Debtors anticipate that coal prices and global demand for coal will eventually recover.

43.     These negative trends afflicting the coal industry have resulted in corresponding declines in the Debtors' production and shipment of coal.  The chart immediately below demonstrates the steady decrease in the Debtors' aggregate coal sales during the years following the Massey Acquisition.[12]



_____

[12]     Note that the data for the year 2011 in the charts that follow include results for the five-month period prior to the completion of the Massey Acquisition on June 1, 2011 and, thus, for aggregate sales and revenue, understate amounts on a relative basis.

44.     With the decline in sales volumes, the Debtors' revenues have

correspondingly declined in recent years, as set forth in the following chart.



45. Despite aggressive cost-cutting and cash-raising activities undertaken by the Debtors (as described below), the collapse in coal demand and prices has produced (a) a net loss for 2014 of $875 million (on total assets and liabilities of $10.1 billion and $7.1 billion, respectively) and (b) steadily contracting cash flow from operations, as set forth in the following chart.



B.    The Debtors' Efforts to Right-Size Their Business and Maximize Profitability.

46. The Debtors immediately recognized the structural changes in the coal industry that manifested shortly after the Massey Acquisition, and consciously and aggressive engaged in a long-term series of investing, divestiture and right-sizing activities to address the threats to the profitability of their business.  Some of these efforts are described below:

- ***Operational Measures***

  - Generally, over the last four years, the Debtors have engaged in optimal downsizing strategies to adjust to market conditions, including reductions to coal production (and the consequent lowering of production costs) in Central Appalachia and the Powder River Basin;

  - The Debtors have idled or closed more than 80 mines since July of 2011;

  - The Debtors' workforce has been reduced from 14,500 to fewer than 8,000 since July 2011;

  - Capital expenditures have been reduced by approximately 55% from $410 million in 2012 to an estimated $225 million in 2015; and

  - Selling, general and administrative expenses have been reduced by approximately 48% from $210 million in 2012 to an estimated $110 million in 2015.

- ***Divestitures***

  - On December 6, 2013, the Debtors exchanged with Rice Energy, Inc. ("Rice Energy"), their 50% interest in a joint venture with Rice Drilling C, LLC in exchange for $100 million in cash and 9.5 million shares of Rice Energy common stock (valued at the time at $200 million) and have subsequently realized approximately $136.8 million in cash proceeds from various sales of approximately 5.5 million shares of Rice Energy common stock;

  - On December 30, 2014, Debtor subsidiary AMFIRE Mining Company, LLC ("AMFIRE") sold substantially all of its assets (including ten mines and four preparation plants and loadouts) to Rosebud Mining Company for $75.1 million in cash and $12.1 million of assumed liabilities; and

  - The Debtors have further effected a number of smaller asset divestures over the last three years (e.g., the sale of assets related to its Coal Handling Solutions and Dry Systems Technology businesses), generating approximately $40 million in cash proceeds.

- ***Financing Measures***

  - The Debtors issued the 9.75% Notes on October 1, 2011, generating approximately $500 million in proceeds;

  - The Debtors secured the Fourth Amended and Restated Credit Agreement on May 22, 2013, thereby providing long-term support by (a) increasing the amount of their term loan facility by $100 million; (b) extending the

maturity of the Debtors' term loan borrowings from June 30, 2016 to May 22, 2020; (c) increasing the amount of the Revolving Facility by $100 million; and (d) providing certain covenant relief (including a reduction of the minimum liquidity covenant from $500 million to $300 million);

- The Debtors obtained amendments to the Fourth Amended and Restated Credit Agreement (i.e., the prior iteration of the Credit Agreement), dated May 7, 2014, and October 2, 2013, providing the Debtors with covenant relief thereunder (including increases to the amount of additional indebtedness permitted to be incurred by the Debtors by $400 million);

- The Debtors entered into the Credit Agreement on September 24, 2014, thereby (a) extending the maturity of approximately 75% of the commitments available to the Debtors under the Revolving Facility until September 30, 2017; (b) providing the Debtors with certain covenant relief; and (c) facilitating future extensions and refinancings through certain amendments;

- The Debtors raised an additional $714 million through the issuance of $500 million Second Lien Notes in 2014 and the further issuance of an additional $213.6 million in Second Lien Notes during the first three months of 2015; and

- The Debtors entered into a series of privately negotiated transactions during the three-month period ended March 31, 2015, in which they repurchased (for consideration of cash and Second Lien Notes) (a) $223.1 million in principal amount of the 2019 Notes, (b) $115.1 million in principal amount of the 2021 Notes, (c) $107.4 million in principal amount of the 2018 Notes, (d) $82.3 million in principal amount of the 2017 Notes and (e) $68.3 million in principal amount of the 2020 Notes, recognizing a gain on early extinguishment of debt of $364.2 million.

- ***Diversification***

  - On July 1, 2015, Debtor Pennsylvania Services Corporation ("PSC") acquired the 50% of Debtor Pennsylvania Land Resources Holding Company, LLC ("PLR") not previously owned by PSC for approximately $126 million in cash, and are currently engaged in efforts to prove and develop natural gas resources within such acreage.

  - The Debtors' acquisition of PLR allows them to exert sole control over natural gas operations in approximately 25,000 acres in the Marcellus Shale natural gas field of southwestern Pennsylvania, the most profitable and productive region of one of the largest and most concentrated natural gas fields in the United States.  In addition, through PLR, the Debtors

further control rights to develop natural gas resources located at other
depths, including the deep Utica Shale, on certain of the leased acreage
and adjoining properties.

47.     Notwithstanding the efforts described immediately above, because of

(a) the pressures placed on the Debtors' profit margins by steadily falling coal prices and demand

(as set forth in detail in the Crutchfield Declaration), (b) the substantial negative cash flow

resulting therefrom, (c) pressures on the Debtors' liquidity balance caused by reclamation–related

bonding requirements and (d) substantial employee-related legacy liabilities (including more

than $1 billion in other post-employment benefit obligations and over $600 million in potential

MEPP withdrawal liability (as calculated by the Debtors)), the Debtors have determined in their

business judgment, after an extensive and deliberative process, that commencement of these

chapter 11 cases is the best course to preserve and maximize liquidity and value for their

stakeholders.  It is the Debtors' belief that the relief provided by chapter 11 will enable them to

continue to restructure their operations and debt structure while riding out the storm that has

beset the coal industry.  The Debtors believe that, with an appropriately de-leveraged balance

sheet and a focused business plan, their valuable core operations will position them to participate

– profitably – in the coal and broader energy industry going forward, providing thousands of jobs

for their employees and necessary natural resources to their customers.  These chapter 11 cases

are the first step in that process.

## PART IV
### FIRST DAY PLEADINGS

A.     General.

48.     Concurrently with the filing of their chapter 11 cases, the Debtors filed the

First Day Pleadings requesting various forms of relief.  The Debtors anticipate that the Court will

(a) conduct a hearing soon after the Petition Date (the "First Day Hearing") at which it will hear

and consider many of the First Day Pleadings on an interim or final basis, and (b) consider the

remainder of the First Day Pleadings (and final relief for others) on or about a date that is

21 days after the Petition Date.

49.     Generally, the First Day Pleadings have been designed to meet the goals

of (a) preserving and protecting the Debtors' chapter 11 estates, including by paying certain

claims of employees, essential suppliers, lienholders and foreign vendors; (b) obtaining

necessary debtor in possession financing to provide the Debtors' estates with sufficient liquidity

to operate; and (c) establishing procedures for the smooth and efficient functioning of the

Debtors' estates.  I believe that the relief sought in each of the First Day Pleadings is tailored to

meet the goals described above and, ultimately, will be critical to the Debtors' ability to

reorganize successfully.

B.      Joint Administration

50.     The Debtors will present a motion requesting the entry of an order

providing for the joint administration, but not the substantive consolidation, of their chapter 11

cases.  I believe that the joint administration of the Debtors' respective estates is warranted and

will ease the administrative burden for the Court, the Office of the Clerk of the Court and parties

in interest.

C.      Filing Consolidated Lists of Creditors and Related Relief

51.     Given the Debtors' affiliated nature, the Debtors will move for entry of an

order authorizing them to file a single consolidated list of the Debtors' 50 largest unsecured

creditors in these chapter 11 cases in lieu of filing separate lists of the largest 20 unsecured

creditors for each of the Debtors.  Such authority will facilitate the U.S. Trustee's review of

creditors' claims and the appointment of a single creditors' committee in these cases.

The Debtors will also seek a waiver of the requirement that each debtor file a list of creditors containing the name and address of each entity included or to be included on a debtor's schedules of liabilities (as such information will be provided to the Debtors' claims and noticing agent). Finally, the Debtors will seek approval of the form and manner of notice of commencement of these chapter 11 cases and of the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "341 Meeting").

D.      Extension of Time to File Schedules and Statements

        52.      Because of the size and complexity of ANR's businesses and the Debtors' financial affairs, and because of the numerous critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors will move for entry of an order granting them an extension of time until 60 days following the Petition Date to gather the information necessary to complete and file the required: (a) schedules of assets and liabilities; (b) schedules of executory contracts and unexpired leases; and (c) statements of financial affairs.  In addition, the Debtors will request an extension of the time until no later than 45 days after the Petition Date to (a) file their initial reports of financial information in respect of entities in which their chapter 11 estates hold a controlling or substantial interest, as set forth in Bankruptcy Rule 2015.3 or (b) file a motion with the Court seeking a modification of such reporting requirements for cause.  The Debtors also will request waivers of the requirements that ANR (a) file a list of equity security holders within 14 days of the Petition Date, as set forth in Bankruptcy Rule 1007(a)(3) and (b) give notice to equity security holders of the commencement of these chapter 11 cases and the 341 Meeting as set forth in Bankruptcy Rule 2002(d).

E.       Motion to Confirm the Protections of the Automatic Stay

53.      To aid in the administration of the Debtors' bankruptcy cases and to avoid

disruption to the Debtors' business, the Debtors will seek the entry of an order, pursuant to

section 105(a) of the Bankruptcy Code, that confirms the application of three key protections

afforded to the Debtors under the Bankruptcy Code:  (a) the automatic stay provisions of

section 362 of the Bankruptcy Code; (b) the anti-termination and anti-modification provisions of

section 365 of the Bankruptcy Code; and (c) the anti-discrimination provisions of section 525 of

the Bankruptcy Code (the "Code Protections").

54.      The Debtors believe that (a) the extensive and highly regulated nature of

their businesses, (b) their need for, and reliance upon, among other things, contract parties

continuing to perform their obligations and (c) their interactions with parties who may be

unfamiliar with, are mistaken regarding, or who simply ignore the Code Protections require the

entry of an order confirming those protections in order to maximize value for stakeholders.

Furthermore, to ensure that any violations of the Code Protections do not disrupt the Debtors'

businesses, the Debtors are seeking approval of a formal and expeditious process for promptly

adjudicating any such violations, to the extent they are not otherwise resolved.

F.       Motion to Confirm the Administrative
         Expense Priority of Postpetition Goods and Services

55.      The Debtors have moved the Court for an order confirming the

administrative expense priority of goods delivered and services provided after the Petition Date.

In the ordinary course of the Debtors' businesses, numerous suppliers and service providers

provide the Debtors with goods and services that are integral to the Debtors' ongoing operations.

As of the Petition Date, the Debtors had outstanding prepetition purchase orders with many

suppliers of goods and services and the Debtors plan to order additional goods and request

services postpetition for which there are no existing orders.  As a result of the commencement of

these chapter 11 cases, the Debtors believe that their suppliers may perceive a risk that they will

be treated as prepetition general unsecured creditors for the cost of any shipments made or

services provided after the Petition Date.  As a result, suppliers may refuse to ship such goods or

provide such services to the Debtors without certain assurances of payment.  The Debtors believe

that the relief sought in the relevant motion will permit the Debtors to obtain the timely delivery

of goods and uninterrupted provision of services from their suppliers with minimal

administrative burden and expense.

G.    Employee Wages and Benefits

56.    The continued and uninterrupted support of the Debtors' Employees

(as defined in the relevant motion) is essential to the Debtors' success.  The Employees' skills and

their specialized knowledge and understanding of the Debtors' infrastructure, assets and

operations, as well as their relationship with customers, vendors and other third parties, are

essential to the administration of these chapter 11 cases and the preservation of the value of the

Debtors' estates.  As a result of attrition and corresponding increased pressure and responsibility

placed on remaining Employees, however, the Debtors' annual employee turnover has nearly

doubled in recent years.

57.    As of the Petition Date, many Employees were owed or had accrued

various sums for wages, employee benefits, business expenses and payroll deductions.

Interruptions in payment of prepetition wages and benefits will destroy the Debtors' relationships

with the Employees, impose additional hardship on Employees who rely on this compensation to

pay living expenses and jeopardize Employees' continued performance in this critical time as the

Debtors attempt to stabilize their businesses.  In addition, the failure to maintain Employee

wages and benefits would potentially expose the Debtors to significant safety and environmental

risks caused by increased Employee disillusionment or absenteeism.

58.     I believe that without the requested relief, the Employees – whose morale

has been tested by recent reductions in headcount, the decline of the Debtors' businesses and the

decline of the coal industry generally – may seek alternative opportunities.  The loss of valuable

Employees and the resulting need to recruit new personnel into a struggling industry to replenish

the Debtors' workforce would be distracting and counterproductive at this critical time.  Ensuring

the uninterrupted availability of Employee services will assist the Debtors in (a) maintaining a

"business as usual" atmosphere to the extent possible and (b) preserving the Debtors'

relationships with a variety of important constituencies, including key customers and vendors.

These considerations also justify the payment of relatively <u>de minimis</u> amounts in connection

with outstanding WARN liabilities, legacy healthcare obligations and obligations to certain

survivors of the Upper Big Branch mine explosion (and spouses and dependents of those who

were killed), which serve to preserve morale throughout the Debtors' operations and the mining

community and maintain a business as usual atmosphere for the Debtors and their Employees.

For these reasons, among others, the payment of the Employee Wages and Benefits (as defined

in the motion) is essential for the Debtors' restructuring efforts.

59.     Therefore, the Debtors seek authority to pay and honor, in the ordinary

course of business and in their sole discretion, prepetition claims and obligations (other than

certain obligations described in section 503(c) of the Bankruptcy Code) related to Employee

Wages and Benefits and various related costs, expenses, deductions and withholdings.

To facilitate this relief, Debtors also request that the Court authorize and direct financial

institutions to receive, process, honor, and pay checks presented for payment and electronic

payment requests relating to prepetition Employee obligations.

H.    Prepetition Taxes

60.    The Debtors, in the ordinary course of their business, incur various tax and

other liabilities to governmental entities, including, among others, production taxes, black lung

excise taxes, sales and use taxes, franchise taxes, environmental and safety taxes, penalties and

fees, and certain other taxes, assessments and fees (collectively, the "Prepetition Taxes") owed to

certain taxing authorities (the "Taxing Authorities").  Prior to the Petition Date, the Debtors

generally paid their tax obligations as they became due.

61.    The Debtors are required to pay certain severance taxes – i.e., taxes related

to the value or quantity of coal "severed" from the ground – and other production taxes related to

the extraction of coal (collectively, the "Production Taxes").  As of the Petition Date, the Debtors

estimate that the aggregate amount of Production Taxes owing to the Taxing Authorities is

approximately $45 million.

62.    Pursuant to Section 4121 of the Internal Revenue Code, the Debtors are

required to pay federal black lung excise taxes (the "Black Lung Excise Taxes"), the proceeds of

which are held in trust by the federal government and used to compensate coal miners who

develop pneumoconiosis, also known as "black lung disease."  As of the Petition Date, the

Debtors estimate that the aggregate amount of Black Lung Excise Taxes owing to the federal

government is approximately $500,000.

63.    The Debtors are required to pay certain sales taxes, gross receipts taxes

and other similar taxes in connection with the sale of coal to their customers and purchases of

tangible personal property (collectively, the "Sales Taxes").  The Debtors are also required to pay

use taxes (together with the Sales Taxes, the "Sales and Use Taxes") when they make certain

purchases of tangible personal property from out-of-jurisdiction vendors.  As of the Petition Date,

the Debtors estimate that the aggregate amount of Sales and Use Taxes owing to the Taxing

Authorities is less than $1 million.

64.    The Debtors pay franchise taxes to certain of the Taxing Authorities to

maintain the right to operate their business in the relevant taxing jurisdictions (collectively,

the "Franchise Taxes").  The Debtors estimate that the aggregate amount of prepetition Franchise

Taxes owing to the Taxing Authorities is less than $300,000.

65.    In the ordinary course of business, the Debtors pay (a) certain taxes and

fees owing to federal and state Taxing Authorities (collectively, the "Reclamation Taxes"), the

proceeds of which are used to reclaim abandoned mine sites, and (b) various fees, penalties and

assessments to governmental authorities as part of the Debtors' obligations to comply with

environmental, health and safety laws and regulations (together with the Reclamation Taxes,

the "Environmental and Safety Charges").  The Debtors estimate that the aggregate amount of

Environmental and Safety Charges owing to the Taxing Authorities as of the Petition Date is

approximately $14.3 million.

66.    In addition to the Prepetition Taxes described above, the Debtors pay

certain miscellaneous taxes to the Taxing Authorities, including (but not limited to) fuel excise

taxes, heavy vehicle taxes and explosives taxes assessed by federal and certain state Taxing

Authorities (collectively, the "Other Taxes").  The Debtors estimate that the aggregate amount of

prepetition Other Taxes owing to the Taxing Authorities is less than $1 million.

67.    The Debtors seek the entry of interim and final orders allowing them, in

their reasonable discretion, to pay the Prepetition Taxes to the Taxing Authorities, including all

Prepetition Taxes subsequently determined upon audit to be owed for periods prior to the

Petition Date.  The Debtors believe they have ample business justifications to pay the Prepetition

Taxes because it is my understanding that:  (a) certain of the Prepetition Taxes do not constitute

property of the Debtors' chapter 11 estates because they are "trust fund taxes" held by the

Debtors in trust for the benefit of those third parties to whom payment is owed or on behalf of

whom such payment is being made; (b) certain of the Prepetition Taxes may constitute secured

or priority claims the payment of which will not prejudice general unsecured creditors; (c) the

failure to pay certain of the Prepetition Taxes may impact the Debtors' ability to conduct

business in certain jurisdictions and consummate certain necessary postpetition transactions;

(d) the federal government, and governmental authorities in Virginia, West Virginia and

Kentucky may impose personal civil or criminal liability on officers or directors of the Debtors

for the failure to pay certain Prepetition Taxes; and (e) liability for certain unpaid Prepetition

Taxes levied by Wyoming may be asserted against the Debtors' customers.  Therefore, to prevent

immediate and irreparable harm that would result from such disruptions and distractions, the

Debtors seek authority to pay these claims.

I.      Customer Obligations

68.      As is customary in the coal industry, the Debtors' coal sales agreements

obligate the Debtors to fulfill certain obligations to their customers (collectively, the "Customer

Obligations").  The Debtors' Customer Obligations include (but are not limited to):

(a) demurrage obligations, i.e., standard contractual commitments to compensate overseas coal

purchasers if the Debtors fail to deliver coal to the relevant shipping port prior to the expiration

of a target delivery period; and (b) quality and volume adjustments, i.e., obligations to reimburse,

or provide credit adjustments to, customers if (i) a vessel transporting an international shipment

of coal to a customer of the Debtors is unable to accommodate the quantity of coal purchased or

(ii) coal delivered to a customer does not precisely meet agreed-upon quality specifications.

69.    The Debtors believe that it is critical that they be authorized to honor the

Customer Obligations to avoid losing the support of their customer base and to enable the

Debtors to compete for new customers as they reorganize.  The Debtors operate in an intensely

competitive sector of the global economy in which they compete with numerous coal producers

of thermal and metallurgical coal both in the United States and abroad.  Particularly with respect

to metallurgical coal, the Debtors compete with international coal producers and are subject to

global market forces beyond the Debtors' control, such as foreign exchange rates and seaborne

transportation costs.  Given the competitive nature of the coal industry and the ready availability

of coal marketed by other producers, the Debtors cannot afford to alienate their customers by

failing to honor the Customer Obligations.  The Debtors estimate that the amount of outstanding

prepetition Customer Obligations is less than $1.2 million in the aggregate.  Ultimately, the

potential expenditure of estate funds required to fulfill the Customer Obligations is likely to be

minimal when compared to the benefits accruing to the Debtors from the preservation of their

customer relationships.  Accordingly, the Debtors will seek the entry of an order authorizing

them, in their sole discretion, to (a) perform their existing Customer Obligations and (b) enter

into agreements obligating them to pay Customer Obligations as these chapter 11 cases proceed.

J.    Prepetition Claims of Essential Suppliers

70.    The Debtors, in the ordinary course of their business, regularly obtain

certain goods and services from suppliers and service providers that are essential to the continued

operation of the Debtors' businesses (collectively, the "Essential Suppliers").  The Essential

Suppliers generally fall into the following categories:

71.    <u>Safety Equipment and Service Suppliers</u>.  These suppliers provide specialized equipment and services that are necessary for the Debtors to maintain safe working conditions at their mines and to comply with governmental safety regulations.  To ensure the safety of their employees, the Debtors require specialized equipment, goods and parts, such as industry-specific roof bolts and structural supports that meet rigorous regulatory standards. Large quantities of limestone rock dust also are required on a daily basis to prevent mine explosions.  The suppliers of these goods and the other specialized equipment, parts and supplies the Debtors require operate in a niche market, and few, if any, alternative suppliers are available for many such items.  For example, the large, specialized machines used by the Debtors to install roof bolts in underground mines are obtained from, and replacement parts are sold exclusively by, a sole-source supplier.  If any suppliers of essential safety equipment and services refused to do business with the Debtors, the Debtors (a) would be required to invest significant time in obtaining necessary safety-related goods from alternative providers, (b) likely would pay significantly more for such goods (assuming alternative suppliers were available) and (c) could be forced to idle mines until replacement goods are obtained.  Moreover, even if replacement goods were available, substituting a supplier of certain types of safety-related goods would require the Debtors to obtain new regulatory approvals.  The Debtors estimate that the total amount owing to the Debtors' safety equipment and service providers, as of the Petition Date, is approximately $7.8 million.

72.    <u>Environmental Service Providers</u>.  These service providers assist the Debtors in reclaiming inactive coal mines and restoring formerly-mined sites to their pre-mining condition.  The Debtors are required to undertake such reclamation and restoration activities under applicable state and federal laws and regulations, and pursuant to a consent decree entered

in the case of United States, *et al.* v. Alpha Natural Resources, Inc., *et al.*, No. 2:14-CV-11609

(S.D. W. Va. Nov. 26, 2014) to which several of the Debtors are subject.  Few companies exist

that are qualified to undertake reclamation and restoration activities on the scale required by the

Debtors' operations, and the companies with whom the Debtors currently contract have extensive

and highly-specialized knowledge that is essential to providing these necessary environmental

services.  Without the continuation of the Debtors' business relationships with their

environmental service providers, the Debtors would not be able to maintain compliance with

statutory, regulatory and judicial mandates and, as a result, they could not continue to operate.

The Debtors estimate that the total amount owing to the Debtors' environmental service

providers, as of the Petition Date, is approximately $10.3 million.

       73.     Fuel, Lubricant, Chemical and Mineral Suppliers.  The Debtors' coal

mines depend on daily deliveries of fuel, lubricant and specialized chemicals and minerals used

in coal processing.  Large quantities of fuel and lubricants are required to operate and maintain

the working condition of the Debtors' vehicles, heavy equipment and other mining machinery.

Few suppliers can supply the quantities of diesel fuel and lubricant the Debtors require, and even

fewer are equipped to deliver such quantities to remote mine locations on a daily basis.

The Debtors estimate that they use approximately 50 million gallons of diesel fuel annually.

Even if alternative suppliers of fuel capable of delivering the quantities required by the Debtors

could be located, such alternative suppliers likely would charge significantly higher rates than

the Debtors currently pay.  The Debtors' mines also require a steady supply of certain chemicals

and minerals used in coal processing.  For example, large quantities of the mineral magnetite are

required to separate waste material from coal, a process that is particularly important in the

preparation of metallurgical coal.  The Debtors would incur burdensome costs and delays if

forced to locate alternative suppliers of lubricants or coal processing chemicals, because any

chemicals or lubricants provided by a new supplier would have to be extensively tested by the

Debtors prior to use (e.g., to ensure that a newly-sourced lubricant would not damage valuable

heavy machinery).  The Debtors estimate that the total amount owing to the Debtors' fuel,

lubricant, chemical and mineral suppliers, as of the Petition Date, is approximately $5.6 million.

74.     Suppliers of Specialized Goods, and Providers of Specialized Services,

Required for Coal Production and Processing.  The Debtors have longstanding business

relationships with certain suppliers of highly-specialized mining equipment, parts and supplies –

such as engines, heavy machinery, conveyor belts, explosives, tires, batteries, drill bits, electrical

cable, communications equipment, mining tools and parts for specialized mining equipment and

machines – that are essential to the Debtors' operations.  Most of these items are available only

from single-source or limited-source suppliers – such as original equipment manufacturers – and

nearly all of the Debtors' purchases of such items occur on a one-off basis.  Many of these items

are not only industry-specific, but are unique.  The Debtors' suppliers customize mining

equipment and parts to meet the requirements of the Debtors' mines and produce equipment

tailored to the specific coal seam heights and geological conditions of the Debtors' mines.

In addition, many of the specialized machines and parts used by the Debtors to mine and process

coal are subject to regulatory approval, meaning that substituting any supplier (if any substitute

were available) would give rise to costs and delays the Debtors are ill-equipped to incur.

75.     The Debtors' ability to pay their explosives suppliers on an ongoing basis

also is critically important.  As part of their surface mining operations, the Debtors regularly use

explosives to remove large quantities of overburden and provide access to coal seams.  The safe

and effective use of explosives requires the technical expertise and experience of crews provided

by the Debtors' explosives vendors.  In many locations, the Debtors' explosives vendors provide "turnkey" services whereby the vendor handles all aspects of the explosives work to be performed; in other locations, such vendors provide a crew to advise and assist the Debtors' personnel in using the necessary explosives.  These arrangements confer the additional benefit of mitigating the Debtors' liability risks associated with the use of explosives, because the Debtors' explosives vendors contractually share in the insurance liability for such operations.

76.     In many cases, the Debtors have worked with their suppliers of mining equipment, parts and supplies over a number of years and, as a result, the Debtors' suppliers have detailed knowledge regarding the Debtors' mines and machinery.  Even if it were possible to replace these suppliers, it would take months, if not years, for replacement suppliers to provide the same levels of service the Debtors receive from their current suppliers.  It is thus essential that the Debtors maintain their existing business relationships with suppliers of specialized mining equipment, parts and supplies.

77.     In addition, under many of the Debtors' coal sales contracts, the Debtors are obligated to engage the services of specific providers of specialized services related to coal production and processing.  For example, the Debtors frequently are required to engage particular laboratories selected by the Debtors' customers for purposes of testing samples of purchased coal to ensure compliance with the coal quality provisions set forth in the relevant coal sales contracts.  If the Debtors were unable to timely pay providers of specialized services related to coal production and processing, such as laboratories specified by the Debtors' customers, such non-payment could compromise the Debtors' ability to fully perform under the terms of their existing coal sales contracts and could damage valuable customer relationships. The Debtors estimate that the total amount owing to the Debtors' suppliers of specialized goods,

and providers of specialized services, required for the Debtors' coal production and processing

operations, as of the Petition Date, is approximately $19.1 million.

78.     Suppliers of Coal Necessary for the Debtors to Satisfy Their Customer

Obligations.  To meet their obligations under coal sales contracts, the Debtors regularly purchase

particular types of coal from other mining companies for blending and other purposes.

The Debtors require the ability to purchase coal from these suppliers on an as-needed basis to

create the specific blends of coal the Debtors' customers demand, and which the Debtors are

contractually obligated to provide.  Any interruption in the Debtors' ability to procure coal from

these coal producers, therefore, could negatively impact the Debtors' ability to satisfy their

customer obligations at a time when maintaining business-as-usual relationships with customers

is of paramount importance.  Moreover, because the Debtors' coal suppliers are subject to the

same economic headwinds currently affecting the domestic coal industry as a whole, the Debtors'

inability to pay such suppliers for prepetition coal shipments, even for a short period, could

threaten the viability of these coal companies.  Thus, although the Debtors' purchases of coal for

resale represent a very small portion of the Debtors' annual expenditures on goods and services,

the Debtors' ability to pay their coal suppliers as usual is critically important to the Debtors'

operations and long-term viability.  The Debtors estimate that the total amount owing to the

Debtors' suppliers of coal for blending and other purposes, as of the Petition Date, is

approximately $1.7 million.

79.     It is imperative that the Debtors obtain authorization to continue paying

their Essential Suppliers in the ordinary course of business because certain vendors and service

providers are essential to the continued and timely production and delivery of coal upon which

the Debtors' viability depends.  Refusal to deliver goods or services by any one of such vendors

could severely disrupt the production process and jeopardize critical business relationships.

Disruptions to the Debtors' coal production and delivery operations would have an immediate

and harmful impact on revenues while simultaneously eroding customer relations and goodwill.

Accordingly, the Debtors will seek the entry of an order authorizing them, in their discretion, to

pay, in the ordinary course of the Debtors' business, certain prepetition claims of Essential

Suppliers, in an aggregate amount not to exceed $44.5 million, subject to the terms and

conditions set forth in the relevant motion.

K.    Prepetition Lien Claims

80.    In the operation of their businesses, certain parties with commercial or

trade relationships with the Debtors (collectively, the "Lien Claimants") have the ability to, and

do, obtain liens on and interests in property owned by the Debtors, in most cases by possession

of the Debtors' property.  The Debtors believe that the failure to pay the claims of certain of these

parties (collectively, the "Lien Claims") could have a significant adverse impact on their business

operations at a time when the Debtors can ill afford such impact.  The Lien Claimants fall into

two categories:  (a) commercial common carriers (including railroads, contract truckers and

seaborne shippers), customs brokers and warehousemen that ship, transport, store, move through

customs and deliver goods through established distribution networks (e.g., trucking, rail, docks

and terminals), which parties, at any given time, have possession of large quantities of coal that

is en route to the Debtors' domestic and foreign customers (collectively, the "Distribution

Network Vendors"); and (b) parties that may be entitled to assert mechanic's liens, artisan's liens,

contractors' liens, construction liens, mining-related liens, materialmen's liens or other similar

liens on the Debtors' real or personal property (collectively, "Mechanics' Lien Claims"),

including (i) original equipment manufacturers and other service providers that undertake off-site

repairs of the Debtors' specialized mining machinery, equipment and vehicles, and components

thereof, such as engines, pumps, electric motors, transmissions, wheel units, batteries and tires,

and (ii) construction, excavation and engineering contractors engaged in projects at the Debtors'

mines or coal processing facilities.

81.    Although it is difficult to estimate with precision the Distribution Network

Vendor Claims outstanding at any given moment, the Debtors estimate that the amount of

outstanding prepetition Distribution Network Vendor Claims owed to the Distribution Network

Vendors were approximately $12.1 million as of the Petition Date.  The Debtors estimate that the

amount of outstanding prepetition Mechanics' Lien Claims owed to the Mechanics' Lien

Claimants that the Debtors believe are critical to have authority to pay was approximately

$17.7 million as of the Petition Date.

82.    The Debtors believe that payment of the Lien Claims is necessary to the

Debtors' successful reorganization and warranted as a reasonable exercise of the Debtors'

business judgment.  It is essential that the Debtors be permitted immediately to pay the Lien

Claims to insure that the flow of products throughout the Debtors' distribution network

(including products being delivered from the Debtors to their customers) remains constant,

timely and efficient.  Should the Debtors' flow of goods be interrupted, the Debtors could suffer

disruptions of their businesses, with a corresponding loss of customer confidence.  Payment of

the Lien Claims also is justified because holders of Mechanics' Lien Claims perform services –

such as repairing the Debtors' mining equipment, building and maintaining waste impoundments

at the Debtors' coal processing facilities and removing overburden to expose coal seams at the

Debtors' surface mines – that are essential to the Debtors' operations and, in some cases, are

necessary for the Debtors to maintain compliance with governmental regulations.  Finally, it is

my understanding that payments to holders of valid liens will not diminish recoveries available for unsecured creditors.  Accordingly, the Debtors will seek an order authorizing them, in their discretion, to pay certain prepetition Lien Claims, in an aggregate amount not to exceed $29.8 million, subject to the terms and conditions set forth in the relevant motion.

L.      Renewals of Insurance Policies

83.      In the ordinary course of their business, the Debtors maintain numerous insurance policies that provide coverage for, among other things, general commercial liability, property damage, environmental liability, automobile damage and liability, aviation and marine liability, directors and officers liability, transit damage, crime and fiduciary liability and employment practices liability (collectively, as described in the relevant motion, the "Insurance Policies").  Additionally, the Debtors provide workers' compensation coverage (the "Workers' Compensation Program") for their employees at the level required by statute for each state in which the Debtors have employees, including coverage for occupational pneumoconiosis (also known as "black lung") claims under applicable state and federal law.

84.      Although none of the Debtors' Insurance Policies will expire within 21 days of the Petition Date, several will expire in the coming weeks and months (e.g., pollution insurance; international package insurance; special risk business travel insurance; two marine liability insurance policies; and business owners' property insurance).  The Debtors' total costs related to such expiring policies through October of this year are estimated at approximately $93,000.  Accordingly, the Debtors anticipate that, in the near term, they may have to pay a significant amount of annual premiums to renew or replace their expiring Insurance Policies.

85.      The Debtors' ability to maintain and honor their Insurance and Workers' Compensation Obligations (as such terms are defined in the motion) in a timely manner is

critical to the ongoing operation of their businesses and therefore necessary to their successful

reorganization.  Further, the Debtors believe, in their business judgment, that payment of

postpetition Insurance and Workers' Compensation Obligations is sound and prudent.  The

Insurance Policies are essential to preserve the Debtors' businesses and are, in some cases,

required by various laws, regulations and contracts that govern the Debtors' businesses.

Similarly, because the Debtors are statutorily and/or contractually obligated to maintain the

Workers' Compensation Program, their inability to do so may result in adverse legal

consequences that disrupt the reorganization process, including criminal liability and, possibly,

suspension of the Debtors' ability to continue their business operations.  Further, United States

Trustee Guidelines also require the Debtors to maintain "appropriate insurance coverage"

throughout these chapter 11 cases.  Even where coverage is not expressly required, however, it is

sound business practice to maintain essential insurance coverage because any interruption in

such coverage would expose the Debtors to a variety of risks, as described further in the motion.

       86.     Although I do not believe that Court approval is required for the Debtors

to maintain, amend or supplement their existing Insurance Policies and Workers' Compensation

Program in the ordinary course of business following the Petition Date, the Debtors seek relief

out of an abundance of caution.  Because uncertainty as to the effect of these chapter 11 cases

may make the Insurance Carriers, Workers' Compensation Carriers, Brokers and HealthSmart

(all as defined in the motion) reluctant to engage in ordinary course transactions, the Debtors are

seeking an order authorizing them to engage in such transactions.  Similarly, although in many

cases the Debtors do not believe they have any outstanding prepetition obligations or payment

defaults with respect to their Insurance Obligations, the Debtors are seeking authority to pay any

such amounts to ensure continuing insurance coverage during these bankruptcy cases.  Last, the

Debtors request that the Court enter an order authorizing them to (a) maintain the Workers'
Compensation Program, (b) continue processing Workers' Compensation Claims in the ordinary
course and (c) continue paying Self Insured Claims and Deductible Costs (as defined in the
motion).

M.      Adequate Assurance of Payment of Utilities

87.     The Debtors currently use electric, natural gas, water, sewer, waste
removal, telecommunications and other similar services provided by approximately 120 different
utility companies (collectively, the "Utility Companies").  The Debtors estimate that their
average monthly obligations to the Utility Companies on account of services rendered total
approximately $10.1 million.  Uninterrupted utility service is essential to the Debtors' ongoing
operations, as well as the safety thereof, and is thus key to preserving value for all interested
stakeholders.  The Debtors would not be able to operate their mines and coal processing facilities
in the absence of continuous utility service.  Should any Utility Company refuse or discontinue
service, even for a brief period, the affected mine or facility would be forced to stand idle.
The temporary or permanent discontinuation of utility services at any of the Debtors' mines or
other facilities could irreparably harm the Debtors' businesses and the value of the Debtors'
estates.  The Debtors intend to pay any postpetition obligations to the Utility Companies in a
timely fashion and in the ordinary course, as they have substantially done prior to the Petition
Date.

88.     I understand that, pursuant to section 366(c)(2) of the Bankruptcy Code, a
utility may alter, refuse or discontinue a chapter 11 debtor's utility service if the utility does not
receive from the debtor or the trustee adequate "assurance of payment" within 30 days of the
commencement of the debtor's chapter 11 case.  To comply with the requirements of section 366

of the Bankruptcy Code, the Debtors seek an order of this Court authorizing them to provide a

deposit to any requesting Utility Company (each, an "Adequate Assurance Deposit") in an

amount equal to the Debtors' calculation of the cost of two weeks' worth of utility service, based

on recent historical averages, as set forth on the Utility List attached as Exhibit A to the motion.

The aggregate amount of the proposed available Adequate Assurance Deposits is approximately

$2.0 million.  In addition, if any Utility Company believes additional assurance is required, it

may request such assurance, pursuant to specific procedures set forth in the motion.

N.      Procedures for Trading in Equity Securities

89.      As a result of past losses from the operation of their businesses, the

Debtors have estimated that their available net operating losses as of the Petition Date are

approximately $2.60 billion (for federal income tax purposes) and $2.38 billion (for state income

tax purposes) (collectively, the "NOLs"), which amounts could be higher when the Debtors

emerge from chapter 11.  These NOLs are valuable tax attributes.  To preserve to the fullest

extent possible the flexibility to craft a plan of reorganization that maximizes the use of their

NOLs, the Debtors seek the entry of interim and final orders (a) establishing notice and objection

procedures regarding certain transfers of beneficial interests in equity securities in ANR,

(b) establishing a record date for notice and potential sell-down procedures for trading in claims

against the Debtors and (c) granting related relief.  The relief sought will enable the Debtors to

closely monitor certain transfers of equity securities, and thereby preserve the Debtors' ability to

seek the necessary relief at the appropriate time if it appears that such transfers may jeopardize

the Debtors' use of their NOLs.  In addition, establishing a record date with respect to trading in

claims against the Debtors will ensure that claimholders receive sufficient notice that any claims

purchased after such date may ultimately be subject to certain sell-down procedures in the event

an order approving such procedures is sought by the Debtors and entered by the Court to preserve the Debtors' ability to use their NOLs.

O.   Application to Retain Claims Agent

90.   The Debtors recognize that the large number of creditors and other parties in interest involved in these chapter 11 cases may impose heavy administrative and other burdens upon the Court and the Clerk's Office.  To relieve the Court and the Clerk's Office of these burdens, the Debtors will seek the entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") as the Debtors' noticing and claims agent in these chapter 11 cases.  KCC may, among other things:  (a) prepare and serve all notices required in the Debtors' chapter 11 cases, including notice of the commencement of these chapter 11 cases and the 341 Meeting; (b) maintain the official claims register; and (c) assist with the mailing and tabulation of ballots in connection with any vote to accept or reject any plan or plans proposed in these chapter 11 cases.  The Debtors obtained and reviewed engagement proposals from four other claims and noticing agents to ensure selection through a competitive process.  The Debtors submit, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.

P.   Cash Management

91.   As mentioned above, ANR is the direct or indirect parent of each of the other Debtors.  The Debtors and their non-debtor affiliates utilize an integrated, centralized cash management system (the "Cash Management System") to collect, manage, invest and disburse funds throughout the ANR enterprise.  The Cash Management System is well established, and the Debtors maintain current and accurate accounting of all of the Debtors' transactions through the Cash Management System.

92.     As of the Petition Date, the Debtors maintained several of the following types of accounts:  (a) concentration accounts; (b) investment accounts, (c) restricted accounts, (d) petty cash accounts, (e) zero-balance lockbox accounts, (f) depository accounts, (g) payroll accounts, (h) operating accounts, (i) foreign accounts and (j) miscellaneous other accounts.  The Cash Management System is further described, in detail, in the relevant motion.

93.     The Cash Management System provides significant benefits to the Debtors' estates including, among other things, the ability to (a) control and monitor corporate funds, (b) invest idle cash, (c) ensure the maximum availability of funds when and where necessary and (d) reduce costs and administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. The smooth operation of the Debtors' business requires the continuation of the Cash Management System during the pendency of these chapter 11 cases.  Moreover, as a practical matter, it would be difficult, expensive, disruptive and administratively burdensome to require the Debtors to close all of their existing bank accounts and open new, segmented debtor-in-possession bank accounts for each Debtor entity at the very outset of these bankruptcy cases as required by the operating guidelines promulgated by the Office of the United States Trustee.  In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition operations and (b) maximize value for stakeholders by allowing the Debtors to continue their operations without disruption.

94.     Thus, under the circumstances, maintaining the existing Cash Management System (as modified consistent with the DIP Financing (as such term is defined in

the motion)) is not only essential, but is in the best interest of creditors and other parties in

interest.  The Debtors therefore will request authority for the continued use of (a) their current

Cash Management System, (b) certain of their existing bank accounts (as well as authorization

for the Debtors to open and close bank accounts (including as required by the DIP Financing))

and (c) their business forms.  The Debtors also will seek authorization from the Court for the

banks involved in the Debtors' Cash Management System to honor certain transfers and charge

certain bank fees and other amounts as further described in the motion.

95.     Last, the Debtors will seek authority to continue intercompany funding by

engaging in certain intercompany transactions (as more fully discussed in the motion)

("Intercompany Transactions") through the Debtors' Cash Management System.  Continuation of

the Intercompany Transactions is vital to the preservation of the value of the Debtors' estates.

Therefore, the Debtors request that the Court grant super-priority administrative expense status

to all postpetition claims arising from Intercompany Transactions and permit the Debtors to

reconcile and set off any mutual prepetition obligations between Debtors arising from such

transactions through the cash management system.

Q.     Surety Bonds

96.     In the ordinary course of the Debtors' businesses, the Debtors are required

to provide various self-bonded and commercially issued surety bonds to certain third parties to

secure the Debtors' payment or performance of certain obligations, often to governmental units

or other public agencies pursuant to statutory requirements (the "Surety Bond Program").  As of

June 30, 2015, the Debtors had approximately $1.04 billion in outstanding surety bonds.

Approximately $1.01 billion in aggregate amount of surety bonds has been provided by the

Debtors to various governmental authorities and agencies to secure certain reclamation

obligations of the Debtors in relation to their mining operations.  Other categories of Surety

Bonds issued on behalf of the Debtors include court bonds, customs bonds, financial guarantee

bonds, license permit bonds, oil and gas bonds, performance bonds, workers' compensation

bonds and wage bonds.

   97.  It is essential to the Debtors' operations that they maintain their Surety

Bond Program on an ongoing and uninterrupted basis.  The non-payment of obligations under

the Surety Bond Program could result in one or more of the bond issuers attempting to terminate,

declining to renew or refusing to enter into surety bonds with the Debtors in the future.

Any interruption, lapse or termination of the Debtors' Surety Bond Program could severely,

immediately and irreparably harm the Debtors' operations and, consequently, their prospects for

a successful reorganization.  Additionally, it could (a) cause the Debtors to be in violation of

applicable law, (b) prevent them from continuing mining operations and (c) disrupt the provision

of benefits to their employees, among other things.  Furthermore, the Debtors may need

additional bonding capacity not currently provided under the Surety Bond Program to provide

the financial assurances to third parties that are required for the Debtors to continue business

operations during these chapter 11 cases.  The inability to secure a surety bond may require the

Debtors to purchase insurance coverage at greater expense to the Debtors' estates.

   98.  Although I believe that the Debtors may continue their Surety Bond

Program postpetition in the ordinary course of their businesses, the Debtors seek an order

assuring issuers and third parties of the Debtors' immediate authority to maintain, continue and

renew their Surety Bond Program (as further described in the relevant motion) without

interruption.  The Debtors are concerned that, without such assurances, issuers may refuse to

renew or issue new surety bonds, which may severely hinder the Debtors' ability to continue

their business operations.  The Debtors also request that the Court confirm their authority to

maintain collateral and perform under certain postpetition indemnity agreements as necessary to

continue the Surety Bond Program.  Finally, the Debtors seek express authorization for financial

institutions to receive, process, honor and pay checks or electronic fund transfer requests related

to the Surety Bond Program.  The Debtors are <u>not</u> seeking to make payment upon any prepetition

obligations owing under their Surety Bond Program.

R.    <u>Coal Sale Contracts</u>

99.    Sales of coal to customers, particularly sales transacted through coal sale

contracts ("<u>Coal Sale Contracts</u>"), are the primary source of revenue for the Debtors and

accounted for over 87% of the Debtors' 2014 revenues.  The Debtors routinely sell substantially

all of their coal pursuant to the terms of Coal Sale Contracts.  In the ordinary course of their

business, the Debtors are routinely and continually in the process of negotiating, renegotiating,

executing and performing under numerous Coal Sale Contracts, which are an integral and critical

part of the Debtors' operations.  As of the Petition Date, the Debtors had approximately 200 open

Coal Sale Contracts.  Continuing to enter into and perform under Coal Sale Contracts is

necessary to prevent immediate and irreparable harm to the Debtors' business, as further

described in the relevant motion.

100.    I understand that the Debtors may continue to enter into, negotiate and

perform under Coal Sale Contracts in the ordinary course of their business.  Nonetheless, the

Debtors believe that counterparties to the Coal Sale Contracts may be uncertain of the effect of

the Debtors' chapter 11 cases on the Coal Sale Contracts and may, therefore, perceive a risk that

the Debtors lack authority to enter into and perform under them.  This uncertainty may deter

parties from entering into or negotiating Coal Sale Contracts, which would threaten to impair the

Debtors' operations and ultimately undermine the value of the Debtors' estates.  Particularly in

the highly competitive coal supply industry, such uncertainty could create a strong advantage for

the Debtors' competitors and severely harm the Debtors' prospects for a successful reorganization.

101.    Given that the Debtors constantly negotiate, enter into and perform under

Coal Sale Contracts, it would be impracticable, administratively burdensome and costly for the

Debtors to seek Court approval with respect to each separate Coal Sale Contract transaction.

Additionally, the delay associated with seeking Court approval may cause the Debtors to lose

sales opportunities.  Because Coal Sale Contracts are critical to the Debtors' operations and their

ability to generate revenue, the Debtors have sound business reasons to request the entry of an

order confirming, in advance, the Debtors' immediate authority to enter into and perform under

Coal Sale Contracts.

S.      Procedures to Resolve Twenty-Day Claims

102.    In the ordinary course of their business, the Debtors purchased a variety of

goods used in their coal production and processing and other operations.  Goods were received

by the Debtors on a regular basis, and substantial amounts of goods were received within the

20 days immediately prior to the Petition Date (the "Twenty-Day Period").  The Debtors estimate

that within the Twenty-Day Period, the Debtors received goods from suppliers worth

approximately $41 million.  Most of these suppliers have not yet been paid for these goods.

103.    I understand that, pursuant to section 503(b)(9) of the Bankruptcy Code,

claims relating to goods received within the Twenty-Day Period (the "Twenty-Day Claims") may

be entitled to priority treatment as administrative claims.  Many of the Debtors' creditors may be

entitled to assert Twenty-Day Claims.  The Debtors believe that, absent the implementation of

procedures for the orderly assertion and determination of Twenty-Day Claims, numerous parties

would immediately file Twenty-Day Claims and inundate the Debtors (and the Debtors'

professionals) with inquiries and demands related to such claims during the critical initial stages

of these cases.  Accordingly, to (a) avoid the distraction, delay and expense that may ensue,

(b) alleviate the need for creditors to comply with multiple bar dates in these cases, (c) save the

Debtors the expense of multiple bar date mailings and (d) provide a clear and uniform process

for resolving Twenty-Day Claims from the outset of these cases, the Debtors will seek the entry

of an order establishing certain procedures for the assertion and determination of Twenty-Day

Claims.  The Debtors believe that the proposed procedures:  (a) provide clear guidance to all

parties as to how Twenty-Day Claims shall be filed in these cases and will streamline the process

for consideration of such claims; (b) provide the Debtors the opportunity to address the

allowance of claims in an orderly and efficient way; (c) will not impair the substantive rights of

any parties in any way; and (d) will ensure that similarly situated creditors receive equal

treatment.

T.      Reclamation Procedures

        104.    Prior to the Petition Date and in the ordinary course of their business, the

Debtors purchased, on credit, a wide variety of products used in their business operations

(collectively, the "Goods").  As of the Petition Date, the Debtors were in possession of Goods

that had been delivered to them, but for which they had not yet been invoiced by, or made

payment to, the suppliers of such Goods.  As a result of the commencement of these bankruptcy

cases, the Debtors expect to receive numerous written reclamation demands from various

vendors or other parties (collectively, the "Sellers") with respect to such Goods.  The Debtors

also anticipate that a number of Sellers, after becoming aware of the commencement of these

chapter 11 cases, might attempt to interfere with the delivery of Goods to the Debtors, or even

attempt to forcibly repossess delivered Goods from the Debtors.  Accordingly, to avoid

piecemeal litigation that would interfere with the Debtors' reorganization efforts, the Debtors will

seek authority to establish exclusive procedures for the reconciliation and treatment of all

asserted reclamation claims.

105.    The Debtors' business will be severely disrupted if Sellers are allowed to

exercise their reclamation rights without uniform procedures that are fair to all parties

(collectively, the "Reclamation Procedures").  Further, the attention of the Debtors' management

and operational personnel would be diverted from more important operational issues if the

Reclamation Procedures are not approved and the Debtors instead are required to respond to and

resolve each reclamation claim on an *ad hoc* basis, as numerous, individual adversary

proceedings or contested matters are filed or as other actions are taken by Sellers seeking to

enforce their reclamation rights.  Instead, the Reclamation Procedures will effectively and

efficiently streamline the process of resolving the reclamation claims for the Debtors and the

Sellers alike.  The Debtors believe that their ability to resolve Reclamation Claims in this

uniform manner will assist in the consensual resolution of such claims and, ultimately, the

maximization of value for the Debtors, their estates and their creditors.  Therefore, it is in the

best interests of the Debtors and their respective estates and creditors to implement the

Reclamation Procedures.

U.      Reclamation Financing and Cash Collateral

106.    The Debtors intend to use their time in chapter 11 to develop and

implement a business plan to address the challenges faced by the Debtors, de-leverage their

balance sheet and reorganize in a manner that maximizes value for stakeholders.  The Debtors

believe they have certain business strengths and can position themselves advantageously as coal

markets ultimately stabilize and improve.  Unlike other coal companies that have liquidated or

are liquidating in chapter 11, the Debtors believe that the right financing package can give them

time to achieve a better result than a precipitous action at a low point in the market.

107.    Despite the current market challenges, I believe that coal will remain a

critical commodity in the United States and abroad and the industry eventually will stabilize.

Following the adoption of necessary structural changes within the industry, there will be

survivors once pricing again turns favorable, and I believe these chapter 11 cases can help ensure

that the Debtors will be among them.

108.    Accordingly, the Debtors are not commencing an immediate sale process

for their assets.  Although the Debtors' businesses have struggled financially in the current

economic environment, they enter these cases with significant liquidity and believe that a

restructuring process can and will maximize value over time.  The breathing spell of bankruptcy

will give the Debtors time to develop a business and restructuring plan that takes the best

advantage of their many strengths and adapts to changing market dynamics, while avoiding a

precipitous action at a low point in the coal market, which would not benefit the Debtors'

stakeholders.

109.    Among other things, the Debtors have the advantages of geographically

dispersed operations, a number of high performing mines (even in the current market), a strong

management team, investments in critical industry infrastructure assets and a diversified energy

portfolio, having expanded into natural gas with substantial holdings in the Marcellus Shale.

With an appropriately de-leveraged balance sheet, I believe that the Debtors' valuable core

operations will position them to participate profitably in the coal and broader energy industries

going forward, providing thousands of jobs for their employees and high quality products to their customers.

110.    The development and implementation of the Debtors' business plan, however, requires time and funding.  Given the significant cash costs associated with the Debtors' businesses, and in consultation with their financial advisors, the Debtors have determined that they require access to both new capital and existing cash collateral ("Cash Collateral") to provide such time and resources, conduct their business operations, achieve their restructuring goals and maximize value of their estates.

111.    Further, in consultation with their financial advisors, the Debtors have concluded that (a) the short term volatility prevailing in the market made it prudent to lock in adequate financing at the outset of the Debtors' restructuring process (if an appropriate financing facility and agreed use of cash collateral could be obtained) and (b) incurring short term cash losses without the assurance of such financing would be imprudent.  In further consultation with their advisors, the Debtors determined that a delay in obtaining financing could subject them to unnecessary risk that necessary financing on favorable terms (or at all) would be unavailable at a future date, thus undermining the Debtors' ability to successfully restructure.

112.    The Debtors therefore have negotiated and are seeking authority to enter into debtor-in-possession credit agreements, as described in the relevant Motion, that will provide postpetition financing in the form of:  (a) a $300 million term loan facility to provide new liquidity to the Debtors for business needs, including the issuance of letters of credit for the purpose of terminating of Debtors' existing accounts receivables facility; (b) the ability to add a new revolving credit facility of up to $200 million, at the Debtors' option, subject to negotiating financing commitments and further court approval; (c) an approximately $192 million facility

that will allow letters of credit issued under the Prepetition Credit Agreement to continue without being cash collateralized and will allow such letters of credit to be renewed or extended in the future; and (d) a bonding accommodation facility to provide up to $100 million (subject to increase with the consent of the Required Lenders (as such term is defined in the relevant Motion)) in the form of superpriority administrative claims subject to a Bonding Carve Out (as such term is defined in the relevant Motion) or letters of credit to address state bonding requests (collectively, the "DIP Financing").  In conjunction with the proposed DIP Financing, the Debtors also will obtain consensual use of certain cash collateral of the Credit Agreement Lenders and the Second Lien Noteholders.

113.    Through the DIP Financing and the use of Cash Collateral, the Debtors will have access to the necessary funding to (a) continue the day-to-day operations of their businesses, (b) comply with regulatory obligations, (c) develop and implement a long term business plan and (d) properly fund these chapter 11 cases through a successful restructuring. Securing the DIP Financing with the support of  majority of the holders of $2 billion in first and second lien prepetition debt also will send a strong and positive message to the Debtors' employees, regulators and business partners that the Debtors believe will benefit their businesses. For example, the DIP Financing will provide comfort to the Debtors' vendors, suppliers, customers and employees that the Debtors will be able to continue to meet their commitments during these cases.  Likewise, the proposed DIP Financing will help provide governmental agencies with confidence that the Debtors have funding for their reclamation and similar obligations.

114.    The DIP Financing, including the consensual use of Cash Collateral, provides the Debtors with their best opportunity to maintain their current operations and

implement a successful restructuring for the benefit of their creditors.  In light of the Debtors'

overall circumstances, the Debtors believe that they could not obtain postpetition financing from

another lending source on terms equal or superior to the DIP Financing.

115.    For all of these reasons, the Debtors' decision to enter into the DIP

Financing is a sound exercise of their business judgment.


I, Philip J. Cavatoni, the undersigned Executive Vice President and Chief

Financial and Strategy Officer of ANR, declare under penalty of perjury that the foregoing is true

and correct.


Dated:  August 3, 2015

/s/ Philip J. Cavatoni
Philip J. Cavatoni
Executive Vice President and Chief Financial and
Strategy Officer of Alpha Natural Resources, Inc.

**ANNEX A**

## INSTITUTIONAL DEBT STRUCTURE AS OF THE PETITION DATE

| DESCRIPTION OF DEBT | AMOUNT |
|---|---|
| **I.  Secured Debt** | |
| Fifth Amended and Restated Credit Agreement | $611 million |
| Amounts Outstanding Under Revolving Facility | $445 million |
| Letters of Credit Outstanding Under Revolving Facility | $191.2 million |
| 7.5% Senior Secured Second Lien Notes Due 2020 | $714 million |
| **SECURED DEBT TOTAL** | **$1.96 BILLION** |
| **II.  Primary Unsecured Debt** | |
| 3.75% Convertible Senior Notes Due 2017 | $263 million |
| 9.75% Senior Notes Due 2018 | $393 million |
| 6.0% Senior Notes Due 2019 | $577 million |
| 4.875% Convertible Senior Notes Due 2020 | $277 million |
| 6.25% Senior Notes Due 2021 | $585 million |
| **UNSECURED DEBT TOTAL** | **$2.10 BILLION** |
| **III.  3.25% Notes** | |
| 3.25% Secured Convertible Senior Notes Due 2015 | $109 million |
| | |
| **TOTAL INSTITUTIONAL DEBT** | **$4.17 BILLION** |