JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## MOTION OF THE DEBTORS FOR ENTRY OF AN
## ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL
## INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE
## <u>INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016</u>

Alpha Natural Resources, Inc. ("<u>ANR</u>") and certain of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), respectfully

represent as follows:

### <u>General Background</u>

1.      On August 3, 2015 (the "<u>Petition Date</u>"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>").  By order of the Court (Docket No. 129), the

Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

jointly administered.  The Debtors are authorized to continue to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

2.      A comprehensive description of the Debtors' businesses and operations,

capital structure and the events leading to the commencement of these chapter 11 cases can be

found in the amended declarations of (a) Kevin S. Crutchfield, Chief Executive Officer and

Chairman of the Board of Directors of ANR (Docket No. 45), and (b) Philip J. Cavatoni,

Executive Vice President and Chief Financial and Strategy Officer of ANR (Docket No. 46)

(together, the "First Day Declarations"), each of which was filed on the Petition Date.

## Jurisdiction

3.      This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Preliminary Statement

4.      The challenges facing the coal industry in general, and the Debtors in

particular, were discussed at length in the First Day Declarations, other pleadings that have been

filed with this Court and nearly daily news reports.  Since the commencement of these chapter 11

cases, these challenges have only intensified as demand remains stagnant and coal prices have

continued to decline.  In light of these challenges, the Debtors' senior management is particularly

critical to the completion of all business functions required by the chapter 11 process.

The Debtors' senior management has worked tirelessly both prior to and since the Petition Date

to maximize the value of these estates for the benefit of their creditors.  These efforts include, in

addition to running the day-to-day operations of the Debtors:  (a) innumerable meetings with

creditor constituencies and their advisors; (b) months of work on an in-depth, top-down, bottom-

up review of the Debtors' operations as part of a comprehensive effort to restructure the Debtors'

businesses; and (c) the development, and initial implementation of elements of, a value

enhancement plan to improve the immediate and long-term liquidity of the Debtors.

5.      At the same time:  (a) substantial portions of senior management's

compensation, which was provided in the form of the Debtors' equity, diminished significantly as

the value of the equity plummeted; (b) actual compensation earned by senior management in

prior years in the form of deferred compensation is now relegated to general unsecured claim

status; (c) existing retention agreements that had been put in place long before the filing of these

cases are no longer viable; (d) the Debtors' senior managers justifiably perceive uncertainty with

respect to their potential continued employment with the Debtors;  and (e) the pressure on senior

management of maintaining the viability and value of the Debtors' businesses in the face of the

well documented industry challenges and regulatory demands only continues to increase.  For

certain of the Debtors' senior management, these pressures have proven too much, and they have

left the Debtors.[1]

6.      In light of the foregoing, the compensation committee of Debtor ANR

(the "Compensation Committee") recognizes the need to provide incentives to senior

management in order to maximize the value of the Debtors' estates.  Accordingly, since prior to

the Petition Date, the Compensation Committee has been working with Jones Day, Rothschild

Inc. ("Rothschild"), McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey")

and Meridian Compensation Partners, LLC ("Meridian") to develop a key employee incentive

plan (the "KEIP") for those members of the Debtors' senior management who are prohibited by

---

[1]      Senior managers who have departed since the Petition Date include, for example:  (a) the Chief
Commercial Officer; (b) the Vice President of Investor Relations; (c) the Vice President of Total Risk
Management; and (d) the General Manager of Kentucky Operations.  These losses were on top of
significant prepetition departures.

the Bankruptcy Code from participating in key employee retention plans.  The development and

pursuit of the KEIP has been delayed by, among other things, the continuing declines in the coal

industry, which have made structural aspects of the plan a continuously moving target.

The Debtors have now completed their initial business plan, taking into account the deterioration

in the market since August, and believe that they can no longer delay the establishment of a

KEIP (and payment under the 2015 AIB (as defined below)) without risking a diminution in

creditor recoveries.  The Debtors believe that the KEIP, as well as the approval of payments, if

any, that come due under the 2015 AIB, is fair and will motivate the Debtors' senior management

to continue to work hard to achieve the best outcome for these chapter 11 cases.

### Relief Requested

7.      By this Motion, the Debtors seek the entry of an order (the "Order"),

substantially in the form attached hereto as Exhibit A, authorizing and approving, pursuant to

sections 105(a), 363(b), 363(c) and 503(c)(3) of the Bankruptcy Code (a) payments to the

Executive Insiders in the AIB solely for the 2015 plan year and (b) the KEIP.  In support of the

relief requested herein, the Debtors submit:  (a) the Declaration of L. Patrick Hassey

(the "Hassey Declaration"), Chairman of the Compensation Committee, a copy of which is

attached hereto as Exhibit B; (b) the Declaration of Robert Romanchek (the "Romanchek

Declaration"), Partner with Meridian, the Debtors' independent compensation consultant, a copy

of which is attached hereto as Exhibit C; and (c) the Declaration of Kevin M. Carmody

(the "Carmody Declaration"), Practice Leader at McKinsey, the Debtors' turnaround advisor, a

copy of which is attached hereto as Exhibit D.

<u>**Facts Relevant to This Motion**</u>

**A.      Non-Insider Compensation and Retention Agreements**

            8.       On the Petition Date, the Debtors filed the *Motion of Debtors for Interim*

*and Final Orders Authorizing Them to: (A) Pay Prepetition Employee Compensation and*

*Business Expenses; (B) Pay and Honor Employee Medical and Other Benefits; (C) Make*

*Employee Payroll Deductions and Pay Payroll Taxes; (D) Continue Employee Wage and*

*Benefits Programs; and (E) Pay All Costs and Expenses Incident to Any of the Foregoing*

(Docket No. 13) (the "<u>Wage & Benefit Motion</u>").  By the Wage & Benefit Motion, the Debtors

sought authority to pay employees' prepetition and postpetition wages and to continue a number

of employee health and welfare benefit and incentive programs in the ordinary course of business,

including, among others, (a) the Annual Incentive Bonus plan (the "<u>AIB</u>") and (b) the

Operational Safety and Environmental Bonus plan (the "<u>OSEB</u>"), which, together, provide

annual performance incentives to substantially all of the Debtors' non-union hourly and salaried

employees, as more fully described below.  For purposes of their request in the Wage & Benefit

Motion to continue the AIB, however, the Debtors excluded eight executive employees

(collectively, the "<u>Executive Insiders</u>")[2] who were entitled to receive AIB benefits prior to the

Petition Date.  By a final order entered on September 3, 2015 (Docket No. 356) (the "<u>Wage &</u>

<u>Benefit Order</u>"), the Court granted the relief requested in the Wage & Benefit Motion.

The Debtors did not seek inclusion of the Executive Insiders with respect to the relief sought in

the Wage & Benefit Order because they anticipated that the KEIP would be in place well before

the end of the year and would include a 2015 component.

---

[2]       The Executive Insiders consist of Kevin S. Crutchfield, Gary W. Banbury, Philip J. Cavatoni, V. Keith
Hainer, Bruce A. Hartshorn, Alan W. Jones Jr., Mark M. Manno and Richard H. Verheij.

9.      To maintain the stability of their operations and retain critical mid-level managers and other key employees, the Debtors also obtained the *Order (I) Confirming the Debtors' Authority to Continue Prepetition Retention Programs as to Non-Insider Employees in the Ordinary Course of Business, (II) Establishing a Discretionary Pool for the Payment of Future Retention Obligations to Non-Insider Employees and (III) Granting Certain Related Relief* (Docket No. 626) (the "KERP Order").  The KERP Order authorized the Debtors to continue performing under their prepetition retention agreements with such key employees, among other things.  The Executive Insiders, in addition to a further nine senior management employees (collectively, the "Non-Executive Insiders" and, together with the Executive Insiders, the "KEIP Participants"), were excluded from the relief granted by the KERP Order because they are, or potentially may be, "insiders" within the meaning of section 101(31) of the Bankruptcy Code.

10.     The cumulative effect of the Wage & Benefit Order and KERP Order has been to preserve the *status quo* under the Debtors' (a) prepetition incentive programs with respect to all employees other than the Executive Insiders and (b) retention programs with respect to all employees other than the 17 KEIP Participants (i.e., the eight Executive Insiders and the nine Non-Executive Insiders).

**B.      The KEIP Participants**

11.     The Executive Insiders are the current named executive officers of Debtor ANR and the membership of the Debtors' senior management committee.  The Non-Executive Insiders are senior managers of the Debtors who perform a variety of critical functions with regard to the generation of revenue to and the operation of the Debtors' businesses, including domestic and international sales management, operational management, real property management and legal counsel.  These specific skills, along with the KEIP Participants'

familiarity and understanding of the operations, customer and supplier relationships and

infrastructure of the Debtors' operations are vital, not only to the day-to-day operation of their

businesses, but also to the ability of the Debtors to effectuate a successful restructuring.

12.     The KEIP Participants have been deeply involved in the development of

the Debtors' restructuring strategy in addition to their important responsibilities maintaining key

areas of the Debtors' operations.  Leading up to and during these chapter 11 cases, the KEIP

Participants have had to devote significant time to various critical and exigent matters in addition

to the normal affairs attendant to the day-to-day operation of the Debtors' businesses.  These

matters have included, among other things:  (a) responding to customer, supplier, creditor and

employee inquiries about the Debtors' commencement of these cases; (b) negotiations with and

responses to due diligence and meeting requests from significant creditor constituencies,

including, among others, the Creditors' Committee and the DIP Agent, and each of their

respective legal and financial advisors; (c) the preparation, negotiation and, in some cases,

litigation of various of the "first day" and "second day" pleadings filed in these chapter 11 cases;

and (d) the ongoing development of the Debtors' restructuring strategy and business plan.

The Debtors have required, and anticipate that they will continue to require, extraordinary efforts

from each of the KEIP Participants to implement a successful restructuring and to maximize the

value of their estates.  The absence of incentives for the KEIP Participants to successfully

implement the Debtors' restructuring and enhance value at this critical time likely would severely

impact these chapter 11 cases, potentially resulting in significant losses to the Debtors' estates

and their stakeholders.

**C.     The Historical Compensation of the KEIP Participants**

13.     Historically, the KEIP Participants have received three principal forms of

direct compensation:  (a) base salary (including in the form of deferred compensation); (b) cash

bonus awards; and (c) equity incentive awards (collectively, with the value of equity incentive awards measured as of their grant date, "Total Direct Compensation").[3]  This compensation program was designed to support the Debtors' performance and retention objectives, and the compensation earned under certain components varied significantly based upon the Debtors' performance.

14.    The KEIP Participants historically have received cash bonus awards in the form of:  (a) AIB payments, which are variable based on the achievement of annual financial, safety and strategic objectives; and (b) retention payments, which are variable or fixed amounts paid over time to certain KEIP Participants, if they continue to be employed with the Debtors on the applicable payment dates.

*The 2015 AIB and OSEB Programs*

15.    The Debtors have maintained the AIB for at least 11 years.  The AIB provides annual cash incentives for eligible employees to reward performance against critical goals.  Each year, the Compensation Committee approves financial and operational goals for the AIB and confirms final performance achievement and the applicable payment entitlement. For 2015, the Compensation Committee approved a mix of performance metrics for the AIB based upon the following six factors:

> (a)    Profitability (40% of entitlement) calculated with respect to Adjusted EBITDA;[4]

---

[3]    Total Direct Compensation does not include other forms of compensation and benefits that KEIP Participants and other employees receive, which are set forth in greater detail in Wage & Benefit Motion.

[4]    For purposes of the AIB, Adjusted EBITDA generally is calculated as follows:  income from continuing operations plus interest expense, income tax expense, depreciation, depletion and amortization and amortization of acquired intangibles, less interest income and income tax benefit, excluding the effect of the following (collectively, the "AIB Adjustments"):  (a) certain unbudgeted/unfunded litigation or claim judgments and associated fees, civil penalties or settlements; (b) costs, revenue and gains associated with future and completed business combinations, dispositions, reorganizations and/or restructuring programs;

(b)     Expense Reduction (25% of entitlement) calculated as the sum of the Debtors' 2015 (i) overhead and (ii) selling, general and administrative expense reductions excluding the effect of the AIB Adjustments;

(c)     Liquidity (10% of entitlement) calculated as cash plus marketable securities plus undrawn availability under the Debtors' prepetition revolving credit facility and accounts receivable facility, less letters of credit issued against such facilities, as of December 31, 2015 compared against the 2015 budgeted amount, excluding the effect of the Extraordinary Items;

(d)     Gross Debt Reduction (10% of entitlement) calculated as reduction in gross debt balance from January 1, 2015 to December 31, 2015, excluding charges in other debt and debt discount;

(e)     Safety (7.5% of entitlement) divided equally between targets based upon (i) the Total Reportable Incident Rate and (ii) Non-Fatal Days Lost ("NFDLs"), which are standards established by the Mine Safety and Health Administration and are widely used by coal companies to judge their safety performance; and

(f)     Environmental (7.5% of entitlement) calculated as the number of 2015 water quality exceedances divided by the number of 2015 active National Pollutant Discharge Elimination System outlets, multiplied by 100.[5]

16.     Historically, approximately 1,700 of the Debtors' most senior salaried exempt employees have been eligible to receive AIB awards.  Beginning July 1, 2015, however, the Debtors (a) replaced the AIB with the OSEB for approximately 1,200 of these employees and (b) implemented the OSEB for approximately 5,200 non-union employees that are not eligible

---

(continued…)

(c) unbudgeted/unfunded settlement, business optimization charges and pension funding payments; and
(d) certain extraordinary, unusual, infrequent or non-recurring items not encompassed in (a), (b) or (c).

[5]     For employees working out of the Debtors' principal operating locations, performance under the safety and environmental metrics generally is measured by the applicable Debtors' performance at that location. For employees not based out of operating locations, including all employees working at the Debtors' Bristol, Virginia headquarters, performance under the safety and environmental metrics is calculated globally across all locations.

for the AIB.[6]  The OSEB was developed over a period of eight months to promote excellence in

the critical operational areas of safety and environmental compliance.  As such, the OSEB

provides eligible Employees with a quarterly bonus, calculated on a site-specific basis, with

reference to the same safety and environmental metrics as the AIB.

17.     The continuation of the AIB and the OSEB in the ordinary course of

business with respect to all eligible employees other than the Executive Insiders was approved by

the Court pursuant to the Wage and Benefit Order.  Consistent with the Wage & Benefit Order,

the Debtors are in the process of developing the AIB and OSEB goals and metrics for the 2016

plan year, which will align certain aspects of those programs with certain of the metrics included

in the KEIP.  Upon approval of the KEIP, however, KEIP Participants will not participate in

either the 2016 AIB or OSEB.

*The Equity Incentive Awards*

18.     In prior years, a significant portion of the Total Direct Compensation

provided to the KEIP Participants has taken the form of equity incentive awards.  In 2014, on

average approximately 46% of the Total Direct Compensation of Executive Insiders was in the

form of equity incentive awards,[7] and for certain Executive Insiders as much 69% of their Total

Direct Compensation was in the form of equity incentive awards.  For the Non-Executive

Insiders, in 2014, on average approximately 35% of their Total Direct Compensation was in the

form of equity incentive awards.

---

[6]     The Debtors' approximately 725 union employees as of the date of this Motion are compensated pursuant to
the terms of applicable collective bargaining agreements.

[7]     These awards consisted of:  (a) performance share units, which vested either based upon (i) the Debtors'
total stockholder return relative to its compensation peer group over a three-year period or (ii) a one-year
operating cash flow goal; and (b) restricted stock units, which vest based upon the applicable employee's
continued service with the Debtors, generally over a three-year period.

19.     As a consequence of the Debtors' recent financial difficulties and

precipitous decline in the value of the stock of ANR, however, (a) past equity incentive awards

that were still held by the KEIP Participants have lost substantially all of their value – resulting

in an average decrease in Total Direct Compensation previously awarded to the KEIP

Participants of approximately 39% – and (b) the grant of equity incentive awards during these

chapter 11 cases likely would result in no value to the KEIP Participants.

**D.     Overview of the KEIP**

20.     With the assistance of Meridian, and in coordination with counsel and the

Debtors' other professionals, the Debtors designed the KEIP to incent senior management

employees to meet and exceed certain operational goals that will be critical to the success of the

Debtors' restructuring.  Attached as Appendix 2 to the Romanchek Declaration is a schedule

identifying the KEIP Participants, their titles, salaries and threshold, target and maximum

incentive award opportunity under the terms of the proposed KEIP (the "KEIP Schedule").[8]

21.     The KEIP is comprised of two consecutive three-month performance

periods, with the first performance period starting on January 1, 2016.  Each KEIP Participant is

assigned a target incentive opportunity expressed as a percentage of such KEIP Participant's base

salary.  If target performance goals are achieved across all performance metrics for a

performance period, then each KEIP Participant will earn a target payout for that performance

period.  The KEIP also provides for lesser payouts if threshold performance goals are achieved

and greater payouts if maximum performance goals are achieved.  However, if no threshold

---

[8]     Contemporaneously herewith, the Debtors have filed a motion seeking authorization to file the KEIP
Schedule under seal.  The Debtors intend to share the KEIP Schedule with counsel to the Creditors'
Committee, the U.S. Trustee, the DIP Agent and the ad hoc committee of second lien noteholders on
condition that they maintain the confidentiality of the KEIP Schedule.

performance goals are achieved across all metrics for a given performance period, then no

incentive awards would be earned and paid to KEIP Participants for such performance period.

22.     The performance goals under the KEIP relate to the following three

performance metrics:  (a) an annualized savings metric (the "Value Enhancement Plan"); (b) a

liquidity metric (the "Liquidity Metric"); and (c) a safety and environmental compliance metric

(the "Safety/Environmental Metric").

### E.      The Term and Cost of the KEIP

23.     The KEIP constitutes each of the KEIP Participants' sole incentive

program for the 2016 calendar year.  Performances under the KEIP will be measured as of the

end of each of the first two calendar quarters of 2016, and any award payments will be made in

up to three installments, as more fully described below.  Each KEIP Participant's target incentive

award opportunity is divided equally between two performance periods:  (a) the first

performance period begins on January 1, 2016 and ends on March 31, 2016 (the "First

Performance Period") and (b) the second performance period begins on April 1, 2016 and ends

on June 30, 2016 (the "Second Performance Period" and, together with the First Performance

Period, the "Performance Periods").  Incentive award determinations will be made at the

conclusion of each Performance Period, with any earned incentive award paid in accordance with

the following schedule:  (a) one-third of any earned incentive award to be paid within 30 days

following the conclusion of each applicable Performance Period; (b) one-third of any earned

incentive award to be paid on September 30, 2016 or, if earlier, the date of a confirmed

chapter 11 plan; and (c) the remaining one-third of any earned incentive award to be paid upon

confirmation of a chapter 11 plan; provided, however, that such final third of any earned

incentive award will be forfeited unless the Court has confirmed a chapter 11 plan with respect to

the Debtors by December 31, 2016.  To receive any earned incentive award, a KEIP Participant

must be employed with the Debtors up to and including the date of payment pursuant to the

foregoing schedule (except if the KEIP Participant's employment is terminated without cause

prior to a payment date).

24.     Under the proposed KEIP, if target performance goals are met across all

performance metrics for an applicable Performance Period, each KEIP Participant will earn an

incentive award equal to 100% of the KEIP Participant's target incentive award opportunity.

If lower threshold target performance goals are met across all performance metrics for an

applicable Performance Period, each KEIP Participant will earn an incentive award equal to 50%

of the Participant's target incentive opportunity.  If maximum target performance goals are met

across all performance metrics for an applicable Performance Period, each KEIP Participant will

earn an incentive award equal to 200% of such KEIP Participant's target incentive opportunity.

Payout amounts will be interpolated for performance between threshold and target and between

target and maximum on a straight-line basis.  The payout opportunities are set forth in the KEIP

Schedule.  The aggregate cost of the KEIP to the Debtors will be approximately $7.4 million if

target performance goals are achieved across all metrics for both Performance Periods.  The cost

of the KEIP may surpass this amount only if achieved performances exceed target performances

with the maximum aggregate cost at $14.8 million if achieved performance meets or exceeds

maximum performance goals across all metrics for both Performance Periods.

25.     The aggregate cost (i.e., $7.4 million) of the KEIP if target performance

goals are achieved represents 0.073% of the book value of the Debtors' assets, which is

approximately equal to the median cost of comparable plans approved in other bankruptcy cases.

F.      **The KEIP Metrics and Performance Goals**

*The Value Enhancement Plan*

26.      The Value Enhancement Plan metric incents KEIP Participants to achieve

critical levels of cost savings and thereby maximize the value of the Debtors' estates for the

benefit of stakeholders.  Specifically, the Value Enhancement Plan metric relates to annualized

savings realized through executed initiatives.  The target performance goals with respect to the

Value Enhancement Plan metric are:  (a) $50 million on an annualized basis, with respect to the

First Performance Period; and (b) $75 million on an annualized basis, with respect to the Second

Performance Period.  The Value Enhancement Plan metric has been assigned a weight of 15%

for each Performance Period.  This means that KEIP Participants will receive:  (a) 15% of their

target incentive opportunity if target performance goal is achieved for a Performance Period

(i.e., aggregate cost per Performance Period of approximately $1.11 million at target

performance); (b) 7.5% of their target incentive opportunity if threshold performance goal is

achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately

$0.55 million at threshold performance); and (c) 30% of their target incentive opportunity if

maximum performance goals are achieved for a Performance Period (i.e., aggregate cost per

Performance Period of approximately $2.22 million at maximum performance).  This

performance metric maximum total cost over both Performance Periods to the Debtors is

approximately $4.44 million.

*The Liquidity Metric*

27.      The Liquidity Metric incents KEIP Participants to achieve specified levels

of adjusted ending book cash at the conclusion of each Performance Period, as measured by the

Debtors' 13-week cash forecast.  The target performance goals with respect to the Liquidity

Metric are:  (a) $850 million, with respect to the First Performance Period; and (b) $775 million,

with respect to the Second Performance Period.  The Liquidity metric has been assigned a weight of 27.5% for each Performance Period.  This means that KEIP Participants will receive: (a) 27.5% of their target incentive opportunity if target performance goal is achieved for a Performance Period (i.e., an aggregate cost per Performance Period of approximately $2.0 million at target performance); (b) 13.75% of their target incentive opportunity if threshold performance goal is achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $1.0 million at threshold performance); and (c) 55% of their target incentive opportunity if maximum performance goals are achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $4.1 million at maximum performance).  This performance metric maximum total cost over both Performance Periods to the Debtors is approximately $8.14 million.

*The Safety/Environmental Metric*

28.     The Safety/Environmental Metric incents KEIP Participants to adhere to high safety and environmental standards during each Performance Period.  With respect to the safety metric, the target performance goal is less than 2.42 non-fatal days lost ("NFDLs") for each Performance Period.  The Debtors' actual NFDL performance through September 30, 2015 was 3.28, which is above (i.e., worse than) the proposed target and threshold goals.  Under the environmental metric, the target performance goal is an annualized ratio[9] (the "EC Ratio") of "Water Quality Exceedances" to the number of active "NPDES Outlets" of less than 20.0 for

---

[9]     Annualization is necessary because the Debtors historically have measured environmental compliance on an annual basis, and the Debtors' performance is affected by seasonal considerations.  Annualization is achieved by multiplying the applicable ratio as of the end of each Performance Period by a specified factor (the "Annualization Factor"), which is based upon historical seasonality.  Under the KEIP, the Annualization Factor for the First Performance Period is 2.95, and the Annualization Factor for the Second Performance Period is 1.77.  The resulting ratio is then multiplied by 100 for convenience.

each Performance Period.[10]  The Debtors' annualized EC Ratio based on actual results through September 30, 2015 was 23.97, which is above (i.e., worse than) the proposed threshold and target performance goals.

29.    The Safety/Environmental metric has been assigned a weight of 7.5% for each Performance Period, split evenly between the safety and environmental metrics. This means that each KEIP Participant will receive:  (a) 7.5% of their target incentive opportunity if target performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $0.555 million at target performance); (b) 3.75% of their target incentive opportunity if threshold performance goals are achieved for both the safety and environmental metrics for a Performance Period (i.e., resulting in an aggregate cost per Performance Period of approximately $0.278 million at threshold performance); and (c) 15% of their target incentive opportunity if maximum performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $1.11 million at maximum performance).  The maximum total cost over both Performance Periods to the Debtors under the Safety/Environmental Metric is approximately $2.22 million.

---

[10]    "NPDES Outlets" are water discharge points permitted by the National Pollutant Discharge Elimination System (the "NPDES").  The NPDES was established under the Clean Water Act and provides monitoring and compliance requirements with respect to discharges from permitted sites.  "Water Quality Exceedances" refers to any result greater than an effluent limit for any parameter set forth in an NPDES permit as determined by a Discharge Monitoring Report ("DMR") Sample or any failure to attain a minimum limitation set forth in an NPDES permit as determined by a DMR Sample.

30.    The following chart summarizes the terms of the proposed KEIP.

| METRIC | WEIGHT | AGGREGATE TARGET PERFORMANCE OPPORTUNITY | PERFORMANCE PERIOD | PERFORMANCE GOALS | | PAYOUT (AS A PERCENT OF TARGET OPPORTUNITY) |
|---|---|---|---|---|---|---|
| Value Enhancement Plan | 15.00% | $1.110 million | First Performance Period | Threshold | $42 million | 50% |
| | | | | Target | $50 million | 100% |
| | | | | Maximum | $55 million+ | 200% |
| | 15.00% | $1.110 million | Second Performance Period | Threshold | $64 million | 50% |
| | | | | Target | $75 million | 100% |
| | | | | Maximum | $82 million+ | 200% |
| Liquidity Metric | 27.50% | $2.035 million | First Performance Period | Threshold | $750 million | 50% |
| | | | | Target | $850 million | 100% |
| | | | | Maximum | $900 million+ | 200% |
| | 27.50% | $2.035 million | Second Performance Period | Threshold | $675 million | 50% |
| | | | | Target | $775 million | 100% |
| | | | | Maximum | $800 million+ | 200% |
| Safety Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Safety Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Total | 100% | $7.402 million | | | | |

## G.    Vesting and Payment of Awards and Adjustment of Performance Targets

31.    The Debtors will adjust performance goals to reflect the effect of any

material asset sale or other financing-related transactions to neutralize the impact of such

transactions.  Upon the occurrence of (a) confirmation of a chapter 11 plan; (b) sale of

substantially all (more than 70%) of the Debtors' assets, as measured by revenues or EBITDA; or

(c) any change of control transaction, including a transaction involving a credit bid for more than

50% of the Debtors' assets on the basis of revenues or EBITDA (each, a "Restructuring

Transaction"), each KEIP Participant shall be paid an incentive award within 30 days following

the date of a Restructuring Transaction in amount equal to the Participant's target incentive

opportunity with respect to each Performance Period that is outstanding on the date of such

Restructuring Transaction.  Any KEIP Participant who is terminated without cause will remain

eligible to receive payments in the normal course under the KEIP based on actual performance.

Any KEIP Participant who is terminated for cause will forfeit any entitlement to any incentive

award payout under the KEIP.

## Argument

**A.      Payments to the Executive Insiders under
         the 2015 AIB is an Ordinary Course Transaction**

        32.      The Debtors believe that they are authorized to continue the 2015 AIB

with respect to the Executive Insiders in the ordinary course of their businesses under

section 363(c) of the Bankruptcy Code.  Nevertheless, to allay any potential concerns of the

Executive Insiders that parties in interest may seek to unwind any payments made to them under

the AIB in the future, the Debtors request that the Court enter an order, pursuant to section 105(a)

of the Bankruptcy Code,[11] expressly confirming the Debtors' authority to continue the AIB as to

the Executive Insiders, including by paying amounts thereunder as they come due.

        33.      Section 363(c) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession "may enter into transactions … in the ordinary course of business without

notice or a hearing, and may use property of the estate in the ordinary course of business without

notice or a hearing."  11 U.S.C. § 363(c)(1).  Section 363 is "designed to serve the 'overriding

goal of maximizing the value of the estate' by striking the optimal balance between the interests

of the debtor and the creditors."  Habinger, Inc. v.  Metro. Cosmetic and Reconstructive Surgical

---

[11]       Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment
          that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

Clinic, P.A., 124 B.R. 784, 786 (Bankr. D. Minn. 1990) (quoting United States ex rel. Harrison

v. Estate of Deutscher, 115 B.R. 592 (Bankr. M.D. Tenn. 1990)).  "The framework of

section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in

ordinary transactions without unnecessary creditor and bankruptcy court oversight, while

protecting creditors by giving them an opportunity to be heard when transactions are not

ordinary." In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992); see also Habinger,

124 B.R. at 786 ("The 'ordinary course of business' standard is intended to allow a debtor the

flexibility it needs to run its business and respond quickly to changes in the business climate.")

(internal citations omitted).

      34.    The Bankruptcy Code does not define "ordinary course of business."

However, "through a synthesis of case law, courts have developed a workable analytical

framework for determining whether an activity is within the debtor's 'ordinary course of

business.'" In re Husting Land & Dev., Inc., 255 B.R. 772, 778 (Bankr. D. Utah 2000),

aff'd, 274 B.R. 906 (D. Utah 2002); accord Comm. of Asbestos–Related Litigants and/or

Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616

(Bankr. S.D.N.Y. 1986), rev'd on other grounds, 801 F.2d 60 (2d Cir. 1986).  "Courts have

developed two commonly used joint tests for determining whether a transaction is in the ordinary

course of business:  (1) horizontal dimension test; and (2) vertical dimension (also known as the

reasonable expectations) test." 3 Collier on Bankruptcy ¶ 363.03 (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2015); see also Burlington N. RR Co. v. Dant & Russell, Inc. (In re Dant

& Russell, Inc.), 853 F.2d 700, 704 (9th Cir. 1988) ("Two tests emerge[d] to aid in assessing

whether [postpetition transactions are] executed in the ordinary course of business: (1) vertical

dimension or creditor's expectation test and (2) horizontal dimension test.").

35.     The horizontal dimension test involves a determination of "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." Id. (citing Johnston v. First St. Cos. (In re Waterfront Cos.), 56 B.R. 31, 34-35 (Bankr. D. Minn. 1985) and Johns-Manville, 60 B.R. at 618).  Under the horizontal test, "[t]he transaction need not have been common; it need only be ordinary.  A transaction can be ordinary and still occur only occasionally."  Id. (quoting Johns-Manville, 60 B.R. at 618).

36.     "The touchstone of 'ordinariness'" under the vertical, or reasonable expectations, test is "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.  So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing." Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 394 (S.D.N.Y. 1983); see also Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997) (stating that "ordinary course of business" is intended to "embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business") (quoting Watford v. S. Cent. Farm Credit, ACA (In re Watford), 159 B.R. 597, 599 (M.D. Ga. 1993)).

37.     "A fundamental characteristic of an 'ordinary' post-petition business transaction is its similarity to a pre-petition business practice."  In re Commercial Mortg. & Fin., Co., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (quoting Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.), 186 B.R. 414, 426 (N.D. Ill. 1995)).  The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to

determining whether the transactions are ordinary.  E.g., Harrison, 115 B.R. at 598;

Johns-Manville, 60 B.R. at 617.

38.     As set forth in the Hassey Declaration, the Debtors monitor compensation

practices in the coal industry.  As a result, the Debtors are aware that programs like the AIB are

common and necessary throughout the industry as a means of incentivizing key employees.

Accordingly, the Debtors believe the continuation of the AIB satisfies the horizontal test.

39.     The continuation of the AIB also satisfies the vertical, or "reasonable

expectations," test.  The Debtors' senior executives (currently, the Executive Insiders) have

participated in the AIB since its inception.  By this Motion, therefore, the Debtors seek, in part,

to continue the same incentive program that they maintained prior to the Petition Date with

respect to the Executive Insiders – relief the Debtors have already obtained with respect to every

other eligible employee.  In addition, Debtor ANR previously disclosed the terms of conditions

of the AIB and the Executive Insiders' participation therein in its filings with the United States

Securities and Exchange Commission.[12]  Thus, it should come as no surprise that the Debtors

seek to continue the AIB with respect to the Executive Insiders as part of their ordinary course of

business.  Accordingly, the continuation of the AIB as to the Executive Insiders clearly is

consistent with the Debtors' prepetition business practices and was, or reasonably should have

been, within creditors' expectations.

**B.      Payments to the Executive Insiders under the
        2015 AIB Are Not Limited by 503(c) of the Bankruptcy Code**

40.     Section 503(c) of the Bankruptcy Code, which imposes limitations on

certain transfers made to insiders, officers, managers and consultants, among other parties, is not

---

[12]     See, e.g., Alpha Natural Resources, Inc., *Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934* dated April 9, 2015, at 36-39 (describing the terms of the AIB and payments made
thereunder to the applicable Executive Insiders for 2014).

implicated with respect to the Debtors' request to continue the AIB because: (a) no aspect of the AIB constitutes a transfer made or obligation incurred for inducing any eligible employee to remain with the Debtors' business (which, as more fully discussed below, would contravene section 503(c)(1) of the Bankruptcy Code because the Executive Insiders likely are "insiders" within the meaning of section 101(31) of the Bankruptcy Code); (b) transfers pursuant to the AIB are not severance payments (as limited with respect to insiders by section 503(c)(2) of the Bankruptcy Code);[13] and (c) for the reasons set forth above, the Debtors may make payments under the AIB within the ordinary course of business (and, therefore, without contravening section 503(c)(3) of the Bankruptcy Code, which provides certain limitations on transfers made outside of the ordinary course of business).

41.    Although, for the reasons set forth above, the Debtors believe that they may continue the AIB in the ordinary course of business, the importance of the AIB to the Executive Insiders suggests that an order of this Court will eliminate concerns they may have about their ability to receive and retain payments under the AIB. Accordingly, for the benefit of the Debtors' most senior managers, and to eliminate any doubt on the part of any party as to the propriety of the AIB and any payments made thereunder, the Debtors request that the Court enter an order expressly authorizing them to continue the AIB as to the Executive Insiders, just as the

---

[13]    Section 503(c)(2) of the Bankruptcy Code permits severance payments to "insiders" only if they are part of a program applicable to all employees and are less than ten times the mean of severance payments made to non-management employees during that calendar year. See 11 U.S.C. § 503(c)(2). The Wage & Benefit Order authorized the Debtors to maintain their severance program with respect to their employees, including insider employees, which the Debtors intend to do, subject to the limitations imposed by section 503(c)(2) of the Bankruptcy Code.

Court previously ordered with respect to all of the Debtors' other AIB-eligible employees and

with respect to all employees eligible for the OSEB.[14]

## C.    The KEIP Should be Approved Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code

42.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he [debtor],

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a

debtor to use property of the estate when such use has a "sound business purpose" and when the

use of the property is proposed in good faith.  See, e.g., In re W.A. Mallory Co., 214 B.R. 834,

836 (Bankr. E. D. Va. 1997) (noting that the "requirement [of] a sound business reason … is

similar to many states' 'business judgment rule'"); WBQ P'ship v. Commonwealth of Va. Dep't of

Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

43.    Once the debtor has articulated a valid business purpose for the use of

estate property in a manner that is not in the ordinary course of business, a presumption arises

that the debtor's decision was made on an informed basis, in good faith and in the honest belief

that the action was in the best interest of the company.  See Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656

---

[14]    To the extent that payments to the Executive Insiders under the AIB would constitute the satisfaction of prepetition claims then, just as with respect to the Court's authorization of the Debtors make payments to the Debtors' other employees under the AIB and OSEB in the Wage & Benefit Order, such payments are justified pursuant to the doctrine of necessity because they are necessary to preserve the going concern value of the Debtors' businesses.  See, e.g., Miltenberger v. Logansport, Crawfordsville and Southwestern Ry. Co., 106 U.S. 286, 311 (1882) (holding that "[m]any circumstances may exist which may make it necessary and indispensable to … the preservation of the property, for the receiver to pay pre-existing debts of certain classes out of the earnings of the receivership …."); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-87 (S.D.N.Y. 1987) (finding that a court's equitable powers include authorizing a debtor to pay prepetition debts); accord In re United Am., Inc., 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (noting that "payment of select pre-petition unsecured claims" is necessary at times "because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim"); In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under 11 U.S.C. § 105 the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor.").

(Bankr. S.D.N.Y. 1992).  Furthermore, once "the debtor articulates a reasonable basis for its

business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

generally not entertain objections to the debtor's conduct."  <u>Johns-Manville</u>, 60 B.R. at 616.

Consequently, a debtor's business decision "should be approved by the court unless it is shown to

be so manifestly unreasonable that it could not be based upon sound business judgment, but only

on bad faith, or whim or caprice."  <u>In re Aerovox, Inc.</u>, 269 B.R. 74, 80 (Bankr. D. Mass. 2001)

(internal quotations omitted) (approving the debtor's business decision to implement a retention

program); <u>see also</u> <u>In re Dana Corp.</u>, 358 B.R. 567, 577 (Bankr. S.D.N.Y. 2006) (citing <u>Aerovox</u>

with approval).  Moreover, "[p]arties opposing the proposed exercise of a debtor's business

judgment have the burden of rebutting the presumption of validity."  <u>Integrated Res.</u>, 147 B.R. at

656.

        44.     Section 503(c) of the Bankruptcy Code imposes certain restrictions on the

compensation that a debtor can pay to its executives and other employees in bankruptcy,

including a general prohibition on the payment of retention payments to insiders unless certain

conditions are met.  <u>See</u> 11 U.S.C. § 503(c)(l).  As an initial matter, the KEIP is not subject to the

restrictions in section 503(c)(1) of the Bankruptcy Code because the KEIP is an *incentive* plan,

not a *retention* plan.  No awards are given under the KEIP simply for remaining in the Debtors'

employ.  Rather, as described above, awards are obtainable under the KEIP only after the

achievement of specific metrics tied to (a) value enhancement, (b) liquidity (c) operational safety

and environmental considerations.  Because the KEIP is an incentive plan, with incentive

payments tied to the achievement of specific financial, operational and restructuring metrics, it is

not subject to section 503(c)(1) of the Bankruptcy Code even if it could have some retentive

effect.  See Dana, 358 B.R. at 571 ("[B]ecause a plan has some retentive effect does not mean

that the plan, overall, is retentive rather than incentivizing in nature.").[15]

45.    Section 503(c)(3) of the Bankruptcy Code limits the payment of

obligations outside of the ordinary course of business that are not covered by sections 503(c)(1)

or (2).  Specifically, section 503(c)(3) provides as follows:

> [there shall neither be allowed, nor paid-] (3) other transfers or
> obligations that are outside the ordinary course of business and not
> justified by the facts and circumstances of the case, including
> transfers made to, or obligations incurred for the benefit of,
> officers, managers, or consultants hired after the date of the filing
> of the petition.

11 U.S.C. § 503(c)(3) (emphasis added).  Generally, section 503(c)(3) of the Bankruptcy Code

permits payments to a debtor's employees outside the ordinary course of business if such

payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).

The standards for approval under sections 363(b) and 503(c)(3) are substantially the same.

See In re Velo Holdings, Inc., 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that

the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than

the business judgment standard under section 363(b)."); In re Viking Offshore (USA), Inc.,

No. 08-31219-H3-11, 2008 WL 1930056, at *2 n.1 (Bankr. S.D. Tex. Apr. 30, 2008) (stating that

the two tests are "substantially similar"); In re Global Home Prods., LLC, 369 B.R. 778, 783

(Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the

analysis utilizes the more liberal business judgment review under § 363."); see also In re Borders

---

[15]    Neither is the KEIP subject to the restrictions set forth in section 503(c)(2) of the Bankruptcy Code because
no payments under the KEIP are tied to the termination of the employment of any KEIP Participant.  See
Dana, 358 B.R. at 577–78 (incentive plan was not subject to section 503(c)(2) of the Bankruptcy Code
because incentives were not tied to termination of employment); accord In re Pilgrim's Pride Corp.,
401 B.R. 229, 235–36 (Bankr. N.D. Tex. 2009) (consulting agreement did not fall under section 503(c)(2)
of the Bankruptcy Code because payments were not intended as severance).

Grp., Inc., 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (evaluating debtors' non-insider key

employee retention plan and insider key employee incentive plan under business judgment rule).

46.    In Dana, the bankruptcy court set forth various factors for evaluating

whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of

a management incentive plan under section 503(c)(3) of the Bankruptcy Code.  These factors

include:  (a) whether the plan is calculated to achieve the desired performance; (b) whether the

cost of the plan is reasonable in the context of the debtor's assets, liabilities and earning potential;

(c) whether the scope of the plan is fair and reasonable or whether it discriminates unfairly;

(d) whether the plan is consistent with industry standards; (e) whether the debtor employed

appropriate due diligence efforts in developing the plan; and (f) whether the debtor received

independent counsel in performing due diligence and in creating and authorizing the incentive

compensation.  See Dana, 358 B.R. at 576-77.  As outlined in greater detail below, the KEIP

satisfies each of these factors.

47.    With respect to the first factor, the KEIP is designed to incent the KEIP

Participants to achieve performance goals that are critical to the interests of the Debtors and all

stakeholders.  In particular:  (a) the Value Enhancement Plan incents the KEIP Participants to

achieve critical levels of cost savings and thereby maximize the value of the Debtors' estates for

the benefit of stakeholders; (b) the Liquidity Metric incents the KEIP Participants to achieve

specified levels of adjusted ending book cash at the conclusion of each Performance Period; and

(c) the Safety/Environmental Metric incents the KEIP Participants to adhere to high safety and

environmental standards during each Performance Period.  In each case, the KEIP Participants

must achieve one or more specific goals within a specified time frame to be entitled to receive a

payment under the KEIP, and the size of such incentive payments generally is directly correlated

with the amount by which employees are able to exceed the baseline achievement targets that have been established.

48.     In addition, the Carmody Declaration establishes that, notwithstanding the considerable uncertainties that currently exist in the Debtors' industry, the Debtors and their professional advisors have used their reasonable best efforts to develop appropriate and achievable "stretch" targets under each of the performance metrics comprising the KEIP. In particular: (a) the targets under the Value Enhancement Plan represent the development of specific performance improvement initiatives across various functional areas of the Debtors that are being implemented to realize savings in 2016; (b) the targets under the Liquidity Metric are aggressive but achievable based on the Debtors' near term liquidity forecast, including inputs from the 13-week cash flow forecast and the strategic business planning process; and (c) the targets under the Safety/Environmental Metric represent, in each case, a significant improvement of the Debtors' performance under these measures as of September 30, 2015.

49.     With respect to the second factor, as set forth in the Romanchek Declaration, the cost of the KEIP is reasonable in light of the size of the Debtors and the potential benefit to the Debtors' estates. In particular, the aggregate cost (i.e., $7.4 million) of the KEIP if target performance goals are achieved represents 0.073% of the book value of the Debtors' assets, which is approximately equal to the median cost of comparable plans approved in other bankruptcy cases. Moreover, (a) the target payout opportunity as a percentage of the KEIP Participants' base salaries, (b) the range of payout opportunities as a percentage of the target payout opportunity and (c) the payout timing are consistent with industry standards.

50.     With respect to the third factor, the KEIP is fair and reasonable and does not discriminate unfairly in that it applies to the 17 KEIP Participants, who are the employees

most responsible for overseeing the Debtors' operations and are most directly involved in the efforts to expeditiously complete a restructuring of the Debtors' obligations.  See In re Borders Grp., Inc., 453 B.R. at 475-76 (holding that proposed incentive plan did not discriminate unfairly because it applied to a "carefully selected … leadership team that [would] manage the Debtors and their ongoing business during the pendency of the restructuring process"); cf. In re Dewey & LeBoeuf LLP, No. 12-12321 (MG), 2012 WL 3065275, at *7 (Bankr. S.D.N.Y. July 30, 2012) (holding that incentive plan that applied to those employees who would oversee the collection of the debtor's receivables was "fair and reasonable" and did "not discriminate unfairly").

51.    With respect to the remaining factors, the Romanchek Declaration describes the analysis undertaken by the Debtors' compensation consultant, Meridian, and clearly establishes that the KEIP (a) is otherwise consistent with industry standards, (b) was developed with appropriate due diligence and (c) was developed with the assistance of outside professionals.[16]

52.    Courts in this district have approved plans similar to the KEIP.  See, e.g., In re James River Coal Company, No. 14-31848 (KRH) (Bankr. E.D. Va. June 12, 2014); In re AMF Bowling Worldwide, Inc., No. 12-36495 (KRH) (Bankr. E.D. Va. Jan. 18, 2013); In re Movie Gallery, Inc., No. 10-30696 (DOT) (Bankr. E.D. Va. Sept. 21, 2010); In re Roper Bros. Lumber Co., No. 09-38215 (KRH) (Bankr. E.D. Va. Feb. 25, 2010); In re LandAmerica Fin. Grp., Inc., No. 08-35994 (KRH) (Bankr. E.D. Va. June 22, 2009); In re Circuit City Stores, Inc., No. 08-35653 (KRH) (Bankr. E.D. Va. Mar. 25, 2009); In re NTELOS, Inc., No. 03-32094 (DOT) (Bankr. E.D. Va. June 9, 2003).

---

[16]    Meridian's analysis did not take into account the recent precipitous decline and unprecedented circumstances in the coal industry that provide further justification for the KEIP than the incentive programs of the peer companies that Meridian evaluated.

53.     Here, as demonstrated above, the KEIP is an efficient means to incent the KEIP Participants to achieve the goals that are critical to the successful restructuring of the Debtors' obligations and the maximization of the value of the Debtors' estates.  Accordingly, a sound business purpose exists for the implementation of the KEIP, which should be approved as justified by the facts and circumstances of these chapter 11 cases pursuant to sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

**Waiver of Bankruptcy Rule 6004(h)**

54.     Pursuant to Bankruptcy Rule 6004(h), the Debtors also seek, to the extent it applies, a waiver of any stay of the effectiveness of the Order under Bankruptcy Rule 6004(h).

55.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the KEIP is necessary to incent the KEIP Participants to achieve the goals that are critical to the successful restructuring of the Debtors' obligations and the maximization of the value of the Debtors' estates. Any further delay compromises these efforts to the detriment of all parties in interest. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies, with respect to the Order.

**Notice**

56.     In accordance with the *Order Establishing Certain Notice, Case Management and Administrative Procedures* (Docket No. 111) (the "Case Management Order"), notice of this Motion has been given to (a) all parties on the Master Service List (as defined in the Case Management Order) and (b) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

## **No Prior Request**

57.      No prior request for the relief sought in this Motion has been made to this

or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter the

Order substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein;

and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: December 3, 2015
      Richmond, Virginia

Respectfully submitted,

  /s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

and

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

# EXHIBIT A

## Proposed Form of Order

NAI-1500657174v19

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## ORDER (I) AUTHORIZING PAYMENTS UNDER
## 2015 ANNUAL INCENTIVE BONUS PLAN AND (II) APPROVING KEY
## EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016

This matter coming before the Court on the *Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (the "<u>Motion</u>"),[1] filed by the debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"); the Court having reviewed the Motion, the Hassey Declaration and the Romanchek Declaration and having considered the statements of counsel and evidence adduced with respect to the Motion at a hearing before the Court (the "<u>Hearing</u>"); the Court finding that (a) the Court has jurisdiction

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to

28 U.S.C. § 157(b)(2), (c) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409, (d) notice of the Motion and the Hearing was sufficient under the circumstances, (e) the

Debtors may continue the AIB with respect to the Executive Insiders for 2015 in the ordinary

course of their businesses, (f) a sound business purpose exists for the Debtors' implementation of

the KEIP, which is not designed primarily for retentive effect and is justified by the facts and

circumstances of these chapter 11 cases in that it is narrowly tailored to incent the KEIP

Participants who are vital to the Debtors' successful restructuring and the maximization of value

for the benefit of all parties in interest; and the Court finding that the relief sought in the Motion

is in the best interests of the Debtors, their estates, creditors and all parties in interest; and the

Court having determined that the legal and factual bases set forth in the Motion, the Hassey

Declaration and the Romanchek Declaration and at the Hearing establish just cause for the relief

granted herein; and after due deliberation thereon and good and sufficient cause appearing

therefore;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized, but not directed, to make payments to the

Executive Insiders under the 2015 AIB in the ordinary course of business; provided, however,

that the Debtors will provide the Creditors' Committee and DIP Agent with five business days'

written notice (the "Notice Period") or obtain a further order of the Court prior to paying any

bonus or other amount pursuant to the AIB (a "Proposed Payment").  The Debtors will

simultaneously provide the Creditors' Committee and the DIP Agent with the amount of the

Proposed Payment, together with information establishing the basis for such Proposed Payment

(in the form of the applicable performance goals, levels of achievement, payout metrics and all

other relevant information).  Should the Committee or the DIP Agent object to the Proposed

Payment, the Committee or the DIP Agent, as applicable, shall file an objection (an "Objection")

to such Proposed Payment within the Notice Period setting forth the basis for such Objection,

which Objection shall be heard on an expedited basis.  If each of the Committee and the DIP

Agent either (a) indicates in writing (including email) that it does not object to a Proposed

Payment or (b) fails to file an Objection within the Notice Period, the Debtors may make the

Proposed Payment.  If an Objection is filed, the Debtors shall not make the Proposed Payment

unless and until such Objection is overruled or resolved by agreement between the Debtors and

the Committee or the DIP Agent, as applicable.

3.    Pursuant to section 363(b)(1) and 503(c)(3) of the Bankruptcy Code, the

KEIP for the KEIP Participants is approved in its entirety, and the Debtors are authorized to

implement the KEIP and to make payments thereunder.

4.    The authorization hereunder to make payments to the KEIP Participants

pursuant to the KEIP or to the Executive Insiders pursuant to the AIB shall not create any

obligation on the part of the Debtors or their officers, directors, attorneys or agents to make

payments under the KEIP or the AIB, respectively, unless the participants meet the necessary

conditions under the KEIP or the AIB, as applicable.

5.    The Debtors are authorized to execute and deliver all instruments and

documents, and take all such other actions as may be necessary or appropriate to implement,

effectuate and fully perform under and in accordance with this Order, the KEIP and the AIB.

6.    The terms and conditions of this Order shall be immediately effective and

enforceable upon entry.

7.      This Court shall retain jurisdiction to hear and determine all matters

arising from or related to this Order.

Dated: _____, 2015
            Richmond, Virginia                          _____
                                                        UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Respectfully submitted,

   /s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

and

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

*Attorneys for the Debtors*
*and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

   /s/  Henry P. (Toby) Long, III

NAI-1500657174v19

## **EXHIBIT B**

Hassey Declaration

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF L. PATRICK HASSEY
IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF
AN ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL
INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE
<u>INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016</u>**

I, L. Patrick Hassey, make this Declaration under 28 U.S.C. § 1746 and state the

following under penalty of perjury:

1.      I am a member of the board of directors of Alpha Natural Resources, Inc.

(the "<u>Board</u>") and certain of its direct and indirect subsidiaries, as debtors and debtors in

possession (collectively, the "<u>Debtors</u>").  I have held this position for more than three years.

I am also chairman of the Debtors' compensation committee (the "<u>Compensation Committee</u>")

and a member of the Debtors' audit committee.  I also currently serve as a member of the board

of directors and chairman of the compensation committee of Ryder System, Inc. and a member

of the board of directors of Kaiser Aluminum Corporation.  I previously served as chairman and

chief executive officer of Allegheny Technologies Incorporated and as executive vice president

and a member of the corporate executive committee of Alcoa Incorporated.

2.      I submit this Declaration in support of the *Motion of the Debtors for Entry*

*of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and*

*(II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016*

(the "Motion").

3.      Capitalized terms not otherwise defined herein have the meanings given to
them in the Motion.

4.      Except as otherwise indicated, all statements in this Declaration are based
on my personal experience and knowledge, my discussions with responsible management and
professionals of the Debtors and/or my review of relevant documents.  If called to testify, I could
and would testify to each of the facts set forth herein based on such personal knowledge,
discussions and/or review of documents.  I am authorized to submit this Declaration on behalf of
the Debtors.

**A.      The Role and Composition of the Compensation Committee**

5.      The Compensation Committee currently consists of three members,
including myself.  The Board has determined that all current members of the Compensation
Committee are independent within the meaning of the rules of the New York Stock Exchange.
The Compensation Committee generally is responsible for assisting the Board in all matters
relating to the compensation of the Debtors' directors and executive officers and overseeing their
compliance with legal and regulatory requirements as they relate to matters of compensation.
Among other things, the Compensation Committee is responsible for:  (a) reviewing and
approving the Debtors' executive compensation policies and practices, as well as the corporate
goals and objectives relevant to the compensation of the Debtors' chief executive officer;
(b) reviewing and approving the compensation, including salary, bonuses and benefits, paid to
the Debtors' chief executive officer, other executive officers and directors (including any
employment agreements or similar arrangements), and recommending ratification, in the case of
the Debtors' chief executive officer's compensation, to the independent members of the Board;

(c) evaluating the independence of any advisors retained by the Compensation Committee as

required by law or rule and/or by other criteria as determined by the Compensation Committee;

and (d) reviewing and making recommendations to the Board with respect to cash incentive

compensation plans and equity-based plans, and administering the plans.

**B.     The Compensation Committee's Engagement
         of Meridian Compensation Partners, LLC**

          6.     The Compensation Committee has the authority to engage the services of

outside advisors and, since August 2012, the Compensation Committee has retained Meridian

Compensation Partners, LLC ("Meridian") to provide independent advice to the Compensation

Committee in connection with matters pertaining to the Debtors' executive and director

compensation programs including, without limitation:  (a) reviewing the Debtors' peer group for

benchmarking purposes with respect to compensation and performance; (b) conducting a

competitive assessment of each executive's total direct compensation (e.g., base salary, annual

and long term incentives); (c) presenting trends reports on executive and director compensation

design development and keeping the Compensation Committee apprised of regulatory changes

and other developments related to executive and director compensation; (d) advising the

Compensation Committee regarding annual and long-term incentive plan design; (e) conducting

a competitive assessment of non-employee director compensation; and (f) assisting with the

preparation of proxy disclosures.  To maintain Meridian's independence from management,

Meridian has not provided any services to the Debtors, other than services provided to the

Compensation Committee on executive and director compensation matters.  Meridian's

consultants report directly to the Compensation Committee and, with the consent of the

Compensation Committee, coordinate and gather information with which to advise the

Compensation Committee from members of management and human resources personnel.  Prior

to retaining Meridian and on an annual basis thereafter, the Compensation Committee has

reviewed Meridian's independence and has found each year that Meridian and its consultants

remain independent of management, and that the services provided by Meridian to the

Compensation Committee have not given rise to any conflict of interest.

**C.      The Importance of the KEIP Participants to the Debtors' Businesses**

7.      The Debtors' senior management is critical to the completion of all

business functions required by the chapter 11 process.  Senior management has worked tirelessly

both prior to and since the commencement of these chapter 11 cases to maximize the value of the

Debtors' estates for the benefit of their creditors.  These efforts include, to the best of my

knowledge, in addition to running the day-to-day operations of the Debtors:  (a) innumerable

meetings with creditor constituencies and their advisors; (b) months of work on an in-depth,

top-down, bottom-up review of the Debtors' operations as part of a comprehensive effort to

restructure the Debtors' businesses; and (c) the development, and initial implementation of

elements of, a value enhancement plan to improve the immediate and long-term liquidity of the

Debtors.  At the same time:  (a) substantial portions of senior management's compensation,

which was provided in the form of the Debtors' equity, diminished significantly; (b) actual

compensation earned by senior management in prior years in the form of deferred compensation

is now relegated to general unsecured claim status; (c) existing retention agreements that had

been put in place long before the filing of these cases were no longer viable; (d) the Debtors'

senior managers justifiably perceive uncertainty with respect to their potential continued

employment with the Debtors; and (e) the pressure on senior management of maintaining and

preserving the Debtors' businesses in the face of the well documented industry challenges and

regulatory demands only continues to increase.  For certain of the Debtors' senior management, these pressures have proven too much, and they have left the Debtors.[1]

8.      In light of the foregoing, the Compensation Committee recognizes the need to provide incentives to senior management in order to maximize the value of the Debtors' estates.  Accordingly, since prior to the Petition Date, the Compensation Committee has been working with Jones Day, Rothschild, McKinsey and Meridian to develop a KEIP for those members of the Debtors' senior management who are prohibited by the Bankruptcy Code from participating in key employee retention plans.  The development and pursuit of the KEIP has been delayed by, among other things, the continuing declines in the coal industry, which have made structural aspects of the plan a continuously moving target.  The Debtors have now completed their initial business plan, taking into account the deterioration in the market since August, and believe that they can no longer delay the establishment of a KEIP (and payment under the 2015 AIB (as defined below)) without risking a diminution in creditor recoveries. I believe that the KEIP, as well as the approval of payments, if any, that come due under the 2015 AIB, is fair and will motivate the Debtors' senior management to continue to work hard to achieve the best outcome for these chapter 11 cases.

9.      I believe that the 17 KEIP Participants selected for participation in the KEIP will pay an indispensable role in the operation and restructuring of the Debtors' businesses during these chapter 11 cases and should be incented to maximize the value achieved. The Executive Insiders are the current named executive officers of Debtor ANR and the membership of the Debtors' senior management committee.  In addition, the Non-Executive

---

[1]      Senior managers who have departed since the Petition Date include, for example:  (a) the Chief Commercial Officer; (b) the Vice President of Investor Relations; (c) the Vice President of Total Risk Management; and (d) the General Manager of Kentucky Operations.  These losses were on top of significant prepetition departures.

Insiders are senior managers of the Debtors who perform a variety of critical functions with

regard to the generation of revenue to and the operation of the Debtors' businesses, including

domestic and international sales management, operational management, real property

management and legal counsel.  These specific skills, along with the KEIP Participants'

familiarity and understanding of the operations, customer and supplier relationships and

infrastructure of the Debtors' operations are vital, not only to the day to-day operation of their

businesses, but also to the ability of the Debtors to effectuate a successful restructuring.

          10.     The KEIP Participants have been deeply involved in the development of

the Debtors' restructuring strategy in addition to their important responsibilities maintaining key

areas of the Debtors' operations.  Leading up to and during these chapter 11 cases, the KEIP

Participants have had to devote significant time to various critical and exigent matters in addition

to the normal affairs attendant to the day-to-day operation of the Debtors' businesses.  These

matters have included, among other things:  (a) responding to customer, supplier, creditor and

employee inquiries about the Debtors' commencement of these cases; (b) negotiations with and

responses to due diligence and meeting requests from significant creditor constituencies,

including, among others, the Creditors' Committee and the DIP Agent, and each of their

respective legal and financial advisors; (c) the preparation, negotiation and, in some cases,

litigation of various of the "first day" and "second day" pleadings filed in these chapter 11 cases;

and (d) the ongoing development of the Debtors' restructuring strategy and business plan.  The

Debtors have required, and I believe that they will continue to require, extraordinary efforts from

each of the KEIP Participants to implement a successful restructuring and to maximize the value

of their estates.  The absence of incentives for the KEIP Participants to successfully implement

the Debtors' restructuring and enhance value at this critical time likely would severely impact

Case 15-33896-KRH    Doc 1038    Filed 12/03/15    Entered 12/03/15 23:39:45    Desc Main
Document    Page 44 of 75

these chapter 11 cases, potentially resulting in significant losses to the Debtors' estates and their stakeholders.

**D.      The Historical Compensation of the KEIP Participants**

11.      Historically, the KEIP Participants have received three principal forms of direct compensation:  (a) base salary (including in the form of deferred compensation); (b) cash bonus awards; and (c) equity incentive awards (collectively, with the value of equity incentive awards measured as of their grant date, "Total Direct Compensation").[2]  This compensation program was designed to support the Debtors' performance and retention objectives, and the compensation earned under certain components varied significantly based upon the Debtors' performance.

12.      The KEIP Participants historically have received cash bonus awards in the form of:  (a) AIB payments, which are variable based on the achievement of annual financial, safety and strategic objectives; and (b) retention payments, which are variable or fixed amounts paid over time to certain KEIP Participants, if they continue to be employed with the Debtors on the applicable payment dates.

*The 2015 AIB and OSEB Programs*

13.      The Debtors monitor compensation practices in the coal industry.  As a result, I am aware that programs like the AIB and OSEB are common and necessary throughout the industry as a means of incenting employees.  The Debtors have maintained the AIB for at least 11 years, and the Debtors' senior executives (currently, the Executive Insiders) have participated in the AIB since its inception.  The AIB provides annual cash incentives for eligible

---

[2]      Total Direct Compensation does not include other forms of compensation and benefits that KEIP Participants and other employees receive, which are set forth in greater detail in Wage & Benefit Motion.

employees to reward performance against critical goals.  Each year, the Compensation

Committee approves financial and operational goals for the AIB and confirms final performance

achievement and the applicable payment entitlement.  For 2015, the Compensation Committee

approved a mix of performance metrics for the 2015 AIB based upon the following six factors:

    (a)    <u>Profitability</u> (40% of entitlement) calculated with respect to Adjusted EBITDA;[3]

    (b)    <u>Expense Reduction</u> (25% of entitlement) calculated as the sum of the Debtors' 2015 (i) overhead and (ii) selling, general and administrative expense reductions excluding the effect of the AIB Adjustments;

    (c)    <u>Liquidity</u> (10% of entitlement) calculated as cash plus marketable securities plus undrawn availability under the Debtors' prepetition revolving credit facility and accounts receivable facility, less letters of credit issued against such facilities, as of December 31, 2015 compared against the 2015 budgeted amount, excluding the effect of the Extraordinary Items;

    (d)    <u>Gross Debt Reduction</u> (10% of entitlement) calculated as reduction in gross debt balance from January 1, 2015 to December 31, 2015, excluding charges in other debt and debt discount;

    (e)    <u>Safety</u> (7.5% of entitlement) divided equally between targets based upon (i) the Total Reportable Incident Rate and (ii) Non-Fatal Days Lost ("<u>NFDLs</u>"), which are standards established by the Mine Safety and Health Administration and are widely used by coal companies to judge their safety performance; and

    (f)    <u>Environmental</u> (7.5% of entitlement) calculated as the number of 2015 water quality exceedances divided by the number of 2015

---

[3]    For purposes of the AIB, Adjusted EBITDA generally is calculated as follows:  income from continuing operations plus interest expense, income tax expense, depreciation, depletion and amortization and amortization of acquired intangibles, less interest income and income tax benefit, excluding the effect of the following (collectively, the "<u>AIB Adjustments</u>"): (a) certain unbudgeted/unfunded litigation or claim judgments and associated fees, civil penalties or settlements; (b) costs, revenue and gains associated with future and completed business combinations, dispositions, reorganizations and/or restructuring programs; (c) unbudgeted/unfunded settlement, business optimization charges and pension funding payments; and (d) certain extraordinary, unusual, infrequent or non-recurring items not encompassed in (a), (b) or (c).

active National Pollutant Discharge Elimination System outlets, multiplied by 100.[4]

14.     Historically, approximately 1,700 of the Debtors' most senior salaried exempt employees have been eligible to receive AIB awards.  Beginning July 1, 2015, however, the Debtors (a) replaced the AIB with the OSEB for approximately 1,200 of these employees and (b) implemented the OSEB for approximately 5,200 non-union employees that are not eligible for the AIB.[5]  The OSEB was developed over a period of eight months to promote excellence in the critical operational areas of safety and environmental compliance.  As such, the OSEB provides eligible Employees with a quarterly bonus, calculated on a site-specific basis, with reference to the same safety and environmental metrics as the AIB.

15.     The Debtors are in the process of developing the AIB and OSEB goals and metrics for the 2016 plan year, which will align with certain aspects of those programs and with certain of the metrics included in the KEIP.  Upon approval of the KEIP, however, KEIP Participants will not participate in either the 2016 AIB or OSEB.

*The Equity Incentive Awards*

16.     In prior years, a significant portion of the Total Direct Compensation provided to the KEIP Participants has taken the form of equity incentive awards.  In 2014, on average approximately 46% of the Total Direct Compensation of Executive Insiders was in the

---

[4]     For employees working out of the Debtors' principal operating locations, performance under the safety and environmental metrics generally is measured by the applicable Debtors' performance at that location. For employees not based out of operating locations, including all employees working at the Debtors' Bristol, Virginia headquarters, performance under the safety and environmental metrics is calculated globally across all locations.

[5]     The Debtors' approximately 725 union employees as of the date of this Motion are compensated pursuant to the terms of applicable collective bargaining agreements.

form of equity incentive awards,[6] and for certain Executive Insiders as much 69% of their Total

Direct Compensation was in the form of equity incentive awards.  For the Non-Executive

Insiders, in 2014, on average approximately 35% of their Total Direct Compensation was in the

form of equity incentive awards.

17.     As a consequence of the Debtors' recent financial difficulties and

precipitous decline in the value of the stock of ANR, however, (a) past equity incentive awards

that were still held by the KEIP Participants have lost substantially all of their value – resulting

in an average decrease in Total Direct Compensation previously awarded to the KEIP

Participants of approximately 39% – and (b) the grant of equity incentive awards during these

chapter 11 cases likely would result in no value to the KEIP Participants.

**E.      A Sound Business Purpose Exists for the KEIP, Which is
         Justified by the Facts and Circumstances of These Chapter 11 Cases**

18.     The Debtors designed the KEIP – the terms of which are more fully

described in the Romanchek Declaration filed contemporaneously herewith – with the assistance

of Meridian and in coordination with counsel and the Debtors' other professionals.  The KEIP is

designed to incent the KEIP Participants to achieve performance goals that are critical to the

interests of the Debtors and all stakeholders.  In particular:  (a) the Value Enhancement Plan

incents the KEIP Participants to achieve critical levels of cost savings and thereby maximize the

value of the Debtors' estates for the benefit of all stakeholders; (b) the Liquidity Metric incents

the KEIP Participants to achieve specified levels of adjusted ending book cash at the conclusion

of each Performance Period; and (c) the Safety/Environmental Metric incents the KEIP

---

[6]      These awards consisted of:  (a) performance share units, which vested either based upon (i) the Debtors'
total stockholder return relative to its compensation peer group over a three-year period or (ii) a one-year
operating cash flow goal; and (b) restricted stock units, which vest based upon the applicable employee's
continued service with the Debtors, generally over a three-year period.

Participants to adhere to high safety and environmental standards during each Performance

Period.  In each case, the KEIP Participants must achieve one or more specific goals within a

specified time frame to be entitled to receive a payment under the KEIP, and the size of such

incentive payments generally is directly correlated with the amount by which employees are able

to exceed the baseline achievement targets that have been established.

19.     Based upon advice received from Meridian, I believe that the aggregate

cost (i.e., $7.4 million) of the KEIP if target performance goals are achieved is reasonable in

light of the size of the Debtors and the potential benefit to the Debtors' estates because, for

example, the on-target total incentive payments under the KEIP represent only 0.073% of the

book value of the Debtors' assets, which, I am informed by Meridian, is approximately equal to

the median cost of comparable plans approved in other bankruptcy cases.

20.     In addition, I believe that the KEIP is fair and reasonable in that it applies

to the 17 KEIP Participants, who are the employees most responsible for overseeing the Debtors'

operations and are most directly involved in the efforts to expeditiously complete a restructuring

of the Debtors' obligations.

21.     Based on the analysis provided by Meridian and more fully described in

the Romanchek Declaration, I believe that the key terms of the KEIP and the overall cost of the

KEIP, including (a) the number of participants, (b) the number and duration of performance

periods, (c) the types of performance metrics, (d) the target payout opportunity as a percentage of

participants' base salaries; (e) the range of payout opportunities as a percentage of the target

payout opportunity; (f) the payout timing; and (g) the cost of the program as a percentage of

prepetition assets are consistent with industry standards.

22.     I believe that the KEIP is an efficient means to incent the KEIP

Participants to achieve the goals that are critical to the successful restructuring of the Debtors'

obligations and the maximization of the value of the Debtors' estates.

I, the undersigned, declare under penalty of perjury that the foregoing is true and

correct.

Executed on December 3, 2015          By:   /s/  L. Patrick Hassey
                                             L. Patrick Hassey

# **EXHIBIT C**

Romanchek Declaration

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ROBERT ROMANCHEK
IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF
AN ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL
INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE
<u>INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016</u>**

I, Robert Romanchek, make this Declaration under 28 U.S.C. § 1746 and state the following under penalty of perjury:

1.      I am a partner and executive committee member with Meridian Compensation Partners, LLC ("<u>Meridian</u>"), a consulting firm that is serving as independent compensation consultant to Alpha Natural Resources, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>").

2.      I submit this Declaration in support of the *Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (the "<u>Motion</u>").

3.      Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with responsible management and

professionals of the Debtors and/or my review of relevant documents.  If called to testify, I could

and would testify to each of the facts set forth herein based on such personal knowledge,

discussions and/or review of documents.  I am authorized to submit this Declaration on behalf of

Meridian.

<u>**Qualifications**</u>

5.      I am an expert in executive compensation matters with over 28 years of

experience in the field.  I have familiarized myself with the Debtors, gathered relevant market

data on incentive plans in chapter 11 cases and analyzed whether the Debtors' proposed key

employee incentive program (the "<u>KEIP</u>") is consistent with typical market practice.

6.      I received my bachelor's degree in accounting and economics from

Elmhurst College, my masters degree in business administration from DePaul University College

of Commerce and my juris doctorate from DePaul University College of Law.  I am a licensed

attorney, a Certified Public Accountant and a Certified Executive Compensation Professional.

7.      My curriculum vitae, which includes a list of my publications and

speeches during the past three years, is attached hereto as <u>Appendix 1</u>.

8.      Meridian provides executive compensation consulting and corporate

governance services to over 300 major publicly traded and privately held corporations across all

industries.  My responsibilities at Meridian primarily have involved consulting with corporate

clients, specifically with regard to executive compensation.  I have led numerous client

engagements, frequently present at board and compensation committee meetings and have

lectured extensively on executive compensation matters for such organizations as the National

Association of Corporate Directors, Corporate Board Member and various state bar associations

and industry groups.  I have participated in the analysis, development and/or design of well over

100 management incentive plans for companies inside and outside of chapter 11.

## The Debtors' Engagement of Meridian

9.      Since August 2012, the Debtors' compensation committee

(the "Compensation Committee") has retained Meridian to provide independent advice to the

Compensation Committee in connection with matters pertaining to the Debtors' executive and

director compensation programs including, without limitation:  (a) reviewing the Debtors' peer

group for benchmarking purposes with respect to compensation and performance; (b) conducting

a competitive assessment of each executive's total direct compensation (e.g., base salary, annual

and long term incentives); (c) presenting trends reports on executive and director compensation

design development and keeping the Compensation Committee apprised of regulatory changes

and other developments related to executive and director compensation; (d) advising the

Compensation Committee regarding annual and long-term incentive plan design; (e) conducting

a competitive assessment of non-employee director compensation; and (f) assisting with the

preparation of proxy disclosures.  To maintain Meridian's independence from management,

Meridian has not provided any services to the Debtors, other than services provided to the

Compensation Committee on executive and director compensation matters.  Meridian's

consultants report directly to the Compensation Committee and, with the consent of the

Compensation Committee, coordinate and gather information with which to advise the

Compensation Committee from members of management and human resources personnel.  Prior

to retaining Meridian and on an annual basis thereafter, the Compensation Committee has

reviewed Meridian's independence and has found each year that Meridian and its consultants

remain independent of management, and that the services provided by Meridian to the

Compensation Committee have not given rise to any conflict of interest.

## The Proposed Terms of the KEIP

### A.    The Development and Overview of the KEIP

10.    With the assistance of Meridian, and in coordination with counsel and the Debtors' other professionals, the Debtors designed the KEIP to incent senior management employees to meet and exceed certain operational goals that will be critical to the success of the Debtors' restructuring.  Attached hereto as Appendix 2 is a schedule identifying the senior management employees who are covered by the KEIP (collectively, the "KEIP Participants"), their titles, salaries and threshold, target and maximum incentive award opportunity under the terms of the proposed KEIP (the "KEIP Schedule").[1]

11.    The KEIP is comprised of two consecutive three-month performance periods, with the first performance period starting on January 1, 2016.  Each KEIP Participant is assigned a target incentive opportunity expressed as a percentage of the KEIP Participant's base salary (for a detailed discussion on each KEIP Participant's target payout opportunity see attached KEIP Schedule).  If target performance goals are achieved across all performance metrics for a performance period, then each KEIP Participant will earn a target payout for that performance period.  The KEIP also provides for lesser payouts if lower threshold performance goals are achieved and greater payouts if maximum performance goals are achieved.  However, if no threshold performance goals are achieved across all metrics for a given performance period, then no incentive awards would be earned and paid to KEIP Participants for such performance period.

---

[1]    Contemporaneously herewith, the Debtors have filed a motion seeking authorization to file the KEIP Schedule under seal.  I understand that the Debtors intend to share the KEIP Schedule with counsel to the Creditors' Committee, the U.S. Trustee, the DIP Agent and the *ad hoc* committee of second lien noteholders on condition that they maintain the confidentiality of the KEIP Schedule.

12.    The performance goals under the KEIP relate to the following three

performance metrics:  (a) an annualized savings metric (the "Value Enhancement Plan"); (b) a

liquidity metric (the "Liquidity Metric"); and (c) a safety and environmental compliance metric

(the "Safety/Environmental Metric").

**B.    The Term and Cost of the KEIP**

13.    The KEIP constitutes each of the KEIP Participants' sole incentive

program for the 2016 calendar year.  Performances under the KEIP will be measured as of the

end of each of the first two calendar quarters of 2016, and any award payments will be made in

up to three installments, as more fully described below.  Each KEIP Participant's target incentive

award opportunity is divided equally between two performance periods:  (a) the first

performance period begins on January 1, 2016 and ends on March 31, 2016 (the "First

Performance Period") and (b) the second performance period begins on April 1, 2016 and ends

on June 30, 2016 (the "Second Performance Period" and, together with the First Performance

Period, the "Performance Periods").  Incentive award determinations will be made at the

conclusion of each Performance Period, with any earned incentive award paid in accordance with

the following schedule:  (a) one-third of any earned incentive award to be paid within 30 days

following the conclusion of each applicable Performance Period; (b) one-third of any earned

incentive award to be paid on September 30, 2016 or, if earlier, the date of a confirmed chapter

11 plan; and (c) the remaining one-third of any earned incentive award to be paid upon

confirmation of a chapter 11 plan; provided, however, that such final third of any earned

incentive award will be forfeited unless the Court has confirmed a chapter 11 plan with respect to

the Debtors by December 31, 2016.  To receive any earned incentive award, a KEIP Participant

must be employed with the Debtors up to and including the date of payment pursuant to the

foregoing schedule, except if the KEIP Participant's employment is terminated without cause

prior to a payment date (see paragraph 20 below for discussion of the effect of a termination of employment without cause).

14.     Under the proposed KEIP, if target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 100% of the KEIP Participant's target incentive award opportunity. If threshold target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 50% of the KEIP Participant's target incentive opportunity.  If maximum target performance goals are met across all performance metrics for an applicable Performance Period, each KEIP Participant will earn an incentive award equal to 200% of the KEIP Participant's target incentive opportunity. Payout amounts will be interpolated for performance between threshold and target and between target and maximum on a straight-line basis.  The payout opportunities are set forth in the KEIP Schedule.  The aggregate cost of the KEIP to the Debtors will be approximately $7.4 million if target performance goals are achieved across all metrics for both Performance Periods.  The cost of the KEIP may surpass this amount only if achieved performances exceed target performances with the maximum aggregate cost at $14.8 million if achieved performance meets or exceeds maximum performance goals across all metrics for both Performance Periods.

15.     The aggregate cost (i.e., $7.4 million) of the KEIP if target performance goals are achieved represents 0.073% of the book value of the Debtors' assets, which is approximately equal to the median cost of comparable plans approved in other bankruptcy cases.

## C.     The KEIP Metrics and Performance Goals

### The Value Enhancement Plan

16.     The Value Enhancement Plan metric incents KEIP Participants to achieve critical levels of cost savings and thereby maximize the value of the Debtors' estates for the

benefit of stakeholders.  Specifically, the Value Enhancement Plan metric relates to annualized

savings realized through executed initiatives.  The target performance goals with respect to the

Value Enhancement Plan metric are:  (a) $50 million on an annualized basis, with respect to the

First Performance Period; and (b) $75 million on an annualized basis, with respect to the Second

Performance Period.  The Value Enhancement Plan metric has been assigned a weight of 15%

for each Performance Period.  This means that KEIP Participants will receive:  (a) 15% of their

target incentive opportunity if target performance goal is achieved for a Performance Period

(i.e., aggregate cost per Performance Period of approximately $1.11 million at target

performance); (b) 7.5% of their target incentive opportunity if threshold performance goal is

achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately

$0.55 million at threshold performance); and (c) 30% of their target incentive opportunity if

maximum performance goals are achieved for a Performance Period (i.e., aggregate cost per

Performance Period of approximately $2.22 million at maximum performance).  This

performance metric maximum total cost over both Performance Periods to the Debtors is

approximately $4.44 million.

*The Liquidity Metric*

17.    The Liquidity Metric incents KEIP Participants to achieve specified levels

of adjusted ending book cash at the conclusion of each Performance Period, as measured by the

Debtors' 13-week cash forecast.  The target performance goals with respect to the Liquidity

Metric are:  (a) $850 million, with respect to the First Performance Period; and (b) $775 million,

with respect to the Second Performance Period.  The Liquidity metric has been assigned a weight

of 27.5% for each Performance Period.  This means that KEIP Participants will receive:  (a) 27.5%

of their target incentive opportunity if target performance goal is achieved for a Performance

Period (i.e., an aggregate cost per Performance Period of approximately $2.0 million at target

performance); (b) 13.75% of their target incentive opportunity if threshold performance goal is achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $1.0 million at threshold performance); and (c) 55% of their target incentive opportunity if maximum performance goals are achieved for a Performance Period (i.e., aggregate cost per Performance Period of approximately $4.1 million at maximum performance). This performance metric maximum total cost over both Performance Periods to the Debtors is approximately $8.14 million.

*The Safety/Environmental Metric*

18.    The Safety/Environmental Metric incents KEIP Participants to adhere to high safety and environmental standards during each Performance Period. With respect to the safety metric, the target performance goal is less than 2.42 non-fatal days lost ("NFDLs") for each Performance Period. The Debtors' actual NFDL performance through September 30, 2015 was 3.28, which is above (i.e., worse than) the proposed target and threshold goals. Under the environmental metric, the target performance goal is an annualized ratio[2] (the "EC Ratio") of "Water Quality Exceedances" to the number of active "NPDES Outlets" of less than 20.0 for each Performance Period.[3] The Debtors' annualized EC Ratio based on actual results through September 30, 2015 was 23.97, which is above (i.e., worse than) the proposed threshold and target performance goals.

---

[2]    Annualization is achieved by multiplying the applicable ratio as of the end of each Performance Period by a specified factor (the "Annualization Factor"), which is based upon historical seasonality. Under the KEIP, the Annualization Factor for the First Performance Period is 2.95, and the Annualization Factor for the Second Performance Period is 1.77. The resulting ratio is then multiplied by 100 for convenience.

[3]    "NPDES Outlets" are water discharge points permitted by the National Pollutant Discharge Elimination System (the "NPDES"). The NPDES was established under the Clean Water Act and provides monitoring and compliance requirements with respect to discharges from permitted sites. "Water Quality Exceedances" refers to any result greater than an effluent limit for any parameter set forth in an NPDES permit as determined by a Discharge Monitoring Report ("DMR") Sample or any failure to attain a minimum limitation set forth in an NPDES permit as determined by a DMR Sample.

19.      The Safety/Environmental metric has been assigned a weight of 7.5% for each Performance Period, split evenly between the safety and environmental metrics. This means that each KEIP Participant will receive:  (a) 7.5% of their target incentive opportunity if target performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $0.555 million at target performance); (b) 3.75% of their target incentive opportunity if threshold performance goals are achieved for both the safety and environmental metrics for a Performance Period (i.e., resulting in an aggregate cost per Performance Period of approximately $0.278 million at threshold performance); and (c) 15% of their target incentive opportunity if maximum performance goals are achieved for both the safety and environmental metrics for a Performance Period (resulting in an aggregate cost per Performance Period of approximately $1.11 million at maximum performance).  The maximum total cost over both Performance Periods to the Debtors under the Safety/Environmental Metric is approximately $2.22 million.

20.    The following chart summarizes the terms of the proposed KEIP.

| METRIC | WEIGHT | AGGREGATE TARGET PERFORMANCE OPPORTUNITY | PERFORMANCE PERIOD | PERFORMANCE GOALS | | PAYOUT (AS A PERCENT OF TARGET OPPORTUNITY) |
|---|---|---|---|---|---|---|
| Value Enhancement Plan | 15.00% | $1.110 million | First Performance Period | Threshold | $42 million | 50% |
| | | | | Target | $50 million | 100% |
| | | | | Maximum | $55 million+ | 200% |
| | 15.00% | $1.110 million | Second Performance Period | Threshold | $64 million | 50% |
| | | | | Target | $75 million | 100% |
| | | | | Maximum | $82 million+ | 200% |
| Liquidity Metric | 27.50% | $2.035 million | First Performance Period | Threshold | $750 million | 50% |
| | | | | Target | $850 million | 100% |
| | | | | Maximum | $900 million+ | 200% |
| | 27.50% | $2.035 million | Second Performance Period | Threshold | $675 million | 50% |
| | | | | Target | $775 million | 100% |
| | | | | Maximum | $800 million+ | 200% |
| Safety Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | First Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Safety Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 2.78 | 50% |
| | | | | Target | 2.42 | 100% |
| | | | | Maximum | 2.18 or less | 200% |
| Environmental Metric | 3.75% | $0.278 million | Second Performance Period | Threshold | 23.0 | 50% |
| | | | | Target | 20.0 | 100% |
| | | | | Maximum | 18.0 or less | 200% |
| Total | 100% | $7.402 million | | | | |

**D.    Vesting and Payment of Awards and Adjustment of Performance Targets**

21.    The Debtors will adjust performance goals to reflect the effect of any

material asset sale or other financing-related transactions to neutralize the impact of such

transactions.  Upon the occurrence of (a) confirmation of a chapter 11 plan; (b) sale of

substantially all (more than 70%) of the Debtors' assets, as measured by revenues or EBITDA; or

(c) any change of control transaction, including a transaction involving a credit bid for more than

50% of the Debtors' assets on the basis of revenues or EBITDA (each, a "Restructuring

Transaction"), each KEIP Participant shall be paid an incentive award within 30 days following

the date of a Restructuring Transaction in amount equal to the KEIP Participant's target incentive opportunity with respect to each Performance Period that is outstanding on the date of such Restructuring Transaction.  Any KEIP Participant who is terminated without cause will remain eligible to receive payments in the normal course under the KEIP based on actual performance. Any KEIP Participant who is terminated for cause will forfeit any entitlement to any incentive award payout under the KEIP.

**Meridian's Analysis of the KEIP**

**A.      Meridian's Analysis of the KEIP**

22.     As part of Meridian's engagement, Meridian performed an independent market comparison analysis of the Debtors' KEIP.  Meridian compared the Debtors' KEIP against similar incentive programs (collectively, the "Incentive Programs") of 20 debtor companies ("Peer Companies") (a list of Peer Companies is attached hereto as Appendix 3) that, like the Debtors, (a) had prepetition assets of over $500 million and (b) were involved in manufacturing or other complex asset-intensive businesses.  Meridian specifically excluded from consideration debtor companies in industries dissimilar to that of the Debtors, such as companies in the retail and financial services industries.[4]

23.     Meridian evaluated the following key aspects (to the extent disclosed in court filings) of the key employee incentive programs maintained by the Peer Companies: (a) the number of participants; (b) the number and duration of performance periods; (c) the types of performance metrics; (d) the target payout opportunity as a percentage of participants' base salaries; (e) the range of payout opportunities as a percentage of the target payout opportunity;

---

[4]      Meridian's analysis did not take into account the recent precipitous decline and unprecedented circumstances in the coal industry that may provide a greater justification for the KEIP than the Incentive Programs of the other Peer Companies.

(f) the payout timing; and (g) the cost of the program as a percentage of prepetition assets.

A chart (the "Comparison Chart") summarizing Meridian's analysis of the terms of the Peer

Companies' key employee incentive programs in comparison to the KEIP is attached hereto as

Appendix 4.

       24.     As a result of Meridian's comparative analysis, I have determined that the

key terms of the KEIP and the overall cost of the KEIP are consistent with Peer Company

practice.  In particular, the Debtors propose that the KEIP cover 17 KEIP Participants, which is

slightly over the median number (i.e., 15) of participants in the Peer Companies' Incentive

Programs.  In addition, the two consecutive three-month performance periods proposed in the

KEIP, although a minority practice among Peer Companies, reflect the Debtors' interest of

incenting KEIP Participants to accomplish short-term goals to quickly shore-up the Debtors'

declining financial condition.  Therefore, I believe the relatively short performance periods are

appropriate under the circumstances.  Moreover, the types of performance metrics that the

Debtors propose to employ in the KEIP, cost savings, liquidity and safety and environmental, are

common among the Peer Companies' programs.  Additionally, the Debtors' proposed weighting

of the performance metrics, with particular emphasis on the financial metrics (i.e., 85%

weighting being assigned to the cost savings and liquidity metrics) is consistent with Peer

Company programs.

       25.     Under the proposed KEIP, each KEIP Participant's payout opportunities

relate to performance achieved over two consecutive three-month performance periods,

However, the KEIP, overall, has been structured to cover a twelve-month period because

one-third of earned incentive awards are not paid until December 31, 2016.  Further, the Debtors

specifically have expressed their intent not to seek approval of a KEIP for any period after

June 30, 2016.  Given this design of the KEIP, I believe that each KEIP Participant's target

payout opportunity (expressed as a percentage of salary) falls within Peer Company practices.

In addition, each KEIP Participant's range of payout opportunities (i.e., from 50% to 200% of

target opportunity based on achieved performance) falls within Peer Company practices.

Although the maximum payout opportunity (i.e., 200% of target) is somewhat higher than

median market practice, it is not excessive relative to the range of Peer Company practices.

Earned incentive awards under the KEIP are paid over three equal installments, with the initial

installment being made 30 days after the end of each applicable performance period, is consistent

with the practices of Peer Companies.  Moreover, the deferral of earned incentive awards, the

potential forfeiture of one-third of earned incentive awards and the acceleration of payment of

deferred incentive awards may encourage KEIP Participants to effectively manage the Debtors'

financial condition following the Performance Periods and to obtain a confirmed chapter 11 plan

as quickly as possible.  Finally, the cost of the proposed KEIP (based on payouts at target)

relative to the Debtors' prepetition assets is slightly below the median of the Peer Companies.

      26.      Accordingly, Meridian has found by its independent analysis that the key

terms and cost of the proposed KEIP is consistent with Peer Companies' practices.

      I, the undersigned, declare under penalty of perjury that the foregoing is true and

correct.

Executed on December 3, 2015      By:  /s/  Robert Romanchek           
                              Robert Romanchek

## APPENDIX 1

### Curriculum Vitae

Robert Romanchek, Partner, Senior Consultant and Meridian Executive Committee Member, has more than 28 years of experience in consulting on executive compensation matters and has advised Compensation Committees and executive management at a significant number of large-, mid- and small-cap companies, both public and private.

Bob leads numerous client engagements and provides expert consulting advice on issues relating to executive compensation including, but not limited to, equity and cash-based long-term incentive design and grant structure, short term incentive program design, employment contract design including change-in-control and severance provisions, supplemental retirement and deferred compensation program design and funding, responding to proxy advisory firms and proxy and CD&A disclosure.  Bob also consults on committee meeting process, overall executive compensation philosophy development, outside director pay, and capital structure change transactions including private equity buyouts, initial public offerings, divestiture and spinoffs, and bankruptcy confirmation and emergence.

Bob is a frequent presenter at board and compensation committee meetings, and has lectured extensively on executive compensation matters for such organizations as the National Association of Corporate Directors, the Corporate Board Member organization, and various state bar associations and industry groups.  Bob also has authored numerous articles and has been published in business periodicals such as the NACD Directorship magazine, the Corporate Board Member Board Governance Series, WorldatWork Journal, the International HR Journal, Benefits Quarterly, the Journal of Compensation and Benefits, CFO magazine, the Agenda, Insights and Board Room Reports.

Bob is an attorney and a Certified Public Accountant, and is a Certified Executive Compensation Professional. He is a graduate of the DePaul University College of Law, and also holds an M.B.A., cum laude, from the DePaul University College of Commerce. His undergraduate degree is in accounting and economics.

Below are articles and speeches Bob has given over the last three years.

## 2015

- *NACD Magazine Article*: Drafted an article published in the January/February 2015 NACD "Directorship" magazine entitled "What's a Compensation Committee to do Now?"

- *Corporate Board Member/NYSE Compensation Committee Boot Camp*: Led the Meridian team at this January 21, 2015 conference (co-sponsored by Equilar), held in Tampa, and was the moderator and panel participant on the topic of "Compensation and Regulation: Where Do We Go From Here?"

- *NACD Magazine Article*: Drafted an article, along with Jeff Keckley, published in the March/April 2015 NACD "Directorship" magazine entitled "Executive Pay Tally Sheets: A Best Practice."

- ***Corporate Board Member/NYSE Compensation Strategies Conference***: Led the Meridian team at this March 31, 2015 conference, held at the New York Stock Exchange, and was the moderator and panel participant on the topic of "Regulations Impact on Compensation: Now and in the Future."

- ***NASDAQ Taping***: Conducted our first taped interview with TK Kerstetter at the NASDAQ Exchange, on April 16, 2015, in New York, on the topic of "Is Your Compensation Committee Ready for What Lies Ahead?"

- ***Corporate Board Member/NYSE Taping***: Conducted this "Corporate Governance" interview on November 5, 2015, which was taped and will appear in the next issue of the Corporate Board Member/NYSE magazine, on the topic of "Pay Considerations When Hiring a New CEO From the Outside."

- ***NACD Magazine Article***: Drafted an article, along with Don Kalfen, to be published in the January/February 2016 NACD "Directorship" magazine entitled "Inducement Grants for New Hires: Saving Shares."

**2014**

- **Directory Advisory Article**: January/February 2014 issue; "*Director Independence: A Focus on Board Tenure*"

- **Corporate Board Member Insights**: January 2014 issue; "*Dodd-Frank's Pay Versus Performance Disclosure Requirement: What We Can Expect in Rule Timing and Content*"

- **Board Governance Taping**: March 2014; "Director Independence: The Impact of Long-Tenure"

- **Corporate Board Member Compensation Strategies to Build Shareholder Value Conference**: On April 8, 2014, held at the NYSE, Bob ran a panel discussion on the design of short- and long-term incentives, and a led breakout discussion.

- **Corporate Board Member Chairman & CEO Conference**: Bob was the lead at this April 9, 2014 conference held at the NYSE, and addressed the general session on outside director pay.

- **Director Professionalism**: June 9–10, 2014, Chicago. Bob was the lead for Meridian at this conference and led a general session presentation.

- **Corporate Board Member Boot Camp**: Bob was the lead at this Corporate Board Member outing in Chicago, on September 11, 2014. Bob prepared the materials, led a general session panel discussion and also led a breakout group session.

**2013**

- **Equilar Webinar:** In association with a Corporate Board Member seminar, Bob was the lead speaker at this June 10, 2013 webinar on executive compensation matters.

- **Corporate Board Member Boot Camp:** Bob was the lead at this Corporate Board Member conference in Miami, on January 24 and 25, 2013, and led a general session panel discussion on compensation committee issues, and also led a breakout group session.

- **NACD "Thought Leadership" Article:** Bob wrote an article entitled "A Plea to the SEC" on proxy plumbing that was published in the March 2013 edition of the NACD magazine.

- **Corporate Board Member Compensation Strategies to Build Shareholder Value Conference:** On April 9 and 10, 2013, Bob was the lead at this conference, held at the NYSE. He ran a panel discussion and lead two sessions on long-term incentives.

- **Corporate Board Member Chairman & CEO Conference:** Bob was the lead at this June 10 and 11, 2013 conference held at the NYSE, and addressed the general session on outside director compensation.

- **Corporate Board Member Annual Boardroom Summit:** Bob was the lead at this major Corporate Board Member conference (over 400 outside directors) on October 2–4, 2013, as the sole presenter at a breakout session.

- **Corporate Board Member Special Taping:** Appear as a guest on this special 20-minute videotaped interview occurred on November 6, 2013 at the NYSE, and will be the lead story (and video) in the Corporate Board Member electronic newsletter, to be sent out to all Corporate Board Member "subscribers" on November 14, 2013.

# **APPENDIX 2**

**KEIP Schedule**

**[FILED UNDER SEAL]**

# APPENDIX 3

## List of Peer Companies

| Company Name | Petition Date | Case # | Pre-Petition Assets | Industry |
|---|---|---|---|---|
| Accuride Corporation | 10/08/09 | 09-13449 | $808,550,000 | Manufacturing |
| Chemtura Corporation | 03/18/09 | 09-11233 | $3,064,000,000 | Chemical |
| Eastman Kodak Company | 01/19/12 | 12-10202 | $6,239,000,000 | Electronics |
| Edison Mission Energy | 12/17/12 | 12-49219 | $8,323,000,000 | Energy |
| Exide Technologies (2013) | 06/10/13 | 13-11482 | $2,194,986,000 | Manufacturing |
| James River Coal Company | 04/07/14 | 14-31848 | $1,204,121,000 | Mining |
| Lear Corporation | 07/07/09 | 09-14326 | $6,872,900,000 | Automotive |
| Mesa Air Group, Inc. | 01/05/10 | 10-10018 | $959,205,000 | Aviation |
| NewPage Corporation | 09/07/11 | 11-12804 | $3,512,000,000 | Packaging & Paper |
| NII Holdings, Inc. (2014) | 09/15/14 | 14-12611 | $8,679,954,000 | Telecommunications |
| Nortel Networks, Inc. | 01/14/09 | 09-10138 | $9,000,000,000 | Telecommunications |
| Patriot Coal Corporation (2012) | 07/09/12 | 12-51502 | $3,776,544,000 | Mining |
| Seahawk Drilling, Inc. | 02/11/11 | 11-20089 | $625,336,000 | Oil & Gas |
| Smurfit-Stone Container Corp. | 01/26/09 | 09-10235 | $7,400,000,000 | Paper Products |
| Spansion Inc. | 03/01/09 | 09-10690 | $3,815,645,000 | Manufacturing |
| TerreStar Networks Inc. (2010) | 10/19/10 | 10-15446 | $1,401,602,000 | Telecommunications |
| The Standard Register Company | 03/12/15 | 15-10541 | $500,000,000 | Business Services |
| TOUSA, Inc. | 01/29/08 | 08-10928 | $2,842,200,000 | Construction & Supplies |
| Tronox Incorporated | 01/12/09 | 09-10156 | $1,732,400,000 | Chemical |
| Visteon Corporation | 03/28/09 | 09-11786 | $5,248,000,000 | Automotive |

## APPENDIX 4

**Comparative Analysis of Proposed KEIP Against Debtor Peer Group (i.e., market practice)**

| Term | Proposed KEIP Specification | Market Practice | Meridian Observation of Proposed KEIP Against Market Practice |
|---|---|---|---|
| Participants By Title | ▪ 17 Proposed KEIP Participants<br>— Chief Executive Officer<br>— 4 Executive Vice Presidents<br>— 9 Senior Vice Presidents<br>— 2 Vice Presidents | ▪ Median: 5.5 Insiders<br>▪ Median: 15 Total Participants | ▪ The proposed KEIP total participation level slightly exceeds median.<br>▪ Given that none of the proposed KEIP Participants are eligible to participate in Debtors' KERP or 2016 AIB and that the participation level nominally exceeds median market levels, we believe the proposed KEIP participation level is appropriate under the circumstances. |
| Performance Periods | ▪ First performance period: 1/1/2016 through 3/30/2016<br>▪ Second performance period: 4/1/2016 through 6/30/2016 | ▪ 12-month performance period: 30% of Incentive Plans<br>▪ 6-month performance periods: 30% of Incentive Plans<br>▪ 3- and 4-month performance periods: 20% of Incentive Plans | ▪ There is limited precedent for performance periods of less than 6 months.<br>▪ However, due to the Debtors' rapidly changing (and generally financially adverse) circumstances, incenting management to accomplish short-term goals to quickly shore-up Debtors' financial position is in the best interests of the Debtors' estate and therefore, we believe is appropriate under the circumstances. |
| Performance Measures and Weights | ▪ Value Enhancement Plan (i.e., annualized cost savings) (30.0%)<br>▪ Liquidity (55.0%)<br>▪ Safety – NFDL (7.50%)<br>▪ Environmental – EC (7.50%) | ▪ EBITDA (or a variant of EBITDA): 55% of Incentive Plans<br>▪ Safety/Environmental: 25% of Incentive Plans<br>▪ Asset Sales: 20% of Incentive Plans<br>▪ Cost Reduction: 15% of Incentive Plans<br>▪ Liquidity: 10% of Incentive Plans<br>***Note***: The above statistics relate to prevalence of performance metric among peer group companies. | ▪ The proposed performance measures are consistent with market practice.<br>▪ The heavy weighting of financial measures (i.e., cost reduction and liquidity) is also consistent with market practice. |

| Term | Proposed KEIP Specification | Market Practice | Meridian Observation of Proposed KEIP Against Market Practice |
|---|---|---|---|
| Target Payout Opportunity (expressed as a percent of base salary) | # of Incumbents   Target Opportunity<br>1       175%<br>2       150%<br>6       125%<br>3       75%<br>5       60%<br><br>*See Appendix 2 for target payout opportunities by KEIP Participant* | • CEO target payout opportunity:<br>— Median: 153%<br>— Average: 207%<br>— Range: 70% to 453%<br>Note: Statistics are based on the 6 debtor peer companies that specifically identified CEO target payout opportunity.<br>• Other KEIP Participants[1]<br>— Highest Target Opportunity<br>  • Median: 115%<br>  • Average: 129%<br>  • Range: 55% to 243%<br>— Lowest Target Opportunity<br>  • Median: 56%<br>  • Average: 81%<br>  • Range: 20% to 243% | • CEO target payout opportunity falls within market practice.<br>• For other KEIP Participants, target payout opportunities also fall within market practice. |
| Range of Payout Opportunities (expressed as a percent of target opportunity) | • Minimum: 50% of Target<br>• Maximum: 200% of Target | • Range of payout opportunities at median:<br>— 50% to 179% of target opportunity | • Minimum payout opportunity (as a percent of target) falls within market practice.<br>• Maximum payout opportunity (as a percent of target) is somewhat higher than median market practice but overall it is not excessive relative to range of practice. |

---

[1] One-half of the Peer Companies' disclosed target payout opportunities (expressed as a percentage of base salary) for executives covered under their respective KEIPs. We developed statistics with respect to the lowest and highest target payout opportunity by Peer Company. For example, if a Peer Company's Incentive Plan provided target payout opportunities at 40% of salary, 75% of salary and 110% of salary, we used the 40% and 110% target payout opportunities to develop the statistics shown in the table. Since participant titles were not disclosed by several Peer Companies, the statistics on "Other KEIP Participants" target payout opportunities could be based, in part, on target payout opportunity of non-disclosed CEOs.

| Term | Proposed KEIP Specification | Market Practice | Meridian Observation of Proposed KEIP Against Market Practice |
|------|------------------------------|-----------------|---------------------------------------------------------------|
| Payout Timing | ▪ Earned incentive awards paid according to the following schedule:<br>— 1/3 paid within 30 days following end of each performance period<br>— 1/3 paid on September 30, 2016 or, if sooner, the date of confirmation of a POR/POL<br>— 1/3 paid on December 31, 2016 provided that confirmation of POR/POL has occurred by that date otherwise 1/3 of award is forfeited<br>Note: Participant must be employed on each payment date to receive applicable portion of earned incentive award | ▪ 65% of Incentive Plans provide for payment of incentive awards within a specified period following:<br>— The end of the applicable performance period, or<br>— The accomplishment of a pre-determined milestone<br>▪ 45% of Incentive Plans provide for the payment of incentive awards on the date debtor's plan of reorganization is confirmed | ▪ Payout schedule is consistent with market practice.<br>▪ Deferral of earned incentive awards and potential forfeiture of 1/3 of incentive awards may incent Participants to effectively manage Debtors' financial condition post-performance period and to encourage KEIP Participants to remain employed and to obtain a confirmed POR/POL. |
| KEIP Costs (based on 17 proposed KEIP participants) | ▪ At target aggregate payout: $7,401,950<br>▪ Target payout as a percentage of pre-petition assets: 0.073% | ▪ Target payout to insiders at median as a percent of pre-petition assets: 0.075% | ▪ The cost (at target payout) of the proposed KEIP is consistent with market practice (i.e., target payout opportunity as a percent of pre-petition assets is approximately at median). |

## **EXHIBIT D**

Carmody Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF KEVIN M. CARMODY**
**IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF**
**AN ORDER (I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL**
**INCENTIVE BONUS PLAN AND (II) APPROVING KEY EMPLOYEE**
**INCENTIVE PLAN FOR CERTAIN INSIDER EMPLOYEES FOR 2016**

        I, Kevin M. Carmody, make this Declaration under 28 U.S.C. § 1746 and state the
following under penalty of perjury:

        1.        I am a Practice Leader in the professional services firm of McKinsey
Recovery & Transformation Services U.S., LLC ("<u>McKinsey</u>"), which was retained as
turnaround advisor to Alpha Natural Resources, Inc. ("<u>ANR</u>") and certain of its direct and
indirect subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") in these
chapter 11 cases, pursuant to an order of the Court dated September 17, 2015 (Docket No. 476).

        2.        I submit this Declaration in support of the *Motion of the Debtors for Entry*
*of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and*
*(II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016*
(the "<u>Motion</u>").

        3.        Capitalized terms not otherwise defined herein have the meanings given to
them in the Motion.

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with responsible management and professionals of the Debtors and/or my review of relevant documents.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions and/or review of documents.  I am authorized to submit this Declaration on behalf of McKinsey.

5.      The KEIP consists of three key components:  (a) an annualized savings metric (the "Value Enhancement Plan"); (b) a liquidity metric (the "Liquidity Metric"); and (c) a safety and environmental compliance metric (the "Safety/Environmental Metric").  The proposed terms of the KEIP are described in more detail in the Motion and in the declaration of Robert Romanchek attached as Exhibit C thereto.  McKinsey has assisted the Debtors in developing the Value Enhancement Plan and the Liquidity Metric, and I am aware of the Debtors' historic performance under the safety and environmental standards that gave rise to the Safety/Environmental Metric.

6.      Notwithstanding the considerable uncertainties that currently exist in the Debtors' industry, the Debtors, McKinsey and their other professional advisors have used their reasonable best efforts to develop appropriate and achievable "stretch" targets under each of the performance metrics comprising the KEIP.  In particular:  (a) the targets under the Value Enhancement Plan represent the development of specific performance improvement initiatives across various functional areas of the Debtors that are being implemented to realize savings in 2016; (b) the targets under the Liquidity Metric are aggressive but achievable based on the Debtors' near term liquidity forecast, including inputs from the 13-week cash flow forecast and the strategic business planning process; and (c) the targets under the Safety/Environmental

Metric represent, in each case, a significant improvement of the Debtors' performance under

these measures as of September 30, 2015.

       7.     As a result of the foregoing, I believe that the targets for the various

performance metrics established by the KEIP are appropriate, fair and reasonable.

       I, the undersigned, declare under penalty of perjury that the foregoing is true and

correct.

Executed on December 3, 2015        By:  /s/  Kevin M. Carmody       
                                            Kevin M. Carmody