| | |
|---|---|
| Lynn Lewis Tavenner, Esquire (Va. Bar No. 30083) | John R. Owen, Esquire (admitted *pro hac vice*) |
| Paula S. Beran, Esquire (Va. Bar No. 34679) | Jeremy D. Capps, Esquire (admitted *pro hac vice*) |
| David N. Tabakin, Esquire (Va. Bar No. 82709) | Melissa Y. York (Va. Bar No. 77493) |
| Tavenner & Beran, PLC | Harman, Claytor, Corrigan & Wellman |
| 20 North Eighth Street, Second Floor | P. O. Box 70280 |
| Richmond, Virginia 23219 | Richmond, Virginia 23235 |
| Telephone: (804) 783-8300 | Telephone: (804) 747-5200 |
| Telecopy: (804) 783-0178 | Telecopy: (804) 747-6085 |
| *Proposed Counsel for The Official Committee of Retired Employees* | *Proposed Counsel for The Official Committee of Retired Employees* |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re:

ALPHA NATURAL RESOURCES, INC., *et al*,   Chapter 11 Bankruptcy
                                          Case No. 15-33896-KRH
    Debtors.
                                          (Jointly Administered)

**OBJECTION TO DEBTORS MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING PAYMENTS UNDER 2015 ANNUAL INCENTIVE BONUS PLAN;
AND (II) APPROVING KEY EMPLOYEE INCENTIVE PLAN
FOR CERTAIN INSIDER EMPLOYEES FOR 2016**

    The Official Committee of Retired Employees (the "Official Retiree Committee"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Motion for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan; and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (ECF No. 1038) (the "Motion). In support of its Objection, the Committee respectfully represents as follows:

**Timeline of Events**

    1.    On August 3, 2015 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  By an order of the Court (Docket No. 129), the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being administered jointly.

2. On November 3, 2015, the Debtors filed their Motion, Pursuant to Section 363 of the Bankruptcy Code, for an Order Authorizing Debtors to Terminate Certain Unvested Non-Pension Benefits ("Retiree Benefits Termination Motion") (ECF No. 797).  The Debtors sought entry of an order authorizing them to terminate, effective December 31, 2015, certain benefits they claimed were "unvested, non-pension welfare benefits" (e.g., hospital, medical, prescription, surgical and life insurance) (collectively, the "Non-Pension Retiree Benefits") currently offered to certain of the Debtors' 4,580 non-union retirees and spouses (collectively, the "Non-Union Retirees").  The Debtors set a response deadline of November 13, 2015, and scheduled the Motion for hearing on November 17, 2015.

3. Several interested retired employees filed a response to the Retiree Benefits Termination Motion, asking that the Court enter an order appointing an official retiree committee pursuant to 11 U.S.C. § 1114 and establishing a briefing schedule that would allow the parties to adequately address the Debtors' Motion.  (ECF No. 877.)

4. A separate Motion to Appoint Official Retiree Committee Pursuant to 11 U.S.C. § 1114 (ECF No. 868) was also filed.  The Court heard oral argument on that motion on November 17, 2015, at which time it granted the motion and directed the U.S. Trustee to appoint an official retiree committee.  (ECF No. 970.)

5. The United States Trustee appointed the Official Retiree Committee on December 1, 2015.  (ECF No. 1017.)

6. In the Retiree Benefits Termination Motion, the Debtors claimed that they had authority to terminate the allegedly "unvested, non-pension welfare benefits" in the ordinary course of business pursuant to 11 U.S.C. § 363(c). (ECF No. 797, at ¶ 29.) Alternatively, they argued that they could terminate the benefits as a reasonable exercise of business judgment pursuant to 11 U.S.C. § 363(b). (*Id.* at ¶ 40.)

7. In support of that Retiree Benefits Termination Motion, the Debtors argued that eliminating the $2.7 million financial burden of these benefits would "promote the Debtors' ability to successfully restructure through the improvement of their competitive margins and cash flow." (*Id.* at ¶¶ 5, 40.) They represented to the Court that "maintaining these benefits will continue to burden the Debtors with liabilities and expenses that they can no longer afford." (*Id.* at ¶ 40.)[1]

8. One month after filing the Retiree Benefits Termination Motion, the Debtors filed the instant Motion to Pay Bonuses. In contrast to the dire financial picture painted by the Retiree Benefits Termination Motion, Debtors now seek to compensate 17 "Key Employees" with "incentive" awards to the aggregate tune of $7.4 million to $14.8 million. (ECF No. 1038, at ¶¶ 11, 24.) The Debtors again have only provided 10 days for interested parties to file responses and have set the matter for hearing on December 17, 2015, just two weeks after the motion was filed.[2]

---

[1] The proposed termination of the Non-Pension Retiree Benefits effects 4,580 individuals comprised of retired or disabled employees and their families. These individuals rely on the benefits to purchase health insurance. Without these benefits, many of these former employees would be unable to afford healthcare until they are eligible for Medicare.

[2] The Debtors' Notice provided a response deadline of December 13, 2015, a Sunday. While the Notice arguably complies with certain terms of the Case Management Order (ECF No. 111), pursuant to Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, when a deadline falls on a Sunday, it is extended to the next business day, in this case, Monday, December 14, 2015. As such, the Debtors have provided interested parties even less time to respond than that provided for under the Rules and other provisions of the Case Management Order incorporating Rule 9006(a).

9. The Motion to Pay Bonuses came four days before the Debtors announced that, effective January 1, 2016, they are modifying and greatly reducing benefits provided to current employees. These changes include: (1) terminating medical, dental, vision, prescription, and life insurance benefits six months after an employee's date of disability; (2) terminating short term disability benefits; (3) terminating medical, dental, vision, prescription, life and disability insurance benefits on the date employment ends; (4) suspending 401(k) employer match; (5) eliminating one paid holiday per calendar year; (6) suspending the vacation sellback program; (7) eliminating 12 hours of personal leave per year; (8) suspending vacation and personal leave payout programs; and (9) capping earned vacation time at three weeks. Letter from G. Banbury to Employees (dated Dec. 7, 2015), attached as Ex. A. That announcement informed employees that "the future of our organization hinges on our ability to successfully implement cost savings modifications to our business. These changes are necessary for Alpha's restructuring." (*Id.*) It went on to state that, "[u]nfortunately, in the current economic realities of our industry, we are left with no other option than to implement difficult changes like these. With sustained lows in both demand and pricing, our industry is transforming, and we simply cannot sustain our existing cost structure." (*Id.*)

### The Motion to Pay Bonuses

10. Essential details of the Key Employee Incentive Plan ("KEIP"), such as the identities of 9 of the 17 proposed participants, as well as the award amounts, have not yet been available for review by the Official Retiree Committee, given that the Official Retiree Committee has recently been formed and currently is in the midst of the process of interviewing and hiring its professional team. The KEIP Schedule was filed under seal pursuant to a yet to be ruled upon *Motion of the Debtors for Entry of an Order to File Under Seal Appendix 2 to*

*Declaration of Robert Romanchek in Support of Mot. of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016* (the "Seal Motion")(ECF No. 1039). Even though the Seal Motion provides for the sharing of the KEIP Schedule with certain identified constituents, the Official Retiree Committee is not included in the intended recipient list for the same. While the undersigned counsel for the Official Retiree Committee has been engaged very recently, she intends to request forthwith the information from the Debtors for review and further analysis by the Official Retiree Committee. Further, while she does not envision opposition to such request, to the extent that the requested information is not forthcoming as requested from the Debtors, the Official Retiree Committee would also further object to the Seal Motion.

11. John R. Owen, in his capacity as counsel for certain individual retired employees requested the KEIP Schedule from Debtors' counsel via email on December 7 and again on December 8, 2015[3]. To date, the Official Retiree Committee understands that Mr. Owen has not received the KEIP Schedule or a response to the request.

12. Furthermore, the Motion to Pay Bonuses seeks to pay 8 Executive Insiders — Kevin S. Crutchfield, Gary W. Banbury, Philip J. Cavatoni, V. Keith Hainer, Bruce A. Hartshorn, Alan W. Jones, Jr., Mark M. Manno, and Richard H. Verheij — under the 2015 Annual Incentive Bonus plan ("AIB"), despite the fact that no information is provided as to what the targets were for the 2015 AIB or the amount of the proposed payments.

13. The request to pay millions of dollars in bonuses and incentives comes on the heels of the Debtors' bankruptcy filings and at a time when the company marks its fifth straight

---

[3] Subsequent to taking such action Mr. Owen and his firm, Harman Claytor Corrigan & Wellman, have been selected by the Official Retiree Committee to serve as special counsel on its behalf and intend to take appropriate action for such retention to be approved by this Court.

year of operating in the red. *See* Alpha Natural Resources, Inc., *Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934* (dated Feb. 26, 2015), at 93-94, attached as Ex. B; Alpha Natural Resources, Inc. *Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934* (dated Feb. 28, 2014), at 57-58, attached as Ex. C.

14. Despite declining revenues since 2011, the Debtors have continued to highly compensate their top executives through salaries, bonuses, and compensation packages. For example, Crutchfield and Cavatoni (the only remaining executives for whom SEC filings are available), have been compensated as follows over the past 3 years:

|  | **2014** | **2013** | **2012** |
| --- | --- | --- | --- |
| Crutchfield | $7,775,349 | $7,955,008 | $6,193,368 |
| Cavatoni | $1,976,111 | $1,811,660 | $2,554,626 |

Those earnings included the following bonuses under the Annual Incentive Bonus Plan:

|  | **2014** | **2013** | **2012** |
| --- | --- | --- | --- |
| Crutchfield | $815,100 | $948,024 | $523,7110 |
| Cavatoni | $207,188 | $228,928 | $126,464 |

15. Debtors now argue that because substantial portions of the Key Employees' compensation were provided in the form of equity holdings, which diminished significantly as the value of the equity plummeted, their deferred compensation is in unsecured creditor status and the prior retention agreements are no longer viable. As such, the Debtors contend these Key Employees need to be provided cash bonuses. (ECF No. 1038, at ¶ 5.) This contention ignores that the plummeting stock value has affected ***all*** shareholders, including those retired employees who were provided compensation, severance, and retirement benefits in the form of stock options and to whom the Debtors now wish to terminate paying benefits used to purchase insurance.[4]

---

[4] Countless retired employees now hold worthless stock and risk losing promised benefits while the Debtors seek to

16.    The Debtors argue, as they did with the Retiree Benefits Termination Motion, that they can pay the Executive Insiders under the 2015 AIB pursuant to 11 U.S.C. § 363(c) as a transaction in the ordinary course of business. They also argue that the KEIP should be approved pursuant to 11 U.S.C. § 363(b) and 503(c)(3) as it has a sound business purpose. These arguments in support of spending $7.4 million to $14.8 million are the same arguments the Debtors have made to cut $2.7 million in retiree benefits.[5]

## Argument

17.    As no information has been provided regarding the proposed payments to the Executive Insiders under the 2015 AIB, the Official Retiree Committee objects to those payments being authorized at this time.

18.    Similarly, with regard to the proposed KEIP, more information is needed to ascertain whether it is permissible under §§ 363(b) or 503(c)(3).

19.    Pursuant to § 503(c)(1), a debtor is prohibited from paying,

> [A] transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—
>
> (A)    The transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
> (B)    The services provided by the person are essential to the survival of the business; and
>
> (C)    Either—
>
> (i)    The amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar

---

pay certain executives millions in cash bonuses.

[5] $7.4 million potentially could fund the Non-Pension Retiree Benefits for 2.74 years, while only "costing" the Key Employees an average of just under $159,000 per person.

>> kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>
> (ii) If no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred.

11 U.S.C. § 503(c)(1). Thus, the question is whether the AIB and KEIP are retention payments or incentive payments.

20. "A debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism; the circumstances under which the proposal is made and the structure of the compensation package control." *In re Residential Capital, LLC*, 475 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("*Residential I*"). A plan must present targets that are difficult to achieve, thus forcing executives to work hard to achieve their bonuses. *In re Residential Capital, LLC*, 491 B.R. 73, 86 (Bankr. S.D.N.Y. 2013) ("*Residential II*"). It is a factual question whether incentive targets require management to stretch to meet performance goals. *In re Velo Holdings, Inc.*, 472 B.R. 201, 207 (Bankr. S.D.N.Y. 2012). If a plan's minimum target levels merely match the debtor's business plan projections, then the plan is retentive in nature. *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 315 (Bankr. S.D.N.Y. 2012).

21. Here, the Debtors have labeled both the AIB and KEIP as incentive plans, but the Court is not bound by those characterizations. There is simply not enough information presently before the Court, or interested parties, to ascertain whether these are truly incentive plans versus retention plans. In fact, some key language in the Debtors' own Motion leads the Committee of Retired Employees to believe that these are retention plans merely labeled as incentive plans.

- In light of these challenges, the Debtors' senior management is particularly critical to the completion of all business functions required by the chapter 11 process. (ECF No. 1038, at ¶ 4.)

- [T]he Debtors' senior managers justifiably perceive uncertainty with respect to their potential continued employment with the Debtors. (*Id.* at ¶ 5.)

- For certain of the Debtors' senior management, these pressures have proven too much, and they have left the Debtors. (*Id.*)

- These specific skills, along with the KEIP Participants' familiarity and understanding of the operations, customer and supplier relationships and infrastructure of the Debtors' operations are vital, not only to the day-to-day operation of their businesses, but also to the ability of the Debtors to effectuate a successful restructuring. (*Id.* at ¶ 11.)

22. Furthermore, while the Debtors represent that they have completed a business plan, that plan has not yet been provided to the Court. (*Id.* at ¶ 6.) Therefore, the business plan projections cannot be compared to the AIB and KEIP to see if the targets actually are difficult to achieve and whether management will have to "stretch" to meet their goals.

23. In *Hawker Beechcraft*, the Bankruptcy Court for the Southern District of New York rejected the debtors' proposed KEIP as a retention plan, not an incentive plan, for several reasons. First, the debtors did not identify the roles of each proposed participant and why they would contribute services necessary to achieve the targets. *In re Hawker Beechcraft*, 479 B.R. at 313. Second, while the KEIP included incentivizing targets, the lowest levels were well within reach. *Id.* Third, the KEIP participants would not earn a bonus if they left the debtors' employ prior to the plan's consummation. *Id.* at 314. As such, a participant had "to stay for his pay." *Id.* Finally, the debtors' CEO testified that, absent the KEIP, the participants "could seek alternative employment opportunities and, as a result, immediately undermine the [d]ebtors' restructuring efforts at a critical juncture of the [d]ebtors' chapter 11 cases and in the [d]ebtors' business cycle." *Id.*

9

24. Similarly, in the present case, the KEIP participants have not been identified (at least to the Official Retiree Committee). Furthermore, whether the KEIP targets are well within reach cannot be ascertained, as the Debtors' business plan has not yet been provided. Finally, while the KEIP bonus is "earned" during each performance period, it is paid out in one-third increments only if the participant remains employed, with the last payment made upon confirmation of the chapter 11 plan, but only if accomplished by December 31, 2016. As such, just as with the proposed KEIP in *Hawker Beechcraft*, while the incentivized work has been completed, the participant must "stay for his pay."

25. In *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*"), the United States Bankruptcy Court for the Southern District of New York refused to approve a KEIP based, in part, on the fact that the proposed plan contained a "completion bonus" payable to the participants upon completion of the chapter 11 case. The completion bonus in *Dana I* was not tied to performance, but, instead, was paid out upon the debtors' emergence from bankruptcy regardless of the outcome. *Id.* The court held that "[i]f it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP)." *Id.* at n.3. As such, it was a retention bonus impermissible under § 503(c)(1).

26. In the present case, the proposed KEIP provides that,

Upon the occurrence of (a) confirmation of a chapter 11 plan; (b) sale of substantially all (more than 70%) of the Debtors' assets, as measured by revenues or EBITDA; or (c) any change of control transaction, including a transaction involving a credit bid for more than 50% of the Debtors' assets on the basis of revenues or EBITDA (each, a "Restructuring Transaction"), each KEIP Participant shall be paid an incentive award within 30 days following the date of a Restructuring Transaction in amount equal to the Participant's target incentive opportunity with respect to each Performance Period that is outstanding on the date of such Restructuring Transaction.

10

(ECF No. 1038, at ¶ 31.)  This appears to be similar to the completion bonus that was rejected as a retention plan in *Dana I*.

27. Even if the AIB and KEIP are incentive plans not precluded under § 503(c)(1), the question remains whether they truly have a sound business purpose under §§ 363(b) and 503(c)(3).  Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § (b)(1).  Section 503(c)(3) prohibits a debtor from making "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."  11 U.S.C. § 503(c)(3).  Courts have held that the standard to be applied is the same under §§ 363(b)(1) and 503(c)(3), namely the business judgment test.  *See In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) ("*Dana II*").  The court in *Dana II* enumerated six factors to consider when determining if a compensation plan and its development process meet the business judgment test.

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable: does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

11

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Id.* at 576-77.

28. The Debtors, in conclusory fashion, argue that the proposed KEIP meets all of the *Dana II* factors. (ECF No. 1038, at ¶¶ 47-51.) However, as outlined above, there is insufficient information presently available to evaluate whether these factors truly have been satisfied. For example, while the Debtors argue that the cost of the plan is reasonable since it represents only 0.073% of the book value of their assets, that is belied by the fact that just one month ago the Debtors told this Court that they could not afford $2.7 million in retiree benefits if they hoped to successfully restructure. (ECF No. 1038, at ¶ 49; ECF No. 797, at ¶ 40.) Additionally, as the identities and roles of the Key Employees have not been identified, the Official Retiree Committee cannot assess whether the scope of the proposed KEIP is fair and reasonable. Furthermore, the Debtors have not established how the KEIP compares with prior incentive programs.

29. The Debtors identify several other cases from this District in which allegedly similar KEIP plans have been approved. (ECF No. 1038, at ¶ 52.) Two such examples are the *Movie Gallery* and *Circuit City* cases. The KEIP in *In re Circuit City Stores, Inc.* involved 16 participants and totaled $2.3 million. Objections were filed to the KEIP, and it was ultimately amended after being fully vetted by interested parties and before being approved by the Court. While in retrospect one could point to the fact that Circuit City eventually resulted in liquidation, the merits of the proposed plan were fully scrutinized before approval by the Court. The *Movie Gallery* KEIP had two components, one for employees and one for executives. The employee incentive plan applied to 31 employees and provided bonuses representing two, three, or six months of the employee's current salary. (Case No. 10-30696, ECF No. 147, at ¶¶ 16-17.) The

12

Case 15-33896-KRH    Doc 1067    Filed 12/13/15    Entered 12/13/15 23:20:26    Desc Main
                    Document      Page 13 of 14

projected cost of the employee incentive plan was $484,983. (*Id.* at ¶ 19.) The executive incentive plan applied to 5 executives and the bonuses were comprised of a percentage of the amounts in excess of certain figures that were distributed to holders of Prepetition First Lien Term Loan Secured Claims. (*Id.* at ¶¶ 20-22.) No objections were filed and the proposed KEIP summarily was approved. Accordingly, there is case authority in this jurisdiction for Court approval of a KEIP plans under appropriate circumstances. The Official Retiree Committee suggests, however, that as currently presented, there is insufficient basis to support the same under the current circumstances and to show that the proposed KEIP will actually incentivize a successful restructure in theses Alpha cases.

WHEREFORE, for all of the foregoing reasons, the Official Retiree Committee respectfully requests that this Court deny the Debtors' Motion for Entry of an Order (I) Authorizing Payments Under 2015 Annual Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider Employees for 2016, or, in the alternative, delay a hearing and ruling on this Motion until more facts are presented so that the proposed plans can be properly analyzed.

Respectfully Submitted,

Dated: December 13, 2015          The Official Committee of Retired Employees
       Richmond, VA

                                  By:   */s/    Lynn L. Tavenner*
                                           Proposed Counsel

Lynn L. Tavenner (Va. Bar No. 30083)
Paula S. Beran (Va. Bar No. 34679)
David N. Tabakin (Va. Bar No. 82709)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy: (804) 783-0178

13

And

John R. Owen, Esquire (Virginia Bar No. 39560)(*admitted pro hac vice*)
Jeremy D. Capps, Esquire (Virginia Bar No.. 43909)(*admitted pro hac vice*)
Melissa Y. York, Esquire (Virginia Bar No. 77493)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax

*Proposed Counsel for The Official Committee of Retired Employees*

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2015, I caused to be served a true and accurate copy of the foregoing, via CM/ECF or via e-mail on the following parties, as well as all other parties that receive CM/ECF notification:

Robert B. Van Arsdale, Esq.
Shannon Pecoraro, Esq.
Office of the U.S. Trustee
701 E. Broad St., Suite 4304
Richmond, Virginia 23219

Carl E. Black, Esq.
David G. Heiman, Esq.
Thomas A. Wilson, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114

Tyler P. Brown, Esq.
Shannon Eileen Dailey, Esq.
Henry Pollard Long, III Esq.
Justin F. Paget
Hunton & Williams
901 East Byrd Street
Richmond, VA 2219

Jeffrey B. Ellman, Esq.
Jones Day
1420 Peachtree Street N.E., Suite 800
Atlanta, VA 30309

Robert W. Hamilton, Esq.
Jones Day
326 John H. McConnell Blvd., Suite 600
Columbus, OH 43215

/s/    *Lynn L. Tavenner*