Kristen E. Burgers (VSB No. 67997)
Stephen E. Leach (VSB No. 20601)
LEACH TRAVELL PC
8270 Greensboro Drive, Suite 700
Tysons Corner, Virginia 22102
Telephone: (703) 584-8364
Email: kburgers@ltblaw.com
Email:  sleach@ltblaw.com

*Counsel to Sierra Club, West Virginia Highlands Conservancy
and Ohio Valley Environmental Coalition*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: <br><br> ALPHA NATURAL RESOURCES, INC., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 15-33896 (KRH) <br><br> (Jointly Administered) |

**OBJECTION OF SIERRA CLUB, WEST VIRGINIA HIGHLANDS CONSERVANCY AND OHIO VALLEY ENVIRONMENTAL COALITION TO DEBTORS' MOTION, PURSUANT TO BANKRUPTCY RULE 9019, FOR ENTRY OF STIPULATION AND ORDER CONCERNING RECLAMATION BONDING OF THEIR SURFACE COAL MINING OPERATIONS IN WEST VIRGINIA**

Sierra Club, West Virginia Highlands Conservancy and Ohio Valley Environmental Coalition, parties-in-interest herein (together, the "Environmental Parties"), by counsel, file their objection (the "Objection") to the Debtors' Motion, Pursuant to Bankruptcy Rule 9019, for Entry of Stipulation and Order Concerning Reclamation Bonding of their Surface Coal Mining Operations in West Virginia (the "Settlement Motion") (Doc. 1049) and, in support thereof, respectfully state as follows:

**SUMMARY OF OBJECTION**

1. The Debtors are not entitled to the relief sought in the Settlement Motion. Through the Settlement Motion, the Debtors seek to alter their bonding and reclamation

{LTB-00075757- }

obligations to the West Virginia Department of Environmental Protection ("WVDEP"). Importantly, the Debtors are seeking authorization from this Court, with the consent of WVDEP, to continue to operate a large portion of their West Virginia surface mining operations under self-bonds, even though the Debtors no longer satisfy the legal requirements for such bonding. Notwithstanding that the Debtors have the support of WVDEP, the Debtors are not entitled to this relief, because it is expressly prohibited by federal and state law.

2. Pursuant to federal law, West Virginia has a mandatory duty to compel any operator that lacks adequate reclamation bonds to cease mining immediately and begin reclamation. Because Alpha does not meet the self-bonding criteria and has not posted substitute bonds, West Virginia lacks the legal authority to authorize Alpha to continue to operate its mines in West Virginia without adequate reclamation bonds. Because the proposed settlement would violate federal and state statutes and regulations, West Virginia may not authorize, and this Court may not approve, such a radical deviation from clear and well-established law.

3. In addition to relief which would violate established law and to which they are accordingly not entitled, the Debtors also seek authorization from this Court to pledge the entire amount remaining in its Bonding Accommodation Facility to WVDEP. The Debtors' approved debtor-in-possession financing facility ("DIP Facility") provided for a $100 million reserve (the "Bonding Reserve") to be used for governmental authorities that make any demand, request or requirement for any surety bond, letter of credit, or other financial assurance under applicable law. The Debtors have already pledged $61 million from the Bonding Reserve to the State of Wyoming and the Wyoming Department of Environmental Quality ("WDEQ"). Through the Settlement Motion, the Debtors propose to pledge the remaining $39 million of the Bonding Reserve to WVDEP, leaving no funds to support bonding for environmental reclamation in states

other than Wyoming and West Virginia. All other localities will be left without a source of funding from the Debtors. Moreover, it is not clear whether these other localities have received notice of the proposed settlement.

4.  Because the Debtors' proposed settlement with WVDEP violates federal law and leaves no money to support bonding for environmental reclamation in states other than Wyoming and West Virginia, the Settlement Motion should be denied.

## BACKGROUND

5.  On August 3, 2015 (the "Petition Date"), Alpha Natural Resources, Inc., and its affiliated entities (collectively, the "Debtors" or "Alpha") each filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing these jointly-administered cases (the "Bankruptcy Cases"). The Debtors continue to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.  The Debtors are primarily in the business of owning and operating coal mines. These mines are both surface mines and deep mines, located in Virginia, West Virginia, Pennsylvania, Kentucky, and Wyoming. In connection with their coal mining operations, the Debtors are subject to federal and state laws regulating the mining operations. These laws require the Debtors to obtain permits for their mining operations. As part of the permitting process, the Debtors are obligated to either post commercial bonds or satisfy "self-bonding" requirements. The purpose of bonding is primarily to ensure that the lands on which the mines are located are reclaimed properly and all environmental issues are addressed fully. If the mining company does not satisfy its environmental and reclamation obligations, the states can turn to the bonds as a source of funding for reclamation and environmental restoration.

7. On September 17, 2015, this Court entered an order approving the DIP Facility (Doc. 465). The DIP Facility includes a $100 million Bonding Reserve to be used for governmental authorities that make any demand, request or requirement for any surety bond, letter of credit, or other financial assurance under applicable law. The Bonding Reserve can be used to provide financial assurance in the form of collateralized letters of credit or claims entitled to superpriority treatment in these Bankruptcy Cases.

8. On October 8, 2015, this Court entered an order approving the Debtors' proposed settlement of certain reclamation bonding issues with the State of Wyoming and WDEQ (Doc. 628). Among other things, the order granted Wyoming a superpriority claim in the amount of $61 million.

9. On December 7, 2015, the Debtors filed the Settlement Motion, seeking approval of a settlement with WVDEP, whereby the Debtors agreed to post a $15 million letter of credit, grant WVDEP a superpriority claim in the amount of $24 million, undertake reclamation activities for "at least" one mine, and meet certain other requirements to WVDEP's satisfaction.

10. Among the Alpha mines currently operating under impermissible self-bonds in West Virginia are mines subject to consent decrees between Alpha and the Environmental Groups that require Alpha to design, install, and operate water pollution treatment systems. These include the consent decrees resolving the Environmental Groups' claims in Civil Action Nos. 2:12-cv-3412; 2:13-cv-6870; 5:12-cv-1464; 2:13-cv-2057; and 3:12-cv-0785 in the U.S. District Court for the Southern District of West Virginia.

11. The proposed settlement does not represent the first time that West Virginia regulators have attempted to impermissibly transfer reclamation liabilities from mine operators to the taxpaying public. In 2001, a West Virginia federal judge chastised WVDEP for failing to

require sufficient reclamation bonds, finding that the agency had created "a climate of lawlessness, which creates a pervasive impression that continued disregard for federal law and statutory requirements goes unpunished, or possibly unnoticed." *West Virginia Highlands Conservancy v. Norton*, 161 F. Supp. 2d 676, 684 (S.D.W.Va. 2001). That court further stated, in words applicable here, that "[f]inancial benefits accrue to the owners and operators who were not required to incur the statutory burden and costs attendant to surface mining; political benefits accrue to the state executive and legislators who escape accountability while the mining industry gets a free pass." *Id.*

## OBJECTIONS

12. Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The decision whether to approve a compromise under Rule 9019 is committed to the discretion of the Court, which must determine if the compromise or settlement is fair and equitable. *See In re Three Rivers Woods, Inc.*, 2001 WL 720620 (Bankr. E.D. Va. 2001); *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997).

13. Factors the Court should consider when evaluating a settlement under Bankruptcy Rule 9019 include: (i) the probability of success in the litigation; (ii) the complexity, expense and likely duration of the litigation; (iii) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise, including potential difficulties in collection, if any; and (iv) whether the proposed compromise is fair and equitable to the debtor, its creditors, and other parties in interest. *See Protective Comm. For Indep. Stockholders of TMT Trailer Ferry,*

*Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995); *Frye*, 216 B.R. at 174.

14. Over and above these non-exclusive court-made factors, the Court may not approve a debtor's entry into a settlement agreement that is illegal or otherwise contrary to public policy. When it reviews a proposed agreement under Rule 9019, the Court is "obliged to consider the public policy implications of the settlement, whether or not the issue is raised at all, much less by a non-party." *In re Telcar Grp., Inc.*, 363 B.R. 345, 357 (Bankr. E.D.N.Y. 2007). "If the proposed settlement includes a provision which is illegal or against public policy, then it is irrelevant whether the settlement is in the best interests of the estate or not." *In re Dalen*, 259 B.R. 586, 612 (Bankr. W.D. Mich. 2001). Here, the proposed settlement is illegal and against public policy, and therefore must be rejected.

15. Although bankruptcy courts generally enjoy broad equitable powers under 18 U.S.C. § 105(a), these powers do not include the authority to provide "relief inconsistent with more specific law." *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 615 (B.A.P. 9th Cir. 1990). Simply put, a bankruptcy court's "jurisdiction is not permitted to be exercised in a way which conflicts with other statutes." *In re Chira*, 353 B.R. 693, 735 (Bankr. S.D. Fla. 2006) *aff'd*, 378 B.R. 698 (S.D. Fla. 2007) *aff'd*, 567 F.3d 1307 (11th Cir. 2009). This Court therefore does not have the authority to authorize entry of the proposed settlement because the settlement directly conflicts with federal and state law.

**A.    The Proposed Settlement Violates Federal and State Law.**

16. The Motion should be denied because the proposed settlement violates federal and state law. By allowing Alpha to continue its coal removal operations in West Virginia under permits that lack legally acceptable reclamation bonds, the proposed settlement violates core

provisions of the federal Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201 et seq., and West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"), W. Va. Code §§ 22-3-1 et seq.. This includes, in particular, the fundamental requirement of SMCRA that reclamation bonds "shall be sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture." 30 U.S.C. § 1259(a). For this reason, this Court cannot approve entry of proposed settlement.

1. *The proposed settlement amounts to an impermissible modification to West Virginia's SMCRA program.*

17. In order for this Court to approve Alpha's entry into the proposed settlement, West Virginia would need to modify its surface mining program to eliminate the inherent conflicts between the terms of the proposed settlement and the applicable mandatory requirements and prohibitions of WVSCMRA. Such changes cannot be made on an ad hoc basis or even through unilateral action by West Virginia. Instead, those changes must be submitted to, and approved by, the federal Office of Surface Mining, Reclamation, and Enforcement ("OSM"). West Virginia has made no effort to initiate the process required for approval of such changes, and OSM would be barred from approving those changes as they would render West Virginia's program less stringent than the federal program.

18. WVDEP has a mandatory duty to notify OSM of certain significant events or changes to a state program that "affect the implementation, administration or enforcement of the approved State program." 30 C.F.R. § 732.17(b). Once it is notified of "events or proposed changes that may require a State program amendment, . . . [OSM] shall determine whether a State program amendment is required and notify the State regulatory authority of the decision." 30 C.F.R. § 732.17(c). State program amendments may be required when "conditions or events" either "change the implementation, administration or enforcement of the State

program" or "indicate that the approved State program no longer meets the requirements of the Act or this chapter." 30 C.F.R. § 732.17(e).

19. The significant events or changes for which WVDEP must provide notice and secure OSM approval include "[c]hanges in the provisions, scope or objectives of the State program." 30 C.F.R. § 732.17(b)(1). Here, the proposed settlement would require changes to the requirement that operators maintain valid reclamation bonds for all active mine operations. W. Va. Code R. § 38-2-11.2.a (requiring an operator to provide a bond "[p]rior to issuance of a permit and prior to initiation of surface mining operations"); W. Va.Code § 22-3-11 (requiring, prior to permit issuance, that an operator "furnish a penal bond"). These provisions of the West Virginia program mirror federal requirements. *See* 30 C.F.R. § 800.11 (prohibiting issuance of a mining permit or disturbance of a mining area "prior to acceptance by the regulatory authority of the required performance bond"). West Virginia cannot make this change to its state program without first notifying OSM and securing its approval. OSM could not lawfully approve that change given that it is contrary to the federal SMCRA and state programs must be no less stringent than the federal program. 30 U.S.C. § 1253; 30 C.F.R. § 730.5.

20. WVDEP's duty to notify OSM also applies to "[c]hanges in the authority of the regulatory authority to implement, administer or enforce the approved program." 30 C.F.R. § 732.17(b)(2). Here, the proposed settlement would significantly limit WVDEP's regulatory authority to implement and enforce WVSCMRA's reclamation bonding requirements by requiring WVDEP to violate its non-discretionary duty to issue a notice of violation to any permittee operating without the required valid reclamation bond, as well as its non-discretionary duty to issue a cessation order compelling the permittee to immediately begin reclamation at the mine should the permittee fail to replace the bond. W. Va. Code R. § 38-2-11.2.d. The proposed

settlement also limits WVDEP's authority to take future enforcement action by providing that "[u]nless and until this Consent Order terminates . . . DEP and the Director shall not seek additional collateral or revoke, terminate, refuse to grant or amend or take any other adverse action with respect to the Permits on account of Alpha's self-bonded obligations for the Permits under the Act or the Rule, except in accordance with the provisions of this Consent Order." Doc. 1049 at 24. West Virginia must secure OSM approval before taking any action under this change to the state program. Again, OSM could not lawfully approve such a change, as it directly conflicts with the stronger requirements of the federal program. 30 U.S.C. § 1253; 30 C.F.R. § 730.5.

21.     Finally, WVDEP must provide OSM with notice of "[s]ignificant changes in funding or budgeting relative to the approved program." 30 C.F.R. § 732.17(b)(6). Allowing Alpha to continue operating mines in West Virginia with a cumulative unbonded liability of $229,375,833 in reclamation costs is a significant change in funding that must be reported to OSM. OSM has previously recognized that the financial consequences of the bankruptcy of a major mine operator like Alpha represent a significant change. In its 2002 federal register notice concerning West Virginia's bonding program, OSM stated that "the failure of a large mining company could be a very significant event." 67 Fed. Reg. 37610, 37623 (May 29, 2002).

22.     Because WVDEP has not secured nor even sought approval for these changes, it is prohibited by state and federal law from offering to Alpha the fundamental terms of the proposed settlement. As a result, the proposed settlement is *ultra vires* and entry cannot be approved by this Court.

### 2. *The proposed settlement violates the provisions of SMCRA and WVSCMRA requiring that mine operators maintain valid reclamation bonds at all times.*

23. A fundamental requirement of SMCRA and WVSCMRA is that a mine operator may not conduct surface coal mining operations without first providing an adequate reclamation bond. West Virginia's mining regulations require that an operator provide a bond "[p]rior to issuance of a permit and prior to initiation of surface mining operations." W. Va. Code R. § 38-2-11.2.a; *see also* W. Va.Code § 22-3-11. The federal SMCRA program, from which West Virginia's program is derived, similarly prohibits issuance of a mining permit or disturbance of a mining area "prior to acceptance by the regulatory authority of the required performance bond." ; 30 C.F.R. § 800.11. The penal amount of the bond in West Virginia must be no less than one thousand dollars for each acre or fraction of an acre covered by the permit, and can be as much as five thousand dollars. W. Va. Code § 22-3-11(a). The requirement that a permittee provide and maintain an adequate reclamation bond applies not only at the time of initial permit issuance, but throughout the life of the permit and of the authorized mining operation. *See* W. Va. Code R. § 38-2-11.2.d. The reclamation bonding requirement "continues for the full term of the permit plus any additional period necessary to achieve compliance with the requirements in the reclamation plan of the permit." W. Va. Code § 22-3-11(b); 30 U.S.C. § 1259.

24. In certain limited circumstances, WVDEP may allow a permittee to meet the reclamation bonding requirements by providing a "self-bond." W. Va. Code § 22-3-11(d). However, any state program authorizing the use of self-bonding must "assure that the regulatory authority will have available sufficient money to complete the reclamation plan for any areas which may be in default at any time" and "must provide a substantial economic incentive for the permittee to comply with all reclamation provisions." 30 C.F.R. § 800.11(e).

25. If, after a permit is issued, it becomes clear that a reclamation bond no longer meets the established standards, the permittee must replace the bond within 90-days. The West Virginia SCMRA regulations provide that "[i]f at any time during the period when a self-bond is posted, the financial conditions of the applicant or the parent corporation guarantor change so that the [self-bonding criteria] are not satisfied, the permittee shall notify the Secretary immediately and shall within ninety (90) days post an alternate form of bond in the same amount as the self-bond." W. Va. Code R. § 38-2-11.3.d.7. An existing bond in West Virginia may not be released or replaced "until the permittee has submitted, and the Secretary has approved, acceptable replacement bonds." W. Va. Code R. § 38-2-12.1.b.

26. Operators who fail to provide substitute bonds must immediately stop mining and commence reclamation. WVDEP has a mandatory duty to issue a notice of violation and ultimately a cessation order for each mine covered under a legally invalid self-bond once a self-bonded operator no longer meets the self-bonding criteria and is unable or unwilling to provide an acceptable substitute bond. The WVDEP has no discretion in this matter, but instead "*shall* issue a notice of violation against any operator who is without bond coverage." W. Va. Code R. § 38-2-11.2.d. (emphasis added). WVDEP may provide the operator no more than 15 days following issuance of a notice of violation to replace bond coverage. *Id*. If the operator fails to replace the bond within the specified time period, "a cessation order *shall* be issued, at which time the operator *shall* initiate and complete as contemporaneously as possible total reclamation of all disturbed areas." *Id*. (emphasis added). The operator may not resume mining operations "until the Secretary has determined that an acceptable bond has been posted." *Id*. The federal SMCRA regulations similarly provide that if an operator fails to replace an inadequate or

defective bond within 90 days it "shall cease coal extraction and . . . shall immediately begin to conduct reclamation operations in accordance with the reclamation plan." 30 C.F.R. § 800.16(e).

27. On August 5, 2015, two days after filing for chapter 11 protection, Alpha informed WVDEP of the potential that it no longer satisfied any of the self-bonding criteria, as required under the WVSCMRA regulations. W. Va. Code R. §§ 38-2-11.2.b, 38-2-11.3.d.7

28. West Virginia DEP determined on September 1, 2015, that Alpha no longer satisfies West Virginia's self-bonding criteria and that Alpha was therefore required to post substitute bonds for the same amount within 90 days. *See* Doc. 1049 at 6. Alpha has neither provided the required substitute bonds nor ceased coal extraction and switched to purely reclamation operations. Alpha's self-bonding obligations in West Virginia total $244,375,833. *See* Doc. 1049 at 5.

29. West Virginia had previously determined, on July 24, 2015, that – based on Alpha's financial disclosures from the fourth quarter of 2014 and first quarter of 2015 – Alpha's "ratio of total liabilities to net worth have fluctuated above and below the criteria" and that therefore "WVDEP has determined that it is in the best interest of West Virginia to exercise our discretion and transition the assurance of Alpha reclamation obligations from self-bond to another acceptable form of bond." July 24, 2015 correspondence from WVDEP to Alpha (Exhibit 1).

30. West Virginia's determination that Alpha no longer satisfies the self-bonding criteria is correct. In order to qualify for self-bonding in West Virginia, an operator must demonstrate either (1) that it has a current bond rating of "A" or higher as issued by Moody's or Standard and Poor's; (2) it has a total net worth of at least $10 million, a ratio of total liabilities to net worth of 2.5 times or less, and a ratio of current assets to current liabilities of 1.2 times or

greater; or (3) its fixed assets in the United States total at least $20 million, and it has a ratio of total liabilities to net worth of 2.5 times or less and a ratio of current assets to current liabilities of 1.2 times or greater. W. Va. Code R. § 38-2-11.3.d.2.c. Given that Alpha sought relief under chapter 11 of the Bankruptcy Code, it is doubtful that Alpha can satisfy any of these criteria, as indicated by its seeking relief.

31. Despite its substitution demand and Alpha's subsequent bankruptcy, and despite Alpha's failure to provide a substitute bond or cease coal extraction, West Virginia has not revoked Alpha's permits, as required by federal and state mining laws. Instead, Alpha and West Virginia have now entered into a proposed settlement under which Alpha would be allowed to keep operating the majority of its mines in West Virginia with only its existing, inadequate self-bonds. This Court cannot, and must not, approve Alpha's entry into the proposed settlement. All that West Virginia has secured is an agreement from Alpha and its "debtor-in-possession" creditors to provide a fraction of Alpha's total self-bonding obligations – just $39 million – in the form of either a general collateral bond for $15 million or $24 million in priority over other administrative expenses in Alpha's bankruptcy. *See* Doc. 1049 at 8. Given Alpha's total self-bonding obligations in West Virginia of $244,375,833, this represents coverage of just under 16% of those obligations. Even counting Alpha's non-binding promise to reduce the total amount of West Virginia self-bonds by $10 million, over 83% of Alpha's self-bonding obligations would remain unsecured.

32. Because it does not require Alpha to replace 100% of its self-bonding obligations with valid bonds, the proposed settlement violates the WVSCMRA and federal SMCRA. Once West Virginia determined that Alpha no longer satisfied the self-bonding requirements, it had only two options: (1) accept a substitute bond or bonds that did satisfy all relevant requirements;

or (2) order Alpha to immediately cease extracting coal and to immediately reclaim all mine sites in the state subject to Alpha's self-bonds. West Virginia did neither of these things.

33. Instead of offering a substitute bond in a form allowable under West Virginia law, Alpha – in the proposed settlement – has merely offered West Virginia a $15 million replacement bond and a superpriority claim to a fraction of its remaining self-bonding obligations. The only substitute bonds allowed under West Virginia law are surety bonds (W. Va. Code R. § 38-2-11.3.a); collateral bonds (W. Va. Code R. § 38-2-11.3.b); escrow bonds (W. Va. Code R. § 38-2-11.3.c); or a combination of surety and escrow bonds (W. Va. Code R. § 38-2-11.3.e). All of these are financial instruments backed by a third party. The proposed settlement does not provide an acceptable financial instrument backed by a third party for $229,375,833 of Alpha's bonding obligation.

34. Alpha has not identified any basis that would allow this Court to approve the proposed settlement which would allow Alpha to continue operating under permits that lack a legally acceptable reclamation bond, this Court cannot approve entry of the proposed settlement. That the proposed settlement places some limits on Alpha's ability to secure new permits under self-bonds or commence operations under existing self-bonded permits does not change the fundamental fact that the key provisions of the proposed settlement are directly contrary to SMCRA and WVSCMRA.

35. Although the proposed settlement places some limitations on Alpha's ability to secure new permits, modify existing permits, or begin mining at currently unstarted operations (Doc. 1049 at 25-29), it falls far short of what is required under SMCRA: the immediate cessation of mining and immediate commencement of reclamation at all operations subject to self-bonding.

36. Under SMCRA and West Virginia's surface mining program, WVDEP has a non-discretionary duty to issue a notice of violation to any permittee operating without the required valid reclamation bond, as well as a non-discretionary duty to issue a cessation order compelling the permittee to immediately begin reclamation at the mine should the permittee fail to replace the bond. W. Va. Code R. § 38-2-11.2.d. The operator may not resume mining operations "until the Secretary has determined that an acceptable bond has been posted." *Id*.

37. Rather than comply with this mandatory duty, WVDEP and Alpha have proposed, in the proposed settlement, to limit Alpha's ability to secure new permits, permit amendments, or incidental boundary revisions unless Alpha provides acceptable penal bonds other than self-bonds. Doc. 1049 at 5. Not only does this fail to meet the plain requirements of W. Va. Code R. § 38-2-11.2.d, it merely re-states what WVDEP already ordered in its July 24, 2015 letter instructing Alpha that "WVDEP will not accept any additional assurance under the self-bonding instrument for Alpha Natural Resources at this time." Exhibit 1.

38. Alpha and WVDEP cannot claim that this blatant dereliction of WVDEP's mandatory duties is appropriate here because the Bankruptcy Code's automatic stay provision prevents WVDEP from otherwise carrying out those duties. The automatic stay does not apply to, and therefore cannot prevent, WVDEP's enforcement of SMCRA's bonding requirements because that enforcement is an exercise of WVDEP's police and regulatory powers. Police and regulatory powers are explicitly listed as exceptions to the automatic stay. 11 U.S.C. § 362(b)(4). As the Fourth Circuit has held, "financial assurance regulations are within the regulatory exception [to the automatic stay] because they serve the primary purpose of deterring environmental misconduct." *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 865-66 (4th Cir. 2001). There is no legal constraint on WVDEP's ability to carry out its mandatory duties,

and therefore no justification for this Court entering a proposed settlement that allows WVDEP to do less than is legally required.

39. The proposed settlement also impermissibly precludes WVDEP from taking additional actions that may be required of it under SMCRA in the future. The proposed settlement specifically provides that "[u]nless and until this Consent Order terminates . . . DEP and the Director shall not seek additional collateral or revoke, terminate, refuse to grant or amend or take any other adverse action with respect to the Permits on account of Alpha's self-bonded obligations for the Permits under the Act or the Rule, except in accordance with the provisions of this Consent Order." Doc. 1049 at 24. This Court cannot enter a proposed settlement that requires WVDEP to stand down and not take certain actions that may be required of it in the future.

40. An order from this Court rejecting the proposed settlement would not necessarily mean that Alpha must cease coal production at each of its mines in West Virginia. Alpha retains the option to provide acceptable substitute bonds at some or all of its West Virginia mines. The requirement to cease coal production and begin reclamation only applies at those mines where Alpha cannot or will not provide the type of reclamation bond required by state and federal law.

41. The threat to West Virginia's citizens and environment, should Alpha be allowed to continue operating its mines in direct violation of SMCRA and WVSCMRA, is not theoretical. The requirement that mine operators maintain adequate reclamation bonds at all times is at the core of SMCRA, which was created to prevent the return of dangerous and wasteful mining practices:

> SMCRA was passed, in part, to address known results of unregulated surface mining: disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural, and forestry

{LTB-00075757- }                                - 16 -

> purposes, by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property by degrading the quality of life in local communities, and by counteracting governmental programs and efforts to conserve soil, water, and other natural resources. 30 U.S.C. § 1201(c). *With mandated reclamation plans and reclamation bonds required by federal law to be adequate*, SMCRA was a promise to remedy the abuses, protect the environment, and yet permit the recovery of mineral reserves with approved practices and regulatory oversight.

*W. Virginia Highlands Conservancy v. Norton*, 161 F. Supp. 2d 676, 684 (S.D.W. Va. 2001) (emphasis added).

> 3. *The proposed settlement would threaten to wipe out West Virginia's Special Reclamation Fund, leaving no resources to cover the costs of reclaiming additional sites.*

42. The penal bond amount that West Virginia mine operators are required to maintain from permitting through final reclamation is not expected to cover the full cost of reclamation. For that reason, WVSCMRA provides an additional "Special Reclamation Fund" (SRF) financed through a tax on each ton of coal mined in the state. W. Va. Code § 22-3-11(h). The purpose of the Fund is to provide WVDEP with the financial resources required "for the reclamation and rehabilitation of lands which were subjected to permitted surface-mining operations and abandoned . . . where the amount of the bond posted and forfeited on the land is less than the actual cost of reclamation." W. Va. Code § 22-3-11(g).  If the bond is insufficient, the WVDEP must draw upon the Fund to pay for the deficiency. *West Virginia Highlands Conservancy v. Huffman*, 625 F.3d 159, 163-64 (4th Cir. 2010); W.Va. Code R. § 38-2-12.4.d.

43. Should Alpha forfeit any of its self-bonded operations, the cost of reclamation exceeding the $39 million provided under the proposed settlement would be paid from the Fund. As of its most recent annual report from January 2015, the total "accumulated cash and investments" in the Fund totaled $81.3 million. *See* "2014 SRF Advisory Council Annual

Case 15-33896-KRH    Doc 1082    Filed 12/14/15    Entered 12/14/15 22:34:52    Desc Main
                                Document      Page 18 of 20

Report" at 8 (attached as Exhibit 2). This amount is dwarfed by Alpha's unfunded self-bonded liability, which will total $205 million beyond the $39 million provided under the proposed settlement. Alpha, therefore, could completely wipe out all of the Special Reclamation Fund, leaving West Virginia with no resources to cover the cost of reclamation at remaining Alpha sites let alone any mines forfeited by other operators in the state. In January 2015, the Special Reclamation Fund Advisory Council reported that there were 105 forfeited sites in West Virginia where reclamation would require resources from the Fund. Exhibit 2 at 8. Entry of the proposed settlement therefore carries with it a significant risk of "unreclaimed mine sites, polluted state streams, and an 'immense state liability, incurred by mine operators but borne by the taxpayers.'" *West Virginia Highlands Conservancy v. Norton*, 190 F. Supp. 2d 859, 963 (S.D. W.Va. 2002). Such a possibility is counter to public policy and cannot be approved by this Court.

**B.     The Proposed Settlement Compromises the Potential Reclamation Claims of Other Localities.**

44.     The Motion should be denied because the Debtor proposes to allocate all remaining funds in the Bonding Reserve to WVDEP, without regard to the potential effect on localities other than Wyoming and West Virginia.

45.     In addition to Wyoming and West Virginia, Alpha also operates mines in Kentucky, Pennsylvania, and Virginia. Each of the mines in these states is also subject to reclamation bonding obligations.  It is not clear whether these localities have received notice of the Settlement Motion.

46.     The DIP Facility provided for a $100 million Bonding Reserve to be used for governmental authorities that make any demand, request or requirement for any surety bond, letter of credit, or other financial assurance under applicable law.  The Debtors have already pledged $61 million from the Bonding Reserve to the State of Wyoming and the Wyoming

Department of Environmental Quality ("WDEQ").  Through the Settlement Motion, the Debtors propose to pledge the remaining $39 million of the Bonding Reserve to WVDEP. This means no resources will be left for regulators in Kentucky, Pennsylvania, and Virginia to draw on should Alpha's bonds in those states prove inadequate to cover the full cost of reclamation. Such an outcome is not fair or equitable to those states or, in particular, to the communities who would be forced to contend with unreclaimed or inadequately reclaimed mine sites.

WHEREFORE, for all the foregoing reasons, the Environmental Parties prays for the entry of an order denying the Settlement Motion.

Dated: December 14, 2015               Respectfully submitted,

                                       */s/ Kristen E. Burgers*
                                       Kristen E. Burgers (VSB No. 67997)
                                       Stephen E. Leach (VSB No. 20601)
                                       LEACH TRAVELL PC
                                       8270 Greensboro Drive, Suite 700
                                       Tysons Corner, Virginia 22102
                                       Telephone: (703) 584-8364
                                       Email: kburgers@ltblaw.com

                                       *Counsel to Sierra Club, West Virginia Highlands*
                                       *Conservancy and Ohio Valley Environmental*
                                       *Coalition*

## CERTIFICATE OF SERVICE

      I hereby certify that on December 14, 2015, I caused a copy of the foregoing Objection of Sierra Club, West Virginia Highlands Conservancy and Ohio Valley Environmental Coalition to the Debtors' Motion, Pursuant to Bankruptcy Rule 9019, for Entry of Stipulation and Order Concerning Reclamation Bonding of their Surface Coal Mining Operations in West Virginia to be served (i) via first class mail, postage prepaid, on the parties named below and (ii) via the Court's CM/ECF system, e-mail, and/or first class mail, postage prepaid, on all parties identified on the MSL/2002 Service List (as of December 14, 2015) as published on the Kurtzman Carson Consultants LLC website (www.kccllc.net/alpharestructuring/).

| | |
|---|---|
| David G. Heiman | Tyler P. Brown |
| Carl E. Black | J.R. Smith |
| Thomas A. Wilson | Henry P. (Toby) Long, III |
| Jones Day | Justin F. Paget |
| North Point | Hunton & Williams |
| 901 Lakeside Avenue | 951 East Byrd Street |
| Cleveland, OH 44114 | Richmond, VA 23219 |

      */s/ Kristen E. Burgers*
      Kristen E. Burgers

{LTB-00075757- }