IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:     ALPHA NATURAL RESOURCES     Case No. 15-33896-KRH
              INC., *et al.*,     Chapter 11
                                                     (Jointly Administered)
                     Debtors.

## **Memorandum Opinion**

On August 3, 2015 (the "Petition Date"), Alpha Natural Resources, Inc., and 149[1] of its direct and indirect subsidiaries (each a "Debtor" and collectively, the "Debtors") commenced these bankruptcy cases by each filing a separate voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia.[2] The Debtors continue to manage their properties and operate their businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 cases. On August 5, 2015, the Court entered an order authorizing the joint administration of these Chapter 11 cases.[3]

This matter came before the Court on a motion filed on December 7, 2015, by the Debtors for approval of a compromise pursuant to Federal Rule of Bankruptcy Procedure 9019 between the Debtors and the state of West Virginia (the "Motion").[4] The Debtors operate coal

---

[1] The Chapter 11 petition for one of the Debtors' subsidiaries, Grey Hawk, has since been withdrawn. Order Dismissing Case, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Oct. 8, 2015) ECF No. 638.

[2] All further references to the Bankruptcy Code are to the Bankruptcy Code as codified at 11 U.S.C. §§ 101 *et seq.*

[3] The Debtors' business operations and capital structure is described in the amended declarations of Kevin S. Crutchfield, Chief Executive Officer and Chairman of the Debtors' Board of Directors, and Philip J. Cavatoni, Executive Vice President and Chief Financial and Strategy Officer of the Debtors. Amended Declarations, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Aug. 3, 2015) ECF No. 45 & No. 46.

[4] This is a contested matter under Federal Rule of Bankruptcy Procedure 9014.

mines and mining-related properties throughout the state of West Virginia. The settlement was executed by authorized representatives of the Debtors and the state of West Virginia (the "West Virginia Settlement"). The West Virginia Settlement involves certain bonding obligations that the Debtors have under the West Virginia Surface Mining and Reclamation Act.

On December 14, 2015, the Sierra Club, the West Virginia Highlands Conservancy, and the Ohio Valley Environmental Coalition (collectively, the "Environmental Parties") filed an objection to the Motion on the grounds that the West Virginia Settlement violated certain provisions of West Virginia and federal law. The United States Department of Interior, Office of Surface Mining Reclamation and Enforcement ("OSM"), on behalf of the United States of America, filed a reservation of rights but did not object to the Motion or the terms of the West Virginia Settlement. On December 17, 2015, the Court conducted a hearing on the Motion (the "Hearing"). At the conclusion of the Hearing, the Court overruled the objection of the Environmental Parties and granted the Debtors' Motion. Accordingly, the Court entered an order granting the Motion and approving the West Virginia Settlement on December 22, 2015 (the "Settlement Order"). This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law supporting the Settlement Order in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[5]

**Jurisdiction and Venue**

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for

---

[5] Federal Rule of Bankruptcy Procedure 7052 is made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014. *See* Fed. R. Bankr. P. 9014. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

2

the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

## Factual Background

The Debtors operate an extensive network of coal mines and mining-related properties throughout the state of West Virginia. The Debtors employ approximately 4,100 individuals in West Virginia and hold more than 500 mining permits throughout the state.

In connection with their coal mining operations throughout West Virginia, the Debtors are subject to regulation at the state level by the West Virginia Department of Environmental Protection ("DEP").[6] DEP is responsible for enforcing the various reclamation obligations that stem from West Virginia's Surface Coal Mining and Reclamation Act (the "Act"). *See* W. Va. Code. § 22-3-1, *et seq*. In the mining context, reclamation obligations generally require miners to return land to its natural state following the completion of mining operations. *See, e.g.*, *id.* § 22-3-10. Under the Act, a mine operator must obtain a mining permit from DEP before any surface mining operations can begin. *Id.* § 22-3-8. After DEP approves a mining permit, but before the permit is issued, a mine operator must post a penal bond payable to the state of West Virginia to secure its obligations under the Act, including obligations relating to reclamation. *See id.* § 22-3-11. The amount of the bond ranges between $1,000 and $5,000 per acre or fraction thereof. *Id.* The bond may take the form of a surety bond, collateral bond, escrow bond,

---

[6] West Virginia regulates the coal mining industry in its own state through a system of "cooperative federalism." *See Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001). Under the Surface Mining Control and Reclamation Act ("SMCRA"), the U.S. Secretary of the Interior is responsible for the regulation of surface mining activities unless a state adopts a regulatory structure that is approved by the Department of the Interior. *See* 30 U.S.C. § 1253(a). Once the Department of the Interior is satisfied that the state regulatory system meets its minimum requirements, a state achieves "primacy" under SMCRA, the federal regulations and laws become non-operative, and the state assumes responsibility and authority for directly regulating surface mining activities within its borders. *See id.*; *Bragg*, 248 F.3d at 288-89. West Virginia's system has been approved by the Department of the Interior; thus West Virginia and DEP have "exclusive jurisdiction" to regulate the surface mining industry in the state. *See Bragg*, 248 F.3d at 289; 30 C.F.R. § 948.10.

or a combination of escrow and surety bonds (each a "Commercial Bond" and collectively, "Commercial Bonds"). *See* W. Va. Code R. § 38-2-11.3 (2015). "The period of liability for bond coverage begins with the issuance of a permit and continues for the full term of the permit plus any additional period necessary to achieve compliance with the requirements in the reclamation plan of the permit." W. Va. Code § 22-3-11. A Commercial Bond is necessary unless the mining operator satisfies certain requirements and can "self-bond."

In lieu of a Commercial Bond backed by a third party, DEP may allow for a mining operator to self-bond if the operator can demonstrate to DEP "a history of financial solvency and continuous operation sufficient for authorization to self insure." *Id.* DEP has promulgated the West Virginia Surface Mining Reclamation Rule (the "Rule") which enumerates the self-bonding criteria. *See* W. Va. Code R. § 38-2-11. To qualify for self-bonding under the Rule, an operator must meet one of the following requirements: 1) have its own corporate bonds rated as "A" or higher by Moody's Investor Service or Standard and Poor's Corporation; 2) have a tangible net worth of at least $10 million, a total liabilities to net worth ratio of 2.5 times or less, and an asset to liabilities ratio of 1.2 times or greater; or 3) fixed assets in the United States totaling at least $20 million, a total liabilities to net worth ratio of 2.5 times or less, and an asset to liabilities ratio of 1.2 times or greater. *Id.* § 38-2-11.3.d.2.C. DEP is authorized to initiate forfeiture proceedings for a mining operator's bond in the event the operator's mining permit is revoked. *See* W. Va. Code § 22-3-17(b). DEP is authorized to enter into consent agreements following the initiation of any enforcement action against a permit holder. *See* W. Va. Code. R. § 38-2-20.4.j.

Approximately two weeks prior to the Petition Date, the Acting Director of DEP notified the Debtors that due to their vulnerable financial condition, DEP would no longer permit the

Debtors to satisfy any further bonding obligations through self-bonding. DEP stressed to the Debtors that it recognized the economic pressures on the coal industry, and that it would work with the Debtors to transition from self-bonding to another acceptable form of bond. On August 5, 2015, two days after the Petition Date, the Debtors informed DEP that the Debtors believed they no longer satisfied the self-bonding requirements in the Rule. On September 1, 2015, DEP wrote to the Debtors to confirm that the Debtors were no longer in compliance with the financial ratio requirements set forth in the Rule and that DEP would require a substitute form of bond (the "September 1 Letter").[7] DEP encouraged the Debtors to reach out to DEP in order to work out a consensual solution.

On September 17, 2015, the Court entered an order approving the Debtors' post-petition financing (the "DIP Loan Facility"). The DIP Loan Facility includes a bonding accommodation provision that allows the Debtors to provide financial assurances to governmental authorities in the event that a governmental authority demands that the Debtors transition from self-bonding to Commercial Bonding. The financial assurance can take the form of a collateralized bonding letter of credit, or a superpriority claim that has priority over all other § 503(b) administrative expense claims. The DIP Loan Facility caps the Debtors' bonding accommodation capacity, whether through the issuance of a letter of credit or the grant of a superpriority claim, at $100 million.

On October 8, 2015, the Court approved a settlement agreement between the Debtors and the state of Wyoming (the "Wyoming Settlement"). Stipulation and Order Concerning Debtors' Reclamation Bonding, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Oct. 8, 2015)

---

[7] DEP and the Debtors disagree about whether DEP can demand the Debtors post substitute bonds without violating the provisions of the automatic stay in the Bankruptcy Code. *See* 11 U.S.C. § 362. This issue has not been presented before the Court and the Court makes no findings in regard to it.

ECF No. 628. Just as the Debtors have in West Virginia, the Debtors have extensive mining operations in Wyoming. Wyoming has self-bonding requirements similar to those in effect in West Virginia. Wyoming demanded that the Debtors post $411 million in substitute bonds and collateral to replace the Debtors' outstanding self-bonding obligations. The Wyoming Settlement provided that the Debtors would grant the state of Wyoming a $61 million superpriority claim, and in exchange, Wyoming would refrain from demanding new bonds or taking adverse action with respect to the Debtors' mining permits. The Court approved the Wyoming Settlement without objection. After the Wyoming Settlement, $39 million remained available under the Debtors' DIP Loan Facility that the Debtors could use in order to satisfy any other bonding demands from governmental entities.

As of October 1, 2015, the Debtors had total bonding obligations in West Virginia in the amount of $317,798,455. Surety bonds posted by the Debtors cover $73,422,621 of the total amount. The Debtors have self-bonded the remaining amount of $244,375,833. Pursuant to the September 1 Letter from DEP to the Debtors, the Debtors needed to reach an agreement with DEP or post over $240 million in new Commercial Bonds within 90 days of receipt of the September 1 Letter (the "Enforcement Action").

The West Virginia Settlement resolves the Enforcement Action initiated by DEP against the Debtors. Under the terms of the West Virginia Settlement, the Debtors are required to post a $15 million letter of credit in favor of DEP as a collateral bond and grant DEP a superpriority claim in the amount of $24 million. This amount fully exhausts the remaining $39 million available for bonding accommodations under the Debtors' DIP Loan Facility. The Debtors are further required to use their reasonable best efforts to reduce their self-bonding obligations in West Virginia by $10 million and to commence reclamation on an inactive mining permit within

the state. Nothing in the West Virginia Settlement relieves the Debtors of their reclamation obligations or in any way impairs the rights of DEP to enforce the Debtors' obligations. The $24 million superpriority claim and the $15 million collateral bond will be released by DEP only if the Debtors replace all of their self-bonds with appropriate Commercial Bonds. The West Virginia Settlement also gives DEP the right to demand the substitution of any self-bond with a Commercial Bond should it appear likely that the Debtors will fall out of compliance with any mining permit.

On December 7, 2015, the Debtors filed a Motion to approve the West Virginia Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. The Debtors argued that the West Virginia Settlement was a fair and reasonable compromise and was in the best interest of the Debtors' estates. The Environmental Parties objected to the Motion on the grounds that it violated the Act and SMCRA. In response, the Debtors questioned the standing of the Environmental Parties and reiterated that the agreement was a reasonable exercise of the Debtors' business judgment. DEP responded to the Environmental Parties by arguing (i) that it had the legal authority to enter into the West Virginia Settlement, (ii) that no provision of the West Virginia Settlement violates West Virginia law, and (iii) that the West Virginia Settlement serves the best interests of West Virginia. OSM did not object to the West Virginia Settlement, but it did file a reservation of rights.

**Analysis**

*Standing*

As a threshold matter, this Court must consider whether the Environmental Parties have standing to object to the Debtors' Motion. The Court concludes that they do not. "Article III of the United States Constitution gives federal courts jurisdiction to hear cases and controversies,

7

and the doctrine of standing identifies disputes appropriate for judicial resolution." *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)).  A party must have standing to meet the Article III case or controversy requirement.  To demonstrate standing a party must have suffered a "concrete and particularized injury in fact," that is fairly traceable to the challenged action of the defendant, and that can be redressed by a favorable judicial decision.  *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The injury must be concrete and not "conjectural or hypothetical."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).  "A litigant must clearly and specifically set forth facts sufficient to satisfy these Article III standing requirements."  *Id.*

The Bankruptcy Code sets forth an additional standing requirement to be heard in a Chapter 11 proceeding.  Section 1109(b) provides that "[a] party in interest, including the debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).  "Section 1109(b) 'is to be construed broadly, in order to allow parties affected by a chapter 11 case to appear and be heard'"[8] *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1433 (4th Cir. 1990) (quoting *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. 546, 550 (Bankr. D.N.H. 1988)).  As the Environmental Parties plainly do not fall into any of the specific categories listed in § 1109(b) of the Bankruptcy Code, they must

---

[8] Courts disagree as to whether the analysis for standing under Article III and § 1109 are different. *See In re Global Indus. Tech., Inc.*, 645 F.3d 201, 212 (3d. Cir. 2011) ("Article III standing and standing under the Bankruptcy Code are effectively coextensive."). *But see In re Tower Park Props., LLC*, 803 F.3d 450, 457 n.6 (9th Cir. 2015) (noting that for § 1109(b) to have meaning, it must be narrower than Article III standing). The Court need not resolve this issue in the case at bar, as the Environmental Parties clearly fail to meet either standard.

rely for purposes of standing on being categorized generally as a "party in interest" in order to be heard in this Chapter 11 proceeding.

Although the term "party in interest" is used throughout the Bankruptcy Code, the term is not defined, and the Court of Appeals for the Fourth Circuit has not elaborated on its meaning in § 1109(b). However, the Fourth Circuit has discussed the term in other sections of the Bankruptcy Code. Generally, "a term is presumed to have the same meaning throughout a statute." *Virginia Office for Protection and Advocacy v. Reinhard*, 405 F.3d 185, 190 (4th Cir. 2005) (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). In § 502 of the Bankruptcy Code, the Fourth Circuit has defined "party in interest" as "one who has a pecuniary interest in the distribution of assets to creditors." *Grausz v. Englander*, 321 F.3d 467, 473 (4th Cir. 2003) (citing *Willemain v. Kivitz*, 764 F.2d 1019, 1022 (4th Cir. 1985)). Similarly, in § 102 of the Code, the Fourth Circuit has stated that a "party in interest" is "generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings." *In re Hutchinson*, 5 F.3d 750, 756 (4th Cir. 1993) (quoting *White Cty. Bank v. Leavell (In re Leavell)*, 141 B.R. 393, 399 (Bankr. S.D. Ill. 1992)). Relying on the previous Fourth Circuit rulings, the United States District Court for the Eastern District of Virginia has stated that "'a party in interest' under Title 11 includes the debtor itself, a trustee, or a creditor." *In re Alexander Surveys Int'l., LLC*, 500 B.R. 817, 820 (E.D. Va. 2013) (defining "party in interest" under § 350(b) of the Bankruptcy Code).

Other circuits throughout the country have adopted similar definitions. Interpreting § 1109(b), the Seventh Circuit stated, "the list of 'parties in interest' is not exhaustive, but does suggest that such a party is someone who has a legally recognized interest in the debtor's assets, namely the debtor . . . and the creditors." *In re C.P. Hall Co.*, 750 F.3d 659, 661 (7th Cir. 2014);

9

*see also* 7 Collier on Bankruptcty ¶ 1109.02[1] (Alan A. Resnick & Henry J. Sommer eds., 16th Ed. 2015) ("In general, a 'party in interest' under section 1109(b) is any person with a direct financial stake in the outcome of the case . . . ."). The Third Circuit has held that a "party in interest" under § 1109(b) is "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *In re Global Indus. Tech., Inc.*, 645 F.3d 201, 210 (3d. Cir. 2011) (quoting *In re James Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992)). The Second Circuit likewise recognized that under § 1109(b) "parties in interest typically have a financial stake in the outcome of the litigation . . . ." *In re Teligent Inc.*, 640 F.3d 53, 60 (2d. Cir. 2011).

It is incumbent on the Environmental Parties to demonstrate "not merely standing but that 'a legislatively conferred cause of action encompasses' its claim" against the Debtors and the state of West Virginia. *In re C.P. Hall Co.*, 750 F.3d at 661 (quoting *Lexmark Int'l, Inc.*, 134 S. Ct. at 1387). The Environmental Parties must show that "the Bankruptcy Code conferred . . . the right to butt into a settlement negotiation between other parties." *Id.* (upholding a bankruptcy court's ruling that an excess insurer of the debtor had no standing to object to a settlement between debtor and his primary insurer).

The Court finds that the Environmental Parties do not have Article III standing or statutory standing under § 1109(b) of the Bankruptcy Code. The Environmental Parties have failed to plead any concrete and particularized injury in fact that would result from the approval of the West Virginia Settlement. The only allegations set forth in the Environmental Parties' objection are that the settlement violates the laws of the United States of America and West Virginia. Such allegations, even if true, cannot confer standing upon the Environmental Parties. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998) (holding that "vindication of the rule of law" does not suffice for standing). The Environmental Parties fail to plead how they,

10

or their members could be harmed by the approval of the West Virginia Settlement. As the Environmental Parties have failed to plead *any* basis for standing whatsoever in their objection, the Court need not address whether standing has been proved by the Environmental Parties.

The Environmental Parties also lack standing under § 1109(b) of the Bankruptcy Code. The Environmental Parties do not fall into any of the listed categories in § 1109(b). The Court has been presented with no evidence that any of the Environmental Parties is a creditor in this Chapter 11 case. The Environmental Parties' only chance at standing rests on a showing that the Bankruptcy Code otherwise permits them to object as a "party in interest" under § 1109(b). The Court finds that none of the Environmental Parties are a "party in interest" in this bankruptcy proceeding because the Environmental Parties have no pecuniary interest at stake. Even if the Environmental Parties had some pecuniary interest, standing can only attach under § 1109(b) if the pecuniary interest would be "directly affected" by the bankruptcy proceeding. *In re Hutchinson*, 5 F.3d at 756. A remote pecuniary interest will not suffice for standing. *See In re C.P. Hall Co.*, 750 F.3d at 661 (declaring an excess insurer's pecuniary interest in the settlement between a primary insurer and the debtor as "too remote"); *In re Teligent, Inc.*, 640 F.3d at 61 (finding a law firm's pecuniary interest in a rule 9019 settlement to be "too remote" for § 1109(b) standing when one of the parties was required to sue the law firm as part of the settlement). The Environmental Parties have not demonstrated that the Bankruptcy Code otherwise permits them to be heard as a party in interest in connection with the approval of the West Virginia Settlement.

*9019 Motion*

The Debtors sought this Court's approval of the West Virginia Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. The Debtors argue that this settlement

11

is fair, equitable, and in the best interest of the Debtors and their bankruptcy estates. Without the settlement the Debtors could be responsible for posting over $244 million in substitute Commercial Bonds, which would be a severe challenge for any entity operating under Chapter 11.

Bankruptcy Rule 9019 allows a Debtor in possession, after notice and hearing, to settle a matter with the approval of the Court. Fed. R. Bankr. P. 9019. All compromises and settlements must be "fair and equitable." *Protective Comm. for Indep. Stockholders of TM Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Four factors have been developed to help guide a court's analysis as to whether a settlement should be approved: (i) the probability of success in litigation; (ii) the potential difficulties in any collection; (iii) the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors. *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997) (citing *In re Martin*, 91 F.3d 389, 393 (3d. Cir. 1996)); *see also In re Three Rivers Woods, Inc.*, No. 98-38685, 2001 WL 720620 at *5-6 (Bankr. E.D. Va. Mar. 20, 2001). The Court can approve a proposed settlement so long as it does not fall "below the lowest point in the range of reasonableness." *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)). "In essence, a compromise or settlement will [most] likely gain approval if it is both 'fair and equitable,' as well as representative of the best interests of the estate as a whole." *In re Three Rivers Woods Inc.*, 2001 WL 720620 at *6 (citations omitted). A bankruptcy judge is not required to "conduct a full evidentiary hearing or mini trial" before approving a settlement. *Id.* (citing *DePoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994)). The proponent of the settlement has the burden of proving that the settlement is fair and equitable. *In re Frye*, 216 B.R. at 174 (citing *In re A & C Props.*, 784 F.2d 1377, 1381 (9th Cir. 1986)). Rule

12

9019 requires that notice of the settlement be given to all creditors, the United States trustee, the debtor, and indenture trustees. Fed. R. Bankr. P. 2002(a)(3), 9019(a).

The issue of standing aside, the Court finds that all of the forgoing factors favor the approval of the West Virginia Settlement. The West Virginia Settlement was noticed to all creditors and parties in interest. Although (given the exigencies of surrounding circumstances) the Motion was heard on an expedited basis, no creditor filed an objection to the proposed settlement. The Court finds that the West Virginia Settlement represents a fair and equitable deal for all parties, and is well above the lowest point of reasonableness. Absent the West Virginia settlement, the Debtors and the state of West Virginia would have become embroiled in time consuming, expensive, and distracting litigation over whether West Virginia's substitution demand violated the automatic stay. The Debtors have admitted that this litigation would be "hotly contested." The Debtors' likelihood of success in such litigation is hardly assured, given the regulatory and police power exception to the automatic stay. *See* 11 U.S.C. § 362(b)(4). If the Debtors were to lose the litigation with West Virginia, they would be required to immediately post over $244 million in substitute bonds in order to continue mining in West Virginia. Given the Debtors' limited liquidity, this could be a substantial hurdle that could impair the Debtors' reorganization efforts. The West Virginia Settlement avoids such a result and allows the Debtors to gradually transition away from the self-bonding program while still upholding their reclamation obligations to the state of West Virginia. The Court is convinced that this agreement will best preserve the value of the Debtors' bankruptcy estates, maximize the return to creditors, help preserve jobs, and give the Debtors the opportunity to reorganize their business affairs. Indeed, the Environmental Parties do not dispute that this settlement results in a substantial benefit both to the Debtors and to the state of West Virginia.

Instead, the Environmental Parties argue that even though the West Virginia Settlement is in the best interest of the Debtors and their creditors, the Court should still deny its approval on grounds that the settlement violates state and federal law. The Fourth Circuit has stated that before a Court approves a settlement agreement it must be satisfied that it "is not illegal, a product of collusion, or against the public interest." *U.S. v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (quoting *U.S. v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)). The Court finds the West Virginia Settlement is not *per se* illegal. The parties charged with responsibility for representing the public interests at stake have either consented to the agreement or have not objected to it.

In their objection to the West Virginia Settlement, the Environmental Parties argue this Court is without the authority to approve the settlement agreement because it violates several provisions of West Virginia law. The Environmental Parties argue that DEP simply has no discretion in the enforcement of the laws of West Virginia, and that the Debtors' mining permits must be revoked if the Debtors fail to immediately post $244 million in Commercial Bonds. In effect, the Environmental Parties ask this Court to ignore the positions asserted by DEP and substitute the Court's judgment for the judgment of DEP. The Court will defer to the administrative agency responsible for implementing and enforcing the Act. DEP represents the state of West Virginia and its citizens in this bankruptcy case, and is best aligned to protect the interests of West Virginia. DEP should be allowed to enforce the statutes and rules of West Virginia in a manner consistent with the goals and policies it has adopted. DEP, as a party to the West Virginia Settlement, has exercised its own discretion by entering into the agreement. *See Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980) ("The trial court in approving a settlement need not inquire into the precise legal rights of

14

the parties . . . but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts . . . ."). If the West Virginia Settlement did somehow violate West Virginia law, the Court trusts that DEP would not have entered into it. *See In re High Voltage Eng'g Corp.*, 397 B.R. 579, 603 (Bankr. D. Mass. 2008) (deferring to the New Jersey Department of Environmental Protection when weighing whether a settlement violated New Jersey public policy).

The Court finds that DEP did not violate West Virginia law when it entered into the West Virginia Settlement. West Virginia law clearly permitted DEP to negotiate a compromise and enter into a consent agreement following the initiation of the Enforcement Action. *See* W. Va. Code. R. § 38-2-20.40.j (authorizing DEP to enter into a settlement "at any point in the enforcement process following the issuance of a notice of violation, a cessation order, or a show cause order"). If the Environmental Parties want to litigate the extent of DEP's authority, then they should initiate such action in an appropriate West Virginia forum. The Environmental Parties have challenged the authority of Wyoming to enter into the Wyoming Settlement, for example, by writing to the Director of the Wyoming Department of Environmental Quality and initiating a complaint.

The same reasoning applies to OSM. The Environmental Parties urge this Court to disapprove the West Virginia Settlement on the grounds that it violates federal law. This Court will not step into the shoes of the OSM and act as an enforcer of the Code of Federal Regulations. It is enough that OSM was given notice of the West Virginia Settlement, OSM filed a responsive pleading, and a representative for OSM spoke at the Hearing to consider approval of the West Virginia Settlement. At no time did OSM object to the West Virginia Settlement or to the Wyoming Settlement. As the Court clearly set forth on the record at the

15

Hearing, nothing in the Settlement Order precludes OSM from raising violations of SMCRA or other federal regulations at any time going forward in this bankruptcy case. It is simply not for this Court to raise the prospect of any such violations. Under these circumstances, and given that no party with a real pecuniary interest has raised an objection, the Court decided to grant the Motion and approve the West Virginia Settlement. Accordingly, the Settlement Order was entered on December 22, 2015.

Entered: Jan 20 2016

                                        /s/ Kevin R. Huennekens
                            UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: 1/20/16