IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:        ALPHA NATURAL RESOURCES,                Case No. 15-33896-KRH
              INC., *et al.*,                         Chapter 11
                                                      (Jointly Administered)
                            Debtors.

## MEMORANDUM OPINION

On August 3, 2015 (the "Petition Date"), Alpha Natural Resources, Inc., and 149[1] of its

direct and indirect subsidiaries (the "Debtors") commenced these bankruptcy cases by each filing

a separate voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United

States Bankruptcy Court for the Eastern District of Virginia.[2]  The Debtors continue to manage

their properties and operate their businesses as debtors in possession pursuant to §§ 1107 and

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11

cases.  On August 5, 2015, the Court entered an order authorizing the joint administration of

these Chapter 11 cases.[3]

This matter comes before the Court on the motion (the "Motion") of the Debtors for entry

of an order (i) authorizing payments to executive insiders under the Debtors' 2015 Annual

Incentive Bonus Plan (the "AIB") and (ii) approving the Debtors' Key Employee Incentive Plan

(the "KEIP").[4]  The 2015 AIB component of the Debtors' Motion asked the Court for

---

[1] The Chapter 11 petition for one of the Debtors' subsidiaries, Grey Hawk, has since been withdrawn.  Order Dismissing Case, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Oct. 8, 2015) ECF No. 638.

[2] All further references to the Bankruptcy Code are to the Bankruptcy Code as codified at 11 U.S.C. §§ 101 *et seq.*

[3] *See* Fed. R. Bankr. P. 1015.

[4] This is a contested matter under Federal Rule of Bankruptcy Procedure 9014.

authorization in the ordinary course of its business to pay eight of the Debtors' executive insiders incentives that had been earned pre-petition under the Debtors' longstanding AIB program.  The Court approved the AIB component of the Debtors' Motion on an uncontested basis.  The KEIP component of the Debtors' Motion sought to incentivize the Debtors' senior management team to meet and exceed certain performance goals.  Senior management members would receive monetary rewards based on the performance of the Debtors and the completion of other restructuring milestones.

The Office of the United States Trustee (the "U.S. Trustee"), the United Mine Workers of America (the "UMWA"), and six UMWA associated health and retirement funds (the "UMWA Funds") filed objections to the KEIP (together, the "Objectors" or the "Objections").  The Official Committee of Unsecured Creditors (the "Creditors' Committee"), the Official Committee of Retired Employees (the "Retiree Committee"),[5] the Debtors' post-petition lenders,[6] the Debtors' first-lien lenders, and the Debtors' second-lien lenders (all of which have played an active role in these jointly administered cases) did not object to the KEIP.  On January 22, 2016, the Court conducted an evidentiary hearing to consider granting the KEIP Motion (the "Hearing").  At the conclusion of the Hearing, the Court overruled the Objections and approved the KEIP.  Accordingly, the Court entered an order approving the 2015 AIB payments and the KEIP on January 27, 2016 (the "KEIP Order").  This Memorandum Opinion sets forth the

---

[5] The Creditors' Committee was formed and appointed in accordance with 11 U.S.C. § 1102.  The Retiree Committee was formed and appointed in accordance with 11 U.S.C. § 1114(d).  Both the Creditors' Committee and the Retiree Committee have the powers and duties specified in 11 U.S.C. § 1103.

[6] By final order entered September 17, 2015, the Court authorized the Debtors to obtain post-Petition Date secured financing pursuant to 11 U.S.C. § 364 from the post-petition lenders.(the "Post-Petition Lenders").  *See* Post-Petition Financing Order, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Sept. 17, 2015) ECF No. 465.

Court's findings of fact and conclusions of law supporting the KEIP Order in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[7]

## Jurisdiction and Venue

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

## Factual Background

The Debtors are the largest domestic producers of coal by volume in the United States and are headquartered in Bristol, Virginia.  As of the Petition Date, the Debtors employed almost 8,000 full time employees across many different states; the UMWA represents approximately 1,000 of these employees.  On a consolidated basis, the Debtors had total assets of $10.1 billion and liabilities of $7.1 billion as of the Petition Date.  The Debtors had consolidated 2014 revenues of 4.3 billion.[8]

Prior to the Petition Date, the Debtors had offered two annual employee incentive programs for certain eligible employees.  The AIB had been used for approximately eleven years and rewarded many support and operational staff with a bonus based on the Debtors' performance relative to a number of financial and operational metrics.  The different metrics were assigned a certain weight that determined the amount of the bonus.  The metrics included:

---

[7] Federal Rule of Bankruptcy Procedure 7052 is made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.  *See* Fed. R. Bankr. P. 9014.  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

[8] The Debtors' business operations and capital structure are described in the amended declarations of Kevin S. Crutchfield, Chief Executive Officer and Chairman of the Debtors' Board of Directors, and Philip J. Cavatoni, Executive Vice President and Chief Financial and Strategy Officer of the Debtors.  *See* Amended Declarations, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Aug. 3, 2015) ECF No. 45 & No. 46.

(i) safety (7.5%); (ii) environmental compliance (7.5%); (iii) adjusted EBITDA[9] (40%); (iv) liquidity (10%); (v) gross debt reductions (10%); and (vi) expense reductions (25%).  An independent compensation committee of the Alpha Board of Directors (the "Compensation Committee") designed and approved the AIB.  The Debtors' recently transitioned many of their employees to the Operational Safety and Environmental Bonus ("OSEB") program.  This program distributes a quarterly bonus to all of the Debtors' non-union hourly employees based on environmental and safety metrics in accordance with the performance of the employee's individual work site.  On the Petition Date, the Debtors filed a motion (the "Wage and Benefit Motion") to continue payments under the AIB and OSEB.  The Court granted the Wage and Benefit Motion on a final basis by order entered September 3, 2015.[10]

The Debtors have also compensated a number of important employees through a Key Employee Retention Program (the "KERP").  Prior to the Petition Date, and as the coal industry continued to decline, the Debtors had increasingly relied on retention agreements to combat the departures of key employees.  Following the Petition Date, the Debtors sought the authority to continue the practice of entering into retention agreements in the ordinary course of business.  However, as the Bankruptcy Code clearly prohibits purely retentive agreements for "insiders," the Debtors excluded eight members of the Debtors' senior management team from the KERP (the "Executive Insiders").  *See* 11 U.S.C. §§ 101(31), 503(c)(1).  The U.S. Trustee filed an objection to the KERP on the principal basis that additional employees should be excluded from the KERP because they too should be deemed "insiders" under the Bankruptcy Code and thus

---

[9] EBITDA is a commonly used measure of a company's ability to produce income on its operations in a given year. It is shorthand for earnings before interest, taxes, depreciation, and amortization.  *See* David L. Scott, Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor (3d. ed. 2003).

[10] The Wage and Benefit Motion initially carved out eight executive insiders that were entitled to receive pre-petition bonuses under the AIB.  The KEIP Order expressly approved these payments on an uncontested basis.

ineligible to participate in the KERP.[11]  *See* 11 U.S.C. §§ 101(31), 503(c)(1).  The Debtors

resolved the U.S. Trustee's objection by excluding seven additional individuals from the KERP

(the "Non-Executive Insiders").  The eight Executive Insiders, and the seven additional Non-

Executive Insiders that were all excluded from the KERP constitute the fifteen KEIP participants

(the "KEIP Participants").

The KEIP Participants have historically received three principal forms of compensation:

(i) base salary; (ii) cash bonuses through the AIB and/or the KERP; and (iii) equity awards.  The

equity awards constituted the bulk of the compensation for the KEIP Participants.  On average

the equity awards composed 46% of the Executive Insiders' total compensation, and 35% of the

Non-Executive Insiders' total compensation.  After the Debtors' bankruptcy, these equity

rewards have little or no value.  Following the Petition Date, the KEIP Participants will no longer

receive cash bonuses under the AIB or the KERP.  Going forward, compensation of the KEIP

Participants will consist only in the form of base salary unless the Court approves the KEIP.

The Debtors' KEIP was designed and approved by the Debtors' Compensation

Committee.  The Debtors' Compensation Committee consists of three independent board

members.  The Compensation Committee complies with the independence requirements of the

New York Stock Exchange (NYSE).[12]  Since 2012, the Compensation Committee had retained

---

[11] The UMWA also filed an objection to the KERP on a number of grounds.  The Debtors were able to resolve the UMWA objection by allowing the UMWA to review and object to certain new retention agreements.

[12] Section 952 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") required that the SEC direct the national security exchanges to create rules requiring all members of any compensation committee listed on a national security exchange to be "independent."  *See* 15 U.S.C. § 78j-3(2); 17 C.F.R. § 240.10C-1.  In response, the NYSE required all compensation committee members to be "independent," and that no director could be "independent" unless it is determined that "the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the company)."  NYSE Listed Company Manual §§ 303A.02, 303.A.05; *see* Exchange Act Release No. 34-68637, 2013 WL 10509039 (Jan. 11, 2013) (approving the NYSE compensation committee independence rules).

Meridian Compensation Partners ("Meridian") to provide independent compensation advice to the Compensation Committee.[13]  To maintain their full independence, Meridian does not provide any other advice or services to the Debtors' management and only consults with the Compensation Committee.

To begin developing the outline of the Debtors' KEIP, Meridian looked for companies with a similar profile to the Debtors.  Meridian targeted companies that had operated in a similar industry and that had a comparable amount of assets.  Meridian initially identified forty-three companies that were potentially comparable to the Debtors.  Meridian further narrowed this list to twenty comparable companies.  Meridian then conducted significant research on the twenty remaining companies to develop a foundational design for what the Debtors' KEIP should look like.  One of Meridian's goals was to identify other KEIPs that had been approved by bankruptcy courts in order to best fashion a KEIP that could ultimately obtain approval in this Court.  For example, Meridian informed the Debtors' Compensation Committee that this Court had previously approved a KEIP in the James River Coal Company case.  Meridian noted that the James River Coal Company KEIP had nine total participants, three different payout levels, and was contingent on the consummation of a Chapter 11 plan of reorganization or a sale of substantially all of the assets.  Based on the data sets of the twenty different companies it had researched, Meridian developed preliminary metrics for the Debtors' KEIP.  Four different categories of performance goals were suggested: (i) cost savings; (ii) EBITDA/liquidity; (iii) safety; and (iv) environmental compliance.  The Debtors' financial turnaround advisor, McKinsey Recovery & Transformation Services U.S., LLC, ("McKinsey") then operationalized the savings and EBITDA/liquidity benchmarks in the Meridian model to ultimately determine

---

[13] Dodd-Frank and the SEC mandate that a compensation committee consider several factors when determining the independence of compensation consultants.  *See* 15 U.S.C. § 78j-3(b); 17 C.F.R. § 240.10C-1.

targets the company would need to achieve in order for the KEIP Participants to earn an incentive award.

*KEIP Specifications*

The KEIP incorporates the four metrics that Meridian developed and assigns to each of them a specific weight for determining the amount of a bonus. The amount of the bonus is then determined by which of the three possible payout levels is achieved. The KEIP provides a "threshold" level, a "target" level, and a "maximum" level for each metric. If the Debtors meet the "target" level for all four of the performance metrics, the total bonus pool that will be divided by all the KEIP Participants will be approximately $6.8 million. If the Debtors only meet the lower "threshold" level for all the performance metrics, then the total payout will be reduced to 50% of the "target" level bonus, approximately $3.4 million. In the event, that the Debtors reach the "maximum" level for all four performance metrics, the bonus pool available to all KEIP Participants will increase to 175% of the "target" level bonus, approximately $11.9 million. The critical period within which the four performance metrics must be achieved runs from January 1, 2016 until June 30, 2016. The Debtors' Post-Petition Lenders, the Creditors' Committee, and the Retiree Committee all have the right to object to the Debtors' performance and payout calculations under the KEIP.

i. Weighted Performance Metrics

The cost savings metric is assigned a weight of 30% of the total potential payout under the KEIP. The cost savings metric incents the KEIP participants to achieve cost savings through executed initiatives. The Debtors' KEIP will payout at: (i) the threshold level if the Debtors save $64 million; (ii) the target level if the Debtors save $75 million; and (iii) the maximum level if

the Debtors save $82 million.  These savings expressly exclude any savings achieved through modification of collective bargaining rights or retirement benefits.

The liquidity metric is assigned a weight of 55% under the KEIP.  The liquidity metric measures the amount of cash or cash equivalent securities the Debtors have on June 30, 2016. The Debtors' KEIP will payout at: (i) the threshold level if the Debtors have $675 million in cash; (ii) the target level if the Debtors have $775 million in cash; and (iii) the maximum level if the Debtors have $825 million in cash.  Again, the Debtors will exclude from the liquidity calculation any cash the Debtors saved through modification of collective bargaining rights or retirement benefits.

The safety metric and environmental metric each are assigned a 7.5% weight under the KEIP.  The safety metric is determined by non-fatal days lost, which measures work-related injuries that resulted in missing one or more days from work.  The environmental metric is an annualized ratio that measures certain violations of standards set forth by the National Pollutant Discharge Elimination System and the Clean Water Act.

### ii. Additional Qualification Criteria

The KEIP is further designed to encourage the KEIP Participants to devise an exit strategy that will allow the Debtors to expeditiously emerge from the Chapter 11 proceeding.  A quarter of any bonus that might otherwise be earned under the KEIP will be withheld and later forfeited unless the Debtors confirm a Chapter 11 plan by December 31, 2016.  Alternatively, the KEIP will payout at a "target" level if the Debtors can confirm a Chapter 11 plan or complete a sale of substantially all of the Debtors' assets prior to June 30, 2016.[14]

---

[14] The Debtors' KEIP was scrutinized by all its various constituencies and was subject to a number of revisions.  As originally presented, the Debtors proposed a KEIP with seventeen participants, a 200% "maximum" level payout, and two three-month performance periods.  The KEIP Participants were later reduced to fifteen after two of the

*Objections to the KEIP*

The Objectors raise a number of issues with the proposed KEIP. Initially, the Objectors question whether the KEIP is actually a disguised KERP. The Objectors contend that the KEIP's performance goals have been set too low and, therefore, can be too easily achieved. In the Objectors' view, the KEIP is not designed to incent performance but rather to encourage retention. Therefore, they argue, it cannot be approved under § 503(c)(1) of the Bankruptcy Code. Next, the Objectors contend that, if the KEIP is not primarily retentive, it nevertheless is not justified by the facts and circumstances of this Chapter 11 proceeding under § 503(c)(3) of the Bankruptcy Code. Finally, the Objectors maintain that the Debtors could not possibly have used their business judgment under § 363(b)(1) in formulating the KEIP.

The Objectors did not present any expert testimony of their own in support of the three positions they advanced at the Hearing. The Objectors were content to snipe at the presentation of the Debtors' experts and to argue that the Debtors' evidence was inadequate to meet the requisite burden of proof. The Objectors do not appear to disagree with the inclusion of the safety metric or environmental metric or with the methodology proposed for measuring those two components in the KEIP. It is the cost saving and liquidity performance metrics along with the overall size of the KEIP payout with which the Objectors take issue.

**Analysis**

Enacted in 2005, § 503(c)(1) of the Bankruptcy Code limits any "transfer made to, or [any] obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1). Section 503(c)(1)

---

KEIP Participants left the Debtors' employ. The final version of the KEIP was a product of the Debtors' extensive negotiations with the Creditors' Committee, and other interested parties.

acted as a deathblow to KERPs by imposing severe restrictions on any debtor who wished to make payments to an insider for the purpose of retaining that individual. *See In re U.S. Airways, Inc.*, 329 B.R. 793, 797-98 (Bankr. E.D. Va. 2005) ("Congressional Concern over KERP excesses is clearly reflected in changes to the Bankruptcy Code . . . .  Those changes will severely limit both the circumstances under which severance and retention payments may be made to insiders . . . .").  A debtor who makes payments to a corporate insider for the sole reason of retaining the insider will be subject to the exacting requirements of § 503(c)(1).[15]  *See In re Residential Capital, LLC (Residential Capital II)*, 491 B.R. 73, 83 (Bankr. S.D.N.Y. 2013) ("A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements of section 503(c)(1) . . . .").  However, the analysis under § 503(c) changes when a debtor purports to make a payment not to retain an insider, but primarily to incentivize the insider to achieve certain goals.

On its face, § 503(c)(1) does not apply to a KEIP because the payments thereunder are incentive and not purely retentive.  11 U.S.C. § 503(c)(1).  Incentive payments under a KEIP are governed by the more general provisions § 363(b)(1) and § 503(c)(3).  Section 363(b)(1) allows a debtor in possession to transact business outside the ordinary course with Court approval.  11

---

[15] A KERP under § 503(c)(1) can only be approved if the Court makes a finding that:
(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
(B) the services provided by the person are essential to the survival of the business; and
(C) either—
(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

U.S.C. § 363(b)(1).    Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1).  *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d. Cir. 1983); *In re Gordon Props., LLC*, 504 B.R. 415, 419 (Bankr. E.D. Va. 2013).  The business judgment test asks whether the debtor has proved that the transaction at issue is "within the fair and reasonable business judgment of the Debtors and thus within the zone of acceptability."  *See In re Dana Corp. (Dana II)*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006).  The United States Bankruptcy Court for the Southern District of New York has enumerated several factors a court should consider when applying the business judgment test in the context of approving a KEIP:

— Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance?*

— Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

— Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

— Is the plan or proposal consistent with industry standards?

— What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

— Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Id.* at 566-67 (collecting cases).

Section 503(c)(3) also applies to payments under a KEIP by prohibiting transfers to officers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  Therefore under § 503(c)(3), a debtor is authorized to make payments to its officers and insiders that are not retentive in nature only if the

payments are "justified by the facts and circumstances of the case." *Id.* The Court of Appeals for the Fourth Circuit has not elaborated on the "facts and circumstances" standard under § 503(c)(3). However, a majority of courts outside the Fourth Circuit agree that the "facts and circumstances" test of § 503(c)(3) is identical to the business judgment test under § 363(b)(1). *See In re Patriot Coal Corp.*, 492 B.R. 518, 530-31 (Bankr. E.D. Mo. 2013) (using the business judgment test to analyze an incentive plan under § 503(c)(3)); *In re Borders Grp., Inc.*, 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011) ("[T]he legal standard under § 363(b) is no different than section 503(c)(3) . . . ."); *In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (applying the business judgment test to an incentive plan). The Debtors argue this Court should follow the majority approach and apply the business judgment standard to the Debtors' KEIP.

Other courts adopt the position that § 503(c)(3) imposes a higher standard than the business judgment test because the test under § 503(c)(3) is not the same as the standard under § 363(b)(1). *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) ("[T]he test of section 503(c)(3) should not be equated to the business judgment rule as applied under section 363(b)(1)."); *see also GT Advanced Tech. Inc. v. Harrington*, No. 15-cv-069, 2015 WL 44559502 at *7 (D.N.H. July 15, 2015) (adopting a heightened standard for transactions under § 503(c)(3)). Under the elevated standard set forth in *Pilgrim's Pride*, even if the Court finds the debtor has demonstrated a sound business reason for the incentive proposal, a Court must undertake its own independent analysis to determine if the particular proposal will serve the best interests of creditors and the debtor's estate. *See Pilgrims Pride*, 401 B.R. at 237 ("[E]ven if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it."). The Objectors urge this Court

12

to adopt the heightened standard of *Pilgrim's Pride*, and independently consider whether the

KEIP would maximize the return to creditors and benefit the Debtors' estates.

In light of the clear restrictions on KERPs under § 503(c)(1), a Court must be vigilant

when analyzing the terms of a KEIP and be sure the KEIP is not a disguised KERP that is

primarily intended to reward its participants for retaining their positions with the debtor.  *See* 11

U.S.C. § 503(c)(1); *U.S. Airways*, 329 B.R. at 797-98 (noting the clear restrictions on KERPs

under the 2005 amendments to the Bankruptcy Code).  The burden of proof rests with the

Debtors to prove by a "preponderance of the evidence that the KEIP is primarily incentivizing

and not primarily retentive."  *In re Residential Capital, LLC (Residential Capital I)*, 478 B.R.

154, 170 (Bankr. S.D.N.Y. 2012).  A Court cannot defer to the labels used by a debtor when

determining whether a KEIP's true purpose is to either incent or retain.  *See id.*  ("A debtor's

label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with

skepticism . . . .").  Instead, a court must conduct its own holistic analysis to determine whether

the performance goals in the KEIP constitute meaningful and challenging targets for the debtor.

*See Dana II*, 358 B.R. at 571.  A KEIP that proposes performance goals that are a sure-thing, and

easily achieved through minimal effort by the debtors, should be re-characterized as a KERP that

is primarily retentive and subject to § 503(c)(1).  *See In re Dana Corp. (Dana I)*, 351 B.R. 96,

102 n.3 (Bankr. S.D.N.Y. 2006) ("If it walks like a duck (KERP) and quacks like a duck

(KERP), it's a duck (KERP).").  However, this re-characterization should only occur upon a

finding that the KEIP is *primarily* retentive; a KEIP that merely has some retentive effect should

not be analyzed under § 503(c)(1).  *See Global Home Prods.*, 369 B.R. at 785 ("The entire

analysis changes if a bonus plan is not primarily motivated to retain personnel . . . .").  In certain

terms, it is incumbent on this Court to determine whether the performance goals contained in the

Debtors' KEIP primarily consist of readily obtainable goals that will be easily achieved without any meaningful effort on the part of management.[16]

### The KEIP is not a disguised KERP

The first question this Court must answer is whether the KEIP is truly an incentive plan that should be analyzed under § 363(b)(1) and § 503(c)(3), or whether the KEIP is a disguised KERP that should be scrutinized under § 503(c)(1).  This ultimately depends, first, on whether the metrics and their associated performance goals are an easy reach or a stretch for Debtors' management, and second, on whether the achievement of those goals will have any bearing on the prospects for a successful outcome in these bankruptcy cases.

The uncontroverted testimony from the Debtors' restructuring advisor, Kevin Carmody ("Carmody"),[17] was that the performance goals set forth in the KEIP are aggressive and that the Debtors will struggle to achieve them.   Carmody repeatedly emphasized the difficulty of reaching either the liquidity or the cost savings performance goal in light of the overwhelming pricing pressures facing the coal industry.  Carmody testified that the cost savings targets would be very difficult to achieve, given that the Debtors had been constantly trying to reduce expenses in the years and months leading up to bankruptcy.  Carmody described the targets in relation to the liquidity metric as "aggressive" and a "stretch" to achieve.  The Court has no reason to doubt the testimony of Carmody, who is a well-recognized restructuring expert.  The Court is very

---

[16] Counsel for the UMWA Funds referred to a common sports analogy throughout his argument to differentiate an easily achievable KERP (a layup) from a more difficult KEIP (a three point shot).  But regardless whether the comparison is one of a layup to a three pointer in basketball, a field goal to a touchdown in football, or a bunt to a base hit in baseball, situational circumstances matter.  In the context of a basketball game, a contested layup at the buzzer may be a more difficult feat (and may have a greater bearing on the outcome) than a wide-open three-point attempt in a blowout.  In the cases at bar, the Debtors are confronted with very severe external market pressures.  Product demand and pricing are both at historic lows.  The Debtors' very industry is at risk.  The Debtors desperately need to reduce costs quickly in order to outrun pricing.  That is the Debtors' economic reality.  That the Debtors would want to implement a plan designed to incent management to surmount these problems does not strain credulity.

[17] Carmody leads the corporate restructuring practice at the professional services firm of McKinsey.

aware of the economic pressures confronting the coal industry, as this district has seen recently several coal-related Chapter 11 filings.

The KEIP encourages the Debtors to minimize their cash bleed while simultaneously cutting expenses and maintaining their safety and environmental standards.  Achieving the goals set forth in the plan will give the Debtors a realistic opportunity for a successful emergence from bankruptcy.  Indeed, if the goals are not met, the Debtors' prospects will be rather bleak.  The KEIP ensures that the Debtors maintain a keen focus on the Chapter 11 end-game, by making a significant part of the bonus pool contingent on confirmation of a plan of reorganization.  Savings that may be achieved from collective bargaining modification or from retiree benefit limitations are carved out from the savings and liquidity metrics.

The Court finds under these circumstances that the KEIP is an incentive plan.  Its primary purpose is to incent the KEIP Participants to maintain liquidity and thereby maximize the value of the Debtors' business.  The plan contains challenging goals that will be difficult to achieve in the current economic environment.

The Objectors argue that the KEIP performance goals are not a stretch because the cost savings and liquidity metrics are easily achievable.  The Objectors identified a number of different cost saving opportunities that the Debtors, in conjunction with their restructuring professionals, have developed to both increase the cash reserves and decrease expenditures.  The court views these opportunities as exactly that; opportunities that the Debtors may or may not be able to implement in their restructuring process.  It is vital that the Debtors do achieve the goals that have been established in the KEIP.  The cost savings metric and liquidity metric are not rendered meaningless merely because the Debtors are in the process of deciding on ways to implement those measures.  The uncontroverted testimony regarding the Debtors' cash flows and

15

existing cash forecasts demonstrated that the liquidity targets are appropriate given the Debtors'

actual cash burn and the stiff economic headwinds confronting the coal industry going forward.[18]

The Debtors' proposed KEIP is readily distinguishable from those in other cases that

were found to be disguised KERPs.  In *Residential Capital I*, the court rejected a proposed KEIP

as a disguised KERP because approximately two-thirds of the proposed payout was contingent

on the closing of an asset sale that had already been negotiated pre-petition.  *Residential Capital

I*, 478 B.R. at 172.   As the asset sale in *Residential Capital I* was almost certain to occur

regardless of any further involvement on the part of the KEIP participants, the payments under

the KEIP were found to be impermissible retention payments.  *Id.*   The court in *Residential

Capital I* explained that "the Debtors must more closely link vesting of the KEIP Awards to

metrics that are directly tied to challenging and financial operational goals." *Id.* at 173; *see also

In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 314-15 (Bankr. S.D.N.Y. 2012) (rejecting a

proposed KEIP where 50% of the payout was contingent on an asset sale that was almost certain

to occur).  *But see Residential Capital II*, 491 B.R. at 87 (approving a KEIP where "the full

bonus is based on financial and operational performance metrics").   Similarly, in *Dana I* the

bankruptcy court rejected a KEIP on the grounds that the bonus was paid out upon the debtors

exiting Chapter 11.  *Dana I*, 351 B.R. at 102.  The KEIP was deemed primarily retentive in *Dana

I* because the participants would receive a payout just for being employed "upon the Debtors'

emergence from chapter 11, regardless of the outcome."  *Id.*   Conversely, in this case, every

dollar earned under the KEIP is earned based on the financial and operational performance of the

Debtors.  The debtors in *Dana* and *Residential Capital* were later able to approve a KEIP after

---

[18] Carmody testified that the liquidity metric was a critical component of the KEIP by design.  He explained that
cash is needed to generate value in the Debtors' business plan.  Experience has taught that cash is king in a
restructuring.  Carmody testified that in this case he believed that cash was a better performance metric than
EBITDA.

modifying it with benchmarks based on financial metrics. *See Residential Capital II*, 491 B.R. at 86-87; *Dana II*, 358 B.R. at 582-83.

The Debtors' KEIP more closely resembles KEIPs that have been approved by other courts because the KEIP is primarily contingent on the Debtors' performance. *See Residential Capital II*, 491 B.R at 86-87, *Borders Group*, 453 B.R. at 465-66; *Global Home Prods.*, 369 B.R. at 780-81; *Dana II*, 358 B.R. at 582-83. Notably, the Debtors can earn a "target" level payout for confirmation of a Chapter 11 plan or a sale of substantially all of the Debtors' assets. However, this payout is only earned if the sale or confirmation takes place prior to June 30, 2016. *See Hawker Beechcraft*, 479 B.R. at 315 (criticizing the debtors' KEIP for having a payout from an asset sale with "inflexible" and "indefinite" deadlines). The Court is not aware of any restructuring support agreement or any substantial pre-petition sale negotiations that have occurred in the cases at bar. *See Residential Capital I*, 478 B.R. at 172 (noting the contemplated sale in the KEIP was "substantially negotiated pre-petition"); *Hawker Beechcraft*, 479 B.R. at 309 (rejecting a KEIP where the participants could earn a bonus under a transaction to which the debtor had already agreed in a restructuring support agreement). The Court finds that the KEIP in the cases at bar is not a disguised KERP because the performance goals set forth in the KEIP pose a significant challenge for the Debtors and because a sale of substantially all of the Debtors' assets is not certain to occur by June 30, 2016.

*The KEIP is justified by the facts and circumstances*

As the KEIP is not primarily retentive, the Court can approve the KEIP under § 503(c)(3) of the Bankruptcy Code unless it finds that the payments proposed to be made thereunder are "not justified by the facts and circumstances." 11 U.S.C. § 503(c)(3). The Debtors contend that the Court should defer to the decision of its independent Compensation Committee and apply the

business judgment test of § 363(b)(1).  The Debtors argue that the KEIP is well within the zone

of acceptability.  *See Dana II*, 358 B.R. at 571-72.  Conversely, the Objectors urge this Court to

adopt *Pilgrim's Pride* and apply a higher level of scrutiny to the Debtors' KEIP.[19]  *See Pilgrim's*

*Pride*, 401 B.R. at 236-37.  The Court need not decide between the two approaches, as it finds

the Debtors' KEIP satisfies both standards.

The Court finds that all fifteen of the KEIP participants are necessary for the

development and implementation of the Debtors' business plan and for the Debtors'

reorganization.[20]  Patrick Hassey, the chairman of the Debtors' Compensation Committee,

testified that the KEIP Participants are "the employees most responsible for overseeing the

Debtors' operations and more directly involved in the efforts to expeditiously complete a

restructuring."  *Hassey Decl.* at 11; *see also Hassey Dep.* at 36-38 (describing the roles of the

KEIP participants).[21]  Carmody agreed that all the KEIP participants were important and

"instrumental" to the Debtors' restructuring efforts.

The KEIP was designed and approved by independent members of the Debtors' Board of

Directors.   None of the members of the independent Compensation Committee are KEIP

---

[19] Certain Objectors also asked this Court to apply Delaware's "entire fairness" standard to the KEIP.  *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (requiring directors and officers to prove the "entire fairness" of a conflicted corporate decision).  The Court declines to consider this standard, as the KEIP was developed by an independent compensation consultant and approved by the Debtors' independent Compensation Committee.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994).  The Court finds that there has been no "conflicted corporate decision" made in this case.

[20] All of the rest of the Debtors' non-union employees are eligible for bonuses under the AIB and OSEB.

[21] In lieu of live testimony and after agreeing with the Objectors, the Debtors submitted the declaration and a sealed deposition transcript of Patrick Hassey.  A misunderstanding occurred after Debtors' counsel asked to admit the Hassey declaration while simultaneously handing up to the Court a copy of the Hassey deposition to be marked and admitted.  The Court admitted the sealed Hassey deposition as Debtors' Exhibit 1.  After a clarification with all parties, the Debtors later asked the Court to admit the Hassey declaration, and it was marked and admitted without objection as Debtors' Exhibit 4.  While the transcript of the Hearing seems to reflect that the Hassey declaration may have been admitted twice, the Court is clear that both the Hassey declaration and Hassey deposition were properly marked and admitted into evidence.  Tr. of Hr'g at 113.

Participants.  The design of the KEIP is consistent with KEIPs that have been approved in other

bankruptcy cases and by different bankruptcy courts.  The KEIP was first developed by

Meridian, an independent compensation consultant, further refined by McKinsey, and finally

approved by the independent Compensation Committee.  While the Compensation Committee

did not engage independent counsel to advise it, that fact has never been fatal to the approval of a

KEIP in the past.  *See Borders Group*, 453 B.R. at 477; *Global Home Prods.*, 369 B.R. at 786.[22]

Meridian developed the general structure of the KEIP after comparing twenty different

peer companies that had over $500 million in pre-petition assets and that were involved in a

manufacturing business or in a complex, asset-intensive business.  Meridian found that the

median number of KEIP participants among the peer companies was fifteen – the exact number

of the participants in the Debtors' KEIP.  The Court is satisfied that the size of the participation

pool under the Debtors' KEIP is not inconsistent with those of other similarly situated

businesses.

Meridian also found that 55% of the peer companies used EBITDA (or a variant) as a

metric and that 10% of the peer companies used liquidity as a metric.[23]  Among the peer

companies 25% of them used a safety or environmental metric and 15% of them used a cost

---

[22] Given the need to preserve scarce resources and the need to avoid unnecessary administrative expenses, the Court is not surprised that the Compensation Committee was reluctant to engage independent counsel.  The Court is satisfied that the Compensation Committee was able to obtain the legal advises it needed from Debtors' counsel whose employment as disinterested professionals was previously approved by the Court.  *See* 11 U.S.C. § 330(a); *see also* 11 U.S.C. § 101(14).

[23] The Objectors quibble whether the Debtors should have used EBITDA instead of pure liquidity as a performance metric.  While EBITDA is arguably a variant form for measuring liquidity, the Court defers to the testimony of Carmody, the Debtors' expert financial advisor, on this score.  *See supra* note 18.  The Court has no problem understanding why the Debtors would choose to use cash as their primary metric in lieu of EBITDA.  The Debtors' industry is under enormous economic pressure and would likely struggle to restructure without adequate cash reserves.  The Objectors argue that the liquidity metric is too easy to manipulate.  But they never put forth evidence to show that the Debtors' cash was not its most critically important resource going forward.  The Court notes that the Debtors' Post-Petition Lenders, the Creditors' Committee, and the Retiree Committee all have the power to review and object to any payment (and the basis for such payment) made under the KEIP.  *See* KEIP Order, *In re Alpha Nat. Res. Inc.*, No. 15-33896 (Bankr. E.D. Va. Jan. 27, 2016) ECF No. 1387.

reduction metric. Meridian's research demonstrated that none of the metrics or benchmarks in the KEIP is unusual or grossly disproportionate to comparable KEIPs. Notably, every performance metric used in the KEIP was also used in the Debtors' AIB program.

The Objectors next question the reasonableness of the KEIP generally in light of the total cost of the KEIP and the amount of the prospective bonuses in relation to the KEIP Participants' base salary. If the Debtors hit the established goals, the KEIP participants will receive, depending on the success level achieved and assuming plan confirmation by year-end, somewhere between 60% to 175% of their base salary. At the "target" level, the KEIP will payout approximately $6.8 million. While the Objectors argue that these numbers are too high, the Court finds that the cost of the KEIP is reasonable under all the circumstances.

First, Meridian found that the payout at the "target" level for other KEIPs on average was between 81% to 129% of the participant's base salary when the CEO of the company was excluded.[24] Second, Meridian, found that the payout at the "target" level of the Debtors' KEIP was comparable to other KEIPs as it represented only .073% of the book value of the Debtors' assets.[25] Third, the size of the prospective bonuses under the KEIP is reasonable in light of the reduction the KEIP Participants have experienced in their overall compensation. The KEIP Participants had historically received approximately 46% of their compensation in the form of equity awards. Market conditions and the advent of bankruptcy have now rendered equity awards virtually worthless. Fourth, the Debtors' other workers who are not subject to collective bargaining agreements are eligible for incentive rewards under their relevant OSEB or AIB

---

[24] The median payout was 56% to 115%.

[25] Meridian performed this analysis in connection with an earlier version of the Debtors' KEIP. *See supra* note 14. That version had covered seventeen participants and had included a payout of $7.4 million at the "target" level. Presumably, the ratio between "target" level payout and book value is even less under the present negotiated version of the KEIP.

plans.  None of the KEIP Participants will receive any of the AIB or retention payments in 2016.

Fifth, the KEIP was approved by the independent Compensation Committee.  And finally,

neither the Creditors' Committee nor the Retiree Committee has objected to the KEIP.

Considering all the facts and circumstances, the Court finds that (i) the scope of the KEIP

is reasonable, (ii) suitable due diligence was undertaken for adoption of the KEIP by the

independent Compensation Committee, (iii) the targeted management team of the KEIP is

appropriate, (iv) the cost of the KEIP is reasonable in the context of the Debtors' assets,

liabilities, and earnings potential, (v) the plan is properly designed to achieve the performance

desired, and (vi) the KEIP is consistent with industry standards.  The Court concluded that the

KEIP fell well within the fair and reasonable business judgment of the Debtors.  *See In re Walter

Energy, Inc.*, No. 15-02741, 2015 WL 9583521 at *4-5 (Bankr. N.D. Ala. Dec. 28, 2015)

(applying the business judgment test to a coal company's KERP); *Dana II*, 358 B.R. at 571-72.

Furthermore, the plan is designed to promote a successful result in these Chapter 11 cases

by incentivizing the KEIP participants to preserve the value of the Debtors' estates and thereby

maximize the return to creditors.  The KEIP participants are not merely being rewarded for

closing a sale or confirming a plan of reorganization.  The KEIP participants are tasked with

slowing the Debtors' cash bleed, decreasing expenses, and maintaining liquidity while ensuring

that safety and environmental standards are not compromised.  No party before the Court

disputed the Debtors' need to cut expenses.  No party before the Court disputed the Debtors'

need to stabilize cash flows.  Importantly, the KEIP also incentivizes the KEIP Participants to

achieve these performance goals quickly (*i.e.* within the six-month performance period).

Considering the downward economic trends pervading the coal industry, it is imperative that the

Debtors' act quickly and decisively to control their cash burn.

21

The KEIP is designed to maximize value for the benefit of creditors of the bankruptcy estates.  No expense will be incurred unless success is achieved.  The financial benefits that the Debtors will realize if the KEIP goals are met will far exceed the cost of the program.  It is not simply a drain on the Debtors' remaining, scarce assets.  To the contrary, the KEIP is a prudent investment in the Debtors' business plan, which is the Debtors' best chance for recovery.  The Court has determined from its own independent analysis that the KEIP will serve the best interests of the Debtors' creditors and of these bankruptcy estates.  Accordingly the KEIP satisfies the heightened-scrutiny standard set forth in *Pilgrim's Pride*. *See Pilgrim's Pride*, 401 B.R. at 236-37.  As the KEIP is justified by the facts and circumstances of the case, it may be approved under § 503(c)(3) of the Bankruptcy Code.

### Conclusion

In conclusion, the Court finds that the KEIP is not a disguised KERP.  The KEIP is within the sound business judgment of the Debtors.  The Court has additionally determined independently that approval of the KEIP is in the best interest of the Debtors and their creditor constituencies.  The proposed KEIP incentivizes the KEIP Participants to maximize value over the coming months of the case.  The value preserved can then flow to the other parties and lift every other constituency in this case.  If the KEIP Participants reach their performance goals, every other creditor constituency will see a benefit.  Accordingly, the KEIP Order was entered on January 27, 2016.

Entered: <u>　Feb 24 2016　　　　　　　　　　</u>

<u>　　　/s/ Kevin R. Huennekens　　　　</u>
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: 2/24/16