JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING OF (A) JOINT PLAN OF
## REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION
## AND (B) DISCLOSURE STATEMENT WITH RESPECT TO JOINT
## <u>PLAN OF REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     Alpha Natural Resources, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession in the above-captioned cases hereby file (a) the *Joint Plan of Reorganization of Debtors and Debtors in Possession* (the "<u>Plan</u>") and (b) the *Disclosure Statement with Respect to Joint Plan of Reorganization of Debtors and Debtors in Possession* (the "<u>Disclosure Statement</u>").

2.     The Plan is attached hereto as <u>Exhibit A</u>.

3.     The Disclosure Statement is attached hereto as <u>Exhibit B</u>.

Dated: March 7, 2016
       Richmond, Virginia

Respectfully submitted,

/s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

## Exhibit A

Plan of Reorganization

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## JOINT PLAN OF REORGANIZATION
## OF DEBTORS AND DEBTORS IN POSSESSION

# **TABLE OF CONTENTS**

ARTICLE I – DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ............... 1

    A.    Defined Terms ............................................................................................................... 1

    B.    Rules of Interpretation and Computation of Time ....................................................... 17

           1.    Rules of Interpretation ..................................................................................... 17

           2.    Computation of Time ....................................................................................... 17

ARTICLE II – CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS;
CRAMDOWN; EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................ 17

    A.    Unclassified Claims ..................................................................................................... 18

           1.    Payment of Administrative Claims .................................................................. 18

           2.    Payment of Priority Tax Claims ...................................................................... 20

    B.    Classified Claims and Interests ................................................................................... 20

    C.    Subordination; Reservation of Rights to Reclassify Claims ........................................ 22

    D.    Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims;
Maximum Recovery ..................................................................................................... 22

    E.    Confirmation Without Acceptance by All Impaired Classes ........................................ 22

    F.    Treatment of Executory Contracts and Unexpired Leases ........................................... 22

           1.    Executory Contracts and Unexpired Leases to Be Assumed ........................... 22

           2.    Approval of Assumptions and Assignments; Assignments Related to
Restructuring Transactions .............................................................................. 23

           3.    Payments Related to the Assumption of Executory Contracts and Unexpired
Leases .............................................................................................................. 24

           4.    Contracts and Leases Entered Into After the Petition Date ............................. 24

           5.    Rejection of Executory Contracts and Unexpired Leases ................................ 24

           6.    Rejection Damages Bar Date ............................................................................ 25

           7.    Obligations to Indemnify Directors, Officers and Employees ........................ 25

           8.    No Change in Control ....................................................................................... 26

ARTICLE III – CONFIRMATION OF THE PLAN ........................................................................... 26

    A.    Conditions Precedent to Confirmation ........................................................................ 26

    B.    Conditions Precedent to the Effective Date ................................................................. 26

    C.    Waiver of Conditions to Confirmation or the Effective Date ....................................... 27

    D.    Effect of Nonoccurrence of Conditions to the Effective Date ...................................... 27

    E.    Effect of Confirmation of the Plan .............................................................................. 27

           1.    Dissolution of Official Committees ................................................................. 27

           2.    Preservation of Rights of Action by the Debtors and the Reorganized Debtors;
Recovery Actions ............................................................................................ 27

           3.    Comprehensive Settlement of Claims and Controversies ............................... 28

           4.    Discharge of Claims and Termination of Interests .......................................... 28

| | 5. | Injunction | 28 |
| | 6. | Releases | 29 |
| | 7. | Exculpation | 30 |
| | 8. | Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies | 30 |
| **ARTICLE IV – MEANS FOR IMPLEMENTATION OF THE PLAN** | | | 31 |
| A. | | Continued Corporate Existence and Vesting of Assets | 31 |
| B. | | Restructuring Transactions | 31 |
| | 1. | Restructuring Transactions Generally | 31 |
| | 2. | Establishment of ReorgCo Trust | 32 |
| | 3. | Obligations of Any Successor Corporation in a Restructuring Transaction | 32 |
| C. | | The Resolution of Reclamation Claims | 32 |
| D. | | Corporate Governance and Directors and Officers | 32 |
| | 1. | Constituent Documents of Reorganized ANR, the Other Reorganized Debtors and ReorgCo Trust | 32 |
| | 2. | Directors and Officers of Reorganized ANR and the Other Reorganized Debtors | 32 |
| E. | | General Unsecured Claims Asset Pool | 33 |
| F. | | Restricted Cash Reclamation Accounts | 33 |
| G. | | New ANR Common Stock | 33 |
| H. | | Employment-Related Agreements; Retiree Benefits; Workers' Compensation Programs | 33 |
| | 1. | Employment-Related Agreements | 33 |
| | 2. | Retiree Benefits | 33 |
| | 3. | Continuation of Workers' Compensation Programs | 34 |
| I. | | Corporate Action | 34 |
| J. | | Special Provisions Regarding Insured Claims | 34 |
| | 1. | Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims | 34 |
| | 2. | Assumption and Continuation of Insurance Policies | 34 |
| K. | | Cancellation and Surrender of Instruments, Securities and Other Documentation | 35 |
| | 1. | Notes | 35 |
| | 2. | Old Common Stock | 35 |
| L. | | Release of Liens | 35 |
| M. | | Effectuating Documents; Further Transactions | 35 |
| N. | | Exemption from Certain Transfer Taxes | 35 |
| **ARTICLE V – PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN** | | | 36 |
| A. | | Distributions for Claims Allowed as of the Effective Date | 36 |
| B. | | Method of Distributions to Holders of Claims | 36 |
| C. | | Distributions on Account of Allowed Noteholder Claims | 36 |

D.    Compensation and Reimbursement for Services Related to Distributions.....................36

E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions....................37

    1.    Delivery of Distributions......................................................................37

    2.    Undeliverable Distributions Held by Disbursing Agents.............................37

F.    Timing and Calculation of Amounts to Be Distributed .............................................37

    1.    Distributions to Holders of Allowed Claims............................................37

    2.    Interest on Claims.............................................................................38

    3.    *De Minimis* Distributions.....................................................................38

G.    Distribution Record Date ...................................................................................38

H.    Means of Cash Payments ...................................................................................38

I.    Establishment of Reserves ................................................................................38

J.    Surrender of Canceled Instruments or Securities ...................................................38

K.    Withholding and Reporting Requirements..............................................................39

L.    Setoffs ..........................................................................................................39

M.    Application of Distributions................................................................................39

ARTICLE VI – PROCEDURES FOR RESOLVING DISPUTED CLAIMS ...............................40

A.    Treatment of Disputed Claims ............................................................................40

    1.    Tort Claims .....................................................................................40

    2.    Disputed Insured Claims.....................................................................40

    3.    No Distributions Until Allowance .........................................................40

B.    Prosecution of Objections to Claims.....................................................................41

    1.    Objections to Claims..........................................................................41

    2.    Extension of Claims Objection Bar Date.................................................41

    3.    Authority to Prosecute Objections .......................................................41

    4.    Authority to Amend Schedules ............................................................41

C.    Distributions on Account of Disputed Claims Once Allowed .....................................41

ARTICLE VII – CONSOLIDATION .........................................................................41

A.    Consolidation .................................................................................................41

B.    Order Granting Consolidation.............................................................................42

ARTICLE VIII – RETENTION OF JURISDICTION ......................................................42

ARTICLE IX – MISCELLANEOUS PROVISIONS........................................................43

A.    Modification of the Plan ...................................................................................43

B.    Revocation of the Plan .....................................................................................43

C.    Severability of Plan Provisions ...........................................................................43

D.    Successors and Assigns......................................................................................44

E.    Plan Controls .................................................................................................44

F.      Service of Documents ................................................................................................................ 44

## **TABLE OF EXHIBITS**

Exhibit I.A.49              Debtors in the Chapter 11 Cases

Exhibit I.A.73              Principal Terms of the Exit Facility

Exhibit I.A.146             ReorgCo Trust Agreement

Exhibit I.A.147             ReorgCo Trust Certificate of Trust

Exhibit I.A.184             Schedule of Unencumbered Assets

Exhibit II.F.1.a            Executory Contracts and Unexpired Leases to Be Assumed

Exhibit II.F.1.d            Collective Bargaining Agreements to Be Assumed

Exhibit II.F.4             Previously Assumed Executory Contracts and Unexpired Leases to Be Assigned

Exhibit II.F.5             Executory Contracts and Unexpired Leases to Be Rejected

Exhibit IV.B.1             Restructuring Transactions

Exhibit IV.D.1.a           Form Certificates of Incorporation (or Comparable Constituent Documents) for the
                           Reorganized Debtors

Exhibit IV.D.1.b           Form Bylaws (or Comparable Constituent Documents) for the Reorganized Debtors

Exhibit IV.D.2             Initial Directors and Officers of Each Reorganized Debtor

**INTRODUCTION**

Alpha Natural Resources, Inc., a Delaware corporation, and the other above-captioned debtors and debtors in possession (collectively, as further defined below, the "Debtors") propose the following joint plan of reorganization for the resolution of the outstanding claims against and equity interests in the Debtors. The Debtors are the proponents of the Plan (as such term is defined below) within the meaning of section 1129 of the Bankruptcy Code (as such term is defined below). Reference is made to the Debtors' Disclosure Statement (as such term is defined below), distributed contemporaneously with the Plan, for a discussion of the Debtors' history, business, results of operations, historical financial information, projections and properties and for a summary and analysis of the Plan. Other agreements and documents supplement the Plan and have been or will be filed with the Bankruptcy Court (as such term is defined below). These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

A.    **Defined Terms**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules (as each such term is defined below), shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    "2017 Notes" means the 3.75% senior unsecured notes issued under the 2017/2020 Notes Indenture.

2.    "2017/2020 Notes Guarantors" means the Subsidiary Debtors party to the 2017/2020 Notes Indenture, as guarantors.

3.    "2017/2020 Notes Indenture" means the indenture, dated June 1, 2011, as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, among ANR, as issuer, the 2017/2020 Notes Guarantors and the 2017/2020 Notes Trustee, relating to (a) the 3.75% senior unsecured notes due 2017 and (b) the 4.875% senior unsecured notes due 2020.

4.    "2017/2020 Notes Trustee" means Union Bank of California, in its capacity as trustee under the 2017/2020 Notes Indenture.

5.    "2018 Notes" means the 9.75% senior unsecured notes issued under the 2018 Notes Indenture.

6.    "2018 Notes Indenture" means the indenture, dated June 1, 2011, as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, among ANR, as issuer, the 2017/2020 Notes Guarantors and the 2018 Notes Trustee, relating to the 9.75% senior unsecured notes due 2018.

7.    "2018 Notes Trustee" means Union Bank, N.A., in its capacity as trustee under the 2018 Notes Indenture.

8.    "2019 Notes" means the 6.00% senior unsecured notes issued under the 2019/2021 Notes Indenture.

9.    "2019/2021 Notes Indenture" means, collectively, and as such documents may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, (a) the (i) indenture and (ii) first supplemental indenture, dated June 1, 2011, among ANR, as issuer, the 2017/2020 Notes Guarantors and the 2019/2021 Notes Trustee and (b) the second supplemental indenture, dated June 1, 2011, among ANR, as issuer, the 2017/2020 Notes Guarantors,

certain additional guarantors and the 2019/2021 Notes Trustee, relating to (x) the 6.00% senior unsecured notes due 2019 and (y) the 6.25% senior unsecured notes due 2021.

10.    "2019/2021 Notes Trustee" means Union Bank, N.A., in its capacity as trustee under the 2019/2021 Notes Indenture.

11.    "2020 Notes" means the 4.875% senior unsecured notes issued under the 2017/2020 Notes Indenture.

12.    "2021 Notes" means the 6.25% senior unsecured notes issued under the 2019/2021 Notes Indenture.

13.    "Ad Hoc Committee of Second Lien Noteholders" means the *ad hoc* committee of holders of Second Lien Notes represented in the Chapter 11 Cases by Kirkland & Ellis LLP and Kutak Rock LLP.

14.    "Administrative Claim" means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises); (b) DIP Claims; (c) State Bonding Carve Out Claims; (d) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code; (e) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code; (f) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business; (g) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (h) all Postpetition Intercompany Claims.

15.    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

16.    "Allowed … Claim" means an Allowed Claim in the particular Class or category specified.

17.    "Allowed Claim" when used:

        a.    with respect to any Claim other than an Administrative Claim, means a Claim that is not a Disallowed Claim and:

            i.    (a) is listed on a Debtor's Schedules and not designated in the Schedules as either disputed, contingent or unliquidated and (b) is not otherwise a Disputed Claim;

            ii.    (a) as to which no objection to allowance has been Filed on or before the Claims Objection Bar Date or such other applicable period of limitation fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Claims and (b) is not otherwise a Disputed Claim;

            iii.    that is allowed:  (a) in any Stipulation of Amount and Nature of Claim executed by the applicable Claim holder on or after the Effective Date, (b) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court, (c) pursuant to a Final Order or (d) pursuant to the terms of the Plan; or

            iv.    is asserted in a liquidated proof of Claim that is accepted, and is designated for allowance, by the Debtors, as set forth in one or more notices Filed with the Bankruptcy Court on or before the Effective Date; and

b.    with respect to an Administrative Claim, means an Administrative Claim that is not a Disallowed Claim and:

i.    (a) as to which no objection to allowance has been Filed on or before the Claims Objection Bar Date or such other applicable period of limitation fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Claims and (b) is not otherwise a Disputed Claim;

ii.    that is allowed:  (a) in any Stipulation of Amount and Nature of Claim executed by the applicable Claim holder on or after the Effective Date, (b) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court, (c) pursuant to a Final Order or (d) pursuant to Section II.A.1; or

iii.    is properly asserted in a liquidated proof of Claim that is accepted, and is designated for allowance, by the Debtors, as set forth in one or more notices Filed with the Bankruptcy Court on or before the Effective Date.

18.    "Allowed Interest" means an Interest registered in the stock register, membership interest register or any similar register or schedule maintained by or on behalf of a Debtor as of the Distribution Record Date and not timely objected to or that is allowed by a Final Order.

19.    "ANR" means Debtor Alpha Natural Resources, Inc.

20.    "Assets" means all of a Debtor's property, rights and interest that are property of a Debtor's Estate pursuant to section 541 of the Bankruptcy Code.

21.    "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

22.    "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

23.    "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the District Court.

24.    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

25.    "Bar Date" means the applicable bar date by which a proof of Claim or request for administrative expenses must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

26.    "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 11 Cases, including the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* (Docket No. 1156), entered by the Bankruptcy Court on December 22, 2015, as it may be amended, supplemented or otherwise modified.

27.    "Bidding Procedures Order" means any order of the Court approving bidding procedures in connection with the Core Asset Sale Motion, in form and substance reasonably acceptable to the First Lien Lenders and the First Lien Agent.

28.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.    "Cash" means legal tender of the United States of America and equivalents thereof.

30.    "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever of any of the Debtors or their Estates, including any Recovery Actions, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise.

31.    "Chapter 11 Cases" means, collectively, the bankruptcy cases commenced in the Bankruptcy Court by the Debtors under chapter 11 of the Bankruptcy Code and captioned as In re Alpha Natural Resources, Inc., et al., No. 15-33896 (KRH) (Bankr. E.D. Va.).

32.    "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor.

33.    "Claims and Balloting Agent" means Kurtzman Carson Consultants LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 11 Cases.

34.    "Claims Objection Bar Date" means, for all Claims, including Claims asserting priority under section 503(b)(9) of the Bankruptcy Code, other than Allowed Claims, the latest of:  (a) 180 days after the Effective Date, subject to extension by order of the Bankruptcy Court; (b) 90 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such a Claim.

35.    "Class" means a class of Claims, as described in Article II.

36.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

37.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

38.    "Confirmation Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, which documents will be Filed no later than seven calendar days before the Confirmation Hearing, to the extent not Filed earlier; provided, however, that Exhibits I.A.73, I.A.184, II.F.1.a, II.F.4 and II.F.5 will be Filed no later than seven calendar days prior to the Voting Deadline.  All Confirmation Exhibits will be made available on the Document Website once they are Filed.  The Debtors reserve the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Confirmation Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

39.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

40.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

41.    "Control," "Controlled by" or "under Common Control with" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

42.    "Convenience Claims" means General Unsecured Claims against any of the Debtors that otherwise would be classified in Class 6, but, with respect to each such Claim, either (a) the aggregate amount of such Claim is equal to or less than $5,000 or (b) the aggregate amount of such Claim is reduced to $5,000 pursuant to an election by the Claim holder made on the Ballot provided for voting on the Plan by the Voting Deadline; provided, however, that where any portion(s) of a single Claim has been transferred to a transferee, (a) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (b) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

43.      "Core Asset Sale Motion" means the *Debtors' Omnibus Motion for Entry of: (I) an Order Establishing Bidding and Sale Procedures for the Potential Sale of Certain Mining Properties and Related Assets; (II) One or More Orders Approving the Sale of Such Assets; (III) an Order Approving Settlements Related to Unencumbered Assets and the Pre-Petition Lenders' Diminution Claims; and (IV) an Order Approving Amendments to Certain Case Milestones in Connection with the DIP Credit Agreement* (Docket No. 1464), Filed by the Debtors on February 8, 2016.

44.      "Core Asset Sale Order" means any order entered by the Bankruptcy Court approving one or more sales of Assets in connection with the Core Asset Sale Motion.

45.      "Creditors' Committee" means the statutory official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

46.      "Cross-Collateralization Claims" means Claims against the Debtors arising in connection with "Cross-Collateralization Liens" as such term is defined in the Final DIP Order.

47.      "Cure Amount Claim" means a Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

48.      "De Minimis Sale Order" means the *Order Establishing Procedures for the Sale, Transfer or Abandonment of Miscellaneous and De Minimis Assets and Granting Certain Related Relief* (Docket No. 466), entered by the Bankruptcy Court on September 17, 2015, as it may be amended, supplemented or otherwise modified.

49.      "Debtors" means, collectively, the above-captioned debtors and debtors in possession identified on Exhibit I.A.49.

50.      "Deficiency Claim" means a General Unsecured Claim for the difference between (a) the total amount of an Allowed Claim and (b) the portion of such Allowed Claim that constitutes an Allowed Secured Claim.

51.      "Derivative Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) or Cause of Action that is the property of any of the Debtors' Estates pursuant to section 541 of the Bankruptcy Code.

52.      "Diminution Claim Allowance Settlement" means the settlement among the Debtors and the First Lien Lenders regarding the methodology for calculating the First Lien Lender Diminution Claim.

53.      "DIP Agents" means, together, the First Out DIP Agent and the Second Out DIP Agent.

54.      "DIP Claim" means any Claim against a Debtor arising under or evidenced by (a) the First Out DIP Credit Agreement or the Second Out DIP Credit Agreement and (b) the Final DIP Order.  For the avoidance of doubt, DIP Claims include State Bonding Carve Out Claims, First Out DIP Claims, Second Out DIP Claims, the First Lien Lender Diminution Claim, Massey Convertible Notes Diminution Claims, Second Lien Noteholder Diminution Claims and Cross-Collateralization Claims.

55.      "DIP Credit Agreements" means, together, the First Out DIP Credit Agreement and the Second Out DIP Credit Agreement.

56.      "DIP Lenders" means, collectively, those entities identified as "Lenders" in the DIP Credit Agreements and their respective permitted successors and assigns, solely in their capacity as "Lenders" under the DIP Credit Agreements.

57.      "Disallowed," when used with respect to a Claim, means a Claim that has been disallowed by a Final Order.

58.    "Disbursing Agent" means any Reorganized Debtor in its capacity as disbursing agent pursuant to Article V or any Third Party Disbursing Agent.

59.    "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the Debtors, as plan proponents, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

60.    "Disputed Claim" means:

a.    a Claim that is listed on a Debtor's Schedules as either disputed, contingent or unliquidated;

b.    a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the holder in a proof of Claim varies from the nature or amount of such Claim as it is listed on the Schedules;

c.    a Claim that is not listed on a Debtor's Schedules;

d.    a Claim as to which the applicable Debtor or Reorganized Debtor, or, prior to the Confirmation Date, any other party in interest, has Filed an objection by the Claims Objection Bar Date and such objection has not been withdrawn or denied by a Final Order;

e.    a Claim for which a proof of Claim or request for payment of Administrative Claim is required to be Filed under the Plan and no such proof of Claim or request for payment of Administrative Claim is timely Filed; or

f.    a Tort Claim.

61.    "Distribution" means a distribution under the Plan of Cash, interests, securities or other property, as may be applicable, to the holders of Allowed Claims in accordance with and subject to the terms of the Plan.

62.    "Distribution Cash" means all Cash held by Reorganized ANR as of the Effective Date, less any Cash that is part of the Exit Funding as of the Effective Date.

63.    "Distribution Date" means a date selected by the Reorganized Debtors in accordance with the terms of the Plan to make Distributions on account of Allowed Claims.

64.    "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

65.    "District Court" means the United States District Court for the Eastern District of Virginia.

66.    "Document Website" means the internet address www.kccllc.net/alpharestructuring, at which the Plan, the Disclosure Statement and all Filed Confirmation Exhibits shall be available to any party in interest and the public, free of charge.

67.    "Effective Date" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date in Section III.B have been met or waived in accordance with Section III.C.

68.    "Encumbered Assets" means, collectively, all Assets other than Unencumbered Assets, as of the Effective Date.

69.    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq.*

70.     "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

71.     "Excess Free Cash Flow" means a percentage of Free Cash Flow to be determined pursuant to the Resolution of Reclamation Claims.

72.     "Executory Contract" means a contract to which a Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

73.     "Exit Facility" means a senior secured credit facility, in an amount sufficient to provide for the cash collateralization of letters of credit outstanding under the DIP Credit Agreements and working capital in an amount to be determined, that will be entered into by the Reorganized Debtors, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.73.

74.     "Exit Facility Agent" means the agent for the lenders under the Exit Facility.

75.     "Exit Funding" means working capital for the Reorganized Debtors and any further funding required by the Reorganized Debtors to comply with any Resolution of Reclamation Claims, the sources of which shall be the First Lien Lender Exit Contribution and any other Cash or the proceeds of other financing obtained by the Reorganized Debtors.

76.     "Face Amount" means either (a) the full stated amount in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of a Claim listed on the Debtors' Schedules, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the applicable Debtor or Reorganized Debtor in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code or (iii) proposed by the Debtors or the Reorganized Debtors if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the Debtors' Schedules or is listed in the Debtors' Schedules as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

77.     "Federal Judgment Rate" means 0.33%, the federal post-judgment interest rate, as established by 28 U.S.C. § 1961(a), as of the Petition Date.

78.     "Fee Claim" means a Claim under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases.

79.     "Fee Order" means the *Order, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a) and Local Bankruptcy Rule 2016-1, Establishing Procedures for Interim Monthly Compensation of Professionals* (Docket No. 345), entered by the Bankruptcy Court on September 3, 2015.

80.     "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

81.     "Final DIP Order" means, collectively, and as such orders may be further modified, amended, supplemented or otherwise revised:  (a) the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* (Docket No. 465), entered by the Bankruptcy Court on September 17, 2015; and (b) the *Supplemental DIP Financing Order Authorizing, Pursuant to 11 U.S.C. §§ 105, 363 and 364, (I) Amendment to the DIP Financing and (II) Waiver of Bankruptcy Rule 6004(h) Stay* (Docket No. 973), entered by the Bankruptcy Court on November 19, 2015.

82.    "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

83.    "First Lien Agent" means Citicorp North America, Inc., in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement.

84.    "First Lien Credit Agreement" means the Fifth Amended and Restated Credit Agreement, dated as of September 24, 2014 (as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto), by and among ANR, as borrower, the First Lien Guarantors, the First Lien Lenders and the First Lien Agent.

85.    "First Lien Guarantors" means, collectively, the Subsidiary Debtors signatory to the First Lien Credit Agreement as guarantors thereunder.

86.    "First Lien Lender Claims" means, collectively, any Claims of the First Lien Lenders or the First Lien Agent arising under or in connection with the First Lien Credit Agreement.

87.    "First Lien Lender Diminution Claim" means "Senior Lender Adequate Protection Claim" as such term is defined in the Final DIP Order and as calculated in accordance with the Diminution Claim Allowance Settlement.

88.    "First Lien Lender Distribution" means Distribution Cash and/or other consideration (in a combination to be determined pursuant to the First Lien Lender Settlement) of an aggregate value equal to the aggregate amount of all Allowed Secured First Lien Lender Claims less the total amount of the First Lien Lender Exit Contribution.

89.    "First Lien Lender Exit Contribution" means (a) Cash or other forms of liquidity, in an amount to be determined pursuant to the First Lien Lender Settlement, to fund working capital for the Reorganized Debtors and (b) consideration, in a form and amount to be determined pursuant to the First Lien Lender Settlement, to fund (i) environmental and regulatory compliance obligations of the Reorganized Debtors (inclusive of any Initial Reclamation Contribution) and (ii) certain required Distributions under the Plan; provided that such Cash, other forms of liquidity or consideration, or any portion thereof, may be provided, at the option of the First Lien Lenders and consistent with the First Lien Lender Settlement, by either NewCo or the First Lien Lenders; and provided further that no First Lien Lender Exit Contribution shall be made unless (a) the items described in clauses (c) and (d) of the definition of "First Lien Lender Settlement" shall have been approved by order of the Bankruptcy Court and (b) the Bankruptcy Court shall have entered a Bidding Procedures Order.

90.    "First Lien Lender Remaining Diminution Claim" means the amount of the First Lien Lender Diminution Claim remaining after giving effect to any successful credit bid by the First Lien Lenders of the First Lien Lender Diminution Claim.

91.    "First Lien Lender Settlement" means a settlement among the DIP Lenders, the DIP Agents, the First Lien Lenders, the First Lien Agent and the Debtors, entered into for mutual consideration including:  (a) the establishment of (i) the amount, form and sources of funding of the First Lien Lender Exit Contribution, (ii) the form of the First Lien Lender Distribution and (iii) the amount of Allowed Secured First Lien Lender Claims; (b) the

incorporation of the Unencumbered Assets Settlement and the Diminution Claim Allowance Settlement; and (c) the entry of a Bidding Procedures Order providing for a stalking-horse bid by the First Lien Lenders.

92.     "First Lien Lenders" means, collectively, the lenders party to the First Lien Credit Agreement or their successors or assigns.

93.     "First Out DIP Agent" means Citibank, N.A., in its capacity as administrative agent and collateral agent under the First Out DIP Credit Agreement.

94.     "First Out DIP Claim" means any Claim of the DIP Lenders or the First Out DIP Agent arising under or evidenced by (a) the First Out DIP Credit Agreement and (b) the Final DIP Order (with respect to obligations arising under or evidenced by the Final DIP Order related to the First Out DIP Credit Agreement).

95.     "First Out DIP Credit Agreement" means the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of August 6, 2015, among ANR (as borrower), the Subsidiary Debtors signatory thereto (as guarantors), those entities identified as "Lenders" in such agreement, those entities identified as "Issuing Banks" in such agreement, the First Out DIP Agent and Citigroup Global Markets Inc. (as sole lead arranger and sole book manager), including (a) all amendments thereto and extensions thereof and (b) all security agreements and instruments related thereto.

96.     "Free Cash Flow" means Cash generated by the Reorganized Debtors in an amount equal to earnings before interest and taxes, multiplied by an amount equal to one minus the tax rate applicable to the Reorganized Debtors, minus depreciation, minus amortization, minus any change to the Reorganized Debtors' net working capital, minus capital expenditures, measured on a quarterly basis.

97.     "General Unsecured Claim" means any Claim (including, but not limited to, any Deficiency Claim) that is not an Administrative Claim, Priority Claim, Secured Claim, Convenience Claim, Cure Amount Claim, Priority Tax Claim, Prepetition Intercompany Claim, Section 510(b) Securities Claim or Section 510(b) Old Common Stock Claim.

98.     "General Unsecured Claims Asset Pool" means:  (a) consideration in a form and amount to be determined pursuant to the First Lien Lender Settlement; (b) the total amount of any remaining Distribution Cash after the payment of all other obligations under the Plan; and (c) any Reorganized ANR Equity Distribution, to be distributed Pro Rata to holders of Class 6 Claims pursuant to Section II.B.6.

99.     "Governmental Unit" means a "governmental unit," as defined in section 101(27) of the Bankruptcy Code.

100.    "Indenture Trustees" means, collectively:  (a) the Second Lien Notes Trustee; (b) the Massey Convertible Notes Trustee; (c) the 2017/2020 Notes Trustee; (d) the 2018 Notes Trustee; and (e) the 2019/2021 Notes Trustee.

101.    "Indentures" means, collectively:  (a) the Second Lien Notes Indentures; (b) the Massey Convertible Notes Indenture; (c) the 2017/2020 Notes Indenture; (d) the 2018 Notes Indenture; and (e) the 2019/2021 Notes Indenture.

102.    "Initial Reclamation Contribution" means the total aggregate amount of any portion of the Reclamation Funding Amount contributed on the Effective Date to one or more Restricted Cash Reclamation Accounts.

103.    "Injunction Parties" means, collectively and individually, the Debtors, the Estates, the Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee, the First Lien Agent, the DIP Agents, the First Lien Lenders, the DIP Lenders, NewCo and any Representatives of each of the foregoing.

104.    "Insurance Contract" means any policy of third party liability insurance under which any of the Debtors could have asserted, did assert, or may in the future assert a right to coverage for any claim, together with any other contracts that pertain or relate to such policy.

105.    "Insured Claim" means that portion of any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date:  (a) as to which any Insurer is obligated pursuant to the terms, conditions, limitations and exclusions of its Insurance Contract(s) to pay any judgment, settlement or contractual obligation with respect to the Debtors; or (b) that any Insurer otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable Insurance Contract(s).

106.    "Insurer" means any company or other entity that issued, or is responsible for, an Insurance Contract.

107.    "Intercompany Claim" means any Claim by any Debtor against another Debtor.

108.    "Intercreditor Agreements" means, together, and as such documents may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, (a) the Second Lien Intercreditor Agreement, dated as of May 20, 2014, among the First Lien Agent, the Second Lien Notes Trustee and the other parties thereto and (b) the Debtor-in-Possession Pledge and Security and Intercreditor Agreement, dated as of August 6, 2015, among ANR (as grantor), the additional grantors party thereto, Citibank, N.A. (as term agent, term LC agent and bonding LC agent) and the other agents party thereto.

109.    "Interest" means the rights and interests of the holders of the Old Common Stock of any Debtor, any other instruments evidencing an ownership interest in a Debtor and the rights of any entity to purchase or demand the issuance of any of the foregoing, including:  (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

110.    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Recovery Actions, Derivative Claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

111.    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

112.    "Massey Convertible Notes" means the 3.25% convertible notes issued under the Massey Convertible Notes Indenture.

113.    "Massey Convertible Notes Diminution Claims" means any Claims arising in connection with the "Massey Convertible Notes Adequate Protection Obligations" as such term is defined in the Final DIP Order.

114.    "Massey Convertible Notes Guarantors" means the Subsidiary Debtors party to the Massey Convertible Notes Indenture, as guarantors.

115.    "Massey Convertible Notes Indenture" means the indenture, dated August 12, 2008, as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, among Debtor Alpha Appalachia Holdings, Inc. (f/k/a Massey Energy Company), as issuer, the Massey Convertible Notes Guarantors and the Massey Convertible Notes Trustee, relating to the 3.25% convertible senior notes due 2015.

116.    "Massey Convertible Notes Trustee" means, together, Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as successor trustee under the Massey Convertible Notes Indenture.

117.    "New ANR Common Stock" means the shares of common stock of Reorganized ANR, authorized pursuant to the certificate of incorporation of Reorganized ANR, to be initially issued pursuant to the Plan as of the Effective Date.

118.    "NewCo" means any legal entity or entities created in order to facilitate a successful credit bid by the First Lien Lenders for any of the Debtors' Assets pursuant to a Sale Order.

119.    "Noteholder Claim" means any Claim against a Debtor under or evidenced by a Note, which Claim includes, but is not limited to, principal and interest as of the Petition Date and, only if applicable, Postpetition Interest.

120.    "Notes" means, collectively:  (a) the Second Lien Notes; (b) the Massey Convertible Notes; (c) the 2017 Notes; (d) the 2018 Notes; (e) the 2019 Notes; (f) the 2020 Notes; and (g) the 2021 Notes.

121.    "Notice Parties" means:  (a) prior to the Effective Date, the Debtors, the Creditors' Committee, the Retiree Committee, the DIP Agents, the First Lien Agent, the Ad Hoc Committee of Second Lien Noteholders, the Second Lien Notes Trustee and the UMWA; and (b) on or after the Effective Date, the Reorganized Debtors.

122.    "Official Committees" means, together, the Creditors' Committee and the Retiree Committee.

123.    "Old Common Stock" means, when used with reference to a particular Debtor, the common stock, membership interests, partnership interests or other capital stock issued by such Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto.

124.    "Ordinary Course Professionals Order" means the *Order Authorizing the Retention and Compensation of Professionals Utilized by the Debtors in the Ordinary Course of Business* (Docket No. 346), entered by the Bankruptcy Court on September 3, 2015.

125.    "Other Secured Claims" means, collectively, Secured Claims that are not Administrative Claims, First Lien Lender Claims or Second Lien Noteholder Claims, including Secured Claims arising under or evidenced by the Secured Massey Convertible Notes.

126.    "Person" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

127.    "Petition Date" means August 3, 2015, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

128.    "Plan" means this joint plan of reorganization for the Debtors, and all Confirmation Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

129.    "Postpetition Intercompany Claim" means any Intercompany Claim that is not a Prepetition Intercompany Claim.

130.    "Postpetition Interest" means:  (a) for a Noteholder Claim, the contractual rate of interest set forth in the applicable Indenture; (b) the rate of interest set forth in the contract or other applicable document between the holder of a Claim and the applicable Debtor giving rise to such holder's Claim; (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the applicable Debtor; or (d) if none of the foregoing apply, the Federal Judgment Rate.

131.    "Prepetition Intercompany Claim" means an Intercompany Claim that arose prior to the Petition Date.

132.    "Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

133.     "Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

134.     "Pro Rata" means, when used with reference to a Distribution of property to holders of Allowed Claims in a particular Class or other specified group of Claims pursuant to Article II, proportionately so that, with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating Pro Rata Distribution of property to holders of Allowed Claims in such Class.

135.     "Professional" means any professional (a) employed in the Chapter 11 Cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than a professional entitled to receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order) or (b) seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

136.     "Reclamation Claim Resolution Parties" means the Governmental Units party to the Resolution of Reclamation Claims.

137.     "Reclamation Funding Amount" means consideration in a form and amount to be determined pursuant to the First Lien Lender Settlement and the Resolution of Reclamation Claims, including any Initial Reclamation Contribution, to be contributed into one or more Restricted Cash Reclamation Accounts.

138.     "Reclamation Threshold Amount" means an amount equal to the sum of (a) the Reclamation Funding Amount and (b) an amount to be determined pursuant to the Resolution of Reclamation Claims constituting the maximum aggregate amount of Excess Free Cash Flow deposited by the Reorganized Debtors into the Restricted Cash Reclamation Accounts.

139.     "Recovery Actions" means, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 542, 544, 547, 548, 549 and 550 of the Bankruptcy Code and other similar state law claims and causes of action.

140.     "Reinstated" or "Reinstatement" means rendering a Claim or Interest unimpaired within the meaning of section 1124 of the Bankruptcy Code.  Unless the Plan specifies a particular method of Reinstatement, when the Plan provides that a Claim or Interest will be Reinstated, such Claim or Interest will be Reinstated, at the Debtors' sole discretion, in accordance with one of the following:

a.     The legal, equitable and contractual rights to which such Claim or Interest entitles the holder will be unaltered; or

b.     Notwithstanding any contractual provisions or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

i.     any such default that occurred before or after the commencement of the applicable Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured;

ii.     the maturity of such Claim or Interest as such maturity existed before such default will be reinstated;

      iii.      the holder of such Claim or Interest will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

      iv.      if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, the holder of such Claim will be compensated for any actual pecuniary loss incurred by such holder as a result of such failure; and

      v.      the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest will not otherwise be altered.

141.      "Released Parties" means, collectively and individually, the Debtors, the Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee, the DIP Agents, the DIP Lenders, the First Lien Agent, the First Lien Lenders, NewCo and any Affiliates and Representatives of each of the foregoing.

142.      "Reorganized …" means, when used in reference to a particular Debtor, such Debtor on or after the Effective Date.

143.      "Reorganized ANR Equity Distribution" means a Distribution, if any, of the equity in Reorganized ANR to holders of Class 6 General Unsecured Claims pursuant to Sections II.B.6 and IV.E.

144.      "Reorganized Debtors" means the Debtors on and after the Effective Date and any entities created as part of the Restructuring Transactions, including but not limited to Reorganized ANR.

145.      "ReorgCo Trust" means the trust to be established pursuant to Section IV.B.2 and the ReorgCo Trust Agreement.

146.      "ReorgCo Trust Agreement" means the trust agreement, to be dated on or prior to the Effective Date, between the Debtors (to the extent still in existence following any Restructuring Transaction) and the ReorgCo Trustee, governing ReorgCo Trust, which will be substantially in the form of Exhibit I.A.146, and in form and substance reasonably satisfactory to the DIP Agents and the First Lien Agent.

147.      "ReorgCo Trust Certificate of Trust" means the certificate of trust to be filed pursuant to applicable state law on or prior to the Effective Date, which will be substantially in the form of Exhibit I.A.147, and in form and substance reasonably satisfactory to the DIP Agents and the First Lien Agent.

148.      "ReorgCo Trustee" means (a) as of the Effective Date, the party identified as trustee of ReorgCo Trust in a document to be Filed by the Debtors prior to the Confirmation Hearing or (b) any successor trustee after the Effective Date appointed in accordance with the ReorgCo Trust Agreement.

149.      "Representatives" means, with respect to any entity, any successor, predecessor, assign, subsidiary, affiliate, current or former managed account or fund, officer, director, member of a limited liability company, employee, committee member, partner, agent, attorney, advisor, investment banker, financial advisor, accountant, actuary, consultant or other Professional of such entity, in each case in such capacity, serving on or after the Petition Date.

150.      "Resolution of Reclamation Claims" means, collectively, any agreed-upon and/or court-ordered resolutions with the Reclamation Claim Resolution Parties, approved pursuant to a Final Order of the Bankruptcy Court, regarding the Reorganized Debtors' post-Effective Date reclamation obligations, as further described in Section IV.C.

151.    "Restricted Cash Reclamation Accounts" means, collectively, any accounts created pursuant to the Resolution of Reclamation Claims for the sole purpose of funding the Reorganized Debtors' reclamation obligations to the Reclamation Claim Resolution Parties up to the Reclamation Threshold Amount.

152.    "Restricted Cash Reclamation Account FCF Cap" means an amount of Excess Free Cash Flow generated by the Reorganized Debtors equal to the Reclamation Threshold Amount minus the amount of the Reclamation Funding Amount.

153.    "Restructuring Transactions" means, collectively, those mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions closing under or in connection with the Plan in connection with any Core Asset Sale Order), conversions, liquidations or dissolutions that the Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure of the Reorganized Debtors, as described in greater detail in Section IV.B.

154.    "Retiree Committee" means the official committee of retired employees appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

155.    "Sale Orders" means, collectively, and as such orders may be modified, amended, supplemented or otherwise revised:  (a) the *Order (I) Approving Bidding and Sale Procedures for Certain Mining Properties and Related Assets, (II) Approving the Form and Manner of Notice of the Related Assumption and Assignment of Executory Contracts and Unexpired Leases and (III) Scheduling an Auction and Sale Hearing* (Docket No. 855), entered by the Bankruptcy Court on November 6, 2015; (b) any other sale order entered by the Bankruptcy Court in connection with the *Debtors' Combined Motion for Entry of (A) an Order Establishing Bidding and Sale Procedures for the Potential Sale of Certain Mining Properties and Related Assets and Granting Related Relief and (B) One or More Orders Approving the Sale of Such Properties* (Docket No. 707), Filed by the Debtors on October 22, 2015; and (c) any Core Asset Sale Order.

156.    "Schedules" means the schedules of assets and liabilities and the statement of financial affairs Filed by each Debtor on October 2, 2015, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

157.    "Second Lien Noteholder" means a holder of Second Lien Notes.

158.    "Second Lien Noteholder Claims" means, collectively, any Claims of the Second Lien Notes Trustee or Second Lien Noteholders arising under or in connection with the Second Lien Notes Indentures.

159.    "Second Lien Noteholder Diminution Claims" means "Noteholder Adequate Protection Claims" as such term is defined in the Final DIP Order.

160.    "Second Lien Noteholder Distribution" means consideration in a form and amount to be determined pursuant to the First Lien Lender Settlement, funded by the First Lien Lender Exit Contribution.

161.    "Second Lien Notes" means the 7.50% senior secured notes issued under the Second Lien Notes Indentures.

162.    "Second Lien Notes Indentures" means, together, and as such documents may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto:  (a) the indenture, dated May 20, 2014, among ANR, as issuer, the First Lien Guarantors and the Second Lien Notes Trustee, relating to the $500 million principal amount senior secured 7.50% notes due 2020; and (b) the indenture, dated March 23, 2015, among ANR, as issuer, the First Lien Guarantors and the Second Lien Notes Trustee, relating to the $214 million principal amount Series B senior secured 7.50% notes due 2020.

163.    "Second Lien Notes Trustee" means Wilmington Trust, National Association, in its capacity as trustee and collateral agent under the Second Lien Notes Indentures.

164.    "Second Out DIP Agent" means Citicorp North America, Inc., in its capacity as administrative agent and collateral agent under the Second Out DIP Credit Agreement.

165.    "Second Out DIP Claim" means any Claim of the DIP Lenders or the Second Out DIP Agent arising under or evidenced by (a) the Second Out DIP Credit Agreement and (b) the Final DIP Order (with respect to obligations arising under or evidenced by the Final DIP Order related to the Second Out DIP Credit Agreement).

166.    "Second Out DIP Credit Agreement" means the Superpriority Secured Second Out Debtor-in-Possession Credit Agreement, dated as of September 18, 2015, among ANR (as borrower), the Subsidiary Debtors signatory thereto (as guarantors), those entities identified as "Lenders" in such agreement, those entities identified as "Issuing Banks" in such agreement, the Second Out DIP Agent and Citigroup Global Markets Inc. (as sole lead arranger and sole book manager), including (a) all amendments thereto and extensions thereof and (b) all security agreements and instruments related thereto.

167.    "Secondary Liability Claim" means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort, guaranty or other obligation of another Debtor, including any Claim based on:  (a) vicarious liability; (b) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; (c) guaranties of collection, payments or performance; (d) indemnity bonds, obligations to indemnify or obligations to hold harmless; (e) performance bonds; (f) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor or relating to the obligations or performance of another Debtor; (g) several liability of a member of a consolidated (or equivalent) group of corporations for Taxes of other members of the group or of the entire group; or (h) any other joint or several liability, including Claims for indemnification or contribution, that any Debtor may have in respect of any obligation that is the basis of a Claim.

168.    "Section 510(b) Old Common Stock Claim" means any Claim against any of the Debtors (a) arising from rescission of a purchase or sale of Old Common Stock; (b) for damages arising from the purchase or sale of Old Common Stock; or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

169.    "Section 510(b) Securities Claim" means any Claim against any of the Debtors (a) arising from rescission of a purchase or sale of a Note or any other security of a Debtor other than Old Common Stock; (b) for damages arising from the purchase or sale of a Note or any other security of a Debtor other than Old Common Stock; or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

170.    "Secured … Claim" means a Secured Claim of the particular type specified.

171.    "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

172.    "Secured Tax Claim" means a Secured Claim arising out of a Debtor's liability for any Tax.

173.    "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a, *et seq.*

174.    "Stalking Horse APA" means any asset purchase agreement and all related documentation governing the purchase of any Assets pursuant to any Sale Order by the First Lien Lenders and/or NewCo.

175.    "State Bonding Carve Out Claims" means, together, the Allowed superpriority Claims granted to (a) the State of Wyoming and the Wyoming Department of Environmental Quality pursuant to paragraph 1 of the *Stipulation and Order Concerning Debtors' Reclamation Bonding of Their Surface Coal Mining Operations in Wyoming* (Docket No. 628), entered by the Bankruptcy Court on October 8, 2015, and (b) the West Virginia Department of Environmental Protection pursuant to paragraph 3 of the *Order Concerning Reclamation Bonding of the Debtors' Surface Coal Mining Operations in West Virginia* (Docket No. 1158), entered by the Bankruptcy Court on December 22, 2015.

176.    "Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between the applicable Debtor and a holder of a Claim or Interest, that, prior to the Effective Date, is approved by the Bankruptcy Court (including, but not limited to, agreements settling claims pursuant to authority granted under claims settlement procedures established by order of the Bankruptcy Court in the Chapter 11 Cases), or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or Interest. Any such stipulation or other agreement between any Reorganized Debtor and a holder of a Claim or Interest executed after the Effective Date is not subject to approval of the Bankruptcy Court.

177.    "Subsidiary Debtor" means any Debtor other than ANR.

178.    "Subsidiary Debtor Equity Interest" means, as to a Debtor other than ANR, any Interests in such Debtor.

179.    "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margin, sales, use, *ad valorem*, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, escheat, unclaimed property or windfall, profits, custom, duty or other tax, governmental fee or like assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

180.    "Term Facility Collateral" has the meaning given to such term in Section 1.01 of the First Out DIP Credit Agreement.

181.    "Third Party Disbursing Agent" means an entity expressly designated by a Debtor or Reorganized Debtor to act as a Disbursing Agent pursuant to Article V.

182.    "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment.

183.    "UMWA" means the United Mine Workers of America.

184.    "Unencumbered Assets" means, collectively, the Assets listed in Exhibit I.A.184.

185.    "Unencumbered Assets Settlement" means the settlement among the Debtors and the First Lien Lenders with respect to the assets deemed to have been unperfected or unencumbered as of the Petition Date with respect to debt under the First Lien Credit Agreement.

186.    "Unexpired Lease" means a lease to which a Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

187.    "United States Trustee" means the Office of the United States Trustee for Region Four.

188.    "Unvested Non-Pension Benefits Motion" means the *Motion of the Debtors, Pursuant to Section 363 of the Bankruptcy Code, for an Order Authorizing Debtors to Terminate Certain Unvested Non-Pension Benefits* (Docket No. 797), Filed by the debtors on November 3, 2015.

189.    "Voting Deadline" means the deadline for submitting Ballots either to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code that is specified in the Disclosure Statement, the Ballots or related solicitation documents approved by the Bankruptcy Court.

**B.      Rules of Interpretation and Computation of Time**

**1.      Rules of Interpretation**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Confirmation Exhibit Filed or to be Filed shall mean such document or Confirmation Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors, assigns and Affiliates; (e) all references to Sections, Articles or Confirmation Exhibits are references to Sections, Articles and Confirmation Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a substantive part, or to affect the interpretation, of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

**2.      Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS;**
**CRAMDOWN; EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Notwithstanding the foregoing, in no event shall any holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such holder's Claim.

All Distributions on account of the Claims described in this Article II shall be made from Distribution Cash held by the Reorganized Debtors as of the Effective Date.

A.      **Unclassified Claims**

1.      **Payment of Administrative Claims**

a.      **Administrative Claims in General**

Except as specified in Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim, including each holder of an Allowed State Bonding Carve Out Claim, will receive, in full satisfaction of its Administrative Claim, Distribution Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date or as soon as reasonably practicable thereafter; or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.

b.      **Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing or in the Confirmation Order, will be paid by the Debtors in Distribution Cash equal to the amount of such Administrative Claims.  Any fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

c.      **Ordinary Course Liabilities**

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of Governmental Units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.F.4 and Intercompany Claims that are Administrative Claims, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

d.      **DIP Claims**

All DIP Claims shall be Allowed Claims.  On or before the Effective Date, unless otherwise agreed by the holder of a DIP Claim and the applicable Debtor or Reorganized Debtor, Allowed DIP Claims will be paid in Distribution Cash in an amount equal to the full amount of those Claims.  Allowed DIP Claims will be satisfied, first, from Unencumbered Assets, according to the following priority:  (a) State Bonding Carve Out Claims; (b) First Out DIP Claims; (c) Second Out DIP Claims; (d) any First Lien Lender Remaining Diminution Claim; (e) Massey Convertible Notes Diminution Claims; (f) Second Lien Noteholder Diminution Claims; and (g) Cross-Collateralization Claims, <u>provided</u> that State Bonding Carve Out Claims shall be satisfied solely from Term Facility Collateral.  To the extent that Unencumbered Assets are insufficient to satisfy all Allowed DIP Claims in full, Allowed DIP Claims will be satisfied from Encumbered Assets, according to the following priority:  (a) State Bonding Carve Out Claims; (b) First Out DIP Claims; (c) Second Out DIP Claims; (d) any First Lien Lender Remaining Diminution Claim; and (e) Second Lien Noteholder Diminution Claims, <u>provided</u> that State Bonding Carve Out Claims shall be satisfied solely from Term Facility Collateral.  For the avoidance of doubt, Massey Convertible Notes Diminution Claims and Cross-Collateralization Claims shall be satisfied solely from Unencumbered Assets, and no Encumbered Assets will be distributed on account of such Claims.

e.     **Bar Dates for Administrative Claims**

i.        **General Bar Date Provisions**

Except as otherwise provided in Section II.A.1.e.ii or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, ReorgCo Trust, or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

ii.       **Bar Dates for Certain Administrative Claims**

A.        **Professional Compensation**

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of (a) 90 days after the Effective Date, (b) 30 days after the Filing of the applicable request for payment of the Fee Claim or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

B.        **Ordinary Course Liabilities**

Holders of Allowed Administrative Claims arising from liabilities incurred by a Debtor on or after the Petition Date but prior to the Effective Date in the ordinary course of the Debtor's business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of Governmental Units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.F.4 and Intercompany Claims that are Administrative Claims, will not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.c.  Any Administrative Claims that are filed contrary to this Section shall be deemed disallowed and expunged, subject to resolution and satisfaction in the ordinary course outside these Chapter 11 Cases.

C.        **DIP Claims**

Holders of Allowed Administrative Claims that are DIP Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.d.

### iii.       No Modification of Bar Date Order

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

### 2.       Payment of Priority Tax Claims

#### a.       Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) Distribution Cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) Distribution Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date.

#### b.       Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section II.A.2.a or Section I.A.179, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 6, if not subordinated to Class 6 Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee or their respective property (other than as a holder of an Allowed Class 6 Claim).

### B.       Classified Claims and Interests

1.       **Priority Claims (Class 1 Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Claim in Class 1 will receive Distribution Cash equal to the amount of such Allowed Claim, unless the holder of such Priority Claim and the applicable Debtor or Reorganized Debtor, as applicable, agree to a different treatment.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 1 Claim will be deemed to have accepted the Plan.

2.       **Secured First Lien Lender Claims (Class 2 Claims) are impaired.**  In accordance with the terms of the First Lien Lender Settlement, on the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured First Lien Lender Claim will receive the holder's Pro Rata share of the First Lien Lender Distribution.  All First Lien Lender Claims (including, for the avoidance of doubt, any Deficiency Claims arising under or in connection with the First Lien Credit Agreement), other than Fee Claims, shall be Allowed in an aggregate amount equal to the full amount of such First Lien Lender Claims (including principal, interest, all other amounts due and owing as of the Petition Date and, if applicable, Postpetition Interest), and neither such Claims nor the Distributions thereon shall be subject to reduction, disallowance, subordination, setoff or counterclaim.

3.       **Secured Second Lien Noteholder Claims (Class 3 Claims) are impaired.**  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured Second Lien Noteholder Claim will receive the holder's Pro Rata share of the Second Lien Noteholder Distribution.

4.       **Other Secured Claims (Class 4 Claims) are unimpaired.**  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed

Claim in Class 4 will receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A, B or C below, at the election of the applicable Debtor.  The applicable Debtor will be deemed to have elected Option B except with respect to (a) any Allowed Secured Claim as to which the applicable Debtor elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which the applicable Debtor will be deemed to have elected Option A.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 4 Claim will be deemed to have accepted the Plan.

> *Option A*:  On the Effective Date, Allowed Claims in Class 4 with respect to which the applicable Debtor elects Option A will receive Distribution Cash equal to the amount of such Allowed Claim.

> *Option B*:  On the Effective Date, Allowed Claims in Class 4 with respect to which the applicable Debtor elects or is deemed to have elected Option B will be Reinstated.

> *Option C*:  On the Effective Date, a holder of an Allowed Claim in Class 4 with respect to which the applicable Debtor elects Option C will be entitled to receive (and the applicable Debtor or Reorganized Debtor shall release and transfer to such holder) the collateral securing such Allowed Claim.

Notwithstanding either the foregoing or Section I.A.179, the holder of an Allowed Secured Tax Claim in Class 4 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 6, if not subordinated to Class 6 Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee, or their respective property (other than as a holder of a Class 6 Claim).

5.     **Convenience Claims (Class 5 Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Convenience Claim will receive Distribution Cash equal to the amount of such Allowed Claims (as reduced, if applicable, pursuant to an election by the holder thereof in accordance with Section I.A.42).  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 5 Claim will be deemed to have accepted the Plan.

6.     **General Unsecured Claims (Class 6 Claims) are impaired.**  On the Effective Date, and on each Distribution Date thereafter, each holder of an Allowed General Unsecured Claim will receive a Pro Rata share of any assets contributed to the General Unsecured Claims Asset Pool.

7.     **Prepetition Intercompany Claims (Class 7 Claims) are impaired.**  Subject to the Restructuring Transactions, on the Effective Date, Prepetition Intercompany Claims in Class 7 that are not eliminated by operation of law or otherwise pursuant to the Restructuring Transactions will be deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of Prepetition Intercompany Claims and not entitled to any Distribution of Plan consideration under the Plan.  Each holder of a Class 7 Claim will be deemed to have accepted the Plan.

8.     **Section 510(b) Securities Claims (Class 8 Claims) are impaired.**  No property will be distributed to or retained by the holders of Section 510(b) Securities Claims in Class 8, and such Claims will be extinguished on the Effective Date.  Holders of Class 8 Claims will not receive any Distribution pursuant to the Plan.  Consistent with the language of section 1126(g) of the Bankruptcy Code, each of the holders of Section 510(b) Securities Claims in Class 8 will be deemed to have rejected the Plan.

9.     **Section 510(b) Old Common Stock Claims (Class 9 Claims) are impaired.**  No property will be distributed to or retained by the holders of Section 510(b) Old Common Stock Claims in Class 9, and such Claims will be extinguished on the Effective Date.  Holders of Class 9 Claims will not receive any Distribution pursuant to the Plan.  Consistent with the language of section 1126(g) of the Bankruptcy Code, each of the holders of Section 510(b) Old Common Stock Claims in Class 9 will be deemed to have rejected the Plan.

10.       **Old Common Stock of ANR Interests (Class 10 Interests) are impaired.**  On the Effective Date, the Old Common Stock of ANR and all Interests related thereto will be canceled, and holders of Class 10 Interests will not receive any Distribution pursuant to the Plan.  Consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Class 10 Interest will be deemed to have rejected the Plan.

11.       **Subsidiary Debtor Equity Interests (Class 11 Interests) are unimpaired.**  On the Effective Date, the Subsidiary Debtor Equity Interests will be Reinstated, subject to the Restructuring Transactions. Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 11 Interest will be deemed to have accepted the Plan.

**C.       Subordination; Reservation of Rights to Reclassify Claims**

The allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a holder of a Claim to enforce a subordination agreement, or the terms of the Intercreditor Agreements, against any entity other than the Debtors to the same extent that such agreement is enforceable under applicable nonbankruptcy law.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination.

**D.       Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery**

The classification and treatment of Allowed Claims under the Plan take into consideration all Allowed Secondary Liability Claims.  On the Effective Date, Allowed Secondary Liability Claims will be treated as follows:

1.       The Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by and assigned to another Debtor will be Reinstated.

2.       Except as provided in Section II.D.1, holders of Allowed Secondary Liability Claims against any Debtor will be entitled to only one Distribution in respect of the Liabilities related to such Allowed Secondary Liability Claim and will be deemed satisfied in full by the Distributions on account of the related underlying Allowed Claim.  Notwithstanding the existence of a Secondary Liability Claim, no multiple recovery on account of any Allowed Claim against any Debtor will be provided or permitted.

**E.       Confirmation Without Acceptance by All Impaired Classes**

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan shall constitute a motion for such relief.

**F.       Treatment of Executory Contracts and Unexpired Leases**

**1.       Executory Contracts and Unexpired Leases to Be Assumed**

**a.       Assumption and Assignment Generally**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in

any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume, or assume and assign, as indicated, each Executory Contract or Unexpired Lease listed on Exhibit II.F.1.a; provided, however, that the Debtors and the Reorganized Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.F.1.a to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to Section II.F.5; (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption, or assumption and assignment, pursuant to this Section; or (c) modify the amount of any Cure Amount Claim.  The Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.F.1.a to identify or change the identity of the Reorganized Debtor or other entity that will be an assignee of an Executory Contract or Unexpired Lease. Each contract and lease listed on Exhibit II.F.1.a will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit II.F.1.a will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease (including any related agreements as described in Section II.F.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

**b.** **Assumptions and Assignments of Ancillary Agreements**

Each Executory Contract or Unexpired Lease listed on Exhibit II.F.1.a will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument or other document is listed on Exhibit II.F.1.a, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.F.5 or designated for rejection in accordance with Section II.F.2.

**c.** **Customer Agreements**

To the extent that (a) the Debtors are party to any contract, purchase order or similar agreement providing for the sale of the Debtors' products or services, (b) any such agreement constitutes an Executory Contract or Unexpired Lease and (c) such agreement (i) has not been rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (iii) is not subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (iv) is not listed on Exhibit II.F.1.a, (v) is not listed on Exhibit II.F.5 or (vi) has not been designated for rejection in accordance with Section II.F.2, such agreement (including any related agreements as described in Section II.F.1.b), purchase order or similar agreement will be assumed by the Debtors and assigned to the Reorganized Debtor that will be the owner of the business that performs the obligations to the customer under such agreement, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  The Cure Amount Claim to be paid in connection with the assumption of such a customer-related contract, purchase order or similar agreement that is not specifically identified on Exhibit II.F.1.a shall be $0.00.  Listing a contract, purchase order or similar agreement providing for the sale of the Debtors' products or services on Exhibit II.F.5 will not constitute an admission by a Debtor or Reorganized Debtor that such agreement (including related agreements as described in Section II.F.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder

**d.** **Treatment of Collective Bargaining Agreements**

The treatment of the Debtors' collective bargaining agreements shall be determined pursuant to any motion Filed by the Debtors under section 1113 of the Bankruptcy Code and/or any agreement by the Debtors and the relevant parties that is approved pursuant to a Final Order of the Bankruptcy Court.

**2.** **Approval of Assumptions and Assignments; Assignments Related to Restructuring Transactions**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption (including any related assignment resulting from the Restructuring Transactions or otherwise) of Executory Contracts or Unexpired Leases pursuant to Section II.F as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are

subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.F.5 or (e) are designated for rejection in accordance with the last sentence of this paragraph.  As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or Reorganized Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases or assigned to a particular Reorganized Debtor pursuant to the procedures described in this Section II, will be deemed assigned to the surviving, resulting or acquiring corporation in the applicable Restructuring Transaction, pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption, assumption and assignment, or Cure Amount Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within 10 Business Days of the entry of the order of the Bankruptcy Court resolving the matter against the Debtors.  Such rejection shall be deemed effective as of the Effective Date.

### 3.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the applicable Debtor or Reorganized Debtor:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding (a) the amount of any Cure Amount Claim, (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order or the execution of a Stipulation of Amount and Nature of Claim resolving the dispute and approving the assumption.

### 4.    Contracts and Leases Entered Into After the Petition Date

Contracts, leases and other agreements entered into after the Petition Date by a Debtor, including any Executory Contracts or Unexpired Leases assumed by a Debtor and not thereafter assigned or rejected, will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business, as applicable.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order; provided, however, that any Executory Contracts or Unexpired Leases assumed by a Debtor and not previously assigned will be assigned to the Reorganized Debtor identified on Exhibit II.F.4.  The Debtors and Reorganized Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.F.4 to identify or change the identity of the Reorganized Debtor party that will be the assignee of an Executory Contract or Unexpired Lease.

### 5.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Section II.F (including any related agreements assumed pursuant to Section II.F.1.b), each Executory Contract or Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code.  The Executory Contracts or Unexpired Leases to be rejected will include the Executory Contracts or Unexpired Leases listed on Exhibit II.F.5, provided that the Debtors and the Reorganized Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.F.5 to:  (a) delete any Executory Contract or Unexpired Lease listed therein and add such Executory Contract or Unexpired Lease to Exhibit II.F.1.a, thus providing for its assumption, or assumption and assignment, pursuant to Section II.F.1; or (b) add any Executory Contract or Unexpired Lease to Exhibit II.F.5, notwithstanding any prior assumption of such Executory Contract or Unexpired Lease by the Debtors, thus providing for its rejection pursuant to this Section II.F.5.  Each contract and lease listed on Exhibit II.F.5 will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit II.F.5 will not constitute an admission by a Debtor or Reorganized Debtor that

such contract or lease (including related agreements as described in Section II.F.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.  Irrespective of whether an Executory Contract or Unexpired Lease is listed on Exhibit II.F.5, it will be deemed rejected unless such contract (a) is listed on Exhibit II.F.1.a as of the Effective Date, (b) was previously assumed, assumed and assigned, or rejected by order of the Bankruptcy Court and was not subsequently added to Exhibit II.F.5 or otherwise rejected by the Debtors prior to the Effective Date or (c) is deemed assumed pursuant to the other provisions of this Section II.F.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date; or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Any Claims arising from the rejection of any Executory Contract or Unexpired Lease will be treated as Class 6 Claims (General Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

## 6.     Rejection Damages Bar Date

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be Filed with the Bankruptcy Court and served upon counsel to the Debtors on or before the later of:  (a) 30 days after the Effective Date; or (b) for Executory Contracts identified on Exhibit II.F.5, 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.F.2.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from the Debtors, the Reorganized Debtors or the Estates.

## 7.     Obligations to Indemnify Directors, Officers and Employees

a.      Prior to the Effective Date, the Debtors (a) shall make arrangements to continue liability and fiduciary (including ERISA) insurance, or purchase a tail policy or policies, for the period from and after the Effective Date, for the benefit of any person who is serving or has served as one of the Debtors' directors, officers or employees at any time from and after the Petition Date and (b) may fully pay the premium for such insurance.  Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be continued in accordance with their terms and, to the extent applicable, shall be deemed assumed, or assumed and assigned, by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.

b.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after the Petition Date by reason of such person's prior or future service in such a capacity, or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, will be deemed and treated as Executory Contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

c.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees prior to but not after the Petition Date by reason of such person's prior service in such a capacity, or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or otherwise, will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; provided, however, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as Executory Contracts that are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) will be subject to the bar date provisions of Section II.F.6.

d.      The indemnification obligations in this Section II.F.7 shall not apply to or cover any Claims or causes of action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

**8.      No Change in Control**

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease to a Reorganized Debtor is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party; provided, however, that nothing in this Section II.F.8 shall be deemed to override or render unenforceable any "Change in Control" provisions in any policies of insurance.

**ARTICLE III**
**CONFIRMATION OF THE PLAN**

**A.      Conditions Precedent to Confirmation**

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section III.C:

1.      The Confirmation Order will be reasonably acceptable in form and substance to the Debtors, the DIP Agents and the First Lien Agent.

2.      The Plan shall not have been materially amended, altered or modified from the Plan as Filed, unless such material amendment, alteration or modification has been made in accordance with Section IX.A.

3.      All Confirmation Exhibits are in form and substance reasonably satisfactory to the Debtors, the DIP Agents and the First Lien Agent.

4.      The Resolution of Reclamation Claims has been entered into by the Debtors and the Reclamation Claim Resolution Parties or otherwise ordered by the Bankruptcy Court.

5.      The Debtors, the DIP Lenders, the DIP Agents, First Lien Lenders and the First Lien Agent shall have entered into the First Lien Lender Settlement.

**B.      Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section III.C:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors, the DIP Agents and the First Lien Agent

2.      The Confirmation Order or another order of the Bankruptcy Court shall have been entered approving and authorizing the Debtors, the Reorganized Debtors and the ReorgCo Trustee to take all actions necessary or appropriate to implement the Plan, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      The Confirmation Order shall not be stayed in any respect.

4.       The Exit Funding shall be fully committed and all documents and agreements necessary to effectuate and implement the Exit Funding shall have been executed and delivered by the relevant parties.

5.       The documents effectuating the Exit Facility shall be in form and substance reasonably satisfactory to the Debtors, the DIP Agents and the First Lien Agent, and shall have been executed and delivered by the Reorganized Debtors, the Exit Facility Agent and each of the lenders under the Exit Facility.

6.       The Effective Date shall occur on or before June 30, 2016.

7.       The Plan and all Confirmation Exhibits shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section IX.A of the Plan.

**C.       Waiver of Conditions to Confirmation or the Effective Date**

The conditions to Confirmation set forth in Section III.A and the conditions to the Effective Date set forth in Section III.B may be waived in whole or in part at any time by the Debtors, with the consent of (a) the DIP Agents and (b) the First Lien Agent, without an order of the Bankruptcy Court.

**D.       Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.C, then, except where the failure to satisfy or duly waive a such a condition is within the Debtors' sole control, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.D:  (a) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.F and (iii) the releases described in Section III.E.6; and (b) nothing contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (i) a waiver or release of any Claims by or against, or any Interest in, any Debtor, (ii) an admission of any sort by the Debtors or any other party in interest or (iii) prejudicial in any manner the rights of the Debtors or any other party in interest.

**E.       Effect of Confirmation of the Plan**

**1.       Dissolution of Official Committees**

On the Effective Date, the Official Committees, to the extent not previously dissolved, will dissolve, and the members of the Official Committees and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases.  The Professionals retained by the Official Committees and the respective members thereof shall not be entitled to assert any Fee Claims for any services rendered or expenses incurred after the Effective Date, except, to the extent allowable under applicable law, for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with any final applications for allowance of compensation and reimbursement of expenses of the members of or Professionals to the Official Committees Filed and served after the Effective Date in accordance with the Plan.

**2.       Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Recovery Actions**

Except as otherwise provided in the Plan, any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, or any Final Order of the Bankruptcy Court, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any

claims, demands, rights, defenses and Causes of Action (including any (a) Recovery Actions and (b) Causes of Action identified on the Schedule of any Debtor) that the Debtors or the Estates may hold against any entity.

**3.        Comprehensive Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim (including Prepetition Intercompany Claims) or Interest may have with respect to any Allowed Claim or Allowed Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements, including the First Lien Lender Settlement, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement and the Resolution of Reclamation Claims, are (a) in the best interests of the Debtors, the Reorganized Debtors, the Estates and their respective property and Claim and Interest holders and (b) fair, equitable and reasonable.

**4.        Discharge of Claims and Termination of Interests**

**a.        Complete Satisfaction, Discharge and Release**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and immediately after cancellation of the Old Common Stock of ANR:  (a) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of holders of Interests in the Debtors.

**b.        Discharge and Termination**

In accordance with Section III.E.4.a, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Old Common Stock of ANR, but prior to the issuance of the New ANR Common Stock, of a discharge of all Claims and other debts and Liabilities against the Debtors and a termination of all Interests and other rights of the holders of Interests in the Debtors, pursuant to sections 524(a)(1), 524(a)(2) and 1141(d) of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

**5.        Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order:**

**a.        All Persons who have been, are or may be holders of Claims against or Interests in a Debtor shall be enjoined from taking any of the following actions against or affecting any Injunction Party, or the respective Assets or property thereof, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

**i.        commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any Injunction Party, or the respective Assets or property thereof, (including, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

ii.     enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against any Injunction Party, or the respective Assets or property thereof;

iii.     creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien against any Injunction Party, or the respective Assets or property thereof, other than as contemplated by the Plan;

iv.     asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due an Injunction Party, or the respective Assets or property thereof; and

v.     proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan.

b.     All Persons that have held, currently hold or may hold any Liabilities released or exculpated pursuant to Sections III.E.6 and III.E.7, respectively, will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien; (d) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

6.     Releases

a.     General Releases by Debtors and Reorganized Debtors

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, will forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

b.     General Releases by Holders of Claims or Interests

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code); provided, however, that the foregoing provisions shall not affect any rights to enforce the Plan or the other contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan.

c.       **Release of Released Parties by Other Released Parties**

From and after the Effective Date, except with respect to obligations arising under the Plan or assumed hereunder, to the fullest extent permitted by applicable law, the Released Parties shall release each other from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way relating to:  (a) any Debtor; (b) the Chapter 11 Cases; (c) the Estates; (d) the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, the Disclosure Statement, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party; (e) the process of marketing, selling and disposing of Assets pursuant to the Sale Orders, the De Minimis Sale Order or other orders entered by the Bankruptcy Court in the Chapter 11 Cases approving the sale or other disposition of Assets; or (f) any other act taken or omitted to be taken in connection with the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

7.       **Exculpation**

From and after the Effective Date, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, negotiation, preparation, dissemination, implementation, Confirmation or approval of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, the Disclosure Statement or any contract, employee pension or other benefit plan, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; <u>provided</u>, <u>however</u>, that this section shall not apply to the obligations arising under the Plan or the obligations assumed hereunder; and <u>provided</u> <u>further</u> that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

8.       **Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies**

a.       **Termination**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any Distribution made pursuant to the Plan.  All subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan shall be released and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined. Accordingly, Distributions pursuant to the Plan to holders of Allowed Claims shall not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

b.       **Settlement**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      Continued Corporate Existence and Vesting of Assets**

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section IV.B):  (a) on or before the Effective Date, Reorganized ANR will be incorporated and shall exist as a separate corporate entity, with all corporate powers in accordance with state law and the certificates of incorporation and bylaws attached hereto as Exhibits IV.D.1.a and IV.D.1.b; (b) on or before the Effective Date, ReorgCo Trust will be formed pursuant to the terms of Section IV.B.2 and the ReorgCo Trust Agreement; (c) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; and (d) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, including, without limitation, the First Lien Lender Exit Contribution, will vest, subject to the Restructuring Transactions, in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.  For the avoidance of doubt, the assets to be contributed to the Reorganized Debtors pursuant to the Plan shall not include any Assets subject to an asset sale consummated prior to the Effective Date pursuant to a Sale Order.

**B.      Restructuring Transactions**

**1.        Restructuring Transactions Generally**

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect, in accordance with applicable nonbankruptcy law, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors, including but not limited to the Restructuring Transactions identified on Exhibit IV.B.1, all to the extent not inconsistent with any other terms of the Plan.  Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions closing under or in connection with the Plan in connection with any Core Asset Sale Order), conversions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  The actions to effect these transactions may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including (i) making filings or recordings that may be required by applicable state law in connection with such transactions and (ii) any appropriate positions on one or more tax returns.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors.  Notwithstanding the foregoing and any other provisions of the Plan, nothing in the Plan shall impair, expand or otherwise modify the rights of any party under the Stalking Horse APA or any other agreement entered into pursuant to any Sale Order.

2.        **Establishment of ReorgCo Trust**

On or prior to the Effective Date, ReorgCo Trust shall be established pursuant to the ReorgCo Trust Agreement.  On the Effective Date, all shares of New ANR Common Stock issued pursuant to the Plan shall be transferred to ReorgCo Trust, which transfer shall constitute a Restructuring Transaction within the meaning of Section IV.B.1.  ReorgCo Trust shall conduct its activities consistent with the ReorgCo Trust Agreement. The Debtors or the Reorganized Debtors, as applicable, shall have discretion regarding the tax treatment of ReorgCo Trust.

3.        **Obligations of Any Successor Corporation in a Restructuring Transaction**

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

C.        **The Resolution of Reclamation Claims**

The Debtors contemplate that, prior to the Effective Date, the Resolution of Reclamation Claims among the Debtors and the Reclamation Claim Resolution Parties will be agreed upon and/or ordered by the Bankruptcy Court to effect a comprehensive resolution of the Reorganized Debtors' post-Effective Date reclamation obligations.  The Debtors anticipate that, among other things, the Resolution of Reclamation Claims will:  (a) ensure the continuing existence of the Reorganized Debtors post-Effective Date for the primary purpose of conducting reclamation activities; (b) provide for the creation and funding of the Restricted Cash Reclamation Accounts; (c) establish the Reclamation Threshold Amount; and (d) provide for the selection and appointment of the ReorgCo Trustee by the Reclamation Claim Resolution Parties.

D.        **Corporate Governance and Directors and Officers**

1.        **Constituent Documents of Reorganized ANR, the Other Reorganized Debtors and ReorgCo Trust**

As of the Effective Date:  (a) the certificates of incorporation and the bylaws (or comparable constituent documents) of Reorganized ANR and the other Reorganized Debtors will be substantially in the forms set forth in Exhibits IV.D.1.a and IV.D.1.b, respectively; and (b) the ReorgCo Trust Agreement and the ReorgCo Trust Certificate of Trust will be substantially in the forms set forth in Exhibits I.A.146 and I.A.147, respectively. The certificates of incorporation and bylaws (or comparable constituent documents) of Reorganized ANR and each other Reorganized Debtor, among other things, will (a) prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code and (b) with respect to Reorganized ANR, authorize the issuance of New ANR Common Stock.  After the Effective Date, Reorganized ANR and the other Reorganized Debtors may amend and restate their articles of incorporation or bylaws (or comparable constituent documents) as permitted by applicable state law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, Reorganized ANR and each other Reorganized Debtor shall file such certificates of incorporation (or comparable constituent documents) with the secretaries of state of the states in which Reorganized ANR and such other Reorganized Debtors are incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such states.

2.        **Directors and Officers of Reorganized ANR and the Other Reorganized Debtors**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date:  (a) the initial officers of Reorganized ANR and the other

Reorganized Debtors will consist of the individuals identified on Exhibit IV.D.2; and (b) the initial board of directors of Reorganized ANR and each of the other Reorganized Debtors will consist of the individuals identified, or will be designated pursuant to the procedures specified, on Exhibit IV.D.2.  Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of Reorganized ANR or the applicable other Reorganized Debtor and state law.

**E.**      **General Unsecured Claims Asset Pool**

On the Effective Date, the General Unsecured Claims Asset Pool shall be funded in accordance with Section I.A.98.  Upon the Reorganized Debtors having deposited an amount of Excess Free Cash Flow equal to the Restricted Cash Reclamation Account FCF Cap into the Restricted Cash Reclamation Accounts, all equity in Reorganized ANR shall be contributed to the General Unsecured Claims Asset Pool for Distribution to Holders of Class 6 Claims in accordance with Article V hereof.

**F.**      **Restricted Cash Reclamation Accounts**

The Reorganized Debtors shall fund the Restricted Cash Reclamation Accounts (a) on the Effective Date, with any Initial Reclamation Contribution and (b) thereafter, with the remaining portion of the Reclamation Funding Amount.  On a quarterly basis beginning on the conclusion of the first full calendar year quarter following the Effective Date, the Reorganized Debtors shall deposit all Excess Free Cash Flow into the Restricted Cash Reclamation Accounts, as applicable, until such time as the aggregate amount deposited into the Restricted Cash Reclamation Accounts equals the Reclamation Threshold Amount.  The Reorganized Debtors shall have no obligation to fund the Restricted Cash Reclamation Accounts in an aggregate amount in excess of the Reclamation Threshold Amount.

**G.**      **New ANR Common Stock**

On the Effective Date, all shares of New ANR Common Stock issued pursuant to the Plan shall be transferred to ReorgCo Trust in accordance with Section IV.B.2 and the ReorgCo Trust Agreement.  The New ANR Common Stock, when issued as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable.  Each issuance under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such issuance and by the terms and conditions of the instruments evidencing or relating to such issuance, which terms and conditions shall bind each person or entity receiving such issuance.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the New ANR Common Stock under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder.

**H.**      **Employment-Related Agreements; Retiree Benefits; Workers' Compensation Programs**

**1.**      **Employment-Related Agreements**

As of the Effective Date, the Reorganized Debtors will have authority to:  (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active employees.

**2.**      **Retiree Benefits**

The treatment of non-pension retiree benefits will be determined pursuant to (a) any order granting the Unvested Non-Pension Benefits Motion, (b) any motion Filed by the Debtors pursuant to section 1114 of the Bankruptcy Code and/or (c) any agreement by the Debtors and the relevant parties that is approved pursuant to a Final Order of the Bankruptcy Court.

3.      **Continuation of Workers' Compensation Programs**

From and after the Effective Date:  (a) the Reorganized Debtors will continue to administer and pay all valid claims for benefits and liabilities arising under the Debtors' workers' compensation programs for which the Debtors or the Reorganized Debtors are responsible under applicable state workers' compensation law as of the Effective Date, regardless of when the applicable injuries were incurred, in accordance with the Debtors' prepetition practices and procedures, applicable plan documents and governing state workers' compensation law; and (b) nothing in the Plan shall discharge, release, or relieve the Debtors or the Reorganized Debtors from any current or future liability under applicable state workers' compensation law in the jurisdictions where the Debtors or Reorganized Debtors participate in workers' compensation programs.  The Debtors expressly reserve the right to challenge the validity of any claim for benefits or liabilities arising under any workers' compensation program.

I.      **Corporate Action**

The Restructuring Transactions; the adoption of new or amended and restated certificates of incorporation and bylaws (or comparable constituent documents) for Reorganized ANR and the other Reorganized Debtors; the initial selection of directors and officers for each Reorganized Debtor; the Reorganized Debtors' receipt of the Exit Funding; the entry into the Exit Facility and receipt of the proceeds thereof; the issuance of New ANR Common Stock; the transfer of New ANR Common Stock to ReorgCo Trust; the Distribution of Cash and interests pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing, including the ReorgCo Trust Agreement; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and the other matters provided for under the Plan involving the corporate structure of the Debtors and the Reorganized Debtors or corporate action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Reorganized Debtors or any other Person or entity.

J.      **Special Provisions Regarding Insured Claims**

1.      **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

Distributions, if any, under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law.  Nothing in this Section IV.J will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

2.      **Assumption and Continuation of Insurance Policies**

From and after the Effective Date, each of the Insurance Contracts will be assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code or continued in accordance with its terms, with rights and obligations under such policy such that each of the parties' contractual, legal and equitable rights under each Insurance Contract shall remain unaltered, and the successors to the Debtor parties to each Insurance Contract will continue to be bound by such Insurance Contract as if the Chapter 11 Cases had not occurred.  Nothing in the Plan shall affect, impair or prejudice the rights and defenses of the Insurers or the Reorganized Debtors under the Insurance Contracts in any manner, and such Insurers and Reorganized Debtors shall retain all rights and defenses under the Insurance Contracts, and the Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred.  In addition, notwithstanding anything to the contrary in the Plan, nothing in the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any Insurance Contract, if any, in any respect.  Any such rights and obligations shall be determined under the Insurance Contracts, any agreement of the parties and applicable law.

### K.    Cancellation and Surrender of Instruments, Securities and Other Documentation

#### 1.    Notes

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan or as otherwise provided for herein, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article V, the Indentures and the Notes will be deemed canceled and of no further force and effect against the Debtors, without any further action on the part of any Debtor. The holders of the Notes will have no rights against the Debtors arising from or relating to such instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no Distribution under the Plan will be made to or on behalf of any holder of an Allowed Noteholder Claim until such Notes are surrendered to and received by the applicable Third Party Disbursing Agent to the extent required in Section V.J.  Notwithstanding the foregoing and anything contained in the Plan, the applicable provisions of the Indentures will continue in effect solely for the purposes of allowing the Indenture Trustees or other Disbursing Agents to make Distributions on account of Noteholder Claims as provided in Section V.C.  The Reorganized Debtors shall have not have any obligations to any Indenture Trustee for any fees, costs or expenses.

#### 2.    Old Common Stock

The Old Common Stock of ANR shall be deemed canceled and of no further force and effect on the Effective Date.  The holders of or parties to such canceled securities and other documentation will have no rights arising from or relating to such securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

### L.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the property of any Estate will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date:  (a) the holders of such Liens will be authorized and directed to release any collateral or other property of the Estates (including any cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the Reorganized Debtors; and (b) the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.L.

### M.    Effectuating Documents; Further Transactions

The president, chief executive officer, chief financial officer, treasurer or any vice president of each Debtor or Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary or any assistant secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.

### N.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, filing fee, sales or use Tax or similar Tax:  (a) the issuance, transfer or exchange of New ANR Common Stock; (b) the creation of any mortgage, deed of trust, Lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the execution and delivery of the Exit Facility; (e) any Restructuring Transaction, including any transfers or distributions pursuant to the Plan; (f) any sale of Assets by the Debtors under section 363 of the Bankruptcy Code that closes in connection with the Plan; and (g) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with

the Plan, including any merger agreements, agreements of consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan. The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such Tax and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Tax.

## ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

### A.      Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in this Article **V**, Distributions to be made on the Effective Date to holders of Claims as provided by Article II that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (a) 60 days after the Effective Date; or (b) with respect to any particular Claim, such later date when the applicable conditions of Section II.F.3 (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section V.E.2 (regarding undeliverable Distributions) or Section V.J (regarding surrender of canceled instruments and securities), as applicable, are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section VI.C.

### B.      Method of Distributions to Holders of Claims

The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash, interests and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan. The duties of any Third Party Disbursing Agent shall be set forth in the applicable agreement retaining such Third Party Disbursing Agent.

### C.      Distributions on Account of Allowed Noteholder Claims

Distributions on account of Allowed Noteholder Claims shall be made (a) to the respective Indenture Trustees or (b) with the prior written consent of any Indenture Trustee, through a Third Party Disbursing Agent. If a Distribution is made to an Indenture Trustee, such Indenture Trustee, in its capacity as Third Party Disbursing Agent, shall administer the Distributions in accordance with the Plan and the applicable Indenture and be compensated in accordance with Section V.D below.

### D.      Compensation and Reimbursement for Services Related to Distributions

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments will be made by the Reorganized Debtors and will not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent. For purposes of reviewing the reasonableness of the fees and expenses of any Third Party Disbursing Agent, the Reorganized Debtors shall be provided with copies of invoices of each Third Party Disbursing Agent in the form typically rendered in the regular course of the applicable Third Party Disbursing Agent's business but with sufficient detail that reasonableness may be assessed. To the extent that there are any disputes that the Reorganized Debtors are unable to resolve with a Third Party Disbursing Agent, the Reorganized Debtors may submit such dispute to the Bankruptcy Court for resolution.

**E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.      Delivery of Distributions**

Distributions to holders of Allowed Claims will be made by a Disbursing Agent:  (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Claims and Balloting Agent or the applicable Disbursing Agent, as applicable, after the date of Filing of any related proof of claim; (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and neither the Claims and Balloting Agent nor the applicable Disbursing Agent has received a written notice of a change of address; or (d) if clauses (a) through (c) are not applicable, at the last address directed by such holder in a Filing made after such Claim becomes an Allowed Claim.

**2.      Undeliverable Distributions Held by Disbursing Agents**

**a.      Holding of Undeliverable Distributions**

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address.  Subject to Section V.E.2.c, Distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent pursuant to this Section V.E.2.a until such time as a Distribution becomes deliverable.  Subject to Section V.E.2.c, while remaining in the possession of the applicable Disbursing Agent, undeliverable Distributions will be held for the benefit of the potential claimants of such Distributions.

**b.      After Distributions Become Deliverable**

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date; provided, however, that the applicable Disbursing Agent may, in its sole discretion, establish a record date prior to each Distribution Date, such that only Claims allowed as of the record date will participate in such periodic Distribution.  Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

**c.      Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (a) the Effective Date and (b) the last date on which a Distribution was deliverable to such holder will have its claim for such undeliverable Distribution discharged and will be forever barred from asserting any such claim against the Debtors or the Reorganized Debtors.  Unclaimed Distributions otherwise deliverable to holders of Allowed Claims shall be retained by, or, if held by a Third Party Disbursing Agent, returned to, Reorganized ANR and shall become the property of Reorganized ANR, free of any restrictions thereon.  Nothing contained in the Plan will require any Debtor, any Reorganized Debtor or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

**F.      Timing and Calculation of Amounts to Be Distributed**

**1.      Distributions to Holders of Allowed Claims**

Subject to Section V.A, on the Effective Date, each holder of an Allowed Claim will receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  On each Distribution Date, Distributions also will be made, pursuant to Section VI.C, to holders of Claims that previously were Disputed Claims that were allowed after the most recent Distribution Date.  Such periodic Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.  Distribution Dates shall occur no less frequently than once per year.

2.        **Interest on Claims**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the Debtors, the Estates and the Reorganized Debtors shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes.  Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the Debtors, the Estates or the Reorganized Debtors shall be cancelled as of the Effective Date for federal income tax purposes.

3.        *De Minimis* **Distributions**

No Distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific holder of an Allowed Claim on the applicable Distribution Date has an economic value to less than $25.

G.        **Distribution Record Date**

1.        A Disbursing Agent will have no obligation to, and will not, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the Distribution Record Date.

2.        As of the close of business on the Distribution Record Date, each transfer register for the Notes, as maintained by the respective Indenture Trustees, will be closed.  The applicable Disbursing Agent will have no obligation to, and will not, recognize the transfer or sale of any Noteholder Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make Distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

3.        Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

H.        **Means of Cash Payments**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

I.        **Establishment of Reserves**

The Debtors or Reorganized Debtors may establish any reserves that they deem necessary or advisable to make Distributions to holders of Allowed Claims or otherwise to satisfy their obligations under the Plan.

J.        **Surrender of Canceled Instruments or Securities**

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made

pursuant to the Plan, all outstanding common stock, Notes, Indentures, instruments and securities issued by any of the Debtors will be canceled and of no further force and effect, without any further action on the part of the Bankruptcy Court, any Debtor or any Reorganized Debtor.  The holders of or parties to such canceled instruments and securities will have no rights arising from or relating to such instruments and securities or the cancellation thereof, except the rights provided pursuant to the Plan.

K.      **Withholding and Reporting Requirements**

1.      In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all applicable Tax withholding and reporting requirements imposed by any Governmental Unit, and all Distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, applying a portion of any Cash Distribution to be made under the Plan to pay applicable withholding Taxes, liquidating a portion of any non-Cash Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or requiring Claim holders to pay the withholding Tax amount to the Disbursing Agent in Cash as a condition of receiving any non-Cash Distributions under the Plan.  Any amounts withheld pursuant to this Section shall be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan.  To the extent that any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Disbursing Agent, such Claim holder's Distribution may, in the Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section V.E.

2.      Notwithstanding any other provision of the Plan, each entity receiving a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any Governmental Unit on account of the Distribution, including income, withholding and other Tax obligations.

3.      The Debtors reserve, and the Reorganized Debtors shall have, the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

L.      **Setoffs**

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Reorganized Debtor or, as instructed by a Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of the Claim (before any Distribution is made on account of the Claim) the claims, rights and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of the Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and Causes of Action that the Debtor or Reorganized Debtor may possess against the Claim holder.  The First Lien Lender Remaining Diminution Claim shall not be subject to setoff.

M.      **Application of Distributions**

To the extent applicable, all Distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, will apply to any interest accrued on such Claim after the Petition Date.

## ARTICLE VI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**A.    Treatment of Disputed Claims**

**1.    Tort Claims**

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 11 Cases) not resolved through a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  The Debtors or the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option.  Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code or, after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s).  Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the District Court) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.  Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.1 and applicable nonbankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, as applicable, in Class 6 against the applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with any applicable insurance policy and is not satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' insurance policies will be treated as an Allowed Claim for the purposes of Distributions under the Plan.  In no event will a Distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self-insured retention under any applicable insurance policy.  In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with this Section VI.A.1 and is no longer appealable or subject to review, and applicable nonbankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim.  Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code.  All claims, demands, rights, defenses and Causes of Action that the Debtors or the Reorganized Debtors may have against any Person or entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

**2.    Disputed Insured Claims**

The resolution of Disputed Insured Claims, including Tort Claims, pursuant to this Section VI.A shall be subject to the provisions of Section IV.J.

**3.    No Distributions Until Allowance**

Notwithstanding any other provision of the Plan, no payments or Distributions will be made on account of a Disputed Claim until such Claim (or a portion of such Claim) becomes an Allowed Claim, if ever.

B.    **Prosecution of Objections to Claims**

     1.    **Objections to Claims**

        All objections to Claims must be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, must be made by the Debtors or the Reorganized Debtors by the Claims Objection Bar Date.  If an objection to a Claim has not been Filed or an amendment to the Schedules has not been made by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim in the amount specified in a timely filed proof of Claim or the amount scheduled, as applicable, if such Claim has not been allowed earlier.

     2.    **Extension of Claims Objection Bar Date**

        The Reorganized Debtors may seek authorization to extend the Claims Objection Bar Date for some or all Disputed Claims for cause through the Filing of a motion with the Bankruptcy Court.

     3.    **Authority to Prosecute Objections**

        On or after the Effective Date, only the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims.  On or after the Effective Date, the Reorganized Debtors, and only the Reorganized Debtors, may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

     4.    **Authority to Amend Schedules**

        The Debtors or the Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Reorganized Debtors will provide the holder of such Claim with notice of such amendment and parties in interest will have 30 days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the applicable Disbursing Agent may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

C.    **Distributions on Account of Disputed Claims Once Allowed**

        Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date shall be made in accordance with Article V of the Plan.

**ARTICLE VII**
**CONSOLIDATION**

A.    **Consolidation**

        Pursuant to the Confirmation Order, the Bankruptcy Court will approve the limited administrative consolidation of the Debtors solely for the purpose of implementing the Plan, including for purposes of voting, assessing whether Confirmation standards have been met, calculating and making Distributions under the Plan and filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee.  Pursuant to such order, as of the Effective Date:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (c) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtor will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors, and the Debtors may file and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple Debtors; and (d) Intercompany Claims between Debtors will be eliminated and extinguished.  Such administrative consolidation

(other than for the purpose of implementing the Plan) shall not affect (a) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions as provided in Section IV.B; (b) the vesting of assets in the Reorganized Debtors; (c) the right to distributions from any insurance policies or proceeds of such policies; or (d) the rights of the Debtors or the Reorganized Debtors to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

**B.      Order Granting Consolidation**

            This Plan serves as a motion seeking entry of an order consolidating the Debtors, as described and to the limited extent set forth in Section VII.A.  Unless an objection to such consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section IX.F on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

**ARTICLE VIII**
**RETENTION OF JURISDICTION**

            Pursuant to sections 105(c) and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

            A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims or Interests;

            B.      Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

            C.      Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

            D.      Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

            E.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

            F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

            G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan;

            H.      Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other

agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

I.       Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.       Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

K.       Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.       Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

M.       Enter a final decree or decrees closing the Chapter 11 Cases;

N.       Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

O.       Recover all assets of the Debtors and their Estates, wherever located; and

P.       Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

**A.       Modification of the Plan**

Subject to section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

**B.       Revocation of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (a) a waiver or release of any claims by or against any Debtor; (b) an admission of any sort by any Debtor or any other party in interest; or (c) prejudicial in any manner to the rights of any Debtor or any other party in interest.

**C.       Severability of Plan Provisions**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) non-severable and mutually dependent.

**D.    Successors and Assigns**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each entity.

**E.    Plan Controls**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**F.    Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to:  (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee; (c) the Retiree Committee; (d) the DIP Agents; (e) the First Lien Agent; (f) the Ad Hoc Committee of Second Lien Noteholders; (g) the Second Lien Notes Trustee; or (h) the UMWA must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

**1.    The Debtors and the Reorganized Debtors**

David G. Heiman
Carl E. Black
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Tyler P. Brown
Henry P. (Toby) Long, III
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

(Counsel to the Debtors and the Reorganized Debtors)

2.    **The Creditors' Committee**

Dennis F. Dunne
Evan R. Fleck
Eric K. Stodola
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Place
New York, New York  10005
Telephone:  (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C.  20006
Telephone:  (202) 835-7500

William A. Gray
W. Ashley Burgess
Roy M. Terry, Jr.
SANDS ANDERSON PC
P.O. Box 1998
Richmond, Virginia  23218-1998
Telephone:  (804) 648-1636

(Counsel to the Creditors' Committee)

3.    **The Retiree Committee**

Lynn Lewis Tavenner
Paula S. Beran
David N. Tabakin
TAVENNER & BERAN, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Facsimile:  (804) 783-0178

John R. Owen
Jeremy D. Capps
Melissa Y. York
HARMAN, CLAYTOR, CORRIGAN & WELLMAN
P.O. Box 70280
Richmond, Virginia  23235
Telephone:  (804) 747-5200
Facsimile:  (804) 747-6085

(Counsel to the Retiree Committee)

4.        **The DIP Agents and the First Lien Agent**

Damian S. Schaible
Damon P. Meyer
Bradley A. Schecter
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 710-5800

Dion W. Hayes
Sarah B. Boehm
K. Elizabeth Sieg
MCGUIREWOODS LLP
800 East Canal Street
Richmond, Virginia  23219
Telephone:  (804) 775-1000
Facsimile:  (804) 775-1061

(Counsel to the DIP Agents and the First Lien Agent)

5.        **The Ad Hoc Committee of Second Lien Noteholders**

Paul M. Basta
Stephen E. Hessler
Gregory F. Pesce
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Michael A. Condyles
Peter J. Barrett
Jeremy S. Williams
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700
Facsimile:  (804) 783-6192

(Counsel to the Ad Hoc Committee of Second Lien Noteholders)

6.        **The Second Lien Notes Trustee**

Jayme T. Goldstein
Kenneth Pasquale
Gabriel E. Sasson
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038-4982
Telephone:  (212) 806-5400
Facsimile:  (212) 806-6006

Peter J. Barrett
Jeremy S. Williams
KUTAK ROCK LLP
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700
Facsimile:  (804) 783-6192

(Counsel to the Second Lien Notes Trustee)

7.     **The UMWA**

Sharon L. Levine
Paul Kizel
Philip J. Gross
Nicole M. Brown
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey  07068
Telephone:  (973) 597-2500

Troy Savenko
KAPLAN VOEKLER CUNNINGHAM & FRANK, PLC
1401 East Cary Street
Richmond, Virginia  23219
Telephone:  (804) 823-4000

(Counsel to the UMWA)

Dated:  March 7, 2016

Respectfully submitted,

Alpha Natural Resources, Inc., on its own behalf and
on behalf of each affiliate Debtor

By: _____
Name:   Mark M. Manno
Title:    Executive Vice President, General Counsel and
          Chief Procurement Officer

COUNSEL:

_____
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

**Exhibit I.A.49**

Debtors in the Chapter 11 Cases

## DEBTORS AND DEBTORS IN POSSESSION

| Debtor's Name | Debtor's EIN Number | Case Number |
|---|---|---|
| Alpha Natural Resources, Inc. | 42-1638663 | 15-33896 |
| Alex Energy, Inc. | 55-0755384 | 15-33911 |
| Alpha American Coal Company, LLC | 54-1947356 | 15-33913 |
| Alpha American Coal Holding, LLC | 13-2793319 | 15-33915 |
| Alpha Appalachia Holdings, Inc. | 95-0740960 | 15-33917 |
| Alpha Appalachia Services, Inc. | 54-1095096 | 15-33921 |
| Alpha Coal Resources Company, LLC | 84-1341308 | 15-33925 |
| Alpha Coal Sales Co., LLC | 16-1641207 | 15-33926 |
| Alpha Coal West, Inc. | 35-1867616 | 15-33931 |
| Alpha European Sales, Inc. | 54-1834161 | 15-33898 |
| Alpha India, LLC | 27-4593320 | 15-33937 |
| Alpha Land and Reserves, LLC | 57-1136960 | 15-33939 |
| Alpha Midwest Holding Company | 84-1456626 | 15-33944 |
| Alpha Natural Resources, LLC | 56-2298262 | 15-33947 |
| Alpha Natural Resources International, LLC | 27-4592266 | 15-33950 |
| Alpha Natural Resources Services, LLC | 27-0075099 | 15-33952 |
| Alpha PA Coal Terminal, LLC | 26-1102515 | 15-33955 |
| Alpha Shipping and Chartering, LLC | 41-2136215 | 15-33959 |
| Alpha Sub Eight, LLC | 47-3587689 | 15-33916 |
| Alpha Sub Eleven, Inc. | 47-3640130 | 15-33918 |
| Alpha Sub Nine, LLC | 47-3601607 | 15-33922 |
| Alpha Sub One, LLC | 27-4592410 | 15-33927 |
| Alpha Sub Ten, Inc. | 47-3626036 | 15-33930 |
| Alpha Sub Two, LLC | 27-4592527 | 15-33934 |
| Alpha Terminal Company, LLC | 55-0802473 | 15-33940 |
| Alpha Wyoming Land Company, LLC | 35-1661756 | 15-33949 |
| AMFIRE, LLC | 51-0430939 | 15-33954 |
| AMFIRE Holdings, LLC | 11-3673814 | 15-33958 |
| AMFIRE Mining Company, LLC | 11-3673833 | 15-33963 |
| Appalachia Coal Sales Company, Inc. | 54-1188775 | 15-33900 |
| Appalachia Holding Company | 54-0295165 | 15-33901 |
| Aracoma Coal Company, Inc. | 52-1669141 | 15-33966 |
| Axiom Excavating and Grading Services, LLC | 20-8109122 | 15-33970 |
| Bandmill Coal Corporation | 55-0758310 | 15-33978 |
| Bandytown Coal Company | 55-0751776 | 15-33983 |
| Barbara Holdings Inc. | 25-1292326 | 15-33986 |
| Barnabus Land Company | 55-0728645 | 15-33990 |
| Belfry Coal Corporation | 61-0415137 | 15-33993 |
| Big Bear Mining Company | 22-2138933 | 15-34000 |
| Black Castle Mining Company, Inc. | 52-1891104 | 15-34004 |
| Black King Mine Development Co. | 54-1188659 | 15-34008 |
| Black Mountain Cumberland Resources, Inc. | 27-2323540 | 15-33902 |
| Boone East Development Co. | 55-0717715 | 15-34012 |
| Brooks Run Mining Company, LLC | 52-2070922 | 15-34016 |
| Brooks Run South Mining, LLC | 26-0342580 | 15-34022 |
| Buchanan Energy Company, LLC | 54-0983234 | 15-33895 |
| Castle Gate Holding Company | 84-1456620 | 15-34024 |
| Clear Fork Coal Company | 55-0757300 | 15-34026 |
| Coal Gas Recovery II, LLC | 46-2855899 | 15-34018 |
| Crystal Fuels Company | 55-0732366 | 15-34028 |
| Cumberland Coal Resources, LP | 84-1521723 | 15-34030 |
| Dehue Coal Company | 55-0619956 | 15-33912 |
| Delbarton Mining Company | 55-0764304 | 15-33919 |
| Delta Mine Holding Company | 91-1897558 | 15-33923 |
| DFDSTE Corp. | 84-1199429 | 15-33928 |
| Dickenson-Russell Coal Company, LLC | 54-2079085 | 15-33932 |

| Debtor's Name | Debtor's EIN Number | Case Number |
|---|---|---|
| Dickenson-Russell Land and Reserves, LLC | 20-4278709 | 15-33935 |
| DRIH Corporation | 54-1497754 | 15-33938 |
| Duchess Coal Company | 54-1725084 | 15-33942 |
| Eagle Energy, Inc. | 55-0751738 | 15-33945 |
| Elk Run Coal Company, Inc. | 54-1097978 | 15-33948 |
| Emerald Coal Resources, LP | 84-1521724 | 15-33956 |
| Enterprise Mining Company, LLC | 38-3671602 | 15-33960 |
| Esperanza Coal Co., LLC | 06-1652549 | 15-33962 |
| Foundation Mining, LLC | 20-3378168 | 15-33965 |
| Foundation PA Coal Company, LLC | 84-1521726 | 15-33968 |
| Foundation Royalty Company | 84-1456627 | 15-33971 |
| Freeport Mining, LLC | 84-1521725 | 15-33973 |
| Freeport Resources Company, LLC | 84-1230391 | 15-33975 |
| Goals Coal Company | 55-0737462 | 15-33979 |
| Green Valley Coal Company | 55-0747007 | 15-33985 |
| Greyeagle Coal Company | 55-0771551 | 15-33989 |
| Harlan Reclamation Services LLC | 54-1914510 | 15-33903 |
| Herndon Processing Company, LLC | 51-0442749 | 15-33992 |
| Highland Mining Company | 55-0757301 | 15-33996 |
| Hopkins Creek Coal Company | 54-1136806 | 15-33999 |
| Independence Coal Company, Inc. | 54-1188773 | 15-34002 |
| Jacks Branch Coal Company | 55-0734230 | 15-34005 |
| Jay Creek Holding, LLC | 27-4593143 | 15-34007 |
| Kanawha Energy Company | 55-0765391 | 15-34010 |
| Kepler Processing Company, LLC | 51-0442560 | 15-34013 |
| Kingston Mining, Inc. | 31-1562659 | 15-33924 |
| Kingwood Mining Company, LLC | 57-1148058 | 15-33941 |
| Knox Creek Coal Corporation | 54-1393689 | 15-33904 |
| Lauren Land Company | 61-1209098 | 15-33953 |
| Laxare, Inc. | 55-0486813 | 15-33969 |
| Litwar Processing Company, LLC | 51-0442687 | 15-33976 |
| Logan County Mine Services, Inc. | 31-1708085 | 15-33982 |
| Long Fork Coal Company | 54-1605009 | 15-33987 |
| Lynn Branch Coal Company, Inc. | 54-1537451 | 15-33994 |
| Maple Meadow Mining Company | 55-0529664 | 15-34003 |
| Marfork Coal Company, Inc. | 55-0723539 | 15-34009 |
| Martin County Coal Corporation | 61-0702852 | 15-34015 |
| Maxxim Rebuild Co., LLC | 01-0749355 | 15-34027 |
| Maxxim Shared Services, LLC | 55-0814342 | 15-34029 |
| Maxxum Carbon Resources, LLC | 55-0802477 | 15-34032 |
| McDowell-Wyoming Coal Company, LLC | 54-2079104 | 15-34033 |
| Mill Branch Coal Corporation | 54-1817506 | 15-33905 |
| New Ridge Mining Company | 61-1218677 | 15-34034 |
| New River Energy Corporation | 54-1225713 | 15-34035 |
| Neweagle Industries, Inc. | 54-1695751 | 15-33906 |
| Nicewonder Contracting, Inc. | 20-0388143 | 15-34036 |
| North Fork Coal Corporation | 54-1679027 | 15-33097 |
| Omar Mining Company | 55-0385010 | 15-34038 |
| Paramont Coal Company Virginia, LLC | 56-2298367 | 15-34039 |
| Paynter Branch Mining, Inc. | 55-0746860 | 15-34040 |
| Peerless Eagle Coal Co. | 55-0451306 | 15-34041 |
| Pennsylvania Land Holdings Company, LLC | 84-1452626 | 15-34042 |
| Pennsylvania Land Resources, LLC | 46-2854684 | 15-34020 |
| Pennsylvania Land Resources Holding Company, LLC | 46-2855640 | 15-34043 |
| Pennsylvania Services Corporation | 93-1162601 | 15-34044 |
| Performance Coal Company | 55-0736927 | 15-34045 |
| Peter Cave Mining Company | 61-1360315 | 15-34046 |
| Pigeon Creek Processing Corporation | 54-1900369 | 15-33908 |

| Debtor's Name | Debtor's EIN Number | Case Number |
|---|---|---|
| Pilgrim Mining Company, Inc. | 61-1246461 | 15-34047 |
| Pioneer Fuel Corporation | 55-0545211 | 15-34049 |
| Plateau Mining Corporation | 95-3761213 | 15-34050 |
| Power Mountain Coal Company | 31-1567082 | 15-33914 |
| Premium Energy, LLC | 20-3562770 | 15-33920 |
| Rawl Sales & Processing Co. | 55-0476477 | 15-33929 |
| Republic Energy, Inc. | 55-0741015 | 15-33933 |
| Resource Development LLC | 54-1882316 | 15-33909 |
| Resource Land Company LLC | 54-1912100 | 15-33910 |
| River Processing Corporation | 84-1199433 | 15-33936 |
| Riverside Energy Company, LLC | 51-0442691 | 15-33943 |
| Riverton Coal Production Inc. | 55-0739658 | 15-33946 |
| Road Fork Development Company, Inc. | 54-1293743 | 15-33951 |
| Robinson-Phillips Coal Company | 55-0386264 | 15-33957 |
| Rockspring Development, Inc. | 31-1241956 | 15-33961 |
| Rostraver Energy Company | 25-1418256 | 15-33964 |
| Rum Creek Coal Sales, Inc. | 31-1181801 | 15-33967 |
| Russell Fork Coal Company | 61-0394431 | 15-33972 |
| Shannon-Pocahontas Coal Corporation | 54-1132767 | 15-33974 |
| Shannon-Pocahontas Mining Company | 55-0613879 | 15-33977 |
| Sidney Coal Company, Inc. | 54-1293752 | 15-33981 |
| Spartan Mining Company | 31-1571923 | 15-33984 |
| Stirrat Coal Company | 55-0728501 | 15-33988 |
| Sycamore Fuels, Inc. | 54-1527013 | 15-33991 |
| T. C. H. Coal Co. | 61-0723123 | 15-33995 |
| Tennessee Consolidated Coal Company | 62-6029380 | 15-33997 |
| Thunder Mining Company II, Inc. | 55-0770782 | 15-34001 |
| Trace Creek Coal Company | 25-1418260 | 15-34006 |
| Twin Star Mining, Inc. | 31-1265426 | 15-34011 |
| Wabash Mine Holding Company | 91-1897559 | 15-34014 |
| Warrick Holding Company | 91-1897557 | 15-34017 |
| West Kentucky Energy Company | 27-0516756 | 15-34019 |
| White Buck Coal Company | 55-0747028 | 15-34021 |
| Williams Mountain Coal Company | 55-0729825 | 15-34023 |
| Wyomac Coal Company, Inc. | 55-0574144 | 15-34025 |

## **Exhibit B**

Disclosure Statement

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO BANKRUPTCY COURT APPROVAL OF THE DISCLOSURE STATEMENT.**

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

*Attorneys for Debtors and Debtors in Possession*

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>Alpha Natural Resources, Inc., <u>et al.</u>,<br><br>      Debtors. | Chapter 11<br><br>Case No. 15-33896 (KRH)<br><br>(Jointly Administered) |

# DISCLOSURE STATEMENT

# WITH RESPECT TO

# JOINT PLAN OF REORGANIZATION

# OF DEBTORS AND DEBTORS IN POSSESSION

Dated:  March 7, 2016

| IMPORTANT INFORMATION FOR YOU TO READ |
| --- |

**THE DEADLINE TO VOTE ON THE PLAN IS
[_____], 2016 AT 5:00 P.M. PREVAILING EASTERN TIME,
UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST
BE *ACTUALLY RECEIVED* BY THE CLAIMS AND BALLOTING
AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE III.E OF THE PLAN CONTAINS
RELEASE, EXCULPATION AND INJUNCTION PROVISIONS.  YOU SHOULD REVIEW
AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.**

Alpha Natural Resources, Inc. and 148 of its direct and indirect subsidiaries, as the above-captioned debtors and debtors in possession (collectively, the "Debtors"),[1] are providing you with the information in this Disclosure Statement because you may be a creditor entitled to vote on the Joint Plan of Reorganization of Debtors and Debtors in Possession (along with all Confirmation Exhibits attached thereto or referenced therein, and as amended, supplemented and modified from time to time, the "Plan").[2]

The Debtors believe that the Plan is in the best interests of creditors and other stakeholders.  All creditors entitled to vote on the Plan are urged to vote in favor of it.  A summary of the voting instructions is set forth beginning on page 48 of this Disclosure Statement and in the order (the "Disclosure Statement Order") approving this Disclosure Statement.  More detailed instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan.  To be counted, your ballot must be duly completed, executed and actually received by the Debtors' claims, noticing and balloting agent, Kurtzman Carson Consultants, LLC (the "Claims and Balloting Agent") by 5:00 p.m., prevailing Eastern time, on [_____], 2016, unless this deadline is extended by the Debtors.

The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied or waived.  See Sections V.I and J.  There is no assurance that these conditions will be satisfied or waived.

This Disclosure Statement and any accompanying letters are the only documents to be used in connection with the solicitation of votes on the Plan.  No person is authorized by the Debtors to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein.  If given or made, such information or representation may not be relied upon as having been authorized by the Debtors.  Although the Debtors will make available to creditors entitled to vote on the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND
CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN
ATTACHED HERETO AS EXHIBIT B AND THE RISK FACTORS DESCRIBED IN SECTION X, PRIOR
TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.**

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the documents listed in the "Table of Exhibits" in the Plan (collectively, the "Confirmation Exhibits") and the documents described therein as filed in the above-captioned chapter 11 cases prior to approval of this Disclosure Statement or subsequently as supplemental materials.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.

---

[1]        A schedule identifying each of the Debtors and their respective case numbers is attached hereto as Exhibit A.

[2]        A copy of the Plan is attached hereto as Exhibit B.  Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

Except as otherwise indicated, the Debtors will File all Confirmation Exhibits with the United States Bankruptcy Court for the Eastern District of Virginia and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code, the District Court (together, the "Bankruptcy Court") no later than seven calendar days before the Confirmation Hearing, to the extent not filed earlier; provided, however, that Exhibits I.A.73, I.A.184, II.F.1.a, II.F.4 and II.F.5 will be Filed no later than seven calendar days prior to the Voting Deadline. All Confirmation Exhibits will be made available on the Document Website, www.kccllc.net/alpharestructuring, once they are Filed.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors.  The Debtors reserve the right to modify the Plan consistent with section 1127 of title 11 of the United States Code (as now in effect or hereafter amended, the "Bankruptcy Code") and Rule 3019 of the Federal Rules of Bankruptcy Procedure (together with the local rules of the Bankruptcy Court, as now in effect or hereafter amended, the "Bankruptcy Rules").

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date.  The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations as part of the Debtors' attempt to settle and resolve their liabilities pursuant to the Plan.  This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to Holders of Claims against, or Interests in, either (a) the Debtors or (b) the Reorganized Debtors (as defined in the Plan).  Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Plan-Related Risk Factors" in Section X.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws.  This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

## QUESTIONS AND ADDITIONAL INFORMATION

**If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact the Claims and Balloting Agent, either by (a) visiting the Document Website at www.kccllc.net/alpharestructuring or (b) calling (i) toll-free at (888) 249-2703 or (ii) for callers outside of the United States or Canada, at +1 (310) 751-2602.**

**TABLE OF CONTENTS**

I. INTRODUCTION..................................................................................................................1
   A.   Overview of Restructuring.........................................................................1
   B.   Material Terms of the Plan.........................................................................2
   C.   Parties Entitled to Vote on the Plan..........................................................6
   D.   Solicitation Package...................................................................................7
   E.   Voting Procedures, Ballots and Voting Deadline......................................8
   F.   Confirmation Exhibits...............................................................................9
   G.   Confirmation Hearing and Deadline for Objections to Confirmation.......9

II. THE DEBTORS' PREPETITION BUSINESS AND CORPORATE STRUCTURE.............10
   A.   Background Regarding the Debtors' Business..........................................10
   B.   Structure of Prepetition Operations.........................................................11
   C.   The Debtors' Prepetition Capital Structure..............................................12
      1.   Long-Term Institutional Debt Obligations..................................12
      2.   Trade Debt..................................................................................15
      3.   Non-Capital Lease Obligations..................................................15
      4.   Capital Lease Obligations...........................................................16
      5.   Reclamation Obligations.............................................................16
      6.   Pension Obligations....................................................................17
      7.   Other Post-Employment Benefit Obligations..............................17
      8.   Regulatory Compliance Costs.....................................................17
      9.   Black Lung Benefit Obligations.................................................18
      10.  1974 Pension Plan Obligations...................................................18
   D.   Events Leading to the Commencement of the Chapter 11 Cases.............18

III. THE CHAPTER 11 CASES..............................................................................................20
   A.   Voluntary Petitions..................................................................................20
   B.   First Day Relief........................................................................................20
   C.   Retention of Professionals and Advisors.................................................22
   D.   Statutory Committees...............................................................................22
      1.   The Creditors' Committee..........................................................22
      2.   The Retiree Committee...............................................................22
      3.   Motion to Appoint an Equity Committee....................................23
   E.   Postpetition Financing.............................................................................23
      1.   The DIP Financing......................................................................23
      2.   Adequate Protection...................................................................24
      3.   Amendments to the First Out DIP Credit Agreement..................25
      4.   The Challenge Period..................................................................25
   F.   The Schedules and Statements.................................................................26
   G.   Claims Process and Bar Date...................................................................26
   H.   Bonding Settlements.................................................................................27
      1.   The Wyoming Bonding Request.................................................27
      2.   The West Virginia Bonding Request...........................................27
   I.   Key Employee Motions............................................................................27
      1.   Motion to Continue Retention Programs for Non-Insider Key Employees.....27
      2.   Motion to Approve Payment of the 2015 Annual Incentive Bonus to Certain Insiders and the Key Employee Incentive Plan for 2016.......28
   J.   Sale Motions............................................................................................28
      1.   Motion to Approve Miscellaneous Asset Sale Procedures.........28
      2.   Motion to Approve Rice Shares Sale Procedures........................28
      3.   Motion to Approve Sales of Non-Core Mining Property.............28
      4.   Motion to Approve Sales of Core Mining Property.....................29
   K.   Retiree Benefit Motion............................................................................29

L.    Further Motions and Related Events in the Chapter 11 Cases ...........................................29
      1.    Motion to Extend the Exclusive Filing and Solicitation Periods .....................................29
      2.    Motion to Extend the Removal Period.........................................................................30
      3.    Motion to Dismiss the Chapter 11 Case of Gray Hawk Insurance Company ..................30
      4.    Motion to Extend the Deadline to Assume or
            Reject Non-Residential Real Property Leases ...............................................................30
      5.    Omnibus Motions for Assumption or Rejection
            of Executory Contracts and Unexpired Leases .............................................................30

IV. POSTPETITION PLAN NEGOTIATIONS AND RESTRUCTURING INITIATIVES ....................................31
      A.    The Debtors' Financial and Operational Performance Following the Petition Date .....................31
      B.    The Initial Business Plan and the Case Milestones ...............................................................31
      C.    The Revised Business Plan and Modified Case Milestones......................................................32
      D.    The Extension Agreement..........................................................................................33
      E.    The Plan Structure Agreement ....................................................................................33
      F.    The Stalking Horse Bid .............................................................................................34
      G.    The Sale Motion Settlements ......................................................................................34
            1.    The Unencumbered Assets Settlement ..............................................................34
            2.    The Diminution Claim Allowance Settlement .....................................................35
      H.    Union CBA Negotiations ...........................................................................................36

V. THE PLAN ...............................................................................................................36
      A.    General ..................................................................................................................36
      B.    Classification and Treatment of Claims and Interests Under the Plan ....................................37
      C.    Unclassified Claims ..................................................................................................37
            1.    Payment of Administrative Claims....................................................................37
            2.    Payment of Priority Tax Claims ......................................................................39
      D.    Classified Claims and Interests ....................................................................................39
      E.    Subordination; Reservation of Rights to Reclassify Claims ...................................................41
      F.    Special Provisions Regarding the Treatment of
            Allowed Secondary Liability Claims; Maximum Recovery .....................................................41
      G.    Confirmation Without Acceptance by All Impaired Classes ....................................................42
      H.    Treatment of Executory Contracts and Unexpired Leases ....................................................42
            1.    Executory Contracts and Unexpired Leases to Be Assumed ...............................42
            2.    Approval of Assumptions and Assignments;
                  Assignments Related to Restructuring Transactions...........................................43
            3.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases .....43
            4.    Contracts and Leases Entered Into After the Petition Date ....................................44
            5.    Rejection of Executory Contracts and Unexpired Leases.....................................44
            6.    Rejection Damages Bar Date ..........................................................................44
            7.    Obligations to Indemnify Directors, Officers and Employees................................45
            8.    No Change in Control ...................................................................................45
      I.    Conditions Precedent to Confirmation of the Plan .............................................................45
      J.    Conditions Precedent to the Effective Date ....................................................................46
      K.    Waiver of Conditions to Confirmation or the Effective Date ................................................46
      L.    Effect of Nonoccurrence of Conditions to the Effective Date ...............................................46
      M.    Retention of Jurisdiction by the Bankruptcy Court.............................................................47

VI. VOTING REQUIREMENTS ...........................................................................................48
      A.    Voting Deadline .......................................................................................................48
      B.    Holders of Claims Entitled to Vote ...............................................................................49
      C.    Vote Required for Acceptance by a Class ......................................................................50

VII. CONFIRMATION OF THE PLAN ....................................................................................50
      A.    Confirmation Hearing .................................................................................................50
      B.    Deadline to Object to Confirmation ...............................................................................50

|       | C.  | Requirements for Confirmation of the Plan ................................................................. 51 |
|       |     | 1. | Requirements of Section 1129(a) of the Bankruptcy Code ........................... 51 |
|       |     | 2. | Best Interests of Creditors .......................................................................... 53 |
|       |     | 3. | Feasibility .................................................................................................... 54 |
|       |     | 4. | Requirements of Section 1129(b) of the Bankruptcy Code .......................... 54 |
|       | D.  | Standards Applicable to Certain Releases .................................................................. 55 |

VIII. MEANS OF IMPLEMENTATION OF THE PLAN ......................................................................... 56
|       | A.  | Effect of Confirmation of the Plan ............................................................................. 56 |
|       |     | 1. | Dissolution of Official Committees ............................................................. 56 |
|       |     | 2. | Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Recovery Actions ........................................ 56 |
|       |     | 3. | Comprehensive Settlement of Claims and Controversies ............................ 56 |
|       |     | 4. | Discharge of Claims and Termination of Interests ...................................... 56 |
|       |     | 5. | Injunction ..................................................................................................... 57 |
|       |     | 6. | Releases ........................................................................................................ 58 |
|       |     | 7. | Exculpation ................................................................................................... 58 |
|       |     | 8. | Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies ................................ 59 |
|       | B.  | Continued Corporate Existence and Vesting of Assets ............................................... 59 |
|       | C.  | Restructuring Transactions ......................................................................................... 59 |
|       |     | 1. | Restructuring Transactions Generally .......................................................... 59 |
|       |     | 2. | Establishment of ReorgCo Trust .................................................................. 60 |
|       |     | 3. | Obligations of Any Successor Corporation in a Restructuring Transaction .................. 60 |
|       | D.  | The Resolution of Reclamation Claims ...................................................................... 60 |
|       | E.  | Corporate Governance and Directors and Officers ..................................................... 61 |
|       |     | 1. | Constituent Documents of Reorganized ANR, the Other Reorganized Debtors and ReorgCo Trust ....................................... 61 |
|       |     | 2. | Directors and Officers of Reorganized ANR and the Other Reorganized Debtors .......... 61 |
|       | F.  | General Unsecured Claims Asset Pool ........................................................................ 61 |
|       | G.  | Restricted Cash Reclamation Accounts ...................................................................... 61 |
|       | H.  | New ANR Common Stock .......................................................................................... 61 |
|       | I.  | Employment-Related Agreements; Retiree Benefits; Workers' Compensation Programs ... 62 |
|       |     | 1. | Employment-Related Agreements ................................................................. 62 |
|       |     | 2. | Retiree Benefits ............................................................................................ 62 |
|       |     | 3. | Continuation of Workers' Compensation Programs ..................................... 62 |
|       | J.  | Corporate Action ......................................................................................................... 62 |
|       | K.  | Special Provisions Regarding Insured Claims ............................................................ 63 |
|       |     | 1. | Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims ........ 63 |
|       |     | 2. | Assumption and Continuation of Insurance Policies .................................... 63 |
|       | L.  | Cancellation and Surrender of Instruments, Securities and Other Documentation ...... 63 |
|       |     | 1. | Notes ............................................................................................................. 63 |
|       |     | 2. | Old Common Stock ....................................................................................... 63 |
|       | M.  | Release of Liens .......................................................................................................... 64 |
|       | N.  | Effectuating Documents; Further Transactions ........................................................... 64 |
|       | O.  | Exemption from Certain Transfer Taxes ..................................................................... 64 |
|       | P.  | Provisions Governing Distributions Under the Plan and for Resolving Disputed Claims ...... 64 |
|       |     | 1. | Distributions for Claims Allowed as of the Effective Date .......................... 64 |
|       |     | 2. | Method of Distributions to Holders of Claims ............................................. 65 |
|       |     | 3. | Distributions on Account of Allowed Noteholder Claims ............................ 65 |
|       |     | 4. | Compensation and Reimbursement for Services Related to Distributions .... 65 |
|       |     | 5. | Delivery of Distributions and Undeliverable or Unclaimed Distributions ... 65 |
|       |     | 6. | Timing and Calculation of Amounts to Be Distributed ................................ 66 |
|       |     | 7. | Distribution Record Date ............................................................................. 66 |
|       |     | 8. | Means of Cash Payments .............................................................................. 67 |
|       |     | 9. | Establishment of Reserves ............................................................................ 67 |

| | 10. | Surrender of Canceled Instruments or Securities | 67 |
| | 11. | Withholding and Reporting Requirements | 67 |
| | 12. | Setoffs | 68 |
| | 13. | Application of Distributions | 68 |
| | 14. | Treatment of Disputed Claims | 68 |
| | 15. | Prosecution of Objections to Claims | 69 |
| | 16. | Distributions on Account of Disputed Claims Once Allowed | 70 |
| Q. | | Consolidation | 70 |

**IX. LIQUIDATION ANALYSIS AND FINANCIAL PROJECTIONS** ............... 70

**X. PLAN-RELATED RISK FACTORS** ............... 71
| A. | | Certain Bankruptcy Considerations | 71 |
| | 1. | The Plan May Not Be Accepted or Confirmed | 71 |
| | 2. | Classification and Treatment of Claims and Interests May Not Be Approved | 72 |
| | 3. | The Plan May Not Be Consummated if the Conditions to Effectiveness of the Plan Are Not Satisfied | 73 |
| | 4. | If the Plan Is Not Confirmed or Consummated, or the Reorganization Is Delayed, Distributions to Holders of Allowed Claims May Be Materially Reduced | 73 |
| | 5. | If the Plan Structure Agreement Is Terminated, the Ability of the Debtors to Confirm and Consummate the Plan Could Be Materially and Adversely Affected | 73 |
| | 6. | Distributions to Holders of Allowed Claims Under the Plan May Differ from the Debtors' Estimates | 73 |
| | 7. | The Reorganized Debtors' Ability to Use the Debtors' Pre-Emergence Tax Attributes May Be Significantly Limited Under the United States Federal Income Tax Rules | 74 |
| B. | | General Economic Risk Factors and Risks Specific to the Business of the Debtors | 74 |
| | 1. | The Companies May Not Be Able to Achieve Their Projected Financial Results | 74 |
| | 2. | Future Regulations or Changes in the Interpretation, Application or Enforcement of Existing Regulations Applicable to the Debtors' Business Could Increase the Reorganized Debtors' Operational Costs and Reduce Demand for Coal | 75 |
| | 3. | New Developments in the Regulation of Environmental Matters Could Materially Adversely Affect the Demand for Coal and the Reorganized Debtors' Financial Condition, Operations and Cash Flow | 75 |
| C. | | Risks Related to New ANR Common Stock | 75 |
| | 1. | The Recognized Debtors' Operations May Not Be Profitable After the Effective Date, Which Could Have an Adverse Impact on the Value of the New ANR Common Stock | 75 |
| | 2. | Holders of Shares of New ANR Common Stock Will Be Restricted in Their Ability to Transfer or Re-Sell Their Shares | 76 |
| | 3. | There Is No Established Market for Shares of New ANR Common Stock, Which Means There Are Uncertainties Regarding the Prices and Terms on Which Holders Could Dispose of Their Shares, if at All | 76 |

**XI. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN** ............... 76
| A. | | General | 76 |
| B. | | U.S. Federal Income Tax Consequences to the Debtors | 77 |
| | 1. | Plan Transactions | 77 |
| | 2. | Cancellation of Debt Income | 77 |
| | 3. | Limitation on NOL Carryforwards | 78 |
| | 4. | Alternative Minimum Tax | 79 |
| C. | | U.S. Federal Income Tax Consequences to U.S. Holders of Claims | 79 |
| | 1. | Recognition of Gain or Loss | 80 |
| | 2. | Medicare Surtax | 80 |
| | 3. | Accrued but Unpaid Interest | 80 |
| | 4. | Bad Debt and/or Worthless Securities Deduction | 80 |
| | 5. | Market Discount | 81 |

|  |  | 6. | Information Reporting and Backup Withholding | 81 |
| D. |  | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims | 81 |
|  | 1. | Recognition of Gain or Loss on Exchanges Pursuant to the Plan or Other Subsequent Dispositions | 81 |
|  | 2. | Accrued but Untaxed Interest | 82 |
|  | 3. | Distributions Paid to Non-U.S. Holders | 83 |
|  | 4. | FATCA | 83 |
| E. |  | Importance of Obtaining Professional Tax Assistance | 84 |

XII. APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS .......... 84

| A. | New ANR Common Stock | 84 |
| B. | Initial Offer and Sale | 84 |
| C. | Subsequent Transfers under Federal Securities Law | 85 |
|  | 1. Non-Affiliates | 85 |
|  | 2. Affiliates | 86 |
| D. | Subsequent Transfers Under State Law | 86 |

XIII. RECOMMENDATION AND CONCLUSION ................................................ 87

## TABLE OF EXHIBITS

EXHIBIT A:  Schedule of Debtors and Debtors in Possession

EXHIBIT B:  Joint Plan of Reorganization of Debtors and Debtors in Possession

EXHIBIT C:  Liquidation Analysis

EXHIBIT D:  Prospective Financial Information

# I.

## INTRODUCTION

Alpha Natural Resources, Inc. ("ANR") and certain of its direct and indirect subsidiaries, as the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the jointly-administered cases commenced under chapter 11 of title 11 of the United States Code (as now in effect or hereafter amended, the "Bankruptcy Code"), filed in the United States Bankruptcy Court for the Eastern District of Virginia (together with the District Court to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code, the "Bankruptcy Court") and captioned In re Alpha Natural Resources, Inc., et al., Case No. 15-33896 (KRH) (Bankr. E.D. Va.) (collectively, the "Chapter 11 Cases"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Joint Plan of Reorganization of Debtors and Debtors in Possession (together with all Confirmation Exhibits attached thereto or referenced therein, as they may be amended, modified or supplemented, the "Plan").  A copy of the Plan is attached hereto as Exhibit B.

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, significant events that have occurred during the Chapter 11 Cases and the anticipated organization, operations and capital structure of the Debtors on and after the Effective Date of the Plan and any entities created as part of the Restructuring Transactions (collectively, the "Reorganized Debtors") if the Plan is confirmed and becomes effective.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of Confirmation of the Plan by the the Bankruptcy Court, certain risk factors (including those associated with securities to be issued under the Plan), and the manner in which Distributions will be made under the Plan.  "Confirmation" means the entry by the Bankruptcy Court on the docket of the Chapter 11 Cases of an order (the "Confirmation Order") confirming the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation process and the voting procedures that Holders of Claims in the Chapter 11 Cases who are entitled to vote on the Plan must follow for their votes to be counted are also discussed herein.

The Debtors are the proponents of the Plan and believe that the Plan is the best means to efficiently and effectively pave the way for the Debtors' emergence from bankruptcy.  The Plan is also supported by [_____] (collectively, the "Plan Supporters").

Capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan.  Except as otherwise stated herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

On [_____], 2016, the Bankruptcy Court entered an order (Docket No. [__]) (the "Disclosure Statement Order") approving this Disclosure Statement as containing "adequate information," i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of Claims or Interests to make an informed judgment about the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

## A.    Overview of Restructuring

The coal industry has faced unprecedented and well documented market and regulatory headwinds in recent years that together compelled the Debtors to commence these chapter 11 cases on August 3, 2015 (the "Petition Date").  Since the Petition Date, conditions in the Debtors' industry have continued to deteriorate to the extent that coal production, pricing and exports during the second half of 2015 all declined year-on-year from the same period in 2014.  As a result, and despite the Debtors' continuing efforts to maximize efficiency, certain of their operations have remained cash-flow negative and a burden on their other valuable assets.  The Debtors therefore determined that it was in their best interests and the best interests of their creditors and other stakeholders to preserve and maximize the value of their estates by commencing a process for the sale of their core assets.

To facilitate this sales process, the Debtors' prepetition First Lien Lenders (as defined herein) agreed to serve as a stalking horse bidder by credit bidding $500 million of the secured debt due them for certain of the Debtors' assets.  As a "stalking horse bid," the bid by the First Lien Lenders is subject to higher or otherwise better offers that the Debtors may receive for the assets pursuant to a marketing and sale process approved by the Bankruptcy Court.  The First Lien Lenders' participation in the sale process as stalking horse bidders ensures that the Debtors recover maximum value for their assets in this challenging environment by subjecting the assets to a competitive marketing process, thereby providing considerable benefit to the Debtors' estates.  Notably, the Stalking Horse Bid (as defined herein) does not include any customary bid protections (such as break-up fees or expense reimbursement) generally paid to a stalking horse bidder, and therefore merely sets a floor to begin a bidding process on a level playing field without any cost to the Debtors' estates.  This sale process is already yielding results, with various bidders expressing their early interest for certain of the Debtors' assets.

In connection with the stalking horse process and following extensive analysis and negotiations, the Debtors have negotiated the principal terms of a comprehensive settlement of issues with the First Lien Lenders and the DIP Lenders (as defined herein).  This settlement includes agreements with respect to (a) which of the Debtors' assets shall be deemed not to have been encumbered by the Prepetition Senior Liens (as defined herein) as of the Petition Date and (b) the methodology that will be used to establish the amount of the First Lien Lenders' secured claim granted them as adequate protection for diminution in value of their collateral since the Petition Date.  The Debtors believe that this settlement is reasonable, based on the facts and applicable law, will avoid protracted and uncertain litigation regarding these issues and therefore is in the best interests of their estates.

The Plan provides that:  (a) value will be distributed pursuant to the provisions of the Bankruptcy Code and applicable settlements; and (b) the Debtors will be reorganized by employing those assets that are not sold, which assets will be operated for the principal purpose of conducting and completing environmental reclamation.  To this end, the First Lien Lenders have agreed to provide cash and/or credit support to facilitate the confirmation of the Plan for the remaining assets, including cash and/or credit support for the cost of reclaiming these assets (in addition to providing for the reclamation of the purchased assets in the event the First Lien Lenders are the successful bidder with respect to such assets).  As further support for the Plan, the First Lien Lenders have agreed to provide value to junior creditor constituencies through the Plan.

The Debtors believe that this process will maximize the value obtained for the Debtors' marketable assets for the benefit of their creditors but, in addition, will allow the Debtors' businesses to restructure as going concerns, thereby preserving value and jobs and enabling the Debtors to address their reclamation obligations, for the benefit of all parties in interest in the Chapter 11 Cases.

**B.      Material Terms of the Plan**

As discussed in more detail in Sections IV and V and below, the Plan includes a consensual resolution of a number of complex Claims that have been the subject of extensive and vigorous negotiations beginning prepetition and continuing postpetition among the Debtors and the Plan Supporters.  The distributions under the Plan of Cash, interests, securities or other property, as may be applicable, to the holders of Allowed Claims in accordance with, and subject to the terms of, the Plan (collectively, the "Distributions") reflect the impact of an agreed-upon settlements of certain complex disputes.  The Debtors believe that absent such settlements, these bankruptcy cases would require extensive and potentially prohibitively expensive litigation to the detriment of the Debtors' estates and all stakeholders.  Through the settlement of certain claims, as defined in section 101(5) of the Bankruptcy Code, against the Debtors (collectively, the "Claims") and all other disputed issues among the Debtors and the Plan Supporters, the Plan will allow the Debtors to exit bankruptcy protection expeditiously and with sufficient liquidity to implement their Plan.

THE DEBTORS BELIEVE THAT THE IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF EACH OF THE DEBTORS AND THEIR STAKEHOLDERS.  FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE (I.E., THE DATE BY WHICH YOUR BALLOT MUST BE ACTUALLY RECEIVED), WHICH IS [_____] AT 5:00 P.M. PREVAILING EASTERN TIME.

As set forth in further detail below, the material terms of the Plan are as follows:

| TREATMENT OF CLAIMS AND INTERESTS | All Distributions on account of the Claims described below and in Article II of the Plan shall be made from Distribution Cash held by the Reorganized Debtors as of the Effective Date.  As further described and defined in the Plan, the Plan contemplates the following treatment of Claims and Interests: |
|---|---|

- Administrative Claims – Each holder of an Allowed Administrative Claim, including each holder of an Allowed State Bonding Carve Out Claim, will receive, in full satisfaction of its Administrative Claim, Distribution Cash equal to the amount of such Allowed Administrative Claim.  These Claims are unimpaired and are unclassified under the Plan.

- Priority Tax Claims – Each holder of an Allowed Priority Tax Claim will receive in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) Distribution Cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) Distribution Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date.  These Claims are unimpaired and are unclassified under the Plan.

- Priority Claims – Each holder of an Allowed Priority Claim will receive Distribution Cash equal to the amount of such Allowed Claim, unless the holder of such Priority Claim and the applicable Debtor or Reorganized Debtor agree to a different treatment.  These Claims are Class 1 Claims and are unimpaired under the Plan.

- Secured First Lien Lender Claims – In accordance with the terms of the First Lien Lender Settlement, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured First Lien Lender Claim will receive the holder's Pro Rata share of the First Lien Lender Distribution.  These Claims are Class 2 Claims and are impaired under the Plan.

- Secured Second Lien Noteholder Claims – Unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured Second Lien Noteholder Claim will receive the holder's Pro Rata share of the Second Lien Noteholder Distribution.  These Claims are Class 3 Claims and are impaired under the Plan.

- Other Secured Claims – Unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Other Secured Claim will receive treatment on account of such Claim in the manner set forth in Option A, B or C below, at the election of the applicable Debtor.  The applicable Debtor will be deemed to have elected Option B except with respect to (a) any Allowed Secured Claim as to which the applicable Debtor elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which the applicable Debtor will be deemed to have elected Option A.

  Option A:  On the Effective Date, Allowed Other Secured Claims with respect to which the applicable Debtor elects Option A will receive Distribution Cash equal to the amount of such Allowed Claim.

  Option B:  On the Effective Date, Allowed Other Secured Claims with respect to which the applicable Debtor elects or is deemed to have elected Option B will be Reinstated.

  Option C:  On the Effective Date, a holder of an Allowed Other Secured Claim with respect to which the applicable Debtor elects Option C will be entitled to receive (and the applicable Debtor or Reorganized Debtor shall release and transfer to such holder) the collateral securing such Allowed Claim.

The holder of an Allowed Secured Tax Claim in Class 4 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 6, if not subordinated to Class 6 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors or their respective property (other than as a holder of a Class 6 Claim).

These Claims are Class 4 Claims and are <u>unimpaired</u> under the Plan.

- <u>Convenience Claims</u> – Each holder of an Allowed Convenience Claim will receive Distribution Cash equal to the amount of such Allowed Claims (as reduced, if applicable, pursuant to an election by the holder thereof in accordance with Section I.A.42 of the Plan). These Claims are Class 5 Claims and are <u>unimpaired</u> under the Plan.

- <u>General Unsecured Claims</u> – On the Effective Date, and on each Distribution Date thereafter, each holder of an Allowed General Unsecured Claim will receive a Pro Rata share of any assets contributed to the General Unsecured Claims Asset Pool. These Claims are Class 6 Claims and are <u>impaired</u> under the Plan.

- <u>Prepetition Intercompany Claims</u> – Holders of Prepetition Intercompany Claims will not be entitled to any Distribution of Plan consideration under the Plan. Subject to the Restructuring Transactions, on the Effective Date, Prepetition Intercompany Claims in Class 7 that are not eliminated by operation of law or otherwise pursuant to the Restructuring Transactions will be deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of Prepetition Intercompany Claims and not entitled to any Distribution of Plan consideration under the Plan. Notwithstanding this treatment of Allowed Intercompany Claims, each of the holders of an Intercompany Claim will be deemed to have accepted the Plan. These Claims are Class 7 Claims and are <u>impaired</u> under the Plan.

- <u>Section 510(b) Securities Claims</u> – Holders of Section 510(b) Securities Claims will not receive any Distribution pursuant to the Plan. No property will be distributed to or retained by the holders of Section 510(b) Securities Claims, and such Claims will be extinguished on the Effective Date. Consistent with the language of section 1126(g) of the Bankruptcy Code, each of the holders of Section 510(b) Securities Claims will be deemed to have rejected the Plan. These Claims are Class 8 Claims and are <u>impaired</u> under the Plan.

- <u>Section 510(b) Old Common Stock Claims</u> – No property will be distributed to or retained by the holders of Section 510(b) Old Common Stock Claims, and such Claims will be extinguished on the Effective Date. Consistent with the language of section 1126(g) of the Bankruptcy Code, each of the holders of Section 510(b) Old Common Stock Claims will be deemed to have rejected the Plan. These Claims are Class 9 Claims and are <u>impaired</u> under the Plan.

- <u>Old Common Stock of ANR Interests</u> – On the Effective Date, the Old Common Stock of ANR and all Interests related thereto will be canceled, and holders of Old Common Stock of ANR Interests will not receive any Distribution pursuant to the Plan. Consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of an Old Common Stock of ANR Interest will be deemed to have rejected the Plan. These Interests are Class 10 Interests and are <u>impaired</u> under the Plan.

- <u>Subsidiary Debtor Equity Interests</u> – On the Effective Date, the Subsidiary Debtor Equity Interests will be Reinstated, subject to the Restructuring Transactions. These Interests are Class 11 Interests and are <u>unimpaired</u> under the Plan.

| SETTLEMENT AND COMPROMISE | Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or Allowed Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements, including the First Lien Lender Settlement, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement and the Resolution of Reclamation Claims, are:  (a) in the best interests of the Debtors, the Reorganized Debtors, the Estates and their respective property and Claim and Interest holders; and (b) fair, equitable and reasonable. |
|---|---|
| PLAN DISTRIBUTABLE VALUE | The value of the assets distributable pursuant to the terms of the Plan is $[_____]. |
| MEANS OF IMPLEMENTATION | On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect, in accordance with applicable nonbankruptcy law, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors, including but not limited to the Restructuring Transactions identified on Exhibit IV.B.1 to the Plan, all to the extent not inconsistent with any other terms of the Plan.  Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions closing under or in connection with the Plan in connection with any Core Asset Sale Order), conversions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  The actions to effect these transactions may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including (i) making filings or recordings that may be required by applicable state law in connection with such transactions and (ii) any appropriate positions on one or more tax returns.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors.  Further, nothing in the Plan shall impair, expand or otherwise modify the rights of any party under the Stalking Horse APA or any other agreement entered into pursuant to any Sale Order.<br><br>On or prior to the Effective Date, ReorgCo Trust shall be established pursuant to the ReorgCo Trust Agreement.  On the Effective Date, all shares of New ANR Common Stock issued pursuant to the Plan shall be transferred to ReorgCo Trust, which transfer shall constitute a Restructuring Transaction within the meaning of Section IV.B.1 of the Plan.  ReorgCo Trust shall conduct its activities consistent with the ReorgCo Trust Agreement.  The Debtors or the Reorganized Debtors, as applicable, shall have discretion regarding the tax treatment of ReorgCo Trust. |

| NEW ANR COMMON STOCK | On the Effective Date, all shares of New ANR Common Stock issued pursuant to the Plan shall be transferred to ReorgCo Trust in accordance with Section IV.B.2 of the Plan and the ReorgCo Trust Agreement.  The New ANR Common Stock, when issued as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable.  Each issuance under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such issuance and by the terms and conditions of the instruments evidencing or relating to such issuance, which terms and conditions shall bind each person or entity receiving such issuance. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the New ANR Common Stock under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder. |
|---|---|
| RELEASES | The Plan provides certain customary release provisions for the benefit of the Debtors, the Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee, the DIP Agents, the DIP Lenders, the First Lien Agent, the First Lien Lenders, NewCo and any Affiliates and Representatives of each of the foregoing (collectively, the "Released Parties") to the extent permitted by applicable law. |
| EXCULPATION | The Plan provides certain customary exculpation provisions, which include a full exculpation from liability in favor of the Released Parties for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, negotiation, preparation, dissemination, implementation, Confirmation or approval of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, this Disclosure Statement or any contract, employee pension or other benefit plan, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that such exculpation shall not apply to the obligations arising under the Plan or the obligations assumed thereunder; and provided further that the exculpation provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct. |

## C.    Parties Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote.  In addition, creditors or equity interest holders whose claims or interests are impaired by the plan and will receive no distribution under the plan are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.  For a discussion of these matters, see Section VI.B below.

The following table sets forth which classes of Claims (collectively, the "Classes") are entitled to vote on the Plan and which are not, and sets forth the estimated amount allowed pursuant to the terms of the Plan,[3] the estimated recovery percentage[4] and/or the impairment status for each Class of Claims provided for in the Plan:

| CLASS | DESIGNATION | IMPAIRMENT | ESTIMATED ALLOWED AMOUNT | ESTIMATED RECOVERY | VOTING STATUS |
|---|---|---|---|---|---|
| 1 | Priority Claims | Unimpaired | $[_____] | 100% | Deemed to Accept |
| 2 | Secured First Lien Lender Claims | Impaired | $[_____] | [___]% | Entitled to Vote |

---

[3]    The estimated Allowed amounts set forth herein are estimates only and actual Allowed amounts may be greater or less than such amounts.

[4]    The estimated recovery percentages set forth herein are estimates only and actual recovery percentages may be higher or lower based on, among other things, Allowed Claims arising from the rejection of Executory Contracts or Unexpired Leases and the resolution of disputed or unliquidated Claims.

| 3 | Secured Second Lien Noteholder Claims | Impaired | $[_____] | [___]% | Entitled to Vote |
|---|---|---|---|---|---|
| 4 | Other Secured Claims | Unimpaired | $[_____] | 100% | Deemed to Accept |
| 5 | Convenience Claims | Unimpaired | $[_____] | 100% | Deemed to Accept |
| 6 | General Unsecured Claims | Impaired | $[_____] | [___]% | Entitled to Vote |
| 7 | Prepetition Intercompany Claims | Impaired | $[_____] | 0% | Deemed to Accept |
| 8 | Section 510(b) Securities Claims | Impaired | N/A (Canceled) | 0% | Deemed to Reject |
| 9 | Section 510(b) Old Common Stock Claims | Impaired | N/A (Canceled) | 0% | Deemed to Reject |
| 10 | Old Common Stock of ANR Interests | Impaired | N/A (Canceled) | 0% | Deemed to Reject |
| 11 | Subsidiary Debtor Equity Interests | Unimpaired | N/A (Reinstated) | N/A | Deemed to Accept |

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims actually voted to accept or reject the plan.  Your vote on the Plan is important.  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a plan of reorganization, notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class, as described further in Section VII.C.4 below.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Section V.

**D.    Solicitation Package**

The package of materials (the "Solicitation Package") to be sent to holders of Claims entitled to vote on the Plan will contain:

1.    a cover letter describing (a) the contents of the Solicitation Package, (b) the contents of any enclosed disc and instructions for use of the disc and (c) information about how to obtain, at no charge, paper copies of any materials provided on the disc;

2.    a paper copy of the notice (the "Confirmation Hearing Notice") of the hearing held by the Bankruptcy Court on confirmation of the Plan (as such hearing may be continued, the "Confirmation Hearing");

3.    a copy – either as a paper copy or in an enclosed disc – of the Disclosure Statement Order and this Disclosure Statement, together with the exhibits thereto, including the Plan, that have been filed

with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases ("Filed") before the date of the mailing;

4.      a paper copy of any letter(s) recommending acceptance of the Plan; and

5.      for holders of Claims in voting Classes (i.e., Holders of Claims in Classes 2, 3 and 6), an appropriate form of Ballot, instructions on how to complete the Ballot, a Ballot return envelope and such other materials as the Bankruptcy Court may direct.

In addition to the service procedures outlined above (and to accommodate creditors who wish to review exhibits not included in the Solicitation Packages in the event of paper service): (a) the Plan, this Disclosure Statement and, once they are filed, all exhibits to both documents will be made available online at no charge at www.kccllc.net/alpharestructuring (the "Document Website"); and (b) the Debtors will provide parties in interest with paper copies of the Plan and/or Disclosure Statement, at no charge, upon written request to Alpha Natural Resources Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

**E.      Voting Procedures, Ballots and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan.  Please vote and return your Ballot(s) to the Debtors' claims, noticing and balloting agent, Kurtzman Carson Consultants LLC ("KCC" or the "Claims and Balloting Agent") at Alpha Natural Resources Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, unless you are a beneficial owner of a security who receives a Ballot from a broker, bank, dealer or other agent or nominee (each, a "Master Ballot Agent"), in which case you must return the Ballot to that Master Ballot Agent (or as otherwise instructed by your Master Ballot Agent).  Ballots should not be sent directly to the Debtors, the Creditors' Committee, their agents (other than the Claims and Balloting Agent) or any of the Indenture Trustees.

After carefully reviewing:  (a) the Plan; (b) this Disclosure Statement; (c) the Disclosure Statement Order, which, among other things, (i) establishes the voting procedures, (ii) schedules the Confirmation Hearing and (iii) sets the Voting Deadline and the deadline for objecting to Confirmation of the Plan; and (d) the detailed instructions accompanying your Ballot, please indicate on your Ballot your vote to accept or reject the Plan. For your vote to be counted, you must complete and sign your original Ballot (copies will not be accepted, except with respect to Master Ballots (as defined below), which do not require you to return an original signature) and return it to the appropriate recipient (i.e., either a Master Ballot Agent or the Claims and Balloting Agent) so that it is actually received by the Voting Deadline by the Claims and Balloting Agent.

**Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.**

If you (a) hold Claims in more than one voting Class or (b) hold multiple Claims within one Class, including, for example, if you (x) hold more than one series of Notes, (y) are the beneficial owner of Notes held in street name through more than one Master Ballot Agent or (z) are the beneficial owner of Notes registered in your own name as well as the beneficial owner of Notes registered in street name, you may receive more than one Ballot.

If you are the beneficial owner of Notes held in street name through more than one Master Ballot Agent, for your votes with respect to such Notes to be counted, your Ballots must be mailed to the appropriate Master Ballot Agents at the addresses on the envelopes enclosed with your Ballots so that such Master Ballot Agent has sufficient time to record your votes on a Master Ballot and return such Master Ballot so it is actually received by the Claims and Balloting Agent by the Voting Deadline.

To be counted, all Ballots must be properly completed in accordance with the voting instructions on the Ballot and **actually received** no later than the Voting Deadline (i.e., [_____], 2016 at 5:00 p.m. (prevailing

Eastern time)) by the Claims and Balloting Agent via regular mail, overnight courier or personal delivery at the following address:  **Alpha Natural Resources Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245**.  Except with respect to Ballots used by Master Ballot Agents for recording votes cast by beneficial owners holding securities (each, a "Master Ballot"), no Ballots may be submitted by email or any other means of electronic transmission, and any Ballots submitted by electronic mail or other means of electronic transmission will not be accepted by the Claims and Balloting Agent.  Ballots should not be sent directly to the Debtors.

If a holder of a Claim delivers to the Claims and Balloting Agent more than one timely, properly completed Ballot with respect to such Claim prior to the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly completed Ballot determined by the Claims and Balloting Agent to have been received last from such holder with respect to such Claim.

**IF YOU ARE A HOLDER OF A CLAIM WHO IS ENTITLED TO VOTE ON THE PLAN AS SET FORTH IN THE DISCLOSURE STATEMENT ORDER AND DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN, THE BALLOT OR THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT (A) BY TELEPHONE (i) TOLL-FREE AT (888) 249-2703 AND (ii) FOR CALLERS OUTSIDE OF THE UNITED STATES OR CANADA AT (310) 751-2602, (B) BY EMAIL AT ALPHANRINFO@KCCLLC.COM OR (C) IN WRITING AT ALPHA NATURAL RESOURCES BALLOT PROCESSING, C/O KURTZMAN CARSON CONSULTANTS LLC, 2335 ALASKA AVENUE, EL SEGUNDO, CALIFORNIA 90245.**

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION VI.

Before voting on the Plan, each holder of a Claim in Classes 2, 3 and 6 should read, in its entirety, this Disclosure Statement, the Plan, the Disclosure Statement Order, the Confirmation Hearing Notice and the instructions accompanying the Ballots.  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.  Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (together with the local rules of the Bankruptcy Court, as now in effect or hereafter amended, the "Bankruptcy Rules") and/or consult their own attorney.

F.      **Confirmation Exhibits**

The Debtors will File all of the documents listed on the "Table of Exhibits" in the Plan (collectively, the "Confirmation Exhibits") no later than seven calendar days before the Confirmation Hearing, to the extent not filed earlier; provided, however, that Exhibits I.A.73, I.A.184, II.F.1.a, II.F.4 and II.F.5 will be Filed no later than seven calendar days prior to the Voting Deadline.  All Confirmation Exhibits will be made available on the Document Website, www.kccllc.net/alpharestructuring, once they are Filed.  The Debtors reserve the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Confirmation Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

G.      **Confirmation Hearing and Deadline for Objections to Confirmation**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing has been scheduled for [_____], 2016 at [_____], prevailing Eastern time, before the Honorable Judge Kevin R. Huennekens, United States Bankruptcy Judge for the Eastern District of Virginia, in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Richmond, Virginia 23219. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

Any objection to Confirmation must (a) be in writing, (b) state the name and address of the objecting party and the nature of the Claim or Interest of such party and (c) state with particularity the basis and nature of such objection. Any such objections must be Filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

## II.

### THE DEBTORS' PREPETITION BUSINESS AND CORPORATE STRUCTURE

**A.     Background Regarding the Debtors' Business**

Debtor Alpha Natural Resources, Inc. ("ANR") is a publicly traded Delaware corporation with ticker symbol ANRZQ. The other 148 Debtors are all direct or indirect subsidiaries of ANR. The Debtors maintain their corporate headquarters in Bristol, Virginia, and conduct mining operations primarily in Kentucky, Pennsylvania, Virginia, West Virginia and Wyoming, as more fully described below. Many of the Debtors are effectively single-purpose entities, comprising specific operations tied to specific geographical locations within the Debtors' overall organizational structure.

The enterprise that now comprises the Debtors and their global, multi-platform energy businesses began in 2002 with just seven employees. Slightly over two years later, a prior entity formed in 2004 (also known as Alpha Natural Resources, Inc. but legally distinct from Debtor ANR) ("Former Alpha") became publicly traded, operated in five states, had approximately $1.27 billion in annual revenues and employed approximately 2,600 people.

Less than half a decade later, on July 31, 2009, Former Alpha – by then a $2.5 billion company with more than 3,750 employees following a series of thoughtful and well-timed accretive acquisitions – merged with Foundation Coal Holdings, Inc. (collectively with its then-affiliates, "Foundation"). At the time of the merger, Foundation was a major domestic producer of thermal (or "steam") coal for utilities and industrial plants that had operations in Pennsylvania, West Virginia and Wyoming. Following the merger, Foundation was left as the surviving entity and was renamed "Alpha Natural Resources, Inc." (i.e., the same entity as current Debtor ANR). In addition, the renamed Foundation's common stock replaced the common stock of Former Alpha on the New York Stock Exchange (the "NYSE"). The combined company had *pro forma* 2009 revenues of approximately $4.0 billion, employed 6,400 people and was the nation's largest exporter of metallurgical (or "met") coal, which is a very high quality coal primarily used to make coke, an essential component in the steelmaking process. In 2010, the combined company sold approximately 84.8 million tons of coal at a margin of $11 per ton, generating net income of $95.6 million and free cash flow of $384.7 million.

With a stock price valued at approximately $45 per share, on June 1, 2011, ANR completed its acquisition by merger (the "Massey Acquisition") of Massey Energy Company ("Massey") and certain of its affiliates for approximately $6.7 billion, funding the acquisition primarily with its common stock. At the time of the Massey Acquisition, Massey was one of the nation's largest coal producers, with approximately 2.4 billion tons of proven and probable reserves, 84 operating mines and associated processing and loading facilities in Central Appalachia. Following the Massey Acquisition, ANR: (a) was the second-largest producer of coal in the United States; (b) possessed one of the world's largest and highest quality reserves of met coal, and had further solidified its position as the nation's leading supplier of met coal; (c) generated approximately $7 billion in revenue; (d) operated 145 mines and 35 coal preparation plants; (e) had approximately 14,500 employees; and (f) supplied approximately 10% of the nation's aggregate electricity demand.

As of the commencement of the Chapter 11 Cases on the Petition Date, the Debtors were among the largest domestic producers of coal by volume in the United States, with total assets and liabilities of approximately $10.1 billion and $7.1 billion, respectively, and consolidated 2014 revenues of approximately $4.3 billion ($3.7 billion of which were attributable to coal sales). Further, they were the nation's leading supplier and exporter – and one of the world's largest suppliers – of met coal for steel producers and a major supplier of steam coal to electric utilities and manufacturing industries across the country.

As of the Petition Date, the Debtors employed slightly fewer than 8,000 full-time employees (down approximately 45% from their peak after the Massey Acquisition). Of the Debtors' full-time employees,

approximately 5,700 were paid hourly, 2,300 were salaried and 88% were directly engaged in mining operations. Further, approximately 1,000 of the Debtors' employees (or 12.5%) were represented by the United Mine Workers of America (the "UMWA").  The Debtors' unionized workforce is located in Virginia, West Virginia and Pennsylvania, and 13% of the Debtors' 2014 coal production came from mines operated by UMWA-represented employees.

## B.      Structure of Prepetition Operations

The Debtors sell coal to domestic and foreign electric utilities, steel producers and industrial users, and they maintain solid long-term relationships with numerous power plants operated by a diverse group of domestic electricity generators.  The Debtors' status as the only coal producer with mines and reserves in both Northern Appalachia and the Powder River Basin and their access to international shipping points on the east and gulf coasts of the United States allowed them to maximize flexibility in response to customer demand and facilitate the most economical means of product transportation, providing them with a significant strategic advantage over their competitors.  Approximately 39% of the Debtors' total revenue for 2014 was derived from sales made to customers outside the United States.

Measured by volume, steam coal accounted for 78% of the Debtors' 2014 coal sales (approximately 66 million tons), with met coal accounting for nearly the entirety of the remaining 22% of coal sales (approximately 18.6 million tons).  Measured by revenue, met coal accounted for approximately 43% of the Debtors' 2014 coal sales (as met coal sells at a premium due to its higher quality) and steam coal accounted for approximately 57%.  As of the Petition Date, the Debtors produced and processed approximately 98.7% of the coal they sold,[5] and were a recognized leader in safety and environmental performance within the coal industry.

As of the Petition Date, the Debtors operated in three major coal-producing basins – Northern Appalachia and Central Appalachia (i.e., southwestern Pennsylvania, West Virginia, eastern Kentucky and western Virginia) and Wyoming's Powder River Basin.  The Debtors owned or controlled approximately 2.35 billion tons of proven coal reserves and another 1.20 billion tons of probable reserves.  The Debtors' operations included 22 coal preparation plants, each of which received, blended, processed and shipped coal produced at one or more of the Debtors' 54 active mines.

The Debtors' Northern Appalachia ("NAPP") operations consisted of their Cumberland and Emerald mining complexes and two preparation plants, encompassing approximately 709.7 million tons of reserves (55.8 million of which are assigned to active mines).  In 2014, the Debtors shipped approximately 11 million tons of coal from their NAPP operations (7.6 million tons from Cumberland and 3.4 million tons from Emerald).  Steam coal comprised approximately 86% of this total (shipped primarily to utilities located in the eastern United States), and met coal comprised the remaining 14% (primarily marketed to export customers).  As of the Petition Date, there were approximately 1,080 salaried and hourly employees at the Debtors' NAPP operations, with the entire hourly workforce (i.e., 825 employees) being represented by the UMWA.

The Debtors' Central Appalachian ("CAPP") operations consisted of 50 underground and surface mines and 20 preparation plants, encompassing approximately 2.5 billion tons of proven and probable reserves (approximately 1.16 billion of which are assigned to active mines).  Collectively, the Debtors' CAPP operations shipped approximately 34.1 million tons of coal in 2014, primarily to eastern utilities (steam coal) and steel companies (met coal).  They employed approximately 6,000 salaried and hourly workers, with 130 hourly employees represented by the UMWA.

The Debtors' western coal operations located in the Powder River Basin consisted of their Belle Ayr and Eagle Butte surface mining operations, which collectively shipped approximately 36.5 million tons of steam coal (15.8 million tons from Belle Ayr and 20.7 million tons from Eagle Butte) in 2014, primarily to utility companies located throughout the western, midwestern and southern United States.  As of the Petition Date, the Debtors'

---

[5]      Approximately 1.1% of the coal sold by the Debtors is purchased from third parties and either processed by the Debtors, blended with the Debtors' coal to produce precise product mixtures desired by customers or shipped directly to customers.

western operations controlled approximately 700.1 million tons of coal reserves, all of which were assigned to active mines, and employed approximately 580 salaried and hourly workers (none of whom were union-represented).

On the Petition Date, the Debtors further controlled – through Debtor Pennsylvania Land Resources Holding Company, LLC ("PLR") – approximately 25,000 acres in the Marcellus Shale natural gas field of Southwestern Pennsylvania, and were engaged in efforts to prove and develop natural gas resources within such acreage.  Debtor Pennsylvania Services Corporation's ("PSC") acquisition on July 1, 2015, of the 50% of PLR not previously owned by PSC allowed the Debtors to take sole control of their operations within the most profitable and productive region of one of the largest and most concentrated natural gas fields in the United States.  In addition, through PLR, the Debtors further controlled rights to develop natural gas resources located at other depths, including the deep Utica Shale, on certain of the leased acreage and adjoining properties.

Between July 2011 and the Petition Date, the Debtors idled or closed more than 80 mines, impacting the livelihood of approximately 7,000 employees and their families, primarily in CAPP.  These idled mines imposed substantial annual costs upon the Debtors of approximately $175 million, including costs related to reclamation obligations, employee-related legacy obligations and maintenance and legal costs.

Based on its mining footprint, the Debtors generally report financial results from two segments:  (a) eastern coal operations, consisting of the Debtors' Appalachian mines and certain coal brokerage activities; and (b) western coal operations, consisting of its two Powder River Basin mines.  The Debtors also report financial results from certain ancillary segments of their business under the category of "All Other," including, for example, an idled underground coal mine in Illinois, expenses associated with closed mines, revenues and royalties from the sale of natural gas, mineral leasing rights and general corporate overhead.  During the 2014 calendar year, the Debtors incurred a loss from operations of $875 million.

## C.    The Debtors' Prepetition Capital Structure

### 1.    Long-Term Institutional Debt Obligations[6]

As of the Petition Date, the Debtors had approximately four billion dollars in outstanding funded debt. Included in this total was approximately $1.96 billion in secured prepetition indebtedness, consisting of approximately:

- $1.25 billion in secured indebtedness under the Fifth Amended and Restated Credit Agreement, dated as of September 24, 2014 (the "First Lien Credit Agreement"), by and between (a) ANR, as borrower, (b) certain of ANR's subsidiary Debtors, as guarantors (collectively, the "First Lien Guarantors"), (c) the lenders party thereto (collectively, the "First Lien Lenders") and (d) Citicorp North America, Inc., as administrative agent and collateral agent (the "First Lien Agent").  The First Lien Credit Agreement is generally comprised of two sub-facilities:  (a) a senior secured term loan facility (the "First Lien Term Loan B Facility") in the aggregate principal amount of up to $625 million; and (b) a secured revolving credit facility (the "First Lien Revolving Facility").  As of the Petition Date, the Debtors' secured indebtedness under the First Lien Credit Agreement consisted of the following:

  - $611 million in principal amount (the "Prepetition Secured Term Loan") outstanding under the First Lien Term Loan B Facility;

  - $445 million outstanding under the First Lien Revolving Facility; and

  - $191.2 million in letters of credit issued and outstanding under the First Lien Revolving Facility.

---

[6]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

- $714 million in principal amount of 7.50% senior secured notes issued under the Second Lien Notes Indentures in 2014 and 2015 by ANR and due in 2020 (the "Second Lien Notes").

In addition to secured indebtedness, as of the Petition Date, the Debtors had $2.10 billion in primary institutional unsecured indebtedness, consisting of approximately:

- $263 million in principal amount of 3.75% senior unsecured notes issued under the 2017/2020 Notes Indenture, due in 2017 (the "2017 Notes");

- $393 million in principal amount of 9.75% senior notes issued under the 2018 Notes Indenture, due in 2018 (the "2018 Notes");

- $577 million in principal amount of 6.0% senior unsecured notes issued under the 2019/2021 Notes Indenture, due in 2019 (the "2019 Notes");

- $277 million in principal amount of 4.875% senior unsecured notes issued under the 2017/2020 Notes Indenture, due in 2020 (the "2020 Notes"); and

- $585 million in principal amount of 6.25% senior unsecured notes issued under the 2019/2021 Notes Indenture, due in 2021 (the "2021 Notes").

The Debtors also had issued $109 million in principal amount of 3.25% convertible notes under the Massey Convertible Notes Indenture, due in 2015 (the "Massey Convertible Notes"). As discussed further below, the Massey Convertible Notes are secured, on an equal and ratable basis with the First Lien Lenders, by certain Principal Property (as defined in the Massey Convertible Notes Indenture) but, because the value of the Principal Property is highly uncertain, the extent to which the Massey Convertible Notes are secured is also uncertain. A payment of the principal and interest outstanding under the Massey Convertible Notes due on August 1, 2015 was not made.

a.    **The First Lien Credit Agreement**

All obligations under the First Lien Credit Agreement are: (a) secured (subject to certain exceptions, thresholds and limitations set forth in the First Lien Credit Agreement) by substantially all of the assets of ANR and the First Lien Guarantors (the "Prepetition Collateral"); (b) unconditionally guaranteed by the First Lien Guarantors; and (c) prepayable, in whole or in part, without penalty or premium upon proper notice and in certain minimum amounts. The First Lien Credit Agreement generally contains customary affirmative covenants, representations and warranties and events of default.

As of the Petition Date, assets excepted from the Prepetition Collateral securing the Debtors' obligations under the First Lien Credit Agreement (and the Second Lien Notes, which are secured by a junior lien on all or substantially all of Prepetition Collateral) included: (a) the assets of PLR; (b) the Debtors' minority interest (through holdings of approximately 4.0 million shares of publicly traded common stock) in Rice Energy, Inc. ("Rice Energy"), valued at approximately $72.5 million as of the Petition Date; and (c) the Debtors' unassigned accounts receivable, valued at approximately $8.0 million as of June 30, 2015.

On May 23, 2013, the First Lien Lenders funded the Prepetition Secured Term Loan in the full amount of their respective commitments under the First Lien Term Loan B Facility (i.e., $625 million in the aggregate). The proceeds of the Prepetition Secured Term Loan were used (a) to repay $525 million in principal outstanding under a term loan "A" facility under a prior amended version of the First Lien Credit Agreement, (b) to pay fees and expenses and (c) for general corporate purposes. The Prepetition Secured Term Loan matures on May 22, 2020. At ANR's election, the Prepetition Secured Term Loan bears interest at an annual rate equal to the Adjusted LIBO Rate (as defined in the First Lien Credit Agreement) plus 2.75%. Repayments of 0.25% of the initial principal owing on the Prepetition Secured Term Loan are due at the end of each calendar quarter.

On June 26, 2015, ANR delivered a borrowing request to the First Lien Agent, pursuant to Section 2.03 of the First Lien Credit Agreement, seeking to borrow $445 million under the First Lien Revolving Facility. On June 30, 2015, the First Lien Lenders funded the requested loans in the full amount.  As of the Petition Date, this $445 million represented all outstanding borrowings under the First Lien Revolving Facility and letters of credit outstanding under the First Lien Revolving Facility totaled approximately $191.2 million.  Commitments of the First Lien Lenders under the First Lien Revolving Facility totaling $276 million expire on June 30, 2016, with the remaining $618 million in commitments expiring on September 30, 2017.  Amounts outstanding under the First Lien Revolving Facility bear interest at the rates set forth in the First Lien Credit Agreement for "ABR Borrowings" (as such term is defined therein).

### b.    Second Lien Notes

On May 20, 2014:  (a) ANR, as issuer; (b) the First Lien Guarantors, as guarantors; and (c) Wilmington Trust, National Association (the "Second Lien Notes Trustee"), as trustee and collateral agent, entered into an indenture governing certain of the Second Lien Notes, pursuant to which ANR issued $500 million in aggregate principal amount of Second Lien Notes.  On March 23, 2015:  (a) ANR, as issuer; (b) the First Lien Guarantors, as guarantors; and (c) the Second Lien Notes Trustee, as trustee and Series B collateral agent, entered into an indenture governing additional Second Lien Notes (Series B), pursuant to which ANR issued an additional $214 million in aggregate principal amount of Second Lien Notes.  The Second Lien Notes pay interest semiannually in arrears on February 1 and August 1 of each year, at a rate of 7.50% per year, and will mature on August 1, 2020.  The Second Lien Notes are secured by a second priority lien on all or substantially all of those assets securing ANR's obligations under the First Lien Credit Agreement.

### c.    The Massey Convertible Notes

As a result of the Massey Acquisition, ANR became a guarantor of the Massey Convertible Notes, issued by Massey (now known as Debtor Alpha Appalachia Holdings, Inc.).  Pursuant to the indenture governing the Massey Convertible Notes (the "Massey Convertible Notes Indenture"), a final payment of $109 million of all outstanding principal and accrued and unpaid interest was due on August 1, 2015 upon the maturity of the Massey Convertible Notes, which payment was not made.  Section 1004 of the Massey Convertible Notes Indenture provides that the Debtors may only provide another entity with a lien on Principal Property if holders of the Massey Convertible Notes are equally and ratably secured by such lien.  In connection with the execution of the fifth amendment to the First Lien Credit Agreement, dated September 24, 2014, the First Lien Lenders were granted a lien on the Principal Property, thus triggering the "equal and ratable" provision of the Massey Convertible Notes Indenture and rendering the Massey Convertible Notes secured to the extent of the value of the noteholders' interest in the Principal Property.  No agreed or standard methodology exists for calculating the market value of the Principal Property and, thus, such value is difficult to ascertain and was uncertain as of the Petition Date. The Massey Convertible Notes are guaranteed by certain former Massey subsidiaries (which are among the Debtors).

### d.    2017 Notes/2020 Notes

On June 1, 2011:  (a) ANR, as issuer; (b) certain of ANR's subsidiary Debtors (the "2017/2020 Notes Guarantors"), as guarantors; and (c) Union Bank, N.A. ("Union Bank"), as trustee, entered into an indenture governing the 2017 Notes and the 2020 Notes.  The 2017 Notes and the 2020 Notes are senior unsecured obligations of ANR that rank *pari passu* with ANR's other senior unsecured obligations and are guaranteed by the 2017/2020 Notes Guarantors.  The proceeds of the 2017 Notes and the 2020 Notes, together with cash on hand, were used to repurchase approximately $402.9 million of then-outstanding Massey Convertible Notes and $218.2 million of other then-outstanding unsecured debt.  As of the Petition Date, the principal amount outstanding under the 2017 Notes was $263 million, and the principal amount outstanding under the 2020 Notes was $277 million.

The 2017 Notes bear interest at a rate of 3.75% per year (with an effective rate of 8.49% owing to deferred loan costs and discount), payable semi-annually in arrears on June 15 and December 15 of each year, and are scheduled to mature on December 15, 2017.  The 2020 Notes bear interest at a rate of 4.875% per year (with an effective rate of 9.48% owing to deferred loan costs and discount), payable semi-annually in arrears on June 15 and December 15 of each year, and are scheduled to mature on December 15, 2020.

####        e.        2019 Notes/2021 Notes

On June 1, 2011:  (a) ANR, as issuer; (b) the 2017/2020 Notes Guarantors, as guarantors; and (c) Union Bank, as trustee, entered into an indenture and a first supplemental indenture (together, the "2019/2021 Notes Indenture") governing the 2019 Notes and the 2021 Notes.  Also on June 1, 2011, in connection with the Massey Acquisition, ANR, the 2017/2020 Notes Guarantors, Massey, certain of Massey's wholly owned subsidiaries and Union Bank, as trustee, entered into a second supplement to the 2019/2021 Notes Indenture, pursuant to which Massey and certain wholly owned subsidiaries of Massey agreed to become additional guarantors of the 2019 Notes and the 2021 Notes.

The 2019 Notes bear interest at a rate of 6.00% per annum, payable semi-annually on June 1 and December 1 of each year, beginning on December 1, 2011, and are scheduled to mature on June 1, 2019. The 2021 Notes bear interest at a rate of 6.25% per annum, payable semi-annually on June 1 and December 1 of each year, beginning on December 1, 2011, and are scheduled to mature on June 1, 2021.  As of the Petition Date, the principal amounts outstanding under the 2019 Notes and the 2021 Notes were $577 million and $585 million, respectively.

####        f.        2018 Notes

On October 11, 2011:  (a) ANR, as issuer; (b) the 2017/2020 Notes Guarantors, as guarantors; and (c) Union Bank, as trustee, entered into a third supplement to the 2019/2021 Notes Indenture governing the 2018 Notes.  The 2018 Notes bear interest at a rate of 9.75% per annum, payable semi-annually on April 15 and October 15 of each year, beginning on April 15, 2013, and are scheduled to mature on April 15, 2018.  As of the Petition Date, the principal amount outstanding under the 2018 Notes was $393 million.

###    2.    Trade Debt

As of the Petition Date, the Debtors' trade debt consisted of, among other things, amounts owed to utilities and suppliers of, among other goods and services:  (a) maintenance and repair parts and services, including equipment rebuilds; (b) certain commodities (e.g., fuel and coal); (c) mine roof control and support items; (d) explosives; (e) tires; (f) conveyance structures; (g) ventilation supplies; and (h) lubricants.  The Debtors further relied heavily on suppliers and service providers for (a) construction and reclamation activities, (b) transportation and storage services and (c) information technology services.  The majority of the Debtors' vendors had been paid on negotiated terms, which historically ranged from as few as one to two days (due to the Debtors' desire to take advantage of term-related pricing discounts) to as many as 60 days.  As of the Petition Date, the Debtors estimated that approximately $200 million remained outstanding to their trade vendors, of which amount approximately $41 million related to goods provided to the Debtors within 20 days prior to the Petition Date.

###    3.    Non-Capital Lease Obligations

The great majority of the Debtors' Appalachian coal reserves are subject to leases from third-party landowners.  These leases generally convey mining rights to the Debtors in exchange for a percentage of gross sales in the form of a royalty payment to the lessor, subject to minimum payments.  As of December 31, 2014, approximately 2.57 billion tons of the Debtors' total 3.22 billion tons of Appalachian coal reserve holdings were leased and required minimum royalty and/or per-ton payments.

The Debtors' active Wyoming mines are subject to federal coal leases administered by the U.S. Department of Interior under the Federal Coal Leasing Amendment Act of 1976.  The Debtors must diligently develop each such federal lease within ten years of the lease award, with a required coal extraction of 1.0% of the reserves within that ten-year period and a requirement of continuous mining thereafter.  The Debtors pay the federal government an annual rent of $3.00 per acre and production royalties of 12.5% of gross proceeds on surface mined coal.  As of December 31, 2014, approximately 681.3 million tons of the Debtors' total 700.1 million tons of Wyoming coal reserve holdings were leased and subject to the foregoing terms.

The Debtors' obligations with respect to non-capital leases for calendar year 2014 were approximately $204 million (of which $187 million was attributable to their mining leases).

### 4.    Capital Lease Obligations

As of the Petition Date, ANR's liability relating to capital lease obligations (e.g., leases of certain property, plant and mining equipment) totaled approximately $56 million, with $15.7 million reported as a current portion of long term debt as of December 31, 2014.  Undiscounted cash interest payable on such obligations, with interest rates between 2.13% and 13.86%, was approximately $3.6 million in 2015 and would be approximately $8.7 million in 2016, $8.0 million in the aggregate for 2018 to 2019 and $29.6 million after 2019.

### 5.    Reclamation Obligations

The Debtors' asset retirement (or "reclamation") obligations arise pursuant to the federal Surface Mining Control and Reclamation Act of 1977 and similar state statutes, which generally require that property upon which mining operations have been conducted be restored in accordance with specified standards and an approved reclamation plan.  Standards for mine reclamation have been established by various state and federal regulatory agencies and such standards dictate the reclamation requirements at the Debtors' mining properties.  The Debtors' reclamation obligations consist principally of costs necessary to (a) reclaim refuse and slurry ponds, (b) reclaim the pit and support acreage at surface mines, (c) seal portals at deep mines and (d) treat water used in mining operations.

As of the Petition Date, the Debtors' aggregate accrued reclamation obligations – based on a variety of assumptions tied to the Debtors' then-existing operations and mine plans that may change in light of actual events – were approximately $683 million,[7] with approximately $99 million of that total coming due within one year. Federal and state laws require the Debtors to provide bonds or other collateral with respect to their reclamation obligations.  As of the Petition Date, the Debtors were self-bonded for approximately 96% of their reclamation obligations in Wyoming and 77% of such obligations in West Virginia, subject to periodic evaluation of their financial position by the applicable state.  The Debtors also obtained commercial surety bonds – typically renewable annually – to secure payment of reclamation obligations and other long-term obligations (e.g., federal and state workers' compensation costs, obligations under federal coal leases and other miscellaneous obligations).  As of the Petition Date, the Debtors had outstanding bonds issued by commercial sureties with a total face value amount of approximately $367 million to secure various potential obligations and commitments, with the overwhelming majority related to bonds securing the Debtors' reclamation obligations.  As of the Petition Date, the Debtors had posted approximately $115 million in letters of credit under the First Lien Credit Agreement and the A/R Facility[8] to secure their obligations to the commercial sureties.

Pursuant to a letter to Debtor Alpha Coal West, Inc. ("ACW") dated May 26, 2015 (the "Wyoming Bonding Request"), the Wyoming Department of Environmental Quality (the "WDEQ"):  (a) notified ACW that it and Debtor ANR no longer qualified under the state's self-bonding program with respect to the Debtors' Wyoming reclamation obligations; and (b) required ACW to substitute, within 90 days of the Debtors' receipt of the notice, "either corporate sureties …, cash, governmental securities, federally insured certificates of deposit, or irrevocable letters of credit" valued at more than $400 million.

The Debtors disagreed with the WDEQ's determination, and believed that they fully satisfied all requirements for self-bonding under applicable state regulations for the period in question.  Accordingly, by letter

---

[7]     The Debtors' actual reclamation expenditure over time was expected to be substantially higher than this amount, which was discounted to present value.

[8]     On September 19, 2014, non-Debtor affiliate ANR Second Receivables Funding, LLC ("ANR SRF"), a special purpose indirect subsidiary of ANR, as borrower, entered into a Credit and Security Agreement (the "A/R Facility") with General Electric Capital Corporation, as administrative agent and a lender, swing line lender and LC Lender (as defined in the A/R Facility) and Webster Business Credit Corporation, as a lender and LC Lender.  Under the A/R Facility, ANR SRF was permitted to borrow cash or cause the LC Lenders to issue letters of credit, on a revolving basis, in an amount up to $200 million subject to certain limitations set forth therein.  The obligations of the lenders to make cash advances and of the LC Lenders to issue letters of credit pursuant to the A/R Facility were secured by certain trade receivables owned by ANR SRF.  Further, ANR guaranteed the performance of its subsidiaries (other than ANR SRF) under the A/R Facility and agreements related thereto.  As of the Petition Date, under the A/R Facility, approximately $102.8 million of letters of credit were outstanding.

dated June 2, 2015 (the "June 2 Letter"), the Debtors requested an informal conference with the WDEQ as permitted under applicable law.  On June 26, 2015, ACW and ANR exercised their statutory right under Wyoming law to seek judicial review of the WDEQ's revocation of the Debtors' self-bond by filing an appeal (the "Appeal") thereof in the Sixth Judicial District Court of Campbell County, Wyoming (the "Wyoming Court").  On July 9, 2015, the WDEQ responded to the June 2 Letter indicating its willingness to participate in an informal conference.  Pursuant to a motion filed with the Wyoming Court on July 23, 2015, the Powder River Basin Resource Council, a private, third-party conservation organization, sought to intervene in the Appeal.  On July 24, 2015, ACW and ANR filed an unopposed motion with the Wyoming Court seeking to (a) stay the Appeal pending the informal conference and (b) stay the deadline for the Debtors to comply with the Wyoming Bonding Request.

In addition to the Wyoming Bonding Request, pursuant to a letter to ANR dated July 24, 2015, the West Virginia Department of Environmental Protection, Division of Mining and Reclamation (the "WVDEP") informed ANR that it intended to transition the assurance of the Debtors' reclamation obligations in West Virginia away from self-bonding to other acceptable forms of bond (the "West Virginia Bonding Request").

Further information regarding the consensual resolution of the Wyoming Bonding Request and the West Virginia Bonding Request during the Chapter 11 Cases is provided in Section III.H, below.

6.     **Pension Obligations**

As of the commencement of the Chapter 11 Cases, the Debtors maintained three qualified, non-contributory defined benefit pension plans (collectively, the "Qualified Plans") covering certain salaried and non-union hourly employees.  Benefits under each of the Qualified Plans have been frozen as to eligibility and benefit accrual.  Benefits payable under the Qualified Plans are paid from the assets held within the applicable benefit plan trust.  As of December 31, 2014, the Debtors' accumulated unfunded obligation to the Qualified Plans was approximately $219.7 million.

In addition to the Qualified Plans, the Debtors also had, as of the Petition Date:  (a) the Alpha Natural Resources, Inc. and Subsidiaries Deferred Compensation Plan, as amended and restated effective August 1, 2012; (b) the Alpha Natural Resources, Inc. Non-Employee Directors Deferred Compensation Plan, as initially adopted effective January 1, 2010; (c) the Foundation Coal Supplemental Executive Retirement Plan, effective July 30, 2004, as amended on March 16, 2007, December 11, 2008, July 27, 2009 and January 23, 2014; and (d) the A.T. Massey Coal Company, Inc. Executive Deferred Compensation Plan, as amended and restated as of January 1, 2009 (collectively, the "SERP Plans").  Benefits under these non-qualified plans are completely unfunded.  The Debtors' obligations with respect to the SERP Plans, as of the Petition Date, were (a) $1.6 million in 2015, (b) $3.1 million in the aggregate for 2016 and 2017, (c) $3.1 million in the aggregate for 2018 and 2019 and (d) $30.4 million thereafter.  Certain funding for the SERP Plans was held in a "rabbi trust," which is subject to the claims of the Debtors' creditors.

7.     **Other Post-Employment Benefit Obligations**

As of the Petition Date, the Debtors had short- and long-term liabilities for post-employment medical and life insurance benefits to certain eligible employees under various plans, which liabilities were unfunded.  As of December 31, 2014, the Debtors had total post-employment medical benefit obligations of approximately $1.06 billion, including amounts reported as current liabilities.  As set forth in Section III.K below, the Debtors have filed a motion to terminate certain such obligations pursuant to the terms of the applicable plans.

8.     **Regulatory Compliance Costs**

The coal industry is heavily regulated by federal, state and local authorities with respect to, among other things, (a) permitting and licensing requirements, (b) air and water emissions, (c) property reclamation, (d) remediation of contaminated soil, (e) protection of surface and groundwater and (f) surface subsidence from underground mining.  During 2014, the Debtors incurred capital expenditures of approximately $13.7 million in connection with regulatory compliance.

Although the Debtors work to conduct their mining and other operations in compliance with applicable laws and regulations – and the Debtors are industry leaders in safety and environmental compliance – violations inevitably occur from time to time.  In 2014, the Debtors entered into a consent decree (the "Consent Decree") with the United States Environmental Protection Agency (the "EPA"), the U.S. Department of Justice, the Commonwealths of Kentucky and Pennsylvania and the state of West Virginia regarding claims brought against the Debtors under the Clean Water Act, alleging that certain of the Debtors' mining affiliates in various states exceeded certain water discharge permit limits during the period from 2006 to 2013.  As part of the Consent Decree, the Debtors agreed to (a) implement an integrated environmental management system and an expanded auditing/reporting protocol, (b) install selenium and osmotic pressure treatment facilities at specific locations and (c) take certain other measures.  The Consent Decree obligated the Debtors to make capital expenditures of approximately $163.4 million over the course of the period from 2015 through 2018 to achieve water quality compliance under certain water discharge permits issued by state agencies covered by the Consent Decree.

### 9.    Black Lung Benefit Obligations

The Debtors are required by federal and state statutes to provide benefits to employees for awards related to pneumoconiosis (or "black lung").  In addition, as a result of the Massey Acquisition and the Foundation merger, the Debtors assumed certain black lung benefit obligations.  ANR's subsidiaries are insured for black lung obligations by a third-party insurance provider, with the exception of (a) certain subsidiaries with respect to which ANR is a qualified self-insurer and (b) certain subsidiaries that are self-insured and may fund benefit payments through a Section 501(c)(21) tax-exempt trust fund.  As of December 31, 2014, the Debtors' accrued obligation for black lung benefits totaled approximately $158.6 million.

### 10.    1974 Pension Plan Obligations

Certain of the Debtors are required by collective bargaining agreements with the UMWA to participate in, and make contributions to, the United Mine Workers of America 1974 Pension Plan (the "1974 Pension Plan").  The 1974 Pension Plan is a multi-employer pension plan administered by a board of trustees appointed by the UMWA and the Bituminous Coal Operators' Association.  For the years ended December 31, 2014, 2013 and 2012, the Debtors incurred expenses related to the 1974 Pension Plan of approximately $19 million, $21 million and $23 million, respectively.  As of June 30, 2015, the estimated withdrawal liability should the Debtors withdraw from the 1974 Pension Plan was approximately $607 million.

### D.    Events Leading to the Commencement of the Chapter 11 Cases

Shortly after the Massey Acquisition, the coal industry began to face unprecedented market challenges, leading to a historic decline.  During the past several years, American coal producers have encountered a confluence of macroeconomic headwinds, competitive pressures and regulatory obstacles that, collectively, have distressed the domestic coal industry.  These adverse trends have included:  (a) rapidly falling coal prices due to, among other things, the substantially expanded ability of North American energy companies to produce vast quantities of natural gas; (b) weak demand and significant oversupply for both thermal and metallurgical coal due to slower than expected economic growth in both the United States and overseas markets (such as Europe, where the Debtors are the largest exporter of U.S. coal, and China, the largest user of thermal and met coal in the world); (c) the increasing use and government subsidization of renewable energy technologies, both in the United States and abroad; and (d) the imposition of restrictive federal and state regulations on coal producers and operators of coal-fired power plants, which regulations (i) constrain the use of coal to make electricity, (ii) have precipitously reduced domestic demand for thermal coal and (iii) have sharply increased the costs of maintaining regulatory compliance.

Global coal prices generally correlate to the overall economic condition of the world's leading industrial and developing economies.  As the United States has struggled to recover from a severe recession and many other leading coal-consuming countries have suffered economic downturns or constrained growth in recent years, coal prices have not come close to reaching pre-recession levels.  After briefly spiking in 2011 (immediately after the disaster at the Japanese Fukushima Daiichi nuclear power plant and multiple typhoons striking Australia), global coal prices have been mired in a trend of steady decline.  Even as the United States has enjoyed modest annual gross domestic product growth during the past five years, demand for coal along with coal prices fell sharply over the four-year period prior to the Petition Date, reaching a 10-year low during the summer of 2015.  For example, prices

for met coal and thermal coal fell by approximately 72% and 44%, respectively, between 2011 and the Petition Date and, as of the Petition Date, central Appalachian coal production had declined by approximately 50% since 2008 and by approximately 37% since 2011.

The recent development of new technologies enabling the production of large quantities of domestic natural gas also has driven coal prices lower (e.g., between 2008 and 2013, domestic shale gas production more than quadrupled).  As a result, natural gas prices have fallen approximately 75% from their peak in 2008 and are now well below historical averages.  The availability of cheap natural gas has caused the annual share of total domestic electricity generation attributable to coal to drop from 47% in 2010 to 39% in 2014.  In April 2015, domestic electricity generation powered by natural gas overtook that powered by coal on a monthly basis for the first time in American history, with 31% powered by natural gas (a 21% increase from April 2014) and 30% powered by coal (a 19% decrease from April 2014).

The macroeconomic challenges facing American coal producers in recent years have been compounded by the promulgation of new environmental regulations, and stricter enforcement of existing federal and state regulations, affecting the coal and electrical power industries.  For example:

- in 2014, the United States Supreme Court upheld the EPA's "Cross State Air Pollution Rule" that sharply limits allowable emissions of sulfur dioxide and nitrogen oxides from coal-fired power plants in 28 states;

- the EPA recently issued new rules, known as the Mercury and Air Toxics Standards ("MATS"), limiting mercury emissions from power plants nationwide; and

- the EPA has proposed new rules to reduce carbon dioxide emissions from new and existing power plants, including a strict new carbon emissions rule – the Clean Power Plan – that would force operators of coal-fired power plants to either install costly emission-control technology or close such plants altogether. Moreover, any new coal-fired plant must employ carbon capture and storage technology, a perhaps prohibitively expensive and as-yet unproven technology.[9]

These new regulations (MATS, in particular) have already contributed to the retirement of approximately 400 coal-fired electricity generating units and the loss of over 62,000 megawatts (or approximately 20%) of electric generating capacity.  Moreover, it is expected that these new rules and regulations will (a) force the closure of approximately 468 additional existing coal-fired units with approximately 73,000 megawatts of electric generating capacity, (b) disincentivize utilities from constructing new coal-fired plants and (c) further reduce domestic demand for thermal coal, thereby putting increasing economic pressure on coal producers, including the Debtors.

In recent years, the federal government and many state governments also have enacted new laws designed to subsidize and promote the development and use of alternative energy sources in place of traditional fossil fuels such as coal.  The federal American Recovery and Reinvestment Act of 2009, for example, provided $90 billion for "clean energy" programs, a substantial portion of which was earmarked for the development of renewable energy technologies.  President Barack Obama's administration has signaled its intention to continue subsidizing and promoting the growth of the alternative energy sector, while removing economic benefits currently available to coal and other fossil fuel producers.  In addition, most states have implemented regulatory mandates known as "renewable portfolio standards," which generally require that a certain percentage of the electricity produced in the state must be generated from renewable energy sources.  These efforts placed the Debtors under increasing economic pressures and at competitive disadvantages relative to heavily subsidized alternative energy industries.

In addition to the external challenges facing the coal industry from declining demand, alternative energy sources and a difficult regulatory environment, the Debtors faced intense competition within the coal industry.

---

[9]    The EPA's authority to regulate carbon dioxide emissions in this context was largely, although not entirely, upheld by an opinion of the United States Supreme Court issued on February 8, 2016.

With respect to their domestic customers, the Debtors compete with numerous coal producers based in the Appalachian region and Illinois basin and with a significant number of western coal producers.  Moreover, the recent strength of the U.S. dollar has made domestic coal more expensive relative to foreign coal production from Australia, Indonesia, South Africa and Columbia.  Finally, long-expected consolidation in the coal industry has yet to materialize, resulting in excess production capacity and, thus, depressed prices for the Debtors' coal.

III.

THE CHAPTER 11 CASES

**A.      Voluntary Petitions**

The Debtors commenced their reorganization cases on the Petition Date by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  By an order of the Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors have continued, and will continue until the Effective Date (as defined in the Plan), to manage their properties as debtors-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Chapter 11 Code.  An immediate effect of the filing of the Chapter 11 Cases was the imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined (a) the commencement or continuation of all collection efforts by creditors, (b) the enforcement of liens against any assets of the Debtors and (c) litigation against the Debtors.

**B.      First Day Relief**

On the Petition Date, the Debtors filed various motions for relief and other pleadings (collectively, the "First Day Motions").  The First Day Motions were proposed to ensure the Debtors' orderly transition into chapter 11.  The Court granted the relief requested in the First Day Motions, as described below, with, in certain cases, adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the Office of the United States Trustee for Region Four (the "U.S. Trustee") and other parties in interest.

**1.      Cash Management System**

By a final order entered on October 8, 2015 (the "Cash Management Order"), the Bankruptcy Court authorized the Debtors to continue using:  (a) their prepetition integrated, centralized cash management system (the "Cash Management System"); (b) their existing bank accounts; and (c) their business forms.  In addition, the Bankruptcy Court authorized the Debtors to open and close bank accounts (including as required by the DIP Credit Agreements) and to continue intercompany funding, including by (a) granting superpriority administrative expense status to all postpetition claims arising therefrom and (b) allowing the Debtors to reconcile and set off any mutual prepetition obligations between Debtors arising from such transactions through the Cash Management System.

**2.      Employee Wages and Benefits**

By a final order entered on September 3, 2015 (the "Employee Order"), the Bankruptcy Court granted the Debtors authority to pay and honor, in the ordinary course of business and in their sole discretion, certain prepetition claims and obligations related to employee wages and benefits, as well as various related costs, expenses, deductions and withholdings.

**3.      Workers' Compensation Program and Insurance Policies**

The Debtors obtained a final order authorizing them to (a) maintain their prepetition workers' compensation program, including coverage for occupational pneumoconiosis (also known as "black lung") claims under applicable

state and federal law; (b) continue processing workers' compensation claims in the ordinary course; and (c) continue paying self-insured workers' compensation claims and deductible costs.

By the same order, the Bankruptcy Court authorized the Debtors to maintain and perform under numerous insurance policies that provide coverage for, among other things, (a) general commercial liability, (b) property damage, (c) environmental liability, (d) automobile damage and liability, (e) aviation and marine liability, (f) directors and officers liability, (g) transit damage, (h) crime and fiduciary liability and (i) employment practices liability.

### 4.       Surety Bonds

With respect to the Debtors' surety bond obligations for environmental reclamation and other purposes, the Bankruptcy Court entered interim and final orders confirming the Debtors' authority:  (a) to maintain, continue and renew their surety bond program without interruption; and (b) to maintain collateral and perform under certain postpetition indemnity agreements as necessary to continue such program.

### 5.       Essential Suppliers

The Debtors sought and obtained orders authorizing them to pay up to $44.5 million in prepetition claims of suppliers and service providers that were essential to the continued operation of the Debtors' businesses, including (a) safety equipment and service suppliers; (b) environmental service providers; (c) fuel, lubricant, chemical and mineral suppliers; (d) suppliers of specialized goods, and providers of specialized services, required for coal production and processing; and (e) suppliers of coal necessary for the Debtors to satisfy their customer obligations.

### 6.       Lien Claims

The Bankruptcy Court authorized the Debtors to pay, in their discretion, the claims of certain parties with commercial or trade relationships with the Debtors that may otherwise have held or asserted liens on and interests in property of the Debtors' estates, including by retaining possession of such property.

### 7.       Taxes

The Bankruptcy Court authorized the Debtors to pay various tax and other liabilities to governmental entities, including, among others:  (a) production taxes; (b) black lung excise taxes; (c) sales and use taxes; (d) franchise taxes; (e) environmental and safety taxes; (f) penalties and fees; and (g) certain other taxes, assessments and fees.

### 8.       Coal Sale Contracts

To avoid any uncertainty about the effect of the Chapter 11 Cases on the Debtors' coal sale contracts, which may otherwise have deterred parties from entering into or negotiating such contracts, the Debtors obtained an order confirming their authority to enter into and perform under such contracts.

### 9.       Customer Obligations

The Debtors sought and obtained an order authorizing them to enter into agreements to perform, and to perform, certain obligations to their customers that are customary in the coal industry, including (a) demurrage obligations and (b) quality and volume adjustments.

### 10.      Utilities Adequate Assurance

To comply with the requirements of section 366 of the Bankruptcy Code, the Debtors sought and obtained orders authorizing them to provide a two-week deposit to requesting utility companies in the expected aggregate amount of approximately $2 million.

11.     **Equity Securities Trading Procedures**

The Debtors also obtained an order (a) establishing notice and objection procedures regarding certain transfers of beneficial interests in equity securities in Debtor ANR, (b) establishing a record date for notice and potential sell-down procedures for trading in claims against the Debtors and (c) granting certain other relief related to the preservation of net operating loss tax attributes.

12.     **Administrative and Procedural Motions**

In addition to the foregoing motions, the Debtors obtained various administrative and procedural orders by the First Day Motions, including orders:  (a) providing for the joint administration of the Chapter 11 Cases; (b) establishing case management procedures; (c) authorizing the Debtors to file a consolidated list of their largest 50 unsecured creditors in place of a separate list for each Debtor; (d) extending until October 2, 2015, the deadline for the Debtors to file their schedules of assets and liabilities (collectively, the "Schedules") and statements of financial affairs (collectively, the "Statements"); (e) confirming the protections of the automatic stay of section 362 of the Bankruptcy Code; (f) confirming the administrative expense status of postpetition obligations; (g) establishing procedures for the assertion of claims arising from goods received by the Debtors during the 20-day period prior to the Petition Date under section 503(b)(9) of the Bankruptcy Code; and (h) establishing exclusive procedures for assertion, reconciliation and treatment of reclamation demands.

C.     **Retention of Professionals and Advisors**

Soon after the commencement of the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval of the retention of:  (a) Jones Day, as lead bankruptcy counsel; (b) Hunton & Williams LLP, as co-counsel; (c) Rothschild Inc., as financial advisor and investment banker; (d) KPMG LLP, as auditor; (e) Deloitte Tax LLP, as tax advisor; (f) McKinsey Recovery & Transformation Services U.S., LLC, as turnaround advisor; (g) Alvarez & Marsal North America, LLC, as financial advisor; (h) Jackson Kelly PLLC, Clearly Gottlieb Steen & Hamilton LLP and Quinn Emanuel Urquhart & Sullivan, LLP, as special counsel; (i) Ernst & Young LLP to provide certain accounting services to the Debtors; and (j) KCC as the Debtors' claims, noticing and balloting agent in the Chapter 11 Cases.

These applications were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the U.S. Trustee, the Creditors' Committee and other parties in interest.  In connection with these applications, the Debtors sought and obtained approval to establish procedures for interim monthly compensation of professionals.  The Debtors also sought and obtained approval to employ certain professionals not involved in the administration of the Chapter 11 Cases in the ordinary course of business.

D.     **Statutory Committees**

1.     **The Creditors' Committee**

On August 12, 2015, the U.S. Trustee appointed the official committee of unsecured creditors (as defined in the Plan, the "Creditors' Committee") in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code. The seven members of the Creditors' Committee are:  (a) CB Mining, Inc; (b) Nelson Brothers, LLC; (c) the Pension Benefit Guaranty Corporation; (d) United Mine Workers 1974 Pension Plan and Trust; (e) MUFG Union Bank, N.A. as Indenture Trustee; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, as successor to the Second Lien Notes Trustee, as Indenture Trustee; and (g) the UMWA.  Counsel to the Creditors' Committee are Milbank Tweed Hadley & McCloy LLP and Sands Anderson PC.  The Creditors' Committee also retained Protiviti Inc. as its financial advisor and Jefferies LLC as its investment banker.

2.     **The Retiree Committee**

On November 19, 2015, the Bankruptcy Court entered an order directing the appointment of an official committee of retired employees (the "Retiree Committee") pursuant to section 1114 of the Bankruptcy Code. On December 1, 2015, the U.S. Trustee appointed the Retiree Committee in the Chapter 11 Cases.  The five

members of the Retiree Committee are:  (a) Rickey Simpkins; (b) David Canterbury; (c) Leo Harris; (d) Michael Quillen; and (e) Clarence Whisenhunt, Jr.  Counsel to the Retiree Committee are Tavenner & Beran, PLC and Harman Clayton Corrigan & Wellman, P.C.

### 3. Motion to Appoint an Equity Committee

On November 25, 2015, certain holders of ANR stock filed a motion seeking the appointment of an official committee of equity security holders (an "Equity Committee") in the Chapter 11 Cases.  The motion was opposed by various parties in interest, including the Debtors, the U.S. Trustee, the Creditors' Committee, the administrative agents under the First Lien Credit Agreement and the DIP Credit Agreements and the steering committee of DIP Lenders.  On December 22, 2015, the Bankruptcy Court entered an order denying the shareholders' request to appoint an Equity Committee.

## E. Postpetition Financing

The Debtors' businesses are cash intensive, with significant daily costs to produce and ship coal to customers, satisfy obligations to employees, maintain the safety of their mines and other facilities and fulfill environmental and other regulatory requirements.  As such, in connection with their preparations for the commencement of the Chapter 11 Cases, the Debtors determined that they would require immediate access to postpetition financing and the use of cash collateral (the "DIP Financing") to operate their businesses, preserve value and pursue their restructuring goals.

### 1. The DIP Financing

The Debtors filed a motion (the "DIP Motion") on the Petition Date seeking approval of the DIP Financing under:  (a) that certain Superpriority Secured Debtor-In-Possession Credit Agreement (as amended, the "First Out DIP Credit Agreement") by and among ANR as borrower, certain Debtors party thereto as guarantors, the lenders party thereto (the "First Out DIP Lenders") and Citibank, N.A. (the "First Out Agent"), as Administrative Agent and Collateral Agent; and (b) that certain Superpriority Secured Second Out Debtor-in-Possession Credit Agreement (the "Second Out DIP Credit Agreement" and, together with the First Out DIP Credit Agreement, the "DIP Credit Agreements") by and among ANR as borrower, certain Debtors party thereto as guarantors, the lenders party thereto (the "Second Out DIP Lenders" and, together with the First Out DIP Lenders, the "DIP Lenders"), the issuing banks thereto and Citicorp North America, Inc. (the "Second Out Agent" and, together with the First Out Agent, the "DIP Agents"), as Administrative Agent and Collateral Agent.  On August 4, 2015 and September 17, 2015, the Bankruptcy Court issued orders approving the DIP Financing on an interim and final basis, respectively.

### a. The First Out DIP Credit Agreement

The First Out DIP Credit Agreement provides for:  (a) a term loan (the "DIP Term Loan Facility") not to exceed $300 million, secured by substantially all of the assets of the Debtors, subject to certain excluded assets and carve outs (the "DIP Collateral"), which was to be used (i) to fund operations, (ii) to cash collateralize certain letters of credit and (iii) for the issuance of new letters of credit; (b) a term letter of credit facility in an amount up to $108 million of the $300 million DIP Term Loan Facility (the "DIP Term LC Facility"); and (c) a bonding accommodation facility in an amount up to $100 million (which may be increased with the consent of certain of the First Out DIP Lenders) (the "DIP Bonding Facility").  The DIP Bonding Facility provided the Debtors with the ability to satisfy bonding requests by governmental agencies under state reclamation laws in the form of either an allowed "superpriority" administrative expense claim under section 364 of the Bankruptcy Code in the Chapter 11 Cases, or the posting of a cash collateralized letter of credit.

Borrowings under the DIP Term Loan Facility can be made as either a Eurocurrency Borrowing or an ABR Borrowing.  A Eurocurrency Borrowing accrues interest at LIBOR plus 9.00%, with a LIBOR floor of 1.00%. An ABR Borrowing accrues interest at the Alternative Base Rate plus 8.00%, with an ABR floor of 2.00%.

The First Out DIP Credit Agreement includes covenants that, subject to certain exceptions, require ANR to maintain certain minimum thresholds of liquidity and limit the ability of the Debtors to, among other things:

(a) expend liquidity on capital expenditures, (b) make dispositions of material leases and contracts, (c) make acquisitions, loans or investments, (d) create liens on their property, (e) dispose of assets, (f) incur indebtedness, (g) merge or consolidate with third parties, (h) enter into transactions with affiliated entities and (i) make material changes to their business activities.

The First Out DIP Credit Agreement also allows the Debtors, on a single occasion and subject to receipt of commitments from lenders, to request the addition to the DIP Financing of an asset based revolving credit facility having aggregate commitments not to exceed $200 million (the "DIP Revolving Facility"), and which would also be secured by liens on the DIP Collateral and would be guaranteed by certain of the Debtors.  Liquidity under any DIP Revolving Facility would be made available thereunder based on eligibility criteria and borrowing base calculations (including advance rates and reserves) as set forth therein.  The DIP Revolving Facility would include such other customary terms and conditions as are agreed by the parties, and the effectiveness of the DIP Revolving Facility would be subject to documentation of an amendment to the First Out DIP Credit Agreement, the entry of an appropriate order of the Bankruptcy Court approving the facility, and other customary conditions precedent.  Following the effective date, $100 million of the DIP Revolving Facility would be required to be used to repay the DIP Term Loan Facility.

> **b.      The Second Out DIP Credit Agreement**

The Second Out DIP Credit Agreement consists of a last-out letter of credit replacement facility in an aggregate undrawn amount of approximately $192 million (the "Second Out Facility").  Pursuant to the terms of the Second Out Facility, letters of credit that were outstanding under the prepetition First Lien Credit Facility were deemed to have been issued postpetition under the Second Out Facility, and the Debtors are permitted to further extend or renew these letters of credit on a going-forward basis.  The obligations of the Debtors under the Second Out DIP Credit Agreement are secured by liens on the DIP Collateral.  Unreimbursed drawings under letters of credit under the Second Out Facility bear interest at LIBOR plus 4.00% or at the Alternative Base Rate plus 3.00% (with an ABR floor of 2.00%), as applicable.  The Second Out DIP Credit Agreement incorporates by reference the events of default, affirmative and negative covenants and representations and warranties contained in the First Out DIP Credit Agreement.

The relative rights among the DIP Lenders in the DIP Collateral are set forth in the DIP Orders and that certain Debtor-in-Possession Pledge and Security and Intercreditor Agreement dated as of August 6, 2015 by and among ANR, the guarantors party thereto, the DIP Agents and the other agents party thereto (as amended by that certain First Amendment and Joinder to the Security Agreement dated as of September 18, 2015, and as may be further amended from time to time, the "DIP Security Agreement").

In addition to the security interests granted under the DIP Credit Agreements, the DIP Security Agreement and the DIP Order, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Debtors' obligations under the DIP Credit Agreements constitute allowed claims against the Debtors with priority over any and all administrative expenses, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, subject only to certain carve outs as provided in the DIP Credit Agreements and the DIP Orders.

> **2.      Adequate Protection**

The DIP Order provided the Debtors' First Lien Lenders and the Second Lien Noteholders with adequate protection in the form of certain replacement liens on the Prepetition Collateral and cross-collateralization liens (such liens collectively, the "Adequate Protection Liens") on property of the Debtors unencumbered by the liens supporting the First Lien Credit Agreement (collectively, the "Prepetition Senior Liens"), superpriority administrative claims under section 507(d) of the Bankruptcy Code, the payment of interest, fees and expenses and the right to receive certain financial reporting.

3.      **Amendments to the First Out DIP Credit Agreement**

a.      **Amendment No. 1**

On September 17, 2015, the Debtors entered into Amendment No. 1 to the First Out DIP Credit Agreement. Amendment No. 1 conformed the First Out DIP Credit Agreement with the DIP Order and addressed nonmaterial changes that had occurred since the Petition Date.  Contemporaneous notice of this nonmaterial amendment was given to the Creditors' Committee consistent with paragraph 7(c)(ii) of the DIP Order.

b.      **Amendment No. 2**

On September 18, 2015, the Debtors entered into Amendment No. 2 to the DIP Credit Agreement. Amendment No. 2 was nonmaterial and provided the Debtors with additional time to obtain the entry of the final Cash Management Order. Contemporaneous notice of this nonmaterial amendment was given to the Creditors' Committee consistent with paragraph 7(c)(ii) of the DIP Order.

c.      **Amendment No. 3**

On November 19, 2015, the Bankruptcy Court entered an order (the "First DIP Amendment Order") approving Amendment No. 3 to the First Out DIP Credit Agreement that, among other things:  (a) authorized the Debtors to increase the amount of the DIP Term L/C Facility from $108 million to $138 million; (b) modified certain case milestones provided for under the First Out DIP Credit Agreement, as more fully described below; (c) amended and, in certain cases, restated certain financial reporting and information sharing covenants; and (d) amended and restated covenants governing the capital expenditures permitted under the DIP Credit Agreements and minimum liquidity requirements set forth in the DIP Credit Agreements.  In addition to the foregoing amendments, pursuant to the First DIP Amendment Order, all defaults and events of default that may have occurred under the DIP Credit Agreements as a result of the Debtors' failure to provide to the DIP Lenders certain reporting as required under the First Out DIP Credit Agreement were waived.

d.      **Amendment No. 4**

On November 24, 2015, the Debtors entered into Amendment No. 4 to the First Out DIP Credit Agreement, which the Bankruptcy Court also approved pursuant to the First DIP Amendment Order.  The amendment further modified the case milestones provided for under the First Out DIP Credit Agreement to require the filing by January 22, 2016 of a Plan Structure Agreement based upon an agreed Business Plan (as such terms are defined in Sections IV.D and IV.B, respectively.  Amendment No. 4 also amended the definition of "New Term L/C Conditions" established in the Amendment No. 3 to require the Required Lenders (as defined in the First Out DIP Credit Agreement) to act in a reasonable manner in objecting to the issuance of any letter of credit under the DIP Term LC Facility.

e.      **Amendment No. 5**

On February 8, 2016, in connection with the Core Asset Sales Motion, as defined in Section III.J.4 below, the Debtors further requested that the Bankruptcy Court approve an amendment to the First Out DIP Credit Agreement that would provide for a revised set of milestones modifying the dates by which the Debtors would complete certain key actions and activities necessary to emerging from chapter 11.  These milestones address, among other actions, (a) the filing of a Chapter 11 Plan and related Disclosure Statement, (b) the filing of a motion to approve a Disclosure Statement and plan solicitation process, (c) the filing of any motions for relief under sections 1113 and 1114 of the Bankruptcy Code, (d) completion of a sale hearing for the Core Assets, as defined in Section III.J.4 below, and (e) entry of any orders needed under sections 1113 and 1114 of the Bankruptcy Code.

4.      **The Challenge Period**

Paragraph 23 of the DIP Order provided the Creditors' Committee with a period of 90 days (the "Challenge Period") to file an adversary proceeding or contested matter challenging the validity, enforceability, priority, or

extent of any stipulated debt or security interests thereunder.  On December 8, 2015, the Bankruptcy Court entered a stipulation and consent order extending the Challenge Period through February 1, 2016.  On February 5, 2016, the Bankruptcy Court entered a second stipulation and consent order (the "Second Challenge Period Order") further extending the Challenge Period through and including February 15, 2016.  The Second Challenge Period Order further provided that, if on or before February 15, 2016, the Creditors' Committee (a) provided notice of its intent to pursue claims subject to the Challenge Period and (b) identified such claims and the assets to which they pertain with reasonable specificity, the Challenge Period would be further extended through March 1, 2016 solely for the purpose of permitting the Creditors' Committee to file appropriate papers to commence proceedings with respect to such claims.  On February 15, 2016, the Creditors' Committee filed the *Notice of the Official Committee of Unsecured Creditors' Intention to Pursue Claims* consistent with the terms of the Second Challenge Period Order. On March 1, 2016, the Creditors' Committee filed a motion seeking (a) standing to pursue claims related to the Challenge Period on behalf of the Debtors' estates, (b) a further extension of the Challenge Period pending adjudication of the motion and (c) confirmation that certain additional claims are not subject to the Challenge Period.

**F.      The Schedules and Statements**

Consistent with certain of the first-day relief that the Bankruptcy Court granted the Debtors, on October 2, 2015, the Debtors filed their Schedules and Statements in each of the Chapter 11 Cases. On February 11, 2016, the Debtors filed certain amendments to the Schedules.

**G.      Claims Process and Bar Date**

By an order entered on December 22, 2015 (the "Bar Date Order"), the Bankruptcy Court established the general deadline (the "General Bar Date") and certain other deadlines (collectively with the General Bar Date, the "Bar Dates") and other procedures for filing a proof of claim or request for administrative expenses in the Chapter 11 Cases, as follows:

- all entities (including governmental units) that assert a claim against a Debtor that arose or is deemed to have arisen prior to the Petition Date must file a proof of claim on or before the General Bar Date, which was 5:00 p.m., Eastern Time, on February 19, 2016;

- any entity asserting claims arising from or relating to the rejection of executory contracts or unexpired leases in the applicable Debtor's chapter 11 case, or claims otherwise related to such rejected agreements, are required to file proofs of claim by the later of:  (a) the General Bar Date; and (b) 5:00 p.m., Eastern Time, on the date that is 30 days after the entry of a Court order authorizing such rejection or the deemed rejection date; and

- if a Debtor amends or supplements its Schedules to:  (a) reduce the undisputed, noncontingent and liquidated amount of a claim; (b) change the nature or classification of a claim against the Debtor in a manner adverse to the scheduled creditor; or (c) add a new claim to the Schedules with respect to a party that was not previously served with notice of the Bar Dates (in each case, a "Modified Claim"), the affected claimant may file a proof of claim in respect of the Modified Claim, or amend any previously filed proof of claim to add the Modified Claim, by the later of:  (x) the General Bar Date; and (y) 5:00 p.m., Eastern Time, on the date that is 30 days after the date that notice of the Modified Claim is served on the claimant.

The Debtors provided notice of the Bar Dates as required by the Bar Date Order, including through publication in the national edition of *USA Today* on December 30, 2015.  In addition, packages ("Bar Date Packages") including notice of the Bar Dates and one or more proof of claim forms, as approved by the Court, have been mailed to all known potential claimants, including all entities listed in the Schedules as potentially holding claims.  Further, the Debtors mailed Bar Date Packages to, among others, (a) the U.S. Trustee, (b) counsel to the official committees appointed in the Chapter 11 Cases, (c) the UMWA, (d) all federal and state environmental protection agencies for the jurisdictions in which the Debtors held property or conducted business as of the Petition Date, (e) all parties that had requested notice of the proceedings in the Chapter 11 Cases as of the date of entry of the

Bar Date Order and (f) all parties that had filed proofs of claim in the Chapter 11 Cases as of the date of entry of the Bar Date Order.

As of the date of filing of this Disclosure Statement, the Debtors estimate that approximately 10,350 proofs of claim have been filed in the Chapter 11 Cases to date, asserting liquidated liabilities in the total amount of approximately $14.1 billion.  The Debtors have not yet objected to any proofs of claim.

**H.      Bonding Settlements**

The DIP Order provides for the Bonding Accommodation for governmental authorities that make any demand, request or requirement for any surety bond, letter of credit or other financial assurance pursuant to applicable law, to the extent such surety bond, letter of credit or other financial assurance is to satisfy or replace an amount for which a Debtor is self-bonded (any such demand, request or requirement, a "Bonding Request"). Pursuant to the Bonding Accommodation, the Debtors are authorized to provide financial assurance to such governmental authorities, in an aggregate stated amount of up to the Bonding Accommodation Cap, in the form of (or any combination of):  (a) collateralized letters of credit (a "Bonding Letter of Credit"); or (b) a claim (a "Bonding Superpriority Claim") against the Term Facility Collateral, as defined in the Interim DIP Order, having priority over any or all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code.

**1.      The Wyoming Bonding Request**

On October 8, 2015, the Bankruptcy Court entered a stipulation and order resolving the Bonding Request issued by the WDEQ described in Section II.C.5 above regarding the Debtors' $411 million reclamation bonding obligations relating to surface mining operations in Wyoming by, among other things, granting the WDEQ a Bonding Superpriority Claim in the amount of $61 million against the Debtors' estates to secure the Debtors' reclamation obligations in Wyoming during the pendency of the Chapter 11 Cases.

**2.      The West Virginia Bonding Request**

By a letter dated September 1, 2015, the WVDEP issued a Bonding Request requiring the Debtors to replace self-bonds in the amount of approximately $244 million.  Following extensive negotiations among the parties, on December 22, 2015, the Bankruptcy Court entered an order approving a resolution of the WVDEP's Bonding Request.  Pursuant to the terms of the resolution, which is embodied in a consent order issued by the WVDEP, the Bankruptcy Court granted the WVDEP, among other things, a Bonding Superpriority Claim in the amount of $24 million, in addition to a Bonding Letter of Credit in the amount of $15 million, to support the performance of the Debtors' reclamation obligations in West Virginia, thereby utilizing the remaining $39 million of availability under the Bonding Accommodation.  On January 4, 2016, certain environmental parties, including the Sierra Club, the West Virginia Highlands Conservancy and the Ohio Valley Environmental Coalition, filed a notice of appeal of the Bankruptcy Court's order approving the WVDEP's consent order.  On February 4, 2016, the appeal was dismissed by agreement of the parties.

**I.      Key Employee Motions**

**1.      Motion to Continue Retention Programs for Non-Insider Key Employees**

On August 28, 2015, the Debtors filed a motion (the "KERP Motion") seeking confirmation of their authority to continue in the ordinary course of business their prepetition retention programs with respect to approximately 143 key employees other than the eight senior managers who are members of the Debtors' management committee (collectively, the "Executive Insiders").  Following negotiations with the U.S. Trustee and the Creditors' Committee, among other parties, the Debtors agreed to exclude a further nine key employees that were potential insiders (collectively, the "Non-Executive Insiders") from the KERP Motion.  By an order entered on October 8, 2015, the Bankruptcy Court granted the relief requested in the KERP Motion with respect to the remaining 134 key employees.

### 2. Motion to Approve Payment of the 2015 Annual Incentive Bonus to Certain Insiders and the Key Employee Incentive Plan for 2016

Among other relief granted in the first-day Employee Order, the Bankruptcy Court authorized the Debtors to continue making payments under their annual incentive bonus program (the "AIB") except with respect to the Executive Insiders. As set forth above, the Executive Insiders together with the Non-Executive Insiders also were excluded from the relief granted by the Bankruptcy Court with respect to the KERP Motion. To provide an incentive for these most critical employees to achieve the highest levels of performance during the Chapter 11 Cases, the Debtors filed a motion (the "KEIP Motion") requesting that the Bankruptcy Court authorize them to (a) make payments to the Executive Insiders under the AIB for 2015 and (b) approve a key employee incentive plan (the "KEIP") for the Executive Insiders and Non-Executive Insiders for 2016. Following extensive negotiations, the Creditors' Committee and the Retiree Committee agreed not to object to the proposed KEIP on the condition that the Debtors make certain revisions to the program. Although no party opposed payment of the 2015 AIB, the UMWA and the UMWA Health & Retirement Funds (the "UMWA Funds") objected to the relief requested in the KEIP Motion with respect to the 2016 KEIP. Following discovery and a hearing on the merits, the Bankruptcy Court entered an order authorizing the AIB payments and approving the KEIP on January 27, 2016. The UMWA Funds and the UMWA have filed notices of appeal of the Bankruptcy Court's order.

## J. Sale Motions

### 1. Motion to Approve Miscellaneous Asset Sale Procedures

On September 1, 2015, the Debtors filed a motion seeking to implement procedures (the "Miscellaneous Asset Sale Procedures") by which the Debtors could, in their discretion, sell or abandon certain non-core miscellaneous real or personal property that is no longer needed in the Debtors' ongoing business activities and, in most cases, is of relatively *de minimis* value compared to the Debtors' total assets, without need for further Court approval. The Miscellaneous Asset Sale Procedures permitted the Debtors to streamline the disposition of such assets and avoid the administrative burden and cost of seeking approval of every such transaction. By an order entered on September 17, 2015, the Court approved the Miscellaneous Asset Sale Procedures, with certain adjustments and modifications proposed by the Debtors to accommodate the concerns of parties in interest.

### 2. Motion to Approve Rice Shares Sale Procedures

Prior to the Petition Date, during the first quarter of 2014, Debtor Foundation PA Coal Company, LLC ("Foundation Coal") agreed to transfer its 50% interest in an affiliated entity, Alpha Shale JV, to a non-Debtor entity, Rice Energy, in exchange for over 9.5 million shares of Rice Energy common stock (collectively, the "Rice Shares") and $100 million in cash consideration. As a result of that transaction, Foundation Coal owned a significant amount of Rice Shares as of the Petition Date. In order to monetize the Rice Shares over time and in its discretion, Foundation Coal sought, by a motion filed on December 3, 2015, to establish procedures by which it may sell the Rice Shares in open market transactions without the need for further Court approval. Foundation Coal also sought authorization to pay any related stockbroker commissions and/or fees. By an order entered on December 22, 2015, the Court approved such procedures as modified by the Debtors to accommodate the concerns of parties in interest.

### 3. Motion to Approve Sales of Non-Core Mining Property

By a motion filed on October 22, 2015, the Debtors sought the entry of an order establishing procedures governing: (a) the bidding on, and sale of, certain of the Debtors' non-core mining properties, assets and related infrastructure (collectively, the "Non-Core Assets"); and (b) the assumption and assignment of executory contracts and unexpired leases in connection with sales of Non-Core Assets. In addition, the Debtors moved the Court to schedule certain auctions and final sale hearings in connection with any potential sales. On November 6, 2015, the Court entered an order (the "Non-Core Asset Bidding Procedures Order") establishing the requested bidding and sale procedures, with certain adjustments and modifications to accommodate the concerns of parties in interest, and establishing an auction date, if necessary.

The Debtors solicited expressions of interest pursuant to the Non-Core Asset Bidding Procedures Order by contacting approximately 139 potentially interested parties.  In response, 57 such parties executed non-disclosure agreements in connection with the proposed sales, and the Debtors received indications of interest from 27 such parties.  Although the Debtors received 5 bids for certain of the Non-Core Assets, the Debtors have not qualified any bidders pursuant to the terms of the Non-Core Asset Bidding Procedures Order.  The Debtors therefore adjourned the originally scheduled hearing regarding approval of Non-Core Asset sales.  The Debtors continue to negotiate the sale of certain Non-Core Assets with interested parties in accordance with the Non-Core Asset Bidding Procedures Order.

### 4.    Motion to Approve Sales of Core Mining Property

On February 8, 2016, the Debtors filed a motion (the "Core Asset Sales Motion") seeking an order: (a) establishing procedures relating to the bidding for, and potential sale of, certain key mining properties, assets and related infrastructure (collectively, the "Core Assets"); (b) approving a credit bid of the Debtors' First Lien Lenders (the "Stalking Horse Bid") for certain designated assets (collectively, the "Reserve Price Assets"), as more fully described in Section IV.F; (c) scheduling auctions and final sale hearings, as necessary; and (d) establishing procedures for the assumption and potential assignment of executory contracts and unexpired leases in connection with any sale of Core Assets.  A hearing on the bidding and sale procedures is currently scheduled for March 10, 2016.

In addition to the bidding and sale procedures, the Core Asset Sales Motion also sought approval of two settlements among the Debtors and the First Lien Lenders in connection with any orders approving the sale of Core Assets:  (a) the Unencumbered Asset Settlement (as defined in Section IV.G) establishing which of the Debtors' assets are deemed to have been unperfected or unencumbered as of the Petition Date with respect to the First Lien Credit Agreement; and (b) the Diminution Claim Allowance Settlement (as defined in Section IV.G) establishing the methodology for calculating the First Lien Lenders' claim for the diminution of the value of their interests in collateral relating to the First Lien Credit Agreement.  Finally, as further described in Sections III.E.3, IV.C and IV.D, the Core Asset Sales Motion seeks approval of Amendment No. 5 to the First Out DIP Credit Agreement to establish the revised case milestones set forth therein that govern the chapter 11 plan process.

## K.    Retiree Benefit Motion

The Debtors historically have provided certain of their non-union retirees (collectively, the "Non-Union Retirees") with various unvested, non-pension welfare benefits (e.g., hospital, medical, prescription, surgical and life insurance) (collectively, the "Non-Pension Retiree Benefits").  Payments made to or on behalf of Non-Union Retirees cost the Debtors approximately $2.9 million in 2015, and future expected payments represent an approximately $87.2 million liability on the Debtors' balance sheets.  Thus, given the Debtors' financial condition and their duty to maximize the value of their chapter 11 estates for the benefit of all stakeholders, the Debtors determined to terminate such Non-Pension Retiree Benefits consistent with applicable law (including the Employee Retirement Income Security Act of 1974).  Accordingly, on November 2, 2015, the Debtors filed a motion (the "Retiree Benefit Motion") seeking authorization to terminate such unvested, non-union Non-Pension Retiree Benefits effective as of December 31, 2015.  All of the benefit plans affected by the Retiree Benefit Motion expressly reserve the Debtors' unilateral right to modify or terminate the plans and/or benefits at any time.  As such, under applicable contract and non-bankruptcy law, the Non-Pension Retiree Benefits are not vested, and such plans and/or benefits can be terminated by the Debtors in their business judgment.  The Retiree Benefit Motion remains pending, and the hearing on the Retiree Benefit Motion has been continued to April 12, 2016.

## L.    Further Motions and Related Events in the Chapter 11 Cases

### 1.    Motion to Extend the Exclusive Filing and Solicitation Periods

Pursuant to section 1121(b) of the Bankruptcy Code, a debtor has the exclusive right to file a chapter 11 plan during the first 120 days following the commencement of a chapter 11 case (the "Exclusive Filing Period"). Section 1121(c)(3) of the Bankruptcy Code, in turn, provides a debtor with a total of 180 days from the commencement of the case to solicit acceptances of any chapter 11 plan filed during such 120-day period (the "Exclusive Solicitation Period").  These periods may be extended for "cause" up to a date that is 18 months after

the Petition Date.  On November 3, 2015, the Debtors filed a motion seeking an extension of (a) the Exclusive Filing Period by 120 days, through and including March 30, 2016; and (b) the Exclusive Solicitation Period through and including May 30, 2016, or 61 days after the expiration of the Exclusive Filing Period.  The Court granted the requested relief by an order entered on November 24, 2015.

### 2.    Motion to Extend the Removal Period

Section 1452 of title 28 of the United States Code permits parties, under certain circumstances, to remove claims or causes of action in most civil actions to the district court for the district where such civil action is pending. Bankruptcy Rule 9027, however, establishes a deadline for filing notices of removal of claims or causes of action. By a motion filed on October 16, 2015, the Debtors sought to extend the deadline for the filing of removal notices from November 1, 2015 to the later of (a) April 29, 2016 or (b) 30 days after the entry of an order terminating the automatic stay with respect to any particular civil action sought to be removed.  Further, the Debtors requested that this relief be granted without prejudice to the Debtors' right to seek further extensions.  The Court granted such relief by an order entered on November 6, 2015.

### 3.    Motion to Dismiss the Chapter 11 Case of Gray Hawk Insurance Company

On September 18, 2015, the Debtors filed a motion seeking the withdrawal of the chapter 11 petition and dismissal of the chapter 11 case of Gray Hawk Insurance Company ("Gray Hawk"), effective as the Petition Date, because Gray Hawk is a captive insurance company organized pursuant to the laws of the Commonwealth of Kentucky and, therefore, is not eligible for chapter 11 relief pursuant to section 109(d) of the Bankruptcy Code. The Court entered the requested order on October 8, 2015.

### 4.    Motion to Extend the Deadline to Assume or
### Reject Non-Residential Real Property Leases

Pursuant to section 365(d)(4) of the Bankruptcy Code, the Debtors were required to assume or reject any unexpired non-residential real property leases or subleases within 120 days of the Petition Date, unless such period were extended for up to an additional 90 days by order of the Court for cause, or longer by consent of the counterparties to the applicable leases, or else any such lease is deemed rejected.  By a motion filed on November 3, 2015, the Debtors requested:  (a) an extension of 120-day deadline from December 1, 2015 to and including February 29, 2016; and (b) certain related relief.  The Court granted the requested relief by an order entered on November 24, 2015.

### 5.    Omnibus Motions for Assumption or Rejection
### of Executory Contracts and Unexpired Leases

Pursuant to section 365(a) of the Bankruptcy Code, a debtor, subject to the court's approval, may assume or reject any executory contract or unexpired lease.  The Debtors filed omnibus motions on August 18, 2015, November 3, 2015 and January 7, 2016 seeking orders authorizing the rejection of certain executory contracts and unexpired leases effective as of certain identified dates.  Orders granting such relief were entered by the Court on September 3, 2015, November 24, 2015 and February 2, 2016, respectively.  The Debtors sought to reject such executory contracts and unexpired leases, as applicable, because they had determined, in their business judgment, that the agreements were not necessary to their ongoing business operations and could not be assumed and assigned in an economically beneficial manner.  In addition, on February 29, 2016, the Debtors filed a motion seeking an order authorizing the assumption or rejection, as applicable, of certain unexpired leases of non-residential real property.  This motion currently is scheduled for hearing on April 12, 2016.

# IV.

## POSTPETITION PLAN NEGOTIATIONS AND RESTRUCTURING INITIATIVES

### A.    The Debtors' Financial and Operational Performance Following the Petition Date

The financial headwinds facing the Debtors as of the Petition Date worsened as conditions in the Debtors' industry continued to deteriorate during the postpetition period.  According to the United States Energy Information Administration (the "EIA"), coal production in the United States during the second half of 2015 was 439 million short tons, which represented a 14% reduction, year-on-year, from the same period in 2014 (and a 12% decrease from 2013).  In the aggregate, coal production in the United States during 2015 fell to approximately 890 million short tons, its lowest level since 1985.

The dramatic decline in coal production following the Petition Date was mirrored by a corresponding decrease in coal exports resulting from slower growth in world coal demand and lower international coal prices.  Total coal exports of 16.9 million short tons for third quarter 2015 represented a 14.4% decrease from second quarter 2015 and a 25.6% decrease year-on-year.  The majority of this decline is attributable to decreased export demand for met coal – an important segment of the Debtors' businesses.  In third quarter 2015, steam coal exports totaled 6.6 million short tons, or 6.2% less than second quarter 2015, while met coal exports totaled 10.3 million short tons – a 19.0% decrease from second quarter 2015.  The current global coal market trends are expected to continue as a result of lower mining costs, cheaper transportation costs and favorable exchange rates that provide an advantage to mines in other major coal-exporting countries, and the EIA forecasts coal exports to decline by an additional eight  million short tons (11%) in 2016, and by an additional 2 million short tons (3%) in 2017.

Lower production in the United States did not give rise to any stabilization in coal pricing.  After a slight seasonal rise in prices during the early fall of 2015, coal prices fell below their levels as of the Petition Date and have continued their downward trend.  According to the EIA, as of January 31, 2016, coal prices in Central Appalachia, Northern Appalachia and Wyoming's Powder River Basin had fallen to 84.2%, 92.6% and 95% of their levels immediately prior to the Petition Date.

The challenges facing the coal industry in general have been reflected in the Debtors' financial performance following the Petition Date.  As more fully described in the monthly operating reports filed by the Debtors in the Chapter 11 Cases, the Debtors sustained losses from operations in excess of $228 million from the Petition Date through December 31, 2015 with revenues of $1.14 billion and expenses of $1.37 billion.  Following a short uptick during the months of August and September 2015, the Debtors' cash disbursements have consistently exceeded their receipts, yielding a net decrease in cash and cash equivalents from October 1, 2015 through December 31, 2015 of approximately $249 million.

Since the Petition Date, the Debtors have closed, idled or converted to contract mining status a total of ten mines since the Petition Date, including (a) the Emerald mine in Pennsylvania, (b) two Paramont and one Knox Creek deep mines in Virginia and (c) three Elk Run mines, two Edwight mines and the BRM North mine in West Virginia.  In addition to the outright discontinuation of mining operations at these locations, the Debtors have decreased mining activities or closed portions of various other mines.

Decreased demand, lower prices and the resulting slowdown in operations, including mine idling and closures, has caused substantial attrition to the Debtors' workforce since the Petition Date.  As a result of these factors, in part, the Debtors were compelled to lay off approximately 1,250 employees between the Petition Date and January 31, 2016, in addition to the more than 440 employees who departed voluntarily over the same period.  Among the involuntary terminations were approximately 985 hourly employees and 266 salaried employees.

### B.    The Initial Business Plan and the Case Milestones

Prior to the outset of the Chapter 11 Cases, the Debtors recognized that they would need to develop and refine a long-term business plan (the "Business Plan") and related strategies to maximize value to stakeholders in light of the unprecedented market challenges that had led (and continue to lead) to numerous bankruptcies

throughout the coal industry.  To that end, beginning in July 2015, the Debtors conducted an in-depth analysis of their industry and operations, with the assistance of McKinsey and the Debtors' other professional advisors, to establish a framework upon which the Business Plan could be based.

McKinsey's top-down, bottom-up operational analysis consisted of three principal work streams.  At a macro level, McKinsey investigated trends in pricing, demand and supply of the varieties of coal produced by the Debtors and thereby developed an outlook regarding projected external influences on the Debtors' businesses. Simultaneously, McKinsey embedded a team of professionals at three representative mine sites where they conducted a granular analysis of the Debtors' operations and developed a comprehensive schedule of potential cost savings.  The third concurrent work stream involved a forensic analysis of the Debtors' financial records and extensive interviews with the Debtors' management to determine, on an individual mine-complex level, potential cost savings relating to selling, general and administrative expenses and other external expenses.  All of the cost-saving measures identified by McKinsey and the Debtors were assigned statuses from Level 1 ("Identified") through Level 5 ("Realized") and incorporated into a cost-saving plan, known originally as the "Value Enhancement Plan."

The result of these efforts was the original Business Plan – a nearly 100-page document that comprehensively addressed every aspect of the Debtors' operations.  The development of the Business Plan served as a building block for additional restructuring activities and accomplished much of the foundational work required to move the Chapter 11 Cases forward.  Throughout this development period, the Debtors communicated regularly with key stakeholder groups to discuss the major activities in these cases, the status of the Debtors' operations and the development of the Business Plan.

The First Out DIP Credit Agreement originally provided that the Debtors would deliver an agreed form of five-year Business Plan to the DIP Lenders by no later than October 30, 2015 (the "Business Plan Milestone"), which deadline the Debtors believed would offer them sufficient time to finalize the Business Plan.  The First Out DIP Credit Agreement contemplated that the agreed Business Plan would include, among other things:  (a) a determination of any significant assets of the Debtors to be sold, assigned, abandoned and otherwise disposed of in connection with the Debtors' restructuring; (b) a determination of the assumption, rejection and/or assignment of significant executory contracts and leases; (c) an assessment of the financial impact of mines with respect to which management will cease operations (or otherwise dispose of); and (d) preliminary assumptions with respect to collective bargaining agreements and retiree benefits.

In addition to the Business Plan Milestone, the First Out DIP Credit Agreement established a broader framework for the Debtors to achieve various other key steps toward completing a successful restructuring of their businesses.  In particular, the First Out DIP Credit Agreement required that, among other things:  (a) by November 30, 2015, the Debtors would deliver to the DIP Agents and the DIP Lenders a plan and timeline to market asset sales, assignments, closings and abandonments contemplated by the agreed Business Plan; (b) by December 16, 2015, the Debtors would update the agreed Business Plan and incorporate assumptions with respect to collective bargaining agreements and retiree benefits; (c) by January 5, 2016, the Debtors would deliver proposals to authorized union and retiree representatives; (d) by March 5, 2016, the Debtors would reach agreement with such authorized union and retiree representatives or else file appropriate motions for relief under sections 1113 or 1114 of the Bankruptcy Code, as applicable; (e) by May 25, 2016, the Debtors would file a chapter 11 plan; and (f) within 90 days of such filing, the Debtors would obtain an order of the Bankruptcy Court confirming the Debtors' chapter 11 plan.

## C.    The Revised Business Plan and Modified Case Milestones

The framework originally established by the First Out DIP Credit Agreement proved to be unworkable as a result of rapidly changing conditions in the Debtors' industry as they neared the Business Plan Milestone. As described above, although coal markets enjoyed a minor and short-lived rally immediately following the Petition Date, they quickly deteriorated to unanticipated levels.  With the Business Plan Milestone approaching (together with other intervening deadlines for the Debtors to share initial drafts of the Business Plan with the DIP Agents and the Creditors' Committee), it became apparent to the Debtors that the shifting condition of the Debtors' industry required them to revisit many of the assumptions and strategies upon which the Business Plan had been developed. In particular, the Debtors determined that it was necessary for them:  (a) to selectively identify those Core Assets

that could be self-sustaining under present worsened market conditions; (b) to prepare to restructure their ongoing operations around these identified Core Assets; and (c) to develop a process to separate the viable Core Assets from the Debtors' other assets that may not be profitable in the medium term or with respect to which the accompanying obligations may impair the Debtors' ongoing operations.  To this end, the Debtors engaged in an extensive second-level review of each of their mine complexes to determine (a) whether the applicable operation should be considered to consist of Core Assets and (b) any further strategies that may be available to reduce their cash consumption at each location.

The Debtors and the DIP Lenders recognized that the Debtors required additional time to modify the Business Plan and the Debtors' restructuring strategy in light of worsening conditions in their industry.  Nevertheless, the Debtors also concluded that the increasingly challenging market conditions and their ongoing cash losses required them to accelerate their efforts to complete the Chapter 11 Cases.  They determined, therefore, to move forward with concurrent processes for the sale of their core assets and confirmation of a chapter 11 plan to promote a prompt and successful conclusion to the Chapter 11 Cases and to maximize the value of the Debtors' estates for all stakeholders.

**D.      The Extension Agreement**

The amendments to the DIP Credit Agreements approved pursuant to the First DIP Amendment Order, provided for certain modifications to the case milestones, including that, by January 22, 2016 (the "PSA DIP Milestone"), the Debtors would enter into a plan structure agreement based upon an agreed Business Plan (the "Plan Structure Agreement").  On January 22, 2016, the Debtors and the First Out DIP Lenders entered into an agreement (the "Extension Agreement") extending the deadline for the Debtors to satisfy the PSA DIP Milestone on condition: (a) by February 8, 2016, the Debtors would file a motion seeking to establish the revised case milestones provided for under the Plan Structure Agreement; (b) by February 21, 2016, the Debtors would file the Plan and the Disclosure Statement; (c) by February 25, 2016, the Bankruptcy Court would have approved of the revised case milestones set forth in the Core Asset Sales Motion; and (d) the Debtors would not otherwise be in breach of any of the terms of the Extension Agreement or the First Out DIP Credit Agreement.

The Debtors filed the Core Asset Sales Motion on February 8, 2016, thereby satisfying the first condition under the Extension Agreement.  As set forth in Section III.E.3.e above, the Core Asset Sales Motion seeks approval of Amendment No. 5 to the First Out DIP Credit Agreement, which provides for the following revised case milestones that are set forth in the Plan Structure Agreement:  (a) the filing of the Plan by February 21, 2016; (b) the filing by March 7, 2016 of a motion to approve this Disclosure Statement and the procedures for solicitation of votes on the Plan; (c) the filing by March 21, 2016 of any motions with respect to sections 1113 or 1114 of the Bankruptcy Code; (d) the occurrence of a final sale hearing with respect to the Core Asset Sales Motion by April 12, 2016; (e) the entry of any orders with respect to such motions by May 10, 2016; and (f) the occurrence of the effective date of the Plan, as it may be modified, supplemented or amended, by June 30, 2016.

The Debtors and the First Out DIP Lenders entered into two amendments to the Extension Agreement. The first such amendment extended (a) the deadline for the Debtors to file the Plan and Disclosure Statement until February 29, 2016 and (b) until March 7, 2016, the deadline for the Debtors to obtain approval from the Bankruptcy Court of the revised case milestones agreed to under the Plan Structure Agreement.  The second amendment to the Extension Agreement extended (a) until March 7, 2016, the deadline for the Debtors to file the Plan and Disclosure Statement and (b) until March 14, 2016, the deadline for the Debtors to obtain approval from the Bankruptcy Court of the revised case milestones agreed to under the Plan Structure Agreement.

**E.      The Plan Structure Agreement**

The Plan Structure Agreement is a document that was negotiated and agreed to among the Debtors, the DIP Lenders and the First Lien Lenders to map a path toward a confirmed plan of reorganization.  The Plan Structure Agreement contemplated a series of transactions:  (a) to effectuate a sale of certain of the Debtors' assets to a bidder or group of bidders submitting the highest or otherwise best bid(s) for such assets; and (b) through the chapter 11 plan process, to reorganize the Debtors as a stand-alone entity to operate and reclaim, as necessary, any of the Debtors' assets that are not sold to third parties.  Copies of the Plan Structure Agreement were shared with the Creditors' Committee and the Retiree Committee.

With respect to asset sales, the Plan Structure Agreement provided that (a) the Debtors would commence a sale process for substantially all of the Debtors' remaining assets by February 8, 2016 and (b) the First Lien Lenders would submit a stalking horse credit bid for the Reserve Price Assets.  The Plan Structure Agreement further established the waterfall payment structure set forth in the Plan with respect to the Debtors' encumbered and unencumbered assets, as determined pursuant to the Unencumbered Asset Settlement (as defined below).

F.    **The Stalking Horse Bid**

Among other relief requested in the Core Asset Sales Motion, the Debtors requested that the Bankruptcy Court establish the Stalking Horse Bid of the First Lien Lenders as the lead bid for the Reserve Price Assets, which bid was a central provision of the Plan Structure Agreement, as described above, and critical to the Debtors' restructuring efforts.

The Reserve Price Assets are comprised of:  (a) all assets (including, but not limited to, all mineral rights, fixed and mobile equipment and logistics assets) used or held for use primarily in connection with (i) the Alpha Coal West mine complexes in Wyoming, (ii) the business of Debtor PLR, the Debtors' natural gas business in the Marcellus Shale in southwestern Pennsylvania and (iii) the McClure, Nicholas and Toms Creek mine complexes in West Virginia and Virginia; (b) all coal operations and reserves located in Pennsylvania, including the Cumberland mine complex, the Emerald mine complex, the Freeport reserves, the Sewickley reserves and all assets used or held for use primarily in connection therewith, including all logistics-related assets; (c) the Debtors' interest in Dominion Terminal Associates, a coal export terminal in Newport News, Virginia in which the Debtors own a 41% interest; and (d) certain other designated assets, including certain working capital.  The Reserve Price Assets are encumbered by liens supporting the amounts owed to the First Lien Lenders, including the Prepetition Senior Liens and the Adequate Protection Liens.

The First Lien Lenders agreed to provide the Stalking Horse Bid (through a separate legal entity to serve as purchaser) in the amount of $500 million as a credit bid, plus the assumption of related liabilities, to provide a floor value for the Reserve Price Assets.  Notably, the Stalking Horse Bid does not include any bid protections (such as break-up fees or expense reimbursement) for the benefit of the First Lien Lenders, and therefore merely sets a floor to begin a bidding process on a level playing field at no cost to the Debtors' estates.  The bidding procedures that the Debtors presented to the Bankruptcy Court for approval in the Core Asset Sales Motion will provide an appropriate market test for the Reserve Price Assets, as well as various other assets not included in the Stalking Horse Bid, which also may be sold if appropriate value can be achieved.  Any proceeds of assets sold, any assets that are not sold and any other value that may be contributed by the DIP Lenders or the First Lien Lenders will form the basis for the funding of the Reorganized Debtors under the Plan, thereby maximizing recoveries for the Debtors' creditors.

G.    **The Sale Motion Settlements**

The Plan Structure Agreement also contemplated the settlement of two unresolved matters:  (a) a settlement regarding which of the Debtors' assets were deemed to have been unencumbered by liens of the First Lien Lenders as of the Petition Date, or with respect to which any such interest was unperfected (the "Unencumbered Asset Settlement"); and (b) a settlement regarding the methodology for calculating the First Lien Lenders' claim (the "Diminution Claim") for the diminution of the value of their interests in the Prepetition Collateral (the "Diminution Claim Allowance Settlement" and, together with the Unencumbered Asset Settlement, the "Sale Motion Settlements").  The Sale Motion Settlements will effect the resolution of issues that must be addressed prior to confirmation of the Plan.  As such, pursuant to the Core Asset Sales Motion, the Debtors sought to have the Sale Motion Settlements approved either incident to the sale of some or all of the Reserve Price Assets to the First Lien Lenders or by a separate order of the Bankruptcy Court.  In either case, the Sale Motion Settlements are incorporated into this Disclosure Statement and the Plan.

1.    **The Unencumbered Assets Settlement**

Pursuant to the Unencumbered Assets Settlement, the parties reached agreement on which assets shall be deemed not to be encumbered by the Prepetition Senior Liens (collectively, the "Unencumbered Assets"). The Unencumbered Assets include (a) the assets of PLR, (b) the Rice Energy Shares (and the proceeds of any such shares that are sold), (c) certain of the Debtors' accounts receivable, (d) cash in certain bank and investment accounts

and (e) certain real property and leasehold interests.  A summary of the Unencumbered Assets, as agreed by the Debtors and the First Lien Lenders, is attached as Exhibit G to the Core Asset Sales Motion.  The Debtors and the First Lien Lenders agreed that all assets as of the Petition Date not identified as Unencumbered Assets (collectively, the "Encumbered Assets") were and are encumbered by the Prepetition Senior Liens.  Subject to approval of the Unencumbered Asset Settlement, therefore, the First Lien Lenders would be permitted to credit bid their claims under the First Lien Credit Agreement to purchase the Encumbered Assets.

The Unencumbered Asset Settlement was based on, and consistent with, a detailed analysis performed by the Debtors of the First Lien Lenders' security interests.  The Debtors began with a review of the applicable credit documents to determine which assets were included or excluded from the security interests granted to the First Lien Lenders.  Assets not subject to a security interest included "Excluded Assets" as defined in the First Lien Credit Agreement.  Excluded Assets include, in particular, "Gas Properties" (such as PLR, the shares of Rice Energy and the proceeds thereof), certain equity interests and certain accounts receivable.

The Debtors also examined the perfection of the First Lien Lenders' potential interests in any collateral. The Debtors, for example, reviewed available UCC financing statements with respect to the such collateral and evaluated their various cash accounts as of the Petition Date to determine if such accounts were properly perfected by control agreements or if such accounts (such as securities accounts) could be and were perfected through proper UCC financing statements.

The Debtors also performed an analysis of mortgaged real property interests.  This resulted in identifying a list of unmortgaged – and therefore unperfected – owned real property interests as of the Petition Date.  Similarly, the Debtors identified unmortgaged leases and reviewed all of their material mortgaged leases to determine whether these leases permitted the attachment of liens and, if not, whether the appropriate lessor consents were obtained. This analysis identified a number of unencumbered real property leases, as identified in Exhibit G.  The Debtors also evaluated unique perfection issues for certain other assets to identify other Unencumbered Assets.  All of the information supporting the Debtors' evaluation was shared with the Creditors' Committee to assist in its review of perfection issues.

Upon completing their analysis, the Debtors communicated their conclusions to the First Lien Lenders, and initiated a discussion of the issues in connection with the negotiation of the Plan Structure Agreement.  The First Lien Lenders expressed a view that additional assets were encumbered and subject to their Prepetition Senior Liens, particularly since additional cash and other assets could be traced to their collateral, as proceeds or otherwise. Nevertheless, to avoid a lengthy dispute over these issues and potentially costly forensic accounting and other evaluations, the First Lien Lenders ultimately agreed to accept the Debtors' analysis solely for the purposes of settlement.  The Unencumbered Asset Settlement also is consistent with the stipulations relating to these matters in the DIP Order and the treatment and segregation of potentially unencumbered cash as set forth in the Cash Management Order.

## 2.       The Diminution Claim Allowance Settlement

Because the Stalking Horse Bid seeks to credit bid for certain assets that are unencumbered pursuant to the Unencumbered Assets Settlement, the First Lien Lenders could not use the liens on their existing prepetition debt as consideration for the credit bid.  As set forth in Section III.E.2, above, pursuant to the DIP Order, the First Lien Lenders were granted various forms of adequate protection, including the Adequate Protection Liens over certain liens in the Debtors' assets (including the Unencumbered Assets) for and equal in amount to the aggregate diminution in the value of their respective interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of such collateral, and the priming of their security interests in liens and liens on such collateral.  The DIP Order also grants the First Lien Lenders the right to credit bid the Adequate Protection Liens granted to them up to the amount of their Diminution Claim.  In connection with the Stalking Horse Bid and the Plan Structure Agreement, the Debtors and the First Lien Lenders agreed upon a methodology to be used to establish the amount of the Diminution Claim, solely for settlement purposes, as described in more detail on Exhibit H to the Core Asset Sales Motion.

Following the Petition Date, the Debtors had been operating, and continue to operate, in an historically challenging and worsening coal market.  They had suffered substantial cash losses from operations, estimated at

$228 million through December 31, 2015 and projected to continue for the foreseeable future. The bulk of these cash losses were directly attributable to the First Lien Lenders' cash collateral because the Cash Management Order expressly segregated potentially unencumbered cash for limited uses and provided that encumbered cash would be utilized first. At the same time, given the deterioration of coal markets pushing many of the leading coal companies into bankruptcy, it was reasonable to assume that the Debtors' remaining non-cash assets are not increasing in value at this time. Additionally, by its nature, the use of some assets results in depreciation or other loss of value. Nevertheless, pursuant to the Diminution Claim Allowance Settlement, the Debtors, the First Lien Lenders agreed that the Diminution Claim, for purposes of the sale process and Plan, would be measured solely with reference to the Debtors' cash burn, as more fully described and subject to certain limitations described on Exhibit H to the Core Asset Sales Motion.

**H.      Union CBA Negotiations**

The Debtors' obligations under their collective bargaining agreement with the UMWA (the "CBA") were burdensome when coal markets were strong and are unsustainable in the current climate. Consistent with the requirements of the DIP Order, therefore, on January 5, 2016, the Debtors delivered to the UMWA their proposed modifications to the CBA. These proposed modifications included a total of approximately $63 million in annual cost savings and efficiencies to the Debtors to be achieved predominantly through: (a) the modification of contracting and subcontracting requirements under the CBA; (b) certain wage reductions and shift modifications; (c) the elimination of the Debtors' contributions to various retirement plans, including the 1974 Pension Plan; and (d) certain health and welfare savings. Since delivering their proposal to the UMWA, the Debtors have been involved in intensive negotiations and discovery with the UMWA in an effort to develop sustainable and mutually agreeable modifications to the CBA. Pursuant to the case milestones set forth in the First Out DIP Credit Agreement, as amended, by March 21, 2016, the Debtors are required (a) to reach agreement with the UMWA regarding the proposed modifications to the CBA or (b) to file a motion to reject the CBA pursuant to section 1113 of the Bankruptcy Code.

V.

THE PLAN

**A.      General**

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, BUT IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT B.

Section 1123 of the Bankruptcy Code provides that, except for administrative claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only classify a claim or an equity interest with claims or equity interests, respectively, that are substantially similar.

The Plan creates nine Classes of Claims and two Classes of Interests. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan (as is permitted by section 1123(a)(1) of the Bankruptcy Code) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests. Only holders of Claims that are impaired under the Plan and who will receive Distributions under the Plan are entitled to vote on the Plan.

The following discussion sets forth the classification and treatment of all Claims against, and Interests in, the Debtors.  It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit B, and which you should read carefully before deciding whether to vote to accept or reject the Plan.

**B.    Classification and Treatment of Claims and Interests Under the Plan**

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section II.A of the Plan, are not classified in the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.  Notwithstanding the foregoing, in no event shall any holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such holder's Claim.

If the Plan is confirmed by the Bankruptcy Court, unless a holder of an Allowed Claim consents to different treatment, (a) each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the holder of such Claim voted to accept the Plan and (b) each Allowed Interest in a particular Class will receive the same treatment as the other Allowed Interests in such Class.  Such treatment will be in exchange for and in full satisfaction, release and discharge of, the holder's respective Claims against or Interests in a Debtor, except as otherwise provided in the Plan.  Moreover, upon Confirmation, the Plan will be binding on (a) all holders of Claims regardless of whether such holders voted to accept the Plan and (b) all holders of Interests.  All Distributions on account of the Claims described in Article II of the Plan shall be made from Distribution Cash held by the Reorganized Debtors as of the Effective Date.

**C.    Unclassified Claims**

**1.    Payment of Administrative Claims**

**a.    Administrative Claims in General**

Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim, including each holder of an Allowed State Bonding Carve Out Claim, will receive, in full satisfaction of its Administrative Claim, Distribution Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date or as soon as reasonably practicable thereafter; or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.

**b.    Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to section 1930 of title 28 of the United States Code ("28 U.S.C. § 1930"), as determined by the Bankruptcy Court at the Confirmation Hearing or in the Confirmation Order, will be paid by the Debtors in Distribution Cash equal to the amount of such Administrative Claims.  Any fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

**c.    Ordinary Course Liabilities**

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of Governmental Units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the

Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.F.4 of the Plan and Intercompany Claims that are Administrative Claims, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

> **d.     DIP Claims**

All DIP Claims shall be Allowed Claims.  On or before the Effective Date, unless otherwise agreed by the holder of a DIP Claim and the applicable Debtor or Reorganized Debtor, Allowed DIP Claims will be paid in Distribution Cash in an amount equal to the full amount of those Claims.  Allowed DIP Claims will be satisfied, first, from Unencumbered Assets, according to the following priority:  (a) State Bonding Carve Out Claims; (b) First Out DIP Claims; (c) Second Out DIP Claims; (d) any First Lien Lender Remaining Diminution Claim; (e) Massey Convertible Notes Diminution Claims; (f) Second Lien Noteholder Diminution Claims; and (g) Cross-Collateralization Claims, provided that State Bonding Carve Out Claims shall be satisfied solely from Term Facility Collateral.  To the extent that Unencumbered Assets are insufficient to satisfy all Allowed DIP Claims in full, Allowed DIP Claims will be satisfied from Encumbered Assets, according to the following priority:  (a) State Bonding Carve Out Claims; (b) First Out DIP Claims; (c) Second Out DIP Claims; (d) any First Lien Lender Remaining Diminution Claim; and (e) Second Lien Noteholder Diminution Claims, provided that State Bonding Carve Out Claims shall be satisfied solely from Term Facility Collateral.  For the avoidance of doubt, Massey Convertible Notes Diminution Claims and Cross-Collateralization Claims shall be satisfied solely from Unencumbered Assets, and no Encumbered Assets will be distributed on account of such Claims.

> **e.     Bar Dates for Administrative Claims**

> **i.     General Bar Date Provisions**

Except as otherwise provided in Section II.A.1.e.ii of the Plan or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, ReorgCo Trust or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

> **ii.     Bar Dates for Certain Administrative Claims**

> **A.     Professional Compensation**

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of (a) 90 days after the Effective Date, (b) 30 days after the Filing of the applicable request for payment of the Fee Claim or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

## B.    Ordinary Course Liabilities

Holders of Allowed Administrative Claims arising from liabilities incurred by a Debtor on or after the Petition Date but prior to the Effective Date in the ordinary course of the Debtor's business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of Governmental Units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.F.4 of the Plan and Intercompany Claims that are Administrative Claims, will not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.c of the Plan.  Any Administrative Claims that are filed contrary to Section II.A.1.e.ii.B of the Plan shall be deemed disallowed and expunged, subject to resolution and satisfaction in the ordinary course outside these Chapter 11 Cases.

## C.    DIP Claims

Holders of Allowed Administrative Claims that are DIP Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.d of the Plan.

### iii.    No Modification of Bar Date Order

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## 2.    Payment of Priority Tax Claims

### a.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) Distribution Cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) Distribution Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date.

### b.    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Sections II.A.2.a or I.A.179 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 6, if not subordinated to Class 6 Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee or their respective property (other than as a holder of an Allowed Class 6 Claim).

## D.    Classified Claims and Interests

**1.    Priority Claims (Class 1 Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Claim in Class 1 will receive Distribution Cash equal to the amount of such Allowed Claim, unless the holder of such Priority Claim and the applicable Debtor or Reorganized Debtor, as applicable, agree to a different

treatment.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 1 Claim will be deemed to have accepted the Plan.

  **2.**  **Secured First Lien Lender Claims (Class 2 Claims) are impaired.**  In accordance with the terms of the First Lien Lender Settlement, on the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured First Lien Lender Claim will receive the holder's Pro Rata share of the First Lien Lender Distribution.  All First Lien Lender Claims (including, for the avoidance of doubt, any Deficiency Claims arising under or in connection with the First Lien Credit Agreement), other than Fee Claims, shall be Allowed in an aggregate amount equal to the full amount of such First Lien Lender Claims (including principal, interest, all other amounts due and owing as of the Petition Date and, if applicable, Postpetition Interest), and neither such Claims nor the Distributions thereon shall be subject to reduction, disallowance, subordination, setoff or counterclaim.

  **3.**  **Secured Second Lien Noteholder Claims (Class 3 Claims) are impaired.**  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured Second Lien Noteholder Claim will receive the holder's Pro Rata share of the Second Lien Noteholder Distribution.

  **4.**  **Other Secured Claims (Class 4 Claims) are unimpaired.**  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Claim in Class 4 will receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A, B or C below, at the election of the applicable Debtor.  The applicable Debtor will be deemed to have elected Option B except with respect to (a) any Allowed Secured Claim as to which the applicable Debtor elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which the applicable Debtor will be deemed to have elected Option A.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 4 Claim will be deemed to have accepted the Plan.

    *Option A*:  On the Effective Date, Allowed Claims in Class 4 with respect to which the applicable Debtor elects Option A will receive Distribution Cash equal to the amount of such Allowed Claim.

    *Option B*:  On the Effective Date, Allowed Claims in Class 4 with respect to which the applicable Debtor elects or is deemed to have elected Option B will be Reinstated.

    *Option C*:  On the Effective Date, a holder of an Allowed Claim in Class 4 with respect to which the applicable Debtor elects Option C will be entitled to receive (and the applicable Debtor or Reorganized Debtor shall release and transfer to such holder) the collateral securing such Allowed Claim.

  Notwithstanding either the foregoing or Section I.A.179 of the Plan, the holder of an Allowed Secured Tax Claim in Class 4 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 6, if not subordinated to Class 6 Claims pursuant to an order of the Bankruptcy Court.
The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee, or their respective property (other than as a holder of a Class 6 Claim).

  **5.**  **Convenience Claims (Class 5 Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Convenience Claim will receive Distribution Cash equal to the amount of such Allowed Claims (as reduced, if applicable, pursuant to an election by the holder thereof in accordance with Section I.A.42 of the Plan).  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 5 Claim will be deemed to have accepted the Plan.

6.      **General Unsecured Claims (Class 6 Claims) are impaired.**  On the Effective Date, and on each Distribution Date thereafter, each holder of an Allowed General Unsecured Claim will receive a Pro Rata share of any assets contributed to the General Unsecured Claims Asset Pool.

7.      **Prepetition Intercompany Claims (Class 7 Claims) are impaired.**  Subject to the Restructuring Transactions, on the Effective Date, Prepetition Intercompany Claims in Class 7 that are not eliminated by operation of law or otherwise pursuant to the Restructuring Transactions will be deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of Prepetition Intercompany Claims and not entitled to any Distribution of Plan consideration under the Plan.  Each holder of a Class 7 Claim will be deemed to have accepted the Plan.

8.      **Section 510(b) Securities Claims (Class 8 Claims) are impaired.**  No property will be distributed to or retained by the holders of Section 510(b) Securities Claims in Class 8, and such Claims will be extinguished on the Effective Date.  Holders of Class 8 Claims will not receive any Distribution pursuant to the Plan. Consistent with the language of section 1126(g) of the Bankruptcy Code, each of the holders of Section 510(b) Securities Claims in Class 8 will be deemed to have rejected the Plan.

9.      **Section 510(b) Old Common Stock Claims (Class 9 Claims) are impaired.**  No property will be distributed to or retained by the holders of Section 510(b) Old Common Stock Claims in Class 9, and such Claims will be extinguished on the Effective Date.  Holders of Class 9 Claims will not receive any Distribution pursuant to the Plan.  Consistent with the language of section 1126(g) of the Bankruptcy Code, each of the holders of Section 510(b) Old Common Stock Claims in Class 9 will be deemed to have rejected the Plan.

10.      **Old Common Stock of ANR Interests (Class 10 Interests) are impaired.**  On the Effective Date, the Old Common Stock of ANR and all Interests related thereto will be canceled, and holders of Class 10 Interests will not receive any Distribution pursuant to the Plan.  Consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Class 10 Interest will be deemed to have rejected the Plan.

11.      **Subsidiary Debtor Equity Interests (Class 11 Interests)** are unimpaired.  On the Effective Date, the Subsidiary Debtor Equity Interests will be Reinstated, subject to the Restructuring Transactions.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 11 Claim will be deemed to have accepted the Plan.

E.      **Subordination; Reservation of Rights to Reclassify Claims**

The allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a holder of a Claim to enforce a subordination agreement, or the terms of the Intercreditor Agreements, against any entity other than the Debtors to the same extent that such agreement is enforceable under applicable nonbankruptcy law.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination.

F.      **Special Provisions Regarding the Treatment of
Allowed Secondary Liability Claims; Maximum Recovery**

The classification and treatment of Allowed Claims under the Plan takes into consideration all Allowed Secondary Liability Claims.  On the Effective Date, Allowed Secondary Liability Claims will be treated as follows:

- The Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or

under any Executory Contract or Unexpired Lease that is being assumed by and
assigned to another Debtor will be Reinstated.

- Except as provided in Section II.D.1 of the Plan, holders of Allowed Secondary
  Liability Claims against any Debtor will be entitled to only one Distribution in
  respect of the Liabilities related to such Allowed Secondary Liability Claim and
  will be deemed satisfied in full by the Distributions on account of the related
  underlying Allowed Claim.  Notwithstanding the existence of a Secondary
  Liability Claim, no multiple recovery on account of any Allowed Claim against
  any Debtor will be provided or permitted.

## G.    Confirmation Without Acceptance by All Impaired Classes

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code in the event that any
impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.
The Plan shall constitute a motion for such relief.

## H.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Executory Contracts and Unexpired Leases to Be Assumed

#### a.    Assumption and Assignment Generally

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or
document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in
any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy
Code, the applicable Debtor or Debtors will assume, or assume and assign, as indicated, each Executory Contract or
Unexpired Lease listed on Exhibit II.F.1.a to the Plan; provided, however, that the Debtors and the Reorganized
Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.F.1.a to the Plan to:
(a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to
Section II.F.5 of the Plan; (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its
assumption, or assumption and assignment, pursuant to Section II.F.1.a of the Plan; or (c) modify the amount of any
Cure Amount Claim.  The Debtors reserve the right, at any time until the date that is 30 days after the Effective Date,
to amend Exhibit II.F.1.a to the Plan to identify or change the identity of the Reorganized Debtor or other entity that
will be an assignee of an Executory Contract or Unexpired Lease.  Each contract and lease listed on Exhibit II.F.1.a
to the Plan will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or
Unexpired Lease.  Listing a contract or lease on Exhibit II.F.1.a to the Plan will not constitute an admission by a
Debtor or Reorganized Debtor that such contract or lease (including any related agreements as described in
Section II.F.1.b of the Plan) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor
has any liability thereunder.

#### b.    Assumptions and Assignments of Ancillary Agreements

Each Executory Contract or Unexpired Lease listed on Exhibit II.F.1.a to the Plan will include any
modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any
agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether
such agreement, instrument or other document is listed on Exhibit II.F.1.a to the Plan, unless any such modification,
amendment, supplement, restatement or other agreement is rejected pursuant to Section II.F.5 of the Plan or
designated for rejection in accordance with Section II.F.2 of the Plan.

#### c.    Customer Agreements

To the extent that (a) the Debtors are party to any contract, purchase order or similar agreement providing
for the sale of the Debtors' products or services, (b) any such agreement constitutes an Executory Contract or
Unexpired Lease and (c) such agreement (i) has not been rejected pursuant to a Final Order of the Bankruptcy Court,

(ii) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (iii) is not subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (iv) is not listed on Exhibit II.F.1.a to the Plan, (v) is not listed on Exhibit II.F.5 to the Plan or (vi) has not been designated for rejection in accordance with Section II.F.2 of the Plan, such agreement (including any related agreements as described in Section II.F.1.b of the Plan), purchase order or similar agreement will be assumed by the Debtors and assigned to the Reorganized Debtor that will be the owner of the business that performs the obligations to the customer under such agreement, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  The Cure Amount Claim to be paid in connection with the assumption of such a customer-related contract, purchase order or similar agreement that is not specifically identified on Exhibit II.F.1.a of the Plan shall be $0.00.  Listing a contract, purchase order or similar agreement providing for the sale of the Debtors' products or services on Exhibit II.F.5 of the Plan will not constitute an admission by a Debtor or Reorganized Debtor that such agreement (including related agreements as described in Section II.F.1.b of the Plan) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

> d.      **Treatment of Collective Bargaining Agreements**

The treatment of the Debtors' collective bargaining agreements shall be determined pursuant to any motion Filed by the Debtors under section 1113 of the Bankruptcy Code and/or any agreement by the Debtors and the relevant parties that is approved pursuant to a Final Order of the Bankruptcy Court.

> 2.      **Approval of Assumptions and Assignments;**
> **Assignments Related to Restructuring Transactions**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption (including any related assignment resulting from the Restructuring Transactions or otherwise) of Executory Contracts or Unexpired Leases pursuant to Section II.F of the Plan as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.F.5 of the Plan or (e) are designated for rejection as set forth in the last sentence of this paragraph.  As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or Reorganized Debtor and assumed under the Plan or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases or assigned to a particular Reorganized Debtor pursuant to the procedures described in Section II of the Plan, will be deemed assigned to the surviving, resulting or acquiring corporation in the applicable Restructuring Transaction, pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption, assumption and assignment, or Cure Amount Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within 10 Business Days of the entry of the order of the Bankruptcy Court resolving the matter against the Debtors.  Such rejection shall be deemed effective as of the Effective Date.

> 3.      **Payments Related to the Assumption**
> **of Executory Contracts and Unexpired Leases**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the applicable Debtor or Reorganized Debtor:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding (a) the amount of any Cure Amount Claim, (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order or the execution of a Stipulation of Amount and Nature of Claim resolving the dispute and approving the assumption.

4.      **Contracts and Leases Entered Into After the Petition Date**

Contracts, leases and other agreements entered into after the Petition Date by a Debtor, including any Executory Contracts or Unexpired Leases assumed by a Debtor, and not thereafter assigned or rejected, will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business, as applicable.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order; provided, however, that any Executory Contracts or Unexpired Leases assumed by a Debtor and not previously assigned will be assigned to the Reorganized Debtor identified on Exhibit II.F.4 of the Plan.  The Debtors and Reorganized Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.F.4 to the Plan to identify or change the identity of the Reorganized Debtor party that will be the assignee of an Executory Contract or Unexpired Lease.

5.      **Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Section II.F of the Plan (including any related agreements assumed pursuant to Section II.F.1.b of the Plan), each Executory Contract or Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code.
The Executory Contracts or Unexpired Leases to be rejected will include the Executory Contracts or Unexpired Leases listed on Exhibit II.F.5 attached to the Plan, provided that the Debtors and the Reorganized Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.F.5 to the Plan to:  (a) delete any Executory Contract or Unexpired Lease listed therein and add such Executory Contract or Unexpired Lease to Exhibit II.F.1.a to the Plan, thus providing for its assumption, or assumption and assignment, pursuant to Section II.F.1 of the Plan; or (b) add any Executory Contract or Unexpired Lease to Exhibit II.F.5 to the Plan, notwithstanding any prior assumption of such Executory Contract or Unexpired Lease by the Debtors, thus providing for its rejection pursuant to Section II.F.5 of the Plan.  Each contract and lease listed on Exhibit II.F.5 to the Plan will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit II.F.5 to the Plan will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease (including related agreements as described in Section II.F.1.b of the Plan) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.  Irrespective of whether an Executory Contract or Unexpired Lease is listed on Exhibit II.F.5 to the Plan, it will be deemed rejected unless such contract (a) is listed on Exhibit II.F.1.a to the Plan as of the Effective Date, (b) was previously assumed, assumed and assigned, or rejected by order of the Bankruptcy Court and was not subsequently added to Exhibit II.F.5 to the Plan or otherwise rejected by the Debtors prior to the Effective Date or (c) is deemed assumed pursuant to the other provisions of Section II.F of the Plan.
The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date; or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Any Claims arising from the rejection of any Executory Contract or Unexpired Lease will be treated as Class 6 Claims (General Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

6.      **Rejection Damages Bar Date**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be Filed with the Bankruptcy Court and served upon counsel to the Debtors on or before the later of:  (a) 30 days after the Effective Date; or (b) for Executory Contracts identified on Exhibit II.F.5 to the Plan, 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.F.2 of the Plan.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from the Debtors, the Reorganized Debtors or the Estates.

7.       **Obligations to Indemnify Directors, Officers and Employees**

Prior to the Effective Date, the Debtors (a) shall make arrangements to continue liability and fiduciary (including ERISA) insurance, or purchase a tail policy or policies, for the period from and after the Effective Date, for the benefit of any person who is serving or has served as one of the Debtors' directors, officers or employees at any time from and after the Petition Date and (b) may fully pay the premium for such insurance. Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be continued in accordance with their terms and, to the extent applicable, shall be deemed assumed, or assumed and assigned, by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.

The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after the Petition Date by reason of such person's prior or future service in such a capacity, or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, will be deemed and treated as Executory Contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees prior to but not after the Petition Date by reason of such person's prior service in such a capacity, or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or otherwise, will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; provided, however, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as Executory Contracts that are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) will be subject to the bar date provisions of Section II.F.6 of the Plan.

The indemnification obligations in Section II.F.7 of the Plan shall not apply to or cover any Claims or causes of action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

8.       **No Change in Control**

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease to a Reorganized Debtor is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party; provided, however, that nothing in Section II.F.8 of the Plan shall be deemed to override or render unenforceable any "Change in Control" provisions in any policies of insurance.

**I.       Conditions Precedent to Confirmation of the Plan**

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section III.C of the Plan:

1.       The Confirmation Order will be reasonably acceptable in form and substance to the Debtors, the DIP Agents and the First Lien Agent.

2.      The Plan shall not have been materially amended, altered or modified from the Plan as Filed, unless such material amendment, alteration or modification has been made in accordance with Section IX.A of the Plan.

3.      All Confirmation Exhibits are in form and substance reasonably satisfactory to the Debtors, the DIP Agents and the First Lien Agent.

4.      The Resolution of Reclamation Claims has been entered into by the Debtors and the Reclamation Claim Resolution Parties or otherwise ordered by the Bankruptcy Court.

5.      The Debtors, the DIP Lenders, the DIP Agents, First Lien Lenders and the First Lien Agent shall have entered into the First Lien Lender Settlement.

**J.      Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section III.C of the Plan:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors, the DIP Agents and the First Lien Agent.

2.      The Confirmation Order or another order of the Bankruptcy Court shall have been entered approving and authorizing the Debtors, the Reorganized Debtors and the ReorgCo Trustee to take all actions necessary or appropriate to implement the Plan, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      The Confirmation Order shall not be stayed in any respect.

4.      The Exit Funding shall be fully committed and all documents and agreements necessary to effectuate and implement the Exit Funding shall have been executed and delivered by the relevant parties.

5.      The documents effectuating the Exit Facility shall be in form and substance reasonably satisfactory to the Debtors, the DIP Agents and the First Lien Agent and shall have been executed and delivered by the Reorganized Debtors, the Exit Facility Agent and each of the lenders under the Exit Facility.

6.      The Effective Date shall occur on or before June 30, 2016.

7.      The Plan and all Confirmation Exhibits attached to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section IX.A of the Plan.

**K.      Waiver of Conditions to Confirmation or the Effective Date**

The conditions to Confirmation set forth in Section III.A of the Plan and the conditions to the Effective Date set forth in Section III.B of the Plan may be waived in whole or in part at any time by the Debtors, with the consent of (a) the DIP Agents and (b) the First Lien Agent, without an order of the Bankruptcy Court.

**L.      Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.C of the Plan, then, except where the failure to satisfy or duly waive a such a condition is within the Debtors' sole control, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the

Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section III.D of the Plan:  (a) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.F of the Plan and (iii) the releases described in Section III.E.6 of the Plan; and (b) nothing contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, this Disclosure Statement or the Confirmation Order, will be or will be deemed to be (i) a waiver or release of any Claims by or against, or any Interest in, any Debtor, (ii) an admission of any sort by the Debtors or any other party in interest or (iii) prejudicial in any manner to the rights of the Debtors or any other party in interest.

**M.    Retention of Jurisdiction by the Bankruptcy Court**

Pursuant to sections 105(c) and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

1.    Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims or Interests;

2.    Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.    Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

4.    Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

6.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, this Disclosure Statement or the Confirmation Order;

7.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan;

8.    Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, this Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, this Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

9.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

10.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

11.      Determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, this Disclosure Statement or the Confirmation Order;

12.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

13.      Enter a final decree or decrees closing the Chapter 11 Cases;

14.      Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

15.      Recover all assets of the Debtors and their Estates, wherever located; and

16.      Hear any other matter not inconsistent with the Bankruptcy Code.

## VI.

## VOTING REQUIREMENTS

The Disclosure Statement Order entered by the Bankruptcy Court approved certain procedures for the Debtors' solicitation of votes to approve the Plan, including setting the deadline for voting, which holders of Claims are eligible to receive Ballots to vote on the Plan and certain other voting procedures.

THE DISCLOSURE STATEMENT APPROVAL ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.  YOU SHOULD READ THE DISCLOSURE STATEMENT APPROVAL ORDER, THE CONFIRMATION HEARING NOTICE AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL, AMONG OTHER THINGS, PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

If you have any questions about the procedure for voting your Claim or the Solicitation Package you received, or if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any Exhibits to such documents, please contact the Claims and Balloting Agent (a) by telephone (i) toll-free at (888) 249-2703 and (ii) for callers outside of the United States or Canada at (310) 751-2602, (b) by email at AlphaNRInfo@kccllc.com or (c) in writing at Alpha Natural Resources Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

## A.      Voting Deadline

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims that are entitled to vote on the Plan.  In order to facilitate vote tabulation, there is a separate Ballot designated for each impaired voting Class; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE CLAIMS AND BALLOTING AGENT NO LATER THAN 5:00 P.M. (PREVAILING

EASTERN TIME) ON [_____], 2016, WHICH IS THE VOTING DEADLINE.  BALLOTS SUBMITTED BY BENEFICIAL OWNERS OF NOTES TO A MASTER BALLOT AGENT MUST BE RECEIVED BY SUCH MASTER BALLOT AGENT WITH SUFFICIENT TIME TO ENABLE THE MASTER BALLOT AGENT TO DELIVER A MASTER BALLOT TO THE CLAIMS AND BALLOTING AGENT BY THE VOTING DEADLINE. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE CLAIMS AND BALLOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. EXCEPT WITH RESPECT TO MASTER BALLOTS, WHICH BALLOTS MAY BE SUBMITTED BY EMAIL, NO BALLOTS MAY BE SUBMITTED BY EMAIL OR OTHER MEANS OF ELECTRONIC SUBMISSION, AND ANY BALLOTS OTHER THAN MASTER BALLOTS SUBMITTED BY ELECTRONIC MAIL OR OTHER MEANS OF ELECTRONIC SUBMISSION WILL NOT BE ACCEPTED BY THE CLAIMS AND BALLOTING AGENT.

FOR DETAILED VOTING INSTRUCTIONS, SEE THE DISCLOSURE STATEMENT ORDER.

**B.      Holders of Claims Entitled to Vote**

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (i) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (ii) reinstates the maturity of such claim or equity interest as it existed before the default, (iii) compensates the holder of such claim or equity interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment and (iv) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

In general, a holder of a claim or equity interest may vote to accept or reject a plan if (a) the claim or equity interest is "allowed," which means generally that it is not disputed, contingent or unliquidated, and (b) the claim or equity interest is impaired by a plan.  However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder of such claim or equity interest is not entitled to vote on the plan.  If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote on the plan.

Except as otherwise provided in the Disclosure Statement Order, the holder of a Claim or Interest against one or more Debtors that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (a) the Plan provides a Distribution in respect of such Claim or Interest; and (b) the Claim has been scheduled by the appropriate Debtor (and is not scheduled as disputed, contingent or unliquidated), the holder of such Claim has timely Filed a proof of claim or a proof of claim was deemed timely Filed by an order of the Bankruptcy Court prior to the Voting Deadline.

AS SET FORTH IN THE CONFIRMATION HEARING NOTICE AND IN THE DISCLOSURE STATEMENT ORDER, HOLDERS OF DISPUTED, CONTINGENT OR UNLIQUIDATED CLAIMS MUST FILE MOTIONS TO HAVE THEIR CLAIMS TEMPORARILY ALLOWED FOR VOTING PURPOSES SO THAT IT IS RECEIVED BY THE LATER OF:  (A) [_____], 2016; OR (B) TEN DAYS AFTER THE DATE OF SERVICE OF A NOTICE OF OBJECTION, IF ANY, TO SUCH CLAIM.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

C.    **Vote Required for Acceptance by a Class**

A Class of Claims will have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Order.

## VII.

## CONFIRMATION OF THE PLAN

A.    **Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing at which it will hear objections (if any) and consider evidence with respect to whether the Plan should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code, described below, are met.

The Confirmation Hearing has been scheduled to begin on [_____], at [_____], prevailing Eastern Time, before the Honorable Kevin R. Huennekens, United States Bankruptcy Judge for the Eastern District of Virginia, in a courtroom to be determined at the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Richmond, Virginia 23219. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

B.    **Deadline to Object to Confirmation**

Objections, if any, to the Confirmation of the Plan must: (a) be in writing; (b) state the name and address of the objecting party and the nature of the Claim or Interest of such party; (c) state with particularity the basis and nature of any objection; and (d) be filed with the Bankruptcy Court and served on the following parties so that they are received no later than [_____]:

- the Debtors, c/o Alpha Natural Resources, Inc., One Alpha Place, P.O. Box 16429, Bristol, Virginia 24209 (Attn: Mark M. Manno, Esq., General Counsel);

- counsel to the Debtors, Jones Day, North Point, 901 Lakeside Avenue, Cleveland, Ohio 44114 (Attn: David G. Heiman, Esq., Carl E. Black, Esq. and Thomas A. Wilson, Esq.);

- co-counsel to the Debtors, Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219 (Attn: Tyler P. Brown, Esq. and Henry P. (Toby) Long, Esq.);

- the Office of the United States Trustee, 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201 (Attn: Hugh M. Bernstein, Esq.);

- counsel to the Creditors' Committee, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Evan R. Fleck, Esq. and Eric K. Stodola, Esq.) and Sands Anderson PC, 1111 East Main Street (23219), P.O. Box 1998, Richmond, Virginia 23218 (Attn: William A. Gray, Esq. and W. Ashley Burgess, Esq.);

- counsel to the Retiree Committee, Tavenner & Beran, PLC, 20 North Eighth Street, Second Floor, Richmond, Virginia 23219 (Attn: Lynn Lewis Tavenner, Esq., Paula S. Beran, Esq. and David N. Tabakin, Esq.) and Harman, Claytor, Corrigan &

Wellman, P.O. Box 70280, Richmond, Virginia 23235 (Attn: John R. Owen, Esq. and
Jeremy D. Capps, Esq.);

- counsel to Citibank, N.A., as administrative and collateral agent under the Debtors'
  postpetition secured credit facility, and Citicorp North America, Inc., as administrative
  and collateral agent under the Debtors' prepetition secured credit facility, Davis Polk
  & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017
  (Attn: Damian S. Schaible, Esq., Damon P. Meyer, Esq. and Bradley A. Schecter, Esq.)
  and McGuireWoods LLP, 800 East Canal Street, Richmond, Virginia 23219 (Attn: Dion
  W. Hayes, Esq. and Sarah B. Boehm, Esq.);

- counsel to the *ad hoc* group of holders of Second Lien Notes, Kirkland & Ellis LLP,
  601 Lexington Avenue, New York, New York 10022 (Attn: Paul M. Basta, Esq. and
  Stephen E. Hessler, Esq.), and Kutak Rock LLP, 1111 East Main Street, Suite 800,
  Richmond, Virginia 23219 (Attn: Michael A. Condyles, Esq. and Peter J. Barrett, Esq.);

- counsel to the Second Lien Notes Trustee, Stroock & Stroock & Lavan LLP, 180 Maiden
  Lane, New York, New York 10038 (Attn: Jayme T. Goldstein, Esq., Kenneth Pasquale,
  Esq. and Gabriel E. Sasson, Esq.) and Kutak Rock, LLP, 1111 East Main Street,
  Suite 800, Richmond, Virginia 23219 (Attn: Peter J. Barrett, Esq. and
  Jeremy S. Williams, Esq.); and

- counsel to the UMWA, Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland,
  New Jersey 07068 (Attn: Sharon L. Levine, Esq., Paul Kizel, Esq. and Philip J. Gross,
  Esq.) and Kaplan Voekler Cunningham & Frank, PLC, 1401 East Cary Street, Richmond,
  Virginia 23219 (Attn: Troy Savenko, Esq.).

**C.      Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan are that the Plan (a) is accepted by all impaired
Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly"
and is "fair and equitable" as to such Class, (b) is feasible and (c) is in the "best interests" of creditors and
stockholders that are impaired under the Plan.

**1.      Requirements of Section 1129(a) of the Bankruptcy Code**

A moneyed, business or commercial corporation or trust must satisfy the following requirements pursuant
to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm its plan of reorganization.

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponent(s) of the plan complies with the applicable provisions of the Bankruptcy
  Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by a proponent, by the debtor or by a person issuing
  securities or acquiring property under a plan, for services or for costs and expenses in or
  in connection with the case, or in connection with the plan and incident to the case, has
  been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent(s) of a plan has disclosed the identity and affiliations of any individual
  proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of
  the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a
  successor to the debtor under the plan, and the appointment to, or continuance in, such

office of such individual must be consistent with the interests of creditors and equity security holders and with public policy.

- The proponent(s) of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

- With respect to each impaired class of claims or interests:

  o each holder of a claim or interest of such class:  (a) has accepted the plan; or (b) will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

  o if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan, on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class (a) has accepted the plan or (b) is not impaired under the plan (subject to the "cramdown" provisions discussed in Section VII.C.4).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

  o with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

  o with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:  (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

  o with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim, regular installment payments in cash of a total value, as of the effective date of the plan, equal to the allowed amount of such claim over a period ending not later than five years after the date of the order for relief under section 301, 302 or 303 of the Bankruptcy Code and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

○ with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code but for the secured status of that claim, the holder of that claim will receive, on account of that claim, cash payments in the same manner and over the same period as prescribed in the immediately preceding bullet point above.

• If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

• Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

• All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

• The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or subsection (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code other than those pertaining to voting, which has not yet taken place.

2.    **Best Interests of Creditors**

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of an impaired claim or interest voting against a proposed plan of reorganization must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's assets were liquidated under chapter 7 of the Bankruptcy Code.  To determine what the Holders of Claims and Interests in each impaired Class would receive if the Debtors' assets were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of the Debtors' assets in the context of a hypothetical liquidation.  Such a determination must take into account the fact that secured claims, and any administrative claims resulting from the original chapter 11 cases and from the chapter 7 cases, would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay unsecured creditors and make distributions (if any) to holders of interests.

In support of the Debtors' belief that the Holders of Claims and Interests in each impaired Class will receive at least as much under the Plan than if the Debtors' assets were liquidated, annexed to this Disclosure Statement as Exhibit C is a liquidation analysis prepared by the Debtors with the assistance of professionals of the Debtors (the "Liquidation Analysis") that assumes that the Chapter 11 Cases were converted to chapter 7 cases and each Debtor's assets were liquidated under the direction of a chapter 7 trustee.  THIS LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.  The assumptions used in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors or a chapter 7 trustee.  Accordingly, there can be no assurances that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated.  In addition, any liquidation would take place in the future, at which time circumstances may exist that cannot presently be predicted.  A description of the

procedures followed and the assumptions and qualifications made by the Debtors in connection with the Liquidation Analysis are set forth in the notes thereto.

3.      **Feasibility**

In connection with Confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible in accordance with section 1129(a)(11) of the Bankruptcy Code (which section requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors). The Debtors believe that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation.

To support the Debtors' belief that the Plan is feasible, the Debtors have prepared the projections for the Reorganized Debtors, as set forth in Exhibit D to this Disclosure Statement and discussed in greater detail in Section IX below.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE FINANCIAL ACCOUNTING STANDARDS BOARD, OR THE RULES AND REGULATIONS OF THE SEC.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS.  ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS' MANAGEMENT.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER ENTITY, AS TO THE ACCURACY OF THE PROJECTIONS, OR THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THESE PROJECTIONS. FOR FURTHER INFORMATION ON THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, PLEASE REFER TO THE NARRATIVE AND NOTES TO EXHIBIT D TO THIS DISCLOSURE STATEMENT.

4.      **Requirements of Section 1129(b) of the Bankruptcy Code**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

a.      **Fair and Equitable**

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders, as follows:

- Secured Creditors.  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides:  (a) that each holder of a secured claim included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy

Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

- <u>Unsecured Creditors</u>.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that:  (a) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

- <u>Holders of Interests</u>.  A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that:  (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe the Plan is fair and equitable as to:  (a) Holders of Secured Claims because the Plan provides each Holder of a Secured Claim in Classes that are impaired under the Plan with the indubitable equivalent of its Allowed Secured Claim; and (b) Holders of General Unsecured Claims and Holders of Interests because no Holders of Claims or Interests junior to such parties are receiving any distributions under the Plan on account of such claims or interests.

### b.      Unfair Discrimination

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other similarly situated classes, and no class receives more than it is legally entitled to receive for its claims or interests.  The Debtors carefully designed the Plan, including calculating the distributions to Holders of General Unsecured Claims against each of the Debtors, to ensure recoveries on account of Claims in a particular Class against each of the Debtors did not result in unfair discrimination among similarly situated Classes.  Therefore, the Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for "cramdown," or non-consensual Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## D.      Standards Applicable to Certain Releases

Section III.E.6 of the Plan provides for releases of certain claims against certain parties listed in the Plan (the "<u>Released Parties</u>") in consideration of services provided to the Debtors and the contributions made by the Released Parties to the Chapter 11 Cases.  The Released Parties are, collectively and individually, the Debtors, the Reorganized Debtors, ReorgCo Trust, the ReorgCo Trustee, the DIP Agents, the DIP Lenders, the First Lien Agent, the First Lien Lenders, NewCo and any Affiliates and Representatives of each of the foregoing.  Releases are granted, to the fullest extent permissible under law, by each holder of a Claim to the Released Parties and by the Released Parties to one another, as set forth in Section III.E.6 of the Plan and disclosed herein in Section VIII.A.6.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored, and each of the Released Parties has provided value to the Debtors and aided in the reorganization process, including, with respect to certain Released Parties, by providing financing pursuant to the DIP Credit Agreements, which greatly increased the value of the Debtors' estates and has facilitated the Debtors'

ability to propose and pursue confirmation of the Plan in a highly value-maximizing and efficient manner. In addition, each of the non-Debtor Released Parties played a substantial role in formulating and negotiating the Plan.  Accordingly, the Debtors contend that the circumstances of the Chapter 11 Cases satisfy the requirements for such releases.

<h2 align="center">VIII.</h2>

<h2 align="center">MEANS OF IMPLEMENTATION OF THE PLAN</h2>

**A.    Effect of Confirmation of the Plan**

**1.    Dissolution of Official Committees**

On the Effective Date, the Official Committees, to the extent not previously dissolved, will dissolve, and the members of the Official Committees and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases.  The Professionals retained by the Official Committees and the respective members thereof shall not be entitled to assert any Fee Claims for any services rendered or expenses incurred after the Effective Date, except, to the extent allowable under applicable law, for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with any final applications for allowance of compensation and reimbursement of expenses of the members of or Professionals to the Official Committees Filed and served after the Effective Date in accordance with the Plan.

**2.    Preservation of Rights of Action by the Debtors
and the Reorganized Debtors; Recovery Actions**

Except as otherwise provided in the Plan, any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, or any Final Order of the Bankruptcy Court, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and Causes of Action (including any (a) Recovery Actions and (b) Causes of Action identified on the Schedule of any Debtor) that the Debtors or the Estates may hold against any entity.

**3.    Comprehensive Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim (including Prepetition Intercompany Claims) or Interest may have with respect to any Allowed Claim or Allowed Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements, including the First Lien Lender Settlement, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement and the Resolution of Reclamation Claims, are (a) in the best interests of the Debtors, the Reorganized Debtors, the Estates and their respective property and Claim and Interest holders and (b) fair, equitable and reasonable.

**4.    Discharge of Claims and Termination of Interests**

**a.    Complete Satisfaction, Discharge and Release**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and immediately after cancellation of the Old Common Stock of ANR: (a) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim

based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of holders of Interests in the Debtors.

### b.    Discharge and Termination

In accordance with Section III.E.4.a of the Plan, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Old Common Stock of ANR, but prior to the issuance of the New ANR Common Stock, of a discharge of all Claims and other debts and Liabilities against the Debtors and a termination of all Interests and other rights of the holders of Interests in the Debtors, pursuant to sections 524(a)(1), 524(a)(2) and 1141(d) of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

### 5.    Injunction

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order:**

**a.    All Persons who have been, are or may be holders of Claims against or Interests in a Debtor shall be enjoined from taking any of the following actions against or affecting any Injunction Party, or the respective Assets or property thereof, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

**i.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any Injunction Party, or the respective Assets or property thereof, (including, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

**ii.    enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against any Injunction Party, or the respective Assets or property thereof;**

**iii.    creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien against any Injunction Party, or the respective Assets or property thereof other than as contemplated by the Plan;**

**iv.    asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due an Injunction Party, or the respective Assets or property thereof; and**

**v.    proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth therein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan.**

**b.    All Persons that have held, currently hold or may hold any Liabilities released or exculpated pursuant to Sections III.E.6 and III.E.7 of the Plan, respectively, will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien; (d) except as provided in the Plan, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

6.        Releases

a.        **General Releases by Debtors and Reorganized Debtors**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, will forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

b.        **General Releases by Holders of Claims or Interests**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or this Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code); provided, however, that the foregoing provisions shall not affect any rights to enforce the Plan or the other contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan.

c.        **Release of Released Parties by Other Released Parties**

From and after the Effective Date, except with respect to obligations arising under the Plan or assumed thereunder, to the fullest extent permitted by applicable law, the Released Parties shall release each other from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way relating to:  (a) any Debtor; (b) the Chapter 11 Cases; (c) the Estates; (d) the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, this Disclosure Statement, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party; (e) the process of marketing, selling and disposing of Assets pursuant to the Sale Orders, the De Minimis Sale Order or other orders entered by the Bankruptcy Court in the Chapter 11 Cases approving the sale or other disposition of Assets; or (f) any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

7.        **Exculpation**

From and after the Effective Date, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, negotiation, preparation, dissemination, implementation, Confirmation or approval of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, this Disclosure Statement or any contract, employee pension or other benefit plan, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that this section shall not apply to the obligations arising under the Plan or the obligations assumed thereunder; and provided further that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

8.      **Termination of Certain Subordination Rights
and Settlement of Related Claims and Controversies**

a.      **Termination**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any Distribution made pursuant to the Plan.  All subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan shall be released and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.  Accordingly, Distributions pursuant to the Plan to holders of Allowed Claims shall not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

b.      **Settlement**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

**B.      Continued Corporate Existence and Vesting of Assets**

Except as otherwise provided in the Plan (including with respect to the Restructuring Transactions described in Section IV.B of the Plan):  (a) on or before the Effective Date, Reorganized ANR will be incorporated and shall exist as a separate corporate entity, with all corporate powers in accordance with state law and the certificates of incorporation and bylaws attached to the Plan as Exhibits IV.D.1.a and IV.D.1.b; (b) on or before the Effective Date, ReorgCo Trust will be formed pursuant to the terms of Section IV.B.2 of the Plan and the ReorgCo Trust Agreement; (c) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; and (d) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, including, without limitation, the First Lien Lender Exit Contribution, will vest, subject to the Restructuring Transactions, in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.  For the avoidance of doubt, the assets to be contributed to the Reorganized Debtors pursuant to the Plan shall not include any Assets subject to an asset sale consummated prior to the Effective Date pursuant to a Sale Order.

**C.      Restructuring Transactions**

1.      **Restructuring Transactions Generally**

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be

necessary or appropriate to effect, in accordance with applicable nonbankruptcy law, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors, including but not limited to the Restructuring Transactions identified on Exhibit IV.B.1 to the Plan, all to the extent not inconsistent with any other terms of the Plan. Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions closing under or in connection with the Plan in connection with any Core Asset Sale Order), conversions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate. The actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including (i) making filings or recordings that may be required by applicable state law in connection with such transactions amd (ii) any appropriate positions on one or more tax returns. Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors. Notwithstanding the foregoing and any other provisions of the Plan, nothing in the Plan shall impair, expand or otherwise modify the rights of any party under the Stalking Horse APA or any other agreement entered into pursuant to any Sale Order.

### 2. Establishment of ReorgCo Trust

On or prior to the Effective Date, ReorgCo Trust shall be established pursuant to the ReorgCo Trust Agreement. On the Effective Date, all shares of New ANR Common Stock issued pursuant to the Plan shall be transferred to ReorgCo Trust, which transfer shall constitute a Restructuring Transaction within the meaning of Section IV.B.1 of the Plan. ReorgCo Trust shall conduct its activities consistent with the ReorgCo Trust Agreement. The Debtors or the Reorganized Debtors, as applicable, shall have discretion regarding the tax treatment of ReorgCo Trust.

### 3. Obligations of Any Successor Corporation in a Restructuring Transaction

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### D. The Resolution of Reclamation Claims

The Debtors contemplate that prior to the Effective Date, the Resolution of Reclamation Claims among the Debtors and the Reclamation Claim Resolution Parties will be agreed upon and/or ordered by the Bankruptcy Court to effect a comprehensive resolution of the Reorganized Debtors' post-Effective Date reclamation obligations. The Debtors anticipate that, among other things, the Resolution of Reclamation Claims will: (a) ensure the continuing existence of the Reorganized Debtors post-Effective Date for the primary purpose of conducting reclamation activities; (b) provide for the creation and funding of the Restricted Cash Reclamation Accounts; (c) establish the Reclamation Threshold Amount; and (d) provide for the selection and appointment of the ReorgCo Trustee by the Reclamation Claim Resolution Parties.

E.      **Corporate Governance and Directors and Officers**

1.      **Constituent Documents of Reorganized ANR,
        the Other Reorganized Debtors and ReorgCo Trust**

As of the Effective Date:  (a) the certificates of incorporation and the bylaws (or comparable constituent documents) of Reorganized ANR and the other Reorganized Debtors will be substantially in the forms attached to the Plan as Exhibits IV.D.1.a and IV.D.1.b, respectively; and (b) the ReorgCo Trust Agreement and the ReorgCo Trust Certificate of Trust will be substantially in the forms attached to the Plan as Exhibits I.A.146 and I.A.147, respectively.  The certificates of incorporation and bylaws (or comparable constituent documents) of Reorganized ANR and each other Reorganized Debtor, among other things, will (a) prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code and (b) with respect to Reorganized ANR, authorize the issuance of New ANR Common Stock.  After the Effective Date, Reorganized ANR and the other Reorganized Debtors may amend and restate their articles of incorporation or bylaws (or comparable constituent documents) as permitted by applicable state law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, Reorganized ANR and each other Reorganized Debtor shall file such certificates of incorporation (or comparable constituent documents) with the secretaries of state of the states in which Reorganized ANR and such other Reorganized Debtors are incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such states.

2.      **Directors and Officers of Reorganized ANR and the Other Reorganized Debtors**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date:  (a) the initial officers of Reorganized ANR and the other Reorganized Debtors will consist of the individuals identified on Exhibit IV.D.2 to the Plan; and (b) the initial board of directors of Reorganized ANR and of each of the other Reorganized Debtors will consist of the individuals identified, or will be designated pursuant to the procedures specified, on Exhibit IV.D.2 to the Plan.  Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of Reorganized ANR or the applicable other Reorganized Debtor and state law.

F.      **General Unsecured Claims Asset Pool**

On the Effective Date, the General Unsecured Claims Asset Pool shall be funded in accordance with Section I.A.98 of the Plan.  Upon the Reorganized Debtors having deposited an amount of Excess Free Cash Flow equal to the Restricted Cash Reclamation Account FCF Cap into the Restricted Cash Reclamation Accounts, all equity in Reorganized ANR shall be contributed to the General Unsecured Claims Asset Pool for Distribution to Holders of Class 6 Claims in accordance with Article V of the Plan.

G.      **Restricted Cash Reclamation Accounts**

The Reorganized Debtors shall fund the Restricted Cash Reclamation Accounts (a) on the Effective Date, with any Initial Reclamation Contribution and (b) thereafter, with the remaining portion of the Reclamation Funding Amount.  On a quarterly basis beginning on the conclusion of the first full calendar year quarter following the Effective Date, the Reorganized Debtors shall deposit all Excess Free Cash Flow into the Restricted Cash Reclamation Accounts, as applicable, until such time as the aggregate amount deposited into the Restricted Cash Reclamation Accounts equals the Reclamation Threshold Amount.  The Reorganized Debtors shall have no obligation to fund the Restricted Cash Reclamation Accounts in an aggregate amount in excess of the Reclamation Threshold Amount.

H.      **New ANR Common Stock**

On the Effective Date, all shares of New ANR Common Stock issued pursuant to the Plan shall be transferred to ReorgCo Trust in accordance with Section IV.B.2 of the Plan and the ReorgCo Trust Agreement.

The New ANR Common Stock, when issued as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable.  Each issuance under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such issuance and by the terms and conditions of the instruments evidencing or relating to such issuance, which terms and conditions shall bind each person or entity receiving such issuance.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the New ANR Common Stock under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder.

**I.      Employment-Related Agreements; Retiree Benefits; Workers' Compensation Programs**

**1.      Employment-Related Agreements**

As of the Effective Date, the Reorganized Debtors will have authority to:  (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active employees.

**2.      Retiree Benefits**

The treatment of non-pension retiree benefits will be determined pursuant to (a) any order granting the Unvested Non-Pension Benefits Motion, (b) any motion Filed by the Debtors pursuant to section 1114 of the Bankruptcy Code and/or (c) any agreement by the Debtors and the relevant parties that is approved pursuant to a Final Order of the Bankruptcy Court.

**3.      Continuation of Workers' Compensation Programs**

From and after the Effective Date:  (a) the Reorganized Debtors will continue to administer and pay all valid claims for benefits and liabilities arising under the Debtors' workers' compensation programs for which the Debtors or the Reorganized Debtors are responsible under applicable state workers' compensation law as of the Effective Date, regardless of when the applicable injuries were incurred, in accordance with the Debtors' prepetition practices and procedures, applicable plan documents and governing state workers' compensation law; and (b) nothing in the Plan shall discharge, release, or relieve the Debtors or the Reorganized Debtors from any current or future liability under applicable state workers' compensation law in the jurisdictions where the Debtors or Reorganized Debtors participate in workers' compensation programs.  The Debtors expressly reserve the right to challenge the validity of any claim for benefits or liabilities arising under any workers' compensation program.

**J.      Corporate Action**

The Restructuring Transactions; the adoption of new or amended and restated certificates of incorporation and bylaws (or comparable constituent documents) for Reorganized ANR and the other Reorganized Debtors; the initial selection of directors and officers for each Reorganized Debtor; the Reorganized Debtors' receipt of the Exit Funding; the entry into the Exit Facility and receipt of the proceeds thereof; the issuance of New ANR Common Stock; the transfer of New ANR Common Stock to ReorgCo Trust; the Distribution of Cash and interests pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing, including the ReorgCo Trust Agreement; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and the other matters provided for under the Plan involving the corporate structure of the Debtors and the Reorganized Debtors or corporate action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Reorganized Debtors or any other Person or entity.

K.      **Special Provisions Regarding Insured Claims**

1.      **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

Distributions, if any, under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law.  Nothing in Section IV.J of the Plan will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

2.      **Assumption and Continuation of Insurance Policies**

From and after the Effective Date, each of the Insurance Contracts will be assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code or continued in accordance with its terms, with rights and obligations under such policy such that each of the parties' contractual, legal and equitable rights under each Insurance Contract shall remain unaltered, and the successors to the Debtor parties to each Insurance Contract will continue to be bound by such Insurance Contract as if the Chapter 11 Cases had not occurred.  Nothing in the Plan shall affect, impair or prejudice the rights and defenses of the Insurers or the Reorganized Debtors under the Insurance Contracts in any manner, and such Insurers and Reorganized Debtors shall retain all rights and defenses under the Insurance Contracts, and the Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred.  In addition, notwithstanding anything to the contrary in the Plan, nothing in the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any Insurance Contract, if any, in any respect.  Any such rights and obligations shall be determined under the Insurance Contracts, any agreement of the parties and applicable law.

L.      **Cancellation and Surrender of Instruments, Securities and Other Documentation**

1.      **Notes**

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan or as otherwise provided for therein, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article V of the Plan, the Indentures and the Notes will be deemed canceled and of no further force and effect against the Debtors, without any further action on the part of any Debtor.  The holders of the Notes will have no rights against the Debtors arising from or relating to such instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no Distribution under the Plan will be made to or on behalf of any holder of an Allowed Noteholder Claim until such Notes are surrendered to and received by the applicable Third Party Disbursing Agent to the extent required in Section V.J of the Plan.  Notwithstanding the foregoing and anything contained in the Plan, the applicable provisions of the Indentures will continue in effect solely for the purposes of allowing the Indenture Trustees or other Disbursing Agents to make Distributions on account of Noteholder Claims as provided in Section V.C of the Plan.  The Reorganized Debtors shall have not have any obligations to any Indenture Trustee for any fees, costs or expenses.

2.      **Old Common Stock**

The Old Common Stock of ANR shall be deemed canceled and of no further force and effect on the Effective Date.  The holders of or parties to such canceled securities and other documentation will have no rights arising from or relating to such securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

**M.       Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the property of any Estate will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date:  (a) the holders of such Liens will be authorized and directed to release any collateral or other property of the Estates (including any cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such Liens, including the execution, delivery, filing or recording of such releases as may be requested by the Reorganized Debtors; and (b) the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of Section IV.L of the Plan.

**N.       Effectuating Documents; Further Transactions**

The president, chief executive officer, chief financial officer, treasurer or any vice president of each Debtor or Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary or any assistant secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.

**O.       Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, filing fee, sales or use Tax or similar Tax:  (a) the issuance, transfer or exchange of New ANR Common Stock; (b) the creation of any mortgage, deed of trust, Lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the execution and delivery of the Exit Facility; (e) any Restructuring Transaction, including any transfers or distributions pursuant to the Plan; (f) any sale of Assets by the Debtors under section 363 of the Bankruptcy Code in connection with the Plan; and (g) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.  The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such Tax and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Tax.

**P.       Provisions Governing Distributions Under the Plan and for Resolving Disputed Claims**

**1.       Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in Article V of the Plan, Distributions to be made on the Effective Date to holders of Claims as provided by Article II of the Plan that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than:  (a) 60 days after the Effective Date; or (b) with respect to any particular Claim, such later date when the applicable conditions of Section II.F.3 of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section V.E.2 of the Plan (regarding undeliverable distributions) or Section V.J of the Plan (regarding surrender of canceled instruments and securities), as applicable, are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section VI.C of the Plan.

2.       **Method of Distributions to Holders of Claims**

The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash, interests and other instruments or documents required under the Plan.  Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan.  The duties of any Third Party Disbursing Agent shall be set forth in the applicable agreement retaining such Third Party Disbursing Agent.

3.       **Distributions on Account of Allowed Noteholder Claims**

Distributions on account of Allowed Noteholder Claims shall be made (a) to the respective Indenture Trustees or (b) with the prior written consent of any Indenture Trustee, through a Third Party Disbursing Agent.  If a Distribution is made to an Indenture Trustee, such Indenture Trustee, in its capacity as Third Party Disbursing Agent, shall administer the Distributions in accordance with the Plan and the applicable Indenture and be compensated in accordance with Section V.D of the Plan.

4.       **Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments will be made by the Reorganized Debtors and will not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent. For purposes of reviewing the reasonableness of the fees and expenses of any Third Party Disbursing Agent, the Reorganized Debtors shall be provided with copies of invoices of each Third Party Disbursing Agent in the form typically rendered in the regular course of the applicable Third Party Disbursing Agent's business but with sufficient detail that reasonableness may be assessed.  To the extent that there are any disputes that the Reorganized Debtors are unable to resolve with a Third Party Disbursing Agent, the Reorganized Debtors may submit such dispute to the Bankruptcy Court for resolution.

5.       **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

a.       **Delivery of Distributions**

Distributions to holders of Allowed Claims will be made by a Disbursing Agent:  (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Claims and Balloting Agent or the applicable Disbursing Agent, as applicable, after the date of Filing of any related proof of claim; (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and neither the Claims and Balloting Agent nor the applicable Disbursing Agent has received a written notice of a change of address; or (d) if clauses (a) through (c) are not applicable, at the last address directed by such holder in a Filing made after such Claim becomes an Allowed Claim.

b.       **Undeliverable Distributions Held by Disbursing Agents**

i.       **Holding of Undeliverable Distributions**

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address.  Subject to Section V.E.2.c of the Plan, Distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent pursuant to Section V.E.2.a of the Plan until such time as a Distribution becomes deliverable.  Subject to Section V.E.2.c of the Plan, while remaining in the possession of the applicable Disbursing Agent, undeliverable Distributions will be held for the benefit of the potential claimants of such Distributions.

ii.        **After Distributions Become Deliverable**

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date; provided, however, that the applicable Disbursing Agent may, in its sole discretion, establish a record date prior to each Distribution Date, such that only Claims allowed as of the record date will participate in such periodic Distribution.  Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

iii.        **Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (a) the Effective Date and (b) the last date on which a Distribution was deliverable to such holder will have its claim for such undeliverable Distribution discharged and will be forever barred from asserting any such claim against the Debtors or the Reorganized Debtors.  Unclaimed Distributions otherwise deliverable to holders of Allowed Claims shall be retained by, or, if held by a Third Party Disbursing Agent, returned to, Reorganized ANR and shall become the property of Reorganized ANR, free of any restrictions thereon.  Nothing contained in the Plan will require any Debtor, any Reorganized Debtor or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

6.        **Timing and Calculation of Amounts to Be Distributed**

a.        **Distributions to Holders of Allowed Claims**

Subject to Section V.A of the Plan, on the Effective Date, each holder of an Allowed Claim will receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  On each Distribution Date, Distributions also will be made, pursuant to Section VI.C of the Plan, to holders of Claims that previously were Disputed Claims that were allowed after the most recent Distribution Date.  Such periodic Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class. Distribution Dates shall occur no less frequently than once per year.

b.        **Interest on Claims**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the Debtors, the Estates and the Reorganized Debtors shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes.  Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the Debtors, the Estates or the Reorganized Debtors shall be cancelled as of the Effective Date for federal income tax purposes.

c.        ***De Minimis* Distributions**

No Distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

7.        **Distribution Record Date**

A Disbursing Agent will have no obligation to, and will not, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes of the Plan to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the Distribution Record Date.

As of the close of business on the Distribution Record Date, each transfer register for the Notes, as maintained by the respective Indenture Trustees, will be closed.  The applicable Disbursing Agent will have no obligation to, and will not, recognize the transfer or sale of any Noteholder Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes of the Plan to recognize and make Distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### 8.        Means of Cash Payments

Except as otherwise specified in the Plan, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 9.        Establishment of Reserves

The Debtors or Reorganized Debtors may establish any reserves that they deem necessary or advisable to make Distributions to holders of Allowed Claims or otherwise to satisfy their obligations under the Plan.

### 10.        Surrender of Canceled Instruments or Securities

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all outstanding common stock, Notes, Indentures, instruments and securities issued by any of the Debtors will be canceled and of no further force and effect, without any further action on the part of the Bankruptcy Court, any Debtor or any Reorganized Debtor.  The holders of or parties to such canceled instruments and securities will have no rights arising from or relating to such instruments and securities or the cancellation thereof, except the rights provided pursuant to the Plan.

### 11.        Withholding and Reporting Requirements

In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all applicable Tax withholding and reporting requirements imposed by any Governmental Unit, and all Distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, applying a portion of any Cash Distribution to be made under the Plan to pay applicable withholding Taxes, liquidating a portion of any non-Cash Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or requiring Claim holders to pay the withholding Tax amount to the Disbursing Agent in Cash as a condition of receiving any non-Cash Distributions under the Plan.  Any amounts withheld pursuant to Section V.K of the Plan shall be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan.  To the extent that any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Disbursing Agent, such Claim holder's Distribution may, in the Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section V.E of the Plan.

Notwithstanding any other provision of the Plan, each entity receiving a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any Governmental Unit on account of the Distribution, including income, withholding and other Tax obligations.

The Debtors reserve, and the Reorganized Debtors shall have, the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

## 12.    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Reorganized Debtor or, as instructed by a Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of the Claim (before any Distribution is made on account of the Claim) the claims, rights and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of the Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and Causes of Action that the Debtor or Reorganized Debtor may possess against the Claim holder.  The First Lien Lender Remaining Diminution Claim shall not be subject to setoff.

## 13.    Application of Distributions

To the extent applicable, all Distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, will apply to any interest accrued on such Claim after the Petition Date.

## 14.    Treatment of Disputed Claims

### a.    Tort Claims

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 11 Cases) not resolved through a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  The Debtors or the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option.  Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code or, after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s).  Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the District Court) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.  Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with Section VI.A.1 of the Plan and applicable nonbankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, as applicable, in Class 6 against the applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with any applicable insurance policy and is not satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' insurance policies will be treated as an Allowed Claim for the purposes of Distributions under the Plan.  In no event will a Distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self-insured retention under any applicable insurance policy. In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with Section VI.A.1 of the Plan and is no longer appealable or subject to review, and applicable nonbankruptcy law

provides for no recovery against the applicable Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim.  Nothing contained in Section VI.A.1 of the Plan will constitute or be deemed a waiver of any claim, right or Cause of Action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code.  All claims, demands, rights, defenses and Causes of Action that the Debtors or the Reorganized Debtors may have against any Person or entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

### b.    Disputed Insured Claims

The resolution of Disputed Insured Claims, including Tort Claims, pursuant to Section VI.A of the Plan shall be subject to the provisions of Section IV.J of the Plan.

### c.    No Distributions Until Allowance

Notwithstanding any other provision of the Plan, no payments or Distributions will be made on account of a Disputed Claim until such Claim (or a portion of such Claim) becomes an Allowed Claim, if ever.

### 15.    Prosecution of Objections to Claims

### a.    Objections to Claims

All objections to Claims must be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, must be made by the Debtors or the Reorganized Debtors by the Claims Objection Bar Date.  If an objection to a Claim has not been Filed or an amendment to the Schedules has not been made by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim in the amount specified in a timely filed proof of Claim or the amount scheduled, as applicable, if such Claim has not been allowed earlier.

### b.    Extension of Claims Objection Bar Date

The Reorganized Debtors may seek authorization to extend the Claims Objection Bar Date for some or all Disputed Claims for cause through the Filing of a motion with the Bankruptcy Court.

### c.    Authority to Prosecute Objections

On or after the Effective Date, only the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims.  On or after the Effective Date, the Reorganized Debtors, and only the Reorganized Debtors, may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

### d.    Authority to Amend Schedules

The Debtors or the Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Reorganized Debtors will provide the holder of such Claim with notice of such amendment and parties in interest will have 30 days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the applicable Disbursing Agent may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

16.     **Distributions on Account of Disputed Claims Once Allowed**

Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date shall be made in accordance with Article V of the Plan.

**Q.      Consolidation**

The Plan serves as a motion seeking, pursuant to the Confirmation Order, the Bankruptcy Court's approval of the limited administrative consolidation of the Debtors solely for the purpose of implementing the Plan, including for purposes of voting, assessing whether Confirmation standards have been met, calculating and making Distributions under the Plan and filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee.  Pursuant to such order, as of the Effective Date:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (c) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtor will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors, and the Debtors may file and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple Debtors; and (d) Intercompany Claims between Debtors will be eliminated and extinguished. Such administrative consolidation (other than for the purpose of implementing the Plan) shall not affect (a) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions as provided in Section IV.B of the Plan; (b) the vesting of assets in the Reorganized Debtors; (c) the right to distributions from any insurance policies or proceeds of such policies; or (d) the rights of the Debtors or the Reorganized Debtors to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

Unless an objection to such consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section IX.F of the Plan on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

**IX.**

**LIQUIDATION ANALYSIS AND FINANCIAL PROJECTIONS**

As further discussed below, the Debtors believe the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors.

In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management has, through the development of financial projections for the years [___] through [___], as attached hereto as Exhibit D (the "Financial Projections"), analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business.  The Financial Projections include (a) projected income statements for the fiscal years ended [____], (b) projected balance sheets at [___] and (c) projected statements of cash flows for the fiscal years ended [____].  The Debtors believe that the Reorganized Debtors will have sufficient liquidity to fund obligations as they arise, thereby maintaining value.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a material negative impact on the operations and financial performance of the Debtors, including, but not limited to, an increased risk of inability to meet sales forecasts and higher reorganization expenses.  Additionally, the estimates and assumptions in the Financial Projections, although

considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies.  They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, including assumptions regarding foreign currency exchange rates, all of which are difficult to predict and generally beyond the Debtors' control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially different from those reflected in the Financial Projections.

No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  The inclusion of the Financial Projections should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.  The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

THE FINANCIAL PROJECTIONS SET FORTH IN <u>EXHIBIT D</u> ARE BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT PROJECTIONS WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY.  THE DEBTORS, THE REORGANIZED DEBTORS AND ANY AFFILIATED ENTITY DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS OR TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THESE PROJECTIONS OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS NOR TO INCLUDE SUCH INFORMATION IN DOCUMENTS REQUIRED TO BE FILED WITH THE SEC OR OTHERWISE MAKE SUCH INFORMATION PUBLIC.

# X.

## PLAN-RELATED RISK FACTORS

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE DESCRIBED BELOW.  PRIOR TO VOTING ON THE PLAN, EACH PARTY ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER THESE RISKS, AS WELL AS ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS ATTACHED HERETO.  If any of these risks occur, the Debtors may not be able to conduct their business as currently planned, and their financial condition and operating results could be materially harmed.  In addition to the risks set forth below, risks and uncertainties not presently known to the Debtors, or risks that the Debtors currently consider immaterial, may also impair the business, financial condition, cash flows and results of operations of the Debtors and/or the Reorganized Debtors.

## A.    Certain Bankruptcy Considerations

### 1.    The Plan May Not Be Accepted or Confirmed

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Thus, although the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.  If the Plan is not confirmed or consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidation cases, or that any alternative plan of reorganization would be on terms as favorable to Holders of Claims and Interests as the terms of the Plan.

The Debtors anticipate that certain parties in interest may file objections to the Plan in an effort to persuade the Bankruptcy Court that the Debtors have not satisfied the confirmation requirements under sections 1129(a) and (b) of the Bankruptcy Code. Even if: (a) no objections are filed; (b) all impaired Classes of Claims accept or are deemed to have accepted the Plan; or (c) with respect to any Class of Claims or Interests that rejects or is deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under sections 1129(a) and (b) of the Bankruptcy Code.

As further described in Section VII.C above, section 1129(a) of the Bankruptcy Code requires, among other things, (a) a demonstration that the Confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of the Debtors, except as contemplated by the Plan, and (b) that the value of distributions to parties entitled to vote on the Plan who vote to reject the Plan will be not less than the value of distributions such creditors would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court determines that the Plan violates section 1129 of the Bankruptcy Code in any manner, including, among other things, the cramdown requirements under section 1129(b) of the Bankruptcy Code, the Debtors, have reserved the right to amend the Plan in such a manner so as to satisfy the requirements of section 1129 of the Bankruptcy Code.

**2.     Classification and Treatment of
        Claims and Interests May Not Be Approved**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for confirmation and (b) to use the acceptances received from any Holder pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Holders, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

3.    **The Plan May Not Be Consummated if the
Conditions to Effectiveness of the Plan Are Not Satisfied**

Article III.A and B of the Plan provide for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date, including:  (a) approval of the Confirmation Order and Confirmation Exhibits by certain parties in interest; (b) entry of the Confirmation Order by the Bankruptcy Court; (c) that the Confirmation Order is not stayed in any respect; and (d) approval of the documents effectuating Exit Funding by certain parties in interest.  Many of the conditions are outside of the control of the Debtors.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

4.    **If the Plan Is Not Confirmed or Consummated, or the Reorganization Is
Delayed, Distributions to Holders of Allowed Claims May Be Materially Reduced**

If a liquidation or protracted reorganization were to occur, the distributions to Holders of Allowed Claims would be drastically reduced.  In particular, the Debtors believe that, as set forth in the Liquidation Analysis, in a liquidation under chapter 7, Holders of Allowed Claims would receive substantially less because of the inability in a liquidation to realize the greater going-concern value of the Debtors' assets.  Furthermore, administrative expenses of a chapter 7 trustee and the trustee's attorneys, accountants and other professionals would cause a substantial erosion of the value of the Debtors' estates.  Substantial additional Claims may also arise by reason of a protracted reorganization or liquidation, including from the rejection of previously assumed unexpired leases and other executory contracts, further reducing distributions to Holders of Allowed Claims.

If the Effective Date is delayed, the Debtors may not have sufficient cash available in order to operate their business.  In that case, the Debtors may need new or additional postpetition financing, which may increase the costs of consummating the Plan.  There is no assurance of the terms on which such financing may be available or if such financing will be available.  Any increased costs as a result of the incurrence of additional indebtedness may reduce amounts available to distribute to Holders of Allowed Claims.

5.    **If the Plan Structure Agreement Is Terminated, the Ability of the Debtors
to Confirm and Consummate the Plan Could Be Materially and Adversely Affected**

The Plan Structure Agreement contains a number of termination events, upon the occurrence of which certain parties to the Plan Structure Agreement may terminate such agreement.  If the Plan Structure Agreement is terminated, each of the parties thereto will be released from their obligations in accordance with the terms of the Plan Structure Agreement.  Any such termination may result in the loss of support for the Plan by the Consenting Lienholders, which could adversely affect the Debtors' ability to confirm and consummate the Plan.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new Plan would be as favorable to Holders of Claims as the current Plan. Either outcome may materially reduce distributions to Holders of Claims.

6.    **Distributions to Holders of Allowed Claims Under
the Plan May Differ from the Debtors' Estimates**

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtors' review of (a) the proofs of claim Filed in the Chapter 11 Cases as of the time of the filing of this Disclosure Statement, (b) their books and records and (c) the results of Claim settlements achieved and Claims objections prosecuted to completion as of the time of the filing of this Disclosure Statement.  Upon (a) the passage of all applicable Bar Dates, (b) the completion of further analyses of the proofs of claim and (c) the completion of Claims litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in the Chapter 11 Cases may differ from the Debtors' estimates, and such difference could be material.  For example, the amount of any Disputed Claim that ultimately is allowed may be significantly more or less than estimated amount of such Claim used herein.  Particular risks exist with respect to those Claims, such as Priority Claims, Priority Tax Claims and Secured Claims, that must

be paid in Cash by the Recognized Debtors under the Plan.  If estimates of such Claims are inaccurate, it may materially and adversely affect the Recognized Debtors' financial condition.

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution.  There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

> **7.     The Reorganized Debtors' Ability to Use the Debtors' Pre-Emergence Tax Attributes May Be Significantly Limited Under the United States Federal Income Tax Rules**

The Debtors have experienced losses from the operation of their business.  As a result, the Debtors estimate that their United States federal income tax net operating loss ("NOLs") carryforwards are approximately $3.47 billion (and their United States federal alternative minimum tax NOLs are approximately $2.49 billion as of December 31, 2015, and they expect to have incurred additional NOLs since then.  The Debtors' NOLs and tax basis in assets will be reduced on account of cancellation of indebtedness income, and the Reorganized Debtors' ability to use the remaining NOLs and possibly any recognized built-in losses to offset future taxable income may be significantly limited if the Debtors undergo an "ownership change" as defined in section 382 of the Internal Revenue Code (the "IRC") in connection with the Plan and do not qualify or elect to use a special bankruptcy rule that would prevent a limitation on use of the tax attributes from applying.  An entity that experiences an ownership change generally is subject to an annual limitation on its use of its pre-ownership change tax attributes after the ownership change equal to the equity value of the corporation immediately before the ownership change, multiplied by the long-term tax-exempt rate posted by the Internal Revenue Service (the "IRS") (subject to certain adjustments).  If the Debtors undergo an ownership change in connection with the Plan, however, they will be allowed to calculate the limitation on NOLs, in general, by reference to their equity value immediately after the ownership change (rather than the equity value immediately before the ownership change, as is the case under the general rule for non-bankruptcy ownership changes), thus generally reflecting any increase in the value of the stock due to the cancellation of debt resulting from the Plan.  The annual limitation could also be increased each year to the extent that there is an unused limitation in a prior year.  Even if the Debtors qualify for and elect to use a special bankruptcy rule that would prevent a limitation on use of the tax attributes from applying, the Debtors' NOLs would first be reduced to the extent of certain prior interest deductions taken on account of indebtedness that will be converted into equity under the Plan.  Generally, consummation of a chapter 11 plan of reorganization results in an ownership change.

**B.     General Economic Risk Factors and Risks Specific to the Business of the Debtors**

> **1.     The Companies May Not Be Able to Achieve Their Projected Financial Results**

The financial projections set forth in Exhibit D to this Disclosure Statement represent the best estimate of the future financial performances of the Reorganized Debtors based on currently known facts and assumptions about future operations, as well as the United States and world economies in general and, specifically, as related to the coal industry.  The actual financial results may differ significantly from the projections.  If the Reorganized Debtors do not achieve their projected financial results, then the value of the Reorganized Debtors' debt or equity issued pursuant to the Plan may experience a decline and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Likewise, if ReorgCo Trust, which may continue to conduct certain of the Debtors' operations after the Effective Date, does not achieve its projected financial results, then ReorgCo Trust may not have the ability to satisfy costs associated with various environmental, health and safety regulations applicable to the Debtors' operations, and state and federal agencies may take enforcement actions that force such operations to shut down immediately.

>    **2.    Future Regulations or Changes in the Interpretation, Application or**
>    **Enforcement of Existing Regulations Applicable to the Debtors' Business Could**
>    **Increase the Reorganized Debtors' Operational Costs and Reduce Demand for Coal**

Federal and state authorities regulate the coal mining industry with respect to matters such as (a) employee health and safety, (b) permitting and licensing requirements, (c) the protection of the environment and wildlife, (d) reclamation and restoration of mining properties after mining is completed, (e) surface subsidence from underground mining and (f) the effects of mining on groundwater quality and availability.  Numerous governmental permits and approvals are required for mining operations.  The costs, liabilities and requirements associated with complying with environmental, health and safety requirements are often significant.  New or revised legislation or administrative regulations (or a change in judicial or administrative interpretation, application or enforcement of existing laws and regulations), including proposals related to the protection of the environment or employee health and safety, that would further regulate and tax the coal industry or users of coal may also require the Reorganized Debtors or their customers to change operations significantly or incur increased costs.  Such changes may materially adversely affect Reorganized Debtors' operations, cost structure and consumer demand for coal.  Failure to comply with these laws and regulations may also result in consequences that materially adversely affect the Reorganized Debtors, including:  (a) the assessment of administrative, civil and criminal fines or penalties; (b) the acceleration of reclamation and site restoration costs; (c) the issuance of injunctions to limit or cease operations; (d) the suspension or revocation of permits; and (e) other enforcement measures that could have the effect of limiting production of coal from the Reorganized Debtors' operations.  Additionally, the Mine Safety and Health Administration may order the temporary closure of mines in the event of a perceived imminent danger to miners' safety or health or for certain violations of safety rules.

>    **3.    New Developments in the Regulation of Environmental Matters**
>    **Could Materially Adversely Affect the Demand for Coal and the**
>    **Reorganized Debtors' Financial Condition, Operations and Cash Flow**

The operations of the Debtors are affected by environmental laws and regulations in the United States and other countries that govern, among other things (a) emissions to the air, (b) discharges to water and (c) the reclamation of property upon which mining operations have been conducted.  As further described in Section II.D, legislators in the United States have considered and, in some cases, passed significant new laws to address global climate change, including, among others, those that would impose a nationwide cap on carbon dioxide and other greenhouse gas emissions.  Further, the EPA and other regulators are using existing laws, including the federal Clean Air Act, to impose obligations, including emission limits and technology-based requirements, on producers of carbon dioxide and other greenhouse gas emissions.  Such initiatives may cause a reduction in the demand for coal, which could adversely affect the Reorganized Debtors' operations.

Current and potential future international, federal, state, regional or local laws, regulations or court orders addressing:  (a) greenhouse gas emissions; (b) coal ash; and/or (c) emissions of sulfur dioxide, nitrogen oxides, mercury and other hazardous air pollutants and particulate matter may require additional controls on coal-fueled power plants and industrial boilers and may cause some users of coal to close existing facilities, reduce construction of new facilities or switch from coal to alternative fuels.  These ongoing and future developments may have a material adverse impact on the global demand for coal and, as a result, could materially adversely affect the Reorganized Debtors' financial condition, operations and cash flow.  Even in the absence of future regulatory developments, increased awareness of, and any adverse publicity regarding, greenhouse gases and other air emissions and coal ash disposal associated with coal and coal-fueled power plants could adversely affect the Reorganized Debtors' and the Reorganized Debtors' customers' reputations and reduce demand for coal.

**C.    Risks Related to New ANR Common Stock**

>    **1.    The Recognized Debtors' Operations May Not Be**
>    **Profitable After the Effective Date, Which Could Have**
>    **an Adverse Impact on the Value of the New ANR Common Stock**

Although the restructuring efforts of the Debtors are designed to ensure the profitability and viability of the Reorganized Debtors, and any related or successor entity, the coal industry is facing significant challenges that

threaten such profitability.  If these challenges continue, or if new or unforeseen challenges arise, it is possible that the profitability of the Reorganized Debtors' operations may be threatened.  If the Reorganized Debtors' operations are not profitable, the value of the New ANR Common Stock may materially decrease as a result, thereby affecting the ultimate value of any recovery effected through the distribution of New ANR Common Stock.

**2.      Holders of Shares of New ANR Common Stock Will Be
          Restricted in Their Ability to Transfer or Re-Sell Their Shares**

New ANR Common Stock will be offered under an exemption from registration under the Securities Act and applicable state securities laws.  New ANR Common Stock will not be registered under the Securities Act and, therefore, holders of shares of New ANR Common Stock may only offer or sell the shares pursuant to an exemption from, or in transactions not subject to, the registration requirements of the Securities Act and applicable state securities laws or pursuant to an effective registration statement.

**3.      There Is No Established Market for Shares of New ANR Common Stock,
          Which Means There Are Uncertainties Regarding the Prices and Terms
          on Which Holders Could Dispose of Their Shares, if at All**

No established market exists for the New ANR Common Stock.  The Reorganized Debtors do not intend to apply to list the New ANR Common Stock on any national exchange or interdealer quotation system.  There can be no assurances as to the presence or the liquidity of any trading market for the New ANR Common Stock, that holders will be able to sell their shares at a particular time or that the prices that may be received will be favorable.

**XI.**

**FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

**A.      General**

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN.  NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCES OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS, PARTNERSHIPS OR PARTNERS IN PARTNERSHIPS; NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS OR HOLDERS OF CLAIMS NOT ENTITLED TO VOTE.  THE DESCRIPTION ALSO DOES NOT DISCUSS STATE, LOCAL, NON-U.S. OR NON-INCOME TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  HOLDERS OF CLAIMS ARE URGED TO CONSULT

WITH THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**B.      U.S. Federal Income Tax Consequences to the Debtors**

**1.      Plan Transactions**

Whether the Debtors will recognize taxable gain or loss on the Plan transactions, whether and to what extent the Debtors or the Reorganized Debtors can utilize the Debtors' available tax attributes, including NOLs, to offset any gain on the Plan transactions or any post-Effective Date taxable income, and any other U.S. federal income tax consequences to the Debtors, will depend upon the precise Plan transactions (including the nature and type of the non-Cash consideration distributed to holders of Claims) and other transactions during the Chapter 11 Cases.

**2.      Cancellation of Debt Income**

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income that must be included in the debtor's income.  The amount of the Debtors' COD income will depend upon the value of the Plan consideration distributed on account of the Allowed Claims against the Debtors relative to the amount of such Allowed Claims (or adjusted issue price if different from the amount of the Allowed Claims), as well as the extent to which those Allowed Claims constitute debt for U.S. federal income tax purposes and the extent to which the payment of such Allowed Claims would be deductible for U.S. federal income tax purposes.  However, COD income is excluded from taxable income by a taxpayer that is a debtor in a reorganization case if the discharge is granted by the bankruptcy court or pursuant to a plan of reorganization approved by a bankruptcy court.  The Plan, if approved, would enable the Debtors to qualify for this bankruptcy exclusion rule with respect to any COD income triggered by the Plan.

If COD income of a debtor qualifies for the bankruptcy exclusion, however, certain income tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the COD income. Tax attributes subject to reduction include, in the following order:  (a) NOLs and NOL carryforwards; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's assets, but generally not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate amount of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards.  A debtor may elect to avoid the prescribed order of attribute reduction and instead reduce the basis of depreciable property first.

In the case of affiliated corporations filing a consolidated return, such as ANR and its consolidated U.S. subsidiaries that are taxed as corporations (the "ANR Loss Group"), the attribute reduction rules apply first to the separate attributes of or attributable to the particular corporation whose debt is being discharged, and then, if necessary, to certain attributes of other members of the group.  Accordingly, COD income of a Debtor would result first in the reduction of any NOLs and other attributes, including asset basis, of or attributable to such Debtor, and then, potentially, of consolidated NOLs and/or basis of or attributable to other members of the consolidated group. Attribute reduction does not occur until immediately after the close of the taxable year in which the debt discharge occurs, i.e., after use of any such NOLs and other attributes to determine the consolidated group's taxable income for the tax year in which the debt is discharged.

The ANR Loss Group is expected to recognize a significant amount of COD income in connection with the implementation of the Plan. The Reorganized Debtors have not yet determined whether to elect to first reduce the tax basis in their depreciable property or to reduce NOLs first, which decision will be based in part on the form of the Plan transactions.  Regardless of whether the Reorganized Debtors make this election, it is possible that the Reorganized Debtors' consolidated group will have some NOLs remaining after reduction for COD income, although no assurance can be given at this time.

### 3.      Limitation on NOL Carryforwards

#### a.      General

The Debtors estimate that their U.S. federal income tax NOL carryforwards are approximately $3.47 billion (and their U.S. federal alternative minimum tax NOLs are approximately $2.49 billion) as of December 31, 2015, and they expect to have incurred additional NOLs since then.  Certain of the Debtors' NOLs may be subject to limitation under section 382 of the IRC as a result of a prior Ownership Change (as defined below).

Section 382 of the IRC provides rules limiting the utilization of a corporation's NOLs and other losses, deductions and credits following a more than 50% change in ownership of a corporation's equity (an "Ownership Change").  Generally, consummation of a chapter 11 plan of reorganization results in an Ownership Change.  Depending on the form of the Plan transactions, an Ownership Change may occur with respect to the ANR Loss Group.  Section 382(l)(6) of the IRC sets forth the limitation provisions applicable to corporations that undergo an Ownership Change in bankruptcy that does not qualify for, or for which the corporations elect out of, the Bankruptcy Exception (as defined below).  Therefore, post-Effective Date usage of any NOLs and other tax attributes of the ANR Loss Group (after reduction for COD income) by the Reorganized Debtors' consolidated group will be limited by section 382(l)(6) of the IRC, unless the Bankruptcy Exception applies.  Under section 382(l)(6), the amount of post-Ownership Change annual taxable income of the Reorganized Debtors' consolidated group that can be offset by the pre-Ownership Change NOLs of the ANR Loss Group generally cannot exceed an amount equal to the product of (a) the applicable federal long-term tax-exempt rate in effect on the date of the Ownership Change (e.g., 2.65% for an ownership change occurring in March 2016) and (b) the value of New ANR Common Stock immediately after implementation of the Plan (the "Annual Limitation").  The value of New ANR Common Stock for purposes of this computation would reflect the increase, if any, in value resulting from any surrender or cancellation of any Claims in the Chapter 11 Cases.

The Annual Limitation may be increased if the Debtors have a net unrealized built-in gain immediately before an Ownership Change.  If, however, the Debtors have a net unrealized built-in loss immediately before an Ownership Change, the Annual Limitation may apply to such net unrealized built-in loss.

Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year.  However, notwithstanding the rules noted above, if the Reorganized Debtors and their subsidiaries do not continue the Debtors' historic business or use a significant portion of their assets in a new business for two years after the Ownership Change (the "Business Continuity Requirement"), the Annual Limitation resulting from the Ownership Change is zero.

#### b.      Bankruptcy Exception

Section 382(l)(5) of the IRC (the "Bankruptcy Exception") provides that the Annual Limitation will not apply to limit the utilization of a debtor's NOLs or built-in losses if the debtor stock owned by those persons who were stockholders of the debtor immediately before the Ownership Change, together with the stock received by certain holders of claims pursuant to the debtor's plan, comprise 50% or more of the value of all of the debtor's stock outstanding immediately after the Ownership Change.  Stock received by holders will be included in the 50% calculation if, and to the extent that, such holders constitute "qualified creditors."  A "qualified creditor" is a holder of a claim that (a) was held by such holder since the date that is 18 months before the date on which the debtor first filed its petition with the bankruptcy court or (b) arose in the ordinary course of business and is held by the person who at all times held the beneficial interest in such claim.  In determining whether the Bankruptcy Exception applies, certain holders of claims that would own a *de minimis* amount of the debtor's stock pursuant to the debtor's plan are presumed to have held their claims since the origination of such claims.  In general, this *de minimis* rule applies to holders of claims who would own directly or indirectly less than 5% of the total fair market value of the debtor's stock pursuant to the plan.

If the Bankruptcy Exception applies, a subsequent Ownership Change with respect to the Reorganized Debtors occurring within two years after the Effective Date will result in the reduction of the Annual Limitation, which would otherwise apply to the subsequent Ownership Change, to zero.  Thus, an Ownership Change within two years after the Effective Date would eliminate the ability of the Reorganized Debtors' consolidated group to use

pre-Ownership Change NOLs thereafter.  If the Bankruptcy Exception applies, the Business Continuity Requirement does not apply, although a lesser business continuation requirement may apply under Treasury regulations.  If an Ownership Change occurs after the two years following the Effective Date, then the Reorganized Debtors' consolidated group will become subject to limitation on the use of their NOLs based upon the value of the Reorganized Debtors' consolidated group at the time of that subsequent change.

Although the Annual Limitation will not apply to restrict the deductibility of NOLs if the Bankruptcy Exception applies, NOLs of the ANR Loss Group will be reduced by the amount of any deduction for any interest paid or accrued, with respect to all Allowed Claims converted into New ANR Common Stock, by the Debtors during the three taxable years preceding the taxable year in which the Ownership Change occurs and during the portion of the taxable year of the Ownership Change preceding the Ownership Change.

The availability of the Bankruptcy Exception to the ANR Loss Group is uncertain and will depend upon the precise Plan transactions.  As a result, the ANR Loss Group cannot yet determine whether it will be eligible for the Bankruptcy Exception.

Even if the Bankruptcy Exception otherwise applies, the Reorganized Debtors may elect to not have the Bankruptcy Exception apply, in which event the Annual Limitation would apply.  The Reorganized Debtors' consolidated group will have until the due date of the tax return for the taxable year of the Effective Date to make such a determination.

Whether, and to what extent, the Reorganized Debtors may be able to utilize the ANR Loss Group's NOLs will depend upon the precise Plan transactions and other transactions during the Chapter 11 Cases.

4.      **Alternative Minimum Tax**

In general, a federal alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income ("<u>AMTI</u>") at a 20% rate to the extent that such tax exceeds the corporation's regular federal taxable income for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular federal income tax purposes by available NOL carryforwards, a corporation is generally entitled to offset no more than 90% of its AMTI with NOL carryforwards (as recomputed for AMT purposes).  Accordingly, usage of the Debtors' NOLs by the Reorganized Debtors may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

If a corporation (or a consolidated group) undergoes an Ownership Change and is in a net unrealized built-in loss position on the date of the Ownership Change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

**C.      U.S. Federal Income Tax Consequences to U.S. Holders of Claims**

The U.S. federal income tax consequences of the Plan to a U.S. Holder of a Claim will depend, in part, on whether the U.S. Holder reports income on the accrual or cash basis, whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the U.S. Holder receives distributions under the Plan in more than one taxable year.  For purposes of this discussion, a "<u>U.S. Holder</u>" is a Holder that is:  (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States

persons have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

### 1.     Recognition of Gain or Loss

A U.S. Holder of an Allowed Claim that is exchanged for Cash and/or other property would recognize gain or loss in an amount equal to the difference between (a) the amount of Cash and the fair market value of the other property received by the U.S. Holder with respect to its Allowed Claim and (b) the U.S. Holder's adjusted tax basis in its Claim.  A U.S. Holder's tax basis in other property received would equal the fair market value of such other property, and a U.S. Holder's holding period in other property generally would begin on the day following the day of receipt.

To the extent any portion of a U.S. Holder's recovery is allocable to interest on a Claim, such portion would be treated as interest income to such U.S. Holder.  See the section entitled "Accrued but Unpaid Interest" below for a discussion of the allocation of recoveries first to principal and then to interest.

Gain or loss recognized on the exchange would be capital or ordinary, depending on the status of the Claim in the U.S. Holder's hands, including whether the Claim constitutes a market discount bond in the U.S. Holder's hands.  Generally, any gain or loss recognized would be a long-term capital gain or loss if the Claim is a capital asset in the hands of the U.S. Holder (generally, property held for investment purposes) and the U.S. Holder has held such Claim for more than one year, unless the U.S. Holder had previously claimed a bad debt deduction or the U.S. Holder had accrued market discount with respect to such Claim.  U.S. Holders that recognize capital losses as a result of the receipt of distributions under the Plan may be subject to limitations on the utilization of such capital losses.  See the section entitled "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### 2.     Medicare Surtax

Subject to certain limitations and exceptions, U.S. Holders who are individuals, estates or trusts may be required to pay a 3.8% Medicare surtax on all or part of that U.S. Holder's "net investment income," which includes, among other items, dividends on stock, interest (including discount) on debt, and capital gains from the sale or other taxable disposition of stock or debt.  U.S. Holders should consult their own tax advisors regarding the effect, if any, of this surtax on their receipt of Cash and other property in exchange for Claims pursuant to the Plan.

### 3.     Accrued but Unpaid Interest

In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on the Claim may be required to include such amount as taxable interest income upon receipt of a distribution under the Plan.  A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan.  The Plan provides that, to the extent applicable, all distributions to a U.S. Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date.  The remaining portion of such distributions, if any, will apply to any interest accrued on such Claim after the Petition Date.  There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder and attributable to principal under the Plan is properly allocable to interest.  Each U.S. Holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

### 4.     Bad Debt and/or Worthless Securities Deduction

A U.S. Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165 of the IRC.  The rules governing the character, timing and amount of bad debt or worthless securities

deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed.  U.S. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

5.      **Market Discount**

A U.S. Holder that purchased its Claim from a prior U.S. Holder with market discount will be subject to the market discount rules of the IRC.  Under those rules, assuming that the U.S. Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

6.      **Information Reporting and Backup Withholding**

All distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding.  The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest (including discount).  Under the IRC's backup withholding rules, a U.S. Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the U.S. Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional U.S. federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax.  A U.S. Holder of a Claim may be required to establish an exemption from backup withholding (e.g., by providing a properly completed and executed IRS Form W-9) or to make arrangements with respect to the payment of backup withholding.

D.      **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims**

For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

1.      **Recognition of Gain or Loss on Exchanges
        Pursuant to the Plan or Other Subsequent Dispositions**

Whether a Non-U.S. Holder realizes gain or loss on an exchange of a Claim pursuant to the Plan or a subsequent disposition of equity of Reorganized ANR and the amount of such gain or loss is determined generally in a similar manner as set forth above in connection with U.S. Holders.  See the section regarding "U.S. Federal Income Tax Consequences to U.S. Holders of Claims - Recognition of Gain or Loss" above.

Subject to the application of FATCA (defined below) and/or backup withholding, a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax with respect to any gain realized on the exchange of its Claim pursuant to the Plan, or on the sale or other taxable disposition (including cash redemption) of equity in Reorganized ANR unless:

(a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the exchange occurs and certain other conditions are met;

(b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States); or

(c) the Debtors or Reorganized Debtors, as applicable, are or have been a United States real property holding corporation (a "USRPHC") at any time within the shorter of the five-year period

preceding the exchange or other disposition or the Non-U.S. Holder's holding period for such Claim, provided that, in the case of an exchange of a Claim pursuant to the Plan, this clause (c) will apply only to exchanges of Claims with respect to convertible Notes (i.e., the Massey Convertible Notes, the 2017 Notes or the 2020 Notes).

Regarding clause (a), to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty established through adequate documentation) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed certain capital losses allocable to U.S. sources during the taxable year of the exchange.

Regarding clause (b), the Non-U.S. Holder generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder (including by filing a U.S. tax return).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Regarding clause (c), generally, a corporation is a USRPHC if the fair market value of its U.S. real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests, as defined in the IRC and applicable Treasury regulations, and its other assets used or held for use in a trade or business.  Although not free from doubt, the Debtors believe that they currently are a USRPHC.  Accordingly, gain described in clause (c) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder (including by filing a U.S. tax return) and/or gross proceeds of exchanges or other dispositions described in clause (c) generally will be subject to a 15% withholding tax (absent an applicable exception such as the "regularly traded on an established securities market" exception available with respect to certain less than 5% Non-U.S. Holders).

## 2.    Accrued but Untaxed Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E (or a successor form), as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes entitled to vote;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder tenders a properly completed and executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (a) generally will not be subject to withholding tax, but (b) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for an exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly completed and executed IRS Form W-8BEN or W-8BEN-E (or successor form), as applicable, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.      Distributions Paid to Non-U.S. Holders

Any distributions made with respect to the equity in Reorganized ANR will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles.  If the amount of any distribution exceeds the Reorganized Debtors' current or accumulated profits, such excess will first be treated as a return of capital to the extent of a Non-U.S. Holder's basis in its equity in Reorganized ANR, and thereafter will be treated as capital gain.  Except as described below, dividends paid with respect to equity in Reorganized ANR held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax established through adequate documentation to be available to such holder under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing a properly completed and executed IRS Form W-8BEN or W-8BEN-E (or successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to equity in Reorganized ANR held by a Non-U.S. Holder that are established through adequate documentation to be effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 4.      FATCA

Pursuant to the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities generally must comply with certain information reporting rules with respect to their U.S. account holders and investors or confront a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party).  A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements will generally be subject to a 30% withholding tax with respect to any "withholdable payments."  For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodical income (including interest payments on the Notes and distributions with respect to equity in Reorganized ANR, if any) and, beginning January 1, 2019, they also include the entire gross proceeds from the sale or other disposition of any property of a type which can produce U.S.-source interest or dividends (including equity in Reorganized ANR) even if the payment would otherwise not be subject to U.S. nonresident withholding tax (e.g., because it is capital gain).  Under the applicable final Treasury regulations, withholding under FATCA will generally apply to payments of U.S.-source interest on debt instrument issued or, for U.S. federal income tax purposes, materially modified on or after July 1, 2014.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

We will not pay any additional amounts to Non-U.S. Holders in respect of any amounts withheld pursuant to FATCA.  Under certain circumstances, a Non-U.S. Holder might be eligible for refunds or credits of such taxes.  Non-U.S. Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstances.

Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

**E.      Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**XII.**

**APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS**

**A.      New ANR Common Stock**

The following is a discussion of the federal and state securities laws applicable to the issuance of securities pursuant to the Plan, including New ANR Common Stock.

The Debtors anticipate that no registration statement will be filed under the Securities Act or any state securities laws with respect to the offer and distribution under the Plan of New ANR Common Stock in respect of Claims.  The Debtors believe that the provisions of section 1145(a) of the Bankruptcy Code exempt the offer and distribution of such securities under the Plan from federal and state securities registration requirements as discussed below.

**B.      Initial Offer and Sale**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (b) the recipients of the securities must hold a claim against, interest in or an administrative expense claim in the case concerning the debtor or such affiliate; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in such exchange and partly for cash or property.  Section 1145(a)(2) of the Bankruptcy Code exempts the offer of a security through any warrant, option, right to purchase or conversion privilege that is sold in the manner specified in section 1145(a)(1) and the sale of a security upon the exercise of such a warrant, option, right or privilege.  The Debtors believe that the offer and sale of New ANR Common Stock under the Plan in satisfaction of Claims satisfy the requirements of section 1145(a) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

The exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.  Section 1145(b) of the Bankruptcy Code provides that, with specified exemptions and except with respect to "ordinary trading transactions" of an entity that is not an "issuer," an entity is an "underwriter" if the entity:

- purchases a claim against, an interest in, or a claim for administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

- offers to sell securities offered under a plan for the holders of such securities ("distributors");

- offers to buy securities under a plan from the holders of such securities, if the offer to buy is (a) with a view to distributing such securities and (b) made under a distribution agreement; or

- is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly controlling, controlled by or under common control with the issuer.

Persons who are not deemed "underwriters" may generally resell the securities they received under section 1145(a)(1) without registration under the Securities Act or other applicable law.  Persons deemed "underwriters" may sell such securities without registration only pursuant to exemptions from registration under the Securities Act and other applicable law.

C.      **Subsequent Transfers under Federal Securities Law**

1.      **Non-Affiliates**

Securities issued pursuant to section 1145(a) of the Bankruptcy Code are deemed to have been issued in a public offering pursuant to section 1145(c) of the Bankruptcy Code and are not restricted securities.  In general, therefore, resales of and subsequent transactions in the securities issued under the Plan will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act and are freely tradeable, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to  such securities. For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by or under common control with the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.  Whether or not any particular person would be deemed to be an "affiliate" of the Reorganized Debtors or an "underwriter" or a "dealer" with respect to any securities issued under the Plan will depend upon various facts and circumstances applicable to that person.

Notwithstanding the provisions of section 1145(b) of the Bankruptcy Code regarding accumulators and distributors, in connection with prior bankruptcy cases, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators or distributors of securities who are not "affiliates" of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions."  The staff of the SEC has indicated in this context that a transaction by such non-"affiliates" may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

- either (a) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (b) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

- the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto and documents filed with the SEC pursuant to the Exchange Act; or

- the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a

seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades.

*The Debtors have not sought the views of the SEC on this matter and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any persons intending to rely on such exemption are urged to consult their own counsel as to the applicability thereof to any particular circumstances.*

### 2.    Affiliates

Securities issued under the Plan to "affiliates" of the Reorganized Debtors will be subject to restrictions on resale. Affiliates of the Reorganized Debtors for these purposes will generally include its directors and officers and its controlling stockholders. Although there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" of the debtor. In addition, for any "affiliate" of an issuer deemed to be an underwriter, Rule 144 under the Securities Act provides a safe-harbor from registration under the Securities Act for certain limited public resales of unrestricted securities by "affiliates" of the issuer of such securities. Rule 144 allows a Holder of unrestricted securities that is an affiliate of the issuer of such securities to sell, without registration, within any three-month period a number of shares of such unrestricted securities that does not exceed the greater of 1% of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer.

### D.    Subsequent Transfers Under State Law

The securities issued under the Plan pursuant to section 1145(a) of the Bankruptcy Code generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states. However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims may wish to consult with their own legal advisor regarding the availability of these exemptions in their particular circumstances.

In addition, state securities laws generally provide registration exemptions for subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the securities issued pursuant to the Plan.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER AND OTHER ISSUES ARISING UNDER APPLICABLE SECURITIES LAWS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER NEW ANR COMMON STOCK ISSUED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## XIII.

### RECOMMENDATION AND CONCLUSION

The Debtors believe that the confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated:  March 7, 2016

Respectfully submitted,

Alpha Natural Resources, Inc. (on its own behalf and on behalf of each affiliate Debtor)

By: _____
        Name:
        Title:

## EXHIBIT A

**Schedule of Debtors and Debtors in Possession**

## DEBTORS AND DEBTORS IN POSSESSION

| Debtor's Name | Debtor's EIN Number | Case Number |
|---|---|---|
| Alpha Natural Resources, Inc. | 42-1638663 | 15-33896 |
| Alex Energy, Inc. | 55-0755384 | 15-33911 |
| Alpha American Coal Company, LLC | 54-1947356 | 15-33913 |
| Alpha American Coal Holding, LLC | 13-2793319 | 15-33915 |
| Alpha Appalachia Holdings, Inc. | 95-0740960 | 15-33917 |
| Alpha Appalachia Services, Inc. | 54-1095096 | 15-33921 |
| Alpha Coal Resources Company, LLC | 84-1341308 | 15-33925 |
| Alpha Coal Sales Co., LLC | 16-1641207 | 15-33926 |
| Alpha Coal West, Inc. | 35-1867616 | 15-33931 |
| Alpha European Sales, Inc. | 54-1834161 | 15-33898 |
| Alpha India, LLC | 27-4593320 | 15-33937 |
| Alpha Land and Reserves, LLC | 57-1136960 | 15-33939 |
| Alpha Midwest Holding Company | 84-1456626 | 15-33944 |
| Alpha Natural Resources, LLC | 56-2298262 | 15-33947 |
| Alpha Natural Resources International, LLC | 27-4592266 | 15-33950 |
| Alpha Natural Resources Services, LLC | 27-0075099 | 15-33952 |
| Alpha PA Coal Terminal, LLC | 26-1102515 | 15-33955 |
| Alpha Shipping and Chartering, LLC | 41-2136215 | 15-33959 |
| Alpha Sub Eight, LLC | 47-3587689 | 15-33916 |
| Alpha Sub Eleven, Inc. | 47-3640130 | 15-33918 |
| Alpha Sub Nine, LLC | 47-3601607 | 15-33922 |
| Alpha Sub One, LLC | 27-4592410 | 15-33927 |
| Alpha Sub Ten, Inc. | 47-3626036 | 15-33930 |
| Alpha Sub Two, LLC | 27-4592527 | 15-33934 |
| Alpha Terminal Company, LLC | 55-0802473 | 15-33940 |
| Alpha Wyoming Land Company, LLC | 35-1661756 | 15-33949 |
| AMFIRE, LLC | 51-0430939 | 15-33954 |
| AMFIRE Holdings, LLC | 11-3673814 | 15-33958 |
| AMFIRE Mining Company, LLC | 11-3673833 | 15-33963 |
| Appalachia Coal Sales Company, Inc. | 54-1188775 | 15-33900 |
| Appalachia Holding Company | 54-0295165 | 15-33901 |
| Aracoma Coal Company, Inc. | 52-1669141 | 15-33966 |
| Axiom Excavating and Grading Services, LLC | 20-8109122 | 15-33970 |
| Bandmill Coal Corporation | 55-0758310 | 15-33978 |
| Bandytown Coal Company | 55-0751776 | 15-33983 |
| Barbara Holdings Inc. | 25-1292326 | 15-33986 |
| Barnabus Land Company | 55-0728645 | 15-33990 |
| Belfry Coal Corporation | 61-0415137 | 15-33993 |
| Big Bear Mining Company | 22-2138933 | 15-34000 |
| Black Castle Mining Company, Inc. | 52-1891104 | 15-34004 |
| Black King Mine Development Co. | 54-1188659 | 15-34008 |
| Black Mountain Cumberland Resources, Inc. | 27-2323540 | 15-33902 |
| Boone East Development Co. | 55-0717715 | 15-34012 |
| Brooks Run Mining Company, LLC | 52-2070922 | 15-34016 |
| Brooks Run South Mining, LLC | 26-0342580 | 15-34022 |
| Buchanan Energy Company, LLC | 54-0983234 | 15-33895 |
| Castle Gate Holding Company | 84-1456620 | 15-34024 |
| Clear Fork Coal Company | 55-0757300 | 15-34026 |
| Coal Gas Recovery II, LLC | 46-2855899 | 15-34018 |
| Crystal Fuels Company | 55-0732366 | 15-34028 |
| Cumberland Coal Resources, LP | 84-1521723 | 15-34030 |
| Dehue Coal Company | 55-0619956 | 15-33912 |
| Delbarton Mining Company | 55-0764304 | 15-33919 |
| Delta Mine Holding Company | 91-1897558 | 15-33923 |
| DFDSTE Corp. | 84-1199429 | 15-33928 |
| Dickenson-Russell Coal Company, LLC | 54-2079085 | 15-33932 |

| Debtor's Name | Debtor's EIN Number | Case Number |
|---|---|---|
| Dickenson-Russell Land and Reserves, LLC | 20-4278709 | 15-33935 |
| DRIH Corporation | 54-1497754 | 15-33938 |
| Duchess Coal Company | 54-1725084 | 15-33942 |
| Eagle Energy, Inc. | 55-0751738 | 15-33945 |
| Elk Run Coal Company, Inc. | 54-1097978 | 15-33948 |
| Emerald Coal Resources, LP | 84-1521724 | 15-33956 |
| Enterprise Mining Company, LLC | 38-3671602 | 15-33960 |
| Esperanza Coal Co., LLC | 06-1652549 | 15-33962 |
| Foundation Mining, LLC | 20-3378168 | 15-33965 |
| Foundation PA Coal Company, LLC | 84-1521726 | 15-33968 |
| Foundation Royalty Company | 84-1456627 | 15-33971 |
| Freeport Mining, LLC | 84-1521725 | 15-33973 |
| Freeport Resources Company, LLC | 84-1230391 | 15-33975 |
| Goals Coal Company | 55-0737462 | 15-33979 |
| Green Valley Coal Company | 55-0747007 | 15-33985 |
| Greyeagle Coal Company | 55-0771551 | 15-33989 |
| Harlan Reclamation Services LLC | 54-1914510 | 15-33903 |
| Herndon Processing Company, LLC | 51-0442749 | 15-33992 |
| Highland Mining Company | 55-0757301 | 15-33996 |
| Hopkins Creek Coal Company | 54-1136806 | 15-33999 |
| Independence Coal Company, Inc. | 54-1188773 | 15-34002 |
| Jacks Branch Coal Company | 55-0734230 | 15-34005 |
| Jay Creek Holding, LLC | 27-4593143 | 15-34007 |
| Kanawha Energy Company | 55-0765391 | 15-34010 |
| Kepler Processing Company, LLC | 51-0442560 | 15-34013 |
| Kingston Mining, Inc. | 31-1562659 | 15-33924 |
| Kingwood Mining Company, LLC | 57-1148058 | 15-33941 |
| Knox Creek Coal Corporation | 54-1393689 | 15-33904 |
| Lauren Land Company | 61-1209098 | 15-33953 |
| Laxare, Inc. | 55-0486813 | 15-33969 |
| Litwar Processing Company, LLC | 51-0442687 | 15-33976 |
| Logan County Mine Services, Inc. | 31-1708085 | 15-33982 |
| Long Fork Coal Company | 54-1605009 | 15-33987 |
| Lynn Branch Coal Company, Inc. | 54-1537451 | 15-33994 |
| Maple Meadow Mining Company | 55-0529664 | 15-34003 |
| Marfork Coal Company, Inc. | 55-0723539 | 15-34009 |
| Martin County Coal Corporation | 61-0702852 | 15-34015 |
| Maxxim Rebuild Co., LLC | 01-0749355 | 15-34027 |
| Maxxim Shared Services, LLC | 55-0814342 | 15-34029 |
| Maxxum Carbon Resources, LLC | 55-0802477 | 15-34032 |
| McDowell-Wyoming Coal Company, LLC | 54-2079104 | 15-34033 |
| Mill Branch Coal Corporation | 54-1817506 | 15-33905 |
| New Ridge Mining Company | 61-1218677 | 15-34034 |
| New River Energy Corporation | 54-1225713 | 15-34035 |
| Neweagle Industries, Inc. | 54-1695751 | 15-33906 |
| Nicewonder Contracting, Inc. | 20-0388143 | 15-34036 |
| North Fork Coal Corporation | 54-1679027 | 15-33097 |
| Omar Mining Company | 55-0385010 | 15-34038 |
| Paramont Coal Company Virginia, LLC | 56-2298367 | 15-34039 |
| Paynter Branch Mining, Inc. | 55-0746860 | 15-34040 |
| Peerless Eagle Coal Co. | 55-0451306 | 15-34041 |
| Pennsylvania Land Holdings Company, LLC | 84-1452626 | 15-34042 |
| Pennsylvania Land Resources, LLC | 46-2854684 | 15-34020 |
| Pennsylvania Land Resources Holding Company, LLC | 46-2855640 | 15-34043 |
| Pennsylvania Services Corporation | 93-1162601 | 15-34044 |
| Performance Coal Company | 55-0736927 | 15-34045 |
| Peter Cave Mining Company | 61-1360315 | 15-34046 |
| Pigeon Creek Processing Corporation | 54-1900369 | 15-33908 |

| Debtor's Name | Debtor's EIN Number | Case Number |
|---|---|---|
| Pilgrim Mining Company, Inc. | 61-1246461 | 15-34047 |
| Pioneer Fuel Corporation | 55-0545211 | 15-34049 |
| Plateau Mining Corporation | 95-3761213 | 15-34050 |
| Power Mountain Coal Company | 31-1567082 | 15-33914 |
| Premium Energy, LLC | 20-3562770 | 15-33920 |
| Rawl Sales & Processing Co. | 55-0476477 | 15-33929 |
| Republic Energy, Inc. | 55-0741015 | 15-33933 |
| Resource Development LLC | 54-1882316 | 15-33909 |
| Resource Land Company LLC | 54-1912100 | 15-33910 |
| River Processing Corporation | 84-1199433 | 15-33936 |
| Riverside Energy Company, LLC | 51-0442691 | 15-33943 |
| Riverton Coal Production Inc. | 55-0739658 | 15-33946 |
| Road Fork Development Company, Inc. | 54-1293743 | 15-33951 |
| Robinson-Phillips Coal Company | 55-0386264 | 15-33957 |
| Rockspring Development, Inc. | 31-1241956 | 15-33961 |
| Rostraver Energy Company | 25-1418256 | 15-33964 |
| Rum Creek Coal Sales, Inc. | 31-1181801 | 15-33967 |
| Russell Fork Coal Company | 61-0394431 | 15-33972 |
| Shannon-Pocahontas Coal Corporation | 54-1132767 | 15-33974 |
| Shannon-Pocahontas Mining Company | 55-0613879 | 15-33977 |
| Sidney Coal Company, Inc. | 54-1293752 | 15-33981 |
| Spartan Mining Company | 31-1571923 | 15-33984 |
| Stirrat Coal Company | 55-0728501 | 15-33988 |
| Sycamore Fuels, Inc. | 54-1527013 | 15-33991 |
| T. C. H. Coal Co. | 61-0723123 | 15-33995 |
| Tennessee Consolidated Coal Company | 62-6029380 | 15-33997 |
| Thunder Mining Company II, Inc. | 55-0770782 | 15-34001 |
| Trace Creek Coal Company | 25-1418260 | 15-34006 |
| Twin Star Mining, Inc. | 31-1265426 | 15-34011 |
| Wabash Mine Holding Company | 91-1897559 | 15-34014 |
| Warrick Holding Company | 91-1897557 | 15-34017 |
| West Kentucky Energy Company | 27-0516756 | 15-34019 |
| White Buck Coal Company | 55-0747028 | 15-34021 |
| Williams Mountain Coal Company | 55-0729825 | 15-34023 |
| Wyomac Coal Company, Inc. | 55-0574144 | 15-34025 |

## EXHIBIT B

**Joint Plan of Reorganization of Debtors and Debtors in Possession**

**<u>EXHIBIT C</u>**

**Liquidation Analysis**

<u>**EXHIBIT D**</u>

**Prospective Financial Information**