IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| IN RE: | ALPHA NATURAL RESOURCES, INC., *et al.*, | Case No. 15-33896-KRH |
| | | Chapter 11 |
| | | (Jointly Administered) |
| | Debtors. | |

## MEMORANDUM OPINION

On August 3, 2015 (the "Petition Date"), Alpha Natural Resources, Inc., and 149[1] of its direct and indirect subsidiaries (the "Debtors") commenced these bankruptcy cases by each filing a separate voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia.[2]  The Debtors continue to manage their properties and operate their businesses as debtors in possession ("DIP") pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  On August 5, 2015, the Court entered an order authorizing the joint administration of these chapter 11 cases.[3]  On August 12, 2015, the United States Trustee for the Eastern District of Virginia appointed the statutory committee of unsecured creditors (the "Committee").[4]

This matter comes before the Court on the motion (the "Rejection Motion") of the Debtors for entry of an order authorizing the Debtors to i) reject certain collective bargaining agreements with the United Mine Workers of America (the "UMWA" or "Union") under § 1113

---

[1] The Chapter 11 petition for one of the Debtors' subsidiaries, Grey Hawk, has since been withdrawn.  Order Dismissing Case, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Oct. 8, 2015) ECF No. 638.

[2] All further references to the Bankruptcy Code are to the Bankruptcy Code as codified at 11 U.S.C. §§ 101 *et seq.*

[3] *See* Fed. R. Bankr. P. 1015.

[4] Section 1103 of the Bankruptcy Code sets forth the powers and duties of a committee under Chapter 11 of the Bankruptcy Code.

of the Bankruptcy Code and ii) modify certain retiree benefits under § 1114 including the elimination of the Debtors' liabilities under the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act").[5]

The UMWA filed an objection to the Rejection Motion on the principal basis that §§ 1113 and 1114 do not apply to the Debtors as a matter of law and on alternative grounds that even if §§ 1113 and 1114 do apply, the Debtors have not satisfied the statutory requirements entitling them to relief (the "UMWA Objection").  Two healthcare funds created by the Coal Act (the "Coal Act Funds") and four other UMWA pension and healthcare funds (the "UMWA Funds") also filed objections to the Rejection Motion on a number of grounds (the "Funds Objection," and together with the UMWA Objection, the "Objections" or "Objectors").[6]  The UMWA Funds joined the UMWA Objection in its entirety.  In addition, the Coal Act Funds advanced a separate Objection arguing that § 1114 did not apply to the Coal Act Funds, and that even if § 1114 did apply, the Debtors had not met the procedural and substantive requirements of § 1114 of the Bankruptcy Code.  On May 9, 2016 (the "Hearing Date"), the Court conducted an evidentiary hearing to consider the Debtors' Rejection Motion (the "Hearing").  At the conclusion of the Hearing, the Court announced that it would overrule the Objections and approve the Rejection Motion.  The Court has entered separately an order authorizing the termination of the collective bargaining agreements and approving the modification of certain retiree benefits (the "Rejection Order").  This Memorandum Opinion sets forth the Courts'

---

[5] Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, § 19142, 106 Stat. 27776, 3036-56 (1992) (codified at 26 U.S.C. §§ 9701-9722).

[6] This is a contested matter under Federal Rule of Bankruptcy Procedure 9014.

findings of fact and conclusions of law supporting the Rejection Order in accordance with Rule

7052 of the Federal Rules of Bankruptcy Procedure.[7]


## Jurisdiction and Venue

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C.

§§ 157 and 1334 and the General Order of Reference from the United States District Court for

the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28

U.S.C. § 157(b)(2)(A).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.


## Factual Background

The Debtors, headquartered in Bristol, Virginia, are the largest domestic producers of

coal by volume in the United States.  The Debtors sell both metallurgic coal and steam coal to

international and domestic consumers.  At their height, the Debtors operated 145 mines and

employed 14,500 individuals, generating $7 billion in revenue annually.

Beginning in 2010, the coal industry began to experience serious market challenges that

ultimately affected every major operator in the coal industry.  Both the price of and the demand

for coal began to fall.  That trend has continued to this day.  Between 2011 and 2015, the price of

metallurgic coal fell 72%.  During the same period, the price of steam coal fell 44%.  Factors

leading to the decline of coal prices are lengthy.  The genesis of the problem is simple: too much

supply and too little demand.

---

[7] Federal Rule of Bankruptcy Procedure 7052 is made applicable to this contested matter by Federal Rule of
Bankruptcy Procedure 9014.  *See* Fed. R. Bankr. P. 9014.  Findings of fact shall be construed as conclusions of law
and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

In response to these industry-wide macroeconomic headwinds, the Debtors strove to reduce expenses and balance cash flow.  Capital and administrative expenditures were reduced by over 50%.  Total external spending fell dramatically.  The Debtors' non-unionized employees and retirees were the first to fall victim to the Debtors' struggle to stay ahead of the downward trend.  From 2013 to the Petition Date, the Debtors froze wages, laid off employees and slashed benefits for their non-union employees.  These measures resulted in amortized savings of $173 million.  As of the Petition Date, the Debtors had laid off approximately 46% of their non-union employees, and 32% of their union employees.  By the time the Debtors filed for protection under Chapter 11 of the Bankruptcy Code, the Debtors had closed more than eighty mines.  Total employment count had fallen from 14,500 to less than 8,000.

Following the Petition Date, the price of coal continued to fall.  The Debtors worked to decrease expenditures.  By February 29, 2016, the Debtors had laid off an additional 1,419 non-union employees and an additional 248 union employees.  Beginning on January 1, 2016, non-union employees suffered another round of benefit cuts that saw their health and wellness benefits reduced below pre-petition levels.  The Debtors continue to struggle to outrun the precipitous decline in coal prices.  During the first two months of 2016, the Debtors incurred a net book loss of $126 million.  The Debtors' present cash burn amounts to $10 million each week.  The Debtors have sustained over $300 million in losses since the Petition Date.  While many of the Debtors' non-union employees have suffered through these difficult times, the Debtors' unionized workers have largely avoided this fate due to their collective bargaining agreements.

*The Debtors' Labor & Retiree Obligations*

The Debtors currently employ approximately 610 active employees who are represented by the UMWA (the "Active Union Employees"). These 610 Active Union Employees are covered by a number of collective bargaining agreements. These collective bargaining agreements also provide benefits to approximately 2,600 retired union employees (the "Retired Union Employees," together with the Active Union Employees, the "Union Employees"). The collective bargaining agreements generally provide certain protections and benefits in favor of the collective body of workers covered thereunder. The terms and conditions of each collective bargaining agreement vary, but in many instances, the collective bargaining agreements result in higher labor costs for the Debtors compared to non-union workers. For example, the collective bargaining agreements restrict the Debtors' ability to utilize subcontractors and to modify work schedules. The Debtors' average labor cost for an Active Union Employee is $92,442 as compared to $69,068 for a non-union employee.

The collective bargaining agreements require the Debtors to make payments to the four different UMWA Funds for the benefit of the Retired Union Employees. First, the Debtors are required to make payments to the UMWA 1974 Pension Plan (the "1974 Pension Plan"). The 1974 Pension Plan is a multiemployer pension plan that was initially established by the National Bituminous Coal Wage Agreement ("NBCWA") of 1974. It provides pension benefits to 89,000 beneficiaries and their surviving spouses. The Debtors project the 2016 annual cost for their contributions to the 1974 Pension Plan to be approximately $9.6 million. Second, the Debtors are required to make payments to the UMWA 1993 Pension Plan (the "1993 Pension Plan"). The 1993 Pension Plan is a multiemployer welfare benefit plan that provides benefits to certain retirees whose previous employer is no longer operating and who are not otherwise covered by

the Coal Act. The Debtors project the 2016 annual cost for their contributions to the 1993

Pension Plan to be approximately $1.5 million. Third, the Debtors are required to make

payments to the UMWA 2012 Retiree Account Plan (the "2012 Account Plan"). The 2012

Account Plan is a multiemployer plan that provides yearly one-time lump sum payments to

eligible retirees. The Debtors expect to pay approximately $2.3 million to the 2012 Account

Plan in 2016. Finally, the Debtors are required to make payments to the UMWA Cash Deferred

Savings Plan of 1988 (the "1988 Plan"). The 1988 Plan requires the Debtors to contribute sums

to a 401(k) plan based on hours worked for eligible employees. The Debtors expect to contribute

approximately $36,000 to the 1988 Plan in 2016.

In addition to these four UMWA Funds, the Debtors are required to contribute to the two

Coal Act Funds and adhere to other provision of the Coal Act.[8] The Coal Act requires the

Debtors to maintain and fund their individual employer plans ("IEP") that were in effect pursuant

to wage agreements to which they previously agreed.[9] *See* 26 U.S.C. § 9711. Pursuant to 26

U.S.C. § 9711, the Debtors continue to provide IEPs for the benefit of 1,070 retired coal miners

at an expected cost of $7.1 million in 2016. The two healthcare funds established by the federal

Coal Act are the Combined Benefit Fund (the "Combined Fund")[10], and the UMWA 1992 Plan

(the "1992 Plan"). The Debtors expect to pay a premium in the approximate amount of $334,000

to the Combined Fund in 2016. The 1992 Plan provides benefits to eligible retirees who were

---

[8] The Coal Act was enacted in 1992 to ensure the adequacy of retiree benefits for retired coal miners. "The overarching purpose of the [Coal] Act was to establish a system whereby each current and former signatory operator . . . is required to pay for the benefits provided to its own retirees and to share in the cost of providing benefits to orphaned retirees." *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 576 (4th Cir. 1996) (citing *LTV Corp. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 485 (2d Cir. 1995)).

[9] Prior to the Coal Act, the Debtors had entered into a series of National Bituminous Coal Wage Agreements ("NBCWAs"). The NBCWAs required that the signatory operators fund and maintain IEPs for their own retirees as well as to contribute to different UMWA pension funds. *See District 29, United Mine Workers of Am. v. United Mine Workers of Am. 1992 Benefit Plan*, 179 F.3d 141 (4th Cir. 1999).

[10] The Combined Fund consolidated the 1950 UMWA Benefit Plan, and the 1974 UMWA Benefit Plan.

not covered by the Combined Fund at the time of the enactment of the Coal Act and also provides benefits to "orphan" retirees whose previous employers could no longer provide them with an IEP. *See* 26 U.S.C. § 9712(b).  In 2016, the Debtors expect to pay approximately $1.2 million to the 1992 Plan.

*The Chapter 11 Case*

The Debtors' Chapter 11 case began with the goal of exiting bankruptcy through a classic reorganization that would allow the Debtors to maintain substantially all of their assets while restructuring and modifying their obligations.  On the Petition Date, the Debtors filed a motion requesting approval of a post-petition secured financing facility in the amount of $692 million (the "DIP Financing Agreement").[11]  The DIP Financing Agreement was arranged by a combination of the Debtors' first and second lien lenders (the "DIP Lenders").  It established a number of case milestones that the Debtors were required to timely achieve.  It set a deadline by which the Debtors had to file a Chapter 11 plan of reorganization.   The DIP Financing Agreement required the Debtors to reach a consensual agreement for the modification of their collective bargaining agreements and retiree benefit obligations or to obtain an order from this Court authoring the rejection of those agreements.

On September 17, 2015, the Court approved the DIP Financing Agreement on a final basis (the "DIP Order").  On November 19, 2015, the Court approved amendments three and four to the DIP Financing Agreement.  These amendments called for the Debtors to enter into a

---

[11] The DIP Financing Agreement contained three facilities: (i) a $200 million revolving credit facility; (ii) a $300 million term loan facility; and (iii) a $192 letter of credit facility.

non-binding, plan structure agreement with the DIP Lenders (the "PSA") that would outline several different restructuring scenarios and create a road map for the remainder of the case.

The direction of the case switched course on February 8, 2016, when the Debtors filed a motion with the Court seeking authorization for a going-concern sale of substantially all of the Debtors' core, revenue generating assets (the "Core Assets") under § 363 of the Bankruptcy Code.  Included among the Core Assets were substantially all of the Debtors' coal mining related complexes throughout the United States.  The Debtors' pre-petition lenders agreed to serve as a stalking horse for the sale of the Debtors' Core Assets (the "Stalking Horse Bidder").[12]  The pre-petition lenders initially agreed to credit bid $500 million for the Debtors' Core Assets (the "Stalking Horse Bid").[13]  The Debtors proposed to sell their Core Assets as a going concern, free and clear of liens, claims, and encumbrances as detailed in the asset purchase agreement executed by the Debtors and the Stalking Horse Bidder (the "APA").

The Stalking Horse Bidder has refused to assume any of the Debtors' liabilities and obligations under the Coal Act or to the UMWA Funds.  The Stalking Horse Bidder will not close the sale unless it can receive the Core Assets free and clear of the Debtors' obligations under their collective bargaining agreements.  The collective bargaining agreements that are subject to the Rejection Motion each contain a successorship clause that would bind a subsequent purchaser of the Debtors' business operations.  The successorship provisions need to be either

---

[12] A stalking horse is typically used in an auction to set the floor price for a group of assets and instill confidence in other bidders that the assets are worth at least what the stalking horse bidder is willing to pay. "Stalking horse bids may generate interest in the assets and create a sense of confidence in the value of the assets among prospective buyers who might assume that a willing buyer has conducted due diligence." *See Reagan v. Wetzel*, 403 B.R. 614, 618 n.3 (8th Cir. B.A.P. 2009).

[13] This credit bid was later reduced to $325 million after the Debtors received a separate stalking horse bid for their natural gas related assets held by one of the subsidiary Debtors.

waived by the UMWA or rejected by the Debtors in order to consummate a sale to the Stalking Horse Bidder.[14]

Sections 2.02 and 2.04 of the APA provide that the Stalking Horse Bidder shall not be required to assume or perform any obligations related to collective bargaining agreements, multiemployer pension plans, or the Coal Act.  The APA also requires as a condition of closing that there be "[e]ntry of an Order, in form and substance reasonably acceptable to the Required Lenders and Buyer, by the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case."

Along with the sale motion, the Debtors asked the Court on February 8, 2016, for approval of amendment number five to the DIP Financing Agreement ("Amendment No. 5").  Amendment No. 5 eliminated a potential default under the DIP Financing Agreement by substituting the new case milestones set forth in the PSA for those contained in the DIP Financing Order and the DIP Financing Agreement.  It also established specific deadlines by which the Debtors were required to obtain relief or a settlement with respect to the Debtors collective bargaining agreements and retiree obligations.   On March 11, 2016, the Court approved Amendment No. 5 without objection as a reasonable exercise of the Debtors' business judgment. The Debtors are now required to obtain confirmation of a Chapter 11 plan of

---

[14] Article 10(i) of the APA expressly states that a sale of the Core Assets to the Stalking Horse Bidder will not occur unless:

> The Bankruptcy Court determines that the Sellers can sell the Purchased Assets free and clear of the successor clause in each of the collective bargaining agreement set forth in Schedule 9.01(a) (the "Collective Bargaining Agreements"), Sellers obtain the applicable labor union's consent to waive/remove the successor clause in each of the Collective Bargaining Agreements or the Bankruptcy Court grants the motion (the "Section 1113(c) Motion") filed by the applicable Sellers pursuant to 1113(c) of the Bankruptcy Code authorizing such Sellers to reject each of the Collective Bargaining Agreements.

reorganization by June 30, 2016.  Failure to meet any of the new milestones established by Amendment No. 5 constitutes an event of default under the DIP Financing Agreement.

*The Rejection Motion*

On March 28, 2016, the Debtors filed their Rejection Motion requesting the Court to grant permission: (i) to reject the collective bargaining agreements and the obligations included therewith by and between the Debtors and the UMWA pursuant to § 1113(c) of the Bankruptcy Code; (ii) to modify the Debtors' retiree benefit obligations to the UMWA Funds and under the Debtors' collective bargaining agreements pursuant to § 1114(g) of the Bankruptcy Code; and (iii) to modify the Debtors' retiree benefit obligations under the Coal Act, including payments to the Coal Act Funds pursuant § 1114(g) of the Bankruptcy Code.

The UMWA Objection was filed in opposition to the Rejection Motion on a number of grounds.  As an initial matter, the UMWA argues that §§ 1113 and 1114 are not available to the Debtors because they are liquidating and not reorganizing.  The UMWA argues in the alternative that the relief the Debtors request is not truly necessary, and the Debtors have not satisfied the required elements of §§ 1113 and 1114 of the Bankruptcy Code.

The Funds Objection was filed on behalf of two distinct groups of funds.  The first group was the UMWA Funds – the 1974 Pension Plan, 1993 Pension Plan, 2012 Account Plan, and the 1988 Plan.  These four funds arise out of the Debtors' collective bargaining agreements and are situated in a procedural posture similar to that of the UMWA.  Accordingly, the UMWA Funds joined the UMWA Objection in its entirety.  The Funds Objection focused, therefore, on the rights of the second group – the Coal Act Funds.[15]  The Coal Act Funds advanced three principal

---

[15] Coal Act Funds are comprised of the 1992 Plan and the Combined Fund.

arguments in support of their objection.  First, the Coal Act Funds argued that § 1114 was never meant to apply to retiree obligations that are born out of a federal statute (the Coal Act) and that § 1114 only applies to collectively bargained retiree obligations.  Second, the Coal Act Funds submit that the Debtors have not met the procedural requirements under § 1114 because the Debtors have not submitted a proposal to an "authorized representative" of the Coal Act Funds.  Finally, the Coal Act Funds marshal the same arguments as the UMWA by arguing that even if the procedural requirements of § 1114 are met, the Debtors have failed to carry their burden in regard to the substantive requirements of § 1114.

*UMWA Negotiations*

Leading up to and following the filing of the Rejection Motion, the Debtors and the UMWA attempted to negotiate modifications to the collective bargaining agreements that would prevent an outright rejection of the agreements by the Debtors.  The Debtors and the UMWA met in person and over the telephone on a number of occasions from December 2015 through March 2016.  Both sides exchanged proposals and information.  As the Hearing Date approached, the UMWA initiated negotiations directly with the Stalking Horse Bidder.  These discussions proved to be encouraging.

The first meeting occurred on December 8, 2015.  The Debtors advised the UMWA that they needed to achieve $200 million in savings annually in order to complete a restructuring. The Debtors projected that approximately $60 million of this cost saving would need to come from labor expense reductions.  The Debtors created a data room with 22,000 pages of information relating to financial performance, wages, retiree benefits, cost saving measures, and operational information.

On January 4, 2016, the Debtors advanced their initial proposal to the UMWA (the "January 4 Proposal"). The January 4 Proposal called for a number of wage and efficiency modifications affecting the Active Union Employees that the Debtors hoped would save over $18.7 million annually. The January 4 Proposal also provided for the Debtors cessation of further payments to the UMWA Funds and the Coal Act Funds. Under the January 4 Proposal the Debtors would terminate their IEPs under the Coal Act. The Debtors expected these actions would contribute approximately $44 million in additional annual cost savings. The Debtors stressed in the January 4 Proposal that labor negotiations were the Debtors' top priority.

The Debtors met with the UMWA on January 11 and 12. The UMWA rejected most of the provisions in the January 4 Proposal and did not provide a counterproposal to the Debtors at that time. The Debtors focused on complying with requests for additional data made by the UMWA. The parties met numerous times in person and over telephone conference through February and March.

On March 9, 2016, the UMWA made a counter proposal to the Debtors (the "UMWA Counter Proposal"). The UMWA Counter Proposal generally rejected most of what the Debtors had proposed. A key sticking point was the insistence of the UMWA that any agreement reached with the Debtors be binding upon a subsequent purchaser of the Debtors' assets. On March 18, 2016, the Debtors dismissed most of the UMWA Counter Proposal as unrealistic. The Debtors maintained that the UMWA Counter Proposal would be ineffective in achieving the required cost savings. The Debtors estimated that the UMWA Counter Proposal would yield only $2 million in annual savings. The UMWA Counter Proposal left unaddressed the Debtors' specific proposals regarding the UMWA Funds and other issues pertaining to wages, overtime, holidays, and vacation time. The Debtors advised the UMWA that the Debtors could not agree

12

to bind any subsequent purchaser to the terms of any deal the Debtors and the UMWA might reach. The Stalking Horse Bidder was unwilling to assume the collective bargaining agreements in their current form. The Debtors and the UMWA conferred at least ten times between March 9 and the Hearing Date. The Debtors provided over 39,000 pages of information in their data room that the UMWA requested. The Court finds that this information was complete, reliable, and furnished in a timely manner.

On May 3, 2016, the Debtors responded to the UMWA Counter Proposal with a revised proposal – the UMWA rejected this proposal on the same day. Throughout the negotiation process, the UMWA reiterated that it had no legal authority to negotiate on behalf of the Coal Act Funds because the Coal Act Funds were creatures of federal law. The UMWA also stated that it did not represent the retirees receiving benefits through the Coal Act Funds.

## Analysis

Section 1113 of the Bankruptcy Code allows a Debtor to reject a collective bargaining agreement if a number of procedural and substantive requirements are met. *See* 11 U.S.C. § 1113. A debtor must present a proposal to an "authorized representative" of the employees, provide complete and reliable information and ultimately prove that the modifications to the existing agreements "are necessary to permit the reorganization of the debtor" and ensure that "all creditors, the debtor and all of the affected parties are treated equally and fairly. *Id.* § 1113(b)(1). The Court must also find that the authorized representative has refused to accept a debtor's proposal without good cause, and that the balance of equities clearly favor rejection. *Id.* § 1113(c). The courts have developed a test comprised of nine factors for determining whether a debtor has satisfied the substantive requirements of § 1113 of the Bankruptcy Code. *In re*

*American Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1983); *see In re Lady H Coal Co.*, 193 B.R. 233, 241 (Bankr. S.D.W. Va. 1996) (applying the nine-part test).  The burden of proof differs with respect to each individual element.  *See American Provision*, 44 B.R. at 909-10.

Section 1114 of the Bankruptcy Code allows a debtor to modify the "retiree benefits" of its former employees if it satisfies the nine-part test established for § 1113 relief.  Accordingly, the test for rejection under § 1113 is identical to the test for modification under § 1114.  *See In re Horsehead Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003).  "The statutory requirements for modification of retiree benefits are . . . substantially the same as the requirements for rejection of collective bargaining agreements."  *In re Walter Energy, Inc.*, 542 B.R. 859, 878 (Bankr. N.D. Ala. 2015) (quoting *In re Horizon Nat. Res. Co.*, 316 B.R. 268, 281 (Bankr. E.D. Ky. 2004)).

The Rejection Motion turns on resolving four issues: (i) whether §§ 1113 and 1114 apply to this proceeding; (ii) whether the Debtors' obligations under the Coal Act meet the definition of "retiree benefits" in § 1114(a);[16] (iii) whether the Debtors negotiated and presented a proposal to the "authorized representative" of the Coal Act Funds; and (iv) whether the Debtors otherwise meet the substantive requirements of §§ 1113 and 1114 of the Bankruptcy Code to terminate their collective bargaining agreements with the UMWA and modify their outstanding retiree benefit obligations.

---

[16] The term "retiree benefits" is defined in § 1114(a) of the statute.

*§§ 1113 and 1114 Apply to the Debtors*

Both Objectors argue that this Court cannot grant relief to the Debtors under §§ 1113 and 1114 of the Bankruptcy Code because the Debtors are liquidating and §§ 1113 and 1114 are only available to a debtor that is involved in a "reorganization."  The Objectors maintain that, because §§ 1113 and 1114 use the term "reorganization," relief is unavailable to any party not involved a "reorganization."  *See* 11 U.S.C. § 1113(b)(1)(A) (requiring a debtor to prove that the rejection of a CBA is "necessary to permit the reorganization of the debtor"); 11 U.S.C. § 1114(g) (allowing the modification of retiree benefits when "such modification is necessary to permit the reorganization of the debtor").  The Objectors claim that the recent Stalking Horse Bid under § 363 of the Bankruptcy Code has effectively transformed this bankruptcy case from a reorganization into a liquidation; thus precluding relief for the Debtors under §§ 1113 and 1114 of the Bankruptcy Code.  The Court need make no finding as to whether the Debtors are liquidating or reorganizing.[17]  The Court will follow the majority of courts that have confronted this issue by declining to adopt the narrow reading of the term "reorganization" that the Objectors advance.

The term "reorganization" is not defined in the Bankruptcy Code.  Sections 1113 and 1114  are part of Chapter 11 of the Bankruptcy Code.  Chapter 11 expressly provides for plans of liquidation.  *See* 11 U.S.C. § 1129(a)(11) (noting a Chapter 11 plan of reorganization may provide for liquidation).  Black's Law Dictionary defines reorganization broadly as "[a] financial restructuring of a corporation, esp. in the repayment of debts, under a plan created by a trustee and approved by a court."  *Reorganization*, Black's Law Dictionary (8th Ed. 2004).

---

[17]  The Debtors currently propose to preserve their coal mining complexes and their natural gas facilities as two separate going concern business operations through a § 363 sales process and to reorganize around their remaining assets all subject to confirmation of a plan under § 1129 of the Bankruptcy Code.

Courts unanimously hold that relief under § 1113 is available to liquidating debtors in Chapter 11. *See e.g.*, *United Food & Commercial Workers Union v. Family Snacks Inc. (In re Family Snacks, Inc.)*, 257 B.R. 884, 893 (8th Cir. B.A.P. 2001) ("[C]ourts have applied § 1113 in a liquidation scenario."); *In re Hoffman Bros. Packing Co., Inc.*, 173 B.R. 177, 187-88 (9th Cir. B.A.P. 1994) ("§ 1113 does not preclude rejection of collective bargaining agreements where the purpose or plan of the debtor is to liquidate by a going concern sale of the business."). Likewise, courts have also granted relief under § 1114 when a debtor proposes to liquidate its assets. *See e.g.*, *UMWA 1974 Pension Plan & Trust v. Walter Energy (Walter Energy II)*, No. 16-cv-00057, 2016 WL 2894091, at *8-10 (N.D. Ala. May 18, 2016); *In re SAI Holdings Ltd.*, No 06-33227, 2007 WL 927936, at *4 (Bankr. N.D. Ohio Mar. 26, 2007) ("Section 1114 itself does not distinguish between a liquidating plan and one in which the debtor seeks to rehabilitate its business . . . ."); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 524 (Bankr. S.D.N.Y. 1991) (applying § 1114 to a liquidating debtor). The Court is not aware of, and the Objectors have failed to cite to, any binding authority that supports their interpretation of the statute.

The Debtors are still in the midst of their Chapter 11 case, and their path forward depends on a number of different factors, contingencies, and rulings by this Court. The Court need not engage in the difficult task of determining whether the Debtors are liquidating or reorganizing because the Court finds that the Debtors are eligible for relief under §§ 1113 and 1114 of the Bankruptcy Code. One thing is for sure. No reorganization is possible if the Rejection Motion is denied. The Court declines to apply the narrow construction of the term "reorganization" advanced by the Objectors, and instead will apply the reasoning of the large number of courts that have held that §§ 1113 and 1114 are available to a liquidating debtor.

16

*Obligations Under the Coal Act are "Retiree Benefits"*

As the Debtors' obligations under the Coal Act arise out of federal law, the Coal Act Funds advance the argument that the Debtors' obligations under the Coal Act cannot be modified under § 1114 of the Bankruptcy Code.  The Coal Act Funds maintain that § 1114 only applies to "retiree benefits" under a collective bargaining agreement.  Coal Act obligations, they argue, do not fall within that definition.  Accordingly, the Coal Act Funds conclude, § 1114 of the Bankruptcy Code does not apply to obligations under the Coal Act.

Section 1114(g) of the Bankruptcy Code permits a court to "enter an order providing for modification in the payment of retiree benefits."  11 U.S.C. § 1114(g). Section 1114(a) defines the term "retiree benefits" as:

> payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a).

The definition is comprised of three components: (i) benefit payments to retirees; (ii) made under any plan, fund, or program; (iii) maintained in whole or in part by a debtor.  *Id.*  The Coal Act Funds argue that the Debtors' Coal Act obligations do not meet the third requirement. The Coal Act Funds contend that because the Coal Act Funds were created by Congress, they are not "maintained or established in whole or in part by the debtor." 11 U.S.C. § 1114(a). It follows, they contend, that Coal Act obligations cannot be modified under § 1114 of the Bankruptcy Code.

Relatively few Courts have taken up this question of whether Coal Act obligations are included in the definition of retiree benefits in § 1114(a) of the Bankruptcy Code.  The United

States Bankruptcy Court for the Eastern District of Kentucky did analyze the interplay between

the Coal Act and § 1114(a) and found that obligations under the Coal Act can be modified under

§ 1114.  *Horizon*, 316 B.R. at 274-78 ("If the modification of the Coal Act retiree benefits is

necessary . . . and the other requirements of § 1114 are satisfied, modification must be

permitted.").    The court in *Horizon* noted that modification of Coal Act obligations was

permitted because § 1114 clearly allows for the modification of collectively bargained benefits

or non-collectively bargained benefits.   11 U.S.C. § 1114(b)(1); *Horizon*, 316 B.R. at 275.   The

court in *Horizon* relied on a decision from the Court of Appeals for the Fourth Circuit to support

its decision.   *See Horizon*, 316 B.R. at 279 (citing *United Mine Workers of Am. 1992 Benefit*

*Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 586 (4th Cir.

1999)).   In *Leckie Smokeless Coal Co.*, the Fourth Circuit allowed a debtor to sell certain assets

free and clear of Coal Act obligations under § 363(f)(5) of the Bankruptcy Code.   The Fourth

Circuit noted the absence of any language to the contrary in the Bankruptcy Code by stating that

"Congress has given no indication that bankruptcy courts cannot order property sold free and

clear of interests that Congress has itself created by statute." *Leckie Smokeless Coal*, 99 F.3d at

585-86.   The bankruptcy court in *Horizon* found the Fourth Circuit's reasoning analogous in the

context of § 1114 because Congress could have easily removed Coal Act obligations from the

scope of § 1114 of the Bankruptcy Code.   *Horizon*, 316 B.R. at 279.

The United States Bankruptcy Court for the Northern District of Alabama also squarely

addressed this issue.   *See Walter Energy*, 542 B.R. at 881-84 (holding that Coal Act obligations

can be modified by § 1114).   The court in *Walter Energy* considered an objection from the 1992

Plan and the Combined Fund – the same Coal Act Funds objecting to the Rejection Motion at

bar.   *Id.* at 881.   The Court in *Walter Energy* followed the reasoning in *Horizon* and determined

that the debtors could modify their Coal Act obligations under § 1114 of the Bankruptcy Code. *Id.* at 884. ("[T]he Debtors may use section 1114 to modify Retiree Benefits arising under the Coal Act if the other requirements of section 1114 are satisfied.").

On appeal, the district court in *Walter Energy* rejected the very arguments that the Coal Act Funds now raise in this Court. *See Walter Energy II*, 2016 WL 2894091, at *10-13. The district court rejected the Coal Act Funds' interpretation of the Bankruptcy Code and found that "[a]lthough the Coal Act Funds may be *established* by statute, they are *maintained* by Debtors." *Id.* at *10 (citing *Horizon*, 316 B.R. at 276). The district court went on to hold that because the debtors "maintained in part the Coal Act Plans by funding them, the plans are retirements benefits subject to Section 1114." *Id.*

The Court finds the reasoning of the decisions in *Horizon*, *Walter Energy*, and *Leckie Smokeless Coal Co.* to be persuasive. A plain reading of § 1114(a) of the Bankruptcy Code would appear to encompass obligations under the Coal Act. There is no dispute that the obligations in question are benefit payments or that the payments are made to retirees under a plan or program. The dispute lies with whether the Coal Act Funds are "maintained or established in in whole or in part by the debtor." The Debtors pay premiums to the Coal Act Funds. *See* 26 U.S.C. § 9712(d) (detailing the payment obligations of each contributor to the 1992 Plan); 26 U.S.C. § 9704(a) (detailing the payment obligations for each contributor to the Combined Fund). It follows that these Coal Act Funds are maintained at least <u>in part</u> by the Debtors' contributions. *See Walter Energy II*, 2016 WL 2894091, at *10. The Debtors therefore meet the standard set forth in § 1114(a). The Coal Act Funds argue that Congress meant to apply the definition of retiree benefits only to private obligations. The plain language of § 1114 of the Bankruptcy Code does not support such an application. *Id.* at *11. The statute only requires that

the debtor maintain the fund or program "in whole or in part."  11 U.S.C. § 1114(a). If Congress

had intended the interpretation of the statute advanced by the Objectors, it would have added the

word "private" to modify the terms "plan, fund, or program."  But Congress did not do so.  As

explained by the court in *Horizon*:

> "If Congress wished to exclude Coal Act [benefits] from the reach of [§ 1114] of
> the bankruptcy law, it could have done so by providing exceptions to [the court's
> authority to modify such obligations] or by limiting the definition of [retiree
> benefits] in the Bankruptcy Code or by providing express language in the Coal
> Act that [obligations] remain unaffected by operation of the Bankruptcy Code."

*Horizon*, 316 B.R. at 279 (quoting *Lady H Coal Co. Inc.*, 199 B.R. 595, 603 (S.D.W. Va. 1996)).

### *The Debtors Negotiated with the Authorized Representative of the Coal Act Funds.*

The Debtors were required to "make a proposal to the authorized representative of the

retirees" and demonstrate that "the authorized representative of the retirees refused to accept

such proposal without good cause" in order to obtain authorization to modify retiree benefits

under § 1114.  11 U.S.C.  § 1114(f)(1), (g).  The term "authorized representative" is defined in §

1114(b).  The UMWA is the authorized representative of the UMWA Funds and any UMWA

members receiving retiree benefits pursuant to collective bargaining agreements.  The Debtors

submit that the UMWA is also the authorized representative of the Coal Act Funds.  The UMWA

and the Coal Act Funds take issue with this position.  They assert that the Debtors have failed to

negotiate with any authorized representative of the Coal Act Funds.

Section 1114(b) defines the term "authorized representative" differently depending on

whether the beneficiaries receiving the retirement benefits are covered by a collective bargaining

agreement.   The term "'authorized representative' means the authorized representative

designated pursuant to subsection (c) for persons receiving any retiree benefits covered by a

collective bargaining agreement or subsection (d) in the case of persons receiving retiree benefits

not covered by such an agreement." 11 U.S.C. § 1114(b). For beneficiaries receiving retirement

benefits pursuant to any collective bargaining agreement to which a labor organization is

operating, subsection (c) appoints the labor organization as the authorized representative unless

the labor organization declines or the court appoints a different representative. 11 U.S.C.

§ 1114(c).[18] If an individual receives retirement benefits but not pursuant to a collective

bargaining agreement, subsection (d) designates the appointment of a retiree committee "to serve

as the authorized representative under this section, of those persons receiving any retiree benefits

not covered by a collective bargaining agreement." 11 U.S.C. § 1114(d).[19]

Horizon has been the only case to address this issue. There, the court, without any

statutory analysis, determined the UMWA to be the authorized representative of the Coal Act

Funds. See Horizon, 316 B.R. at 273 ("[T]he Union [UMWA], having undertaken to represent

the Coal Act retirees, constitutes their 'authorized representative' within the meaning of

§ 1114.").

The original starting point for all of the beneficiaries under of the Combined Fund and

1992 Plan was either a UMWA collectively bargained agreement or another UMWA benefit

fund. The Coal Act Funds' argument ignores this reality. The Coal Act Funds have resorted to

procedural gamesmanship. The retirees under the Coal Act are all UMWA members who were

---

[18] Where the designated union declines to represent the retirees, § 1114(c)(2) authorizes:

> the court, upon a motion by any party in interest, and after notice and a hearing, [to] appoint a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits or if the court otherwise determines that it is appropriate, from among such persons, to serve as the authorized representative of such persons under this section.

[19] On November 11, 2015, the Court ordered the Office of the United States Trustee to appoint a retiree committee under § 1114(d) of the Bankruptcy Code (the "Retiree Committee"). The Retiree Committee was appointed to represent non-union retirees in response to a motion by the Debtors that asked the Court to allow it to terminate non-pension benefits to its non-union retirees.

covered by collective bargaining agreements and were eligible for participation in a UMWA pension fund.

The participants in the Coal Act Funds are all connected to the UMWA. The Combined Fund was created by the Coal Act. Its purpose was to combine two existing UMWA trust funds, the UMWA 1950 Benefit Trust and the UMWA 1974 Benefit Trust. 11 U.S.C. § 9703(f); *see In re Chateaugay Corp.* 53 F.3d 483-87 (describing the creation of the Combined Fund). Accordingly, all the participants in the Combined Fund were members of either the UMWA 1950 Benefit Trust or the UMWA 1974 Benefit Trust.

The 1992 Plan covers individuals who would have been eligible for coverage under the Combined Fund but for its cutoff date. It also covers "orphan" retirees whose previous employer had failed to provide for an IEP as required by the 1978 National Bituminous Coal Wage Agreement. *See* 26 U.S.C. § 9712(b) (establishing eligibility requirements for the 1992 Plan); *In re Olga Coal Co.*, 159 F.3d 62, 64-66 (2d Cir. 1998) (describing the formation of the 1992 Plan). Accordingly, if a miner receives benefits under the 1992 Plan, it is because the miner was covered under an IEP as required by the 1978 National Bituminous Coal Wage Agreement, or because the miner would have fit the eligibility requirements under the UMWA 1950 Benefit Trust or the UMWA 1974 Benefit Trust. *See In re Olga Coal Co.*, 159 F.3d at 65; *Holland v. Double G Coal Co. Inc.*, 888 F.Supp. 351, 354 (S.D.W. Va. 1995) ("[T]he 1992 Benefit Plan is designed to 'backstop' the first two vehicles of health coverage and provide coverage for those who do not receive benefits under the Combined Fund or individual employer plans."). Both the scenarios for participation in the 1992 Fund require the initial participation in a UMWA benefit trust or a UMWA collectively bargained agreement.

The only reason these retirees receive benefits under the Coal Act Funds is because they are members of the UMWA who previously received coverage pursuant to collective bargaining agreements.  Section 1114(b)(1) provides that a labor union shall be the authorized representative for a retiree if the retiree receives "*any* retiree benefits covered by a collective bargaining agreement."  11 U.S.C. § 1114(b)(1).  The retirees receiving benefits pursuant to the Coal Act Funds are members of the UMWA and receive benefits covered by collective bargaining agreements.

The Coal Act anticipates UMWA involvement in the distribution of benefits.  Section 9711 of the Coal Act states that the "last signatory operator shall not be treated as failing to meet the requirements of subsection (a) or (b) if benefits are provided to eligible beneficiaries under managed care and cost containment rules and procedures described in section 9712(c) or agreed to by the last signatory operator and the United Mine Workers of America." 26 U.S.C. § 9711(d). The UMWA asked the Debtors for information during the negotiations relating to Coal Act retirees.  The Coal Act Funds never made any motion to reconstitute the existing Retiree Committee that the Court appointed in this case to broaden its mandate, or otherwise seek to establish a different authorized representative for the Coal Act retirees.  As the UMWA already represents the retirees receiving benefits under the Coal Act and they receive other benefits pursuant to collective bargaining agreements, the Court finds it naturally appropriate that it be the authorized representative of the retirees under the Coal Act. 11 U.S.C. § 1114(b)(1). No other party is better situated than the UMWA to represent these retirees.

*The Debtors Have Met the Substantive Requirements of §§ 1113 & 1114*

The Objectors question whether the Debtors have met the nine-factor test set forth in

*American Provision Co.*, in order to obtain relief under §§ 1113 and 1114 of the Bankruptcy

Code. 44 B.R. at 909. The nine-factor test requires that:

> 1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

> 2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

> 3. The proposed modifications must be necessary to permit the reorganization of the debtor.

> 4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

> 5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

> 6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

> 7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

> 8. The Union must have refused to accept the proposal without good cause.

> 9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*Id.*

While the Objectors' primary focus is that it is not "necessary" that the Debtors obtain

the requested relief, *see* 11 U.S.C. § 1113(b)(1)(A) (requiring that the debtors proposal be

"necessary to permit the reorganization of the debtor); 11 U.S.C. § 1114(g)(3) (conditioning any

relief unless the court finds that the modification "is necessary to permit the reorganization of the

debtor"), the Court will analyze each of the nine elements for compliance.

24

<u>The Debtors Made a Timely Initial Proposal</u>

Sections 1113 and 1114 require the Debtors to make a proposal to an authorized representative or the union prior to filing their Rejection Motion.  11 U.S.C. §§ 1113(b)(1)(A), 1114(f)(1)(A); *see Walter Energy*, 542 B.R. 884 ("[T]he bar for satisfying this requirement is low because in most cases, this factor is a 'routine formality.'").  The Debtors made their initial proposal to the UMWA on January 4, 2016.  The Debtors filed their Rejection Motion with the Court on March 28, 2016.  As the Court has found that the UMWA is the authorized representative for the Coal Act Funds, the Debtors' January 4 Proposal satisfied this requirement.

The Initial Proposal was Based on Complete
Information, and the Debtors Provided the
<u>Objectors with the Required Information</u>

Factors two and five require that the proposal must be based on "complete and reliable information available at the time of such proposal" and the debtors must provide "relevant information as is necessary to evaluate the proposal."  11 U.S.C. § 1113(b)(1)(A), (B); 11 U.S.C. § 1114(f)(1)(A), (B).  The UMWA admits that it received information from the Debtors.  It complains, however, that the information it received was incomplete because the Debtors' business plan was not dynamic.  The UMWA also contends that the Debtors failed to provide mine-specific information.

"The debtor is required to gather the 'most complete information at the time and to base its proposal on the information it considers reliable.'"  *See In re AMR Corp.*, 477 B.R. 384, 409 (Bankr. S.D.N.Y. 2012) (quoting *In re Karykeion, Inc.*, 435 B.R. 663, 678 (Bankr. C.D. Cal. 2010)).  The debtor must provide the union or authorized representative with a business plan that can be manipulated by the union as well as the underlying data that supports the business plan.

See *In re Patriot Coal Corp.*, 493 B.R. 65, 115 (Bankr. E.D. Mo. 2013) ("[T]he debtor must provide the union with a dynamic business model . . . which the union can use to change inputs and evaluate diverging data."). Importantly, "debtor can only be required to provide information that is within the debtor's power to provide." *In re Pinnacle Airlines Corp.*, 483 B.R. 381, 411 (Bankr. S.D.N.Y. 2012). Accordingly, a proposed buyer of a debtors' business operations need not provide its own business plan. *See Walter Energy*, 542 B.R. at 887.

At the time of the January 4 Proposal, the Debtors' data room was populated with over 22,000 pages of information. The UMWA had access to all this information. The Debtors timely complied with all of the requests for additional data made by the UMWA. The Debtors added new information to the data room in most cases within twenty-four hours of the receipt of a UMWA request. On January 30, 2016, the Debtors uploaded their dynamic business model to the data room. The Debtors developed their business plan with the assistance of their restructuring advisors, McKinsey Recovery & Transformation Services LLC ("McKinsey"). The Debtors have considered revisions to their business plan as market conditions in the industry have continued to deteriorate. The Debtors' financial outlook has only worsened since the Debtors made the January 4 Proposal.

There was no evidence that the Debtors did not base their January 4 Proposal on a full and complete account of the information available "at the time." 11 U.S.C. §§ 1113(b)(1)(A), 1114(f)(1)(A) The Debtors provided the UMWA with enough information to evaluate the Debtors' proposal. 11 U.S.C. §§ 1113(b)(1)(B), 1114(f)(1)(B). The Debtors offered to meet with the UMWA throughout the negotiation process. The Debtors responded quickly and efficiently to data requests. The Debtors did provide the UMWA with a dynamic business model that was supported by over 39,000 pages of information in its data room. *See e.g.*, *Walter Energy*, 542

B.R. 886-88; *In re 710 Long Ridge Road Operating Co., LLC*, 518 B.R. 810, 834-35 (Bankr.

D.N.J. 2014); *Patriot Coal*, 493 B.R. at 114-18. The Debtors have met their burden under factors

two and five.


<u>The Relief is Necessary to Permit a Reorganization</u>

The Court must find that the requested relief in the Debtors' Rejection Motion is

necessary for the Debtors to reorganize. The UMWA argues that the Debtors failed to meet their

burden because the Debtors' proposals are not narrowly tailored and because some of their

modifications would only have a negligible impact on the Debtors' financial condition. The

Coal Act Funds echo similar arguments and emphasize the relatively small amount of money the

Debtors owe to the Coal Act Funds compared to the Debtors' larger obligations under the

collective bargaining agreements. The Court is familiar with the dire market conditions that

confront the Debtors' business operation. The coal industry is not merely in the trough of a

business cycle, as the UMWA would suggest. The Debtors simply cannot sustain viability

without reducing annual spending. The Debtors' labor force is an essential component of the

Debtors' spending reduction initiative. The Debtors' non-union labor force has suffered through

significant cuts to both wages and benefits. The contentions of the UMWA to the contrary

notwithstanding, the relief requested in the Rejection Motion will not provide the Debtors with a

windfall at the expense of the Union Employees.

The Court of Appeals of the Fourth Circuit has not adopted a definition for "necessary."

The Court of Appeals for the Third Circuit, relying in large measure upon the legislative history

behind § 1113, construed the term to mean modifications necessary to prevent the debtor's

liquidation. *See Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am., AFL-CIO, CLC*,

791 F.2d 1074, 1089 (3d Cir. 1986). The Court of Appeals for the Second Circuit found the

Third Circuit's interpretation "troubling" and went on to "conclude that the necessity

requirement places on the debtor the burden of proving that its proposal is made in good faith,

and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to

complete the reorganization process successfully." *See Truck Drivers Local 807, Int'l Bhd. Of*

*Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transportation, Inc. (In re*

*Carey Transportation Inc.)*, 816 F.2d 82, 89-90 (2d Cir. 1987). Courts have found that the

"necessary" standard has been satisfied when a debtor has proven that modification or rejection

is necessary to achieve a sale under § 363 of the Bankruptcy Code. *See Walter Energy*, 542 B.R.

890 (requiring only that the debtor's "Final Proposal be necessary to permit the Debtors'

reorganization –i.e., . . . those modifications necessary to consummate a going-concern sale");

*Karykeion*, 435 B.R. at 679 (finding the debtor had proven that rejection was necessary when the

closing of a § 363 sale was contingent on rejection of a collective bargaining agreement)

    The Debtors booked a loss of $1.47 billion in 2015. The Debtors' losses through the first

three months of 2016 were $182 million. The Debtors have consumed almost $300 million in

cash since the Petition Date. Throughout this case, the price of coal has continued to fall. The

Debtors cash burn rate is unsustainable. The uncontroverted testimony of the financial advisor

engaged by the Debtors in this case was that the relief requested by the Debtors in their Rejection

Motion was essential to effectuating the Debtors' reorganization.[20] The Stalking Horse Bidder

will not purchase the Core Assets if they remain subject to the collective bargaining

---

[20] Kevin Carmody ("Carmody") leads the corporate restructuring service line at McKinsey. At the Hearing,
Carmody testified: "I'm very concerned that if we don't get relief under the Coal Act and we don't hit our business
plan, . . . all the variables that we talked about in this case, that we would not successfully be able to reorganize the
business, and that could result in a liquidation. So based on that, I think it's important and essential to get relief."

28

agreements.[21]  The price the Debtors will receive for the sale of their Core Assets will fall without a stalking horse bidder.  The Debtors have been attempting to sell their Core Assets for many months.  No viable bidder has indicated a willingness to purchase the Core Assets subject to the Debtors' collective bargaining agreements.[22]

The arguments advanced by the Coal Act Funds take a slightly a different tact.  They point to the $800 million in cash reserves the Debtors' hope to have on hand as of June 30.   The Coal Act Funds observe that the Debtors' Coal Act obligations represent less than 1% of this expected cash reserve.  The requested relief amounts, therefore, to very little. This argument ignores the truly daunting scale of the liabilities facing the Debtors.  The Debtors' reclamation obligations to the states of West Virginia and Wyoming alone exceed $700 million.  *See In re Alpha Nat. Res.*, 544 B.R. 848, 853 (Bankr. E.D. Va. 2016).  The Debtors' have various other liabilities, such as $692 million owed to their DIP Lenders, $1.25 billion due to their first lien lenders, $714 million outstanding to their second lien lenders, and $2.1 billion owed on unsecured notes.  The Debtors' April 2016 monthly operating report listed over $7.5 *billion* in total liabilities.   The elimination of the Debtors' Coal Act obligations is not rendered unnecessary solely because the Debtors' have other liabilities that dwarf their Coal Act obligations in comparison.  The Debtors immediate need is to balance their cash flows and reduce their spending.  Reducing the Debtors' Coal Act obligations brings the Debtors closer to achieving this goal. If the Debtors fail to balance their cash flows they may fail to timely confirm

[21] Either rejection of the collective bargaining agreements or waiver of the successorship clause by the UMWA is a condition to closing the APA.

[22] The Debtors' investment banker, Rothschild, Inc., reported that the Debtors have contacted over 150 potential purchasers, and received over twenty-four formal indications of interest.  None of these indications of interest had a cash offer for a UMWA mine complex, and no other viable bidder offered to assume the Debtors' collective bargaining agreements.

a Chapter 11 plan of reorganization. This could trigger a default under the DIP Financing Agreement and lead to a full-scale liquidation.

Finally, the UMWA argues that it is unnecessary to eliminate the UMWA collective bargaining agreements because the UMWA operated mine complexes are cash flow positive. The Court is not persuaded. The Debtors business does not operate as a confederation of individual mines – the Debtors operate as a single, fully integrated enterprise. No such mine-by-mine analysis is appropriate. *In re Trump Entm't Resorts, Inc.*, 519 B.R. 76, 92 (Bankr. D. Del. 2014) (analyzing § 1113(b) of the Bankruptcy Code with respect to "the Debtors" without distinguishing the application on a per-debtor or per-subsidiary basis).

It is incumbent upon a court to consider a debtor's proposal in its entirety. A debtor is not required to prove that every part of its proposal is the necessity. *See Horsehead Indus.*, 300 B.R. at 584. "If a debtor were required to prove the necessity of each element of its proposal, a union could defeat the motion by singling out any element of the proposal as unnecessary where an alternative could be reasonably substituted." *Patriot Coal*, 493 B.R. at 125. (citing *New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 348 (2d Cir. 1988)). The Court will not scrutinize whether each individual modification is necessary. Instead, the Court will consider the Debtors' proposal as a whole and ask whether the proposal is necessary to effectuate a reorganization.

The Court finds that the Debtors have met their burden to prove that the rejection of the collective bargaining agreements and the modification of their retiree benefits are necessary under both the Second Circuit and the Third Circuit tests. The Court finds that the relief requested in the Rejection Motion is necessary for the Debtors to have any hope for effectuating a reorganization in this case.

<u>All Parties are Treated Fairly and Equitably</u>

Sections 1113 and 1114 require that the debtor's modification treat the affected parties fairly and equitably.  *See* 11 U.S.C. §§ 1113(b)(1)(A), 1114(f)(1)(A).  The purpose of this requirement "is to spread the burdens of saving the company to every constituency while ensuring that all sacrifice to a similar degree."  *In re Century Brass Prods. Inc.*, 795 F.2d 265, 273 (2d. Cir. 1986).  To determine whether all parties are proportionally sharing in the burden, a court can consider pre-petition wage and benefit reductions.  *See Carey Transportation Inc.*, 816 F.2d at 91.  A debtor's managers and non-union employees should share in any reductions.  *See id.* at 90-91; *In re Indiana Grocery Co., Inc.*, 136 B.R. 182, 194 (Bankr. S.D. Ind. 1990) (finding a debtor failed the "fair and equitable" test when the debtor's management had no reduction in compensation).  However, "[t]he 'fair and equitable' requirement does not mean that the non-union employees must take pay reductions in equal percentages."  *Walter Energy*, 532 B.R. at 892 (citing *In re Alabama Symphony Ass'n*, 155 B.R. 556, 575 (Bankr. N.D. Ala. 1993)); *see Indiana Grocery*, 136 B.R. at 194 ("Equity under section 1113 means fairness under the circumstances, not a dollar for dollar comparison.").

The Court finds that the Debtors' non-union and union employees have been treated in a fair and equitable manner.  The Debtors' non-union employees have suffered all of the labor cost reductions up until the Rejection Motion.  The Debtors have cut their non-union benefits twice, frozen non-union wages, and terminated almost 1500 non-union employees.  The UMWA does not dispute that the non-union employees have shared in the sacrifice.  Instead, the UMWA

contends that the Debtors' Key Employee Incentive Program (KEIP)[23] demonstrate that the Debtors proposal is not "fair and equitable."

As the Court found when it approved the KEIP, the Debtors' senior management has experienced a reduction in total compensation. But more importantly, the Debtors' KEIP is critical to the Debtors' resurgence. The KEIP will ensure that Debtors' management remains focused through the bankruptcy proceedings. The incentives under the KEIP will be paid only if success is achieved. That success will inure to the benefit of both union and non-union employees of the Debtors. *See Walter Energy*, 542 B.R. at 893 (finding that the key employee plan was "critically necessary" to ensure the debtors' operations could be sold as a going concern and promoted fair and equitable treatment).

### The Debtors Negotiated in Good Faith with the Union

Factors six and seven require that the Debtors meet with the union at reasonable times, and negotiate in good faith. 11 U.S.C. §§ 1113(b)(2), 1114(f)(2). No party disputes that the Debtors met with the Union at reasonable times. The UMWA disputes that the Debtors negotiated in good faith. The UMWA contends that any chance for compromise with the Union was eliminated when the Debtors entered into the agreement with the Stalking Horse Bidder. The UMWA argues that the refusal of the Stalking Horse Bidder to accept the collective bargaining agreements forced the Debtors to file the Rejection Motion. The UMWA relies on *Lady H Coal Co.* to support its position.

---

[23] The Debtors' KEIP offered incentive payments to fifteen member of the Debtors' senior management team if the Debtors met certain performance metrics. The four metrics were: i) liquidity; ii) cost savings; iii) work place safety; and iv) environmental compliance. The amount of the incentive payment depends entirely on the threshold level of achievement attained. *See Alpha Nat. Res.*, 546 B.R. at 353-54.

In *Lady H Coal*, the United States Bankruptcy Court for the Southern District of West Virginia found that a debtor had not met the good faith requirements for rejection under § 1113 when the Debtor was "locked into an agreement" with a purchaser prior to beginning negotiations with the union and did not pursue a sale with a buyer who was willing to assume the collective bargaining agreement. *Lady H Coal*, 193 B.R. at 242. The case at bar is different. The Debtors did not sign the APA until well after negotiations had begun with the Union. *See Walter Energy*, 542 B.R. at 894-95. Additionally, no party has put forth a viable bid to assume the Debtors' obligations under their collective bargaining agreements. The Debtors recognized that they could not force the Stalking Horse Bidder to assume the collective bargaining agreements. The Debtors, therefore, facilitated negotiations between the UMWA and the Stalking Horse Bidder directly. These negotiations potentially proved fruitful. The UMWA believes that it may have a deal that is better than the Debtors' proposal.[24] The Court finds the Debtors have acted in good faith throughout the negotiations. The Debtors have submitted proposals, responded to information requests, and were willing to meet with the union frequently throughout the negotiations.

## The Union Refused to Accept the Proposal Without Good Cause

It must be shown that the union rejected the Debtors' proposals "without good cause." 11 U.S.C. §§ 1113(c)(2), 1114(g)(2). Once a union rejects an offer from a debtor, it is incumbent on the union to produce evidence that it had good cause to reject the proposal. *See Patriot Coal*, 493 B.R. at 135 ("The union has the burden of proof that it had good cause to reject the debtor's

---

[24] Counsel for the UMWA stated at the Hearing that the UMWA had very recently received an offer from the Stalking Horse Bidder. Although the UMWA opposed the relief in the Rejection Motion, the UMWA planned to send the proposal from the Stalking Horse Bidder out to its membership for its consideration.

proposal."); *American Provision*, 44 B.R. at 910.  "Where a proposal is necessary for the

debtor's viability and the other section 1114 requirements are met, no good causes [sic] exists to

reject the proposal, even if the proposal requires sacrifices by the union or retirees." *Walter*

*Energy*, 542 B.R. at 895.  If a union fails to compromise with the debtor, its rejection shall be

without good cause.  *See Royal Composing Room*, 848 F.2d at 349.  A union can prove it had

good cause to reject a debtor's proposal when the union's counter proposal adequately meets the

debtor's need for spending reductions.  *See id.*  Because the UMWA has rejected the Debtors'

proposals, they must demonstrate their "reason for declining to accept the debtor's proposal in

whole or in part." *Carey Transportation.*, 816 F.2d at 92.

The Court did receive into evidence the UWMA Counter Proposal.  No direct evidence

was offered, however, as to why the UMWA rejected the Debtors' January 4 Proposal.  The

UMWA Counter Proposal was only capable of being accepted in its entirety, and it was

expressly "conditioned on acceptance and adoption by any purchaser of UMWA-represented

assets of the bankrupt estate."  Under the UMWA Counter Proposal, there could be no agreement

unless the Debtors were able to obtain the approval of the Stalking Horse Bidder.  The Union has

failed to carry its burden of proving that it had just cause for its insistence on the successorship

provision.  The Debtors advised the UMWA on multiple occasions that the Debtors could not

force any potential purchaser to accept an agreement.  *See Walter Energy*, 54 B.R. 897 ("It was

not, and is not, reasonable or good cause, for the Union to outright reject a proposal by

demanding conduct or action the Debtors do not control.").  Moreover, none of the viable bidders

for the Debtors' Core Assets indicated a willingness to accept the Core Assets subject to the

collective bargaining agreement.  Consequentially, the UMWA's insistence on the inclusion of a

term that was a poison pill to any sale of the Core Assets constitutes a rejection without just cause.

## The Balance of the Equities Favor Rejection

The final factor this Court must weigh is whether the balance of equities favors rejection or modification.  11 U.S.C. §§ 1113(c)(3), 1114(g)(3).  The Second Circuit has identified least six "equitable considerations" that a court may consider:

(1) the likelihood and consequences of liquidation if rejection is not permitted;

(2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;

(3) the likelihood and consequences of a strike if the bargaining agreement is voided;

(4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

(5) the cost spreading abilities of various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of other in the industry;

(6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*Carey Transportation.*, 816 F.2d at 93. Many of the six factors are already encompassed in the Court's previous nine-factor analysis. *See In re Mesaba Aviation Inc.*, 341 B.R. 693, 758 (Bankr. D. Minn.) *rev'd on other grounds* 350 B.R. 435 (D. Minn. 2006). A court is not limited to just the six equitable considerations set forth in *Carey Transportation*.  It can consider other

equitable principles as well.  *See e.g.*, *Pinnacle Airlines Corp.*, 483 B.R. at 410 (considering an additional equitable factor: "whether imposing the requested pay cuts or other concessions would still be preferable to the loss of everyone's jobs.").

The threat of liquidation and loss of every union and non-union job permeates the Court's concern in this case, and overrides the other equitable considerations.   Without a rejection of the collective bargaining agreements, the sale to the Stalking Horse Bidder will not close.   There has been no indication that any other party is willing to step forward and assume the collective bargaining agreements.   The Debtors desperately need to bring their cash bleed under control if they have any hope of avoiding liquidation.   No party has suggested how the Debtors might replace the $60 million in expected savings from the Rejection Motion with savings from some other source.[25]   The Court finds that the balance of equities weighs in favor of the Debtors.


**Conclusion**

The Court finds that §§ 1113 and 1114 of the Bankruptcy Code apply to this proceeding. The Court also finds that the Debtors' obligations under the Coal Act are "retiree benefits" and that the Debtors negotiated and presented their January 4 Proposal to the "authorized representative" of the Coal Act Funds.   Finally, the Court concludes that the Debtors have satisfied the nine-factor test set forth in *American Provision Co.* in order to obtain relief under §§ 1113 and 1114 of the Bankruptcy Code to terminate their collective bargaining agreements with the UMWA and modify their outstanding retiree benefit obligations.   Accordingly, the Court will

---

[25] The Court considered in its analysis of the equities that the relief requested in the Rejection Motion would not necessarily result in an actual loss of retiree benefits for the Debtors' Union Employees.  The 1,070 retirees who receive benefits from the Debtors' IEP will be transitioned to the 1992 Plan.  *See* 26 U.S.C. § 9712(b)(2)(B). Additionally, funding for the Coal Act Funds is backstopped up to certain limits by the federal government and by the Abandoned Mine Reclamation Fund. *See* 30 U.S.C. §§ 1231, 1232(h)-(i).  The Debtors have also stated their intention to establish a voluntary employees' beneficiary association for some of their retirees who are affected by the Rejection Motion. *See* 26 U.S.C. § 501(c)(9).

permit the Debtors to reject their collective bargaining agreements with the UMWA pursuant to

§ 1113(c) of the Bankruptcy Code and to modify their retiree benefit obligations to the UMWA

Funds and (under the Coal Act) with the Coal Act Funds pursuant to § 1114(g) of the

Bankruptcy Code.

     A separate order shall issue.

Entered: <u>May 24 2016</u>

        <u>/s/ Kevin R. Huennekens</u>
        UNITED STATES BANKRUPTCY JUDGE

     Entered on Docket: 5/24/16