JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., et al., | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING CERTAIN EXHIBITS TO
## SECOND AMENDED JOINT PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

Pursuant to Section I.A.58 of the *Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (the "Plan"), attached as Exhibit A to the *Notice of Filing of Solicitation Versions of (A) Second Amended Joint Plan of Reorganization and (B) Related Second Amended Disclosure Statement* (Docket No. 2594), filed on June 2, 2016, the above-captioned debtors and debtors in possession (the "Debtors") hereby file the following exhibits to the Plan (collectively, the "Exhibits"):

| | |
|---|---|
| Exhibit I.A.61 | Principal Terms of Contingent Credit Support |
| Exhibit I.A.100 | Principal Terms of the Exit Facility |
| Exhibit I.A.119 | Form of Promissory Note to Be Issued to the First Lien Lenders by NewCo |

NAI-1501346351v1

Exhibit I.A.132        Principal Terms of the GUC Distribution Note

Exhibit I.A.162        Principal Terms of the NewCo ABL Facility

Exhibit I.A.169        Principal Terms of the NewCo Preferred Interests

Exhibit I.A.170        Principal Terms of the NewCo Warrant Agreement

Exhibit I.A.211        Principal Terms of the Reorganized ANR Preferred Interests

Exhibit I.A.216        Principal Terms of the Resolution of Reclamation Obligations

Exhibit I.A.222        Principal Terms of Second Lien Distribution Note

Exhibit I.A.227        Principal Terms of Second Lien Noteholder Distribution

Exhibit I.A.247        Principal Terms of Series A Preferred Interests

Exhibit I.A.248        Principal Terms of Series B Preferred Interests

Exhibit IV.E.2        Initial Directors and Officers of Each Reorganized Debtor

Exhibit IV.G        Additional Terms Related to Reorganized ANR Contingent
                    Revenue Payment

The Debtors reserve their all of their rights with respect to the Exhibits, including the

right to "modify, amend, supplement, restate or withdraw any of the … Exhibits after they are

Filed," as set forth at Section I.A.58  in the Plan.

NAI-1501346351v1                            -2-

Dated: June 30, 2016
      Richmond, Virginia

Respectfully submitted,

/s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

## EXHIBIT I.A.61

**Principal Terms of Contingent Credit Support**

NAI-1501346351v1

**EXHIBIT I.A.61**

**PRINCIPAL TERMS OF CONTINGENT CREDIT SUPPORT[1]**

On the Effective Date, NewCo will provide Reorganized ANR with unsecured credit support (the "Loan(s)"), subject to the terms and conditions of the Global Settlement Term Sheet. The definitive documentation governing the credit support shall provide generally for the following:

| | |
|---|---|
| Borrower | Reorganized ANR |
| Lender(s) | NewCo |
| Guarantor(s) | Substantially all domestic subsidiaries of the Borrower |
| Principal Amount | Commitment to make one or more loans to Borrower up to $35,000,000.00 at any time outstanding |
| Interest Rate | Applicable federal rate in effect under 1274(d) of the Internal Revenue Code (or 2%, whichever is lesser) |
| Maturity | September 30, 2019 |
| Amortization | None |
| Security | None |
| Other Key Terms | If the amount of cash and cash equivalents (other than certain restricted cash) of the Borrower and its subsidiaries (on a consolidated basis) exceeds $20,000,000 at any time on or prior to September 30, 2018, then the Borrower shall repay the Loans in the amount of such excess.  If the amount of cash and cash equivalents (other than certain restricted cash) held by the Borrower and its subsidiaries (on a consolidated basis) exceeds $30,000,000 at any time after September 30, 2018, then the Borrower shall repay the Loans in the amount of such excess. <br><br> After giving effect to any Loans, the balance of cash and cash equivalents (excluding certain restricted cash) held by the Borrower and its subsidiaries (on a consolidated basis) shall not exceed $20,000,000. |

---

[1]   Capitalized terms not otherwise defined in this exhibit shall have the meaning ascribed to them in the Plan.

## EXHIBIT I.A.100

## Principal Terms of the Exit Facility

**EXHIBIT I.A.100**

**PRINCIPAL TERMS OF EXIT FACILITY[1]**

On the Effective Date, Reorganized ANR will be provided with the Exit Facility. Discussions with lender parties are ongoing.  The terms set forth below reflect the structure currently being discussed. Final terms remains subject to material change and this Exhibit will be amended as and when appropriate.

| | |
|---|---|
| Borrower | ANR, Inc. ("ANR") |
| Lender(s) | To Be Determined |
| Guarantor(s) | Reorganized Alpha Coal Sales, LLC ("ACS") and ANR's direct and indirect mining subsidiaries ("Mining Companies" and together with ANR, Inc. and ACS, the "Loan Parties") |
| Principal Amount | $125,000,000 |
| Interest Rate | LIBOR plus [10.00]% (with a LIBOR floor of 1.00%) per annum on the aggregate cash collateral supporting outstanding letters of credit |
| Maturity | Three years from the closing of the Exit Facility |
| Amortization | None |
| Administrative Agent | To Be Determined |
| Security | First priority perfected security interest in the following: (a) accounts receivable, (b) as-extracted collateral and other coal inventory and certain contract rights in respect thereof, (c) certain restricted cash, and (d) all proceeds of any of the foregoing. |
| Financial Covenants | To include monthly tests of: (i) minimum liquidity of $[TBD] million at all times; (ii) collateral coverage ratio of no less than [TBD]x at all times; (iii) customary dilution limit satisfactory to the agent. |
| Default Rate | [4.00]% per annum above the applicable rates of interest and rate for letter of credit fees. |

---

[1]     Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

| | |
|---|---|
| Early Termination | If the Borrower terminates the Exit Facility prior to the maturity date, the Borrower shall pay an early termination fee to be negotiated. |
| Other Key Terms | Customary reserves and covenants for facilities of this type. |
| Fees, Expenses and Indemnification | The Exit Facility is anticipated to require the payment of certain fees and expenses, potentially including a commitment fee, reimbursement of certain expenses and a break up fee if an alternative transaction is consummated.  In addition, the Exit Facility is anticipated to include customary indemnification provisions. |

## EXHIBIT I.A.119

**Form of Promissory Note to Be Issued to the First Lien Lenders by NewCo**

NAI-1501346351v1

DRAFT DATED JUNE 30, 2016

**CONTURA ENERGY, INC.**

**AS ISSUER**

**AND EACH OF THE GUARANTORS PARTY HERETO**

**10.00% SENIOR SECURED FIRST LIEN NOTES**

**INDENTURE**

**DATED AS OF JULY [15], 2016**

**[•]**

**AS TRUSTEE AND COLLATERAL AGENT**

#88605336v6

## TABLE OF CONTENTS

PAGE

### Article 1
### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01. *Definitions* ...........................................................................................1
Section 1.02. *Other Definitions* ...............................................................................32
Section 1.03. *Rules of Construction* ........................................................................33
Section 1.04. *References to Subordination* ..............................................................33
Section 1.05. *Acts of Holders* ..................................................................................34

### Article 2
### THE NOTES

Section 2.01. *Designation, Amount and Issuance of Notes* .....................................35
Section 2.02. *Form of Notes* ....................................................................................35
Section 2.03. *Denomination of Notes* ......................................................................37
Section 2.04. *Payments* ............................................................................................37
Section 2.05. *Execution and Authentication* ...........................................................39
Section 2.06. *Registrar and Paying Agent* ..............................................................40
Section 2.07. *Money and Securities Held in Trust* ..................................................42
Section 2.08. *Holder Lists* .......................................................................................42
Section 2.09. *Transfer and Exchange* ......................................................................43
Section 2.10. *Transfer Restrictions* .........................................................................47
Section 2.11. *Replacement Notes* .............................................................................49
Section 2.12. *Temporary Notes* ................................................................................49
Section 2.13. *Cancellation* .......................................................................................50
Section 2.14. *Outstanding Notes* ..............................................................................50
Section 2.15. *Persons Deemed Owners* ...................................................................51
Section 2.16. *Repurchases* .......................................................................................51
Section 2.17. *CUSIP and ISIN Numbers* .................................................................51

### Article 3
### REPURCHASE AT THE OPTION OF THE HOLDER

Section 3.01. *Change of Control Permits Holders to Require the Company to Repurchase the Notes* ......................................................................51
Section 3.02. *Change of Control Notice* ..................................................................52
Section 3.03. *Change of Control Repurchase Notice* ..............................................54
Section 3.04. *Withdrawal of Change of Control Repurchase Notice* ......................55
Section 3.05. *Effect of Change of Control Repurchase Notice* ...............................55
Section 3.06. *Notes Repurchased in Part* ................................................................56
Section 3.07. *Covenant to Comply With Securities Laws Upon Repurchase of Notes* ....56
Section 3.08. *Deposit of Change of Control Repurchase Price* ..............................57
Section 3.09. *Covenant Not to Repurchase Notes Upon Certain Events of Default* ........57

i

## Article 4
## COVENANTS

Section 4.01.  *Payment of Notes* ........................................................................57
Section 4.02.  *144A Information* .........................................................................58
Section 4.03.  *Reports* ........................................................................................58
Section 4.04.  *Compliance Certificate* ...............................................................59
Section 4.05.  *Restriction on Purchases by the Company* ..................................60
Section 4.06.  *Taxes* ...........................................................................................60
Section 4.07.  *Corporate Existence* ....................................................................60
Section 4.08.  *Stay, Extension and Usury Laws* .................................................60
Section 4.09.  *Further Instruments and Acts* ......................................................61
Section 4.10.  *Restricted Payments* ....................................................................61
Section 4.11.  *Dividend and Other Payment Restrictions Affecting Restricted
    Subsidiaries* .................................................................................64
Section 4.12.  *Incurrence of Indebtedness and Issuance of Preferred Stock* ....66
Section 4.13.  *Asset Sales* ..................................................................................71
Section 4.14.  *Transactions with Affiliates* ........................................................74
Section 4.15.  *Liens* ............................................................................................77
Section 4.16.  *Additional Note Guarantees* ........................................................77
Section 4.17.  *Designation of Restricted and Unrestricted Subsidiaries* ...........77
Section 4.18.  *After-Acquired Property* ..............................................................78
Section 4.19.  *Limitation on Issuance of Equity Interests* ..................................78
Section 4.20.  *Business Activities* .......................................................................79

## Article 5
## CONSOLIDATION, MERGER AND SALE OF ASSETS

Section 5.01.  *Company May Consolidate, Merge or Sell Its Assets Only on Certain
    Terms* ............................................................................................79
Section 5.02.  *Successor Substituted* ..................................................................80

## Article 6
## DEFAULTS AND REMEDIES

Section 6.01.  *Events of Default* ..........................................................................80
Section 6.02.  *Acceleration* .................................................................................83
Section 6.03.  *Other Remedies* ...........................................................................84
Section 6.04.  *[Reserved]* ...................................................................................84
Section 6.05.  *Waiver of Past Defaults* ...............................................................84
Section 6.06.  *Control by Majority* .....................................................................84
Section 6.07.  *Limitation on Suits* .......................................................................84
Section 6.08.  *Rights of Holders to Receive Payment* ........................................85
Section 6.09.  *Collection Suit by Trustee* ...........................................................85
Section 6.10.  *Trustee May File Proofs of Claim* ...............................................85
Section 6.11.  *Priorities* .....................................................................................86
Section 6.12.  *Undertaking for Costs* ..................................................................87

## Article 7
## TRUSTEE

Section 7.01. *Duties of Trustee* ................................................................................87
Section 7.02. *Rights of Trustee* ................................................................................88
Section 7.03. *Individual Rights of Trustee* .............................................................89
Section 7.04. *Trustee's Disclaimer* ..........................................................................89
Section 7.05. *Notice of Defaults* ..............................................................................89
Section 7.06. *Compensation and Indemnity* ............................................................90
Section 7.07. *Replacement of Trustee* .....................................................................91
Section 7.08. *Successor Trustee by Merger* .............................................................92
Section 7.09. *Eligibility; Disqualification* ...............................................................92
Section 7.10. *Trustee's Application for Instructions from the Company* ..................92

## Article 8
## SATISFACTION AND DISCHARGE

Section 8.01. *Discharge of Liability on Notes* ........................................................92
Section 8.02. *Repayment to the Company* ................................................................93

## Article 9
## AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01. *Without Consent of Holders* ...............................................................93
Section 9.02. *With Consent of Holders* ....................................................................94
Section 9.03. *Execution of Supplemental Indentures* ...............................................96
Section 9.04. *Notices of Supplemental Indentures and Intercreditor Agreement* .....96
Section 9.05. *Effect of Supplemental Indentures* .....................................................96
Section 9.06. *Revocation and Effect of Consents, Waivers and Actions* .................96
Section 9.07. *Notation on, or Exchange of, Notes* ....................................................97
Section 9.08. *Payment for Consent* ..........................................................................97

## Article 10
## REDEMPTION AT THE OPTION OF THE COMPANY

Section 10.01. *No Sinking Fund* ...............................................................................97
Section 10.02. *Right To Redeem the Notes* ...............................................................97
Section 10.03. *Redemption Notice* ............................................................................98
Section 10.04. *Effect of Redemption Notice* .............................................................98
Section 10.05. *Deposit of Redemption Price* ............................................................98
Section 10.06. *Effect of Deposit* ...............................................................................99
Section 10.07. *Covenant Not to Redeem Notes Upon Certain Events of Default* ......99
Section 10.08. *Repayment to the Company* ...............................................................99

## Article 11
## NOTE GUARANTEES

Section 11.01. *Note Guarantees* ...............................................................................100

#88605336v6

Section 11.02. *Limitation on Guarantor Liability* .......................................102
Section 11.03. *Execution and Delivery of Note Guarantee* ...........................102
Section 11.04. *Guarantors May Consolidate, etc., on Certain Terms*...........102
Section 11.05. *Releases*.................................................................................103

## Article 12
## INTERCREDITOR AGREEMENT

## Article 13
## COLLATERAL

Section 13.01. *Security Documents* ...............................................................106
Section 13.02. *Collateral Agent*....................................................................108
Section 13.03. *Authorization of Actions to Be Taken* ...................................109
Section 13.04. *Release of Collateral*.............................................................110
Section 13.05. *Use of Collateral; Compliance with Section 314(d) of the TIA*.............112
Section 13.06. *Powers Exercisable by Receiver or Trustee* ..........................112
Section 13.07. *Voting*....................................................................................112
Section 13.08. *Appointment and Authorization of [•] as Collateral Agent* ...................113
Section 13.09. *Recordings and Opinions*.......................................................113
Section 13.10. *Release Upon Termination of the Company's Obligations* ...................114
Section 13.11. *Bonded Contracts*..................................................................114

## Article 14
## MISCELLANEOUS

Section 14.01. *Trust Indenture Act Controls* ................................................115
Section 14.02. *Notices*..................................................................................115
Section 14.03. *Certificate and Opinion as to Conditions Precedent*.............116
Section 14.04. *Statements Required in Certificate or Opinion*.....................116
Section 14.05. *Separability Clause* ...............................................................117
Section 14.06. *Rules by Trustee*....................................................................117
Section 14.07. *Governing Law and Waiver of Jury Trial*.............................117
Section 14.08. *Calculations* ..........................................................................117
Section 14.09. *No Recourse Against Others* .................................................117
Section 14.10. *Successors* .............................................................................117
Section 14.11. *Multiple Originals*.................................................................117
Section 14.12. *Table of Contents; Headings* .................................................118
Section 14.13. *Force Majeure* .......................................................................118
Section 14.14. *Submission to Jurisdiction* ....................................................118
Section 14.15. *Legal Holidays* ......................................................................118
Section 14.16. *Benefits of Indenture* .............................................................118
Section 14.17. *U.S.A* .....................................................................................118
Section 14.18. *Tax Withholding*....................................................................119

Form of Note                                                        A-1
Form of Transfer Certificate                                        B-1

#88605336v6

Form of Supplemental Indenture                                    C-1
Schedule of Existing Indebtedness                          Schedule I
Schedule of Existing Investments                          Schedule II
Schedule of Existing Liens                               Schedule III

v

#88605336v6

INDENTURE, dated as of July [15], 2016 among Contura Energy, Inc., a Delaware corporation (the "**Company**"), the Guarantors (as defined below) party hereto and [•], as trustee (the "**Trustee**") and collateral agent (the "**Collateral Agent**").

WHEREAS, the Company has duly authorized the creation of an issue of three hundred million dollars ($300,000,000) aggregate principal amount of the Company's 10.00% Senior Secured First Lien Notes; and

WHEREAS, the Company and each of the Guarantors has duly authorized the execution and delivery of this Indenture. ,

NOW THEREFORE, each party agrees as follows for the benefit of each of the other parties hereto and for the equal and ratable benefit of the Holders (as defined below) of the Company's 10.00% Senior Secured First Lien Notes:

**Article 1**

**DEFINITIONS AND INCORPORATION BY REFERENCE**

Section 1.01.   *Definitions*.

"**Acquired Debt**" means, with respect to any specified Person:

(1) Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming, a Subsidiary of, such specified Person; and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Affiliate**" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "**control**," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Applicable Procedures**" means, with respect to any transfer or transaction involving a Global Note or any beneficial interest therein, the rules and procedures of the Depositary for such Note, in each case to the extent applicable to such transfer or transaction and as in effect from time to time.

"**Asset Sale**" means:

(1) the sale, lease, conveyance or other disposition of any assets or rights, *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by Article 5 and not by Section 4.13; and

(2) the issuance of Equity Interests by any of the Company's Restricted Subsidiaries or the sale of Equity Interests in any of the Company's Subsidiaries (other than directors' qualifying Equity Interests or Equity Interests required by applicable law to be held by a Person other than the Company or one of its Restricted Subsidiaries).

Notwithstanding anything to the contrary in the preceding paragraph, none of the following items will be deemed to be an Asset Sale (other than to the extent such Asset Sale includes Equity Interests of a Guarantor (or any debt security that is convertible into, or exchangeable for, Equity Interest of a Guarantor) not received by the Company or another Guarantor):

(1) any single transaction or series of transactions in a twelve-month period that involves assets having an aggregate Fair Market Value of less than $10.0 million;

(2) a transfer of assets (including, without limitation, Equity Interests) constituting Collateral between or among the Company and the Guarantors;

(3) a transfer of assets that are not Collateral between or among the Company and its Restricted Subsidiaries;

(4) an issuance of Equity Interests by a Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary of the Company;

(5) any sale or other disposition of damaged, worn-out or obsolete assets or assets otherwise unsuitable or no longer required for use in the ordinary course of the business of the Company and its Restricted Subsidiaries (including the abandonment or other disposition of property that is, in the reasonable judgment of the Company, no longer profitable, economically practicable to maintain or useful in the conduct of the business of the Company and its Restricted Subsidiaries, taken as whole);

(6) a Restricted Payment that does not violate Section 4.10, or a Permitted Investment;

(7) the licensing or sublicensing of intellectual property or other general intangibles on customary terms in the ordinary course of business and the abandonment of intellectual property which is no longer used or useful in or material to the businesses of the Company and its Restricted Subsidiaries;

(8) the sale, lease, sublease, license, sublicense, consignment, conveyance or other disposition of products, services, inventory and other assets in the

2

#88605336v6

ordinary course of business, including leases with respect to facilities that are temporarily not in use or pending their disposition;

(9) a disposition of leasehold improvements or leased assets in connection with the termination of any operating lease;

(10) dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements or the sale or other disposition of Hedging Obligations or other financial instruments in the ordinary course of business;

(11) any foreclosure or any similar action with respect to the property or other assets of the Company or any Restricted Subsidiary;

(12) the sublease or assignment to third parties of leased facilities in the ordinary course of business;

(13) a Casualty or Condemnation Event whose proceeds are subject to Section 4.13;

(14) the creation of or realization on a Lien to the extent that the granting of such Lien was not in violation of Section 4.14;

(15) any surrender or waiver of contract rights or settlement, release, recovery on or surrender of contract, tort or other claims;

(16) the sale or other disposition of cash or Cash Equivalents; and

(17) to the extent allowable under Section 1031 of the Internal Revenue Code of 1986 or any successor provision, or any similar provision of any foreign country, any exchange of like property (excluding any boot thereon) for use in a Permitted Business, *provided* that the aggregate Fair Market Value of the property or assets (including cash and Cash Equivalents) received by the Company and its Restricted Subsidiaries in such exchange is at least equal to the aggregate Fair Market Value of the property or assets disposed of by the Company or such Restricted Subsidiaries in such exchange.

Notwithstanding anything to the contrary in the preceding paragraph, the Company may voluntarily treat any transaction otherwise exempt from the definition of "Asset Sale" pursuant to clauses (1) through (17) above as an "Asset Sale" by designating such transaction as an Asset Sale for purposes of this Indenture in an Officers' Certificate delivered to the Trustee.

"**Attributable Debt**" in respect of a sale and leaseback transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction, including any period for which such lease has been extended or may, at the

3

#88605336v6

option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with U.S. GAAP; *provided*, *however*, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Attributable Debt represented thereby will be the amount of liability in respect thereof determined in accordance with the definition of "Capital Lease Obligation."

"**Bankruptcy Law**" means Title 11, United States Code, or any similar U.S. federal, state or non-U.S. law for the relief of debtors.

"**Beneficial Owner**" has the meaning assigned to such term in Rules 13d-3 and 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular person or group, such person or group will be deemed to have beneficial ownership of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time. The terms "**Beneficially Own**" and "**Beneficially Owned**" have a corresponding meaning.

"**Board of Directors**" means the board of directors of the Company or a committee of such board duly authorized to act for it.

"**Board Resolution**" means a copy of one or more resolutions certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Bonded Contract**" means, with respect to the Company or any Subsidiary of the Company, any construction contract of the Company or such Subsidiary with respect to which (i) a surety bond is required to be issued in connection with such construction contract and (ii) a Surety has issued such Surety Bond for the benefit or account of the Company or such Subsidiary.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which the Federal Reserve Bank of New York or the place of payment is authorized or required by law or executive order to close or be closed.

"**Capital Lease Obligation**" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with U.S. GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease on or prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"**Capital Stock**" means, for any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of, or interests in (however designated), the equity of such Person, but excluding any debt securities convertible into such equity.

"**Cash Equivalents**" means:

4

(1) any evidence of Indebtedness issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof with a final maturity not exceeding five years from the date of acquisition;

(2) deposits, certificates of deposit or acceptances of any financial institution that is a member of the Federal Reserve System and whose unsecured long term debt is rated at least "A" by Standard & Poor's Ratings, a division of McGraw Hill Financial, Inc. ("**S&P**"), or at least "A2" by Moody's Investors Service, Inc. ("**Moody's**") or any respective successor agency;

(3) commercial paper with a maturity of 365 days or less issued by a corporation (other than an Affiliate of the Company) organized and existing under the laws of the United States of America, any state thereof or the District of Columbia and rated at least "A-1" by S&P and at least "P-1" by Moody's or any respective successor agency;

(4) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States or issued by any agency thereof and backed by the full faith and credit of the United States maturing within 365 days from the date of acquisition;

(5) readily marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 365 days from the date of acquisition and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's or any respective successor agency;

(6) demand deposits, savings deposits, time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Section 3(a)(62) of the Exchange Act) with maturities of not more than 365 days from the date of acquisition;

(7) money market funds which invest substantially all of their assets in securities described in the preceding clauses (1) through (6); and

(8) in the case of a Foreign Subsidiary, instruments equivalent to those referred to in clauses (1) through (7) above denominated in a foreign currency, which are (i) substantially equivalent in tenor, (ii) issued by, or entered into with, foreign persons with credit quality generally accepted by businesses in the jurisdictions in which such Foreign Subsidiary operates and (iii) customarily used by businesses for short-term cash management purposes in any jurisdiction outside of the United States to the extent reasonably required in connection with any business conducted by such Foreign Subsidiary.

5

"**Casualty or Condemnation Event**" means any taking under power of eminent domain or similar proceeding and any insured loss, in each case, relating to property or other assets that constituted Collateral owned by the Company or a Guarantor.

"**Change of Control**" means an event that will be deemed to occur if any of the following occurs:

(i) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act other than the Company, its Restricted Subsidiaries, and the Company and its Restricted Subsidiaries' employee benefit plans, has become the direct or indirect Beneficial Owner of shares of the Voting Stock of the Company representing more than 50% of the voting power of all of the Company's Voting Stock;

(ii) the consummation of:

(I) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any person;

(II) any transaction or series of related transactions in connection with which (whether by means of exchange, liquidation, consolidation, merger, combination, reclassification, recapitalization, acquisition or otherwise) all of the Common Stock is exchanged for, converted into, acquired for, or constitutes solely the right to receive, other securities, other property, assets or cash, but excluding any merger, consolidation, share exchange or acquisition of the Company with or by another person pursuant to which the persons that Beneficially Owned, directly or indirectly, the shares of the Company's Voting Stock immediately prior to such transaction Beneficially Own, directly or indirectly, immediately after such transaction, shares of the surviving, continuing or acquiring corporation's Voting Stock representing more than 50% of the total outstanding voting power of all outstanding classes of Voting Stock of the surviving, continuing or acquiring corporation in substantially the same proportions vis-à-vis each other as immediately prior to such transaction; or

(iii) the Company's stockholders approve any plan or proposal for the liquidation or dissolution of the Company.

"**Close of Busines**s" means 5:00 p.m., New York City time.

"**Collateral**" means all property subject or purported to be subject, from time to time, to a Lien under any of the Security Documents.

"**Collateral Agent**" means the party serving in such capacity under this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, means such successor.

"**Commercial Motor Vehicles**" has the meaning set forth in the Security Agreement.

#88605336v6

"**Common Stock**" means the shares of the common stock of the Company, par value [$0.01] per share, or any other shares of Capital Stock of the Company into which such shares of common stock will be reclassified or changed.

"**Company**" means the party named as such in the first paragraph of this Indenture until a successor or assignee replaces it pursuant to the applicable provisions hereof and, thereafter, means the successor or assignee.

"**Company Order**" means a written request or order signed in the name of the Company by any Officer.

"**Consolidated Cash Flow**" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period (A) *plus*, without duplication to the extent the same was deducted in calculating Consolidated Net Income:

(1) provision for taxes based on income, profits or capital, including without limitation state, franchise and similar taxes (such as the Pennsylvania and West Virginia franchise tax), of such Person and its Restricted Subsidiaries or the Tax Amount for such period, to the extent that such provision for taxes or Tax Amount was deducted in computing such Consolidated Net Income; *plus*

(2) the Fixed Charges of such Person and its Restricted Subsidiaries for such period, to the extent that such Fixed Charges were deducted in computing such Consolidated Net Income; *plus*

(3) depreciation, depletion, amortization (including amortization of intangibles, deferred financing fees and any amortization included in pension, OPEB or other employee benefit expenses, but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash expenses (including without limitation write-downs and impairment of property, plant, equipment and intangibles and other long-lived assets and the impact of purchase accounting, but excluding any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, depletion, amortization and other non-cash expenses were deducted in computing such Consolidated Net Income; *plus*

(4) The noncash portion of 'straight-line" rent expense; *plus*

(5) the income attributable to the minority equity interests of third parties in any non-Wholly Owned Subsidiary in such period or any prior period, except to the extent of dividends declared or paid on Equity Interests held by third parties; *plus*

(6) any other noncash charges (but excluding any such charge which requires an accrual of, or a cash reserve for, anticipated cash charges for any future period); provided that, for purposes of this clause (6), any noncash charges

7

or losses shall be treated as cash charges or losses in any subsequent period during which cash disbursements attributable thereto are made; *plus*

(7) any non-cash portion of asset retirement obligations in accordance with Accounting Standards Codifications ("ASC") 410 Asset Retirement and Environmental Obligations, and any similar accounting in prior periods; *minus*

(B)(1) noncash items increasing such Consolidated Net Income for such period, other than any items which represent the reversal of any accrual of, or cash reserve for, anticipated charges in any prior period where such accrual or reserve is no longer required, (2) the losses attributable to the minority equity interests of third parties in any non-Wholly Owned Subsidiary, in each case, on a consolidated basis and determined in accordance with GAAP and (3) the cash portion of "straight-line" rent expense which exceeds the amount expensed in respect of such rent expense.

"**Consolidated Net Income**" means, with respect to any specified Person for any period, the aggregate of the net income (loss) from continuing operations of such Person and its Restricted Subsidiaries for such period, on a consolidated basis determined in accordance with U.S. GAAP and without any reduction in respect of preferred stock dividends; *provided* that:

(1) any net after-tax extraordinary, unusual or nonrecurring gains or losses or income or expense or charges (including, without limitation, income, expenses and charges from litigation and arbitration settlements, severance, retention, relocation and other restructuring costs), less all fees and expenses relating thereto, shall be excluded;

(2) fees, expenses or charges related to any Asset Sale, any Asset Acquisition (or any similar transaction or transactions), any incurrence or repayment of Indebtedness, including any refinancing transaction or any amendment or modification of any Indebtedness, or the issuance of any Equity Interests and including any such transaction occurring on, prior to or after the date of the indenture (in each case, whether or not successful) shall be excluded;

(3) net after-tax income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded;

(4) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the Board of Directors of the Company) shall be excluded;

(5) any net after-tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness, Hedging Obligations or other derivative instruments shall be excluded;

8

#88605336v6

(6)(a) the Net Income for such period of any Person that is not a Subsidiary, or that is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments in respect of equity that are actually paid in cash (or to the extent converted into cash) by the referent Person to the Company or a Restricted Subsidiary thereof in respect of such period and (b) the Net Income for such period shall include any dividend, distribution or other payments in respect of equity paid in cash by such Person to the Company or a Restricted Subsidiary thereof in excess of the amount included in clause (a);

(7) any increase in depreciation, depletion or amortization or any one-time non-cash charges (such as purchased in-process research and development or capitalized manufacturing profit in inventory) resulting from purchase accounting in connection with any acquisition that is consummated prior to or after the Issue Date shall be excluded;

(8) any noncash impairment charges resulting from the application of ASC 350 Intangibles—Goodwill and Other and ASC 360 Property, Plant and Equipment and the amortization of intangibles pursuant to ASC 805 Business Combinations shall be excluded;

(9) any long-term incentive plan accruals and any non-cash compensation expense realized from grants of stock appreciation or similar rights, stock options or other rights to officers, directors and employees of such Person or any of its Restricted Subsidiaries shall be excluded;

(10)(A) any net unrealized gain or loss (after any offset) resulting in such period from obligations under any Hedge Obligations and the application of ASC 815 Derivatives and Hedging and (B) any net unrealized gain or loss (after any offset) resulting in such period from currency translation gains or losses shall be excluded; and

(11) the cumulative effect of a change in accounting principles will be excluded.

"**Consolidated Total Assets**" means, at any date, with respect to any Person, the total assets of such Person and its Restricted Subsidiaries determined on a consolidated basis in accordance with GAAP.

"**Corporate Trust Office**" means the corporate trust office of the Trustee at which the trust created by this Indenture will be administered, which office, as of the Issue Date, is located at [•], [Address], and may later be located at such other address as the Trustee, upon delivering notice to the Holders, the Paying Agent, the Registrar and the Company, designates.

"**Custodian**" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

9

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Definitive Notes**" means Notes that are in registered definitive form.

"**Depositary**" means DTC; *provided* that the Company may at any time, upon delivering notice to the Holders, the Company, the Trustee, the Registrar and the Paying Agent, appoint a successor Depositary.

"**Disqualified Stock**" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the earlier of (x) the date that is 91 days after the date on which the Notes mature and (y) the date that is 91 days after the date no Notes remain outstanding; *provided* that only the portion of the Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock; *provided, further,* that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Restricted Subsidiaries or by any such plan to such employees, such Capital Stock will not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability. Notwithstanding anything to the contrary in the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase or redeem such Capital Stock upon the occurrence of a Change of Control or an Asset Sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 4.10. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company or any and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory repurchase or redemption provisions of, such Disqualified Stock exclusive of accrued dividends (other than the accretion, accumulation or payment-in-kind of dividends).

"**DTC**" means The Depository Trust Company.

"**Equity Interests**" means Capital Stock; *provided*, *however*, that "Equity Interests" does not include any debt security that is convertible into, or exchangeable for, (x) Capital Stock or (b) Capital Stock and/or cash based on the value of such Capital Stock).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Property**" has the meaning set forth in the Security Agreement.

10

"**Excluded Real Property**" means any real property owned by the Company or a Guarantor:

(1) with a Fair Market Value of less than $[•] million;

(2) on the Issue Date and not subject to a mortgage or deed trust in favor of the collateral agent under the Senior Credit Agreement as of the Issue Date; or

(3) if the collateral agent under the Senior Credit Agreement has elected to not take a security interest in such parcel of owned real property;

*provided*, *however*, that if, after the Issue Date, the Company or any Guarantor grants a mortgage or deed of trust in favor of collateral agent under the Senior Credit Agreement on any Excluded Real Property, such real property shall cease to be Excluded Real Property for so long as such mortgage or deed of trust remains in place and the Company or any Guarantor, as applicable, shall grant a mortgage or deed of trust over such real property in favor of the Collateral Agent as if such property is subject to Section 4.19 and shall be subject to the requirements of Section 13.01(b).

"**Excluded Subsidiary**" shall mean (a) any direct or indirect U.S. Subsidiary of a direct or indirect Foreign Subsidiary of the Company, (b) any Unrestricted Subsidiary and (c) any Foreign Subsidiary.

"**Existing Indebtedness**" means all Indebtedness of the Company and its Subsidiaries (other than Indebtedness under the Senior Credit Agreement) in existence on the Issue Date as listed on *Schedule I* hereto, until such amounts are repaid.

"**Fair Market Value**" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by (unless otherwise provided in this Indenture) the Board of Directors.

"**Fixed Charge Coverage Ratio**" means with respect to any specified Person for any period, the ratio of the Consolidated Cash Flow of such Person for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than (i) ordinary working capital borrowings and (ii) Indebtedness incurred under any revolving credit facility for ordinary working capital purposes unless such Indebtedness has been permanently repaid and has not been replaced) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "**Calculation Date**"), then the Fixed Charge Coverage Ratio will be calculated after giving *pro forma* effect, in the good-faith judgment of the Chief Financial Officer of the Company as set forth in an certificate (with supporting calculations) delivered to the Trustee, to such incurrence, assumption, guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of preferred

11

stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio:

(1) acquisitions of business entities or property and assets constituting a division or line of business that have been made by the specified Person or any of its Restricted Subsidiaries, including through Investments, mergers or consolidations, or any Person or any of its Restricted Subsidiaries acquired by the specified Person or any of its Restricted Subsidiaries, and including all related financing transactions and including increases in ownership of Restricted Subsidiaries, during the reference period or subsequent to such reference period and on or prior to the Calculation Date, or that are to be made on the Calculation Date, will be given *pro forma* effect, in the good-faith judgment of the Chief Financial Officer of the Company, as if they had occurred on the first day of the reference period, in accordance with Regulation S-X promulgated under the Exchange Act. Whenever *pro forma* effect is given to a transaction, the Chief Financial Officer shall deliver to the Trustee a certificate;

(2) the Consolidated Cash Flow attributable to discontinued operations, as determined in accordance with U.S. GAAP, and operations or businesses (and ownership interests therein) disposed of on or prior to the Calculation Date, will be excluded;

(3) the Fixed Charges attributable to discontinued operations, as determined in accordance with U.S. GAAP, and operations or businesses (and ownership interests therein) disposed of on or prior to the Calculation Date, will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date;

(4) any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such reference period;

(5) any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such reference period;

(6) if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had een the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness if such Hedging Obligation has a remaining term as of the Calculation Date that exceeds 12 months); and

(7) if any Indebtedness is incurred under a revolving credit facility and is being given *pro forma* effect in such calculation, the interest on such Indebtedness

12

#88605336v6

shall be calculated based upon the average daily balance of such Indebtedness during the applicable period except as set forth in the first paragraph of this definition; and

"**Fixed Charges**" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1) the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, excluding amortization of debt issuance costs and the expensing of any bridge or other financing fees, but including original issue discount, non-cash interest payments, the interest component of any deferred payment obligations (classified as Indebtedness under the Indenture), the interest component of all payments associated with Capital Lease Obligations and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; *plus*

(2) the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of Disqualified Stock of the Company or preferred stock of any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests of the Company (other than Disqualified Stock) or to the Company or any of its Restricted Subsidiaries, and (b) a fraction, the numerator of which is one and the denominator of which is one minus the then-current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, determined on a consolidated basis in accordance with U.S. GAAP; *plus*

(3) the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; *plus*

(4) all cash dividend payments or other cash distributions on any series of preferred equity of such Person and all other dividend payments or other distributions on the Disqualified Stock of such Person; *plus*

(5) plus all capital expenditures; *plus*

(6) all Settlement Obligations; *less*

(7) interest income.

"**Free Trade Date**" means the date that is one year after the relevant Last Original Issue Date.

"**Global Note**" means a permanent global note that is in the form of the Note attached hereto as Exhibit A and that is registered in the name of the Depositary or the nominee of the Depositary and deposited with the Depositary, the nominee of the Depositary or a custodian appointed by the Depositary or the nominee of the Depositary.

"**Global Notes Legend**" means the legend identified as such in Exhibit A hereto.

13

"**guarantee**" means a guarantee, other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"**Guarantors**" means any Restricted Subsidiary of the Company that executes a Note Guarantee in accordance with the provisions of this Indenture, and their respective successors and assigns, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

"**Hedging Obligations**" means, with respect to any specified Person, the obligations of such Person under:

(1) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements;

(2) other agreements or arrangements designed to manage interest rates or interest rate risk; and

(3) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

"**Holder**" or "**Holders**" means a Person or Persons in whose name a Note is registered in the Register.

"**Indebtedness**" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

(1) in respect of borrowed money;

(2) evidenced by bonds (excluding Surety Bonds), notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(3) in respect of banker's acceptances;

(4) representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions;

(5) representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed, but excluding any accrued liabilities being contested in good faith by appropriate proceedings promptly instituted and diligently conducted; or

14

(6) representing any Hedging Obligations,

in each case, if and to the extent any of the preceding items would appear as a liability upon a balance sheet (excluding the footnotes) of the specified Person prepared in accordance with U.S. GAAP. In addition, the term "Indebtedness" includes, (i) to the extent not otherwise included, the guarantee by the specified Person of any Indebtedness of any other Person and (ii) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) equal to the lesser of (x) the Fair Market Value of such asset as of the date of determination and (y) the amount of such Indebtedness.

Notwithstanding anything to the contrary in the foregoing paragraph, the term "Indebtedness" will not include (a) in connection with the purchase by the Company or any of its Restricted Subsidiaries of any business, post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing unless such payments are required under U.S. GAAP to appear as a liability on the balance sheet (excluding the footnotes), *provided*, that at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 30 days thereafter; (b) contingent obligations incurred in the ordinary course of business and not in respect of borrowed money; (c) deferred or prepaid revenues; (d) any Capital Stock other than Disqualified Stock; or (e) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller. Indebtedness shall be calculated without giving effect to the effects of Accounting Standards Codification Topic 815 "Derivatives and Hedging" and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

"**Indenture**" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"**Intercreditor Agreement**" means (i) that certain intercreditor and subordination agreement, to be dated the Issue Date, among the Collateral Agent and the collateral agent under the Senior Credit Agreement and acknowledged by the Company and certain of its Subsidiaries, as amended, supplemented, restated, modified or renewed, in whole or in part from time to time, or any other successor agreement and whether among the same or any other parties or (ii) any replacement thereof entered into pursuant to Section 13.02(e).

"**Investments**" means, with respect to any specified Person, all direct or indirect investments by such specified Person in other Persons (including Affiliates) in the forms of loans (including guarantees of Indebtedness or other Obligations), advances or capital contributions (excluding (i) commission, travel and similar advances to officers and employees made in the ordinary course of business and (ii) extensions of credit to customers or advances, deposits or payment to or with suppliers, lessors or utilities or for

15

workers' compensation, in each case, that are incurred in the ordinary course of business and recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of such specified Person prepared in accordance with U.S. GAAP), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with U.S. GAAP. The acquisition by the Company or any Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person determined as provided in Section 4.10(c). Except as otherwise provided in this Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value but after giving effect (without duplication) to all subsequent reductions in the amount of such Investment as a result of (x) the repayment or disposition thereof for cash or (y) the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary (valued proportionately to the equity interest in such Unrestricted Subsidiary of the Company or such Restricted Subsidiary owning such Unrestricted Subsidiary at the time of such redesignation) at the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of such redesignation, in the case of clauses (x) and (y), not to exceed the original amount, or Fair Market Value, of such Investment.

"**Issue Date**" means July [15], 2016.

"**Last Original Issue Date**" means the last date of original issuance of the Notes; *provided*, *however*, that Notes originally issued hereunder on the Issue Date (or any Notes issued in exchange therefor or in substitution thereof) shall have a separate Last Original Issue Date (determined as aforesaid) than any other Notes originally issued hereunder (or any Notes issued in exchange therefor or in substitution thereof).

"**Lien**" means, with respect to any property, (a) any mortgage, deed of trust, lien (statutory or other), judgment liens, pledge, encumbrance, claim, charge, assignment, hypothecation, deposit arrangement, security interest or encumbrance of any kind or any arrangement to provide priority or preference, including any easement, servitude, right-of-way or other encumbrance on title to real property, in each of the foregoing cases whether voluntary or imposed or arising by operation of law, and any agreement to give any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement and any lease in the nature thereof and any option, call, trust, contractual, statutory, UCC or similar right relating to such property, (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, and (d) any other arrangement having the effect of providing security.

"**Legal Requirements**" means, as to any Person, any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, judgment, decree, verdict, order, consent order, consent decree, writ, declaration or injunction, policies and procedures, Order or determination of an arbitrator or a court or other governmental authority, and the interpretation or administration

16

thereof, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, in each case whether or not having the force of law.

"**Net Proceeds**" means the aggregate cash proceeds and Cash Equivalents received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale or Casualty or Condemnation Event (including, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale or Casualty or Condemnation Event, including, without limitation, legal, accounting and investment banking fees and sales commissions, and any relocation expenses incurred as a result of the Asset Sale or Casualty or Condemnation Event, taxes paid or payable as a result of the Asset Sale or Casualty or Condemnation Event, in each case, after taking into account, without duplication, (1) any available tax credits or deductions and any tax sharing arrangements, and amounts required to be applied to the repayment of Indebtedness secured by a Permitted Lien on the asset or assets that were the subject of such Asset Sale or Casualty or Condemnation Event (other than Senior Lien Obligations) and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with U.S. GAAP, (2) any reserve or payment with respect to liabilities associated with such asset or assets and retained by the Company or any of its Restricted Subsidiaries after such sale or other disposition thereof, including, without limitation, severance costs, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, (3) any cash escrows in connection with purchase price adjustments, reserves or indemnities (until released) and (4) in the case of any Asset Sale by a Restricted Subsidiary that is not a Guarantor, payments to holders of Equity Interests in such Restricted Subsidiary in such capacity (other than such Equity Interests held by the Company or any Restricted Subsidiary) to the extent that such payment is required to permit the distribution of such proceeds in respect of the Equity Interests in such Restricted Subsidiary held by the Company or any Restricted Subsidiary.

"**Non-Recourse Debt**" means Indebtedness:

(1) as to which none of the Company and its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender, except, in each case, to the extent not prohibited by Section 4.10;

(2) no default with respect to which (including any rights that the holders of the Indebtedness may have to take enforcement action against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness of the Company or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity; and

17

(3) as to which the lenders have been notified in writing that they will not have any recourse to the Equity Interests or assets of the Company or any Restricted Subsidiary, except as set forth above.

"**Note Documents**" means, collectively, this Indenture, the Notes, the Note Guarantees, the Security Documents, the Intercreditor Agreement and all other documents and instruments executed and delivered in connection herewith, in each case as such agreements may be amended, restated, supplemented or otherwise modified from time to time.

"**Note Guarantees**" means the guarantees by each Guarantor of the Company's Obligations under this Indenture and the Notes, executed pursuant to the provisions of this Indenture.

"**Note Liens**" means all Liens in favor of the Collateral Agent on Collateral securing the Obligations under the Notes.

"**Note Obligations**" means the Obligations of the Company and the other obligors (including the Guarantors) under this Indenture and the other Note Documents to pay principal, premium, if any, and interest (including any interest accruing after the commencement of bankruptcy or insolvency proceedings, whether or not allowed or allowable as a claim in such proceedings) when due and payable, and all other amounts due or to become due under or in connection with the Note Documents and the performance of all other Obligations of the Company and the Guarantors under the Note Documents, according to the respective terms thereof.

"**Notes**" means any of the Company's 10.00% Senior Secured First Lien Notes issued under this Indenture.

"**Obligations**" means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness.

"**Officer**" means the Chairman of the Board, the Vice Chairman, the Chief Executive Officer, the President, the Chief Financial Officer, any Executive Vice President, any Senior Vice President, any Vice President, the Chief Accounting Officer, the Treasurer or the Secretary of the Company.

"**Officers' Certificate**" means a written certificate containing the information specified in Sections 14.03 and 14.04 hereof, signed in the name of the Company by any two Officers, and delivered to the Trustee; *provided* that, if such certificate is given pursuant to Section 4.04 hereof, (i) one of the Officers signing such certificate must be the Chief Financial Officer or the Chief Accounting Officer of the Company and (ii) such certificate need not contain the information specified in Sections 14.03 and 14.04 hereof.

"**Open of Business**" means 9:00 a.m., New York City time.

18

#88605336v6

"**Opinion of Counsel**" means a written opinion containing the information specified in Sections 14.03 and 14.04 hereof, from legal counsel who is reasonably satisfactory to the Trustee. The counsel may be an employee of, or counsel to, the Company who is reasonably satisfactory to the Trustee.

"**Order**" means any judgment, decree, verdict, order, consent order, consent decree, writ, declaration or injunction.

"**Permitted Secured Obligations**" means obligations under any Additional Notes, other Indebtedness secured by the Note Liens or Senior Lien Obligations; *provided* that (i) the representative of such Permitted Secured Obligation executes a joinder agreement to the Security Agreement and the Intercreditor Agreement, in each case, in the form attached thereto, agreeing to be bound thereby and (ii) the Company has designated such Debt as "Permitted Secured Obligations" under this Indenture (pursuant to an Officers' Certificate), the Security Agreement and the Intercreditor Agreement.

"**Permitted Business**" means any business conducted by the Company or any of its Restricted Subsidiaries on the Issue Date and any business that, in the good faith judgment of the Board of Directors, is similar or reasonably related, ancillary, supplemental or complementary thereto or a reasonable extension, development or expansions thereof.

"**Permitted Hedging Obligations**" means any Hedging Obligations that would constitute Permitted Debt pursuant to clause (8) of the definition of "Permitted Debt."

"**Permitted Investments**" means:

(1) (i) any Investment in the Company or any Guarantor and (ii) any Investment by any Restricted Subsidiary of the Company that is not a Guarantor in the Company or any Restricted Subsidiary;

(2) any Investment in Cash Equivalents;

(3) any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

(a) such Person becomes a Guarantor; or

(b) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or any Guarantor;

(4) any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.13 or from a sale or other disposition of assets not constituting an Asset Sale;

19

#88605336v6

(5) any acquisition of assets or Capital Stock solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Company;

(6) any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes;

(7) Investments represented by Permitted Hedging Obligations;

(8) any Investment of the Company or any of its Restricted Subsidiaries existing on the Issue Date as listed on Schedule II hereto, and any extension, modification or renewal of such existing Investments, to the extent not involving any additional Investment other than as the result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities, in each case, pursuant to the terms of such Investments as in effect on the Issue Date;

(9) guarantees of Indebtedness otherwise permitted by the terms of this Indenture;

(10) receivables owing to the Company or any of its Restricted Subsidiaries, prepaid expenses, and lease, utility, workers' compensation and other deposits, if created, acquired or entered into in the ordinary course of business;

(11) payroll, business-related travel and similar advances to cover matters that are expected at the time of such advances to be ultimately treated as expenses for accounting purposes and that are made in the ordinary course of business;

(12) Investments consisting of purchases and acquisitions of inventory, supplies, material or equipment pursuant to joint marketing, joint development or similar arrangements with other Persons;

(13) advances, loans, rebates and extensions of credit (including the creation of receivables and endorsements for collection and deposit) to suppliers, customers and vendors, and performance guarantees, in each case in the ordinary course of business;

(14) Investments resulting from the acquisition of a Person, otherwise permitted by this Indenture, which Investments at the time of such acquisition were held by the acquired Person and were not acquired in contemplation of the acquisition of such Person;

(15) stock, obligations or securities received in satisfaction of judgments and any renewal or replacement thereof;

20

(16) repurchases of any Notes; and

(17) [Investments in Permitted Joint Ventures having an aggregate Fair Market Value, when taken together with all other Investments made pursuant to this clause that are at the time outstanding, not to exceed $[•] million (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value), in each case, net of (i) any cash return of capital on such Investments received by the Company or any Guarantor and (ii) the Fair Market Value of any return, to the Company or any Guarantor, of equipment or other asset invested or contributed pursuant to this clause (17) net of any liabilities (with the Fair Market Value of such equipment or asset being measured at the time of such return; provided that the Fair Market Value shall be no greater than the Fair Market Value of such equipment or other asset calculated at the time of such Investment for purposes of this clause (16)); and]

[(18) Investments consisting of (together, the "**Settlement Obligations**"):

(i) contingent credit support to the UCC in an amount not exceeding $35.0 million that may be available to ReorgCo if ReorgCo's balance sheet cash falls below $20 million at any time prior to September 30, 2018;

(ii) VEBA contributions to the UMVA in an amount not exceeding $6.0 million during the year ended December 31, 2016 or $12.0 million during the year ended December 31, 2017;

(iii) West Virginia Reclamation Fundings in an amount not exceeding $10.0 million during the year ended December 31, 2017, $10 million during the year ended December 31, 2018, $10.0 million during the year ended December 31, 2019, or $12.0 million during the year ended December 31, 2020;

(iv) VEBA contributions for non-union retirees in an amount not exceeding $3.0 million during the year ended December 31, 2017, $3.0 million during the year ended December 31, 2018, $2.0 million during the year ended December 31, 2019, $1.0 million during the year ended December 31, 2020, or $1.0 million during the year ended December 31, 2021;

(v) cash payments to Coal Act fund pursuant to the 1974 Plan in an amount not exceeding $0.5.0 million during the year ended December 31, 2017, $1.0 million during the year ended December 31, 2018, $2.0 million during the year ended December 31, 2019, $2.0 million during the year ended December 31, 2020, or $2.0 million during the year ended December 31, 2021; and

21

#88605336v6

(vi) to the extent ReorgCo has not made Excess Free Cash Flow (as defined in [•]) contributions to West Virginia of at least $50.0 million by December 31, 2020, an amount not exceeding $10.0 million during the year ended December 31, 2021 (reduced dollar-for-dollar by any amount ReorgCo contributes during the years ended December 31, 2016 to 2020).]

In the event that an Investment (or any portion thereof) meets the criteria of more than one of the categories of Permitted Investments described in clauses (1) through (17) above, the Company will be permitted to classify (and may from time to time thereafter reclassify) such Investment (or any portion thereof) and will only be required to include such Investment in one of the categories of Permitted Investments described in clauses (1) through (17) above. At the time of making such Investment or upon any later reclassification, the Company may divide and classify an Investment in more than one of the categories of Permitted Investments described in clauses (1) through (17) above.

"**Permitted Liens**" means:

(1) Liens on the Collateral incurred to secure the Notes issued on the Issue Date (or any Notes issued in exchange therefor or in substitution thereof in the same principal amount as such Notes exchanged or substituted) and the related Note Guarantees;

(2) any Lien on Collateral (whose priority shall be governed by the Intercreditor Agreement) securing Permitted Secured Obligations (other than Note Obligations relating to the initial Notes issued under this Indenture, but including any Note Obligations relating to any Additional Notes) so long as the aggregate principal amount outstanding under Permitted Secured Obligations does not exceed the principal amount which could be incurred under clause (1) of the definition of "Permitted Debt"; *provided* that neither the Company nor any Restricted Subsidiary shall grant or permit any additional Liens on any asset to secure Permitted Secured Obligations unless such Company or Restricted Subsidiary concurrently grants a Lien on such asset to secure the Note Obligations;

(3) Liens in favor of the Company or the Guarantors;

(4) Liens on property of a Person existing at the time such Person becomes a Restricted Subsidiary of the Company or is merged with or into or consolidated with the Company or any Restricted Subsidiary securing Acquired Debt, *provided* that such Liens were in existence prior to the contemplation of such Person becoming a Restricted Subsidiary of the Company or such merger or consolidation and do not extend to any assets other than those of the Person that becomes a Restricted Subsidiary of the Company or is merged into or consolidated with the Company or any Restricted Subsidiary of the Company (plus improvements and accessions to such property or proceeds or distributions thereof);

22

#88605336v6

(5) Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Company or any Restricted Subsidiary of the Company (plus improvements and accessions to such property or proceeds or distributions thereof) securing Acquired Debt, *provided* that such Liens were in existence prior to such acquisition and not incurred in contemplation of such acquisition;

(6) Liens (other than Liens imposed by the Employee Retirement Income Security Act of 1974, as amended) in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), insurance, surety, bid, performance, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (in each case, exclusive of obligations for the payment of Indebtedness); *provided*, that, such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with U.S. GAAP, which proceedings (or any Order entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(7) Liens to secure Indebtedness (including Capital Lease Obligations) or Attributable Debt permitted by clause (4) of the definition of "Permitted Debt" covering only the assets acquired with or financed by such Indebtedness (plus improvements and accessions to such property or proceeds or distributions thereof);

(8) Liens existing on the Issue Date (other than the Senior Liens) listed on Schedule III hereto;

(9) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded, which proceedings (or Order entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien; *provided* that any reserve or other appropriate provision as is required in conformity with U.S. GAAP has been made therefor;

(10) any state of facts an accurate survey would disclose, prescriptive easements or adverse possession claims, minor encumbrances, easements or reservations of, or rights of others for, or pursuant to any leases, licenses, rights-of-way or other similar agreements or arrangements, development, air or water rights, sewers, electric lines, telegraph and telephone lines and other utility lines, pipelines, service lines, railroad lines, improvements and structures located on, over or under, any property, drains, drainage ditches, culverts, electric power or gas generating or co-generation, storage and transmission facilities and other similar purposes, zoning or other restrictions as to the use of real property or

23

#88605336v6

minor defects in title, which were not incurred to secure payment of Indebtedness and that do not in the aggregate materially adversely affect the value or marketability of said properties or materially impair their use in the operation of the business of the owner or operator of such properties or business;

(11) *[Reserved]*;

(12) Liens to secure any Permitted Refinancing Indebtedness incurred to refinance secured Indebtedness permitted to be incurred under this Indenture (other than the Senior Credit Agreement or the Notes); *provided, however,* that (i) the new Lien is limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Indebtedness (plus improvements and accessions to, such property or assets or proceeds or distributions thereof) and (ii) the new Lien is of no higher priority than the original Lien;

(13) Liens or leases or licenses or sublicenses or subleases by the Company or any Restricted Subsidiary as licensor, lessor, sublicensor or sublessor of any of such Person's property, including intellectual property, on customary terms entered into in the ordinary course of business so long as such leases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Company or any Restricted Subsidiary or (ii) materially impair the use (for its intended purposes) or the value of the property subject thereto;

(14) Liens in the ordinary course of business on specific items of inventory or other goods, and proceeds thereof, of any Person securing such Person's obligations (exclusive of obligations for the payment of Indebtedness) in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Restricted Subsidiary of the Company;

(15) Liens incurred or pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security and employee health and disability benefits, or casualty-liability insurance or self insurance or securing letters of credit issued in the ordinary course of business; *provided*, that, such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with U.S. GAAP, which proceedings (or any Order entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

24

(16) judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made in conformity with U.S. GAAP;

(17) Liens on (a) assets (other than those constituting Collateral) securing Permitted Hedging Obligations and (b) assets constituting Collateral securing Permitted Hedging Obligations that are Senior Lien Obligations;

(18) any interest or title of a lessor, licensor or sublicensor under any lease, license or sublicense of the property of the Company or any Restricted Subsidiary thereof, including intellectual property, as applicable, on customary terms entered into in the ordinary course of business;

(19) Liens in favor of any collecting or payor bank having a right of setoff, revocation, refund or chargeback with respect to money or instruments of the Company or any Restricted Subsidiary thereof on deposit with or in possession of such bank;

(20) any obligations or duties affecting any of the property of the Company or any of its Restricted Subsidiaries to any municipality or public authority with respect to any franchise, grant, license, or permit that do not materially impair the use of such property for the purposes for which it is held;

(21) Liens on any property in favor of domestic or foreign governmental bodies to secure partial, progress, advance or other payment pursuant to any contract or statute, not yet due and payable;

(22) any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Company or any of the Guarantors;

(23) Liens on deposit accounts incurred to secure Treasury Management Arrangements pursuant to such Treasury Management Arrangements incurred in the ordinary course of business;

(24) any netting or set-off arrangements entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of its banking arrangements (including, for the avoidance of doubt, cash pooling arrangements) for the purposes of netting debit and credit balances of the Company or any of its Restricted Subsidiaries, including pursuant to any cash management agreement;

(25) Liens arising from UCC financing statement filings regarding operating leases entered into by the Company or any Restricted Subsidiary of the Company in the ordinary course of business or other precautionary UCC financing statement filings;

(26) *[Reserved]*;

25

#88605336v6

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business in accordance with past practices;

(28) Liens imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business (including customary contractual landlords' liens under operating leases entered into in the ordinary course of business); and (i) which do not in the aggregate materially detract from the value of the property of the Companies, taken as a whole, or the Loan Parties, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Company and its Restricted Subsidiaries, taken as a whole, and (ii) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings timely initiated and for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(29) Liens granted to joint venture partners on Equity Interests owned by the Company or any Restricted Subsidiary in connection with the formation of a Person (other than an individual) in which the ownership interests are held in part by the Company or a Restricted Subsidiary and a non-Affiliated Person, including, without limitation, rights of first refusal and rights of first offer held by such joint venture partners in respect of transfers of Equity Interests in such joint ventures; and

(30) Liens not otherwise permitted hereunder and incurred in the ordinary course of business securing Indebtedness or other obligations that (i) do not materially impair the use of such assets in the operation of the business of the Company or any Restricted Subsidiary and (ii) do not, in the aggregate, exceed $10.0 million at any one time outstanding.

"**Permitted Refinancing Indebtedness**" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness), *provided*, that:

(1) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, incurred in connection therewith);

26

(2) such Permitted Refinancing Indebtedness has a final maturity date the same as or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged;

(3) if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is Subordinated Indebtedness, such Permitted Refinancing Indebtedness is subordinated in right of payment on terms at least as favorable to the holders of Notes as those contained in the documentation governing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged;

(4) if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is unsecured Indebtedness, such Permitted Refinancing Indebtedness is unsecured Indebtedness; and

(5) such Permitted Refinancing Indebtedness is not incurred by a Person other than the Company and any of the Guarantors to renew refund, refinance, replace, defease or discharge any Indebtedness of the Company or a Guarantor.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restricted Notes Legend**" means the legend identified as such set forth in Exhibit A hereto, or any other similar legend indicating the restricted status of the Notes under Rule 144.

"**Restricted Subsidiary**" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary. Where such term is used without a referent Person, such term shall be deemed to mean a Subsidiary of the Company that is not an Unrestricted Subsidiary, unless the context otherwise requires.

"**Rule 144**" means Rule 144 under the Securities Act (or any successor provision), as it may be amended from time to time.

"**Rule 144A**" means Rule 144A under the Securities Act (or any successor provision), as it may be amended from time to time.

"**SEC**" means the Securities and Exchange Commission.

"**Secured Parties**" has the meaning set forth in the Security Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

27

"**Security Agreement**" means that certain security agreement, dated as of the Issue Date, among the Company, the Guarantors and the Collateral Agent, as amended, modified, restated, supplemented or replaced from time to time in accordance with this Indenture and the terms thereunder.

"**Security Documents**" means the Security Agreement and all security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements or other grants or transfers for security executed and delivered by the Company or any other Guarantor creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Agent, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"**Senior Credit Agreement**" means the Credit Agreement, dated as of [•], among the Company, certain subsidiaries of the Company as co-borrowers, the guarantors party thereto, the lenders party thereto, together with any amendments, supplements, modifications, extensions, renewals or restatements thereof or any other credit facilities with banks or other institutional lenders that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing credit facility or amendment, supplement, modification, renewal, or restatement, that increases the amount borrowable thereunder, alters the maturity thereof or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender, group of lenders or investors[; *provided* that, in the case of any agreement or instrument other than the Senior Credit Agreement in effect on the Issue Date, as amended from time to time, (i) such other agent, lender, group of lenders or investors does not include any distressed credit fund or other similar or related financing institution (each, a "**Prohibited Lender**"), (ii) such Senior Credit Agreement prohibits such other agent, lender, group of lenders or investors from assigning or transferring their rights under such Senior Credit Agreement to any Prohibited Lender and (iii) is designated in an Officers' Certificate as a "Senior Credit Agreement" for purposes of this Indenture].

"**Senior Facility Documents**" means the agreements and other instruments governing the Senior Credit Agreement, together with any guarantees thereof and any security documents, other collateral documents and other instruments relating thereto (including documents and instruments governing Hedging Obligations required by the Senior Credit Agreement or relating to Senior Lien Obligations), to the extent such are effective at the relevant time, as each may be amended, modified, restated, supplemented, replaced or refinanced from time to time.

"**Senior Liens**" means all Liens in favor of the collateral agent under the Senior Credit Agreement on Collateral securing the Senior Lien Obligations.

"**Senior Lien Obligations**" means the Obligations of the borrowers and other obligors (including the Company and the Guarantors) under the Senior Credit Agreement or any of the other Senior Facility Documents, to pay principal, premium, if any, and interest (including any interest accruing after the commencement of bankruptcy or

28

insolvency proceedings, whether or not allowed or allowable as a claim in such proceedings) when due and payable, and all other amounts due or to become due under or in connection with the Senior Facility Documents and the performance of all other Obligations of the obligors thereunder to the lenders and agents under the Senior Facility Documents, according to the respective terms thereof.

"**Significant Subsidiary**" means any Subsidiary that is a "significant subsidiary" of the Company within the meaning of Rule 1-02(w) of Regulation S-X promulgated under the Exchange Act.

"**Stated Maturity**" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal, as applicable, was scheduled to be paid in the documentation governing such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof; *provided*, *however*, that, with respect to Section 4.10(a)(3), the Stated Maturity of any Existing Indebtedness shall be the Stated Maturity as of the Issue Date or a later date to the extent the documents governing such Indebtedness shall have been amended or modified to provide for such later date.

"**Subsidiary**" means, with respect to any specified Person:

(1) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person (or a combination thereof); and

(2) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof) to the extent such partnership is included in the consolidated financial statements of such Person.

"**Surety**" means any nationally recognized insurance or surety company or other financial institution that issues a Surety Bond for the benefit or account of the Company or any Subsidiary of the Company.

"**Surety Bond**" means any surety, bid or performance bond or other similar instrument of suretyship.

"**Surety Priority Collateral**" means, with respect to a Surety Bond, accounts receivable of the Company or a Subsidiary of the Company generated by the Bonded Contract to which such Surety Bond relates and inventory purchased by the Company or any of its Subsidiaries specifically for incorporation into the construction project that is

29

the subject of such Bonded Contract, and, in each case, which secure the obligations of the Company or such Subsidiary to the Surety issuing such Surety Bond.

"**TIA**" means the Trust Indenture Act of 1939 as in effect on the Issue Date; *provided*, *however*, that if the TIA is amended after such date, TIA means, to the extent required by any such amendment, the TIA as so amended.

"**Total Leverage Ratio**" means with respect to any specified Person on any date of determination, the ratio of (x) the aggregate amount of all Indebtedness of such Person, as of the last date of the most recent fiscal quarter referred to in clause (y) below, determined on a consolidated basis, net of Cash and Cash Equivalents to (y) the aggregate amount of Consolidated Cash Flow of such Person for the four most recently completed fiscal quarters prior to such date of determination for which internal financial statements are available, in each case with such pro forma adjustments to Indebtedness and Consolidated Cash Flow as are consistent with the pro forma adjustment provisions of the Fixed Charge Coverage Ratio.

"**Transfer**" means, with respect to any Restricted Note that bears, or is required to bear, the Restricted Note Legend, any sale, pledge, transfer, loan, hypothecation or other disposition of such Restricted Note.

"**Transfer Agent**" means, initially, [•], in its capacity as the transfer agent for the Common Stock, and any successor entity acting in such capacity.

"**Treasury Management Arrangement**" means any agreement or other arrangement governing the provision of treasury or cash management services, including, without limitation, deposit accounts, overdraft, overnight draft, credit cards, debit cards, p-cards (including purchasing cards, employee credit card programs and commercial cards), funds transfer, automated clearinghouse, direct debit, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services, netting services, cash pooling arrangements, credit and debit card acceptance or merchant services and other treasury or cash management services.

"**Trust Officer**" means any officer within the corporate trust department of the Trustee (or any successor group of the Trustee) with direct responsibility for the administration of this Indenture and also means, with respect to a particular corporate trust matter hereunder, any other officer of the Trustee to whom such matter is referred because of his or her knowledge of and familiarity with the particular subject.

"**Trustee**" means the party named as the "Trustee" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, means such successor. The foregoing sentence will likewise apply to any such subsequent successor or successors.

"**UCC**" means the New York Uniform Commercial Code as in effect from time to time.

30

#88605336v6

"**Unrestricted Subsidiary**" means any Subsidiary of the Company that is designated by the Board of Directors as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(1) has no Indebtedness other than Non-Recourse Debt;

(2) is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary of the Company unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Company or any such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3) is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has a direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

(4) has not guaranteed or otherwise provided credit support for any Indebtedness of the Company or any of the Company's Restricted Subsidiaries.

"**U.S. GAAP**" means generally accepted accounting principles set forth in opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession in the United States in effect on the date of this Indenture.

"**U.S. Subsidiary**" means, with respect to any Person, any Subsidiary of such Person other than a Foreign Subsidiary.

"**Voting Stock**" of a Person means Capital Stock of such Person of the class or classes pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of such Person (irrespective of whether or not at the time Capital Stock of any other class or classes will have or might have voting power by reason of the happening of any contingency).

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1) the sum of the products obtained by multiplying (a) the amount of each then-remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of such Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2) the then-outstanding principal amount of such Indebtedness.

31

"**Wholly Owned Restricted Subsidiary**" of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) are at the time owned by such Person or by one or more Wholly Owned Restricted Subsidiaries of such Person.

"**Wholly Owned Subsidiary**" of any specified Person means, (a) any corporation one hundred percent of whose capital stock (other than directors' qualifying shares and other nominal shares required to be held by local nationals, in each case to the extent required under applicable Legal Requirements) is at the time owned by such Person and/or one or more Wholly Owned Subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person and/or one or more Wholly Owned Subsidiaries of such Person have a one hundred percent Equity Interest (other than directors' qualifying shares and other nominal shares required to be held by local nationals, in each case to the extent required under applicable Legal Requirements) at such time.

Section 1.02.   *Other Definitions*.

| Term Section: | Defined in: |
|---|---|
| "**Act**" | 1.05 |
| "**Additional Notes**" | 2.01(a) |
| "**Affiliate Transaction**" | 4.14(a) |
| "**Agent Members**" | 2.02(c) |
| "**Aggregate Payments**" | 12.02 |
| "**Bonded Contract Default**" | 13.11(a) |
| "**Calculation Date**" | 1.01 |
| "**Change of Control Notice**" | 3.02(a) |
| "**Change of Control Notice Date**" | 3.02(a) |
| "**Change of Control Offer**" | 3.01(a) |
| "**Change of Control Repurchase Date**" | 3.01(c) |
| "**Change of Control Repurchase Notice**" | 3.03(a)(1) |
| "**Change of Control Repurchase Price**" | 3.01(b) |
| "**Contributing Guarantors**" | 11.02 |
| "**Defaulted Amount**" | 2.04(c) |
| "**Default Interest**" | 2.04(c) |
| "**Event of Default**" | 6.01(a) |
| "**Excess Proceeds**" | 4.13(c) |
| "**Fair Share**" | 11.02 |
| "**Fair Share Contribution Amount**" | 11.02 |
| "**Funding Guarantor**" | 11.02 |
| "**incur**" | 4.12(a) |
| "**Interest Payment Date**" | 2.04(a) |
| "**Maturity Date**" | 2.04(a) |
| "**Moody's**" | 1.01 |
| "**Mortgage Deliverables**" | 13.01(b) |
| "**Net Proceeds Offer**" | 4.13(c) |

#88605336v6

| Term Section: | Defined in: |
|---|---|
| "Net Proceeds Offer Price" | 4.13(c) |
| "Offer Period" | 4.13(f) |
| "Paying Agent" | 2.06(a) |
| "Permitted Debt" | 4.12(b) |
| "Prohibited Lender" | 1.01 |
| "Redemption Date" | 10.02(c) |
| "Redemption Notice" | 10.03 |
| "Redemption Notice Date" | 10.03 |
| "Register" | 2.06(a) |
| "Registrar" | 2.06(a) |
| "Regular Record Date" | 2.04(a) |
| "Reorganization Event" | 5.01 |
| "Reorganization Successor Corporation" | 5.01(a)(ii) |
| "Restricted Note" | 2.10(a) |
| "Restricted Payments" | 4.10(a) |
| "S&P" | 1.01 |
| "Special Regular Record Date" | 2.04(c)(i) |
| "Subordinated Indebtedness" | 4.10(a)(3) |
| "Temporary Notes" | 2.12 |

Section 1.03.   *Rules of Construction*. Unless the context requires otherwise:

(1) a term has the meaning assigned to it;

(2) an accounting term not otherwise defined has the meaning assigned to it and will be construed in accordance with U.S. GAAP;

(3) "**or**" is not exclusive;

(4) "**including**" means including, without limitation;

(5) words in the singular include the plural, and words in the plural include the singular;

(6) all references to $, dollars, cash payments or money refer to United States currency; and

(7) all references to interest on the Notes will not, for the avoidance of doubt, include any Default Interest payable on a Defaulted Amount pursuant to the terms of Section 2.04 hereof.

Section 1.04.   *References to Subordination*. For the avoidance of doubt, for all purposes under this Indenture, including, without limitation, Section 4.10 and Section 4.12, this Indenture shall not treat Indebtedness as being (x) contractually subordinated or junior or (y) subordinated or junior in right of payment, in each case, to any other Indebtedness merely because such Indebtedness is (i) unsecured, (ii) secured by Liens of

33

a junior priority on the same collateral to those securing such other Indebtedness or (iii) secured by different collateral.

Section 1.05. *Acts of Holders*. Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action will become effective when such instrument or instruments are delivered to the Trustee and to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent will be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section 1.05. The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to such officer the execution thereof. Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit will also constitute sufficient proof of such signer's authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient. request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Note will bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee, the Company, the Paying Agent or the Registrar in reliance thereon, whether or not notation of such action is made upon such Note.

If the Company will solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company will have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the Close of Business on such record date will be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and, for that purpose, the outstanding Notes will be computed as of such record date; *provided* that no such authorization, agreement or consent by the Holders on such record date will be deemed effective unless it will become effective pursuant to the provisions of this Indenture not later than six months after the record date.

34

**Article 2**

**THE NOTES**

Section 2.01.   *Designation, Amount and Issuance of Notes*.

(a) The Notes will be designated as "10.00% Senior Secured First Lien Notes." The initial aggregate principal amount of Notes to be issued, authenticated and delivered on the Issue Date under this Indenture is three hundred million dollars ($300,000,000). From time to time, the Company may issue and execute, and the Trustee may authenticate, Notes delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Sections 2.09, 2.11, 2.12 and 3.06 hereof. In addition, the Company may issue an unlimited aggregate principal amount of additional Notes ("**Additional Notes**") in accordance with clause (b) of this Section 2.01, so long as the incurrence of the Indebtedness represented by such Additional Notes is at such time permitted by Sections 4.12 and 4.15.

(b) Without the consent of any Holder, and notwithstanding anything to the contrary in Sections 2.01(a) or 2.05 hereof, the Company may increase the aggregate principal amount of the Notes issued under this Indenture by reopening this Indenture and issuing Additional Notes, so long as the incurrence of the Indebtedness represented by such Additional Notes is at such time permitted by Sections 4.12 and 4.15, with the same terms as the initial Notes (except, to the extent applicable, with respect to the date as of which interest shall begin to accrue on such Additional Notes and as to the Last Original Issue Date with respect to such Additional Notes as provided in the proviso to the definition thereof), which Notes will, subject to the foregoing, be considered to be part of the same series of Notes as those initially issued hereunder; *provided, however*, that if any such Additional Notes are not fungible with other Notes issued hereunder for federal income tax purposes, then such Additional Notes shall have a separate CUSIP number. Prior to issuing any such Additional Notes, the Company will deliver to the Trustee a Company Order, an Officers' Certificate and an Opinion of Counsel, which Officers' Certificate and Opinion of Counsel will address any matters required to be addressed under Section 14.04 hereof.

Section 2.02.   *Form of Notes*.

(a) *General*. The Notes will be substantially in the form of Exhibit A hereto, but may include any notations, legends or endorsements required by any applicable law (or regulation promulgated thereunder), stock exchange rule or usage, or any insertions, omissions or other variations otherwise permitted or required by this Indenture. Whenever any such notation, legend or endorsement, or any such insertion, omission or other variation is applicable to a Note, the Company will provide such notation, legend or endorsement, or such insertion, omission or other variation to the Trustee in writing.

Each Note will bear a Trustee's certificate of authentication substantially in the form set forth in Exhibit A hereto.

#88605336v6

Notes that are Global Notes will bear the Global Notes Legend and the "Schedule of Increases and Decreases of Global Note" attached thereto.

Notes that are Restricted Notes will bear the Restricted Notes Legend.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Company, the Guarantors, the Trustee and the Collateral Agent, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent that any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture will govern and control.

(b) *Initial and Subsequent Notes*. The Notes initially will be issued in global form, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Trustee, at its Corporate Trust Office, as custodian for the Depositary. Except to the extent provided in Section 2.09(c) hereof, all Notes will be represented by one or more Global Notes.

(c) *Global Notes*. Each Global Note will represent the aggregate principal amount of then outstanding Notes endorsed thereon and provide that it represents such aggregate principal amount of then outstanding Notes, which aggregate principal amount may, from time to time, be reduced or increased to reflect transfers, exchanges, conversions, redemptions or repurchases by the Company. the Trustee, or the custodian holding such Global Note for the Depositary, at the direction of the Trustee, may endorse a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of then outstanding Notes represented thereby, and whenever the Holder of a Global Note delivers instructions to the Trustee to increase or decrease the aggregate principal amount of then outstanding Notes represented by a Global Note in accordance with Section 2.09 hereof, the Trustee, or the custodian holding such Global Note for the Depositary, at the direction of the Trustee, will endorse such Global Note to reflect such increase or decrease in the aggregate principal amount of then outstanding Notes represented thereby. None of the Trustee, the Collateral Agent, the Company, the Guarantors or any agent of the Trustee, the Collateral Agent, the Company or the Guarantors will have any responsibility or bear any liability for any aspect of the records relating to, or payments made on account of, the ownership of any beneficial interest in a Global Note or with respect to maintaining, supervising or reviewing any records relating to such beneficial interest.

Neither any member of, or participant in, the Depositary (collectively, the "**Agent Members**") nor any other Person on whose behalf an Agent Member may act will have any rights under this Indenture with respect to any Global Note or under such Global Note, and the Company, the Guarantors, the Trustee, the Collateral Agent and any agent of the Company, the Guarantors, the Trustee or the Collateral Agent, may, for all purposes, treat the Depositary, or its nominee, if any, as the absolute owner and Holder of such Global Note.

36

#88605336v6

The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action that such Holder is entitled to take under this Indenture or the Notes with respect to such Global Note, and, notwithstanding the foregoing, nothing herein will prevent the Company, the Guarantors, the Trustee, the Collateral Agent, the Paying Agent or any agent of the Company, the Guarantors, the Trustee, the Collateral Agent or the Paying Agent from giving effect to any written certification, proxy or other authorization furnished by such Holder or impair, as between the Depositary, its Agent Members and any other Person on whose behalf an Agent Member may act, the operation of their respective customary practices governing the exercise of the rights of a Holder of any interest in any Global Note.

Section 2.03.   *Denomination of Notes*. The Notes will be issuable in registered form without coupons in minimum denominations of $2,000 principal amount and in integral multiples of $1,000 in excess thereof.

Section 2.04.   *Payments*.

(a)      *General.*

(i) *Payment at Maturity*. Unless earlier paid or deemed paid pursuant to any of Sections 3.05, 4.13 or 10.06 hereof, the Notes will mature on [•], 2021 (the "**Maturity Date**"), and, on the Maturity Date, the Company will pay each Holder of Notes $1,000 in cash for each $1,000 principal amount of Notes held, together with accrued and unpaid interest to, but not including, the Maturity Date on such Notes.

(ii) *Payment of Interest*. Each Note will accrue interest at a rate equal to 10.00% per annum from the most recent date to which interest has been paid or duly provided for, or, if no interest has been paid or duly provided for, [•], 2016 (or such other date provided for in Section 2.01(b) with respect to Additional Notes issued in accordance with such Section) until, subject to the provisions of clause (d) of this Section 2.04, the date the principal amount of such Note is paid or deemed paid, as the case may be, pursuant to clause (i) of this Section 2.04(a) or any of Sections 3.05, 4.13 or 10.06 hereof.

Interest will be payable semi-annually in arrears on [•] and [•] of each year (each, an "**Interest Payment Date**"), beginning [•], [•] (or such other date provided for in Section 2.01(b) with respect to Additional Notes issued in accordance with such Section), to the Holder of each such Note as of the Close of Business on the [•] and [•], as the case may be, immediately preceding the applicable Interest Payment Date (each such date, a "**Regular Record Date**"), regardless of whether such Note is repurchased or redeemed after such Regular Record Date. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

(iii) *Method of Payment*. The Company will pay the principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption

37

Price for, and the interest on, any Global Note to the Depositary by wire transfer of immediately available funds on the relevant payment date.

The Company will pay the principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or Redemption Price for, and any interest due on the Maturity Date on, any Definitive Note in cash to the applicable Holder of such Note at the office of the Paying Agent on the relevant payment date.

The Company will pay interest due, on an Interest Payment Date, on any Definitive Note (except interest due on the Maturity Date) to the applicable Holder of such Note (i) if such Holder holds $5,000,000 or less aggregate principal amount of Notes, by check mailed to such Holder's registered address, and (ii) if such Holder holds more than $5,000,000 aggregate principal amount of Notes, (A) by check mailed to such Holder's registered address or (B) if such Holder delivers, not later than the Regular Record Date relating to such Interest Payment Date, a written request to the Registrar that the Company make such payments by wire transfer to an account of such Holder within the United States, by wire transfer of immediately available funds to such account, which request shall remain in effect until such Holder notifies, in writing, the Registrar to the contrary.

(b) *Interest Rights Preserved*. Subject to the provisions of Section 2.04(d) hereof, and, to the extent applicable, Sections 2.09 and 2.11 hereof, each Note delivered under this Indenture upon registration of transfer of, or in exchange for, or in lieu of, any other Note will carry any rights to the payment and accrual of interest that were carried by the relevant surrendered Note, Notes, or portion(s) thereof.

(c) *Defaulted Amounts*. Whenever any amount payable on a Note (including, the principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or Redemption Price for, and interest on, such Note) has become due and payable, but the Company fails to punctually pay or duly provide for such amount (any such amount, a "**Defaulted Amount**"), such Defaulted Amount will forthwith cease to be payable to the Holder of such Note on the relevant payment date by virtue of its having been due such payment on such payment date, but will instead, to the extent permitted under applicable law, accrue interest (including post-petition interest in any proceeding under Bankruptcy Law) ("**Default Interest**") at a rate equal to [•]% per annum from, and including, such payment date and to, but excluding, the date on which such Defaulted Amount is paid by the Company in accordance with either clause (i) or (ii) below.

(i) The Company may elect to pay any Defaulted Amount and Default Interest on such Defaulted Amount to the Persons in whose names the Notes (or their respective predecessor Notes) are registered at the Close of Business on a special record date for the payment of such Defaulted Amount and Default Interest (a "**Special Regular Record Date**") fixed in accordance with the following procedures:

(A) At least 30 days before the date on which the Company proposes to pay such Defaulted Amounts and Default Interest thereon, the Company will deliver to the Trustee written notice of (I) the proposed payment date for such

38

Defaulted Amounts and Default Interest thereon and (II) the aggregate amount of such Defaulted Amounts and Default Interest thereon.

(B) Simultaneously with delivering such notice to the Trustee, the Company will either (I) deposit with the Trustee an amount of money, in immediately available funds, equal to the aggregate amount of such Defaulted Amounts and Default Interest thereon, or (II) take other actions that the Trustee deems reasonably satisfactory to ensure that an amount of money, in immediately available funds, equal to the aggregate of such Defaulted Amounts and Default Interest thereon will be deposited with the Trustee by 10:00 a.m., New York City time, on the proposed payment date, and in either case, upon receipt of such money, the Trustee will hold such money in trust for the benefit of the Persons entitled to such Defaulted Amounts and Default Interest pursuant to this Section 2.04(d)(i).

(C) Upon (i) receipt of such notice and (ii) the Company's depositing such money or taking such other actions reasonably satisfactory to the Trustee, the Company will promptly fix a Special Regular Record Date for the payment of such Defaulted Amounts and Default Interest thereon, which Special Regular Record Date will be not more than 15 calendar days and not less than 10 calendar days prior to the proposed payment date, and notify the Trustee of the Special Regular Record Date. The Trustee will then, in the name and at the expense of the Company, deliver notice to each Holder specifying such Special Regular Record Date and the date on which such Defaulted Amounts and Default Interest thereon will be paid by the Company.

(D) After such notice has been delivered by the Trustee, such Defaulted Amounts and Default Interest thereon will be paid to the Persons in whose names the Notes (or their respective predecessor Notes) are registered at the Close of Business on the Special Regular Record Date specified in such notice and such Defaulted Amounts and Default Interest thereon will no longer be payable pursuant to the following clause (ii) of this Section 2.04(d)(i).

(ii) The Company may pay any Defaulted Amounts and Default Interest on such Defaulted Amounts in any other lawful manner that is not inconsistent with the requirements of any securities exchange or automated quotation system on which the Notes are then listed (or, if applicable, have been approved for listing) or designated for issuance, and upon such notice as may be required by such exchange or automated quotation system, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment will be deemed practicable by the Trustee.

Section 2.05. *Execution and Authentication.*

(a) *In General.* A Note will be valid only if executed by the Company and authenticated by the Trustee.

#88605336v6

(b) *Execution*. A Note will be deemed to have been executed by the Company when an Officer signs such Note on behalf of the Company. The Officer's signature may be manual or facsimile, and the validity of such Officer's signature will not turn on whether such signatory remains an Officer at the time the Trustee authenticates such Note.

(c) *Authentication*. A Note will be deemed authenticated when an authorized signatory of the Trustee manually signs the certificate of authentication on such Note. An authorized signatory of the Trustee will manually sign the certificate of authentication on a Note only if (i) the Company delivers such Note to the Trustee, (ii) such Note is validly executed by the Company in accordance with Section 2.05(b) hereof, and (iii) the Company delivers, before or with such Note, a Company Order setting forth (A) a request that the Trustee authenticate such Note; (B) the principal amount of such Note; (C) the name of the Holder of such Note, (D) the date on which such Note is to be authenticated; and (E) any insertions, omissions or other variations, notations, legends or endorsements permitted under Section 2.02 hereof and applicable to such Note. If the Company Order also specifies that the Trustee must deliver such Note to any Holder or the Depositary, the Trustee will promptly deliver such Note in accordance with such Company Order.

The Trustee may appoint an authenticating agent. If the Trustee appoints an authenticating agent and such authenticating agent is reasonably acceptable to the Company, such authenticating agent may authenticate a Note whenever the Trustee may authenticate such Note. For purposes of this provision, each reference in this Indenture to authentication by the Trustee will be deemed to include authentication by an authenticating agent, and an authenticating agent will have the same rights to deal with the Company as the Trustee would have if it were performing the duties that the authentication agent was validly appointed to undertake.

Section 2.06.   *Registrar and Paying Agent*.

(a) *General*. The Company will maintain an office or agency in the continental United States where Notes may be presented for registration of transfer or for exchange (the "**Registrar**"), an office or agency where the Notes may be presented for payment, repurchase or redemption (the "**Paying Agent**") and an office or agency where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served.

The Registrar will keep a register for the recordation of, and will record, the names and addresses of Holders, the Notes held by each Holder and the transfer, exchange, repurchase and redemption of Notes (the "**Register**"). Absent manifest error, the entries in the Register will be conclusive and the parties may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Holder hereunder for all purposes of this Indenture. The Register will be in written form or in any form capable of being converted into written form within a reasonably prompt period of time.

The Company may have one or more registrars, one or more paying agents and one or more places where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served. Before appointing any Registrar or Paying

Agent that is not otherwise a party to this Indenture, the Company will enter into an appropriate agency agreement with such Registrar or Paying Agent, as the case may be, which agency agreement will implement the provisions of this Indenture that relate to such replacement or additional registrar or paying agent, as the case may be. The term Registrar includes any additional registrars named pursuant to this Indenture. The term Paying Agent includes any additional paying agent named pursuant to this Indenture. Upon the occurrence of any Event of Default under Section 6.01(a)(xii) or 6.01(a)(xiii) with respect to the Company, the Trustee shall be the Paying Agent.

(b) *Initial Designations*. The Company initially appoints the Trustee as each of the Registrar and the Paying Agent, and the Notes initially may be presented for registration of transfer or for exchange, payment, repurchase and redemption to the Trustee, in its capacity as the Registrar or Paying Agent, as the case may be, at the Corporate Trust Office. Notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served at the Corporate Trust Office.

(c) *Removal, Resignation and Replacement*. The Company may remove any Registrar or Paying Agent by delivering written notice to the Trustee and to such Registrar or Paying Agent; *provided*, *however*, that no such removal will become effective unless (i) after such removal, at least one Registrar and Paying Agent will remain; (ii) a successor has accepted appointment as Registrar or Paying Agent, as the case may be, the Company and such successor have entered into an agency agreement in accordance with Section 2.06(a) hereof, and the Company has delivered written notice of such appointment and a copy of such agency agreement to the Trustee, or (iii) the Company has delivered written notice to the Trustee that the Trustee will serve as the successor Registrar or Paying Agent, as the case may be, in accordance with Section 2.06(d) hereof; and *provided*, *further*, that the right to effect any such change or removal in no way relieves the Company of its obligation to maintain a Registrar and Paying Agent in the continental United States. The Company may also change the place where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served, or reduce the number of such places; *provided*, *however*, that the right to effect any such change or reduction in no way relieves the Company of its obligation to maintain a place in the continental United States where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served.

In addition, the Registrar or Paying Agent may resign at any time by delivering written notice of such resignation to each of the Company and the Trustee; *provided*, *however*, that if the Trustee is serving as Registrar or Paying Agent, the Trustee may resign from such capacity only if it also resigns as Trustee in accordance with Section 7.07 hereof. If, after any such resignation, at least one Registrar and Paying Agent does not remain, the Trustee will immediately be deemed to serve such empty office or agency in accordance with Section 2.06(d) hereof.

(d) *Failure to Maintain an Office or Agency*. If the Company fails to maintain in the continental United States, a Registrar, Paying Agent or place where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served, the Trustee will act as the Registrar, Paying Agent, or place, as the case may be,

41

and the office where the Notes may be presented for registration of transfer or for exchange, presented for payment, repurchase or redemption, or place where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served, as the case may be, will be the Corporate Trust Office. In each such case, the Trustee will be entitled to compensation for such action pursuant to Section 7.06 hereof.

(e) *Notices*. Promptly upon the effectiveness of any removal or appointment of a Registrar or Paying Agent, or upon any change in the location of the office of any Registrar or Paying Agent, or of the place where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served, the Company will deliver to each Holder notice of such removal, appointment or change in location, as the case may be, which notice will include a brief description of the removal, appointment or change in location, as the case may be, and list the name and address of each continuing (and newly appointed, if applicable) Registrar and Paying Agent and place where notices and demands to, or upon, the Company with respect to the Notes and this Indenture may be served.

Section 2.07.   *Money and Securities Held in Trust*.

Except as otherwise provided herein, by no later than 10:00 a.m., New York City time, on each due date for a payment on any Note, the Company will deposit with the Paying Agent an amount of money in immediately available funds, if deposited on the due date sufficient to make such payment when due.

The Company will require that each Paying Agent (other than the Trustee, if the Trustee is a Paying Agent) agree in writing that it will (i) segregate all money and securities it holds for making payments with respect to the Notes; (ii) hold such money and securities in trust for the benefit of Holders; and (iii) notify the Trustee, in writing, as promptly as practicable, if the Company defaults in making any payment on the Notes.

If any such default has occurred and is continuing, the Paying Agent will, upon receiving a written request from the Trustee, forthwith pay to the Trustee all of the money and securities it holds in trust. In addition, at any time, the Company may require a Paying Agent to pay all money and securities that it holds for making payments with respect to the Notes to the Trustee and to account for any money and securities it has disbursed. After delivering all of such money and securities to the Trustee pursuant to this Section 2.07, the Paying Agent (in its capacity as such) will have no further liability for such money and securities.

Section 2.08.   *Holder Lists*.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Company will furnish to the Trustee, (i) within five Business Days after each Regular Record Date, a list of the names and addresses of Holders as of such Regular Record Date, and (ii) at such other times as the Trustee may request in writing, within 30 days after receipt by the Company of such request, a list of the names and

42

addresses of Holders as of no more than 15 days immediately prior to the date such list is furnished, in each case, in such form as the Trustee may reasonably require.

Section 2.09.   *Transfer and Exchange*.

(a) *Provisions Applicable to All Transfers and Exchanges*.

(i) Subject to the restrictions set forth in this Section 2.09, Definitive Notes and beneficial interests in Global Notes may be transferred or exchanged from time to time as desired, and each such transfer or exchange will be noted by the Registrar in the Register.

(ii) All Notes issued upon any registration of transfer or exchange in accordance with this Indenture will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(iii) No service charge will be imposed on any Holder of a Definitive Note or any owner of a beneficial interest in a Global Note for any exchange or registration of transfer, but each of the Company, the Trustee or the Registrar may require such Holder or owner of a beneficial interest to pay a sum sufficient to cover any transfer tax, assessment or other governmental charge imposed in connection with such registration of transfer or exchange.

(iv) Unless the Company specifies otherwise, none of the Company, the Trustee, the Registrar or any co-registrar will be required to exchange or register a transfer of any Note (i) subject to a Change of Control Repurchase Notice validly delivered pursuant to Section 3.03 hereof, except to the extent any portion of such Note is not subject to a Change of Control Repurchase Notice or the Company fails to pay the applicable Change of Control Repurchase Price when due, (ii) subject to a notice of a Net Proceeds Offer validly delivered pursuant to Section 4.13 hereof, except to the extent any portion of such Note is not subject to a Net Proceeds Offer or the Company fails to pay the applicable Net Proceeds Offer Price when due or (iii) after the Company has delivered a Redemption Notice pursuant to Section 10.03 hereof, except to the extent the Company fails to pay the applicable Redemption Price when due.

(v) The Trustee will have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on Transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depositary participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(b) *In General; Transfer and Exchange of Beneficial Interests in Global Notes*. So long as the Notes are eligible for book-entry settlement with the Depositary (unless otherwise required by law and except to the extent required by Section 2.09(c) hereof):

43

#88605336v6

(i) all Notes will be represented by one or more Global Notes;

(ii) every transfer and exchange of a beneficial interest in a Global Note will be effected through the Depositary in accordance with the Applicable Procedures and the provisions of this Indenture (including the restrictions on Transfer set forth in Section 2.10 hereof); and

(iii) each Global Note may be transferred only as a whole and only (A) by the Depositary to a nominee of the Depositary, (B) by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or (C) by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(c) *Transfer and Exchange of Global Notes*.

(i) Notwithstanding any other provision of this Indenture, each Global Note will be exchanged for Definitive Notes if the Depositary delivers notice to the Company that:

(I) the Depositary is unwilling or unable to continue to act as Depositary; or

(II) the Depositary is no longer registered as a clearing agency under the Exchange Act,

and , in each case, the Company promptly delivers a copy of such notice to the Trustee and the Company fails to appoint a successor Depositary within 90 days after receiving notice from the Depositary.

In each such case, (1) each Global Note will be deemed surrendered to the Trustee for cancellation, (2) the Trustee will promptly cancel each such Global Note in accordance with the Applicable Procedures, (3) the Company, (x) in accordance with Section 2.05 hereof, will promptly execute, for each beneficial interest in each Global Note so cancelled, an aggregate principal amount of Definitive Notes equal to the aggregate principal amount of such beneficial interest, registered in such name and authorized denominations as the Depositary specifies, and bearing such legends as such Definitive Notes are required to bear under Section 2.02 and Section 2.10 hereof, and, (y) as provided in Section 2.05(c) hereof, will promptly deliver to the Trustee such Definitive Notes and a Company Order including the information specified in Section 2.05(c) hereof with respect to such Definitive Notes, and (4) the Trustee, upon receipt of such Definitive Notes and such Company Order, in accordance with Section 2.05 hereof, will promptly authenticate, and deliver to the Holder specified in such Company Order, such Definitive Notes.

(ii) In addition:

(I) if an Event of Default has occurred and is continuing, any owner of a beneficial interest in a Global Note may exchange such beneficial interest for

44

Definitive Notes by delivering a written request to the Company, the Registrar and the Trustee; or

(II) at any time, the Company may, in its sole discretion, at the request of the owner of a beneficial interest in a Global Note, permit the exchange of such owner's beneficial interest, by delivering a written request to the Registrar, the Trustee and the owner of such beneficial interest. each case, (1) upon receipt of such request, the Registrar will promptly deliver written notice of such request to the Company and the Trustee, which notice must identify the owner of the beneficial interest to be exchanged, the aggregate principal amount of such beneficial interest and the CUSIP number of the relevant Global Note; (2) the Trustee, upon receipt of such notice, will promptly cause the aggregate principal amount of such Global Note to be reduced by the aggregate principal amount of the beneficial interest to be so exchanged in accordance with the Applicable Procedures, (3) the Company (x) in accordance with Section 2.05 hereof, will promptly execute, for such beneficial interest, a Definitive Note having aggregate principal amount equal to the aggregate principal amount of such beneficial interest, registered in the name of the owner specified in the notice delivered by the Registrar, and bearing such legends as such Definitive Note is required to bear under Sections 2.02 and 2.10 hereof, and, (y) as provided in Section 2.05(c) hereof, will promptly deliver to the Trustee such Definitive Note and a Company Order including the information specified in Section 2.05(c) hereof with respect to such Definitive Note, and (4) the Trustee, upon receipt of such Definitive Note and such Company Order, will promptly, in accordance with Section 2.05 hereof, authenticate, and deliver to the Holder specified in such Company Order, such Definitive Note. If, after such exchange, all of the beneficial interests in a Global Note have been exchanged for Definitive Notes, such Global Note will be deemed surrendered to the Trustee for cancellation, and the Trustee will cause such Global Note to be cancelled in accordance with the Applicable Procedures.

(d) *Transfer and Exchange of Definitive Notes*. If Definitive Notes are issued, a Holder may:

(i) transfer a Definitive Note by: (A) surrendering such Definitive Note for registration of transfer to the Registrar, together with any endorsements or instruments of transfer reasonably required by any of the Company, the Trustee and the Registrar; (B) if such Definitive Note is a Restricted Note, delivering any documentation that any of the Company, the Trustee and the Registrar require to ensure that such transfer complies with Section 2.10 hereof and any applicable securities laws; and (C) satisfying any other requirements for such transfer set forth in this Section 2.09 and Section 2.10 hereof. Upon the satisfaction of conditions (A), (B) and (C), (1) the Company, (x) in accordance with Section 2.05 hereof, will promptly execute a new Definitive Note, in the name of the designated transferee, having an aggregate principal amount equal to that of the transferred Definitive Note and bearing such legends as such Definitive Note is required to bear under Sections 2.02 and 2.10 hereof, and (y) as provided in Section 2.05(c) hereof, will promptly deliver to the Trustee such Definitive Note and a Company Order including the information specified in Section 2.05(c) with respect to such Definitive Note, and (2) the Trustee, upon receipt of such Definitive Note and such Company Order, will

45

#88605336v6

promptly, in accordance with Section 2.05 hereof, authenticate, and deliver to the Holder specified in such Company Order, such Definitive Note;

(ii) exchange one or more Definitive Notes for one or more other Definitive Notes of any authorized denominations, and in aggregate principal amount equal to the aggregate principal amount of the one or more Definitive Notes to be exchanged, by surrendering such one or more Definitive Notes, together with any endorsements or instruments of transfer reasonably required by any of the Company, the Trustee and the Registrar, at any office or agency maintained by the Company for such purposes pursuant to Section 2.06 hereof. Whenever a Holder so surrenders one or more Definitive Notes for exchange, (1) the Company, (x) in accordance with Section 2.05 hereof, will promptly execute one or more new Definitive Notes, each in the name of such Holder, in the authorized denomination or denominations that such Holder requested (which authorized denomination or authorized denominations, as the case may be, must, in aggregate, equal the aggregate principal amount of the one or more Definitive Notes to be exchanged), and bearing a unique registration number not contemporaneously outstanding and such legends as such Definitive Note is required to bear under Sections 2.02 and 2.10 hereof, and (y) as provided in Section 2.05(c) hereof, will promptly deliver to the Trustee each such Definitive Note and a Company Order including the information specified in Section 2.05(c) with respect to each such Definitive Note, and (2) the Trustee, upon receipt of each such Definitive Note and such Company Order, will promptly, in accordance with Section 2.05 hereof, authenticate, and deliver to the Holder specified in such Company Order, each such Definitive Note; and

(iii) if then permitted by the Applicable Procedures, transfer or exchange a Definitive Note for a beneficial interest in a Global Note by (A) surrendering such Definitive Note for registration of transfer or exchange, together with any endorsements or instruments of transfer reasonably required by any of the Company, the Trustee and the Registrar, at any office or agency maintained by the Company for such purposes pursuant to Section 2.06 hereof; (B) if such Definitive Note is a Restricted Note, delivering any documentation that any of the Company, the Trustee and the Registrar require to ensure that such transfer complies with Section 2.10 hereof and any applicable securities laws; (C) satisfying any other requirements for such transfer set forth in this Section 2.09 and Section 2.10 hereof; and (D) providing written instructions to the Trustee to make an adjustment in its books and records with respect to the applicable Global Note to reflect an increase in the aggregate principal amount of the Notes represented by such Global Note, which instructions will contain information regarding the Depositary account to be credited with such increase. Upon the satisfaction of conditions (A), (B), (C) and (D), the Trustee (1) will promptly cancel such Definitive Note and, (2) will promptly cause the aggregate principal amount of Notes represented by such Global Note to be increased by the aggregate principal amount of such Definitive Note, and credit, or cause to be credited, the account of the Person specified in the instructions provided by the exchanging Holder in an amount equal to the aggregate principal amount of such Definitive Note, in each case, in accordance with the Applicable Procedures. If at the time of such exchange, a Depositary has been appointed but no Global Notes are then outstanding, the Company, (x) in accordance with Section 2.05 hereof, will promptly execute and deliver to the Trustee, a new Global Note registered in

46

the name of the Depositary or a nominee of the Depositary, as the case may be, having the appropriate aggregate principal amount, and bearing such legends as such Global Note is required to bear under Sections 2.02 and 2.10 hereof, and (y) as provided in Section 2.05(c) hereof, will promptly deliver to the Trustee such Global Note and a Company Order including the information specified in Section 2.05(c) with respect to such Global Note, and (2) the Trustee, upon receipt of such Global Note and such Company Order, will promptly, in accordance with Section 2.05 hereof, authenticate, and deliver to the depositary, its nominee, or a custodian of the depositary or its nominee, as the case may be, such Global Note.

Section 2.10.   *Transfer Restrictions*.

(a) *Restricted Notes*.

(i) *General*. Each Note (and every security issued in exchange therefor or substitution thereof) that bears, or that is required under this Section 2.10 to bear, the Restricted Notes Legend will be deemed a "**Restricted Note**," and will be subject to the restrictions on Transfer set forth in this Indenture (including in the Restricted Notes Legend) unless such restrictions on Transfer are eliminated or otherwise waived by written consent of the Company, and each Holder of a Restricted Note, by such Holder's acceptance of such Restricted Note, will be deemed to be bound by the restrictions on Transfer applicable to such Note.

(ii) *When Restrictions Apply*. Except as provided elsewhere in this Indenture (including clause (iii) of this Section 2.10(a)), until the Free Trade Date of a Note, every certificate evidencing such Note (and every security issued in exchange therefor or substitution thereof) will bear the Restricted Notes Legend unless:

(A) such Note is being Transferred to a person (other than (x) the Company or (y) an affiliate (as defined in Rule 144) of the Company) pursuant to a registration statement that was effective under the Securities Act at the time of such Transfer; or

(B) such Note is being Transferred to a person (other than (x) the Company or (y) an affiliate (as defined in Rule 144) of the Company) pursuant to an available exemption from the registration requirements of the Securities Act (including Rule 144) and, after such Transfer, such Note will no longer constitute "a restricted security" (within the meaning of Rule 144),

and, in case (B), the Holder effecting such Transfer delivers to the Trustee, the Company and the Registrar any documents or evidence required pursuant to the Restricted Notes Legend or this Indenture (including, in the case of Definitive Notes, clause (iii) of this Section 2.10(a)).

(iii) *Termination of Transfer Restrictions*.

47

(I) Except as otherwise provided in this Indenture (including clause (II) of this Section 2.10(a)(iii)) or as permitted under the terms of the Restricted Notes Legend, if a Holder requests that the Company remove the Restricted Notes Legend from a Definitive Note that is a Restricted Note, the Restricted Notes Legend will not be removed from such Restricted Note unless such Holder delivers, (1) to each of the Company and the Registrar a transfer certificate in the form attached as Exhibit B hereto and, (2) to each of the Company, the Registrar and the Trustee, any evidence that each of the Company, the Registrar and the Trustee, as the case may be, reasonably require, that (x) neither the Restricted Notes Legend nor the Transfer restrictions set forth therein are required to ensure that Transfers of such Restricted Note will comply with applicable law and (y) after such Transfer, such Restricted Note will not be a "restricted security" (within the meaning of Rule 144); *provided, however*, that, upon provision of such required transfer certificate and evidence, the Company, the Trustee and the Registrar will permit such Restricted Note to be exchanged in accordance with Section 2.09(d)(ii) hereof for one or more new Definitive Notes that do not bear the Restricted Notes Legend. In addition, upon receipt by the Trustee and the Registrar of a Company Order specifying that a Note need not bear the Restricted Notes Legend to comply with applicable law, each of the Trustee and the Registrar will permit such Note to be exchanged in accordance with Section 2.09(d)(ii) hereof for one or more new Definitive Notes that do not bear the Restricted Notes Legend.

(II) At any time on or after the Free Trade Date with respect to a Note, if such Note is represented by one or more Global Notes that are Restricted Notes, the Company shall delegend such Note by:

(1) providing written notice to the Trustee and the Registrar that the Free Trade Date has occurred and instructing the Trustee to remove the Restricted Notes Legend from such Global Notes or to deem the Restricted Notes Legend removed;

(2) providing written notice to each owner of a beneficial interest in any of such Global Notes, which notice will state that the Restricted Notes Legend has been removed or has been deemed removed from the applicable Global Note and include the unrestricted CUSIP that will thereafter apply to such applicable Global Note;

(3) providing written notice to the Trustee and the Depositary that the CUSIP number for each such Global Note will be changed to an unrestricted CUSIP number, which unrestricted CUSIP number will be listed in such notice;

(4) complying with any Applicable Procedures for delegending; and

(5) providing written notice to the Transfer Agent that the Free Trade Date has occurred,

48

#88605336v6

whereupon the Restricted Notes Legend will be deemed removed from such Global Notes.

(iv) *Reinstatement of Restricted Notes Legend.* If the Restricted Notes Legend is removed from the face of a Definitive Note and the Definitive Note is subsequently held by an affiliate (as defined in Rule 144) of the Company, the Restricted Notes Legend will be reinstated.

(b) *[Reserved]*.

Section 2.11.  *Replacement Notes.*

If (a)(i) a mutilated Note is surrendered to the Registrar or (ii) the Holder of a Note claims that such Note has been lost, destroyed or stolen and provides the Company and the Trustee with (A) evidence of such loss, theft or destruction that is reasonably satisfactory to the Company and the Trustee and (B) any amount or kind of security or indemnity that either of the Company or the Trustee reasonably request to protect itself from any loss that it may suffer upon replacement of such Note, and, in either case, (b) such Holder satisfies any other reasonable requirements of the Trustee, including the payment of any tax or other governmental charge that may be imposed in connection with the replacement of such Note, then, unless the Company or the Trustee receives notice that such Note has been acquired by a bona fide purchaser, the Company will, in accordance with Section 2.05 hereof, promptly execute and deliver to the Trustee, and the Trustee, upon receipt of a Company Order, in accordance with Section 2.05 hereof, and the documents required by Sections 14.03 and 14.04 hereof, will promptly authenticate and deliver, in the name of such Holder, a replacement Note having the same aggregate principal amount as the Note that was mutilated or claimed to be lost, destroyed or stolen, bearing any restrictive legends required by Section 2.02 or 2.10 hereof and with a certificate number not contemporaneously outstanding.

Every new Note issued pursuant to this Section 2.11 in exchange for any mutilated Note, or in lieu of any destroyed, lost or stolen Note, will constitute an original contractual obligation of the Company and any other obligor upon the Notes, regardless of whether the mutilated, destroyed, lost or stolen Note will be at any time enforceable by anyone, and will be entitled to all benefits of (and will be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

Section 2.12.  *Temporary Notes.* Until Definitive Notes are ready for delivery, the Company may execute and the Trustee or an authenticating agent appointed by the Trustee will, upon written request of the Company, authenticate and deliver temporary Notes (printed or lithographed) ("**Temporary Notes**"). Temporary Notes will be issuable in any authorized denomination, and substantially in the form of Definitive Notes, but with such omissions, insertions and variations as may be appropriate for Temporary Notes, all as may be determined by the Company. Every such Temporary Note will be executed by the Company and authenticated by the Trustee or such authenticating agent upon the same conditions and in substantially the same manner, and with the same effect, as the Definitive Notes. Without unreasonable delay the Company will prepare, execute

49

and deliver to the Trustee or such authenticating agent Definitive Notes (other than any Global Note) and thereupon any or all Temporary Notes (other than any Global Note) may be surrendered in exchange therefor, at each office or agency maintained by the Company pursuant to Section 2.06 hereof and the Trustee or such authenticating agent will authenticate and deliver in exchange for such Temporary Notes Definitive Notes having an aggregate principal amount equal to such Temporary Notes. Such exchange will be made by the Company at its own expense and without any charge therefor. Until so exchanged, the Temporary Notes will, in all respects, be entitled to the same benefits and subject to the same limitations under this Indenture as Definitive Notes authenticated and delivered hereunder.

Section 2.13.   *Cancellation*. At any time, the Company may deliver Notes to the Trustee for cancellation. Whenever any Note is surrendered to the Registrar or Paying Agent for registration of transfer, exchange, repurchase, redemption or payment, the Registrar or Paying Agent, as the case may be, will promptly forward such Note to the Trustee. Upon receipt of any such Note, the Trustee, in its customary manner, will promptly cancel and dispose of such Note. The Company may not issue new Notes to replace Notes that it has repurchased, redeemed, paid or delivered to the Trustee for cancellation.

Section 2.14.   *Outstanding Notes*. At any time, Notes outstanding are limited to all Notes authenticated by the Trustee except (i) those cancelled by it, (ii) those delivered to it for cancellation and (iii) those deemed not outstanding under Sections 3.05, 4.13, and 10.06 hereof and clauses (a) and (b) of this Section 2.14.

(a) If a Note is replaced pursuant to Section 2.11 hereof, such Note will cease to be outstanding at the time of its replacement unless the Trustee and the Company receive proof satisfactory to them that such Note is held by a bona fide purchaser.

(b) In addition, if the Company, any other obligor or an Affiliate of the Company or an Affiliate of such other obligor holds a Note, such Note will be disregarded and deemed not to be outstanding for purposes of determining whether the Holders of the requisite aggregate principal amount of Notes have given or concurred in any request, demand, authorization, direction, notice, consent, waiver or other action hereunder. Subject to the foregoing, only Notes outstanding at the time of any such determination will be considered in such determination (including determinations pursuant to Article 6 and Article 9 hereof).

#88605336v6

Section 2.15.   *Persons Deemed Owners*. Prior to due presentment of a Note for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Note is registered in the Register as the owner of such Note for the purpose of receiving the payment of the principal, Change of Control Repurchase Price, the Net Proceeds Offer Price or Redemption Price of, and interest, if any, on, such Note and for all other purposes whatsoever with respect to such Note, and none of the Company, the Trustee or any agent of the Company or the Trustee will be affected by any notice to the contrary.

Section 2.16.   *Repurchases*. The Company may, from time to time, repurchase Notes in open market purchases or in negotiated transactions without delivering prior notice to Holders; *provided* that the aggregate amount of the consideration paid by the Company for any such repurchases shall not exceed $35 million in any twelve-month period or $100 million prior to the Maturity Date.

Section 2.17.   *CUSIP and ISIN Numbers*.

(a)  Whenever "CUSIP" and "ISIN" numbers are generally in use, the Company will use CUSIP and ISIN numbers with respect to the Notes, which CUSIP and ISIN numbers (i) for Restricted Notes, will be restricted numbers, and (ii) for Notes that are not Restricted Notes, will be unrestricted numbers. Whenever the Company uses CUSIP and ISIN numbers, the Trustee will also use CUSIP and ISIN numbers in each notice it delivers to the Holders; *provided* that neither the Company nor the Trustee will be responsible for any defect in any CUSIP or ISIN number that appears on any Note, check, advice of payment or notice, including any notice delivered pursuant to Section 10.03. The Company will promptly notify the Trustee in writing in the event of any change in the CUSIP or ISIN numbers.

(b)  Whenever any of the CUSIP or ISIN numbers with respect to the Notes change, cease to be used, or begin to be used, the Company will deliver prompt written notice of such change, cessation, or beginning to each of the Trustee and the Holders.

## Article 3

## REPURCHASE AT THE OPTION OF THE HOLDER

Section 3.01.   *Change of Control Permits Holders to Require the Company to Repurchase the Notes*.

(a) *General*. If a Change of Control occurs at any time prior to the Maturity Date, each Holder will have the right to require the Company to repurchase all of its Notes or any portion of its Notes in principal amount equal to $1,000 or an integral multiple of $1,000 in excess thereof (so long as the remaining portion of any such Notes equals $2,000 or an integral multiple of $1,000 in excess thereof) on the Change of Control Repurchase Date for such Change of Control for an amount of cash equal to the Change of Control Repurchase Price for such Change of Control Repurchase Date and such Notes. Notwithstanding anything to the contrary in this Section 3.01, the Company will not be

required to make an offer to repurchase the Notes pursuant to this Section 3.01 (a "**Change of Control Offer**") upon a Change of Control (1) if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Article 3 and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer or (2) if a Redemption Notice has been given pursuant Article 11 hereof in respect of all outstanding Notes, unless and until there is a default in payment of the applicable Redemption Price.

(b) *Change of Control Repurchase Price*. The "**Change of Control Repurchase Price**" means, for any Notes to be repurchased on any Change of Control Repurchase Date, a price equal to 101% of the principal amount of such Notes, plus accrued and unpaid interest, if any, on such Notes to, but excluding, such Change of Control Repurchase Date; *provided, however*, that if a Change of Control Repurchase Date occurs after a Regular Record Date, but on or prior to the Interest Payment Date corresponding to such Regular Record Date, the Company will pay the accrued and unpaid interest on such Notes, on such Interest Payment Date, to the Holder of such Notes as of the Close of Business on such Regular Record Date, and the Change of Control Repurchase Price shall not include such accrued and unpaid interest.

(c) *Change of Control Repurchase Date*. The "**Change of Control Repurchase Date**" means, for any Change of Control, the date specified by the Company in the Change of Control Notice for such Change of Control, which date will be not less than 20 Business Days, nor more than 35 Business Days, immediately following the Change of Control Notice Date for such Change of Control.

(d) *Redemption Following Completion of Change of Control Offer*. In the event that Holders of at least 90% of the aggregate principal amount of the outstanding Notes accept a Change of Control Offer and the Company purchases all of the Notes validly tendered and not validly withdrawn held by such Holders, the Company will have the right, upon not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to Article 3 hereof, to redeem all of the Notes that remain outstanding following such purchase at a redemption price equal to the Change of Control Repurchase Price plus, to the extent not included in the Change of Control Repurchase Price, accrued and unpaid interest on the Notes that remain outstanding, to the date of redemption (subject to the right of Holders on the relevant record date to receive interest due on the relevant interest payment date).

Section 3.02.   *Change of Control Notice*.

(a) *General*. On or before the 10th calendar day immediately following the effective date of a Change of Control, the Company will deliver to each Holder (and to any beneficial owners of a Global Note, as required by applicable law), the Trustee and the Paying Agent written notice of such Change of Control and the resulting repurchase right (the "**Change of Control Notice**," and the date of such mailing, the "**Change of Control Notice Date**"). Simultaneously with mailing any Change of Control Notice to the Holders, the Trustee and the Paying Agent, the Company will publish a notice containing the same information as the Change of Control Notice (i) in a newspaper of

#88605336v6

general circulation in The City of New York and (ii) on its website or through such other public medium as the Company may use at such time. Notwithstanding anything to the contrary contained herein, a Change of Control Offer may be made in advance of a Change of Control, conditioned upon the consummation of such Change of Control, if a definitive agreement is in place for the Change of Control at the time the Change of Control Offer is made.

For any Change of Control, the Change of Control Notice corresponding to such Change of Control will specify:

(1) briefly, the events causing such Change of Control;

(2) the effective date of such Change of Control;

(3) the last date on which a Holder may exercise its right to require the Company to repurchase its Notes as a result of such Change of Control under this Article 3;

(4) the procedures that a Holder must follow to require the Company to repurchase a Note;

(5) the Change of Control Repurchase Price for each $1,000 principal amount of Notes for such Change of Control;

(6) the Change of Control Repurchase Date for such Change of Control;

(7) that the Change of Control Repurchase Price for any Note for which a Change of Control Repurchase Notice has been duly tendered and not validly withdrawn will be paid promptly following the later of the Change of Control Repurchase Date and the time such Note is surrendered for repurchase;

(8) the name and address of the Paying Agent;

(9) the procedures for withdrawing a Change of Control Repurchase Notice;

(10) that if a Note or portion of a Note is subject to a validly delivered Change of Control Repurchase Notice, unless the Company defaults in paying the Change of Control Repurchase Price for such Note or portion of a Note, interest, if any, on such Note or portion of a Note will cease to accrue on and after the Change of Control Repurchase Date; and

(11) the CUSIP and ISIN number(s) of the Notes.

(b) *Failure or Defect*. Notwithstanding anything provided elsewhere in this Indenture, neither the failure of the Company to deliver a Change of Control Notice nor a defect in a Change of Control Notice delivered by the Company will limit the repurchase

53

rights of any Holder under this Article 3 or impair or otherwise affect the validity of any proceedings relating to the repurchase of any Note pursuant to this Article 3.

Section 3.03.   *Change of Control Repurchase Notice.*

(a) *General.* To exercise its repurchase rights under Section 3.01(a) hereof with respect to any Notes pursuant to a Change of Control, the Holder thereof must deliver to the Paying Agent, by the Close of Business on the Business Day immediately preceding the Change of Control Repurchase Date, subject to extension to comply with applicable law:

(1) a duly completed "Option of Holder to Elect Purchase," substantially in the form set forth in Exhibit A hereto (a "**Change of Control Repurchase Notice**") setting forth that such Holder is tendering such Notes for repurchase; and

(2) such Notes (A) by book-entry transfer if such Notes are Global Notes, or (B) by physical delivery, if such Notes are Definitive Notes, in each case, together with any endorsements or other documents reasonably requested by the Paying Agent, the Trustee or the Company.

(b) *Contents of Change of Control Repurchase Notice.* The Change of Control Repurchase Notice for any Note must state:

(i) if such Note is to be repurchased in part, the principal amount of such Note to be repurchased, which principal amount must equal $1,000 or an integral multiple of $1,000 in excess thereof (so long as the remaining portion of such Note equals $2,000 or an integral multiple of $1,000 in excess thereof);

(ii) that such Note will be repurchased by the Company pursuant to the provisions of this Article 3 hereof; and

(iii) if such Note is a Definitive Note, the certificate number of such Note.

If the Notes to be repurchased are Global Notes, the Change of Control Repurchase Notice for such Notes must comply with the Applicable Procedures.

(c) *Notice to Company.* If any Holder validly delivers to the Paying Agent a Change of Control Repurchase Notice with respect to a Note or any portion of a Note, the Paying Agent will promptly deliver to the Company a copy of such Change of Control Repurchase Notice.

(d) *Effect of Improper Notice.* Unless and until the Paying Agent receives a validly endorsed and delivered Change of Control Repurchase Notice with respect to a Note, together with such Note, in a form that conforms in all material aspects with the description contained in such Change of Control Repurchase Notice, the Holder submitting the Notes will not be entitled to receive the Change of Control Repurchase Price for such Note.

54

Section 3.04.   *Withdrawal of Change of Control Repurchase Notice.*

(a) *General*. After a Holder delivers a Change of Control Repurchase Notice with respect to a Note, such Holder may withdraw such Change of Control Repurchase Notice with respect to such Note or any portion of such Note in principal amount equal to $1,000 or an integral multiple of $1,000 in excess thereof (so long as the remaining portion of such Note not subject to the Change of Control Repurchase Notice equals $2,000 or an integral multiple of $1,000 in excess thereof) by delivering to the Paying Agent a written notice of withdrawal prior to the Close of Business on the Business Day immediately preceding the Change of Control Repurchase Date to the Paying Agent. Any such withdrawal notice must state:

> (A) the principal amount of the Note with respect to which such notice of withdrawal pertains, which must equal $2,000 or an integral multiple of $1,000 in excess thereof;

> (B) the principal amount of such Note that remains subject to the original Change of Control Repurchase Notice, which portion must have a principal amount equal to $1,000 or an integral multiple of $1,000 in excess thereof; and

> (C) if the Notes subject to such Change of Control Repurchase Notice were Definitive Notes, the certificate numbers of the Notes to be withdrawn and the Notes that will remain subject to the Change of Control Repurchase Notice.

If the Notes to be withdrawn are Global Notes, a Holder must deliver its notice of withdrawal in compliance with the Applicable Procedures.

(b) *Return of Note*. Upon receipt of a validly delivered withdrawal notice, the Paying Agent will promptly (i) if such notice pertains to a Definitive Note or a portion of a Definitive Note, return such Note or portion of a Note to such Holder, in the amount specified in such withdrawal notice; and, (ii) if such notice pertains to a beneficial interest in a Global Note, in compliance with the Applicable Procedures, deem to be cancelled any instructions for book-entry transfer of such beneficial interest, in the amount specified in such withdrawal notice.

(c) *Notice to Company*. If any Holder validly delivers to the Paying Agent a notice of withdrawal with respect to a Note or any portion of a Note, the Paying Agent will promptly deliver to the Company a copy of such notice of withdrawal.

Section 3.05.   *Effect of Change of Control Repurchase Notice.*

(a) *Timing of Payment*. Upon the Paying Agent's receipt of (i) a valid Change of Control Repurchase Notice (together with all necessary endorsements) and (ii) the Notes to which such Change of Control Repurchase Notice pertains, the Holder of the Notes to which such Change of Control Repurchase Notice pertains will be entitled, except to the extent such Holder has validly withdrawn such Change of Control Repurchase Notice in accordance with Section 3.04 hereof to receive the Change of Control Repurchase Price with respect to such Notes on the later of the following (subject to extension to comply

55

with applicable law) (i) the Change of Control Repurchase Date and (ii)(A) if such Notes are Definitive Notes, the date of delivery of such Notes to the Paying Agent, duly endorsed, or (B) if such Notes are Global Notes, the date of book-entry transfer of such Notes to the Paying Agent, or, if such later date is not a Business Day, the Business Day immediately following such later date.

(b) *Effect of Deposit*. If, as of 10:00 a.m., New York City time, on the Change of Control Repurchase Date for any Change of Control, the Company, in accordance with Section 3.08 hereof, has deposited with the Paying Agent money sufficient to pay the Change of Control Repurchase Price for every Note subject to a Change of Control Repurchase Notice validly delivered in accordance with Section 3.03 hereof and not validly withdrawn in accordance with Section 3.04 hereof, at the Close of Business on the Change of Control Repurchase Date:

(1) the Notes to be repurchased will cease to be outstanding and interest will cease to accrue on such Notes (whether or not book-entry transfer of such Notes is made or whether or not such Notes are delivered to the Paying Agent), except to the extent provided in the proviso to Section 3.01(b); and

(2) all other rights of the Holders of such Notes with respect to such Notes (other than the right to receive payment of the Change of Control Repurchase Price upon delivery or transfer of such Notes and any Defaulted Amounts or Default Interest with respect to the Notes, and other than as provided in the proviso to Section 3.01(b)) will terminate.

Section 3.06.   *Notes Repurchased in Part*. If any Definitive Note is to be repurchased only in part, the Holder must surrender such Note at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder of such Note or such Holder's attorney-in-fact, duly authorized in writing), whereupon the Company, in accordance with Section 2.05 hereof, will promptly execute, and, upon receipt of a Company Order and the documents required by Sections 14.03 and 14.04 hereof, the Trustee, in accordance with Section 2.05 hereof, will promptly authenticate and deliver, to the surrendering Holder, a new Note or Notes of any authorized denomination or denominations requested by such Holder in aggregate principal amount equal to the portion of the principal amount of the Note so surrendered which is not repurchased. If any Global Note is repurchased in part, the Company will instruct the Trustee to decrease the principal amount of such Global Note by the principal amount repurchased. Any Notes that are repurchased or owned by the Company, whether or not in connection with a Change of Control, will be submitted to the Trustee for cancellation and will be duly retired by the Company.

Section 3.07.   *Covenant to Comply With Securities Laws Upon Repurchase of Notes*. In connection with any repurchase offer pursuant to a Change of Control Repurchase Notice under this Article 3, the Company will, to the extent applicable, (i) comply with Rule 13e-4 and any other tender offer rules under the Exchange Act that may be applicable at the time of the offer to repurchase the Notes, and (ii) otherwise

56

#88605336v6

comply with any applicable United States federal and state securities laws so as to permit Holders to exercise their rights and obligations under Section 3.01 hereof in the time and in the manner specified in Sections 3.01 and 3.03 hereof.

Section 3.08.   *Deposit of Change of Control Repurchase Price*. Prior to 10:00 a.m., New York City time, on the Change of Control Repurchase Date, the Company will deposit with the Trustee or with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, will segregate and hold in trust as provided in Section 2.07 hereof) an amount of immediately available funds sufficient to pay the Change of Control Repurchase Price of all the Notes or portions thereof that the Company is required to repurchase on such Change of Control Repurchase Date.

Section 3.09.   *Covenant Not to Repurchase Notes Upon Certain Events of Default*.

(a) *General*. Notwithstanding anything to the contrary in this Article 3, the Company will not purchase any Notes under this Article 3 if, as of the Change of Control Repurchase Date, the principal amount of the Notes has been accelerated, such acceleration has not been rescinded and such acceleration did not result from a Default that would be cured by the Company's payment of the Change of Control Repurchase Price.

(b) *Deemed Withdrawals*. If, on any Change of Control Repurchase Date, (i) a Change of Control Repurchase Notice for a Note has been validly tendered in accordance with Section 3.03 hereof and has not been validly withdrawn in accordance with Section 3.04 hereof, and (ii) pursuant to this Section 3.09, the Company is not permitted to purchase Notes, the Paying Agent, upon receipt of written notice from the Company stating that the Company, pursuant to this Section 3.09, is not permitted to purchase Notes, will deem such Change of Control Repurchase Notice to be withdrawn.

(c) *Return of Notes*. If a Holder tenders a Note for purchase pursuant to this Article 3 and, on the Change of Control Repurchase Date, pursuant to this Section 3.09, the Company is not permitted to purchase such Note, the Paying Agent will (i) if such Note is a Definitive Note, return such Note to such Holder, and (ii) if such Note is held in book-entry form, in compliance with the Applicable Procedures, deem to be cancelled any instructions for book-entry transfer of such Note.

**Article 4**

**COVENANTS**

Section 4.01.   *Payment of Notes*. The Company will pay or cause to be paid the principal of, Change of Control Repurchase Price, the Net Proceeds Offer Price or Redemption Price for, and any accrued and unpaid interest on, the Notes on the dates and in the manner required under this Indenture. Any principal of, Change of Control Repurchase Price, Net Proceeds Offer Price or Redemption Price for, or interest on, a

57

Note will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds, as of 10:00 a.m. New York City time on the due date, money deposited by the Company in immediately available funds and designated for, and sufficient to pay, such principal, Change of Control Repurchase Price, the Net Proceeds Offer Price, Redemption Price or interest then due. To the extent lawful, the Company will also pay Default Interest (including post-petition interest in any proceeding under any Bankruptcy Law) on any Defaulted Amounts in accordance with Section 2.04 hereof.

Section 4.02.   *144A Information*. Whenever the Company is not subject to Section 13 or Section 15(d) of the Exchange Act, if any Notes constitute "restricted securities" within the meaning of Rule 144, the Company will, upon the request of a Holder or beneficial owner of the Notes, promptly furnish or cause to be furnished to the applicable Holder, beneficial owner, or any prospective purchaser designated by the applicable Holder or beneficial owner, of the Notes, all of the information that a prospective purchaser of the Notes is required to receive under Rule 144A(d)(4) of the Securities Act for the Notes to be resold to such prospective purchaser pursuant the exemption from registration provided by Rule 144A.

Section 4.03.   *Reports*.

If: (1) required by the rules and regulations of the SEC, the Company will furnish to the Trustee, no later than the dates specified in the SEC's rules and regulations (including any extensions provided therein), or (2) not required by the rules and regulations of the SEC, the Company will furnish to the Trustee, no later than the dates specified in the SEC's rules and regulations (including any extensions provided therein) for a filer that is a "non-accelerated filer" (or any successor term that provides an entity with the greatest time period for filing periodic reports with the SEC):

(1) all quarterly and annual reports that would be required to be filed with the SEC on Forms 10-K and 10-Q (or any successor or comparable forms) if the Company were required to file such reports; *provided, however*, that the Company shall have any additional 30 days to furnish its Annual Report on Form 10-K for the year ended December 31, 2016, and an additional 15 days to furnish its Quarterly Report on Form 10-Q for the quarters ended June 30, 2016 and September 30, 2016; and

(2) all current reports that would be required to be filed with the SEC on Form 8-K (or any successor or comparable form) if the Company were required to file such reports.

All such reports will be prepared in all material respects in accordance with all of the rules and regulations applicable to such reports. Each annual report on Form 10-K will include a report on the Company's consolidated financial statements by the Company's certified independent accountants. Notwithstanding anything to the contrary above, the Company shall not be required to disclose to the Trustee (or the Holders) any materials for which it has sought and has received (or reasonably expects to receive)

#88605336v6

confidential treatment from the SEC. All reports filed with the SEC via EDGAR (or any successor system) or posted on the Company's website (without any restrictions on access) shall be deemed to have been furnished to the Trustee in accordance with this Section 4.03.

The Company will arrange and participate in quarterly conference calls to discuss its results of operations no later than three business days following that date on which each of the quarterly and annual reports are made available as provided above; provided that the Company may limit the information made available during such conference calls to the extent the Company determines, in its sole discretion, that such information that (x) would not be material to Holders or to the business, assets, operations or financial positions of the Company and its Restricted Subsidiaries, taken as a whole, or (y) would otherwise cause material competitive harm to the business, assets, operations, financial position or prospects of the Company and its Restricted Subsidiaries, taken as a whole. The Company will provide on its public website (or through a public announcement or such other medium as the Company may use at the time) dial-in conference call information and presentations or materials referred to on such calls, if any, substantially concurrently with the posting of such reports as provided for above.

The Company will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept the Company's filings for any reason, the Company will post the reports required by this Section 4.03 on its website (without any restrictions on access) within the time periods proscribed above.

Delivery of such quarterly and annual reports, and such other documents, information and other reports to the Trustee will be for informational purposes only, and the Trustee's receipt of such will not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely conclusively on Officers' Certificates).

Section 4.04.   *Compliance Certificate.*

(a) *Annual Compliance Certificate.* Within 90 days after the end of each fiscal year of the Company, beginning with the fiscal year ending on December 31, 2016, the Company will deliver to the Trustee an Officers' Certificate, which Officers' Certificate will state (i) that the Officers signing such Officers' Certificate have supervised a review of the activities of the Company and its Subsidiaries with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture during the preceding fiscal year, and (ii) to the knowledge of each of the Officers signing such Officers' Certificate, (A) whether the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (without regard to any period of grace or requirement of notice provided under this Indenture) or, if one or more Defaults or Events of Default have occurred, what events triggered such Defaults or Events of Default and what actions the Company

#88605336v6

is taking or proposes to take with respect to such Defaults or Events of Default, and (B) whether any event has occurred and remains in existence by reason of which any payment of the principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption Price for, or interest on, a Note is prohibited, and, if any such event has occurred and remains in existence, a description, in reasonable detail, of such event or events and what actions the Company is taking or proposes to take with respect to such event or events.

(b) *Certificate of Default or Event of Default*. As soon as possible, and in any event within five Business Days after a Default occurs, the Company will deliver to the Trustee an Officers' Certificate describing such Default, its status and a description, in reasonable detail, of what action the Company is taking or proposes to take with respect to such Default.

Section 4.05.  *Restriction on Purchases by the Company*. Neither the Company nor any of its Subsidiaries will purchase or otherwise acquire any Notes without canceling such Notes. In addition, the Company will comply the restrictions on the amounts of repurchases set forth in Section 2.16 herein.

Section 4.06.  *Taxes*. The Company will pay, and will cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessments and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders.

Section 4.07.  *Corporate Existence*. Subject to Article 5 hereof, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect:

(a) its corporate existence, and the corporate, partnership or other existence of each of its Restricted Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or such Restricted Subsidiary, as applicable; and

(b) the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries;

*provided, however,* that the Company will not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors determines that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders.

Section 4.08.  *Stay, Extension and Usury Laws*. The Company and each of the Guarantors covenants that, to the extent that it may lawfully do so, it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated

60

herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture; and each of the Company and the Guarantors, to the extent that it may lawfully do so, hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will instead suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.09.   *Further Instruments and Acts*. Upon request of the Trustee, the Company and each of the Guarantors will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the terms of this Indenture.

Section 4.10.   *Restricted Payments*.

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1) declare or pay any dividend or make any other payment or distribution on or in respect of the Company's or any Restricted Subsidiary's Equity Interests (including any such payment in connection with any merger or consolidation involving such Person), except dividends or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Company or such Restricted Subsidiary and except dividends or distributions payable solely to the Company or any of its Restricted Subsidiaries (and, if such Restricted Subsidiary is not a Wholly Owned Subsidiary, to its other Equity Interest holders on a pro rata basis with respect to the class of Equity Interests on which such dividend or distribution is made, or on a basis that results in the receipt by the Company or any of its Restricted Subsidiaries of dividends or distributions of greater value than it would receive on a pro rata basis);

(2) purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company) any Equity Interests of the Company;

(3) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Indebtedness ("**Subordinated Indebtedness**") of the Company or any Guarantor that is (i) Indebtedness that is contractually subordinated to the Notes or to any Note Guarantee (excluding any intercompany Indebtedness between or among the Company and any of its Restricted Subsidiaries) or (ii) unsecured Indebtedness, except, in each case, payments of interest or principal at the Stated Maturity thereof, other than, in the case of any such Existing Indebtedness with a Stated Maturity prior to [•], 2021, the purchase, repurchase, redemption, defeasance or other acquisition of any such Existing Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition; or

61

(4) make any Restricted Investment

(all such payments and other actions set forth in these clauses (1) through (4) above being collectively referred to as "**Restricted Payments**").

(b) Notwithstanding anything to the contrary therein, Section 4.10(a) will not prohibit:

(1) the payment of any dividend or distribution on account of Equity Interests or the consummation of any redemption within 60 days after the date of declaration of the dividend or distribution on account of Equity Interests or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Section 4.10;

(2) the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Indebtedness, unsecured Indebtedness or Disqualified Stock of the Company or any Guarantor in exchange for, by conversion into or out of, or with the net cash proceeds from, an incurrence of Permitted Refinancing Indebtedness, which incurrence occurs substantially concurrently with such purchase, repurchase, redemption, defeasance or other acquisition or retirement for value;

(3) so long as no Default or Event of Default has occurred and is continuing, the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company or any Restricted Subsidiary of the Company held by any current or former officer, director, employee or consultant of the Company or any Restricted Subsidiary of the Company or any permitted transferee of the foregoing pursuant to any equity subscription agreement, stock option agreement, shareholders' agreement or similar agreement; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed $1.0 million in any twelve-month period; *provided, further*, that such amount in any twelve-month period may be increased by an amount not to exceed:

(a) the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Company to officers, directors, employees or consultants of the Company, any of its Subsidiaries or any of its direct or indirect parent companies that occurs after the Issue Date to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the making of Restricted Payments pursuant to Section 4.10(b); *plus*

(b) the cash proceeds of key man life insurance policies received by the Company or any Restricted Subsidiary of the Company after the Issue Date; and in addition, cancellation of Indebtedness owing to the Company or any Restricted Subsidiary from any current or former officer,

62

#88605336v6

director or employee (or any permitted transferees thereof) of the Company or any Restricted Subsidiary of the Company in connection with a repurchase of Equity Interests of the Company or any Restricted Subsidiary of the Company from such Persons will not be deemed to constitute a Restricted Payment for purposes of this Section 4.10 or any other provisions of this Indenture;

(4) the purchase, redemption or other acquisition or retirement for value of Equity Interests (x) deemed to occur upon the exercise of stock options, warrants, convertible notes or similar rights to acquire Equity Interests to the extent that such Equity Interests represent all or a portion of the exercise or exchange price of those stock options, warrants, convertible notes or similar rights, or (y) made in lieu of payment of withholding taxes in connection with the vesting of Equity Interests or any exercise or exchange of stock options, warrants, convertible notes or similar rights to acquire such Equity Interests;

(5) any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Indebtedness, unsecured Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary upon a Change of Control or Asset Sale to the extent required by this Indenture or other instrument pursuant to which such Indebtedness or Disqualified Stock was issued, but only if the Company or such Restricted Subsidiary has first complied with its obligation under Article 3 and Section 4.13 hereof, as applicable;

(6) the making of any Restricted Payment in exchange for, or out of or with the net cash proceeds from the substantially concurrent contribution to the common equity of the Company or from the substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests (other than Disqualified Stock) of the Company;

(7) so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, Restricted Payments in an amount such that after giving *pro forma* effect to such payment the Company would have a Fixed Charge Coverage Ratio for the four quarter period immediately prior to such payment of at least 2.0 to 1.0 and a Total Leverage Ratio of no more than 2.01 to 1.0;

(8) payments of cash, dividends, distributions, advances or other Restricted Payments by the Company or any of its Restricted Subsidiaries to allow the payment of cash in lieu of the issuance of fractional shares;

(9) so long as no Default or Event of Default has occurred and is continuing or would be caused thereby, other Restricted Payments in an aggregate amount not to exceed $10.0 million in the aggregate since the Issue Date, plus if any such Restricted Payment under this clause (9) was used to make an Investment, the cash return of capital with respect to such Investment (less the cost of disposition, if any); and

#88605336v6

(10) Subject to Sections 2.16 and 4.05 herein, repurchases of Notes.

(c) The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or the relevant Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The Fair Market Value of any assets or securities that are required to be valued by this covenant will be determined by the Company or, if such Fair Market Value is in excess of $10.0 million, by the Board of Directors, whose resolution with respect thereto will be delivered to the Trustee.

(d) For purposes of determining compliance with this Section 4.10, in the event that a proposed Restricted Payment (or portion thereof) meets the criteria of more than one of the categories of Restricted Payments described in Sections 4.10(b)(1) through Section 4.10(b)(10) or is entitled to be incurred as one or more categories of Permitted Investments or pursuant to Section 4.10(a), the Company will be entitled to classify such Restricted Payment or portion thereof in any manner that complies with this Section 4.10, and such Restricted Payment will be treated as having been made pursuant to only such clause or clauses, categories of Permitted Investments or Section 4.10(a).

Section 4.11.  *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1) pay dividends or make any other distributions on its Capital Stock to any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to any of its Restricted Subsidiaries (it being understood that the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock);

(2) make loans or advances to any of its Restricted Subsidiaries; or

(3) sell, lease or transfer any of its properties or assets to any of its Restricted Subsidiaries.

(b) The restrictions in Section 4.11(a) will not apply to encumbrances or restrictions existing under or by reason of:

(1) agreements in effect on the Issue Date and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of such agreements, *provided* that the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not, in the good faith judgment of the Board of Directors, materially more restrictive, taken as

64

#88605336v6

a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the Issue Date;

(2) this Indenture, the Notes and the Note Guarantees and the Security Documents;

(3) applicable law, rule, regulation, order, approval, license, permit or similar restriction (whether or not existing on the Issue Date);

(4) (a) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired and does not in the good faith judgment of the Board of Directors materially adversely affect the ability of the Company to make scheduled payments of interest and principal on the Notes, *provided* that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be incurred; and (b) any amendment, modification, replacement or refinancing thereof, *provided* that after giving effect to such amendment, modification, replacement or refinancing thereof, such encumbrances or restrictions of the type set forth in clauses (1), (2) and (3) of Section 4.11(a) are not, in the good faith judgment of the Board of Directors, materially more restrictive, taken as a whole, than prior to such amendment, modification, replacement or refinancing;

(5) customary non-assignment provisions in contracts and licenses entered into in the ordinary course of business;

(6) purchase money obligations or similar obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased (plus improvements and accessions to such property, or assets or proceeds or distributions thereof) of the nature described in Section 4.11(a)(3);

(7) any agreement for the sale or other disposition of the Capital Stock or assets of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending such sale or other disposition;

(8) Permitted Refinancing Indebtedness, *provided* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not, in the good faith judgment of the Board of Directors, materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced, extended, renewed, refunded, replaced, defeased or discharged;

(9) Liens permitted to be incurred under the provisions of the covenant described above under Section 4.14 that limit the right of the debtor to dispose of the assets subject to such Liens (plus improvements and accessions to such property, or assets or proceeds or distributions thereof);

65

(10) customary provisions in joint venture agreements or other similar agreements;

(11) customary provisions in Permitted Hedging Obligations;

(12) restrictions on cash or other deposits or net worth imposed by customers under contracts or other agreements entered into in the ordinary course of business;

(13) restrictions on other Indebtedness incurred in compliance with Section 4.12, *provided* that such restrictions will not materially affect the Company's ability to make principal or interest payments on the Notes and are customary for instruments of such type;

(14) encumbrances on property that exist at the time such property was acquired by the Company or any Restricted Subsidiaries;

(15) encumbrances or restrictions consisting of customary restrictions on the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract or similar property or asset;

(16) customary guarantees by the Company under non-Indebtedness obligations of a Subsidiary set forth in leases, licenses and other agreements entered into by the Subsidiary in the ordinary course of business; and

(17) restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Company or any of its Restricted Subsidiaries is a party entered into in the ordinary course of business, *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Company or such Restricted Subsidiary that are the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Company or such Restricted Subsidiary or the assets or property of any other Restricted Subsidiary.

(c) For purposes of determining compliance with this Section 4.11, the subordination of loans or advances made to the Company or a Restricted Subsidiary to other Indebtedness incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

Section 4.12.   *Incurrence of Indebtedness and Issuance of Preferred Stock.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, enter into a guarantee of or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "**incur**") any Indebtedness (including Acquired Debt), and the Company will not issue any Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock or preferred interests.

66

(b) Notwithstanding anything to the contrary therein, Section 4.12(a) will not prohibit the incurrence of any of the following items of Indebtedness or the issuance of any of the following Disqualified Stock (collectively, "**Permitted Debt**"):

(1) the incurrence and guarantee by the Company or any Restricted Subsidiary, of Indebtedness and letters of credit (and reimbursement obligations with respect thereto) under one or more Permitted Secured Obligations (other than Note Obligations relating to the initial Notes issued under this Indenture, but including any Note Obligations relating to any Additional Notes) (with letters of credit being deemed to have a principal amount equal to the maximum remaining potential liability of the Company or any Restricted Subsidiary thereunder) not to exceed $100.0 million, less the amount applied to permanently repay Indebtedness pursuant to Section 4.12(b);

(2) the incurrence by the Company and its Restricted Subsidiaries of the Existing Indebtedness listed on Schedule I hereto;

(3) the incurrence by the Company and the Guarantors of Indebtedness represented by the Notes and the related Note Guarantees to be issued on the Issue Date;

(4) the incurrence by the Company or any of its Restricted Subsidiaries of Attributable Debt in connection with a sale and leaseback transaction or Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing or reimbursing all or any part of the purchase price or cost of design, development, construction, installation, expansion, repair or improvement of property (either real or personal), plant or equipment or other fixed or capital assets used or useful in the business of the Company or any of its Restricted Subsidiaries (in each case, whether through the direct purchase of such assets or the purchase of Equity Interests of any Person owning such assets), which incurrence occurs within 365 days of such purchase, design, development, construction, installation, expansion, repair or improvement, in an aggregate principal amount, including, without duplication, all Permitted Refinancing Indebtedness incurred under Section 4.12(b)(5) below to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (4), not to exceed, at one time outstanding, $100 million, less any amount of Indebtedness incurred under Section 4.12(b)(15).

(5) the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to extend, renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted to be incurred under Section 4.13(a) or clause (2), (3), (4), (5) or (15) of this Section 4.12(b);

67

#88605336v6

(6) the incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness (or the guarantees of any such intercompany Indebtedness) between or among the Company or any of its Restricted Subsidiaries; *provided, however,* that:

(A) the aggregate principal amount of intercompany Indebtedness (or the guarantees of any such intercompany Indebtedness) between or among the Company or any of its Restricted Subsidiaries must be incurred pursuant to an intercompany note (which may take the form of a grid note) that is pledged to the Collateral Agent in accordance with the terms of the Security Agreement; and

(B) if the Company or any Guarantor is the obligor on such Indebtedness and the payee is not the Company or a Guarantor, then such Indebtedness (other than Indebtedness incurred in the ordinary course in connection with the cash or tax management operations of the Company and its Subsidiaries) must be expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Company, or the Note Guarantee, in the case of a Guarantor;

*provided, further,* that (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary of the Company and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary of the Company, will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6);

(7) the issuance by any of the Company's Restricted Subsidiaries to the Company or to any of its Restricted Subsidiaries of shares of preferred stock; *provided, however,* that:

(A) any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company; and

(B) any sale or other transfer of any such preferred stock to a Person that is not the Company or a Restricted Subsidiary of the Company, will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this clause (7);

(8) Hedging Obligations that are not incurred for speculative purposes but for the purpose of (a) fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (b) fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (c) fixing or hedging commodity price risk, including the price or

68

cost of raw materials, emission rights, manufactured products or related commodities, with respect to any commodity purchases or sales;

(9) the guarantee by the Company or any of the Guarantors of Indebtedness of the Company or a Guarantor, and the guarantee by any Restricted Subsidiary of the Company that is not a Guarantor of Indebtedness of another Restricted Subsidiary that is not a Guarantor, in each case, to the extent that the guaranteed Indebtedness was permitted to be incurred by another provision of this Section 4.12; *provided* that if the Indebtedness being guaranteed is subordinated in right of payment to or *pari passu* with the Notes, then the guarantee must be subordinated or *pari passu,* as applicable, in right of payment to the same extent as the Indebtedness guaranteed;

(10) the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of workers' compensation claims, unemployment or other insurance or self-insurance obligations, health, disability or other benefits to employees or former employees and their families, bankers' acceptances and similar obligations in the ordinary course of business;

(11) the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five (5) Business Days;

(12) the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from customary agreements of the Company or any such Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the acquisition or sale or other disposition of any business, assets or Capital Stock of the Company or any of its Restricted Subsidiaries, other than, in the case of any such disposition by the Company or any of its Restricted Subsidiaries, guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Capital Stock;

(13) the incurrence of contingent liabilities arising out of endorsements of checks and other negotiable instruments for deposit or collection in the ordinary course of business;

(14) the incurrence of Indebtedness in the ordinary course of business under any agreement between the Company or any of its Restricted Subsidiaries and any commercial bank or other financial institution relating to Treasury Management Arrangements;

(15) Acquired Debt incurred by a Person prior to the time that such Person was acquired by or merged into the Company or any of its Restricted Subsidiaries and that was not incurred in connection with, or in contemplation of, such acquisition or merger, in an aggregate amount, including, without duplication, all

69

Permitted Refinancing Indebtedness incurred under Section 4.12(b)(5) to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (15), not to exceed $100 million at any time outstanding, less any amount of Indebtedness incurred under Section 4.12(b)(4);

(16) Indebtedness incurred pursuant to a contingent seven year 5% note issued to the UMWA, whereby to the extent the VEBA legislation is not approved by August 1, 2017 and December 1, 2017, UMWA may receive payment from the Company in an amount not to exceed $17.5 million;

(17) Indebtedness incurred pursuant to a Category 1 note in an amount not to exceed $5.5 million; and

(18) the incurrence by the Company or any of the Guarantors of additional Indebtedness or Disqualified Stock in an aggregate principal amount (or accreted value, as applicable) at any time outstanding not to exceed $10.0 million.

(c) Any Indebtedness incurred under a Senior Credit Agreement that is allocated to Section 4.12(b)(1) shall be deemed for purposes of this covenant to have been incurred on the date such Indebtedness was first incurred until such Indebtedness is actually repaid, other than pursuant to "cash sweep" provisions or any similar provisions under any Senior Credit Agreement that provide that such Indebtedness is deemed to be repaid daily (or otherwise periodically).

(d) For purposes of determining compliance with this Section 4.12, in the event that an item of proposed Indebtedness or Disqualified Stock meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (18) of Section 4.12(b), or is entitled to be incurred pursuant to Section 4.12(a), the Company will be permitted to classify all or a portion of such item of Indebtedness or Disqualified Stock on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness or Disqualified Stock (based on circumstances existing on the date of such reclassification), in any manner that complies with this covenant, except that Indebtedness outstanding under the Senior Credit Agreement on the Issue Date will at all times be deemed to have been incurred on such date in reliance on the exception provided by Section 4.12(b)(1). The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this covenant, *provided*, in each such case, that the amount of any such accrual, accretion or payment is included in Fixed Charges of the Company as accrued. For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be utilized, calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred. Notwithstanding anything to the contrary in this covenant, the maximum amount of

70

Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

(e) The amount of any Indebtedness outstanding as of any date will be:

(1) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(2) the principal amount of the Indebtedness, in the case of any other Indebtedness; and

(3) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(A) the Fair Market Value of such assets at the date of determination; and

(B) the amount of the Indebtedness of the other Person.

(f) Notwithstanding anything to the contrary in this Indenture, the Company will not, and will not permit any of the Guarantors to, incur any secured Indebtedness to renew, refund, refinance, replace, defease or discharge any unsecured Indebtedness.

Section 4.13.   *Asset Sales*.

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1) the Company (or its Restricted Subsidiaries, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of;

(2) at least 75% of the consideration received in the Asset Sale by the Company or its Restricted Subsidiaries is in the form of cash or Cash Equivalents. For purposes of this clause (2), each of the following will be deemed to be Cash Equivalents:

(i) any liabilities, as shown on the Company's most recent consolidated balance sheet, of the Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes or any Note Guarantee) that are assumed by the transferee of any such assets pursuant to a customary assumption or similar agreement; and

(ii) any securities, notes or other obligations received by the Company or any Restricted Subsidiary from such transferee that are converted by the Company or any Restricted Subsidiary into cash or Cash Equivalents within 180 days of receipt thereof, to the extent of the cash or Cash Equivalents received in that conversion.

71

#88605336v6

(b) Within 30 days after the receipt of any Net Proceeds from any Asset Sale or a Casualty or Condemnation Event in which Net Proceeds are received in respect of the condemnation, destruction, damage or loss of any Collateral, the Company or any Restricted Subsidiary must apply those Net Proceeds to permanently repay (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly permanently reduce commitments with respect thereto) (A) Permitted Secured Obligations (other than Note Obligations) secured by Liens permitted under this Indenture, which Liens rank higher in priority than the Note Liens; (B) Note Obligations, on a pro rata basis with such adjustments as may be needed so that only Notes in minimum amounts of $1,000 and integral multiples of $1,000 (so long as the remaining portion of each Note to be repurchased in part equals $2,000 or an integral multiple of $1,000 in excess thereof) or (C) to the extent that assets sold in an Asset Sale are held by a Restricted Subsidiary that is not a Guarantor and the Net Proceeds do not constitute Collateral, Indebtedness of such Restricted Subsidiary that is not a Guarantor.

(c) Any Net Proceeds from Asset Sales or a Casualty or Condemnation Event that are not applied or invested as provided in Section 4.13(b) will constitute "**Excess Proceeds**." When the aggregate amount of Excess Proceeds exceeds $10.0 million within a twelve month period, within 30 days thereof, the Company will make an offer (a "**Net Proceeds Offer**") to all holders of Notes and other Permitted Secured Obligations containing provisions similar to those set forth in this Section 4.13 with respect to asset sales, casualties or condemnations to purchase the maximum principal amount of Notes and other Permitted Secured Obligations (plus all accrued and unpaid interest) after deducting the amount of all fees and expenses, including premiums, incurred in connection therewith that may be purchased out of the Excess Proceeds by mailing, or delivering electronically if held by DTC, the notice required pursuant to the terms of Section 4.13(h), with a copy to the Trustee. The offer price in any Net Proceeds Offer (the "**Net Proceeds Offer Price**") will be equal to 100% of the principal amount, plus accrued and unpaid interest, if any, to, but not including, the date of purchase, and will be payable in cash. Pending the application of any Net Proceeds under this Section 4.13, the Company or any of its Restricted Subsidiaries may temporarily reduce revolving credit borrowings under the Senior Credit Agreement or such Net Proceeds shall be held as Collateral.

(d) If any Excess Proceeds remain after consummation of a Net Proceeds Offer, the Company and its Restricted Subsidiaries may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture. If the aggregate principal amount of Notes and other Permitted Secured Obligations tendered in such Net Proceeds Offer exceeds the amount of Excess Proceeds, the Trustee will select the Notes, and the Company or its agent shall select the other Permitted Secured Obligations, as the case may be, to be purchased on a *pro rata* basis with such adjustments as may be needed so that only Notes in minimum amounts of $1,000 and integral multiples of $1,000 (so long as the remaining portion of each Note to be repurchased in part equals $2,000 or an integral multiple of $1,000 in excess thereof) will be purchased. Upon completion of each Net Proceeds Offer, the amount of Excess Proceeds will be reset at zero. If the Company makes a Net Proceeds Offer prior to the deadline specified in clause (b) above, with respect to any Net Proceeds, the Company's obligations with respect to such Net

72

#88605336v6

Proceeds under this covenant shall be deemed satisfied after completion of such Net Proceeds Offer.

(e) The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to a Net Proceeds Offer. To the extent that the provisions of any securities laws or regulations conflict with this Section 4.13, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.13 by virtue of such compliance.

(f) Not later than the date upon which written notice of an Net Proceeds Offer is delivered to the Trustee as provided above, the Company shall deliver to the Trustee an Officers' Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales or Casualty or Condemnation Event pursuant to which such Net Proceeds Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.13(b). On such date, the Company shall also irrevocably deposit with the Trustee (or, if the Trustee is not the Paying Agent, the Paying Agent) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Company and to be held for payment in accordance with the provisions of this Section 4.13. Upon the expiration of the period for which the Net Proceeds Offer remains open (the "**Offer Period**"), the Company shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Company. The Trustee (or, if the Trustee is not the Paying Agent, the Paying Agent) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price. In the event that the Excess Proceeds delivered by the Company to the Trustee (or, if the Trustee is not the Paying Agent, the Paying Agent) are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Company immediately after the expiration of the Offer Period for application in accordance with this Section 4.13.

(g) Holders electing to have a Note purchased shall be required to surrender such Note, with an appropriate form duly completed, to the Company at the address specified in the notice at least three Business Days prior to the purchase date. Holders shall be entitled to withdraw their election if the Trustee or the Company receives not later than one Business Day prior to the purchase date, a facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered by the holder for purchase and a statement that such holder is withdrawing his election to have such Note purchased.

(h) Notices of a Net Proceeds Offer shall be mailed by the Company by first class mail, postage prepaid, or delivered electronically if held by the Depository, at least 30 but not more than 60 days before the purchase date to each holder of Notes at such Holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

73

#88605336v6

(i) Notwithstanding anything to the contrary in this Section 4.13, the Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale consisting of, in whole or in part, any Equity Interests of a Guarantor (including any debt security that is convertible into, or exchangeable for, Equity Interest of a Guarantor), other than an Asset Sale consisting of all of the Equity Interests of such Guarantor.

Section 4.14.   *Transactions with Affiliates.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each, an "**Affiliate Transaction**") involving aggregate payments in excess of $120,000.00, unless:

(1) the Affiliate Transaction is on terms that are no less favorable to the Company or the relevant Restricted Subsidiary, taken as a whole, than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person that is not an Affiliate of the Company; and

(2) the Company delivers to the Trustee, with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $2.5 million, a resolution of the Board of Directors set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with this Section 4.14 and that such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors; and

(3) the Company delivers to the Trustee, with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10.0 million, a favorable written opinion from a nationally recognized investment banking, appraisal or accounting firm (i) as to the fairness of the transaction to the Company and its Subsidiaries from a financial point of view or (ii) stating that the terms of such transaction are, taken as a whole, no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable arm's-length transaction by the Company or such Restricted Subsidiary with a Person that is not an Affiliate of the Company or any Restricted Subsidiary.

(b) The following items will be deemed not to be Affiliate Transactions and, therefore, will not be subject to the provisions of Section 4.14(a):

(1) any consulting or employment agreement or arrangements, incentive compensation plan, stock option or stock ownership plan, employee benefit plan, severance arrangements, officer or director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business for the benefit of directors, officers,

74

employees and consultants of the Company, a Restricted Subsidiary of the Company or a direct or indirect parent of the Company and payments and transactions pursuant thereto;

(2) transactions between or among the Company and/or its Restricted Subsidiaries;

(3) transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person (and no other Affiliate of the Company owns any interest in such Person except through the Company);

(4) payment of reasonable fees and reimbursement of expenses of directors, officer, employees, experts and consultants;

(5) any transaction in which the only consideration paid by the Company or any Restricted Subsidiary consists of Equity Interests (other than Disqualified Stock) of the Company or any contribution of capital to the Company;

(6) Restricted Payments that do not violate the provisions of Section 4.10 of this Indenture;

(7) transactions pursuant to agreements or arrangements as in effect on the Issue Date, or any amendment, modification, or supplement thereto or replacement thereof (so long as such agreement or arrangement, as so amended, modified or supplemented or replaced, is not materially more disadvantageous, taken as a whole, than such agreement or arrangement as in effect on the Issue Date, as determined in good faith by the Company);

(8) transactions between the Company or any Restricted Subsidiary and any Person that is an Affiliate of the Company or any Restricted Subsidiary solely because a director of such Person is also a director of the Company or any direct or indirect parent entity thereof, *provided* that such director abstains from voting as a director of the Company or any direct or indirect parent entity of the Company, as the case may be, on any matter involving such other Person;

(9) purchases or sales of goods and/or services in the ordinary course of business on terms that are no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person that is not an Affiliate of the Company;

(10) if such Affiliate Transaction is with an Affiliate in its capacity as a holder of Indebtedness of the Company or any Restricted Subsidiary, a transaction in which such Affiliate is treated no more favorably than the other holders of Indebtedness of the Company or such Restricted Subsidiary;

75

(11) transactions with any joint venture engaged in a Permitted Business; *provided* that all the outstanding ownership interests of such joint venture are owned only by the Company, its Restricted Subsidiaries and Persons that are not Affiliates of the Company;

(12) any Investment of the Company or any of its Restricted Subsidiaries existing on the Issue Date listed on Schedule II hereto, and any extension, modification or renewal of such existing Investments, to the extent not involving any additional Investment other than as the result of the accrual or accretion of interest or original issue discount or the issuance of pay-in-kind securities, in each case, pursuant to the terms of such Investments as in effect on the Issue Date;

(13) the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business or transactions undertaken in good faith for the purpose of improving the consolidated tax efficiency of the Company or any Restricted Subsidiary and not for the purpose of circumventing any provision of this Indenture;

(14) any merger, consolidation or reorganization of the Company with an Affiliate of the Company solely for the purpose of (a) forming or collapsing a holding company structure or (b) reincorporating the Company in a new jurisdiction;

(15) entering into one or more agreements that provide registration rights to the security holders of the Company or any direct or indirect parent of the Company or amending such agreement with security holders of the Company or any direct or any indirect parent of the Company and the performance of such agreements;

(16) any (x) purchase of any class of Indebtedness from, or lending of any class of Indebtedness to, the Company or any of its Restricted Subsidiaries by an Affiliate of the Company, so long as the aggregate principal amount of such class of Indebtedness purchased or loaned by such Affiliates does not exceed the aggregate principal amount of such class of Indebtedness purchased by non-Affiliate investors; and (y) repurchases, redemptions or other retirements for value by the Company or any of its Restricted Subsidiaries of Indebtedness of any class held by any Affiliate of the Company, so long as such repurchase, redemption or other retirement for value is on the same terms as are made available to investors holding such class of Indebtedness generally, and Affiliates have an economic interest in no more than 50% of the aggregate principal amount of such class of Indebtedness; and

(17) advances to employees of the Company or any Restricted Subsidiary of the Company made in the ordinary course of business and in a manner that is consistent with past practice.

76

Section 4.15.   *Liens*.

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

Section 4.16.   *Additional Note Guarantees*.

If, after the date of this Indenture, (i) the Company or any Restricted Subsidiary of the Company forms or acquires any U.S. Subsidiary that is a Restricted Subsidiary of the Company (other than an Excluded Subsidiary), (ii) any Restricted Subsidiary of the Company that is not a Guarantor guarantees, is an obligor of, or provides credit support for, any Indebtedness or (iii) an Excluded Subsidiary no longer constitutes an Excluded Subsidiary pursuant to the definition thereof, then the Company shall cause such Restricted Subsidiary, within 30 Business Days after the date of such event:

(1) execute and deliver to the Trustee a supplemental indenture in the form attached hereto as Exhibit C pursuant to which such Restricted Subsidiary shall unconditionally guarantee all of the Company's obligations under the Notes on the terms set forth in this Indenture;

(2) execute and deliver all supplements or joinders, as applicable, to the applicable Security Documents in order to grant a Lien in the Collateral owned by such Restricted Subsidiary to the same extent as that set forth in this Indenture and the Security Documents and take all actions required by the Security Documents to perfect such Lien; and

(3) deliver to the Trustee an Opinion of Counsel that such supplemental indenture and the other documents described in clause (2) above have been duly authorized, executed and delivered by such Restricted Subsidiary and constitute a valid and legally binding and enforceable obligations of such Restricted Subsidiary, subject to customary exceptions.

Thereafter, such Restricted Subsidiary shall be a Guarantor for all purposes.

Section 4.17.   *Designation of Restricted and Unrestricted Subsidiaries*.

As of the Issue Date, all of the Subsidiaries of the Company are Restricted Subsidiaries and are listed on Schedule II hereto. The Company may at any time after the Issue Date (a) designate any Restricted Subsidiary to be an Unrestricted Subsidiary and (b) redesignate any Unrestricted Subsidiary as a Restricted Subsidiary; *provided*, that immediately before and after any such designation, no Default or Event of Default shall have occurred and be continuing. If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Restricted Subsidiary designated as an Unrestricted Subsidiary will be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments pursuant to Section 4.10 or under one or more clauses of the definition of "Permitted

77

#88605336v6

Investments," as determined by the Company. That designation will only be permitted if the Investment would be permitted at that time and if such Restricted Subsidiary otherwise meets the definition of an "Unrestricted Subsidiary." The Company may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if that redesignation would not cause a Default.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee a certified copy of a resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 4.09. If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Unrestricted Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.11, the Company will be in default of such covenant. The Board of Directors may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company, *provided* that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if (1) such Indebtedness is permitted under Section 4.11, calculated on a *pro forma* basis as if such designation had occurred at the beginning of the four-quarter period referred to in such Section; and (2) no Default or Event of Default would be in existence following such designation.

Section 4.18.   *After-Acquired Property*.

Subject to Section 13.01 of this Indenture and the Security Documents, if at any time after the Issue Date the Company or any of its Subsidiaries that is a Guarantor own any property (other than Excluded Property and Excluded Real Property), the Company or such Guarantor shall, as promptly as practicable after such property is acquired or such Subsidiary becomes a Guarantor, execute and deliver such mortgages, deeds of trust, deeds to secure debt, security instruments, financing statements and certificates or such other documentation as shall be reasonably necessary to vest in the Collateral Agent, for the benefit of the Holders and the Trustee, a perfected Lien (with the priority required hereunder and under the Security Documents), subject only to Permitted Liens, in such property and to have such property added to the Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to relate to such property to the same extent and with the same force and effect.

Section 4.19.   *Limitation on Issuance of Equity Interests*.

No Guarantor shall issue any Equity Interest of such Guarantor (including by way of sales of treasury stock or the issuance of any debt security that is convertible into, or exchangeable for, Equity Interest of such Guarantor) to any Person other than (i) to the Company or any other Guarantor or (ii) in connection with the transfer of all of the Equity Interests of such Guarantor otherwise permitted under this Indenture.

78

#88605336v6

Section 4.20.   *Business Activities*.

The Company will not, and will not permit any Restricted Subsidiary to, engage in any business other than the coal mining business, and business incidental thereto, except to such extent as would not be material in the opinion of the Board of Directors (which opinion shall be reasonable and made in good faith) to the Company and its Restricted Subsidiaries taken as a whole.

**Article 5**

**CONSOLIDATION, MERGER AND SALE OF ASSETS**

Section 5.01.   *Company May Consolidate, Merge or Sell Its Assets Only on Certain Terms*. The Company will not, directly or indirectly, (1) consolidate with or merge with or into, or (2) sell, convey, transfer or lease all or substantially all of its properties and assets to, any other Person (any such transaction, a "**Reorganization Event**"), unless:

(a) either:

(i) the Company is the surviving corporation; or

(ii) the resulting, surviving or transferee Person (if other than the Company) of such Reorganization Event (the "**Reorganization Successor Corporation**"):

(I) is a corporation organized and validly existing under the laws of the United States of America, any State thereof or the District of Columbia; and

(II) expressly assumes, by executing and delivering a supplemental indenture to the Trustee that is reasonably satisfactory in form to the Trustee in accordance with Section 9.03 hereof and any other agreements reasonably satisfactory to the Trustee and the Collateral Agent, all of the obligations of the Company under the Notes, this Indenture and the Security Documents;

(b) immediately after giving effect to such Reorganization Event, no Default will have occurred and be continuing;

(c) either (i) the Company or the Reorganization Successor Corporation would, on the date of such transaction after giving *pro forma* effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period, be permitted to make a restricted payment pursuant to Section 4.10(b)(7) hereof; or (ii) the Company or the Reorganization Successor Corporation would have (x) a Fixed Charge Coverage Ratio equal to or greater than the actual Fixed Charge Coverage Ratio of the Company for the four-quarter period immediately prior to such transaction and (y) a Total Leverage Ratio equal to or less than the actual Total Leverage Ratio of the Company immediately prior to such transaction; and

79

(d) prior to the effective date of such Reorganization Event, the Company delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that:

(i) such Reorganization Event and such supplemental indenture and agreements entered into by the Company or the Reorganization Successor Corporation comply with Section 5.01(a) hereof; and

(ii) all conditions precedent to such Reorganization Event provided in this Indenture have been satisfied.

Section 5.02.   *Successor Substituted*. If any Reorganization Event occurs that complies with Sections 5.01(a)(ii), 5.01(b) and 5.01(c) hereof, and the Company has complied with Section 5.01(d) hereof:

(a) from and after the date of such Reorganization Event, the Reorganization Successor Corporation for such Reorganization Event will succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such Reorganization Successor Corporation had been named as the Company herein; and

(b) except in the case of a Reorganization Event that is a conveyance, transfer or lease of all or substantially all of the Company's assets (other than a conveyance or transfer of all of the Company's assets other than assets with a Fair Market Value of less than $2.5 million), the Person named as the "Company" in the first paragraph of this Indenture or any successor (other than such Reorganization Successor Corporation) that will thereafter have become such in the manner prescribed in this Article 5 will be released from its obligations under this Indenture.

## Article 6

## DEFAULTS AND REMEDIES

Section 6.01.   *Events of Default*.

(a) *General*. Each of the following events will be an "**Event of Default**":

(i) the Company fails to pay the principal of the Notes (including any Change of Control Repurchase Price, the Net Proceeds Offer Price or Redemption Price) when due at maturity, upon Redemption, repurchase upon a Change of Control, declaration of acceleration or otherwise;

(ii) the Company fails to pay any interest when due and such failure continues for a period of 30 days after the applicable due date;

(iii) the Company fails to give any Change of Control Notice, Redemption Notice, notice of a Net Proceeds Offer or notice of a Change of Control when due;

(iv) *[Reserved]*.

80

#88605336v6

(v) the Company fails to comply with its obligations under Article 5 hereof or any Guarantor fails to comply with its obligations under Section 11.04 hereof;

(vi) the Company fails to perform or observe any of its covenants or warranties in this Indenture or in the Notes (other than a covenant or agreement specifically addressed in clauses (i) through (v) above) and such failure continues for a period of 30 days after (A) the Company receives notice of such failure from the Trustee or (B) the Company and the Trustee receive notice of such failure from Holders of at least 25% of the aggregate principal amount of then outstanding Notes;

(vii) the default by the Company or any Subsidiary with respect to any mortgage, agreement or other instrument under which there may be outstanding, or by which there may be secured or evidenced, any indebtedness for money borrowed by the Company and/or any Subsidiaries in excess of $10.0 million in the aggregate, whether such indebtedness exists as of the Issue Date or is later created, if that default:

(A) results in such indebtedness becoming or being declared due and payable (prior to its express maturity); or

(B) constitutes a failure to pay the principal of, or interest on, such indebtedness when due and payable at its Stated Maturity, upon required repurchase, upon declaration or otherwise;

(viii) a final judgment for the payment of $10.0 million or more (excluding any amounts covered by insurance) is rendered against the Company or any of its Subsidiaries, and such judgment is not discharged or stayed within 60 days after (i) the date on which all rights to appeal such judgment have expired if no appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished;

(ix) unless all of the Collateral has been released from the Note Liens in accordance with the provisions of the Security Documents and the Intercreditor Agreement, the default, repudiation or disaffirmation by the Company or any of the Guarantors of any of their obligations under the Security Documents (other than by reason of (a) a release of such obligation or Lien related thereto in accordance with this Indenture, the Security Documents and the Intercreditor Agreement or (b) the failure of the Collateral Agent to maintain possession of certificates, instruments or other documents actually delivered to it representing securities or other possessory collateral pledged under the Security Documents), which default, repudiation or disaffirmation results in Collateral having an aggregate Fair Market Value in excess of [$2.5 million] not being subject to a valid, perfected security interest in favor of the Collateral Agent under any applicable law (other than the law of any foreign jurisdiction) (to the extent required under the Security Documents and the Intercreditor Agreement), or a determination in a judicial proceeding that the Security Documents are unenforceable or invalid against the Company or any of the Guarantors for any reason with respect to Collateral having an aggregate Fair Market Value of [$2.5 million] or more, *provided* that such default, repudiation, disaffirmation or determination is not rescinded, stayed or waived by the Persons having such authority pursuant to the Security Documents or

81

#88605336v6

otherwise cured within 60 days after the Company receives written notice thereof specifying such occurrence from the Trustee or the holders of at least 25% of the outstanding principal amount of the Notes demanding that such default be remedied;

(x) failure by the Company or any Guarantor to comply with the terms of any Security Document, after giving effect to any applicable grace periods or time periods for performance specified therein or, in the absence of any grace periods or time periods for performance specified therein, failure by the Company or any Guarantor, for 30 days after written notice (demanding that such default be remedied) from the Trustee or the Holders of at least 25% in principal amount of the Notes then outstanding has been received by the Company, to comply with the terms of the applicable Security Document;

(xi) any Note Guarantee of a Guarantor ceases to be in full force and effect, other than in accordance the terms of this Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guarantee;

(xii) the Company, any Guarantor or any Significant Subsidiary, pursuant to or within the meaning of any Bankruptcy Law:

(A) commences a voluntary case;

(B) consents to the entry of an order for relief against it in an involuntary case;

(C) consents to the appointment of a Custodian of it or for any substantial part of its property;

(D) makes a general assignment for the benefit of its creditors;

(E) takes any comparable action under any foreign laws relating to insolvency; or

(F) generally is not paying its debts as they become due; or

(xiii) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A) is for relief against the Company, any Guarantor or any Significant Subsidiary in an involuntary case or proceeding;

(B) appoints a Custodian of the Company, any Guarantor or any Significant Subsidiary, or for any substantial part of the property of the Company, any Guarantor or any Significant Subsidiary;

(C) orders the winding up or liquidation of the Company, any Guarantor or any Significant Subsidiary; or

#88605336v6

(D) grants any similar relief under any foreign laws; , in each such case, the order or decree remains unstayed and in effect for 60 days.

(b) *Cause Irrelevant*. Each of the events enumerated in Section 6.01(a) hereof will constitute an Event of Default whatever the cause and regardless of whether voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

Section 6.02.   *Acceleration*.

(a) *Automatic Acceleration in Certain Circumstances*. If an Event of Default specified in Section 6.01(a)(xii) or 6.01(a)(xiii) hereof occurs with respect to the Company, the principal amount of, and all accrued and unpaid interest, if any, on, all of the then outstanding Notes will immediately become due and payable without any further action or notice by any party.

(b) *Optional Acceleration*. If any other Event of Default occurs and is continuing, the Trustee, by delivering a written notice to the Company, or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, by delivering a written notice to the Company and the Trustee, may declare the principal amount of, and all accrued and unpaid interest, if any, on all then outstanding Notes immediately due and payable, and upon such declaration, the principal amount of, and all accrued and unpaid interest, if any, on all then outstanding Notes will immediately become due and payable.

(c) *Rescission of Acceleration*. Notwithstanding anything to the contrary in this Indenture, the Holders of a majority of the aggregate principal amount of the then outstanding Notes may, on behalf of the Holders of all of the then outstanding Notes, rescind any acceleration of the Notes and its consequences hereunder by delivering notice to the Trustee if (i) such rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (ii) all existing Events of Default (other than the nonpayment of the principal of, interest, if any, on, or the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption Price for, the Notes that has become due solely as a result of acceleration) have been cured or waived. No such rescission will affect any subsequent Default or impair any right consequent thereto.

83

Section 6.03.   *Other Remedies*. If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, accrued and unpaid interest, if any, or payment of the Change of Control Repurchase Price, the Net Proceeds Offer Price or Redemption Price for, the Notes or to enforce the performance of any provision of the Notes or this Indenture regarding any other matter. Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of the Notes in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default will not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are cumulative.

Section 6.04.   *[Reserved]*.

Section 6.05.   *Waiver of Past Defaults*. If an Event of Default described in Sections 6.01(a)(i), 6.01(a)(ii), 6.01(a)(iii), 6.01(a)(iv) or 6.01(a)(vi) (which, in the case of Section 6.01(a)(vi) only, relates to a covenant that cannot be amended without the consent of each affected Holder) or a Default that would lead to such an Event of Default occurs and is continuing, such Event of Default or Default may be waived only with the consent of each affected Holder. Every other Event of Default or Default may be waived by the Holders of a majority of the aggregate principal amount of then outstanding Notes. Whenever any Event of Default is so waived, it will cease to exist, and whenever any Default is so waived, it will be deemed cured and any Event of Default arising therefrom will be deemed not to occur. However, no such waiver will extend to any subsequent or other Default or Event of Default or impair any consequent right.

Section 6.06.   *Control by Majority*. At any time, the Holders of a majority of the aggregate principal amount of then outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or for exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, subject to Section 7.01 hereof, that the Trustee determines to be unduly prejudicial to the rights of a Holder or to the Trustee, or that would potentially involve the Trustee in personal liability unless the Trustee is offered indemnity or security satisfactory to it against any loss, liability or expense to the Trustee that may result from the Trustee's instituting such proceeding as the Trustee. Prior to taking any action hereunder, the Trustee will be entitled to indemnification satisfactory to it against all losses, liabilities and expenses caused by taking or not taking such action.

Section 6.07.   *Limitation on Suits*. Except to enforce its rights to receive the principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption Price for, interest, if any, on, a Note, no Holder may pursue a remedy with respect to this Indenture or the Notes unless:

(a) such Holder has previously delivered to the Trustee written notice that an Event of Default has occurred and is continuing;

84

(b) the Holders of at least 25% of the aggregate principal amount of then-outstanding Notes deliver to the Trustee a written request that the Trustee pursue a remedy with respect to such Event of Default;

(c) such Holder or Holders have offered and, if requested, provided, to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or other expense of compliance with such written request;

(d) the Trustee has not complied with such written request within 60 days after receipt of such written request and offer of security or indemnity; and

(e) during such 60-day period, the Holders of a majority of the aggregate principal amount of then outstanding Notes did not deliver to the Trustee a direction inconsistent with such written request. Holder may not use this Indenture to prejudice the rights of any other Holder or to obtain a preference or priority over any other Holder, it being understood that the Trustee does not have any affirmative duty to ascertain whether any usage of this Indenture by a Holder is unduly prejudicial to such other Holders.

Section 6.08.  *Rights of Holders to Receive Payment*. Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of the principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption Price for, accrued and unpaid interest, if any, on, its Note, on or after the respective due date, or to bring suit for the enforcement of any such payment and/or delivery on or after the respective due date, will not be impaired or affected without the consent of such Holder and will not be subject to the requirements of Section 6.07 hereof.

Section 6.09.  *Collection Suit by Trustee*. If an Event of Default specified in Section 6.01(a)(i), 6.01(a)(ii), 6.01(a)(iii) or 6.01(a)(iv) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption Price for, interest, if any, on, and, to the extent lawful, any Default Interest on any Defaulted Amounts, and such further amount as is sufficient to cover the costs and expenses of collection provided for under Section 7.06 hereof.

Section 6.10.  *Trustee May File Proofs of Claim*. The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the Company, its creditors or its property and, unless prohibited by law or applicable regulations, will be entitled to collect, receive and distribute any money or other property payable or deliverable on any such claims, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee consents to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the

85

Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 hereof out of the estate in any such proceeding, will be denied for any reason, payment of the same will be secured by a lien on, and will be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained will be deemed to authorize the Trustee to authorize or consent to, or to accept or to adopt on behalf of any Holder, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.11.   *Priorities*. Subject to the terms of the Intercreditor Agreement and the Security Documents, if the Trustee or the Collateral Agent, as the case may be, collects any money or property pursuant to this Article 6 (including proceeds from the exercise of any remedies on the Collateral), it will pay out the money or property in the following order:

FIRST: to the Trustee and the Collateral Agent, their agents and attorneys for amounts due under Section 7.06 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee or the Collateral Agent and the costs and expenses of collection;

SECOND: to the Holders, for any amounts due and unpaid on the principal of, the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption Price for, accrued and unpaid interest on, any Note, without preference or priority of any kind, according to such amounts due and payable on all of the Notes; and

THIRD: the balance, if any, to the Company or to such other party as a court of competent jurisdiction directs.

The Trustee or the Collateral Agent, as the case may be, may fix a record date and payment date for any payment to the Holders pursuant to this Section 6.11. If the Trustee or the Collateral Agent, as the case may be, so fixes a record date and a payment date, at least 15 days prior to such record date, the Company will deliver to each Holder and the Trustee a written notice, which notice will state such record date, such payment date and the amount of such payment.

#88605336v6

Section 6.12. *Undertaking for Costs*. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.12 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.08 hereof or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

**Article 7**

**TRUSTEE**

Section 7.01. *Duties of Trustee.*

(a) If an Event of Default has occurred and is continuing, the Trustee will exercise the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b) Except during the continuance of an Event of Default:

(i) the Trustee undertakes to perform such duties, and only such duties, as are specifically set forth in this Indenture, and no implied covenants or obligations will be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.

(c) The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i) this paragraph does not limit the effect of Section 7.01(b) hereof;

(ii) the Trustee will not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii) the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Sections 6.06, 14.03 or 14.04 hereof.

(d) Whether herein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to Sections 7.01(a), (b) and (c) hereof.

#88605336v6

(e) The Trustee will not be liable for interest on any money received by it or risk or expend any of its own funds.

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g) No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(h) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee will be subject to the provisions of this Article 7, and the provisions of this Article 7 will apply to the Trustee, Collateral Agent, Registrar, Paying Agent and Conversion Agent.

(i) The Trustee will not be deemed to have notice of a Default or an Event of Default unless (i) a Trust Officer of the Trustee has received written notice at its Corporate Trust Office thereof from the Company or any Holder or (ii) a Trust Officer has actual knowledge thereof.

Section 7.02.   *Rights of Trustee*.

(a) The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document. The Trustee may, however, in its discretion make such further inquiry or investigation into such facts or matters as it may see fit and, if the Trustee determines to make such further inquiry or investigation, it will be entitled to examine the books, records and premises of the Company, personally or by agent or attorney and at the expense of the Company, and will incur no liability of any kind by reason of such inquiry or investigation.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate or Opinion of Counsel.

(c) The Trustee may act through agents, attorneys or custodians and will not be responsible for the misconduct or negligence of any agent, attorney or custodian appointed with due care.

(d) So long as the Trustee's conduct does not constitute willful misconduct or negligence, the Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e) The Trustee may consult with counsel of its own selection, and the advice or Opinion of Counsel with respect to legal matters relating to this Indenture and the Notes will be full and complete authorization and protection from liability in respect to any

88

#88605336v6

action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f) The permissive rights of the Trustee to do things enumerated in this Indenture will not be construed as a duty unless so specified herein.

(g) The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred by it in compliance with such request or direction.

(h) The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and will be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder, including the Collateral Agent, Registrar and Paying Agent.

(i) The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any Person authorized to sign an Officers' Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(j) In no event will the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 7.03.   *Individual Rights of Trustee*. The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee. However, if the Trustee acquires any conflicting interest it must eliminate the conflict within 90 days or resign. Any Paying Agent, Registrar or co-registrar may do the same with like rights. However, the Trustee must comply with Section 7.09 hereof.

Section 7.04.   *Trustee's Disclaimer*. The Trustee will not be responsible for and makes no representation as to the validity, priority or adequacy of this Indenture or the Notes, it will not be accountable for the Company's use of the proceeds from the Notes, and it will not be responsible for any statement of the Company in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

Section 7.05.   *Notice of Defaults*. If a Default occurs and is continuing and (i) is known to the Trustee, the Trustee will send to each Holder notice of the Default within the earlier of 90 days after such Default first occurs and 30 days after such Default is actually known to a Trust Officer or written notice of such Default is received by the Trustee, and, (ii) if it is not known to the Trustee at such time, the Trustee will send to

89

each Holder notice of the Default as soon as practicable after it is known to the Trustee; *provided*, *however*, that except in the case of a Default that is, or would lead to, an Event of Default described in Section 6.01(a)(i), 6.01(a)(ii), 6.01(a)(iii) or 6.01(a)(iv) hereof, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of Holders.

Section 7.06.   *Compensation and Indemnity*.

(a) The Company will pay to the Trustee, from time to time, such compensation as will be agreed upon, from time to time, in writing for its services. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. The Company will reimburse the Trustee upon request for all reasonable out-of-pocket fees and expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses will include the reasonable compensation, fees and expenses, disbursements and advances of the Trustee's agents, counsel, accountants and experts. The Company will fully indemnify the Trustee against any and all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses) incurred by it in connection with the acceptance and administration of this trust and the performance of its duties hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Company, any Holder or any other Person). The Trustee will notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company of any claim for which it may seek indemnity of which a Trust Officer has actually received written notice will not relieve the Company of its obligations hereunder except to the extent such failure is adjudicated by a court of competent jurisdiction to have materially prejudiced the Company. The Company will defend the claim and the Trustee will cooperate in the defense. If the Trustee is advised by counsel that it may have available to it defenses that are in conflict with the defenses available to the Company, then the Trustee may have separate counsel, and the Company will pay the reasonable fees and expenses of such counsel. The Company will pay the reasonable fees and expenses of counsel to the Trustee incurred in evaluating whether such defense and/or conflict exists. The Company need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misconduct or negligence. The Company need not pay for any settlement made by the Trustee without the Company's consent, such consent not to be unreasonably withheld. All indemnifications and releases from liability granted hereunder to the Trustee will extend to its officers, directors, employees, agents, attorneys, custodians, successors and assigns.

(b) To secure the Company's payment obligations under this Section 7.06, the Trustee will have a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by the Trustee, other than money or property held in trust to pay the principal, accrued and unpaid interest, if any, or payment of the Change of Control Repurchase Price, the Net Proceeds Offer Price or Redemption Price on particular Notes.

(c) The Company's payment obligations pursuant to this Section 7.06 will survive the resignation or removal of the Trustee and the discharge of this Indenture. If the

90

Trustee incurs expenses after the occurrence of a Default specified in Sections 6.01(a)(xii) or 6.01(a)(xiii) hereof with respect to the Company, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

Section 7.07.   *Replacement of Trustee.*

(a) The Trustee or the Collateral Agent may resign at any time by notifying the Company, in writing, at least 30 days prior to the proposed resignation. The Holders of a majority in aggregate principal amount of then outstanding Notes may remove the Trustee by notifying the Trustee, in writing. The Company may remove the Trustee if:

(i) the Trustee fails to comply with Section 7.09 hereof;

(ii) the Trustee is adjudged bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting.

(b) If the Trustee resigns, is removed by the Company or by the Holders of a majority in aggregate principal amount of the Notes then outstanding, or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Company will promptly appoint a successor Trustee.

(c) A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee will send a notice of its succession to Holders. The retiring Trustee will, upon payment of all of its costs and the costs of its agents and counsel, promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.06 hereof.

(d) If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of at least 10% of the aggregate principal amount of the Notes then outstanding may petition, at the expense of the Company, any court of competent jurisdiction for the appointment of a successor Trustee.

(e) If the Trustee, after written request by any Holder, fails to comply with Section 7.09 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the Company's obligations under Section 7.06 hereof will continue for the benefit of the retiring Trustee.

91

Section 7.08.  *Successor Trustee by Merger*.

(a) If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation or banking association without any further act will be the successor Trustee.

(b) In case at the time such successor or successors by merger, conversion or consolidation to the Trustee succeeds to the trusts created by this Indenture, any of the Notes have been authenticated, but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor Trustee, and deliver such Notes so authenticated; and, in case at that time any of the Notes have not been authenticated, any such successor to the Trustee may authenticate such Notes, either in the name of any predecessor Trustee hereunder or in the name of the successor to the Trustee.

Section 7.09.  *Eligibility; Disqualification*. The Trustee will have (or, in the case of a corporation included in a bank holding company system, the related bank holding company will have) a combined capital and surplus of at least $100,000,000, as set forth in its (or its related bank holding company's) most recent published annual report of condition.

Section 7.10.  *Trustee's Application for Instructions from the Company*. Any application by the Trustee for written instructions from the Company may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action will be taken or such omission will be effective. The Trustee will not be liable to the Company for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date will not be less than three Business Days after the date any Officer actually receives such application, unless any such Officer has consented in writing to any earlier date), unless prior to taking any such action (or the effective date in the case of any omission), the Trustee has received written instructions in response to such application specifying the action to be taken or omitted.

**Article 8**

**SATISFACTION AND DISCHARGE**

Section 8.01.  *Discharge of Liability on Notes*. When (a)(i) the Company delivers to the Registrar all outstanding Notes (other than Notes replaced pursuant to Section 2.11 hereof) for cancellation or (ii) all outstanding Notes have become due and payable, by reason of the issuance of a Redemption Notice or otherwise, and the Company irrevocably deposits with the Trustee or delivers to the Holders, as applicable, cash sufficient to pay all amounts due and owing on all outstanding Notes (other than Notes replaced pursuant to Section 2.11 hereof), (b) the Company pays all other sums payable by it under this Indenture with respect to the then outstanding Notes and (c) the Company delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating

#88605336v6

that all of the applicable conditions precedent to the discharge of this Indenture described in this section have been satisfied, then, subject to Section 7.06 hereof, this Indenture will cease to be of further effect with respect to the Notes and the Holders and the Trustee will acknowledge the satisfaction and discharge of this Indenture with respect to the Notes.

Notwithstanding the satisfaction and discharge of this Indenture, (i) any obligation of the Company to the Trustee under Article 7 hereof with respect to compensation or indemnity, and (ii) any obligation of the Trustee with respect to money deposited with the Trustee under this Article 8 and Section 14.02 hereof will survive.

Section 8.02.   *Repayment to the Company*. Subject to any applicable unclaimed property law, the Trustee and the Paying Agent, upon receiving a written request from the Company, will promptly turn over to the Company any cash, securities or other property held for payment on the Notes that remains unclaimed two years (unless a shorter period is provided for in this Indenture) after the date on which such payment was due. After the Trustee and the Paying Agent return such cash and securities to the Company, the Trustee and the Paying Agent will have no further liability to any Holder with respect to such cash, securities or other property, and any Holder entitled to the payment of such cash, securities or other property under the Notes or this Indenture must look to the Company for payment as a general creditor of the Company.

## Article 9

### AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.01.   *Without Consent of Holders*. The Company, the Trustee and the Collateral Agent may amend or supplement this Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or any Security Documents without the consent of any Holder:

(a) to add guarantees or additional obligors with respect to the Company's obligations under this Indenture or the Notes;

(b) to allow any Guarantor to execute a supplemental Indenture or a Note Guarantee with respect to the Notes or to release a Guarantor as provided in this Indenture;

(c) to provide for the assumption of the Company's or a Guarantor's obligations under this Indenture and under the Notes or Note Guarantees, as applicable, by a Reorganization Successor Corporation as described in Article 5 or Article 11 hereof;

(d) *[Reserved]*.

(e) to surrender any right or power conferred upon the Company or a Guarantor under this Indenture;

93

(f) to add to the Company's or a Guarantor's covenants for the benefit of the Holders;

(g) to cure any ambiguity or correct any inconsistency or defect in this Indenture or in the Notes that does not advqersely affect Holders;

(h) to comply with any requirement of the SEC in connection with any qualification of this Indenture or a supplement hereto under the TIA;

(i) to evidence the acceptance of appointment by a successor Trustee with respect to this Indenture;

(j) to comply with the rules of any applicable depositary;

(k) to make, complete, confirm or add any grant of Collateral permitted or required by this Indenture, the Intercreditor Agreement or any of the Security Documents or any release of Collateral that is permitted under this Indenture, the Intercreditor Agreement and the Security Documents;

(l) to provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture as of the date hereof;

(m) to secure any Permitted Secured Obligations under the Security Documents and to appropriately include the same in the Intercreditor Agreement; or

(n) to make any other change; *provided* that such change individually, or in the aggregate with all other such changes, does not have, and will not have, an adverse effect on the interest of the Holders. addition, the Trustee and the Collateral Agent will be authorized to amend the Intercreditor Agreement or the Security Documents to add additional secured parties holding Senior Lien Obligations permitted by this Indenture with the same Lien priorities and rights as provided in the Intercreditor Agreement or to enter into intercreditor arrangements with the holders of any such Indebtedness so long as the terms of such intercreditor arrangements are not less favorable to the Holders than the intercreditor provisions contained in the Security Agreement and the Intercreditor Agreement.

Section 9.02.   *With Consent of Holders*. With the written consent of the Holders of at least a majority of the aggregate principal amount of the Notes then outstanding (including consents obtained in connection with a repurchase of, or tender offer or exchange offer for, Notes), by Act of such Holders delivered to the Company and the Trustee, the Company and the Guarantors, when authorized by a Board Resolution, may amend or supplement this Indenture, the Notes, the Note Guarantees, the Security Documents and the Intercreditor Agreement (provided that amendments to the Intercreditor Agreement shall also comply with the requirements therefor set forth in the Intercreditor Agreement) or waive compliance with any provision of this Indenture, the Notes, the Note Guarantees, the Security Documents and the Intercreditor Agreement (provided that waivers of compliance with any provision of the Intercreditor Agreement shall also comply with the requirements therefor set forth in the Intercreditor Agreement);

94

#88605336v6

*provided*, *however*, that, without the consent of each affected Holder, no amendment or supplement to, or waiver of, any provision of this Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or any Security Documents, may:

(a) reduce the principal amount of, or change the Maturity Date of, any Note;

(b) reduce the rate of, or extend the stated time for payment of, interest on any Note;

(c) reduce the Change of Control Repurchase Price, the Net Proceeds Offer Price or the Redemption Price of any Note or change the time at which, or the circumstances under which, the Notes may, or will be, redeemed or repurchased;

(d) impair the contractual right of any Holder to institute suit for any payment on any Note;

(e) make any Note payable in a currency other than that stated in the Note;

(f) *[Reserved]*.

(g) change the ranking of the Notes;

(h) reduce any voting requirements included in this Indenture;

(i) make any change to any amendment, modification or waiver provision of this Indenture that requires the consent of each affected Holder;

(j) reduce the percentage of the aggregate principal amount of then outstanding Notes whose Holders must consent to an amendment of this Indenture or a waiver of a past default; or

(k) release any Guarantor from any of its obligations under its Note Guarantee or this Indenture, except in accordance with the terms of this Indenture. addition, (x) subject to the terms of the Intercreditor Agreement, any amendment to, or waiver of, the provisions of this Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or any Security Document that has the effect of releasing all or substantially all of the Collateral from the Note Liens or (y) any changes in the provisions of the Intercreditor Agreement or this Indenture or any material change in the provisions in the Security Documents, in each case dealing with the application of proceeds of Collateral upon exercise of remedies with respect to such Collateral that adversely affects the Holders, shall require the consent of the Holders of at least 75% in aggregate principal amount of the Notes then outstanding under this Indenture (including any consents obtained in connection with a tender offer or exchange for the Notes). will not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, but it will be sufficient if such consent approves the substance of such proposed amendment.

#88605336v6

Section 9.03.   *Execution of Supplemental Indentures*. Upon the request of the Company, the Trustee will sign any supplemental indenture authorized pursuant to this Article 9 if the amendment contained therein does not affect the rights, duties, liabilities or immunities of the Trustee under this Indenture. If the supplemental indenture adversely affects the Trustee's rights, duties, liabilities or immunities under this Indenture, then the Trustee may, but need not, sign such supplemental indenture. In executing any such supplemental indenture, the Trustee will be provided with, and, subject to the provisions of Section 7.01 hereof, will be fully protected in conclusively relying upon, an Officers' Certificate and an Opinion of Counsel stating that such supplemental indenture is authorized and permitted under this Indenture.

Section 9.04.   *Notices of Supplemental Indentures and Intercreditor Agreement*.

(a) After an amendment or supplement to this Indenture or the Notes pursuant to Sections 9.01 or 9.02 hereof becomes effective, the Company will promptly deliver notice to the Trustee, which notice will briefly describe the substance of such amendment or supplement to this Indenture in reasonable detail and state the effective date of such amendment or supplement. The Company, or the Trustee, at the direction of the Company, will then promptly deliver a copy of such notice to each Holder. The failure to deliver such notice to each Holder, or any defect in such notice, will not impair or affect the validity of such amendment or supplement to this Indenture.

(b) After an amendment to the Intercreditor Agreement pursuant to Sections 9.01 or 9.02 hereof becomes effective, the Collateral Agent will promptly deliver such amendment to the Company. The failure to deliver such notice to the Company will not impair or affect the validity of such amendment to the Intercreditor Agreement.

Section 9.05.   *Effect of Supplemental Indentures*. Upon the execution of any supplemental indenture under this Article 9:

(a) this Indenture will be modified in accordance therewith;

(b) such supplemental indenture will form a part of this Indenture for all purposes; and

(c) every Holder of Notes theretofore, or thereafter, authenticated and delivered hereunder will be bound thereby.

Section 9.06.   *Revocation and Effect of Consents, Waivers and Actions*.

(a) *Revocation*. Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder, and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder, or subsequent Holder, may revoke the consent as to its Note or portion of a Note if the Trustee receives the notice of revocation before the date the amendment, supplement or waiver becomes effective.

#88605336v6

(b) *Special Record Dates*. The Company may, but is not obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above or required, or permitted, to be taken pursuant to this Indenture. If a record date is fixed, then those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, will be entitled to give such consent, to revoke any consent previously given or to take any such action, regardless of whether such Persons continue to be Holders after such record date. No such consent will be valid or effective for more than 120 days after such record date.

(c) *Binding Effect*. After an amendment, supplement or waiver becomes effective, it will bind every applicable Holder. Any amendment or supplement will become effective in accordance with the terms of the supplemental indenture relating thereto, which will become effective upon the execution thereof by the Trustee.

Section 9.07.   *Notation on, or Exchange of, Notes*. If any amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder of such Note to deliver such Note to the Trustee. The Trustee may place an appropriate notation on such Note about the changed terms and return it to the Holder. Alternatively, if the Company or the Trustee so determines, the Company, in exchange for the Note, will issue and the Trustee will authenticate a new Note that reflects the changed terms.

Section 9.08.   *Payment for Consent*. Neither the Company nor any Affiliate of the Company shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or any other Note Document unless such consideration is offered to be paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

## Article 10

## REDEMPTION AT THE OPTION OF THE COMPANY

Section 10.01. *No Sinking Fund*. No sinking fund is provided for the Notes.

Section 10.02. *Right To Redeem the Notes*.  The notes are subject to redemption, at the option of the Company, in whole or in part, at the redemption prices (expressed as percentages of the principal amount to be redeemed) set forth below, plus accrued and unpaid interest, if any, to, but not including the redemption date (subject to the right of holders of record on the relevant regular record date to receive interest due on an interest payment date), if redeemed during the twelve-month period beginning on:

| Date | Percentage |
|---|---|
| [•], 2016 | 107.500% |
| [•], 2017 | 107.500% |
| [•], 2018 | 105.000% |
| [•], 2019 and thereafter | 100.000% |

97

#88605336v6

Section 10.03. *Redemption Notice*. At least 30 calendar days but not more than 45 calendar days prior to any Redemption Date, the Company will send to each Holder (and to any beneficial owner of a Global Note, as required by applicable law) a written notice of redemption (the "**Redemption Notice**," and the date of such sending, the "**Redemption Notice Date**") and, substantially contemporaneously therewith, the Company will issue a press release announcing such redemption.

For any redemption, the Redemption Notice corresponding to such redemption will specify:

(1) briefly, a description of the Company's redemption right under this Indenture;

(2) the Redemption Price for such Redemption Date (for each $1,000 principal amount of Notes);

(3) the Redemption Date for such redemption;

(4) the name and address of the Paying Agent;

(5) that Notes must be surrendered to the Paying Agent on or before the Redemption Date to collect the Redemption Price;

(6) that, unless the Company defaults in paying the Redemption Price on the Redemption Date, interest, if any, on a Note will cease to accrue on and after the Redemption Date; and

(7) the CUSIP and ISIN number(s) of the Notes.

On any Redemption Notice Date, the Company will also furnish to the Trustee an Officers' Certificate, which Officers' Certificate will set forth the aggregate principal amount of Notes then outstanding and include a copy of the Redemption Notice delivered by the Company on such Redemption Notice Date.

Section 10.04. *Effect of Redemption Notice*. After the Company has delivered a Redemption Notice, each Holder will have the right to receive payment of the Redemption Price for its Notes on the later of (i) the Redemption Date and (ii)(a) if the Notes are Definitive Notes, delivery of its Notes to the Paying Agent or (b) if the Notes are Global Notes, compliance with the Applicable Procedures relating to the redemption and delivery of the beneficial interests to be redeemed to the Paying Agent.

Section 10.05. *Deposit of Redemption Price*. Prior to 10:00 a.m., New York City time, on the Redemption Date, the Company will deposit with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, will segregate and hold in trust as provided in Section 2.07 hereof) an amount of

98

immediately available funds sufficient to pay the Redemption Price of all of the then-outstanding Notes.

Section 10.06. *Effect of Deposit*. If, as of 10:00 a.m., New York City time, on any Redemption Date, the Company, in accordance with Section 10.05 hereof, has deposited with the Paying Agent money sufficient to pay the Redemption Price for every Note validly delivered in accordance with Section 10.04 hereof, then, at the Close of Business on such Redemption Date:

(1) every Note outstanding immediately prior to the Close of Business on such Redemption Date will cease to be outstanding and interest, if any, on such Notes will cease to accrue (regardless of whether such Notes were delivered to the Paying Agent or book-entry transfer has been made, as applicable), except to the extent provided in the proviso to Section 10.02(b); and

(2) all other rights of the Holders of such Notes with respect to such Notes (other than the right to receive payment of the Redemption Price and other than as provided in the proviso to Section 10.02(b)) and the Security Documents will terminate.

Section 10.07. *Covenant Not to Redeem Notes Upon Certain Events of Default*.

(a) *General*. Notwithstanding anything to the contrary in this Article 10, the Company will not redeem any Notes under this Article 10 if the principal amount of the Notes has been accelerated and such acceleration has not been rescinded on, or prior to, the Redemption Date (except in the case of an acceleration resulting from a default by the Company that would be cured by the Company's payment of the Redemption Price for such Notes).

(b) *Return of Notes*. If a Holder delivers a Note for redemption pursuant to Section 10.04 and, on the Redemption Date, pursuant to this Section 10.07, the Company is not permitted to redeem such Note, the Paying Agent will (i) if such Note is a Definitive Note, return such Note to such Holder, and (ii) if such Note is held in book-entry form, in compliance with the Applicable Procedures, deem to be cancelled any instructions for book-entry transfer of such Note.

Section 10.08. *Repayment to the Company.* Subject to any applicable property laws, if, six months after the Redemption Date, any cash held by the Paying Agent remains unclaimed, the Paying Agent will promptly return such cash to the Company; *provided*, *however*, that, to the extent that the aggregate amount of cash deposited by the Company pursuant to Section 10.05 exceeds the aggregate Redemption Price of every Note outstanding, then as soon as practicable following the Redemption Date, the Trustee will return such excess to the Company.

#88605336v6

**Article 11**

**NOTE GUARANTEES**

Section 11.01. *Note Guarantees*.

(a) Subject to this Article 11, each of the Guarantors hereby, jointly and severally, unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder, that:

(1) the principal of, premium, if any, and interest on, the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof, and

(2) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b) The Guarantors hereby agree that their obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenants that this Note Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(c) If any Holder or the Trustee is required by any court or otherwise to return to the Company, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Company or the Guarantors, any amount paid by any of them to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

100

#88605336v6

(d) Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee.

(e) All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Indenture. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under its guarantee of the Notes such that its Aggregate Payments exceed its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors, multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under its guarantee of the Notes in respect of the obligations guaranteed. "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under its guarantee of the Notes that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of state law, *provided* that solely for purposes of calculating the Fair Share Contribution Amount with respect to any Contributing Guarantor for purposes of this Section 11.01, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of its guarantee of the Notes (including in respect of this Section 11.01), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 11.01. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 11.01.

101

Section 11.02. *Limitation on Guarantor Liability*.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of applicable Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Note Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 11, result in the obligations of such Guarantor under its Note Guarantee not constituting a fraudulent transfer or conveyance.

Section 11.03. *Execution and Delivery of Note Guarantee*.

To evidence its Note Guarantee set forth in Section 11.01, each Guarantor hereby agrees that this Indenture will be executed on behalf of such Guarantor by one of its Officers (but the failure to execute such notation shall not affect the validity of any Note Guarantee). Each Guarantor hereby agrees that its Note Guarantee set forth in Section 11.01 hereof shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Note Guarantee on the Notes.

Each Guarantor hereby agrees that its Note Guarantee set forth in Section 11.01 will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee. If an Officer whose signature is on this Indenture or on the Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee will be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, will be deemed to constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

Section 11.04. *Guarantors May Consolidate, etc., on Certain Terms*.

Except as otherwise provided in Section 11.05, a Guarantor may not, directly or indirectly, (1) consolidate with or merge with or into, or (2) sell, convey, transfer or lease all or substantially all of its properties and assets to (whether or not such Guarantor is the surviving Person), any other Person, other than the Company or another Guarantor, unless:

> (1) immediately after giving effect to that transaction, no Default or Event of Default exists; and

> (2) either:

102

(a) the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Company or another Guarantor) expressly assumes, by executing and delivering a supplemental indenture to the Trustee that is satisfactory in form to the Trustee in accordance with Section 9.03 hereof and any other agreements reasonably satisfactory to the Trustee and the Collateral Agent, all of the obligations of that Guarantor under its Note Guarantee, this Indenture, the Intercreditor Agreement and all appropriate Security Documents; or

(b) such transaction is permitted by Section 4.13. case of any such consolidation, merger, sale, conveyance, transfer or lease and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee of such Guarantor and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by such Guarantor, such successor Person will succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor. Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; *provided*, *however*, that the Note Guarantee of such successor Person will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee. All the Note Guarantees so issued will in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution. as set forth in Article 4 and Article 5, and notwithstanding clauses (1) and (2)(a) and (b) above, nothing contained in this Indenture or in any of the Notes will prevent any consolidation, amalgamation or merger of a Guarantor with or into the Company or another Guarantor, or will prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety to the Company or another Guarantor.

Section 11.05. *Releases*.

The Note Guarantee of any Guarantor, and the Collateral Agent's Lien on the Collateral of such Guarantor, will be released:

(1) in connection with any sale or other disposition of all, of the assets of a Guarantor (including by way of merger or consolidation) to such Person that is not (either before or after giving effect to such transaction) the Company or a Subsidiary if the sale or other disposition does not violate Section 4.13 (for the avoidance of doubt, it is understood that the acquiror of such assets only shall be released from the Note Gaurantee and not the seller or other transferor of such assets);

(2) in connection with any sale or other disposition of Capital Stock of that Guarantor to a Person that is not (either before or after giving effect to such transaction) the Company or a Subsidiary, if the sale or other disposition does not

103

violate Section 4.13 and the Guarantor ceases to be a Restricted Subsidiary of the Company as a result of the sale or other disposition;

(3) if the Guarantor becomes an Excluded Subsidiary;

(4) with respect to a Guarantor that is a Foreign Subsidiary, if such Foreign Subsidiary ceases to, directly or indirectly be liable, contingently or otherwise, for any Indebtedness with, or guarantee any Indebtedness of, the Company or any of the Company's U.S. Subsidiaries; or

(5) upon the liquidation or dissolution of such Guarantor following the transfer of all of its assets to the Company or another Guarantor.

Notwithstanding the foregoing, no Guarantor shall be released from its Guarantee for so long as such Guarantor guarantees, is an obligor of, or provides credit support for, any Indebtedness of the Company. If the Note Guarantee of any Guarantor is released, the Company shall deliver to the Trustee an Officers' Certificate stating the identity of the released Guarantor, the basis for release in reasonable detail and that such release complies with this Indenture. Upon delivery by the Company to the Trustee of an Officers' Certificate and an Opinion of Counsel to the effect that the conditions of any of clauses (1) through (6) of this Section 11.05 have been met with respect to a Guarantor in accordance with the provisions of this Indenture, including without limitation, in the case Section 11.05(1) hereof, Section 4.14 hereof, the Trustee will execute any documents reasonably required in order to evidence the release of such Guarantor from its obligations under its Note Guarantee. Any Guarantor not released from its obligations under its Note Guarantee as provided in this Section 11.05 will remain liable for the full amount of principal of and interest and premium, if any, on the Notes and for the other obligations of any Guarantor under this Indenture as provided in this Article 11.

## Article 12

## INTERCREDITOR AGREEMENT

Each Holder, by accepting a Note, agrees that the Note Liens and the Senior Liens are subject to the terms of the Intercreditor Agreement. Each Holder, by accepting a Note, hereby authorizes and directs the Trustee to enter into the Intercreditor Agreement on behalf of the

Holder and agrees that such Holder shall comply with the provisions of the Intercreditor Agreement applicable to it in its capacity as such to the same extent as if such Holder were a party thereto. The Intercreditor Agreement will define the relative rights of holders of Liens securing Note Obligations and Senior Lien Obligations. Nothing in this Indenture or the Intercreditor Agreement will:

(a) impair, as between the Company and Holders, the obligation of the Company, which is absolute and unconditional, to pay principal of, and interest on, Notes in accordance with their terms or to perform any other obligation of the Company or any

104

#88605336v6

other obligor under this Indenture, the Notes, the Note Guarantees and the Security Documents;

(b) prevent the Trustee, the Collateral Agent or any Holder from exercising against the Company or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights or remedies as a secured party as provided in the Intercreditor Agreement or otherwise in a manner inconsistent with, or that would result in a violation of, the terms of the Intercreditor Agreement); or

(c) restrict the right of the Trustee, the Collateral Agent or any Holder (in each case except as provided in the Intercreditor Agreement):

(i) to make, support or oppose any request for an order for dismissal, abstention or conversion in any Insolvency Proceeding (as defined in the Intercreditor Agreement);

(ii) to make, support or oppose, in any Insolvency Proceeding (as defined in the Intercreditor Agreement), any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(iii) to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any Insolvency Proceeding (as defined in the Intercreditor Agreement) and, if appointed, to serve and act as a member of such committee;

(iv) to seek or object to the appointment of any professional person to serve in any capacity in any Insolvency Proceeding (as defined in the Intercreditor Agreement)or to support or object to any request for compensation made by any professional person or others therein;

(v) to make, support or oppose any request for an order appointing a trustee or examiner in any Insolvency Proceeding (as defined in the Intercreditor Agreement); or

(vi) otherwise file in any Insolvency Proceeding (as defined in the Intercreditor Agreement) any pleadings, objections, motions or agreements that assert rights available to unsecured creditors of an obligor arising under bankruptcy law or applicable non-bankruptcy law, to the extent consistent with the terms and provisions of the Intercreditor Agreement, including filings in respect of any disclosure statement, plan of reorganization or liquidation or other matters relating to the administration of an Insolvency Proceeding (as defined in the Intercreditor Agreement).

#88605336v6

**Article 13**

**COLLATERAL**

Section 13.01. *Security Documents*.

(a) The payment of the principal of, and accrued and unpaid interest, if any, on the Notes when due, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise and whether by the Company pursuant to the Notes or by a Guarantor pursuant to its Note Guarantee, the payment of all other Obligations and the performance of all other obligations of the Company and the Guarantors under the Note Documents and any then Permitted Secured Obligations will be secured as provided in the Security Documents (subject to the terms of the Intercreditor Agreement) to be entered into by the Company, the Guarantors and the Collateral Agent (and, to the extent applicable, the Trustee and the representatives of the holders of Permitted Secured Obligations) as required or permitted by this Indenture.

(b) The Company shall, and shall cause each Guarantor to, and each Guarantor shall execute the Security Agreement and each other Security Document necessary to create a Lien in all the assets of the Company and each Guarantor securing the Senior Lien Obligations on the Issue Date (other than Excluded Property) and make all filings and take all other actions as are necessary or required by the Security Documents to establish and maintain (at the sole cost and expense of the Company and the Guarantors) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected security interest. In the case of real property owned by the Company or a Guarantor on the Issue Date that is subject to a mortgage that secures the Senior Lien Obligations, the Company or such Guarantor, as applicable, shall also deliver the following within 120 days of closing (collectively, "**Mortgage Deliverables**"), but, if Senior Lien Obligations are in effect when mortgages were put in place to secure Senior Lien Obligations, only to the extent such deliverables were provided to the holders of the Senior Lien Obligations in connection with their mortgage on such property: (i) a fully paid policy or policies or marked-up unconditional binder having the same effect of lender's title insurance, paid for by the Company and the Guarantors, in an amount equal to the amount of title insurance obtained pursuant to the Senior Lien Obligations, issued by a nationally recognized title insurance company, insuring the Lien of each mortgage as a valid Lien on the mortgaged property described therein, free of any title exceptions and other Liens except Permitted Liens, (ii) an as-is survey of the property subject to any such mortgage certified to the Company, Collateral Agent and the title company, meeting minimum standard detail requirements for ALTA/ACSM Land Title Surveys and dated (or redated) not earlier than six months prior to the date of delivery thereof under such Senior Lien Obligations, (iii) a customary opinion of counsel addressing such matters as were addressed in the comparable opinion provided to the holders of Senior Lien Obligations, (iv) evidence of insurance required to be maintained pursuant to the mortgages and this Indenture and (v) if required by applicable law, flood hazard determination certificates and, if required, notices to the

106

record owner of any improvements in a special flood hazard area, together with evidence of acceptable flood insurance coverage.

(c) If the Company or any Guarantor acquires any property that is required to be Collateral pursuant to this Indenture or the Security Documents, or any Restricted Subsidiary becomes a Guarantor that is required to pledge its assets as Collateral pursuant to this Indenture or the Security Documents, the Company or such Guarantor shall execute a joinder to an existing Security Document or enter into a new Security Document (in each case, to the extent necessary to cause such asset be so pledged), and take all steps necessary to validly perfect such Lien (to the extent required by the Security Documents), subject to no prior Liens other than Permitted Liens (including the Senior Liens on such assets). To the extent that the Company or such Guarantor is entering into a joinder, entering into a new Security Document, providing Mortgage Deliverables (in the case of real property) or taking other steps to perfect such Lien in order to secure Senior Lien Obligations, the Company or such Guarantor may take the same steps in connection with this Indenture (with such changes as are appropriate to reflect the applicable priority of the Lien, or the applicable perfection requirements, consistent with the terms of the Security Documents, the Intercreditor Agreement and the Liens being created on the Issue Date), which shall satisfy the obligations hereunder, and the Trustee and the Collateral Agent, as applicable, are authorized and directed to execute any documentation consistent therewith.

(d) The Company and each Guarantor shall execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements or amendments or continuation statements in respect thereof), that may be required under any applicable law, to ensure that the Liens of the Security Documents on the Collateral remain perfected (to the extent required by the Security Documents) with the priority required by the Security Documents and the Intercreditor Agreement, all at the expense of the Company and Guarantors and provide to the Collateral Agent and the Trustee, from time to time upon reasonable request, evidence reasonably satisfactory to the Collateral Agent and the Trustee as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(e) With respect to all Commercial Motor Vehicles covered by a certificate of title or ownership, in each case with an individual Fair Market Value of $25,000.00 or more per Commercial Motor Vehicle (it being understood and agreed that, for the avoidance of doubt, in determining the Fair Market Value of any such Commercial Motor Vehicle, the Fair Market Value of any equipment installed thereon shall be included in any such determination), use commercially reasonable efforts to:

(i) within 120 days after the Issue Date, cause to be delivered to the applicable governmental authority a duly completed application, pay any applicable fees and take any other actions within its control necessary in order to cause the certificate of title for such Commercial Motor Vehicle at all times to be registered with the applicable governmental authority showing "[•], as Collateral Agent" as lienholder, other than those

107

Commercial Motor Vehicles registered in a state that prohibits a second lien being noted on the certificate of title or ownership with respect to such Commercial Vehicle,

(ii) if necessary to perfect in any jurisdiction, cause the Liens of the Collateral Agent to be identified on a notice of lien or other filing made in the appropriate filing office in the applicable jurisdiction and pay all applicable fees in connection therewith, and

(iii) deliver the original certificates of title for such Commercial Motor Vehicles and any document evidencing official notification from the applicable governmental authority of the perfection of the Security Interest in any Commercial Motor Vehicles to the Collateral Agent or its agent, including any service company for purposes of effecting the requirements of this clause (e).

(f) Within the time period provided in Section 3.4(b) of the Security Agreement, with respect to each Deposit Account (as defined in the Security Agreement) listed on Schedule 15(a) to the Perfection Certificate (as defined in the Security Agreement), enter into and deliver a Deposit Account Control Agreement (as defined in the Security Agreement) to the extent possible after using commercially reasonable efforts.

Section 13.02. *Collateral Agent*.

(a) The Collateral Agent shall have all the rights and protections provided in the Security Documents and, additionally, shall have all the rights and protections in its dealings under the Security Documents as are provided to the Trustee under Article 7.

(b) Subject to Section 7.01, none of the Collateral Agent, Trustee, Paying Agent, Registrar or transfer agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, validity, perfection, priority, sufficiency, protection or enforcement of any Note Liens or any other security interest in the Collateral, or any defect or deficiency as to any such matters.

(c) Except as required or permitted by the Security Documents and the Intercreditor Agreement, the Holders, by accepting a Note, acknowledge that the Collateral Agent will not be obligated:

(1) to act upon directions purported to be delivered to it by any Person, except in accordance with the Security Documents and the Intercreditor Agreement;

(2) to foreclose upon or otherwise enforce any Note Lien; or

(3) to take any other action whatsoever with regard to any or all of the Note Liens, Security Documents or Collateral.

108

#88605336v6

(d) The Collateral Agent is authorized and empowered to appoint one or more sub-agents as it deems necessary or appropriate.

(e) If the Company (i) incurs Senior Lien Obligations at any time when no Intercreditor Agreement is in effect or at any time when Indebtedness constituting Senior Lien Obligations entitled to the benefit of an existing Intercreditor Agreement is concurrently retired, and (ii) delivers to the Collateral Agent an Officer's Certificate so stating and requesting the Collateral Agent to enter into an Intercreditor Agreement in favor of a designated agent or representative for the holders of the Senior Lien Obligations so incurred, the Collateral Agent shall (and is hereby authorized and directed to) enter into such Intercreditor Agreement and bind the Holders on the terms set forth therein and perform and observe its obligations thereunder; *provided* that such Intercreditor Agreement (x) is entered into within 90 days after such Intercreditor Agreement referred to in clause (i) ceased to be in effect or was retired and (y) contains terms no less favorable to the Holders than such Intercreditor Agreement referred to in clause (i).

Section 13.03. *Authorization of Actions to Be Taken*.

(a) Each Holder of Notes, by its acceptance thereof, (i) consents and agrees to the terms of each Security Document and the Intercreditor Agreement, as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, (ii) authorizes and directs the Trustee and the Collateral Agent to enter into the Security Documents to which it is a party, (iii) authorizes and empowers the Trustee and the Collateral Agent to execute and deliver the Intercreditor Agreement and (iv) authorizes and empowers the Trustee and the Collateral Agent to bind the Holders of Notes as set forth in the Security Documents to which it is a party and the Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b) The Trustee is authorized and empowered to receive for the benefit of the Holders of Notes any funds collected or distributed to the Collateral Agent under the Security Documents and the Intercreditor Agreement to which the Trustee is a party and, subject to the terms of the Security Documents and the Intercreditor Agreement, to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture, the Security Documents and the Intercreditor Agreement.

(c) Subject to the provisions of Section 7.01 and Section 7.02, the Security Documents and the Intercreditor Agreement, the Trustee may (but shall not be obligated to), in its sole discretion and without the consent of the Holders, direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1) foreclose upon or otherwise enforce any or all of the Note Liens;

109

#88605336v6

(2) enforce any of the terms of the Security Documents to which the Collateral Agent or the Trustee is a party (subject to the terms of the Intercreditor Agreement); or

(3) collect and receive payment of any and all Obligations hereunder.

Subject to the Intercreditor Agreement and at the Company's sole cost and expense, the Trustee is hereby authorized and empowered by each Holder of Notes (by its acceptance thereof) to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem reasonably expedient to protect or enforce the Note Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents or this Indenture, and such suits and proceedings as the Trustee may deem reasonably expedient, at the Company's sole cost and expense, to preserve or protect its interests and the interests of the Holders in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the Note Liens or be prejudicial to the interests of Holders or the Trustee.

Section 13.04. *Release of Collateral*.

(a) Collateral may be released from the Lien and security interest created by the Security Documents at any time or from time to time in accordance with the provisions of the Security Documents and in accordance with Article 9. In addition, the Company and the Guarantors will be entitled to the release of assets included in the Collateral from the Note Liens, and the Trustee shall (or, if the Trustee is not then the Collateral Agent, shall direct the Collateral Agent to) release the same from such Liens at the Company's sole cost and expense, under any one or more of the following circumstances without the need for any further action (other than as provided for by this Section 13.04) by any Person:

(i) pursuant to an amendment or waiver in accordance with Article 9;

(ii) in whole or in part, as applicable, as to all or any portion of property subject to such Note Liens which has been taken by eminent domain, condemnation or other similar circumstances;

(iii) in part, as to any property that (1) is sold, transferred or otherwise disposed of by the Company or any Guarantor (other than to the Company or another Guarantor) in a transaction not prohibited by this Indenture at the time of such sale, transfer or disposition, (2) is owned or at any time acquired by a Guarantor that has been released from its guarantee pursuant to Section 11.05, concurrently with the release of such guarantee or (3) is or becomes Excluded Property; and

(iv) as to property that constitutes less than all or substantially all of the Collateral securing the Notes, with the consent of the Holders of at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class (which

110

#88605336v6

consent may be obtained in connection with an exchange offer or tender offer and associated consent solicitation); and

(v) upon the release of all Liens on such property or assets securing Senior Lien Obligations in accordance with Section [•] of the Intercreditor Agreement; *provided*, *however*, that (i) in the case of a sale or Disposition (as defined in the Intercreditor Agreement) pursuant to clause (A) of such Section [•], if the proceeds thereof are not applied in accordance with Section [•] of the Intercreditor Agreement to repay the Senior Lien Obligations or Note Obligations, such sale or Disposition (as defined in the Intercreditor Agreement) is permitted pursuant to the terms of the Note Documents, and (ii) in the case of a release pursuant to clause (A) of such Section [•] (other than in connection with a sale or Disposition (as defined in the Intercreditor Agreement) pursuant to, and in accordance with, clause (v)(i) above), if such release is of property or assets that has a value, together with the aggregate value of all prior releases of property or assets pursuant to this clause (v), that is in excess of [•] (excluding, for purposes of the [•] cap, any Environmental Sensitive Real Property (as defined in the Intercreditor Agreement)) such release is permitted pursuant to the terms of the Note Documents.

With respect to any release of Collateral requiring the Trustee's consent or other release hereunder, upon receipt of an Officers' Certificate and an Opinion of Counsel each stating that all conditions precedent under this Indenture, the Security Documents and the Intercreditor Agreement to such release have been met and that it is proper for the Trustee or Collateral Agent to execute and deliver the documents requested by the Company in connection with such release, and any necessary or proper instruments of termination, satisfaction or release prepared by the Company, the Trustee shall, or shall cause the Collateral Agent to, execute, deliver or acknowledge (at the Company's expense) such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the Intercreditor Agreement. Neither the Trustee nor the Collateral Agent shall be liable for any such release undertaken in reliance upon any such Officers' Certificate and Opinion of Counsel, and the Trustee and the Collateral Agent shall not be under any obligation to release any such Lien and security interest, or execute and deliver any such instrument of release, satisfaction or termination, unless and until it receives such Officers' Certificate and Opinion of Counsel.

Notwithstanding the foregoing, (i) at any time when a Default or Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and, if the Trustee is not then the Collateral Agent, the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Collateral pursuant to the provisions of this Indenture or the Security Documents will be effective as against the Holders, except as otherwise provided in the Intercreditor Agreement or, subject to the terms of the Intercreditor Agreement, in connection with the exercise of remedies by the Collateral Agent and (ii) if any asset of the Company or any Restricted Subsidiary that was released from the Note Liens pursuant to this Indenture, the Intercreditor Agreement or the Security Documents is subsequently subject to any Lien to secure Senior Lien Obligations, such Company or Restricted Subsidiary shall concurrently grant a Lien on such asset to secure the Note Obligations.

111

Section 13.05. *Use of Collateral; Compliance with Section 314(d) of the TIA*.

(a) Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have commenced enforcement of remedies under the Security Documents, except to the extent otherwise provided in the Security Documents, this Indenture or the Senior Credit Agreement or other Senior Facility Documents, the Company and the Guarantors will have the right to remain in possession and retain exclusive control of the Collateral to alter or repair the Collateral, to freely operate the Collateral and to collect, invest and dispose of any income thereon.

(b) The release of any Collateral from the terms of this Indenture will not be deemed to impair the security under this Indenture in contravention of provisions hereof if and to the extent the Collateral is released pursuant to the terms hereof. To the extent applicable, the Company will comply with Section 314(d) of the TIA relating to the release of property or securities subject to the Lien of the Security Documents. Any certificate or opinion required by Section 314(d) of the TIA may be made by an Officer of the Company except in cases where Section 314(d) of the TIA requires that such certificate or opinion be made by an independent Person, which Person will be an independent engineer, appraiser or other expert selected by the Company. Notwithstanding anything to the contrary in this paragraph, the Company will not be required to comply with all or any portion of Section 314(d) of the TIA if it determines, in good faith based on advice of counsel, that under the terms of Section 314(d) of the TIA and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of Section 314(d) of the TIA is inapplicable to the released Collateral.

Section 13.06. *Powers Exercisable by Receiver or Trustee*.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article 13 upon the Company or a Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Company or a Guarantor or of any officer or officers thereof required by the provisions of this Article 13; and if the Trustee or the Collateral Agent shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee or the Collateral Agent, as the case may be.

Section 13.07. *Voting*.

In connection with any matter under the Security Agreement requiring a vote of holders of Secured Obligations (as defined in the Security Agreement), the holders of such Secured Obligations shall be treated as a single class and the Holders shall cast their votes in accordance with this Indenture. The amount of the Notes to be voted by the Holders will equal the aggregate outstanding principal amount of the Notes. Following and in accordance with the outcome of the applicable vote under this Indenture, the

#88605336v6

Trustee shall vote the total amount of the Notes as a block in respect of any vote under the Security Agreement.

Section 13.08. *Appointment and Authorization of [•] as Collateral Agent.*

(a) [•] is hereby designated and appointed as the Collateral Agent of the Holders under the Security Documents and the Intercreditor Agreement, and is authorized as the Collateral Agent for such Holders to execute and enter into each of the Security Documents, the Intercreditor Agreement and all other instruments relating to the Security Documents and the Intercreditor Agreement and (i) to take action and exercise such powers and remedies as are expressly required or permitted hereunder and under the Security Documents and the Intercreditor Agreement and all instruments relating hereto and thereto and (ii) to exercise such powers and perform such duties as are, in each case, expressly delegated to the Collateral Agent by the terms hereof and thereof, together with such other powers as are reasonably incidental hereto and thereto.

(b) Notwithstanding any provision to the contrary elsewhere in this Indenture, the Intercreditor Agreement or the Security Documents, the Collateral Agent shall not have (i) any duties or responsibilities except those expressly set forth herein or therein or (ii) any fiduciary relationship with any Holder, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture, the Intercreditor Agreement or any Security Document or otherwise exist against the Collateral Agent.

The Collateral Agent may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder or under the Intercreditor Agreement or the Security Documents in good faith and in accordance with the advice or opinion of such counsel.

Section 13.09. *Recordings and Opinions.*

(a) The Company and the Guarantors shall furnish to the Collateral Agent and the Trustee on December 31 of each year, commencing December 31, 2016, an Opinion of Counsel, dated as of such date, stating that:

(1) in the opinion of such counsel, (A) no further action was necessary to maintain the perfection of the security interest in the Collateral described in both the applicable UCC-1 financing statement and the Security Agreement and for which perfection under the UCC of the Company's or applicable Guarantor's jurisdiction of organization may occur by the filing of a UCC-1 financing statement with the appropriate filing office of the applicable party's jurisdiction of organization, and (B) based on relevant laws as in effect on the date of such Opinion of Counsel, all financing statements and continuation statements have been executed and filed that are necessary as of such date and during the succeeding 12 months fully to preserve and perfect the Note Liens, to the extent the Note Liens can be perfected by such; and

113

(2) in the opinions of such counsel, no further action is necessary to maintain such Liens as effective and perfected.

Section 13.10. *Release Upon Termination of the Company's Obligations*.

In the event that (i) the Company delivers to the Trustee, in form and substance acceptable to it, an Officers' Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security Documents have been satisfied and discharged by the payment in full of the Company's Obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, the Trustee shall deliver to the Company and the Collateral Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

Section 13.11. *Bonded Contracts*.

(a) Notwithstanding anything to the contrary contained herein or in the Security Documents, if, pursuant to the terms of any Surety Bond, the Surety issuing such Surety Bond is required or has elected to complete the performance of the related Bonded Contract on behalf of the Company or any Subsidiary of the Company (a "**Bonded Contract Default**"), any Lien in favor of such Surety, whether existing on the Issue Date or thereafter created, in any Surety Priority Collateral securing such Surety Bond shall be senior to the Liens under the Security Documents in such Surety Priority Collateral.

(b) In the event of a Bonded Contract Default:

(1) neither the Trustee nor the Collateral Agent shall take any action to foreclose or otherwise realize upon, or take any other enforcement action with respect to the Surety Priority Collateral related to such Bonded Contract until the earliest to occur of:

(A) completion of the projects under such Bonded Contract and reimbursement to the Surety of all reimbursement obligations of the Company or any of its Subsidiaries relating to such projects under such Bonded Contract, and

(B) if the Surety is released from any obligations with respect to such Bonded Contract or the related project (because of the termination or cancellation of the project or Bonded Contract or any release or settlement of any obligations the Surety may have with respect to such project or otherwise), reimbursement to such Surety of all reimbursement obligations of the Company or any Subsidiary of the Company relating to such projects.

114

(2) the Surety shall be entitled to use, solely for the purpose of completing such Bonded Contract, any inventory of the Company or any of its Subsidiaries that was purchased specifically for the completion of such Bonded Contract.

(c) Each Surety issuing a Surety Bond for the account of the Company or a Subsidiary of the Company for any Bonded Contract secured by Surety Priority Collateral shall be a third party beneficiary of this Section 13.11.

## Article 14

## MISCELLANEOUS

Section 14.01. *Trust Indenture Act Controls*. Except as expressly provided for herein, if any provision of this Indenture limits, qualifies, or conflicts with another provision that is required to be included in this Indenture by the TIA, the required provision will control.

Section 14.02. *Notices*. Any request, demand, authorization, notice, waiver, consent or communication will be in writing and delivered in Person or mailed by first-class mail, postage prepaid, addressed as follows or transmitted by facsimile transmission, electronic mail or other similar means of unsecured electronic methods to the following:

if to the Company or a Guarantor:

Contura Energy, Inc.
[Address]

if to the Trustee, Collateral Agent, Registrar or Paying Agent:

[•]
[Address]

The Company, the Guarantors or the Trustee, by notice given to the other in the manner provided above, may designate additional or different addresses for subsequent notices or communications.

Any notice or communication given to a Holder will be mailed to the Holder, by first class mail, postage prepaid, at the Holder's address as it appears on the registration books of the Registrar and will be deemed given on the date of such mailing; *provided*, *however*, that with respect to any Global Note, such notice or communication will be sent to the Holder thereof pursuant to the Applicable Procedures.

Failure to mail or send a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders. If a notice or communication

#88605336v6

is mailed or sent in the manner provided above, it is duly given, whether or not received by the addressee.

If the Company or any Guarantor mails or sends a notice or communication to the Holders, it will, at the same time, mail a copy to the Trustee and each of the Registrar, Paying Agent and Conversion Agent.

If the Company or any Guarantor is required under this Indenture to give a notice to the Holders, in lieu of delivering such notice to the Holders, the Company or such Guarantor may deliver such notice to the Trustee and cause the Trustee, at the Company's or Guarantor's expense, as applicable, to have delivered such notice to the Holders on or prior to the date on which the Company or such Guarantor would otherwise have been required to deliver such notice to the Holders. In such a case, the Company or such Guarantor will also cause the Trustee to mail a copy of the notice to each of the Registrar, Paying Agent and Conversion Agent (if other than the Trustee) at the same time it sends the notice to the Holders.

Section 14.03. *Certificate and Opinion as to Conditions Precedent.* Upon any request or application by the Company to the Trustee to take any action under this Indenture other than the authentication of the initial Global Note on the Issue Date, the Company will furnish to the Trustee:

(a) an Officers' Certificate stating that, in the judgment or opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b) an Opinion of Counsel stating that, in the judgment or opinion of such counsel, all such conditions precedent relating to the proposed action (to the extent of legal conclusions and subject to reasonable assumptions and exclusions) have been complied with.

Section 14.04. *Statements Required in Certificate or Opinion.* Each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition (except for such Officers' Certificate required to be delivered pursuant to Section 4.04 hereof) provided for in this Indenture will include:

(a) a statement that each Person making such Officers' Certificate or Opinion of Counsel has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements, judgments or opinions contained in such Officers' Certificate or Opinion of Counsel are based;

(c) a statement that, in the judgment or opinion of each such Person, he has made such examination or investigation as is necessary to enable such Person to express an informed judgment or opinion as to whether or not such covenant or condition has been complied with; and

116

(d) a statement that, in the judgment or opinion of such Person, such covenant or condition has been complied with.

Section 14.05. *Separability Clause*. In case any provision in this Indenture or in the Notes will be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 14.06. *Rules by Trustee*. The Trustee may make reasonable rules for action by, or a meeting of, Holders.

Section 14.07. *Governing Law and Waiver of Jury Trial*. THE INDENTURE AND EACH NOTE AND NOTE GUARANTEE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. EACH OF THE COMPANY, THE GUARANTORS, THE TRUSTEE AND THE COLLATERAL AGENT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 14.08. *Calculations*. Except as otherwise provided in this Indenture, the Company will be responsible for making all calculations called for under the Notes and this Indenture. The Company will make all calculations in good faith and, absent manifest error, its calculations will be final and binding on all Holders. The Company will provide a schedule of its calculations to the Trustee, and the Trustee is entitled to rely conclusively upon the accuracy of the Company's calculations without independent verification. If any Holder requests from the Trustee a copy of such schedule, the Trustee will promptly forward a copy of such schedule to such Holder. Calculations will be made to the nearest cent (with 0.5 of a cent rounded upward) or to the nearest 1/10,000th of a share (with 5/100,000ths rounded upward), as the case may be.

Section 14.09. *No Recourse Against Others*. A director, officer, employee, member, manager or stockholder, as such, of the Company or any Guarantor will not have any liability for any obligations of the Company or the Guarantors under the Notes, this Indenture, the Note Guarantees, the Intercreditor Agreement or the Security Documents or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Note, each Holder waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes and the Note Guarantees.

Section 14.10. *Successors*. All agreements of the Company, the Guarantors, the Trustee, the Collateral Agent, the Registrar and the Paying Agent in this Indenture and the Notes will bind their respective successors.

Section 14.11. *Multiple Originals*. The parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture. The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission will constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties

117

#88605336v6

hereto transmitted by facsimile or PDF will be deemed to be their original signatures for all purposes.

Section 14.12. *Table of Contents; Headings*. The table of contents and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof, and will not modify or restrict any of the terms or provisions hereof.

Section 14.13. *Force Majeure*. The Trustee, Registrar, Paying Agent and Conversion Agent will not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of such Person (including, but not limited to, any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

Section 14.14. *Submission to Jurisdiction*. Each of the Company and Guarantors: (a) agrees that any suit, action or proceeding against it arising out of or relating to this Indenture or the Notes, as the case may be, may be instituted in any U.S. federal court with applicable subject matter jurisdiction sitting in The City of New York; (b) waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum; and (c) submits to the nonexclusive jurisdiction of such courts in any suit, action or proceeding.

Section 14.15. *Legal Holidays*. If the Maturity Date or any Interest Payment Date, Change of Control Repurchase Date, date upon which any Notes are to be repurchased pursuant to a Net Proceeds Offer, Redemption Date or Conversion Date is not a Business Day, then any action to be taken on such date need not be taken on such date, but may be taken on the immediately following Business Day with the same force and effect as if taken on such date, and no interest will accrue for the period from and after such date.

Section 14.16. *Benefits of Indenture*. Except as provided in Section 13.11, nothing in this Indenture or in the Notes or the Note Guarantees, expressed or implied, will give to any Person, other than the parties hereto, any Paying Agent, Registrar, and their successors hereunder, and the Holders any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.17. *U.S.A. Patriot Act*. The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. Patriot Act, the Trustee, like all financial institutions, in order to help fight the funding of terrorism and money laundering, is required to obtain, verify and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. Patriot Act.

118

#88605336v6

Section 14.18. *Tax Withholding*. Nothing herein shall preclude any tax withholding required by law or regulation.

[*Signature Pages Follow*]

#88605336v6

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as a deed the day and year first before written.

CONTURA ENERGY, INC., as Issuer


By: _____

Name:

Title:



[•], Guarantors


By: _____

Name:

Title:



Signature Page
10.00% Senior Secured First Lien Notes Indenture



#88605336v6

IN WITNESS WHEREOF, the undersigned, being duly authorized, has executed this Indenture as of the day and year first before written.

[•], as Trustee and
Collateral Agent

By: _____
Name:
Title:

Signature Page
10.00% Senior Secured First Lien Notes Indenture

#88605336v6

**EXHIBIT A**

**FORM OF NOTE**

[FORM OF FACE OF NOTE]

NO AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY MAY PURCHASE OR OTHERWISE ACQUIRE THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN.

*[Include the following legend for Global Notes only (the "**Global Notes Legend**"):]*

IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITARY OR A NOMINEE OF THE DEPOSITARY, WHICH MAY BE TREATED BY THE COMPANY, THE TRUSTEE AND ANY AGENT THEREOF AS OWNER AND HOLDER OF THIS NOTE FOR ALL PURPOSES. THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN. OF THIS GLOBAL NOTE WILL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY, OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE, AND TRANSFERS OF PORTIONS OF THIS GLOBAL NOTE WILL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN ARTICLE 2 OF THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

*[Include the following legend on all Notes that are Restricted Notes (the "**Restricted Notes Legend**"):]*

SALE OF THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, PRIOR TO THE RESALE RESTRICTION TERMINATION DATE (AS DEFINED BELOW), THIS NOTE (AND ANY BENEFICIAL INTEREST HEREIN) MAY NOT BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED, EXCEPT:

(A)    TO THE COMPANY OR ANY SUBSIDIARY THEREOF;

A-1

#88605336v6

(B)      PURSUANT TO A REGISTRATION STATEMENT THAT HAS
         BECOME EFFECTIVE UNDER THE SECURITIES ACT;

(C)      TO A PERSON THAT YOU REASONABLY BELIEVE TO BE A
         QUALIFIED INSTITUTIONAL BUYER AND IN COMPLIANCE
         WITH RULE 144A UNDER THE SECURITIES ACT; OR

(D)      UNDER ANY OTHER AVAILABLE EXEMPTION FROM THE
         REGISTRATION REQUIREMENTS OF THE SECURITIES ACT
         (INCLUDING, IF AVAILABLE, THE EXEMPTION PROVIDED BY
         RULE 144 UNDER THE SECURITIES ACT).

THE "RESALE RESTRICTION TERMINATION DATE" MEANS THE DATE: (A)
THAT IS AT LEAST ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE OF
THE COMPANY'S 10.00% SENIOR SECURED FIRST LIEN NOTES; AND (B) ON
WHICH THE COMPANY HAS INSTRUCTED THE TRUSTEE THAT THIS
LEGEND WILL NO LONGER APPLY, IN ACCORDANCE WITH THE
PROCEDURES DESCRIBED IN THE INDENTURE FOR THE NOTES.

PRIOR TO ANY TRANSFER PURSUANT TO THE FOREGOING CLAUSE (D), THE
COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE
DELIVERY OF SUCH CERTIFICATIONS, LEGAL OPINIONS OR OTHER
INFORMATION AS THEY MAY REASONABLY REQUIRE AND MAY RELY
UPON TO CONFIRM THAT SUCH TRANSFER IS BEING MADE PURSUANT TO
AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE
REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

#88605336v6

No.: [ ]
CUSIP: [ ] *
ISN: : [ ]*

Principal Amount $[ ]
[as revised by the Schedule of Increases
Decreases of Global Note attached hereto][1]

**Contura Energy, Inc.**
**10.00% Senior Secured First Lien Notes**

Contura Energy, Inc., a Delaware corporation (the "**Company**"), promises to pay to [ ],[2] or registered assigns, the principal amount of $[ ] (as revised by the Schedule of Increases and Decreases of Global Note attached hereto)][3] on the Maturity Date (as defined in the within-mentioned Indenture).

Payment Dates: [•] and [•], beginning [•].

Record Dates: [•] and [•] of each year, beginning [•].

provisions of this Note are set forth on the other side of this Note.

---

* Upon the removal of the Restricted Notes Legend in accordance with the within-mentioned Indenture, these CUSIP and ISIN numbers will be deemed removed and replaced with CUSIP number [ ] and ISIN number [ ].

[1] Include for Global Notes only.

[2] Insert Cede & Co. for Global Notes.

[3] Include for Global Notes only.

A-3

CONTURA ENERGY, INC.

By:  _____
Name:
Title:
Dated:

A-4

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

[•], as Trustee, certifies that this is one of the Notes referred to in the within-mentioned Indenture.


By: _____

Authorized Signatory

Dated:

A-5

#88605336v6

[FORM OF REVERSE OF NOTE]

**Contura Energy, Inc.**
**10.00% Senior Secured First Lien Notes**

This Note is one of a duly authorized issue of notes of Contura Energy, Inc. (the "**Company**"), designated as its 10.00% Senior Secured First Lien Notes (the "**Notes**"), all issued or to be issued under and pursuant to an indenture dated as of the Issue Date (the "**Indenture**"), among the Company, the guarantors party thereto (the "**Guarantors**") and [•], as trustee (the "**Trustee**") and collateral agent (the "**Collateral Agent**"), to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Collateral Agent, the Company, the Guarantors and the Holders. Capitalized terms used herein and not defined herein have the meanings ascribed to them in the Indenture, and the terms of the Notes include those stated in the Indenture and those incorporated into the Indenture. Notwithstanding anything herein to the contrary, to the extent that any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture will govern and control. The Notes and the related Note Guarantees are secured obligations of the Company and the relevant Guarantors. The Notes and the related Note Guarantees are secured by the Collateral pursuant to the Security Documents referred to in the Indenture, subject to the terms of the Intercreditor Agreement. The Note Liens, which secure the Notes and the related Note Guarantees, and the Senior Liens are subject to the terms of the Intercreditor Agreement. Each Holder, by accepting a Note agrees that the Note Liens and the Senior Liens are subject to the terms of the Intercreditor Agreement. The Holders, by accepting a Note, hereby authorize and direct the Trustee and the Collateral Agent to enter into the Intercreditor Agreement on behalf of the Holders and agree that the Holders shall comply with the provisions of the Intercreditor Agreement applicable to them in their capacities as such to the same extent as if the Holders were parties thereto.

1.      Interest. This Note will bear interest at a rate equal to 10.00% per annum. Interest on this Note will accrue from the most recent date to which interest has been paid or provided for, or, if no interest has been paid or provided for, [•]. Interest will be payable semiannually in arrears on [•] and [•] of each year, beginning on [•]. Each payment of cash interest on this Note will include interest accrued for the period commencing on and including the immediately preceding Interest Payment Date (or, if none, [•]) through, and including, the day before the applicable Interest Payment Date.

Pursuant to Section 2.04 of the Indenture, in certain circumstances, the Company will pay Default Interest on Defaulted Amounts with respect to this Note.

2.      Method of Payment. The Company will promptly make all payments on this Note on the dates and in the manner provided herein and in the Indenture. Payments on Notes represented by a Global Note (including principal and interest) will be made by wire transfer of immediately available funds to the accounts specified by Depositary. The Company will pay principal of, and any Change of Control Repurchase Price, Net Proceeds Offer Price or Redemption Price for, Definitive Notes at the office or agency

A-6

#88605336v6

designated by the Company for such purpose. Interest on Definitive Notes will be made by check or by wire transfer, as described in Section 2.04, except that any payment of Interest due on the Maturity Date will be made at the office or agency designated by the Company for such purpose. All payments on this Note will be made in money of the United States that at the time of payment is legal tender for payment of public and private debts.

3.      Payment, Agent, Conversion Agent and Registrar. Initially, [•] will act as the Trustee, Paying Agent and Registrar. The Company may appoint and change any Paying Agent or Registrar, *provided* that the Company will maintain at least one Paying Agent, Conversion Agent and Registrar in the continental United States. The Company or any of its Subsidiaries or any of their Affiliates may act as Paying Agent or Registrar.

4.      Repurchase By the Company at the Option of the Holder. At the option of the Holder, and subject to the terms and conditions of the Indenture, upon the occurrence of a Change of Control, each Holder will have the right, at its option, to require the Company to repurchase for cash all of its Notes, or any portion of its Notes having a principal amount equal to $1,000 or an integral multiple of $1,000 in excess thereof (so long as the remaining portion of any such Notes equals $2,000 or an integral multiple of $1,000 in excess thereof), at a Change of Control Repurchase Price equal to 101% of the principal amount of Notes to be purchased plus accrued and unpaid interest, if any, to but excluding, the Change of Control Repurchase Date, unless the Change of Control Repurchase Date occurs after a Regular Record Date and on or prior to the Interest Payment Date corresponding to such Regular Record Date, in which case the Company will pay the accrued and unpaid interest on such Notes, on such Interest Payment Date, to the Holder of such Notes as of the Close of Business on such Regular Record Date, and the Change of Control Repurchase Price shall not include such accrued and unpaid interest. To exercise its purchase right, a Holder must comply with the procedures set forth in Article 3 of the Indenture.

Upon the occurrence of an Asset Sale or Casualty or Condemnation Event, the Company may be obligated to make an offer to purchase the Notes from the Holders with Excess Proceeds of such Asset Sale or Casualty or Condemnation Event at a purchase price equal to 101% of the principal amount of such Notes plus accrued interest on such principal amount to the date of purchase, as provided in, and subject to the terms of, the Indenture.

5.      Redemption at the Option of the Company. The notes are subject to redemption, at the option of the Company, in whole or in part, at the redemption prices (expressed as percentages of the principal amount to be redeemed) set forth below, plus accrued and unpaid interest, if any, to, but not including the redemption date (subject to the right of holders of record on the relevant regular record date to receive interest due on an interest payment date), if redeemed during the twelve-month period beginning on:

| Date | Percentage |
|---|---|
| [•], 2016 | 107.500% |
| [•], 2017 | 107.500% |

A-7

#88605336v6

| | |
|---|---|
| [•], 2018 ..................................................................................... | 105.000% |
| [•], 2019 and thereafter .............................................................. | 100.000% |

6.      <u>Ranking and Collateral</u>. The Notes and the Note Guarantees are general senior secured obligations of the Company and the Guarantors, respectively, and are *pari passu* in right of payment with all existing and future Indebtedness of the Company and the Guarantors that is not, by its terms, expressly subordinated in right of payment to the Notes or Note Guarantees. The security interests securing the Notes and the Note Guarantees will be, pursuant to the Intercreditor Agreement, second in priority to any and all security interests at any time granted to secure the Senior Lien Obligations on a first priority basis, and first in priority to any and all security interests at any time granted to secure the Senior Lien Obligations on a second priority basis.

7.      <u>Denominations; Transfer; Exchange</u>. The Notes are in fully registered form, without coupons, in minimum denominations of $2,000 of principal amount and in integral multiples of $1,000 in excess thereof. A Holder may transfer or exchange Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Registrar need not transfer or exchange any Notes (i) in respect of which a Change of Control Repurchase Notice has been given and not withdrawn (except, in the case of a Note to be repurchased in part, the portion of the Note not to be repurchased), (ii) that is to be repurchased pursuant to a Net Proceeds Offer (except, in the case of a Note to be repurchased in part, the portion of the Note not to be repurchased) or (iii) after the Company has delivered a Notice of Redemption.

8.      <u>Amendment, Supplement and Waiver</u>. Subject to certain exceptions, the Indenture permits the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and any Security Documents to be amended or supplemented with the written consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes. In certain circumstances, the Company and the Trustee may also amend or supplement the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or any Security Documents without the consent of any Holder. Subject to certain exceptions, the Indenture permits the waiver of certain Events of Default or the noncompliance with certain provisions of the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and any Security Documents with the written consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes.

In addition, (x) subject to the terms of the Intercreditor Agreement, any amendment to, or waiver of, the provisions of the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement or any Security Document that has the effect of releasing all or substantially all of the Collateral from the Note Liens or (y) any changes in the provisions of the Intercreditor Agreement or the Indenture or any material change in the provisions in the Security Documents, in each case dealing with the application of proceeds of Collateral upon exercise of remedies with respect to such Collateral that adversely affects the Holders, shall require the consent of the Holders of at least 75% in

A-8

aggregate principal amount of the Notes then outstanding under the Indenture (including any consents obtained in connection with a tender offer or exchange for the Notes).

9.    Defaults and Remedies. Subject to the immediately following paragraph, if an Event of Default specified in the Indenture occurs and is continuing, the Trustee, by delivering a written notice to the Company, or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, by delivering a written notice to the Company and the Trustee, may declare all the Notes to be due and payable immediately by delivering notice to the Company. In addition, certain specified Events of Default will cause the Notes to become immediately due and payable without the Trustee or Holders taking any action.

Holders may not enforce the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and any Security Documents except as provided in the Indenture. The Trustee may refuse to enforce the Indenture, the Notes, the Note Guarantees, the Intercreditor Agreement and any Security Documents unless it receives indemnity or security satisfactory to it. Holders of a majority of the principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power, subject to certain limitations set forth in the Indenture. Subject to certain exceptions, the Trustee may withhold from Holders notice of any continuing Event of Default or Default if it determines that withholding notice is in their interest.

10.    Persons Deemed Owners. The Holder of this Note will be treated as the owner of this Note for all purposes.

11.    Unclaimed Money or Notes. The Trustee and the Paying Agent will return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the Notes that remain unclaimed for two years, subject to applicable unclaimed property law. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors, unless an applicable abandoned property law designates another Person.

12.    Trustee Dealings with the Company. The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not the Trustee.

13.    Calculations in Respect of Notes. Except as otherwise provided in the Indenture, the Company will be responsible for making all calculations called for under the Notes and the Indenture. The Company will make these calculations in good faith and, absent manifest error, its calculations will be final and binding on all Holders.

14.    No Recourse Against Others. A director, officer, employee or stockholder, as such, of the Company or any Guarantor will not have any liability for any obligations of the Company or the Guarantors under the Notes or the Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Note,

A-9

#88605336v6

each Holder waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes

15.     Authentication. This Note will not be valid until an authorized signatory of the Trustee manually signs the Trustee's certificate of authentication on the other side of this Note.

16.     Abbreviations. Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= custodian), and U/G/M/A (= Uniform Gift to Minors Act).

17.     GOVERNING LAW. THE INDENTURE AND THE NOTES WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

18.     CUSIP and ISIN Numbers. Pursuant to a recommendation promulgated by the Committee on Uniform Note Identification Procedures and the International Securities Identification Numbers Organisation, the Company has caused CUSIP and ISIN numbers to be printed on the Notes, and the Trustee may use CUSIP and ISIN numbers in any notices as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice, and reliance may be placed only on the other identification numbers placed thereon.

        The Company will furnish to any Holder, upon written request and without charge, a copy of the Indenture which has in it the text of this Note. Requests may be made to:

Contura Energy, Inc.
[•]

A-10

#88605336v6

## OPTION OF HOLDER TO ELECT PURCHASE

[•]
[•]

      The undersigned registered owner of this Note hereby acknowledges receipt of a notice from Contura Energy, Inc. (the "**Company**") as to the occurrence of a Change of Control or Asset Sale or Casualty or Condemnation Event with respect to the Company and specifying the Change of Control Repurchase Date or the date (the "**Net Proceeds Offer Settlement Date**") that Notes will be purchased pursuant to the Net Proceeds Offer, as applicable, and requests and instructs the Company to pay to the Holder hereof in accordance with the applicable provisions of the Indenture referred to in this Note (1) the entire principal amount of this Note, or the portion thereof (that is equal to $1,000 principal amount or an integral multiple of $1,000 in excess thereof (so long as the remaining portion of this Note equals $2,000 or an integral multiple of $1,000 in excess thereof)) below designated, and (2) if such Change of Control Repurchase Date or the Net Proceeds Offer Settlement Date, as applicable, does not occur during the period after a Regular Record Date and on or prior to the corresponding Interest Payment Date, accrued and unpaid interest, if any, thereon to, but excluding, such Change of Control Repurchase Date or Net Proceeds Offer Settlement Date, as applicable. The amount the Company is required to repurchase in the case of a Net Proceeds Offer is subject to reduction as and to the extent provided in Section 4.13 of the Indenture.

Principal amount to be repaid (if less than all): $ ,000

Signature Guaranteed

_____
Participant in a Recognized Signature

Guarantee Medallion Program

By: _____
Authorized Signatory

A-11

*[Include for Global Note]*

**SCHEDULE OF INCREASES AND DECREASES OF GLOBAL NOTE**

Initial Principal Amount of Global Note: $[ ]

| Date | Amount of Increase in Principal Amount of Global Note | Amount of Decrease in Principal Amount of Global Note | Principal Amount of global Note After Increase or Decrease | Notation by Registrar Custodian |
|------|------|------|------|------|

A-12

#88605336v6

**EXHIBIT B**

**FORM OF TRANSFER CERTIFICATE**

CONTURA ENERGY, INC.
10.00% SENIOR SECURED FIRST LIEN NOTES

Transfer Certificate

In connection with any transfer of any of this Note, the undersigned registered owner of this Note hereby certifies, with respect to $ principal amount of the above-captioned Notes presented or surrendered on the date hereof (the "**Surrendered Note**") for registration of transfer, or for exchange or conversion where the securities issuable upon such exchange or conversion are to be registered in a name other than that of the undersigned registered owner (each such transaction being a "**Transfer**"), that such Transfer complies with the restrictive legend set forth on the face of the Surrendered Note for the reason checked below:

The Transfer of the Surrendered Note is being made to the Company or a Subsidiary thereof; or

The Transfer of the Surrendered Note complies with Rule 144A under the Securities Act; or

The Transfer of the Surrendered Note is being made pursuant to an effective registration statement under the Securities Act; or

The Transfer of the Surrendered Note is being made pursuant to another available exemption from the registration requirement of the Securities Act.

Date:_____

By:  _____

(If the registered owner is a corporation, partnership or fiduciary, the title of the Person signing on behalf of such registered owner must be stated.)

Signature Guaranteed

_____
Participant in a Recognized Signature

Guarantee Medallion Program

By:_____
    Authorized Signatory

B-1

**EXHIBIT C**

[FORM OF SUPPLEMENTAL INDENTURE]

SUPPLEMENTAL INDENTURE (this "**Supplemental Indenture**") dated as of [ ], among [NEW GUARANTOR] (the "**New Guarantor**"), a subsidiary of CONTURA ENERGY, INC. (or its successor), a Delaware corporation (the "Company"), and [•], a national banking association, as trustee (the "**Trustee**") and collateral agent under the indenture referred to below.

WHEREAS the Company (or its successor) has heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise modified, the "**Indenture**") dated as of July [15], 2016, providing for the issuance of the Company's 10.00% Senior Secured First Lien Notes (the "**Notes**"), initially in an aggregate principal amount of three hundred million dollars ($300,000,000);

WHEREAS Section 4.16 of the Indenture provides that, under certain circumstances, the Company is required to cause the New Guarantor to execute and deliver to the Trustee a supplemental indenture pursuant to which the New Guarantor shall unconditionally guarantee all the obligations of the Company under the Notes and the Indenture pursuant to a Note Guarantee on the terms and conditions set forth herein; and

WHEREAS pursuant to Section 9.01(b) of the Indenture, the Trustee and the Company are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders (as defined in the Indenture) as follows:

1. Defined Terms. As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined. The words "**herein,**" "**hereof**" and "**hereby**" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2. Agreement to Guarantee. The New Guarantor hereby agrees, jointly and severally with all existing Guarantors (if any), to unconditionally guarantee the Obligations of the Company under the Notes and the Indenture on the terms and subject to the conditions set forth in Article 11 of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

3. Notices. All notices or other communications to the New Guarantor shall be given as provided in Section 14.02 of the Indenture.

C-1

#88605336v6

4.  Ratification of Indenture; Supplemental Indentures Part of Indenture. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder shall be bound hereby.

5.  Governing Law. THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6.  Trustee Makes No Representation. The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

7.  Counterparts. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8.  Effect of Headings. The Section headings herein are for convenience only and shall not affect the construction thereof.

C-2

#88605336v6

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

CONTURA ENERGY, INC.

By: _____
Name:
Title:

[NEW GUARANTOR]

By: _____
Name:
Title:

[•],
as Trustee and collateral agent

By: _____
Name:
Title:

C-3

#88605336v6

**SCHEDULE I**

**SCHEDULE OF EXISTING INDEBTEDNESS**

1. **Contura Energy, Inc.**

Amounts as of [•]

#88605336v6

<u>**SCHEDULE II**</u>

**SCHEDULE OF EXISTING INVESTMENTS**

1.    The following Affiliates and Joint Ventures:

| Name of Affiliate | Jurisdiction of Incorporation | Percentage of Voting Stock Owned by Company |
|---|---|---|
| | | |

SII-1

#88605336v6

| Name of Affiliate | Jurisdiction of Incorporation | Percentage of Voting Stock Owned by Company |
|---|---|---|
| | | |

2.    The following Subsidiaries:

| Name of Affiliate | Jurisdiction of Incorporation | Percentage of Voting Stock Owned by Administrative Borrower[4] |
|---|---|---|
| | | |

---

[4] Directly or indirectly through its subsidiaries, nominees or trustees. Unless otherwise noted in this Schedule II, all companies have only a single class of equity interests.

SII-2

#88605336v6

| Name of Affiliate | Jurisdiction of Incorporation | Percentage of Voting Stock Owned by Administrative Borrower[5] |
|---|---|---|
| | | |

---

[5] Directly or indirectly through its subsidiaries, nominees or trustees. Unless otherwise noted in this Schedule II, all companies have only a single class of equity interests.

SII-3

#88605336v6

| Name of Affiliate | Jurisdiction of Incorporation | Percentage of Voting Stock Owned by Administrative Borrower[6] |
|---|---|---|

[6] Directly or indirectly through its subsidiaries, nominees or trustees. Unless otherwise noted in this Schedule II, all companies have only a single class of equity interests.

SII-4

#88605336v6

| Name of Affiliate | Jurisdiction of Incorporation | Percentage of Voting Stock Owned by Administrative Borrower[7] |
|---|---|---|

---

[7] Directly or indirectly through its subsidiaries, nominees or trustees. Unless otherwise noted in this Schedule II, all companies have only a single class of equity interests.

SII-5

#88605336v6

**SCHEDULE III**

**SCHEDULE OF EXISTING LIENS**

#88605336v6

## EXHIBIT I.A.132

**Principal Terms of the GUC Distribution Note**

NAI-1501346351v1

**EXHIBIT I.A.132**

**PRINCIPAL TERMS OF THE GUC DISTRIBUTION NOTE[1]**

On the Effective Date, if the First Lien Lender Distributable Cash Recovery Threshold is not met, NewCo will issue an unsecured, non-interest bearing promissory note.  The definitive documentation governing the promissory note shall provide generally for the following:

| | |
|---|---|
| Obligor | NewCo |
| Payee | Holders of Allowed Category 1 General Unsecured Claims |
| Guarantor(s) | To Be Determined |
| Principal Amount | $5,500,000.00 |
| Interest Rate | 5.00% |
| Maturity | 18 months after the Effective Date |
| Amortization | None |
| Security | None |
| Other Key Terms | Restrictions against (i) NewCo issuing additional debt and preferred equity that is secured, senior or structurally senior to, or *pari passu* with, the GUC Distribution Note and (ii) the sale of all or substantially all of the assets of NewCo. |

---

[1]   Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

## EXHIBIT I.A.162

**Principal Terms of the NewCo ABL Facility**

**EXHIBIT I.A.162**

**PRINCIPAL TERMS OF THE NEWCO ABL FACILITY[1]**

On the Effective Date, Contura Energy, Inc. shall enter into a new delayed-draw term loan facility.  The definitive documentation governing such facility shall generally provide for the following terms:

| | |
|---|---|
| Borrower | Contura Energy, Inc. |
| Guarantor | Each of the Borrower's existing and newly acquired or created material wholly-owned domestic restricted subsidiaries, and any other subsidiaries or parent entities of the Borrower that from time to time guaranty the $300 million takeback notes financing (the "Takeback Notes") (collectively, "Guarantors" and, together with Borrower, "Loan Parties") |
| Obligation | The obligations under the Facility (as such term is defined below) shall be secured on a first priority basis by all the Loan Parties' existing and future ABL Priority Collateral (to be defined in a customary manner in the definitive documents) and on a second priority basis by all of the Loan Parties' existing and future Notes Priority Collateral (to be defined in a customary manner in the definitive documents) |
| Facility Amount | A senior secured multiple draw term loan facility (the "Facility", and the loans thereunder, the "Loans") in the maximum funded principal amount of $42.5 million. Loans under the Facility to be made in not more than three drawings during the period commencing not earlier than 15 days following closing and ending on the date that is six months following closing.[2] Funding shall not be permitted to the extent the excess of pro forma Collateral Value over the aggregate amount of outstanding Loans and other credit exposure, if any, under the Facility (including other permitted pari passu debt for borrowed money and issued letters of credit (excluding, for the avoidance of doubt, any cash collateralized letters of credit) incurred as additional obligations under the Facility (with limitations on such debt and letters of credit to be agreed upon in the definitive documents)) (the "Outstandings") would be less than the greater of (x) $8 million and (y) 18% of the Outstandings (the greater of (x) and (y), the "Required Coverage Amount"); and prepayment of the Loans shall be required to the extent at any time the Outstandings are such that the excess of Collateral Value over |

---

[1]     Capitalized terms not otherwise defined in this exhibit shall have the meaning ascribed to them in the Plan.

[2]     Timeline may be modestly extended to account for solicitation period mechanics.

| | |
|---|---|
| | Outstandings is less than the Required Coverage Amount. |
| | "Collateral Value" means, with respect to the Loan Parties at any time, the sum of (i) 85% of the value of eligible accounts receivable plus (ii) 65% of the value of eligible inventory plus (iii) 100% of qualified cash subject to control agreements in favor of the Facility. |
| Interest Rate | At the option of the Borrower (i) LIBOR plus 5.0% (with a LIBOR floor of 1.0%) or (ii) base rate plus 4.0% (with a base rate floor of 2.0%) |
| Maturity | Four years from the closing date of the Facility |
| Amortization | None |
| Representations and Warranties | Customary and appropriate for facilities of this type |
| Affirmative Covenants | Customary and appropriate for facilities of this type |
| Negative Covenants | Customary and appropriate for facilities of this type; provided, however, that the Facility shall permit debt, loans, liens, investments, dividends, distributions, prepayments, or asset sales (other than a sale or disposition of all or substantially all the assets of the Borrower and its subsidiaries) to be made if immediately before and after giving effect to such transaction, on a pro forma basis, the excess of Collateral Value over Outstandings shall at least equal the Required Coverage Amount; provided, however, that in no event shall any consensual liens be permitted on the ABL Priority Collateral (other than certain non-material liens incurred in the ordinary course of business and other liens to be agreed upon in the definitive documents) other than those securing the Facility. |
| Financial Covenants | None |
| Events of Default | Customary and appropriate for facilities of this type |

## EXHIBIT I.A.169

## Principal Terms of the NewCo Preferred Interests

**EXHIBIT I.A.169**

**PRINCIPAL TERMS OF THE NEWCO PREFERRED INTERESTS[1]**

As set forth in the Plan, holders of Allowed Second Lien Noteholder Claims may receive, subject to the rights of the *Ad Hoc* Committee of Second Lien Noteholders to allocate such consideration, the Second Lien NewCo Equity Distribution, which includes a distribution of NewCo Preferred Interests where certain conditions related to value are met.

Specifically, pursuant to Section I.A.223 of the Plan, holders of Allowed Second Lien Noteholder Claims would receive NewCo Preferred Interests of an aggregate value equal to the total value of the NewCo Equity to be received (as of the Effective Date) less $300 million. Because the value of the NewCo Equity is expected to be less than $300 million on the Effective Date, however, holders of Allowed Second Lien Noteholder Claims are not expected to receive any NewCo Preferred Interests.  Accordingly, no principal terms of such NewCo Preferred Interests are described herein.

---

[1]   Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

# EXHIBIT I.A.170

**Principal Terms of the NewCo Warrant Agreement**

NAI-1501346351v1

**EXHIBIT I.A.170**

**PRINCIPAL TERMS OF THE NEWCO WARRANT AGREEMENT[1]**

On the Effective Date, NewCo will issue the NewCo Warrants, which shall provide generally for the following:

| | |
|---|---|
| Issuer | NewCo |
| Type of Security | Seven-year warrants exercisable for NewCo Common Stock or Exchange Property (as defined below).  The NewCo Warrants will be held in DTC and generally freely transferable (subject to applicable securities laws and contractual restrictions). |
| Exercise Price | The aggregate exercise price for all NewCo Warrants shall be equal to (i) 100% recovery for the First Lien Lenders on par, *plus* accrued and unpaid interest (at the non-default rate) as of the Petition Date, *less* the aggregate amount of all cash or cash equivalents distributed to the First Lien Lenders under the Plan *less* the face amount or aggregate liquidation preference of Takeback/Preferred Consideration, *divided by* (ii) the percentage determined by dividing the amount of NewCo Common Stock issued to the First Lien Lenders by the Plan, by the amount of NewCo Common Stock issued to the First Lien Lenders, the Second Lien Noteholders and the holders of Category 2 General Unsecured Claims by the Plan. |
| Exercise | The NewCo Warrants shall be exercisable at any time from and after the Effective Date until the seventh anniversary of the Effective Date.<br><br>Exercises that are net-settled shall value a share of NewCo Common Stock (i) by reference to its daily volume-weighted average price for the 10 trading days prior to exercise (if the NewCo Common Stock is listed on the New York Stock Exchange, the NASDAQ Global Market or the NASDAQ Global Select Market (the "Principal Exchanges")) and (ii) otherwise, generally, by reference to an independent and nationally recognized investment banking or valuation firm's appraisal of fair market value in accordance with IRS Revenue Ruling 59-60. |

---

[1] Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

| | |
|---|---|
| Other Key Terms | The NewCo Warrants will include standard anti-dilution adjustments, and an adjustment for any issuance of NewCo Common Stock at a price below the Exercise Price.<br><br>Upon the occurrence of a merger or other transaction pursuant to which NewCo Common Stock is converted into or exchanged for cash, securities or other property, the NewCo Warrants shall become exercisable for the type and amount of property (the "<u>Exchange Property</u>") that a holder of NewCo Common Stock would have been entitled to receive in such transaction; *provided* that if the Exchange Property consists solely of cash, the NewCo Warrants shall be automatically exercised for cash.<br><br>If NewCo Common Stock is not listed on a Principal Exchange, NewCo shall deliver to holders of NewCo Warrants, within 90 days after each fiscal year end, annual audited financial statements, which shall include (i) a calculation of EBITDA with a reconciliation to the audited operating and cash flow statements and (ii) a management discussion and analysis of NewCo consistent with the requirements of Regulation S-K for the last fiscal year.<br><br>Further, if NewCo Common Stock is not listed on a Principal Exchange, NewCo shall deliver to holders of NewCo Warrants an appraisal of fair market value of the  NewCo Common Stock, (i) within 90 days after each fiscal year end, (ii) within 45 days after June 30 of the fifth through seventh fiscal years and (iii) after June 30 of any fiscal year and subject to certain conditions, upon request of a holder of NewCo Warrants. |

## EXHIBIT I.A.211

**Principal Terms of the Reorganized ANR Preferred Interests**

**EXHIBIT I.A.211**

**Principal Terms of the Reorganized ANR Preferred Interests[1]**

On the Effective Date, Reorganized ANR will issue the Reorganized ANR Preferred Interests which shall provide generally for the following:

| Issuer | Reorganized ANR |
|---|---|
| Type of Security | Preferred Stock |
| Liquidation Preference | *Series A Preferred Interests*: <br><br> • 65% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR until the aggregate of all such amounts equals $75,000,000; and <br><br> • 50% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR in excess of $75,000,000. <br><br> *Series B Preferred Interests*: <br><br> • 3% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR until the aggregate of all such amounts equals $75,000,000; and <br><br> • 3% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR in excess of $75,000,000. |
| Conversion Rights | None |
| Security | None |
| Other Key Terms | *Priority*:  Parity with Reorganized ANR Common Stock (subject to special distribution allocation). Junior to any subsequently created class of capital stock designated as senior to Reorganized ANR Preferred Interests (subject to the the consent of the holders of such interests). <br><br> *Voting Rights*:  One vote per share of held on the applicable record date. |

---

[1]  Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

**EXHIBIT I.A.216**

**Principal Terms of the Resolution of Reclamation Obligations**

## PRINCIPAL TERMS OF RESOLUTION OF RECLAMATION OBLIGATIONS[1]

The Debtors anticipate that the Resolution of Reclamation Obligations will consist of the following agreements (collectively, the "Agreements"):

- an agreement (the "Reclamation Funding Agreement") among the Debtors, NewCo and the applicable regulatory authorities for each of the states where the Reorganized Debtors will hold mining assets following the Effective Date (collectively, the "Regulatory Authorities") providing for the provision and allocation among the Regulatory Authorities of certain funds by NewCo and the Reorganized Debtors to support the Reorganized Debtors' performance of their reclamation obligations; and

- separate agreements (collectively, the "Reclamation Settlement Agreements") among the Debtors, NewCo and each of the Regulatory Authorities providing for the use of the funds allocated to the applicable Regulatory Authority, pursuant to the Reclamation Funding Agreement, and other matters relating to environmental reclamation in the applicable state.

The Debtors are currently working, in consultation with applicable counterparties, to resolve a number of outstanding issues with respect to each of the agreements comprising the Resolution of Reclamation Obligations.  In connection with this process, the Debtors and the applicable counterparties may agree to revise certain provisions of such agreements.  As a result, although the Debtors do not believe that any revisions are likely to be material, the terms of the agreements summarized herein remain subject to change.

This summary is provided solely for the convenience of parties in interest.  In the event of any conflict between this summary and any of the definitive documents, the applicable definitive documents shall govern.

---

[1]  Capitalized terms not otherwise defined herein have the meanings given to them in the *Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (as it may be modified, supplemented or amended, the "Plan"), the solicitation version of which is attached as Exhibit A to the *Notice of Filing of Solicitation Versions of (A) Second Amended Joint Plan of Reorganization and (B) Related Second Amended Disclosure Statement* (Docket No. 2594).

*The Reclamation Funding Agreement*

| | |
|---|---|
| Establishment of the Restricted Cash Reclamation Accounts | The Agreements provide for the Debtors' establishment of an interest bearing segregated deposit account for each Regulatory Authority in which the applicable Regulatory Authority will hold a first priority security interest, perfected by "control" under the Uniform Commercial Code.<br><br>The Restricted Cash Reclamation Accounts will be funded in accordance with the Agreements.  Certain such funds are subject to allocation among the Restricted Cash Reclamation Accounts pursuant to the Reclamation Funding Agreement. |
| NewCo Periodic Reclamation Payments | NewCo will pay the aggregate amount of $50,000,000 into the various Restricted Cash Reclamation Accounts according to the following schedule:<br><br>• $8,000,000 immediately upon the Effective Date;<br>• $10,000,000 on the anniversary of the Effective Date in each of 2017, 2018, and 2019; and<br>• $12,000,000 on the anniversary of the Effective Date in 2020. |
| NewCo Contingent Payment Obligation | NewCo will pay up to an aggregate amount of $50,000,000 in annual installments into the various Restricted Cash Reclamation Accounts as a contingent payment obligation from 2021 through 2025 solely to the extent that:<br><br>• the Reorganized Debtors do not make Free Cash Flow contributions equal to or exceeding such amount through December 31, 2020; or<br>• Free Cash Flow contributions are reduced by the payment of the Reorganized ANR Contingent Revenue Payment. |
| Reorganized Debtor Periodic Reclamation Payments | The Reorganized Debtors will pay the aggregate amount of $109,000,000 into the various Restricted Cash Reclamation Accounts according to the following schedule:<br><br>• $5,000,000 in 2016;<br>• $10,000,000 in each of 2017 and 2018; and<br>• $12,000,000 in each year from 2019 through 2025.<br><br>All such payments will be made in equal monthly installments in the year in which they are due. |

| | |
|---|---|
| Reorganized Debtor Excess Cash Flow Payments | On a quarterly basis, the Reorganized Debtors will pay 50% of the Free Cash Flow into the Restricted Cash Reclamation Accounts until reclamation is completed or the balances in the Restricted Cash Reclamation Accounts equals or exceeds 125% of the estimated total remaining cost of reclamation, mitigation and water treatment. |
| Allocation of Periodic Contributions | For the period from the Effective Date through December 31, 2018, the foregoing contributions will be allocated among the various Restricted Cash Reclamation Accounts based upon the Debtors' current relative asset retirement obligations in each state, as follows: 83% for West Virginia; 11.25% for Kentucky; 4% for Virginia; 1% for Illinois; and 0.75% for Tennessee. <br><br> The allocation of Periodic Contributions to the Restricted Cash Reclamation Accounts shall be reassessed and adjusted bi-annually beginning on January 1, 2019 based upon the estimated total cost of remaining reclamation in each state. |
| Surety Collateral Returns | In addition to the foregoing allocated contributions to the Restricted Cash Reclamation Accounts, any collateral returned to the Reorganized Debtors from any surety bond issuer will be paid into the Restricted Cash Reclamation Account of the applicable Regulatory Authority. |
| Parent Guaranty | NewCo's obligations under the Funding Agreement will be guaranteed by its parent, if any. |

NAI-1501350329v5

*The Reclamation Settlement Agreements*

| Operation of Mining Sites | The Reorganized Debtors may mine coal at their sites other than those with only reclamation activities to be completed (the "Reclaim-Only Sites") and, with certain exceptions, may remove coal incidental to their reclamation activities at Reclaim-Only Sites. |
|---|---|
| Continuation of Existing Bonds | All bonds associated with permits being retained by the Reorganized Debtors shall remain in place or, with respect to commercial bonds, shall be replaced with surety bonds or other financial assurance reasonably acceptable to the applicable Regulatory Authority of an identical amount. |
| Self-Bonding in West Virginia | Active, Inactive and Not Started Sites.  The Reorganized Debtors will either:<br><br>• Post bonds with respect to (a) sites where mining operations are active or have not yet been started within 30 days after the Effective Date and (b) inactive mining sites within 180 days after the Effective Date; or<br>• Place in escrow as of the Effective Date:  (a) the amount of collateral required to collateralize any bonds subject to a commitment to issue; (b) the amount of any collateral allocated by the Debtors and the First Lien Lenders to obtain bonds for the applicable sites; (c) $10,000,000, or such lesser amount as may be necessary to provide a cash bond for any sites for which a surety bond has not been posted.<br><br>Additional Financial Assurance.  On or before the Effective Date, the Debtors shall post a letter of credit or cash bond in the amount of $24,000,000, in addition to the $15,000,000 previously posted, pending (a) the Reorganized Debtors' replacement of all self-bonds with commercial bonds or (b) completion of reclamation at all self-bonded sites.<br><br>Reduction in Self-Bonded Reclamation Obligations.  The Reorganized Debtors will reduce their self-bonded obligations with respect to their Reclaim-Only Sites according to the following schedule:<br><br>• 25% by December 31, 2020;<br>• 50% by December 31, 2023; and<br>• 100% by the tenth anniversary of the Effective Date. |

| Establishment and Funding of the Restricted Cash Reclamation Account | In addition to the amounts to be contributed pursuant to the Reclamation Funding Agreement, the Reorganized Debtors will contribute a percentage (ranging from 25% to 75%) of the net cash proceeds of material asset sales in any state into the applicable Restricted Cash Reclamation Account.<br><br>All funds deposited into the Restricted Cash Reclamation Accounts may be used solely to fund reclamation, mitigation and water treatment and management obligations in the applicable state.<br><br>Each Regulatory Authority may audit its applicable Restricted Cash Reclamation Account at any time and from time to time upon reasonable notice. |
|---|---|
| Reclamation Compliance | The Reorganized Debtors will acknowledge their obligations to fully reclaim all of their permitted mining sites in accordance with their permits and all applicable state and federal laws.<br><br>Reclamation of all Reclaim-Only Sites shall be complete or current by the tenth anniversary of the Effective Date. |
| Reclamation Agreements | The Reorganized Debtors and the applicable Regulatory Authority will enter into general and, in appropriate circumstances, site-specific agreements providing a schedule of priority for reclamation, mitigation and water treatment and management. |
| Use of Funds in Restricted Cash Reclamation Account | The Reorganized Debtors may use funds contributed to the Restricted Cash Reclamation Account in the performance of their obligations to complete reclamation, mitigation and water treatment and management only within the applicable state and only in accordance with the applicable permits and any applicable reclamation agreements.<br><br>The Reorganized Debtors may use funds in the Restricted Cash Reclamation Account for mitigation under section 404 of the Clean Water Act only if agreed to by the applicable Regulatory Authority.<br><br>Upon written confirmation from any Regulatory Authority confirming the full reclamation of all permits in the state and the release of the associated bonds, any remaining funds in the Restricted Cash Reclamation Account shall be delivered to the Reorganized Debtors. |

NAI-1501350329v5

| Budgeting and Accounting for Reclamation and Water Treatment | The Reorganized Debtors will provide each Regulatory Authority with initial, long-term and semi-annual budgets, subject to approval by the applicable Regulatory Authority, and quarterly statements of Free Cash Flow and actual-to-budgeted expenditures from the Restricted Cash Reclamation Account.

The Reorganized Debtors shall meet with each Regulatory Authority on a quarterly basis to review (a) reclamation progress, (b) the budgets, (c) reclamation spending from the applicable Restricted Cash Reclamation Account and (d) any matters relevant to its obligations to fund the Restricted Cash Reclamation Account. |
|---|---|
| Other Provisions on Bonding and Reclamation | Permit Revisions.  The Reorganized Debtors and the Regulatory Authorities agree to cooperate and work in good faith with each other with respect to any proposed permit revisions to facilitate the completion of reclamation in a manner consistent with applicable reclamation agreements and applicable state and federal law.

Permit Transfers.  Where applicable, the Regulatory Authorities will review permit transfer applications and complete permit transfers expeditiously, including with respect to the transfer of permits to NewCo.

Site Access.  Without limiting the reclamation obligations of the Reorganized Debtors, the Reorganized Debtors and the Regulatory Authorities will work cooperatively and in good faith to address and remedy any issue with accessing sites that are subject to rejected leases to complete reclamation.

Consent Orders.  The Reorganized Debtors and the applicable Regulatory Authority will negotiate in good faith with respect to any consent orders the Regulatory Authority deems necessary or appropriate to embody the terms of the applicable Reclamation Settlement Agreement and any related reclamation agreements. |
| Limitations on Certain Transactions | Asset Sales.  Subject to certain additional limitations in certain circumstances, the Reorganized Debtors will provide reasonable notice to, and consult with, the applicable Regulatory Authority with respect to all material asset sales involving mining assets or permits in the state.

No Dividends.  Until the Reorganized Debtors have fulfilled their obligations to bond and fully fund reclamation, mitigation and water management and treatment in accordance with the Reclamation Settlement Agreements, they shall not make any dividends or other distributions on account of any equity interests in the Reorganized Debtors, except as provided for under the Plan. |

| Releases | Although the Debtors continue to negotiate the scope of releases provided for under the Reclamation Settlement Agreements with the Regulatory Authorities, the Debtors anticipate that such releases will include the following parties: |
|---|---|
| | • The Debtors' shareholders, directors, officers employees and agents with respect to any claims, violations or conditions arising prior to the Effective Date.  The Regulatory Authorities will not link such parties to any applicant/violator system with respect to any such claim, violation or condition.  Such release shall not apply to any claim or violation with respect to assets and permits being retained by the Reorganized Debtors first arising after the Effective Date (whether or not the conditions giving rise to such claims or violations arose prior to or after the Effective Date). <br> • NewCo, its subsidiaries, the First Lien Lenders, the First Lien Agent, the DIP Lenders, the DIP Agent any affiliate of any of the foregoing and their related parties with respect to any claims, violations or conditions (a) arising prior to the Effective Date or (b) relating to assets or permits retained by the Reorganized Debtors. <br> • The Reorganized Debtors and their related parties with respect to any claims, violations or conditions (a) arising after the Effective Date and (b) relating to assets or permits transferred to NewCo pursuant to the sale. <br><br> In addition, the sale of assets to NewCo pursuant to the Plan and NewCo's funding of the Reorganized Debtors' reclamation obligations pursuant to the Reclamation Funding Agreement shall not cause NewCo or the Reorganized Debtors to be deemed to be owners or controllers of each other or of each other's businesses. |
| Events of Default | Events of default: <br><br> • NewCo's or the Reorganized Debtors' failure to make any payment under the Reclamation Funding Agreement within 10 days of the date it is due; <br> • The failure of the Reorganized Debtors to timely comply with their reclamation obligations; <br> • The Reorganized Debtors' actual expenditures from the reclamation accounts materially exceeding its budgeted expenditures; and <br> • The filing by the Reorganized Debtors of a voluntary petition for relief under the Bankruptcy Code, or an involuntary petition that is not dismissed within 60 days. <br><br> Upon the occurrence and, in certain circumstances, continuation of an Event of Default, the applicable Regulatory Authority may: |

| | |
|---|---|
| | • Terminate the applicable Reclamation Settlement Agreement;<br>• Deliver a notice of termination of the right to use cash in the Restricted Cash Reclamation Account and require that such funds be delivered to the Regulatory Authority;<br>• Draw down on any letter of credit or collateral posted pursuant to the applicable Reclamation Settlement Agreement;<br>• Revoke any or all of the Reorganized Debtors' permits in the state and forfeit the amount of any bonds therefor; and/or<br>• Take any other regulatory or enforcement action permitted by law. |
| Timely Reclamation | If the Reorganized Debtors are performing the reclamation obligations under their permits in accordance with the terms of the Reclamation Settlement Agreements, the time frames and provisions of their permits or any applicable reclamation agreements or consent orders, the Regulatory Authorities shall take no action to forfeit applicable reclamation bonds or issue any notice of noncompliance or cessation order based solely on a failure to undertake reclamation in a timely manner. |
| Incidental Permit Transfers and Phased Bond Releases | Permit Transfers and Phased Bond Releases. After the Effective Date, the applicable permits will be assigned and transferred to NewCo (or its designee) in accordance with the terms of the Stalking Horse APA, and the transferee of the Transferred Permits will assume all liabilities and obligations associated with such permits.<br><br>Phased Bond Releases. Upon submittal of the appropriate replacement bonds to the applicable Regulatory Authority, any corresponding reclamation bonds originally issued to the Debtors with respect to such transferred permits will be released in accordance with the standard permit procedures under applicable State and federal law.<br><br>Permit Transfers Incidental to Restructuring Transactions. To the extent the restructuring transactions contemplated by the Plan, as a technical matter, may require updates, modifications or transfers of any permits that will remain with the Reorganized Debtors, the Reorganized Debtors and the Department agree to cooperate and work in good faith with each other to effectuate such updates, modifications or transfers. |
| Third Party Beneficiaries | The First Lien Lenders and their related parties are the only third party beneficiaries of the Reclamation Settlement Agreements. |

NAI-1501350329v5

# EXHIBIT I.A.222

## Principal Terms of Second Lien Distribution Note

NAI-1501346351v1

**EXHIBIT I.A.222**

**PRINCIPAL TERMS OF THE SECOND LIEN DISTRIBUTION NOTE[1]**

On the Effective Date, if the First Lien Distributable Cash Recovery Threshold is not met, in addition to the payment of $4,000,000 in cash allocated to the applicable Second Lien Noteholders, the Second Lien Distribution Note will be issued, structured not as a note but as a term loan tranche of the NewCo ABL Facility (the "$8.5M Tranche").  As set forth in detail below, the $8.5M Tranche will generally provide for the following:

| | |
|---|---|
| Borrower | Contura Energy, Inc., a Delaware corporation |
| Guarantor | Each of the Borrower's existing and newly acquired or created material wholly-owned domestic restricted subsidiaries, and any other subsidiaries or parent entities of the Borrower that from time to time guaranty the $300 million takeback notes financing (the "Takeback Notes") (collectively, "Guarantors" and, together with Borrower, "Loan Parties") |
| Obligation | The obligations under the $8.5M Tranche shall be secured on a first priority basis by all the Loan Parties' existing and future ABL Priority Collateral (to be defined in a customary manner in the definitive documents) and on a second priority basis by all of the Loan Parties' existing and future Notes Priority Collateral (to be defined in a customary manner in the definitive documents) |
| Facility Amount | $8,500,000.00 |
| Interest Rate | At the option of the Borrower (i) LIBOR plus 5.0% (with a LIBOR floor of 1.0%) or (ii) base rate plus 4.0% (with a base rate floor of 2.0%) |
| Maturity | 18 months from the date of issuance |
| Amortization | None |
| Representations and Warranties | Same as NewCo ABL Facility |
| Affirmative Covenants | Same as NewCo ABL Facility |
| Negative Covenants | Same as NewCo ABL Facility |

---

[1]     Capitalized terms not otherwise defined in this exhibit shall have the meaning ascribed to them in the Plan.

| Financial Covenants | None |
|---|---|
| Events of Default | Same as NewCo ABL Facility |

## EXHIBIT I.A.227

**Principal Terms of Second Lien Noteholder Distribution**

**EXHIBIT I.A.227**

**PRINCIPAL TERMS OF THE SECOND LIEN NOTEHOLDER DISTRIBUTION[1]**


Section I.A.227 of the Plan defines the Second Lien Noteholder Distribution as: "(a) to the extent that the aggregate value of all NewCo Equity plus the First Lien Lender Takeback/Preferred Consideration is greater than $300 million, the Second Lien NewCo Equity Distribution; and (b) the Second Lien Noteholder Reserve Price Assets Distribution."

Pursuant to the Second Lien NewCo Equity Distribution, holders of Allowed Second Lien Noteholder Claims may receive, subject to the rights of the *Ad Hoc* Committee of Second Lien Noteholders to allocate such consideration:  (i) 7.5% of the NewCo Common Stock and (ii) NewCo Preferred Interests representing the aggregate value equal to the to the total value of NewCo Equity as of the Effective Date less $300 million.  Because the value of the NewCo Equity is expected to be less than $300 million on the Effective Date, however, holders of Allowed Second Lien Noteholder Claims are not expected to receive any NewCo Preferred Interests.  Accordingly, the Second Lien NewCo Equity Distribution component of the Second Lien Noteholder Distribution will consist solely of 7.5% of the NewCo Common Stock.

Pursuant to the Second Lien Noteholder Reserve Price Assets Distribution, holders of Allowed Second Lien Noteholder Claims may receive, subject to the First Lien Distributable Cash Recovery Threshold being met and the rights of the Ad Hoc Committee of Second Lien Noteholders to allocate such consideration,[2] a cash distribution equal to the Second Lien Noteholder Distribution Cash Component, which is expected to be, and in no event shall be less than, $12,500,000; <u>provided</u>, however, if the First Lien Distributable Cash Recovery Threshold is not met, subject to the rights of the *Ad Hoc* Committee of Second Lien Noteholders to allocate such consideration, holders of Allowed Second Lien Noteholder Claims may receive the distribution consisting of cash and debt described on Exhibit I.A.222 (Principal Terms of the Second Lien Distribution Note).

Accordingly, the Second Lien Noteholder Distribution is expected to consist of (i) 7.5% of the NewCo Common Stock and (ii) cash in an aggregate amount of, and in no event less than, $12,500,000.00; <u>provided</u>, that if the First Lien Distributable Cash Recovery Threshold is not met, the distribution described in this clause (ii) would consist of the cash and debt described on Exhibit I.A.222 (Principal Terms of the Second Lien Distribution Note).

---

[1]  Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

[2]  The *Ad Hoc* Committee of Second Lien Noteholders may allocate a portion of the cash received by certain second lien noteholders serving as backstop parties as part of the Second Lien Noteholder Reserve Price Assets Distribution to compensate any Second Lien Noteholder who participates in the NewCo ABL Facility and is not an accredited investor and unable to receive Newco Common Stock.

# EXHIBIT I.A.247

**Principal Terms of Series A Preferred Interests**

NAI-1501346351v1

**EXHIBIT I.A.247**

**Principal Terms of Series A Preferred Interests[1]**

On the Effective Date, Reorganized ANR will issue Series A Preferred Interests which shall provide generally for the following:

| | |
|---|---|
| Issuer | Reorganized ANR |
| Type of Security | Preferred Stock |
| Liquidation Preference | 65% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR until the aggregate of all such amounts equals $75,000,000. <br><br> 50% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR in excess of $75,000,000. |
| Dividends and Distributions | 65% of all dividend or distribution amounts until the aggregate of all such amounts equals $75,000,000. <br><br> 50% of all dividend and distribution amounts in excess of $75,000,000. |
| Conversion Rights | None |
| Security | None |
| Other Key Terms | *Priority*:  Parity with Series B Preferred Interests and Reorganized ANR Common Stock (subject to special distribution allocation). Junior to any subsequently created class of capital stock designated as senior to Series A Preferred Interests (subject to the the consent of the holders of the Series A Preferred Interests). <br><br> *Voting*:  One vote per share held on the applicable record date. |

---

[1]     Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

# EXHIBIT I.A.248

## Principal Terms of Series B Preferred Interests

**EXHIBIT I.A.248**

**Principal Terms of Series B Preferred Interests[1]**

On the Effective Date, Reorganized ANR will issue Series B Preferred Interests which shall provide generally for the following:

| | |
|---|---|
| Issuer | Reorganized ANR |
| Type of Security | Preferred Stock |
| Liquidation Preference | 3% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR until the aggregate of all such amounts equals $75,000,000.<br><br>3% of all amounts legally available for distribution to stockholders out of the assets of Reorganized ANR in excess of $75,000,000. |
| Dividends and Distributions | 3% of all dividend or distribution amounts until the aggregate of all such amounts equals $75,000,000.<br><br>3% of all dividend and distribution amounts in excess of $75,000,000. |
| Conversion Rights | None |
| Security | None |
| Other Key Terms | *Priority*:  Parity with Series A Preferred Interests and Reorganized ANR Common Stock (subject to special distribution allocation). Junior to any subsequently created class of capital stock designated as senior to Series B Preferred Interests (subject to the the consent of the holders of the Series B Preferred Interests).<br><br>*Voting*:  One vote per share held on the applicable record date.. |

---

[1]　Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

## EXHIBIT IV.E.2

**Initial Directors and Officers of Each Reorganized Debtor**

NAI-1501346351v1

## EXHIBIT IV.E.2

**Initial Directors and Officers of Each Reorganized Debtor**

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Alex Energy, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Andrew B. McCallister; Michael T. Jarrell; Steven R. Poe; James v. Wood, III; Alan W. Jones<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha American Coal Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha American Coal Holding, LLC | David J. Stetson | President:  David J. Stetson<br>Vice President:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Appalachia Holdings, LLC | David J. Stetson | President:  David J. Stetson<br>Chief Executive Officer:  David J. Stetson<br>Chief Financial Officer:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister<br>General Counsel:  Andrew B. McCallister |
| Alpha Appalachia Services, LLC | David J. Stetson | President:  David J. Stetson<br>Vice President:  Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Coal Resources Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Coal Sales Company, LLC | David J. Stetson | President:  David J. Stetson<br>Senior Vice President – Thermal:  William F. Davison<br>Senior Vice President – Met:  Daniel E. Horn<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Coal West, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Alpha European Sales, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister; William F. Davison<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Alpha India, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Alpha Land and Reserves, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Alpha Midwest Holding Company, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Alpha Natural Resources Holdings, Inc.[1] | W. Douglas Blackburn<br>James K. Martin<br>David J. Stetson | President: David J. Stetson<br>Chief Executive Officer: David J. Stetson<br>Chief Financial Officer: Alan W. Jones, Jr.<br>Senior Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Senior Vice President – Administrative Services: Judy T. Hill<br>Secretary: Andrew B. McCallister<br>General Counsel: Andrew B. McCallister |
| Alpha Natural Resources, Inc. | David J. Stetson | Chief Executive Officer: David J. Stetson<br>Chief Financial Officer: Alan W. Jones, Jr.<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister<br>General Counsel: Andrew B. McCallister |

[1]   Consistent with Section IV.E.2 of the Plan, the board of directors of Alpha Natural Resources Holdings, Inc. will initially consist of five members.  The identity of the two members not listed on this Exhibit shall be disclosed in an amended Exhibit filed prior to the Confirmation Hearing.

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Alpha Natural Resources, LLC | David J. Stetson | President:  David J. Stetson<br>Chief Executive Officer:  David J. Stetson<br>Chief Financial Officer:  Alan W. Jones, Jr.<br>Senior Vice President – Administrative Services: Judy T. Hill<br>Secretary:  Andrew B. McCallister<br>General Counsel:  Andrew B. McCallister |
| Alpha Natural Resources International, LLC | David J. Stetson | President:  David J. Stetson<br>Chief Financial Officer:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Natural Resources Services, LLC | David J. Stetson | President:  David J. Stetson<br>Chief Executive Officer:  David J. Stetson<br>Chief Financial Officer:  Alan W. Jones, Jr.<br>Senior Vice President:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Senior Vice President – Strategic Sourcing and Materials Management:  Macs E. Hall<br>Senior Vice President – Administrative Services: Judy T. Hill<br>Vice President:  John E. Guy; Philip C. Monroe<br>Vice President – Safety and Health:  Brian S. Keaton<br>Vice President – Idle Operations:  Joseph G. Pugh<br>Controller:  Roger D. Ketron<br>Assistant Controller:  John E. Guy<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister<br>General Counsel:  Andrew B. McCallister<br>Assistant General Counsel – Litigation: Philip C. Monroe |
| Alpha PA Coal Terminal, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; William F. Davison<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Shipping and Chartering, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Daniel E. Horn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Sub Eight, LLC | Andrew B. McCallister | President:  Andrew B. McCallister<br>Vice President:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Alpha Sub Eleven, LLC | Alan W. Jones, Jr. | President:  Andrew B. McCallister<br>Vice President:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Sub Nine, LLC | Andrew B. McCallister | President:  Andrew B. McCallister<br>Vice President:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Sub One, LLC | Andrew B. McCallister | President:  Andrew B. McCallister<br>Vice President:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Sub Ten, LLC | Andrew B. McCallister | President:  Andrew B. McCallister<br>Vice President:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Sub Two, LLC | Andrew B. McCallister | President:  Andrew B. McCallister<br>Vice President:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Terminal Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Daniel E. Horn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Alpha Wyoming Land Company, LLC | Alan W. Jones, Jr.<br>David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| AMFIRE, LLC | Alan W. Jones, Jr. | President:  Alan W. Jones, Jr.<br>Vice President:  Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| AMFIRE Holdings, LLC | Alan W. Jones, Jr. | President:  Alan W. Jones, Jr.<br>Vice President:  Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| AMFIRE Mining Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| ANR, Inc.[2] | W. Douglas Blackburn<br>James K. Martin<br>David J. Stetson | Chief Executive Officer:  David J. Stetson<br>Chief Financial Officer:  Alan W. Jones, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister<br>General Counsel:  Andrew B. McCallister |
| Appalachia Coal Sales Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Daniel E. Horn; William F. Davison<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Appalachia Holding Company, LLC | David J. Stetson | President:  David J. Stetson<br>Senior Vice President – Administrative Services: Judy T. Hill<br>Vice President:  Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Aracoma Coal Company, LLC | David J. Stetson | President:  Gary D. Goff<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Axiom Excavating and Grading Services, LLC | David J. Stetson<br>Christopher L. Slone | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Bandmill Coal, LLC | David J. Stetson | President:  James M. Doczi<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Paul Dempsey<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

---

[2]     Consistent with Section IV.E.2 of the Plan, the board of directors of ANR, Inc. will initially consist of five members.  The identity of the two members not listed on this Exhibit shall be disclosed in an amended Exhibit prior to the Confirmation Hearing.

-6-

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Bandytown Coal Company, LLC | David J. Stetson | President:  Kermit E. Fincham, Jr.<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Barbara Holdings, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Barnabus Land Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Michael R. Blackburn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Belfry Coal, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Big Bear Mining Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Black Castle Mining Company, LLC | David J. Stetson | President:  Michael T. Jarrell<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Gary Meade<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Black King Mine Development Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Michael R. Blackburn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Black Mountain Cumberland Resources, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Boone East Development Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Michael R. Blackburn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Brooks Run Mining Company, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Brooks Run South Mining, LLC | David J. Stetson | President:  Benjamin G. Worley<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Buchanan Energy Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Castle Gate Holding Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Clear Fork Coal Company, LLC | David J. Stetson | President:  Philip D. Ellis<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Coal Gas Recovery II, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Crystal Fuels Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Cumberland Coal Resources, LP | N/A | Executive Committee Members:<br>Alan W. Jones, Jr., David J. Stetson |

-7-

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Dehue Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Delbarton Mining Company, LLC | David J. Stetson | President:  Gary Meade<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Delta Mine Holding Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| DFDSTE, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Dickenson-Russell Coal Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Dickenson-Russell Land and Reserves, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| DRIH, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Duchess Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Eagle Energy, LLC | David J. Stetson | President: Kermit E. Fincham, Jr.<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Elk Run Coal Company, LLC | David J. Stetson | President: Steven R. Poe<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister; Michael T. Jarrell; Jeffery A. Ellis; James V. Wood, III<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Emerald Coal Resources, LP | N/A | Executive Committee Members: David J. Stetson, Alan W. Jones, Jr. |
| Enterprise Mining Company, LLC | David J. Stetson | President: Christopher L. Slone<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr..; Christopher L. Slone<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Esperanza Coal Company, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Foundation Mining, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Foundation PA Coal Company, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Foundation Royalty Company, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |
| Freeport Mining, LLC | David J. Stetson | President: David J. Stetson<br>Vice Presidents: Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer: Alan W. Jones, Jr.<br>Secretary: Andrew B. McCallister |

| **REORGANIZED DEBTOR** | **DIRECTORS/MANGERS** | **OFFICERS** |
|---|---|---|
| Freeport Resources Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Goals Coal Company, LLC | David J. Stetson | President:  Kermit E. Fincham, Jr.<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Green Valley Coal Company, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Vice President – Land:  David J. Stetson<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Greyeagle Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Harlan Reclamation Services, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Herndon Processing Company, LLC | David J. Stetson | President:  Thomas M. Haynes, Jr.<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Highland Mining Company, LLC | David J. Stetson | President:  Gary D. Goff<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Hopkins Creek Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Independence Coal Company, LLC | David J. Stetson | President:  Michael T. Jarrell<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Jacks Branch Coal Company, LLC | David J. Stetson | President:  Michael T. Jarrell<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; James V. Wood, III; Christopher M. Hamilton<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Jay Creek Holding, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; David J. Stetson<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Kanawha Energy Company, LLC | David J. Stetson | President:  James V. Wood, III<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Kepler Processing Company, LLC | David J. Stetson | President:  Thomas M. Haynes, Jr.<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Kingston Mining, LLC | David J. Stetson | President:  Benjamin G. Worley<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Kingwood Mining Company, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Knox Creek Coal, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| **Reorganized Debtor** | **Directors/Mangers** | **Officers** |
|---|---|---|
| Lauren Land Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Michael R. Blackburn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Laxare, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Michael R. Blackburn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Litwar Processing Company, LLC | David J. Stetson | President:  William Todd Bowman<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Logan County Mine Services, LLC | David J. Stetson | President:  S. Craig Boggs<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Long Fork Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Lynn Branch Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Maple Meadow Mining Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Marfork Coal Company, LLC | David J. Stetson | President:  Philip D. Ellis<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; James V. Wood, III<br>Vice President – Surface Operations:  Michael T. Jarrell<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| **REORGANIZED DEBTOR** | **DIRECTORS/MANGERS** | **OFFICERS** |
|---|---|---|
| Martin County Coal, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Maxxim Rebuild Company, LLC | David J. Stetson | President:  Anthony W. Keaton<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Vice President – Asset Management Services:  Mark S. Stowers<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Maxxim Shared Services, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Vice Presidents – Operations:  S. Craig Boggs; Jeffery A. Ellis; Jason E. Whitehead<br>Vice President – Human Resources:  Jeffery M. Gillenwater<br>Vice President – Engineering Methods and Standards:  Joseph G. Pugh<br>Vice President – Engineering:  Christopher L. Slone<br>Vice President – Asset Management Services:  Mark S. Stowers<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Maxxum Carbon Resources, LLC | Alan W. Jones, Jr. | President:  Alan W. Jones, Jr.<br>Vice President:  Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| McDowell-Wyoming Coal Company, LLC | David J. Stetson | President:  Thomas M. Haynes, Jr.<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Mill Branch Coal, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| New Ridge Mining Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| **REORGANIZED DEBTOR** | **DIRECTORS/MANGERS** | **OFFICERS** |
|---|---|---|
| New River Energy, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Neweagle Industries, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Nicewonder Contracting, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Russell S. Lambert<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| North Fork Coal, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Omar Mining Company, LLC | David J. Stetson | President:  Kermit E. Fincham, Jr.<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Paramont Coal Company Virginia, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister;  Christopher L. Slone<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Paynter Branch Mining, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Peerless Eagle Coal Company, LLC | David J. Stetson | President:  Jason E. Whitehead<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

-14-

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Pennsylvania Land Holdings Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Pennsylvania Land Resources, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Pennsylvania Land Resources Holding Company, LLC | Alan W. Jones, Jr.<br>David J. Stetson<br>Andrew B. McCallister | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Pennsylvania Services, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Performance Coal Company, LLC | David J. Stetson | President:  Kenneth D. Williams<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Peter Cave Mining Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Pigeon Creek Processing, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Pilgrim Mining Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Pioneer Fuel, LLC | David J. Stetson | President:  Steven R. Poe<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Plateau Mining, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Power Mountain Coal Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Premium Energy, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Rawl Sales & Processing Company, LLC | David J. Stetson | President:  John L. Cline, Jr.<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Vice President – Land:  David J. Stetson<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Republic Energy, LLC | David J. Stetson | President:  Steven R. Poe<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; James V. Wood, III<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Resource Development, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Christopher L. Slone<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Resource Land Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| River Processing, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Riverside Energy Company, LLC | David J. Stetson | President:  Benjamin G. Worley<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Riverton Coal Production, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Road Fork Development Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Benjamin G. Worley; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Robinson-Phillips Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Rockspring Development, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Rostraver Energy Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Michael R. Blackburn<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Rum Creek Coal Sales, LLC | David J. Stetson | President:  Gary D. Goff<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Russell Fork Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Shannon-Pocahontas Coal, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Shannon-Pocahontas Mining Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Sidney Coal Company, LLC | David J. Stetson | President:  Gary Meade<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.; Christopher L. Slone<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Spartan Mining Company, LLC | David J. Stetson | President:  James V. Wood, III<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; Michael T. Jarrell; Gary Meade; Benjamin G. Worley<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Stirrat Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Sycamore Fuels, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| T. C. H. Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Tennessee Consolidated Coal Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Thunder Mining Company II, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Trace Creek Coal Company, LLC | David J. Stetson | President:  Gary D. Goff<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Vice President – Land:  David J. Stetson<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Twin Star Mining, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister; John L. Cline, Jr.<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Wabash Mine Holding Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Warrick Holding Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| West Kentucky Energy Company, LLC | David J. Stetson | President:  David J. Stetson<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| White Buck Coal Company, LLC | David J. Stetson | President:  David H. Decker<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

-20-

| REORGANIZED DEBTOR | DIRECTORS/MANGERS | OFFICERS |
|---|---|---|
| Williams Mountain Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |
| Wyomac Coal Company, LLC | David J. Stetson | President:  Christopher L. Slone<br>Vice Presidents:  Alan W. Jones, Jr.; Andrew B. McCallister<br>Treasurer:  Alan W. Jones, Jr.<br>Secretary:  Andrew B. McCallister |

## EXHIBIT IV.G

**Additional Terms Related to Reorganized ANR Contingent Revenue Payment**

NAI-1501346351v1

**EXHIBIT IV.G**

**ADDITIONAL TERMS RELATED TO TRADABILITY OF
REORGANIZED ANR CONTINGENT REVENUE PAYMENT[1]**

On the Effective Date, Reorganized ANR will enter into a "Contingent Revenue Payment Agreement" which shall provide for the Reorganized ANR Contingent Revenue Payment as more fully discussed in Section IV.G of the Plan.

The Contingent Revenue Payment Agreement shall provide that the rights contained in the securities granted by such agreement shall be generally freely transferable, subject to the rules and procedures of the DTC.

---

[1]    Capitalized terms not otherwise defined in this Exhibit shall have the meaning given to them in the Plan.

NAI-1501370869v1