<div style="display: flex; justify-content: space-between;">

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

-and-

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77979)

</div>

*Attorneys for Debtors and Debtors in Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

### ORDER CONFIRMING SECOND AMENDED JOINT PLAN OF
### <u>REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION, AS MODIFIED</u>

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

having proposed the *Second Amended Joint Plan of Reorganization of Debtors and Debtors in*

*Possession* (in the form dated as of May 27, 2016 and included in the solicitation packages

distributed to the creditors that were entitled to vote thereon, the "<u>May 27 Plan</u>," a true and

correct copy of which (without exhibits) is attached hereto as Appendix I), as modified by the

modifications, true and correct copies of which are annexed hereto as Appendix II (collectively,

the "Modifications," and, together with the May 27 Plan, as modified and including the exhibits

thereto, the "Plan");[1] the Bankruptcy Court having conducted an evidentiary hearing to consider

confirmation of the Plan on July 7, 2016 (the "Confirmation Hearing"); the Bankruptcy Court

having considered:  (i) the testimony of the witnesses called at the Confirmation Hearing, as well

as the declarations included among the exhibits admitted into evidence at the Confirmation

Hearing; (ii) the arguments of counsel presented at the Confirmation Hearing; (iii) the objections

filed with respect to Confirmation of the Plan (any such objection, an "Objection"); (iv) the

resolution, settlement or withdrawal of certain Objections, including as described on the record

of the Confirmation Hearing; and (v) the pleadings and other papers filed by the Debtors and

other parties in support of the Plan, including:

- the *Consolidated Reply in Support of Confirmation of Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (Docket No. 2943) (the "Consolidated Reply");

- the *Debtors' Memorandum of Law in Support of Confirmation of Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (Docket No. 2942) (the "Confirmation Memorandum"), including the summary of the Debtors' compliance with the standards of sections 1129(a) and 1129(b) of the Bankruptcy Code (inclusive of the standards of sections 1122, 1123 and 1124 of the Bankruptcy Code) attached as Exhibit A thereto (the "Confirmation Standards Exhibit");

- the *Declaration of Kevin Carmody in Support of Confirmation of the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (Docket No. 2960) (the "Carmody Declaration");

- the *Declaration of Andy Eidson in Support of Confirmation of the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (Docket No. 2962) (the "Eidson Declaration");

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Plan, the NewCo Asset Sale Motion (as such term is defined below) or the Stalking Horse APA (as such term is defined in the Plan), as applicable.

- the *Declaration of Homer Parkhill in Support of Confirmation of the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (Docket No. 2964) (the "Parkhill Declaration");

- the *Statement and Reply of the Administrative Agents for the Pre-Petition and Debtor-in-Possession Credit Facilities in Support of Confirmation of the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (Docket No. 2944) and the *Declaration of Bradley Meyer, Partner, Ducera Partners LLC, in Support of Confirmation of the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* attached thereto;

- the *Response of Wilmington Trust, National Association to the United States Trustee's Objection to Confirmation of Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession and Joinder in Respect of Debtors' Consolidated Reply in Support of Confirmation* (Docket No. 2945);

- the *Reply of Official Committee of Unsecured Creditors to Objection of U.S. Trustee to Confirmation of Debtors' Second Amended Joint Plan of Reorganization* (Docket No. 2946); and

- the *Joinder of the Ad Hoc Committee of Second Lien Noteholders of Alpha Natural Resources, Inc. to Debtors' Confirmation Brief and Reply Brief* (Docket No. 2949);

and the Bankruptcy Court being familiar with the Plan and other relevant factors affecting these Chapter 11 Cases; the Bankruptcy Court having found that due and proper notice has been given with respect to the Confirmation Hearing and the deadlines and procedures for filing objections to the Plan; the appearance of all interested parties having been duly noted in the record of the Confirmation Hearing; and upon the record of the Confirmation Hearing, and after due deliberation thereon, and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND CONCLUDED that:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.    The findings and conclusions set forth herein and those made on the record during the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to

Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

### JURISDICTION, VENUE AND ELIGIBILITY

B.      The Bankruptcy Court has jurisdiction over this matter and these chapter 11 cases pursuant to 28 U.S.C. § 1334.  Venue in this Court was proper as of the Petition Date and remains proper under 28 U.S.C. §§ 1408 and 1409.

C.      Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).  This Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed, and this Court's exercise of such jurisdiction to enter a Final Order with respect thereto is proper in all respects.

D.      The Debtors were and continue to be eligible for relief under section 109 of the Bankruptcy Code, and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

### JUDICIAL NOTICE

E.      The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Bankruptcy Court or its duly appointed agent, including, but not limited to, all pleadings and other documents filed, all orders entered and all evidence and arguments made, proffered, adduced and/or presented at the various hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases.

### MODIFICATIONS OF THE PLAN

F.      The Modifications do not materially and adversely affect or change the treatment of any Claim against any Debtor or any Interest in any Debtor.  Pursuant to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional

disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or

rejections of the Plan under section 1126 of the Bankruptcy Code, nor do they require that

holders of Claims against the Debtors be afforded an opportunity to change previously cast

acceptances or rejections of the Plan as filed with the Bankruptcy Court.  The filing of the

Modifications attached as Appendix II to the *Notice of Filing of Proposed Form of Order*

*Confirming Second Amended Joint Plan of Reorganization of Debtors and Debtors in*

*Possession, As Modified* filed on July 6, 2016 (Docket No. 2969) and the disclosure of the

Modifications on the record at the Confirmation Hearing, constitute due and sufficient notice

thereof under the circumstances of the Chapter 11 Cases.  Accordingly, the Plan (which consists

of the May 27 Plan as modified by the Modifications) is properly before the Bankruptcy Court,

and all votes cast with respect to the May 27 Plan prior to the Modifications shall be binding and

shall apply with respect to the Plan.

## STANDARDS FOR CONFIRMATION
## UNDER SECTION 1129 OF THE BANKRUPTCY CODE

G.      The evidentiary record of the Confirmation Hearing and the Confirmation

Standards Exhibit support the findings of fact and conclusions of law set forth in the following

paragraphs.

H.      <u>Section 1129(a)(1)</u>.  The Plan complies with each applicable provision of the

Bankruptcy Code.  In particular, the Plan complies with the requirements of sections 1122 and

1123 of the Bankruptcy Code as follows:

1.      In accordance with section 1122(a) of the Bankruptcy Code, Section II.B of the Plan classifies each Claim against and Interest in the Debtors into a Class containing only substantially similar Claims or Interests (*see* Confirmation Standards Exhibit, at 3-4);

2.      In accordance with section 1123(a)(1) of the Bankruptcy Code, Section II.B of the Plan properly classifies all Claims and Interests that require classification (*see id*. at 5);

3.     In accordance with section 1123(a)(2) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes each Class of Claims and Interests that is not impaired under the Plan (*see id.*);

4.     In accordance with section 1123(a)(3) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes the treatment of each Class of Claims or Interests that is impaired under the Plan (*see id.*);

5.     In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Interest of a particular Class unless the holder of such a Claim or Interest has agreed to less favorable treatment (*see id.*);

6.     In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation, including, without limitation, (a) the consummation of the NewCo Asset Sale, (b) the incorporation and authorization of the Global Settlement, the First Lien Lender Settlement, the Second Lien Noteholder Settlement (including the NewCo ABL Facility contemplated thereby), the Environmental Groups Settlement, the Resolution of Reclamation Obligations, the Retiree Committee Settlement, the UMWA Funds Settlement and the Restructuring Transactions and (c) provisions regarding the post-Effective Date corporate management and governance of the Reorganized Debtors (as set forth in Article IV of the Plan) (*see id.* at 5-6);

7.     In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors' charters, bylaws or comparable constituent documents contain provisions prohibiting the issuance of non-voting equity securities and providing for the appropriate distribution of voting power among all classes of equity securities authorized for issuance (*see id.* at 6);

8.     In accordance with section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the Reorganized Debtors' charters, bylaws or comparable constituent documents regarding the manner of selection of officers, directors or comparable positions of the Reorganized Debtors, including, without limitation, the provisions of Section IV.E.2 of the Plan, are consistent with the interests of creditors and equity security holders and with public policy (*see id.* at 7);

9.     In accordance with section 1123(b)(1) of the Bankruptcy Code, Section II.B of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests (*see id.*);

10.    In accordance with section 1123(b)(2) of the Bankruptcy Code, Section II.G and other provisions of the Plan provide for the assumption, assumption and assignment, or rejection of the Executory Contracts or Unexpired Leases of the Debtors that have not been previously rejected pursuant to section 365 of the Bankruptcy Code and orders of the Bankruptcy Court (*see id.*);

11.    In accordance with section 1123(b)(3) of the Bankruptcy Code, Section III.E.2 of the Plan provides that, except as otherwise provided in the Plan; the Global Settlement Stipulation; any contract, instrument, release or other agreement entered into or delivered in connection with the Plan; or any Final Order of the Bankruptcy Court, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and Causes of Action (including any (a) Recovery Actions and (b) Causes of Action identified on the Schedule of any Debtor) that the Debtors or the Estates may hold against any Person (*see id.* at 7-8);

12.    In accordance with section 1123(b)(5) of the Bankruptcy Code, Section II.B of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims in each Class (*see id.* at 8);

13.    In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including, without limitation, the execution and performance of the Exit Financing Documents (as defined below) and the payment of any Liquidated Damage Fee (as defined in the Exit Facility Documents) and expense reimbursement provided for therein and in accordance with their terms, and the provisions of Article III, Article IV, Article V, Article VI, Article VII, Article VIII and Article IX of the Plan (*see id.* at 8-9); and

14.    In accordance with section 1123(d) of the Bankruptcy Code, Section II.G.3 of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.  All Cure Amount Claims will be determined in accordance with the underlying agreements and applicable law.

I.    <u>Section 1129(a)(2)</u>.  The Debtors have complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof.  In particular, the Plan complies with the requirements of sections 1125 and 1126 of the Bankruptcy Code as follows:

1.    In compliance with the *Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Reorganization, (III) Scheduling Hearing on Confirmation of Joint Plan of Reorganization and (IV) Approving Related Notice Procedures*, entered on May 26, 2016 (Docket No. 2549) (the "<u>Disclosure Statement Order</u>"), on or before June 1, 2016, the Debtors, through their Claims and Noticing Agent, Kurtzman Carson Consultants LLC ("<u>KCC</u>"), caused copies of the following materials to be transmitted to all holders of Claims in Classes that were entitled to

vote to accept or reject the Plan (i.e., Allowed Claims in Classes 2, 3, 4, 6A, 6B and 6C):

- a cover letter describing (a) the contents of the Solicitation Package, (b) the contents of the enclosed CD-ROM and instructions for use of the CD-ROM and (c) information about how to obtain, at no charge, paper copies of any materials provided on the CD-ROM;

- notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- the Disclosure Statement (together with the exhibits thereto, including the May 27 Plan);

- the Disclosure Statement Order;

- the Debtors' letter recommending acceptance of the Plan; and

- an appropriate form of Ballot (collectively with the materials described in the preceding bullets, the "Solicitation Package").

*See Affidavit of Service of Jeffrey Miller re: Documents Served on June 1, 2016* (Docket No. 2662).

2.    On May 25, 2016, the Debtors filed Exhibit I.A.72 (Debtors in the Chapter 11 Cases) along with the Plan. *See Notice of Filing of Solicitation Versions of (A) Second Amended Joint Plan of Reorganization and (B) Related Second Amended Disclosure Statement* (Docket No. 2594), dated June 2, 2016, at Annex A.

3.    In compliance with the Disclosure Statement Order, on or before June 1, 2016, the Debtors, through KCC, transmitted (a) the Confirmation Hearing Notice and (b) a Notice of Non-Voting Status (as such term is defined in the Disclosure Statement Order) to all holders of Claims and Interests in the Non-Voting Classes (as such term is defined in the Disclosure Statement Order) other than Classes 7 and 11. *See id*.

4.    In compliance with the Disclosure Statement Order, on or before June 1, 2016, the Debtors, through KCC, transmitted Solicitation Packages to:  (a) the Office of the United States Trustee for the Eastern District of Virginia; (b) all persons or entities that timely filed proofs of Claim on or before the Record Date (as that term is defined in the Disclosure Statement Order), other than a proof of Claim filed by an Indenture Trustee or a Noteholder asserting a Noteholder Claim; (c) all persons or entities identified in the Debtors' respective Schedules filed on October 2, 2015 as holding liquidated, non-contingent, undisputed Claims as of the Record Date; (d) all other known holders of Claims against the Debtors, if any, as of the Record Date; (e) all parties in interest that had filed requests for notice in accordance with Bankruptcy Rule 2002 in the Chapter 11 Cases on or

before the Record Date; and (f) all parties to Executory Contracts or Unexpired Leases with the Debtors, as reflected on the Debtors' books and records or the Schedules, that had not previously been (i) assumed and assigned pursuant to an order of the Court or (ii) rejected by an order of the Court (or had been rejected but with respect to which the bar date for asserting rejection damages Claims had not passed as of the Record Date).  *See id*.

5.  In compliance with the Disclosure Statement Order, on June 7, 2016, the Debtors caused a copy of the Confirmation Hearing Notice to be published in the (a) national edition of *USA Today* and (b) *Richmond Times-Dispatch. See Affidavits of Publication re Notice of (A) Deadline for Casting Votes to Accept or Reject Second Amended Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Second Amended Joint Plan of Reorganization and (C) Related Matters*, dated June 23, 2016 (Docket No. 2760).

6.  On June 22, 2016, the Debtors filed (and made available on the Document Website) the following Confirmation Exhibits:  (a) Exhibit I.A.76 (Schedule of Designated Non-Reserve Price Assets); (b) Exhibit I.A.77 (Schedule of Designated Reserve Price Assets); (c) Exhibit I.A.215 (Reserve Price Assets Schedule); (d) Exhibit I.A.250 (Stalking Horse APA); (e) Exhibit II.G.1.a (Executory Contracts and Unexpired Leases to Be Assumed); (f) Exhibit II.G.4 (Previously Assumed Executory Contracts and Unexpired Leases to Be Assigned); (g) Exhibit II.G.5 (Executory Contracts and Unexpired Leases to Be Rejected); and (h) Exhibit IV.B.1 (Restructuring Transactions).  *See Notice of Filing Certain Exhibits to Second Amended Joint Plan of Reorganization* (Docket No. 2757).

7.  On June 30, 2016, the Debtors filed (and made available on the Document Website) amended versions of the following Confirmation Exhibits: (a) Exhibit II.G.1.a (Executory Contracts and Unexpired Leases to Be Assumed); (b) Exhibit II.G.4 (Previously Assumed Executory Contracts and Unexpired Leases to Be Assigned); and (c) Exhibit II.G.5 (Executory Contracts and Unexpired Leases to Be Rejected).  *See Notice of Filing Certain Amended Exhibits to Second Amended Joint Plan of Reorganization* (Docket No. 2886).

8.  On June 30, 2016, the Debtors filed (and made available on the Document Website) the following Confirmation Exhibits:  (a) Exhibit I.A.61 (Principal Terms of Contingent Credit Support); (b) Exhibit I.A.100 (Principal Terms of the Exit Facility); (c) Exhibit I.A.119 (Form of Promissory Note to Be Issued to the First Lien Lenders by NewCo); (d) Exhibit I.A.132 (Principal Terms of the GUC Distribution Note); (e) Exhibit I.A.162 (Principal Terms of the NewCo ABL Facility); (f) Exhibit I.A.169 (Principal Terms of the NewCo Preferred Interests); (g) Exhibit I.A.170 (Principal Terms of the NewCo Warrant Agreement); (h) Exhibit I.A.211 (Principal Terms of the Reorganized ANR Preferred Interests); (i) Exhibit I.A.216 (Principal Terms of the Resolution of Reclamation Obligations); (j) Exhibit I.A.222 (Principal Terms of Second Lien Distribution Note); (k) Exhibit I.A.227 (Principal Terms of Second Lien Noteholder

Distribution); (l) Exhibit I.A.247 (Principal Terms of Series A Preferred Interests); (m) Exhibit I.A.248 (Principal Terms of Series B Preferred Interests); (n) Exhibit IV.E.1.a (Form Certificates of Incorporation (or Comparable Constituent Documents) for the Reorganized Debtors); (o) Exhibit IV.E.1.b (Form Bylaws (or Comparable Constituent Documents) for the Reorganized Debtors); (p) Exhibit IV.E.2 (Initial Directors and Officers of Each Reorganized Debtor); and (q) Exhibit IV.G (Additional Terms Related to Reorganized ANR Contingent Revenue Payment). *See Notice of Filing Certain Exhibits to Second Amended Joint Plan of Reorganization* (Docket No. 2888) and *Notice of Filing Certain Exhibits to Second Amended Joint Plan of Reorganization* (Docket No. 2889).

9.  On July 6, 2016, the Debtors filed (and made available on the Document Website) amended versions of the following Confirmation Exhibits:  (a) Exhibit I.A.61 (Principal Terms of Contingent Credit Support); (b) Exhibit I.A.100 (Principal Terms of the Exit Facility); (c) Exhibit I.A.132 (Principal Terms of the GUC Distribution Note); (d) Exhibit I.A.170 (Principal Terms of the NewCo Warrant Agreement); and (e) Exhibit IV.E.2 (Initial Directors and Officers of Each Reorganized Debtor). *See Second Notice of Filing Certain Amended Exhibits to Second Amended Joint Plan of Reorganization* (Docket No. 2967).

10.  On July 8, 2016, the Debtors filed (and made available on the Document Website) an amended version of Exhibit I.A.250 (Stalking Horse APA) to the Plan. *See Third Notice of Filing Certain Amended Exhibits to Second Amended Joint Plan of Reorganization* (Docket No. 3002).

11.  The Confirmation Hearing Notice provided due and proper notice of the Confirmation Hearing and all relevant dates, deadlines, procedures and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the Voting Deadline; the Objection Deadline (as such term is defined in the Confirmation Hearing Notice); the time, date and place of the Confirmation Hearing; and the release provisions in the Plan.  *See* Disclosure Statement Order at ¶ 9.

12.  All persons entitled to receive notice of the Disclosure Statement, the Plan and the Confirmation Hearing were given proper, timely and adequate notice in accordance with the Disclosure Statement Order, applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto.  *See* Confirmation Standards Exhibit at 9-10.

13.  The Debtors solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, including, without limitation, the inclusion of a letter from the Debtors recommending acceptance of the Plan in the Solicitation Packages. Accordingly, the Debtors are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section III.E.7 of the Plan.  *See id.*

14.     Claims and Interests in Classes 1, 5 and 11 under the Plan are unimpaired, and such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. *See id*. at 10.

15.     The Plan was voted on by six Classes of impaired Claims that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (i.e., Classes 2, 3, 4, 6A, 6B and 6C). *See id*. at 9-10.

16.     Claims in Class 7 are impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code. To the extent that Class 7 Claims are not eliminated by operation of law in the Restructuring Transactions, such Claims are deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of such Claims and are not entitled to any Distribution under the Plan. Notwithstanding this treatment, however, each holder of a Claim in Class 7 is deemed to have accepted the Plan. *See id.* at 10.

17.     KCC has made a final determination of the validity of, and tabulation with respect to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan, including the amount and number of accepting and rejecting Claims in Classes 2, 3, 4, 6A, 6B and 6C under the Plan. *See generally Declaration of P. Joseph Morrow IV Regarding the Solicitation and Tabulation of Votes on, and the Results of Voting With Respect to, Debtors' Second Amended Joint Plan of Reorganization* (Docket No. 2941) and *Supplemental Declaration of P. Joseph Morrow IV Regarding the Solicitation and Tabulation of Votes on, and the Results of Voting With Respect to, Debtors' Second Amended Joint Plan of Reorganization* (Docket No. 3011) (collectively, the "Voting Declaration").

18.     The Voting Declaration sets forth the tabulation of votes, as required by the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order. *See generally* Voting Declaration.

19.     All six of the impaired Classes that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (i.e., Classes 2, 3, 4, 6A, 6B and 6C) accepted the Plan, consistent with section 1126(c) of the Bankruptcy Code. *See generally* Voting Declaration.

J.     Section 1129(a)(3). The Plan has been proposed in good faith and not by any

means forbidden by law. The Chapter 11 Cases were filed with an honest belief that the Debtors

were in need of reorganization, and the Plan was negotiated and proposed with the intention of

accomplishing a successful restructuring and reorganization and for no ulterior purpose.

The Plan fairly achieves a result consistent with the objectives and purposes of the Bankruptcy

Code. In so finding, the Bankruptcy Court has considered the totality of the circumstances in

these Chapter 11 Cases.  The Plan is the result of extensive good faith, arm's-length negotiations between the Debtors and certain of their principal constituencies (including the Creditors' Committee, the DIP Lenders, the DIP Agents, the First Lien Lenders, the First Lien Agent, the Second Lien Notes Trustee, the *Ad Hoc* Committee of Second Lien Noteholders, the Massey Convertible Notes Trustee, the Retiree Committee and the parties to the other settlements embodied in the Plan or approved by this Order and each of their respective Representatives) and reflects substantial input from the principal constituencies having an interest in the Chapter 11 Cases and, as evidenced by strong creditor support for the Plan (including the acceptance of the Plan by Classes 2, 3, 4, 6A, 6B and 6C) and the numerous settlements embodied in or related to the Plan, achieves the goal of broadly consensual reorganization embodied by the Bankruptcy Code.  Further, as described in greater detail below, the Plan's indemnification, exculpation, release and injunction provisions have been negotiated in good faith, and are consistent with sections 105, 1123(b)(6), 1129 and 1142 of the Bankruptcy Code and applicable law in this Circuit.  *See* Confirmation Standards Exhibit, at 10-11.

K.      Section 1129(a)(4).  No payment for services or costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be made by a Debtor other than payments that have been approved or are subject to approval by order of the Bankruptcy Court, including paragraphs 78-86 of this Order.  Pursuant to Sections II.A.1.h.ii.A and VIII.B of the Plan, and except as otherwise provided under the Plan or herein, all such payments to be made to Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date will be subject to review and approval by the Bankruptcy Court.  *See id.* at 11-12.

L.      Section 1129(a)(5).  The Debtors have disclosed (1) the identities of the officers

and directors of Reorganized ANR and each other Reorganized Debtor and (2) the identity of

any insiders that will be employed or retained by the Reorganized Debtors on Exhibit IV.E.2 to

the Plan.  The compensation of the Reorganized Debtors' directors will be consistent with each

Reorganized Debtor's applicable constituent documents, as disclosed on Exhibits IV.E.1.a

and IV.E.1.b to the Plan.  The Debtors disclosed (1) the affiliations of their proposed respective

directors and officers and (2) the compensation of any insiders to be employed or retained by the

Reorganized Debtors (to the extent not previously disclosed) at or prior to the Confirmation

Hearing.  The prior compensation of the Debtors' officers and directors has been disclosed by the

Debtors in their previous filings with the United States Securities and Exchange Commission

(the "SEC") (including ANR's most recent proxy statement, filed on April 9, 2015).  In addition,

the Debtors disclosed officer and director compensation in Exhibit A to the *Reply in Support of*

*Motion of the Debtors for Entry of an Order (I) Authorizing Payments Under 2015 Annual*

*Incentive Bonus Plan and (II) Approving Key Employee Incentive Plan for Certain Insider*

*Employees for 2016* (Docket No. 1318), dated January 20, 2016.  The proposed directors and

officers for the Reorganized Debtors as set forth on Exhibit IV.E.2 to the Plan are qualified, and

the appointments to, or continuance in, such offices by the proposed directors and officers is

consistent with the interests of holders of Claims and Interests and with public policy and the

terms of the Global Settlement.  *See id.* at 12-13.

M.      The Debtors further disclosed:  (1) the identities of the officers and employees of

the Debtors who will take on interim roles with NewCo and its anticipated affiliates to assist in

efforts to prepare for the closing of the NewCo Asset Sale and other transactions to occur on the

Effective Date (the "Designated Employees"); (2) each Designated Employee's role/title with the

Debtors; and (3) each Designated Employee's role/title on an interim basis with NewCo and its anticipated affiliates.  None of the Designated Employees is a member of executive management of the Debtors or has, or will have, any material decision-making power in connection with the Plan or any aspect of the Chapter 11 Cases.  *See Notice of Appointment of Interim Management of NewCo Entities in Connection with Preparations to Implement the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (Docket No. 2705).  As such, these interim appointments are appropriate.

N.      Section 1129(a)(6).  The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency.  *See* Confirmation Standards Exhibit, at 13.

O.      Section 1129(a)(7).  Each holder of a Claim or Interest in each impaired Class of Claims or Interests that has not accepted the Plan will, on account of such Claim or Interest, receive or retain property under the Plan having a value, as of the Effective Date, that is not less than the amount that such holder would have received or retained if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  The Debtors have demonstrated that the Plan is in the best interests of their creditors.  *See id.* at 13-14.

P.      Section 1129(a)(8).  The Plan has not been accepted by all impaired classes of Claims and Interests because, pursuant to the Disclosure Statement Order, the holders of Claims in Class 8 (Section 510(b) Securities Claims), Class 9 (Section 510(b) Old Common Stock Claims) and Class 10 (Old Common Stock of ANR Interests) are deemed to have rejected the Plan.  Nevertheless, as more fully explained below, the Plan is confirmable because it satisfies section 1129(b)(1) of the Bankruptcy Code with respect to such non-accepting Classes of Claims and Interests.  *See generally* Voting Declaration; Confirmation Standards Exhibit, at 14.

Q.  Section 1129(a)(9).  The Plan provides treatment for Administrative Claims, Priority Tax Claims and Priority Claims that is consistent with the requirements of section 1129(a)(9) of the Bankruptcy Code.  *See* Confirmation Standards Exhibit, at 14-16.

R.  Section 1129(a)(10). The Plan has been accepted by all six classes of impaired Claims that are entitled to vote on the Plan (i.e., Classes 2, 3, 4, 6A, 6B and 6C), determined without including any acceptance of the Plan by any insider.  *See generally* Voting Declaration; Confirmation Standards Exhibit, at 16.

S.  Section 1129(a)(11).  The Plan is feasible, within the meaning of section 1129(a)(11) of the Bankruptcy Code.  The Debtors' projections of the capitalization and financial information of the Reorganized Debtors and NewCo as of the Effective Date are reasonable and made in good faith and Confirmation of the Plan is not likely to be followed by the liquidation (other than the potential liquidation of inactive Debtor entities that no longer serve an ongoing business purpose, as described in Exhibit IV.B.1 to the Plan) or the need for further financial reorganization of the Reorganized Debtors.  *See* Confirmation Standards Exhibit, at 16-17; Carmody Declaration, at ¶¶ 14-27.  The Debtors have demonstrated a reasonable assurance of the Plan's prospects for success and the Reorganized Debtors' ability to comply with their obligations related to Reclamation Activities arising in connection with any Resolution of Reclamation Obligations.  *See* Carmody Declaration, at ¶¶ 14-27.

T.  Section 1129(a)(12).  The Plan provides that Administrative Claims for fees payable pursuant to section 1930 of title 28 of the United States Code will be paid by the Debtors in Distribution Cash equal to the amount of such Administrative Claims on or before the Effective Date.  After the Effective Date, all fees payable pursuant to section 1930 of title 28 of the United States Code will be paid out of the reserves established pursuant to Section V.J of the

Plan by the applicable Reorganized Debtor until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code. *See* Confirmation Standards Exhibit, at 17.

U.      Section 1129(a)(13).  As required by section 1129(a)(13) of the Bankruptcy Code, following the Effective Date of the Plan, and consistent with Section IV.M.2 of the Plan, the payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code) will continue to the extent provided by prior orders of the Bankruptcy Court (including the 1113/1114 Order and the *Stipulation and Agreed Order Among the Debtors, the Retiree Committee and the First Lien Agent:  (I) Resolving Motion of the Debtors, Pursuant to Section 363 of the Bankruptcy Code, for an Order Authorizing Debtors to Terminate Certain Unvested Non-Pension Benefits; and (II) Granting Certain Related Relief* in the form entered by the Bankruptcy Court for the duration of the periods the Debtors have obligated themselves to provide such benefits, thereby satisfying section 1129(a)(13) of the Bankruptcy Code; provided, however, that nothing in this Order shall be construed to restrict or enlarge the Reorganized Debtors' rights to modify any such retiree benefits (including health and welfare benefits) under applicable non-bankruptcy law after the occurrence of the Effective Date.  *See* Confirmation Standards Exhibit, at 17.

V.      Sections 1129(a)(14), 1129(a)(15) and 1129(a)(16).  Sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code do not apply to the Debtors.

W.      Section 1129(b).  Notwithstanding the fact that the Plan does not comply with section 1129(a)(8) of the Bankruptcy Code, the Plan may still be confirmed because it does not "discriminate unfairly" and is fair and equitable with respect to Classes 8, 9 and 10

(i.e., the Classes that are impaired and deemed to reject the Plan) (the "Deemed Rejecting

Classes").

1.   Unfair Discrimination.  The Plan does not discriminate unfairly with respect to holders of Claims and Interests in the Deemed Rejecting Classes because such holders are receiving the same treatment as holders of similarly situated Claims and Interests against the applicable Debtor. *See* Confirmation Standards Exhibit, at 18-19.

2.   Fair and Equitable.  The Plan is fair and equitable with respect to each Deemed Rejecting Class because (a) it does not provide a recovery on account of any Claim or Interest that is junior in priority to the impaired, non-accepting Classes of Claims and Interests and (b) no holder of a Claim or Interest in any Class will receive or retain property under the Plan that has a value greater than 100% of such holder's Allowed Claim or Interest. *See id.* at 19.

X.   Section 1129(c).  The Plan is the only plan that has been filed in the Chapter 11

Cases that has been found to satisfy the requirements of subsections (a) and (b) of section 1129

of the Bankruptcy Code.  Accordingly, the requirements of section 1129(c) of the Bankruptcy

Code have been satisfied.

Y.   Section 1129(d).  No party in interest, including, but not limited to, any

Governmental Unit, has requested that the Bankruptcy Court deny Confirmation of the Plan on

grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the

application of section 5 of the Securities Act, and the principal purpose of the Plan is not such

avoidance.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the

Bankruptcy Code.

Z.   Section 1129(e).  None of the Chapter 11 Cases are small business cases within

the meaning of the Bankruptcy Code.  Accordingly, section 1129(e) of the Bankruptcy Code is

inapplicable to these Chapter 11 Cases.

## COMPLIANCE WITH BANKRUPTCY RULE 3016

AA.     The Plan is dated and identifies the Debtors as the proponents of the Plan, thereby satisfying Bankruptcy Rule 3016(a).

BB.     The Disclosure Statement and the May 27 Plan were filed together under Docket No. 2594 in the Chapter 11 Cases, thereby satisfying Bankruptcy Rule 3016(b).

CC.     The injunction provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined by the Plan and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

## BURDEN OF PROOF AND
## SATISFACTION OF CONFIRMATION REQUIREMENTS

DD.     The Debtors, as proponents of the Plan, have met their burden of proving each element of section 1129 of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for confirmation.  Each witness who testified on behalf of the Debtors or the First Lien Lenders at or in connection with the Confirmation Hearing was credible, reliable and qualified to testify as to the topics addressed in his testimony.

EE.     Based upon the foregoing, and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Debtors have satisfied all of the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## THE NEWCO ASSET SALE

FF.     On March 11, 2016, the Bankruptcy Court entered the Bidding Procedures Order (Docket No. 1754), which, among other things, (1) approved the Bidding Procedures and (2) authorized certain related contract procedures.

GG.    As evidenced by the affidavits of service previously filed with the Bankruptcy Court, including the affidavits identified in paragraph I above, and based on the representations of counsel at the Confirmation Hearing:  (1) proper, timely, adequate and sufficient notice of the Core Asset Sale Motion, the NewCo Asset Sale and the time and place of the hearing to approve the NewCo Asset Sale has been provided in accordance with sections 102(1), 363, 365 and 1123(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and the Bidding Procedures Order; (2) such notice was good and sufficient, appropriate under the particular circumstances and consistent with all applicable orders of the Bankruptcy Court; and (3) no other or further notice of the Core Asset Sale Motion, the NewCo Asset Sale or the time and place of the hearing to approve the NewCo Asset Sale shall be required.  Notice of the Core Asset Sale Motion, the NewCo Asset Sale and the time and place of the hearing to approve the NewCo Asset Sale was also posted electronically on the KCC website, at http://www.kccllc.net/alpharestructuring, and published in *USA Today*.

HH.    The Debtors served (1) the Auction and Hearing Notice, (2) individualized notice of any potential assumption and assignment of Executory Contracts and Unexpired Leases in connection with the Core Asset Sale Motion on each non-Debtor counterparty thereto pursuant to the Bidding Procedures Order and/or (3) a notice of the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan on all counterparties thereto, consistent with the terms of the Contract Procedures Order.  All such parties have been provided with a reasonable opportunity to object and be heard with respect to the Core Asset Sale Motion and the relief requested therein, including the assumption and assignment of any Executory Contracts and Unexpired Leases in connection therewith and any Cure Amount Claims in respect thereof.

II.      A reasonable opportunity to object or be heard regarding the relief requested in the Core Asset Sale Motion and granted herein has been afforded to all interested persons and entities.

JJ.      As demonstrated by the record of the Confirmation Hearing and the docket in the Chapter 11 Cases, the Debtors have demonstrated good and sufficient reasons for the Bankruptcy Court to approve the NewCo Asset Sale and the other relief granted herein with respect to the NewCo Asset Sale.

KK.      The Debtors and their Professionals marketed the NewCo Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order.  Based upon the record of the Chapter 11 Cases, creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the NewCo Assets.  The Debtors and their Professionals, agents and other representatives: (1) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the NewCo Assets; and (2) faithfully executed their duties in (a) considering all offers and bids throughout the Bidding Process and (b) determining that NewCo is the Successful Bidder for the NewCo Assets.  *See* Parkhill Declaration ¶¶ 16-32.

LL.      In accordance with the Bidding Procedures Order, the Stalking Horse APA was deemed a Qualified Bid, and NewCo was eligible to participate in the Bid Process and any Auction as a Qualified Bidder.

MM.    No other bids received for the NewCo Assets as part of the Bid Process were determined to be Qualified Bids after consultation with the Consultation Parties.  As such, after consultation with the Consultation Parties, the Debtors designated NewCo's bid as reflected in the Stalking Horse APA as the Successful Bid for the NewCo Assets.  *See Notice of Designation*

*of Successful Bidder for Reserve Price Assets and Cancellation of Auction for Reserve Price Assets* (Docket No. 2419).

NN.    As set forth in the DIP Credit Agreement and the Lender Settlements Order, the First Lien Lenders have the right to credit bid under section 363(k) of the Bankruptcy Code with respect to (1) debt under the First Lien Credit Agreement and (2) the First Lien Lender Diminution Claim.  NewCo is duly authorized to and may credit bid such debt and claims on behalf of the First Lien Lenders.  The Purchase Price to be paid by NewCo is fair and constitutes reasonably equivalent value and reasonable market value for the NewCo Assets.

OO.    The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the NewCo Assets.  The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.

PP.    The Debtors are the sole and lawful owners of the NewCo Assets, and the NewCo Assets are property of the Debtors' Estates under section 541 of the Bankruptcy Code.

QQ.    NewCo is a purchaser in good faith with respect to the NewCo Assets, as that term is used in section 363(m) of the Bankruptcy Code.  The Stalking Horse APA was negotiated, proposed and entered into by the parties in good faith, from arm's length bargaining positions and without collusion or fraud, and NewCo is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the NewCo Asset Sale.  None of the Debtors nor NewCo has engaged in conduct that would cause or permit the NewCo Asset Sale to be voided under section 363(n) of the Bankruptcy Code.

RR.    The Debtors' determination that the NewCo Asset Sale set forth in the Plan and the Stalking Horse APA constitutes the highest and best offer for the NewCo Assets is a valid

and sound exercise of the Debtors' business judgment.  The Debtors have determined that consummating the NewCo Asset Sale under the terms set forth in the Plan, the Stalking Horse APA and the related agreements contemplated thereby (collectively, the "Related Agreements") represents the best opportunity for the Debtors' Estates to realize the greatest value for the NewCo Assets and will provide a greater recovery for the Debtors' creditors, including through a reduction of claims against the Debtors' Estates, than would be provided by any other practical or available alternative.

SS.    Sound business reasons have been articulated for performing the obligations set forth in the Stalking Horse APA and for selling the NewCo Assets as set forth in the Core Asset Sale Motion and the Plan, and it is a reasonable exercise of business judgment by the Debtors to execute, deliver and consummate the Stalking Horse APA with NewCo and the transactions contemplated thereby.

TT.    Except as specifically provided in the Stalking Horse APA or this Order, NewCo shall not assume or become liable for any Encumbrances (as defined below) relating to the NewCo Assets sold by the Debtors.  Any such valid and enforceable Encumbrances shall be treated in accordance with the terms of the Plan.

UU.    The Debtors may sell the NewCo Assets free and clear of any Encumbrances because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of such Encumbrances who did not object, or who withdrew their objections, to the NewCo Asset Sale, the Core Asset Sale Motion or the Plan are deemed to have consented to the sale of the NewCo Assets free and clear of any Encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.

VV. The terms and conditions set forth in the Stalking Horse APA, including the total consideration to be realized by the Debtors, are fair and reasonable, and the transaction contemplated by the Stalking Horse APA is in the best interests of the Debtors, their creditors and their Estates.

WW. A valid business purpose exists for approval of the NewCo Asset Sale contemplated by the Plan and the Core Asset Sale Motion pursuant to sections 363(b), 363(f) and 363(m) of the Bankruptcy Code. As a condition to purchasing the NewCo Assets, NewCo requires that: (1) the NewCo Assets be sold free and clear of Encumbrances; and (2) NewCo shall have no liability whatsoever for any obligations of, or claims (including, without limitation, as defined in section 101(5) of the Bankruptcy Code) against, the Debtors except as expressly provided in the Stalking Horse APA, the Related Agreements or this Order. Except as otherwise explicitly provided in the Stalking Horse APA, the Related Agreements or this Order, NewCo will not enter into the Stalking Horse APA and consummate the transactions contemplated thereby, thus adversely affecting the Debtors' Estates and undermining the ability of the Debtors to consummate the Plan, if: (a) the NewCo Asset Sale were not free and clear of Encumbrances; (b) if NewCo or any of its affiliates were or would be liable for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code and any claims on a theory of successor liability) against, the Debtors or any of their employees or affiliates; (c) the corporate structure of NewCo or the transactions contemplated in the Stalking Horse APA were in a form other than the form described in the Stalking Horse APA and the Plan; and (d) the injunction, exculpation and release provisions in the Plan were not approved by the Bankruptcy Court.

XX.     The transfer of the NewCo Assets to NewCo is or will be a legal, valid and effective transfer of the NewCo Assets, and will vest NewCo with all right, title and interest in and to the NewCo Assets, free and clear of any Encumbrances, except those Encumbrances explicitly and expressly permitted by the Stalking Horse APA, the Related Agreements or this Order.

YY.     An injunction against creditors and third parties pursuing Encumbrances is necessary to induce NewCo to close the NewCo Asset Sale.  The issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtors' Estates and will benefit all creditors.

ZZ.     The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the NewCo Asset Sale have been satisfied.

AAA.  No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the NewCo Asset Sale or related transactions contemplated by the Stalking Horse APA.

## RESTRUCTURING TRANSACTIONS

BBB.  The Restructuring Transactions described in Article IV of, and Exhibit IV.B.1 to, the Plan are the result of extensive negotiations between the Debtors and certain of their primary stakeholder constituencies and have been proposed in good faith.  The Restructuring Transactions are critical to the success and feasibility of the Plan and are necessary and appropriate for the consummation of the Plan (including the NewCo Asset Sale), and such transactions are in the best interests of the Debtors, the Reorganized Debtors, their Estates and creditors.  The Restructuring Transactions promote, among other things:  (1) a tax-efficient, value-generating structure for the NewCo Asset Sale; and (2) the creation of a rational corporate structure for the Reorganized Debtors, facilitating appropriate financial reporting according to

business lines.  Over time, a number of corporate acquisitions and divestitures by the Debtors have resulted in a complex corporate structure.  The Restructuring Transactions work to streamline this corporate structure to better reflect and serve the Reorganized Debtors' operational functions.  The Restructuring Transactions have not been entered into (1) fraudulently, nor with the intent to hinder, delay or defraud any entity to which the Debtors or the Reorganized Debtors are, or may become, indebted on or after the Effective Date; or (2) for the principal purpose of avoiding taxes or the application of section 5 of the Securities Act.  The NewCo Asset Sale and all transactions constituting Restructuring Transactions are transactions under the Plan and are therefore entitled to the exemptions provided in section 1146 of the Bankruptcy Code.

## IMPLEMENTING DOCUMENTS

CCC.   All documents and agreements necessary to implement the Plan and all other relevant and necessary documents (including, but not limited to, (1) the Stalking Horse APA and the Related Agreements, (2) the agreements underlying the Resolution of Reclamation Obligations and (3) the Exit Facility) are essential elements of the Plan and have been negotiated in good faith and at arm's-length.  Entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, their Estates and the holders of Claims and Interests and shall, upon completion of documentation and execution, be valid, binding and enforceable agreements and shall not be in conflict with any federal, state or local law.  The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements and/or the principal terms thereof.  The Debtors and the Reorganized Debtors, as applicable, are authorized, without any further notice, action, order or approval of the Bankruptcy Court, to finalize, execute and deliver all agreements, documents, instruments and

certificates relating to the Plan and to perform their obligations under such agreements, documents, instruments and certificates, including, without limitation, the Exit Financing Documents and the Resolution of Reclamation Obligations.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

DDD.  Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the occurrence of the Effective Date, Section II.G of the Plan provides for the assumption, assumption and assignment, or rejection of certain Executory Contracts and Unexpired Leases. The Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan and are in the best interests of the Debtors, their estates, holders of Claims and other parties in interest in the Chapter 11 Cases. *See* Eidson Declaration ¶ 34.  The Debtors have filed Exhibits II.G.1.a, II.G.4 and II.G.5 to the Plan (as they may have been amended or supplemented) and either have provided or will provide notice of the Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases and any related Cure Amount Claims in accordance with the procedures (collectively, the "Contract Procedures") set forth in or incorporated into the Contract Procedures Order.

EEE.  The Executory Contracts and Unexpired Leases assumed by the Debtors and assigned to NewCo (or its designated subsidiaries) in connection with the NewCo Asset Sale are an integral part of the NewCo Assets and, accordingly, such assumptions and assignments are reasonable and enhance the value of the Estates.  Counterparties to Executory Contracts and Unexpired Leases who did not timely object to the assignment of such agreements to NewCo (or its designated subsidiaries) shall be deemed to have waived any objections to the assignability of such agreements and consented to such assignment.

FFF.   The Debtors have (1) cured, or provided adequate assurance of cure of, any default by the Debtors existing prior to the Closing Date under any of the Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors and assigned to NewCo within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (2) compensated, or provided adequate assurance of compensation, to the non-Debtor counterparties for any actual pecuniary loss to such party resulting from a default by the Debtors prior to the Effective Date under such contracts and leases, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. NewCo has provided adequate assurance of its (or its designated subsidiaries') future performance of and under such contracts and leases within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

## SETTLEMENTS AND RELEASES

GGG.   Pursuant to Bankruptcy Rule 9019(a), and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan (collectively, the "Settlements"), including, but not limited, to:  (1) the Unencumbered Assets Settlement; (2) the Diminution Claim Allowance Settlement; (3) the Global Settlement; (4) the Resolution of Reclamation Obligations, including agreements substantially in the forms filed as Exhibits to the (a) *Notice of Filing of Certain Agreements with the United States in Connection with Resolution of Reclamation Obligations* on July 7, 2016 (Docket No. 2985) and (b) *Second Notice of Filing Certain Agreements in Connection with Resolution of Reclamation Obligations* filed on July 8, 2016 (Docket No. 3010); (5) the First Lien Lender Settlement; (6) the Second Lien Noteholder Settlement; (7) the Environmental Groups Settlement; (8) the Retiree Committee Settlement; and (9) the UMWA Funds Settlement.

HHH.  Based upon the representations and arguments of counsel to the Debtors, the Global Settlement Parties, the Reclamation Obligation Resolution Parties, the Retiree Committee, the non-Debtor counterparties to the Environmental Groups Settlement (collectively, the "Environmental Groups") and the UMWA Funds and all other testimony either actually given or proffered and other evidence introduced at the Confirmation Hearing and the full record of these Chapter 11 Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, this Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of all Settlements, including the Global Settlement, the Resolution of Reclamation Obligations, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement and the UMWA Funds Settlement, and the effectuation of the transactions previously approved by the Bankruptcy Court in, among others, the Global Settlement Stipulation, the Lender Settlements Order and the Retiree Committee Settlement provided for herein or in the Plan.  Such approval is appropriate because, among other things:

- the Settlements reflect a reasonable balance between certainty and the risks and expenses of both future litigation and the continuation or conversion of these Chapter 11 Cases;

- absent the Settlements, there is a likelihood of complex and protracted litigation with the attendant expense, inconvenience and delay that would risk the Debtors' reorganization efforts and the rehabilitation of the Debtors' businesses;

- the Settlements fall well within the range of reasonableness for the resolution of complex litigation;

- the Settlements are fair, equitable and reasonable and in the best interests of the Debtors and their Estates, the Reorganized Debtors and their respective property, creditors and equity security holders, other parties in interest in the Chapter 11 Cases and the general public;

- the Settlements will maximize the value of the Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating

> outside of bankruptcy protection in the ordinary course of business and in compliance with applicable law;
>
> • the Settlements are essential to the successful implementation of the Plan;
>
> • the Settlements are supported by, as applicable, the Debtors, the Global Settlement Parties, the Retiree Committee, the Environmental Groups and the UMWA Funds;
>
> • the Resolution of Reclamation Obligations is supported by the Reclamation Obligation Resolution Parties;
>
> • the Settlements are the product of arm's length bargaining and good faith negotiations between and among the Debtors, the Global Settlement Parties, the Retiree Committee, the Environmental Groups and the UMWA Funds, all of which are represented by knowledgeable, competent and experienced counsel; and
>
> • the Resolution of Reclamation Obligations is the product of arm's length bargaining and good faith negotiations between and among the Debtors, the First Lien Lenders, NewCo and the Reclamation Obligation Resolution Parties.

*See* Parkhill Declaration ¶¶ 8-15; Eidson Declaration ¶¶ 15-31.

III.   Further, based on the record before the Bankruptcy Court, including, but not limited to, the evidence proffered, adduced and/or presented at the Confirmation Hearing, which is reasonable, persuasive and credible, and has not been controverted by other evidence, the release, exculpation and injunction provisions set forth in the Plan (collectively, the "Plan Releases") are necessary and fair because:  (1) the non-Debtor Released Parties have contributed substantial assets to the reorganization and/or were critical contributors to the Settlements that make Confirmation of the Plan possible; (2) the Plan Releases are (i) essential to the Debtors' reorganization, (ii)  in the best interests of the Debtors, their Estates and parties in interest, (iii) essential consideration for the substantial concessions and contributions made by the Released Parties throughout the Chapter 11 Cases, (iv) a critical element of the integrated and related Settlements that are the foundation of the Plan and (v) integral to the structure of the Plan

NAI-1501465154v6                    -29-

and formed part of the agreement among all parties in interest embodied thereby; (3) all impaired Classes entitled to vote on the Plan have voted overwhelmingly to accept the Plan; (4) the Plan provides increased recoveries to various Classes affected by the Plan Releases who would receive smaller recoveries, or no recoveries at all, if the Debtors were liquidated or in the absence of some or all of the Settlements; and (5) the Plan Releases do not relieve any Released Party of any liability arising out of an act or omission constituting gross negligence or willful misconduct.

JJJ.    Accordingly, without limiting the provisions of paragraph 36 hereof, the Bankruptcy Court finds that: (1) the release of potential Claims belonging to the Debtors or their Estates pursuant to the Plan represent a sound and valid exercise of the Debtors' business judgment; (2) the third-party releases (including non-consensual third party releases) contemplated by the Plan are necessary and fair under the circumstances of the Chapter 11 Cases and consistent with applicable law; and (3) the Plan Releases were proposed in good faith, are essential to the Plan, are appropriately tailored, are intended to promote finality and prevent parties from attempting to circumvent the Plan's terms and are consistent with the Bankruptcy Code and applicable law and, therefore, valid and binding. The third-party releases were disclosed in the Disclosure Statement and the Ballots and therefore consented to by all parties who voted in favor of the Plan, but, subject to the provisions of paragraph 36 hereof, shall also be binding on creditors who did not vote in favor of the Plan. In light of all the circumstances, the Plan Releases are consistent with the prevailing law in this District and are fair to the releasing parties.

KKK.  This Court has jurisdiction under sections 157 and 1334(a) and (b) of title 28 of the United States Code to approve the releases, exculpations and injunctions set forth in

Section III.E of the Plan.  Section 105(a) of the Bankruptcy Code permits issuance of the

injunctions and approval of the releases and exculpations set forth in Section III.E of the Plan.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

LLL.    The conditions precedent to Confirmation of the Plan set forth in Section III.A of

the Plan have been satisfied or duly waived in accordance with Section III.C of the Plan.

## RETENTION OF JURISDICTION

MMM. The Bankruptcy Court properly retains jurisdiction over the matters set forth in

Article VIII of the Plan and, subject to Article VIII of the Plan, the Bankruptcy Court properly

retains jurisdiction over (1) any matter arising under the Bankruptcy Code, (2) arising in, or

related to, the Chapter 11 Cases, the Plan or this Order after Confirmation thereof and after the

Effective Date and (3) any other matter or proceeding that is within the Bankruptcy Court's

jurisdiction pursuant to 28 U.S.C. § 1334 or 28 U.S.C. § 157.

## MISCELLANEOUS

NNN.   All findings and conclusions contained in the Lender Settlements Order, the

Global Settlement Stipulation, the Resolution of Reclamation Obligations, the First Lien Lender

Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the

Retiree Committee Settlement and the UMWA Funds Settlement are included herein by

reference, the same as if such findings and conclusions were set forth herein in full.  Except as

may be set forth explicitly herein or in an amendment to any of the documents executed in

connection with Lender Settlements Order, the Global Settlement, the Resolution of Reclamation

Obligations, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the

Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds

Settlement, this Order does not modify or amend any of the provisions thereof.

NAI-1501465154v6

OOO.  The Debtors have and continue to maintain adequate and sufficient security for any and all liabilities related to Black Lung Benefits in accordance with applicable law.

PPP.    All parties have had a full and fair opportunity to litigate all issues raised or that might have been raised in the Objections, and the Objections have been fully considered by the Bankruptcy Court.

QQQ.  Given the facts and circumstances of these Chapter 11 Cases, it is appropriate that the 14-day stay imposed by Bankruptcy Rules 3020(e) and 7062(a) be waived.  Time is of the essence in closing the NewCo Asset Sale, and the Debtors and NewCo intend to close the NewCo Asset Sale as soon as practicable in accordance with the terms of the Stalking Horse APA.  Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk their appeal being foreclosed as moot.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, AS FOLLOWS:

A.     **Confirmation of Plan**

1.      The Plan and each of its provisions (whether or not specifically approved herein) are CONFIRMED in each and every respect, pursuant to section 1129 of the Bankruptcy Code; provided, however, that if there is any direct conflict between the terms of the Plan and the terms of this Order, the terms of this Order shall control.

2.      The Effective Date of the Plan shall occur on the date determined by the Debtors when the conditions set forth in Section III.B of the Plan have been satisfied or, if applicable, have been waived in accordance with Section III.C of the Plan.  For the avoidance of doubt, consistent with the terms thereof, the condition to the Effective Date set forth at Section III.B.8 of the Plan may not be waived without the prior written consent of the UMWA Funds.

3.      Any objections or responses to Confirmation of the Plan and the approval of the NewCo Asset Sale or any other relief granted herein, and any reservation of rights contained therein, that (a) have not been withdrawn, waived or settled prior to the entry of this Order or (b) are not cured by the relief granted herein, are hereby OVERRULED in their entirety and on their merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.  For the avoidance of doubt, and without limiting the foregoing, any timely objections to the Cure Amount Claims and to the assumption or assumption and assignment of any Executory Contracts or Unexpired Leases, other than issues relating to the assignability of such agreements, are preserved to the extent provided in the Contract Procedures Order.

**B.    Approval of NewCo Asset Sale**

4.      The Stalking Horse APA, the Related Agreements (including, but not limited to, any transition agreements that may be entered into between the Debtors, the Reorganized Debtors and NewCo or any affiliates thereof) and the transactions contemplated thereby, including the Restructuring Transactions, are approved, and the Debtors are authorized and empowered to enter into the Stalking Horse APA and the Related Agreements (including any transition agreements) and to perform their obligations thereunder subject to the terms and conditions thereof.  Upon entry of this Order, the Debtors are further authorized and empowered to take any and all actions as may be necessary or appropriate to effectuate the terms of the Stalking Horse APA and the Related Agreements, including expending any necessary or appropriate funds post-Confirmation, without any further corporate authorization or order of the Bankruptcy Court.

5.      The Debtors are hereby authorized and empowered, pursuant to sections 105, 363(b), 363(f) and 1123(b)(4) of the Bankruptcy Code, to sell the NewCo Assets to NewCo pursuant to and in accordance with the terms and conditions of the Stalking Horse APA, and,

pursuant to section 363 of the Bankruptcy Code, title to the NewCo Assets shall pass to NewCo at the closing under the Stalking Horse APA (the "Closing"), in accordance with Section 5.09(b) of the Stalking Horse APA, free and clear of any and all mortgages, options, pledges, liens, charges, security interests, encumbrances, restrictions, leases, licenses, easements, liabilities or claims of any nature whatsoever, direct or indirect, whether accrued, absolute, contingent or otherwise, including, without limitation, any of the foregoing related to applicable environmental laws and regulations with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing, any Black Lung Claims, any Coal Act Claims, any MEPP Claims and any other employee, workers' compensation, occupational disease or unemployment or temporary disability related Claim, in each case other than the Assumed Liabilities and Permitted Encumbrances (as such terms are defined in the Stalking Horse APA) (collectively, and excluding such Assumed Liabilities and Permitted Encumbrances, the "Encumbrances").  All such Encumbrances upon the NewCo Assets shall be and hereby are unconditionally released, discharged and terminated, with all such Encumbrances to be treated in accordance with the terms of the Plan.

6.     Without limiting the generality of the foregoing paragraph, neither NewCo, any affiliate of NewCo, any of the First Lien Lenders nor the First Lien Agent, nor any director, officer, agent, representative, successor, assign, equity holder, employee or professional of any of the foregoing shall, except as expressly provided in the Stalking Horse APA (including with respect to the assumption and assignment of any Executory Contract or Unexpired Lease), assume or be obligated to pay, perform or otherwise discharge any:

(a)     Black Lung Liabilities and Workers' Compensation Liabilities related to the NewCo Assets, including to and with respect to Business Employees and former employees who worked or who were employed at the NewCo Assets, including, but not limited to, any such Black Lung Liabilities and

Workers' Compensation Liabilities of the Sellers or any of their respective Affiliates with respect to any of their respective predecessors, other than (i) with respect to any Transferred Employee (except as otherwise set forth in the following clause (iii)), any and all claims relating to employee health and safety, including claims for injury, sickness, disease or death, including any Workers' Compensation Liabilities, to the extent arising out of an event or injurious exposure that occurs after the Closing, (ii) with respect to any Transferred Employee represented by the UMWA, other than Black Lung Liabilities, any and all claims relating to employee health and safety, including claims for injury, sickness, disease or death, to the extent arising out of an event or injurious exposure that occurs before, on or after the Closing and (iii) any and all Black Lung Liabilities with respect to any Transferred Employee (including any Transferred Employee represented by the UMWA) who is employed by NewCo or the applicable Designated Buyer for a period of not less than one year (as defined in 20 C.F.R. § 725.101(a)(32)) if NewCo or the applicable Designated Buyer is otherwise liable to such Transferred Employee for such Black Lung Liabilities;

(b)     Liability with respect to any coal sales, natural gas sales in any way related to the PLR Complex (it being understood that certain of such Liabilities have been assigned to the purchaser of such assets pursuant to the PLR Order and the agreements attached thereto) or other goods sold or any service provided by the Debtors, including any such Liability (as defined in the Stalking Horse APA) or obligation (i) pursuant to any express or implied representation, warranty, agreement, coal specification undertaking or guarantee made by the Debtors, or alleged to have been made by the Debtors, (ii) imposed or asserted to be imposed by operation of Applicable Law or (iii) pursuant to any doctrine of product liability; or

(c)     Liability (as defined in the Stalking Horse APA) arising under, relating to or with respect to any multiemployer pension plan.

7.      The Debtors and NewCo are authorized to and shall comply with all provisions of the Stalking Horse APA.

8.      The transfer of the NewCo Assets to NewCo pursuant to the Stalking Horse APA constitutes a legal, valid and effective transfer and shall vest NewCo with all right, title and interest of the Debtors in and to the NewCo Assets so transferred, and such transfer shall occur as set forth in the Restructuring Transactions described in Exhibit IV.B.1 to the Plan.

9. This Order and the Stalking Horse APA shall be binding upon, and shall inure to the benefit of, the Debtors, NewCo and their respective successors and assigns, including, without limitation, any Reorganized Debtor and any chapter 11 trustee hereinafter appointed for the Debtors.

10. As of the Closing, each of the Encumbrances against or in the NewCo Assets, if any, shall be deemed to be released.

11. All Avoidance Actions against the persons set forth in Schedule 2.01(n) to the Stalking Horse APA (if any) are hereby released and waived in accordance with Section 2.01(n) of the Stalking Horse APA.

12. Effective as of the Closing, all parties and/or entities asserting Encumbrances or contract rights against the Debtors and/or any of the NewCo Assets (other than rights under the assumed Executory Contracts or Unexpired Leases assigned to NewCo) are hereby permanently enjoined and precluded from, with respect to such Encumbrances or contract rights: (a) asserting, commencing or continuing in any manner any action against NewCo or any Affiliate of NewCo (including, for the avoidance of doubt, the First Lien Lenders) or the First Lien Agent, or any director, officer, agent, representative, successor, assign, equity holder, employee or professional of any of the foregoing (all such entities collectively, the "Protected Parties") or against any Protected Party's assets or properties, including, without limitation, the NewCo Assets; (b) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award, decree or order against the Protected Parties or any properties or assets of the Protected Parties, including, without limitation, the NewCo Assets; (c) creating, perfecting or enforcing any encumbrance of any kind against the Protected Parties or any properties or assets of the Protected Parties, including, without limitation, the NewCo Assets; (d) asserting any

NAI-1501465154v6

-36-

setoff, right of subrogation or recoupment of any kind against any obligation due to the Protected

Parties; and (e) taking any action, in any manner, in any place whatsoever, that does not conform

to or comply with the provisions of the Stalking Horse APA or this Order.

13.    If any person or entity that has filed financing statements, mortgages, mechanic's

liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the

NewCo Assets shall not have delivered to the Debtors prior to the Closing, in proper form for

filing and executed by the appropriate parties, termination statements, instruments of satisfaction

and releases of the Encumbrances that the person or entity has with respect to the NewCo Assets,

the Reorganized Debtors are hereby authorized to execute and file such statements, instruments,

releases and other documents on behalf of the person or entity with respect to the NewCo Assets.

14.    The provisions of this Order authorizing the sale of the NewCo Assets free and

clear of Encumbrances shall be self-executing, and none of the Debtors, the Reorganized

Debtors, NewCo nor any other party shall be required to execute or file releases, termination

statements, assignments, cancellations, consents or other instruments to effectuate, consummate

and/or implement the provisions hereof with respect to such sale; provided, however, that this

paragraph shall not excuse such parties from performing any and all of their respective

obligations under the Stalking Horse APA.  Without in any way limiting the foregoing, NewCo

is empowered to execute and file releases, termination statements, assignments, consents,

cancellations or other instruments to effectuate, consummate and/or implement the provisions

hereof with respect to such sale.

15.    Each and every federal, state and local government agency or department and all

filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of

deeds and other similar persons are hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse APA, the Related Agreements and this Order. A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

16. Consummation of the NewCo Asset Sale and the transactions contemplated by the Stalking Horse APA does not effect a *de facto* merger, consolidation, mere continuation or continuity of enterprise of the Debtors and NewCo or any affiliate of NewCo or result in the continuation of the Debtors' business under the control of NewCo or any affiliate of NewCo. NewCo and its affiliates are not, nor will any of them become by virtue of the NewCo Asset Sale, the alter ego of, a successor in interest to or a continuation of the Debtors, nor is any of NewCo or its affiliates otherwise liable for the Debtors' debts and obligations, unless otherwise specifically provided for in the Stalking Horse APA or pursuant to this Order; provided, however, that NewCo shall be treated as a continuation of and successor to ANR solely for U.S. federal income tax purposes (to the extent provided by the Internal Revenue Code) and section 1145 of the Bankruptcy Code.

17. All entities that are presently, or as of the Closing may be, in possession of some or all of the NewCo Assets are hereby directed to surrender possession of the NewCo Assets to NewCo upon the Closing.

18. In connection with the purchase of the NewCo Assets, NewCo is a purchaser in good faith for fair value within the meaning of section 363(m) of the Bankruptcy Code, and NewCo is entitled to the protections of section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification or appeal of the authorization provided herein to consummate the NewCo Asset Sale shall not affect the validity of the sale to NewCo, unless such authorization is duly stayed pending such appeal prior to the Closing.

19. The NewCo Asset Sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code. The consideration provided by NewCo for the NewCo Assets shall be deemed to constitute reasonably equivalent value and fair consideration.

20. From and after entry of this Order and as long as the Stalking Horse APA has not been terminated pursuant to its terms, none of the Debtors, the Reorganized Debtors, nor any other person shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the NewCo Assets either to the Debtors prior to the Closing for subsequent transfer to NewCo, or to NewCo in accordance with the terms and conditions of the Stalking Horse APA and this Order.

21. For the avoidance of doubt, upon the occurrence of the Closing, except as specifically included in the Assumed Liabilities or set forth in a Final Order of the Bankruptcy Court, neither NewCo, any of its affiliates, any of the First Lien Lenders nor the First Lien Agent shall, or shall be deemed to: (a) be the successor of, or successor employer (as described under the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA) and applicable regulations thereunder) to, the Debtors (including, without limitation, with respect to any collective bargaining agreements, pension plan (including any Pension Plan) or any plan for the provision of medical, surgical or hospital care benefits, or benefits in the event of sickness, accident, disability or death) and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have any successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor, employment or benefits law, *de facto*

merger, substantial continuity, mere continuation or continuity of enterprise, whether known or unknown as of the Closing, then existing or thereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the NewCo Assets, the Debtors or their affiliates or predecessors or any obligations of the Debtors or their affiliates or predecessors arising prior to the Closing; or (c) otherwise be liable in any way with respect to any Excluded Liability; provided, however, NewCo shall be treated as a continuation of and successor to ANR solely for U.S. federal income tax purposes (to the extent provided by the Internal Revenue Code) and section 1145 of the Bankruptcy Code.

22.     This Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, in accordance with the Stalking Horse APA, subject in each case to compliance with any applicable legal requirements under police or regulatory law.  Without limiting the foregoing sentence, no Governmental Unit may revoke or suspend any right, license, trademark or other permission relating to the use of the NewCo Assets sold, transferred or conveyed to NewCo on account of the filing or pendency of these Chapter 11 Cases or the consummation of the NewCo Asset Sale.

23.     Nothing in this Order or the Stalking Horse APA shall release, nullify, preclude or enjoin the enforcement of any police power or regulatory liability to a Governmental Unit that any entity would be subject to as the owner, lessee, permittee, controller or operator of property or a mining operation after the Closing, including, but not limited to, liability for reclamation pursuant to the Surface Mining Control and Reclamation Act ("SMCRA") and applicable state law, whether or not the conditions giving rise to such enforcement arose prior to or after the

Effective Date, provided, however, that nothing in this paragraph shall limit or modify the Resolution of Reclamation Obligations with respect to the parties thereto.

24.     No provision of the Bidding Procedures Order, this Order, the Stalking Horse APA or any Related Agreement (or any other purchase and sale agreement) shall be a ruling or is intended to be construed as a ruling on whether NewCo (or any affiliate thereof) is a successor to the Debtors for purposes of registration and reporting under the federal securities laws (including relevant rules and regulations promulgated thereunder) (the "Federal Securities Laws"), and NewCo's (or any affiliate thereof's) obligation, if any, to file periodic public reports with the SEC shall be governed by applicable provisions of the Federal Securities Laws.  Except as may be expressly set forth herein, nothing in the Bidding Procedures Order, this Order, the Stalking Horse APA or any Related Agreements shall relieve or excuse the Debtors, the Reorganized Debtors, NewCo or any other party from complying with any and all applicable Federal Securities Laws.

25.     As provided in Section 7.14 of the Stalking Horse APA, upon the dissolution of ANR, the Reorganized Debtors will automatically succeed to the rights, and are authorized to assume and perform the obligations, of ANR arising after the Closing under the Transaction Documents (as defined in the Stalking Horse APA).

26.     As of the Closing, all agreements of any kind whatsoever and all orders of the Bankruptcy Court entered prior to the date hereof shall be deemed amended or otherwise modified to the extent required to permit consummation of the NewCo Asset Sale.

27.     The Stalking Horse APA, the Related Agreements and any other related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto in accordance with the terms thereof,

provided that:  (a) an order of the Bankruptcy Court has approved such modification, amendment or supplement; (b) such modification, amendment or supplement is not material; (c) such modification, amendment or supplement is made in the ordinary course of business; or (d) such modification, amendment or supplement is made in accordance with the terms thereof.

28.     In the event of any inconsistencies between this Order and the Stalking Horse APA, this Order shall govern in all respects.

### C.     Approval of Settlements

29.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and pursuant to Bankruptcy Rule 9019, the Settlements set forth in or incorporated into the Plan (including, without limitation, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement, the Global Settlement, the Resolution of Reclamation Obligations, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement and the UMWA Funds Settlement), and all agreements and other documents relating to the foregoing, are approved in all respects on a final, non-contingent basis.

30.     The Debtors and the Reorganized Debtors, as applicable, are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers related to the Settlements, and to take any and all actions reasonably necessary or appropriate to consummate the Settlements.

### D.     Approval of Releases

31.     The Plan Releases are approved in all respects, incorporated herein in their entirety, so ordered and shall be immediately effective on the Effective Date without further order or action on the part of the Bankruptcy Court, any of the parties to such releases or any other party.

32.     Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all Persons who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement, the Global Settlement Stipulation, the Resolution of Reclamation Obligations, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that (a) arises under any transition agreement entered into by the Debtors or the Reorganized Debtors and effective on and following the Effective Date and (b) otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

33.     Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim or Interest, to the fullest extent permissible under law, shall be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such Person has, had or may have against any Released Party (which release will be in addition to the

discharge of Claims and termination of Interests provided herein and under the Plan and the Bankruptcy Code); provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that the foregoing provisions shall not affect any rights to enforce the Plan, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement, the Global Settlement Stipulation, the Resolution of Reclamation Obligations, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement or the other contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan.  For the avoidance of doubt and without limiting any releases granted in the Resolution of Reclamation Obligations, nothing in this paragraph shall release any Person from any liabilities owing to the United States of America.

34.     From and after the Effective Date, except with respect to obligations arising under (a) the Plan, (b) the Unencumbered Assets Settlement, (c) the Diminution Claim Allowance Settlement, (d) the Global Settlement, (e) the Resolution of Reclamation Obligations, (f) the First Lien Lender Settlement, (g) the Second Lien Noteholder Settlement, (h) the Environmental Groups Settlement, (i) the Retiree Committee Settlement, (j) the UMWA Funds Settlement, (k) that certain Agreement to Fund the VEBA between Contura Energy, Inc. and the UMWA, (l) that certain Memorandum of Understanding on Transition of New Labor Agreements among Contura Energy, Inc., the UMWA and Debtors Cumberland Coal Resources, LP, Emerald Coal Resources, LP, Litwar Processing Company, LLC, Power Mountain Coal Company, Goals Coal Company, Bandmill Coal Corporation, Longfork Coal Company, Omar Mining Company and

Dickenson-Russel Coal Company, LLC and (m) that certain Agreement to Mine the Foundation Reserves Under the Terms of the 2016 Agreement between Contura Energy, Inc. and the UMWA, or other obligations assumed in connection with the Plan or this Order, to the fullest extent permitted by applicable law, the Released Parties shall release one another from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way relating to:  (a) any Debtor; (b) the Chapter 11 Cases; (c) the Estates; (d) the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, the Disclosure Statement, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement, the Global Settlement, the Resolution of Reclamation Obligations, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement, or any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party; (e) the process of marketing, selling and disposing of Assets pursuant to the Sale Orders, the *De Minimis* Sale Order or other orders entered by the Bankruptcy Court in the Chapter 11 Cases approving the sale or other disposition of Assets, including in connection with the NewCo Asset Sale; or (f) any other act taken or omitted to be taken in connection with the Chapter 11 Cases or the implementation of the Plan; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

35.     Notwithstanding anything in the Plan or this Confirmation Order to the contrary, Sections III.E.5 and III.E.6 of the Plan shall not apply with respect to the prosecution by plaintiffs of claims asserted against certain former directors and officers of Massey Energy Company in the litigation captioned as *In re Massey Energy Co. Deriv. & Class Action Litigation*, C.A. No. 5430-CB (Del. Ch.).

36.     Except (A) as expressly limited by the terms of the Resolution of Reclamation Obligations (to the extent applicable, and only as applicable to the signatory agencies or nongovernmental parties thereto) and (B) subject to subsection (a)(ii)(B) of this paragraph 36 and paragraph 23 of this Order, with respect to any relief expressly granted to NewCo in the Plan or this Order (including, but not limited to, any provisions of the Plan or this Order approving the NewCo Asset Sale free and clear of Encumbrances), nothing in the Plan or this Order:

    (a)     releases, discharges, exculpates, precludes or enjoins the enforcement of:

        i.      any liability or obligation to, or any claim or any cause of action by, a Governmental Unit under any applicable Environmental Law to which any Reorganized Debtor is subject to the extent that it is the owner, lessee, permittee, controller or operator of real property or a mining operation after the Effective Date (whether or not such liability, obligation, claim or cause of action is based in whole or in part on acts or omissions prior to the Effective Date);

        ii.     the obligations under the Consent Decree in United States, *et al.* v. Alpha Natural Resources, Inc. *et al.*, No. 2:14-11609 (S.D.W.Va.) either:  (A) against the Reorganized Debtors with respect to their facilities or future facilities; or (B) against NewCo with respect to Section IX thereof, including the construction and operation of the Advanced Water Treatment Plant and related obligations, as it pertains to the Cumberland and Emerald mining complexes;

        iii.    any liability to a Governmental Unit under Environmental Law, the Federal Mine Safety and Health Act of 1977, any state mine safety law, ERISA, the Black Lung Act or other applicable police or regulatory law, in each case, that is not a Claim;

iv.      any claim of a Governmental Unit under any Environmental Law, ERISA, the Black Lung Act or other applicable police or regulatory law, in each case, arising after the Effective Date;

v.      any liability to a Governmental Unit on the part of any Person or entity other than the Debtors or the Reorganized Debtors, or any claim assertable by a Governmental Unit against any Person or entity other than the Debtors or the Reorganized Debtors; or

vi.      any valid right of setoff or recoupment by any Governmental Unit, subject to the requirements of section 553 of the Bankruptcy Code or other applicable law; provided that, for the avoidance of doubt, the preservation of such setoff and recoupment rights shall not limit or impede the free and clear nature of the NewCo Asset Sale consistent with Section IV.C of the Plan; provided further that NewCo is not purchasing any federal or state tax refunds of the Debtors;

(b)      enjoins or otherwise bars any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (a) hereof (provided that the Bankruptcy Court retains jurisdiction to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Plan, any document relating to the Plan or the Restructuring Transactions, the Stalking Horse APA, this Order or the Bankruptcy Code), or shall divest any tribunal or other government body of any jurisdiction it may have under Environmental Law, ERISA, the Black Lung Act or other applicable police or regulatory law to adjudicate any defense asserted under the Plan or the Confirmation Order; and/or

(c)      authorizes the transfer or assignment of any (i) license, (ii) permit, (iii) registration, (iv) lease, (v) authorization, (vi) approval, (vii) agreement or (viii) contract, in each case, with a Governmental Unit, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, court orders and approvals under non-bankruptcy laws and regulations;

provided, however, for the avoidance of doubt, the foregoing does not (i) limit or modify any provision of the Plan or this Order that expressly addresses Governmental Units, Black Lung Claims or ERISA matters or (ii) limit the exculpation expressly set forth in Section III.E.7 of the Plan;

provided, further, for the avoidance of doubt, the foregoing does not limit any releases, discharges, exculpations, preclusions or injunctions in any agreement forming part of the Resolution of Reclamation Obligations to which any Governmental Unit is signatory.

37. For the purposes of the foregoing paragraph, the term "Environmental Law" shall mean all federal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law, all judicial and administrative orders, agreements and determinations and all common law concerning pollution or protection of the environment, or environmental impacts on human health and safety, including the Atomic Energy Act; the Clean Air Act; the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right to Know Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Resource Conservation and Recovery Act; the Safe Drinking Water Act; SMCRA; the Toxic Substances Control Act; and any state or local equivalents of the foregoing.

38. Nothing in the Plan or this Order:  (a) administers or otherwise affects the trust established by the Debtors pursuant to 26 U.S.C. § 501(c)(21) as security for the payment of Black Lung Claims, or the funds deposited (and required to be deposited) therein, except that the Reorganized Debtors are vested with such legal title or other authority as necessary to effectuate the equitable purpose of the trust; (b) impairs or otherwise affects the obligation of the Debtors to maintain funds in the trust as required by the U.S. Department of Labor on February 6, 2014; or (c) enjoins or otherwise precludes any Governmental Unit from drawing on funds in the trust, including for Black Lung Claims discharged pursuant to the Plan.

39.    Nothing in the Plan or this Order:

(a)    releases, discharges, exculpates, precludes or enjoins the enforcement of any liability or obligation under the Black Lung Act with respect to: (i) any miner whose last day of employment with any of the Debtors occurred on or after the Petition Date (the obligation for which shall be assumed by the Reorganized Debtors); or (ii) any miner employed by any of the Reorganized Debtors (including, for (i) and (ii), any liability or obligation under the Black Lung Act with respect to any dependent or survivor of such a miner); or

(b)    enjoins or otherwise bars the U.S. Department of Labor from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (a) hereof, or shall divest any tribunal or other government body of any jurisdiction it may have under the Black Lung Act or other applicable police or regulatory law to adjudicate any defense asserted under the Plan or this Order.

40.    Nothing in paragraph 8 of the *Order (I) Authorizing the Debtors to (A) Reject Certain Unexpired Leases of Nonresidential Real Property and (B) Assume Certain Leases of Nonresidential Real Property, and (II) Granting Related Relief* (Docket No. 2727) or any similar orders entered by the Bankruptcy Court (a) applies to (i) the Office of Surface Mining Reclamation and Enforcement; (ii) the West Virginia Department of Environmental Protection; (iii) the Illinois Department of Natural Resources; (iv) the Kentucky Energy and Environment Cabinet, Department for Natural Resources; or (v) the Virginia Department of Mines, Minerals and Energy; or (b) interferes in any way with such parties' enforcement of the surface mining laws against the Debtors, the Reorganized Debtors or any other parties.

41.    From and after the Effective Date, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, negotiation, preparation, dissemination, implementation, Confirmation or approval of the Plan (or the Distributions under the Plan), the Confirmation Exhibits, the Disclosure Statement, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement, the Global Settlement Stipulation, the First Lien

Lender Settlement, the Second Lien Noteholder Settlement, the Resolution of Reclamation Obligations, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement or any contract, employee pension or other benefit plan, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that this paragraph shall not apply to the obligations arising under the Plan, the obligations assumed thereunder, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement, the Global Settlement Stipulation, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Resolution of Reclamation Obligations, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement; and provided further that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**E.      Consolidation of the Debtors**

42.      As no objections to such consolidation have been filed or served by any party, pursuant to Section VII.B of the Plan, the limited administrative consolidation of the Debtors solely for the purpose of implementing the Plan, including for purposes of voting, assessing whether Confirmation standards have been met, calculating and making Distributions under the Plan and filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee, is hereby approved.  Pursuant to such administrative consolidation, and without in any way modifying, limiting or impairing the effectiveness of the Restructuring Transactions described on Exhibit IV.B.1 to the Plan, as of the Effective Date:  (a) all assets and liabilities of

the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (c) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors, and the Debtors may file and the Bankruptcy Court will sustain objections to Claims for the same liability that are filed against multiple Debtors; and (d) Intercompany Claims between Debtors will be eliminated and extinguished.

43.    Such administrative consolidation (other than for the purpose of implementing the Plan) shall not affect (a) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions as provided in Section IV.B of the Plan; (b) the vesting of the Assets (subject to the provisions of paragraph 46 hereof) in the applicable Reorganized Debtors; (c) the right to distributions from any Insurance Contracts or the proceeds thereof; or (d) the rights of any Person to contest alleged setoff or recoupment efforts on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

## F.    Vesting and Transfer of Assets

44.    On the Effective Date, except as otherwise provided in the Plan (including with respect to the Restructuring Transactions described in Section IV.B of, and Exhibit IV.B.1 to, the Plan) or this Order:  (a) Reorganized Holdings and Reorganized Opco shall exist as separate corporate entities, with all corporate powers in accordance with state law and the certificates of incorporation and bylaws included in Exhibits IV.E.1.a and IV.E.1.b to the Plan; (b) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a direct or indirect

subsidiary of Reorganized Opco, and as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; and (c) on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Estate of each Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan will vest, subject to the Restructuring Transactions and the provisions of paragraph 46 hereof, in the applicable Reorganized Debtor or its successors or assigns, as the case may be, free and clear of all Claims, Liens, charges, Liabilities, other encumbrances, Interests and other interests.  Such vesting does not constitute a voidable transfer under the Bankruptcy Code or applicable nonbankruptcy law.

45.     On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or this Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

46.     For the avoidance of doubt, the assets to be contributed to the Reorganized Debtors pursuant to the Plan shall not include (a) the NewCo Assets subject to the NewCo Asset Sale or (b) any other Assets subject to an asset sale consummated on or prior to the Effective Date pursuant to a Sale Order or the *De Minimis* Sale Order.

### G.       Restructuring Transactions

47.       On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate, in accordance with applicable nonbankruptcy law, to effectuate (a) the Distributions contemplated by the Plan, (b) the NewCo Asset Sale, (c) a corporate restructuring of their respective businesses or (d) the simplification of the overall corporate structure of the Reorganized Debtors, including, but not limited to, the Restructuring Transactions identified on Exhibit IV.B.1 to the Plan, all to the extent not inconsistent with any other terms of the Plan.  Unless otherwise provided by the terms of a Restructuring Transaction in accordance with applicable law (including as may be set forth on Exhibit IV.B.1 to the Plan), all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions under or in connection with the Plan or any Core Asset Sale Order, including the NewCo Asset Sale), conversions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  To the extent applicable, the Restructuring Transactions shall be deemed to occur in the order and manner described in Exhibit IV.B.1 to the Plan.  For the avoidance of doubt, any Restructuring Transaction that results in the continued ownership of Alpha Natural Resources, Inc. by any Reorganized Debtor, in whatever legal form Alpha Natural Resources, Inc. may exist after the occurrence of the Effective Date, shall not result in any liability to any Reorganized Debtor inconsistent with the terms of the Plan or this Order, nor shall the Restructuring Transactions result in any liability to NewCo, its Representatives or any affiliate of the foregoing except as expressly provided in the Stalking Horse APA.  To the extent required by the Internal Revenue Code (and any other

applicable law), this Order shall constitute a "plan of liquidation" solely with respect to any liquidation of any Debtor for U.S. federal income tax (and other applicable tax) purposes.

## H.   Approval of Discharge of Claims and Termination of Interests

48.   The discharge and termination of interest provisions set forth in Section III.E.4 of the Plan are approved in all respects, incorporated herein in their entirety, so ordered and shall be immediately effective on the Effective Date without further order or action on the part of the Bankruptcy Court or any other party.

49.   Except as specifically set forth in the Plan or this Order, as of the Effective Date and consistent with Exhibit IV.B.1 to the Plan, the Reorganized Debtors shall be discharged of all Claims and other debts and Liabilities, including Black Lung Claims, and all Interests and other rights of the holders of Interests in the Debtors shall be terminated, pursuant to sections 524(a)(1), 524(a)(2) and 1141(d) of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

## I.   Release of Liens

50.   The release and discharge of all mortgages, deeds of trust, liens or other security interests against the property of any Estate as set forth in Section IV.Q of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Bankruptcy Court.  As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement this Order and Section IV.Q of the Plan.

51.   Pursuant to section 1142 of the Bankruptcy Code, all entities holding Claims against or Interests in the Debtors that are treated under the Plan are hereby directed to execute,

deliver, file or record any document, and to take any action, necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan.  Upon the entry of this Order, all entities holding Claims against or Interests in the Debtors that are treated under the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

**J.     Injunction**

52.     As of the Effective Date, except as provided in the Plan or this Order, all Persons who have been, are or may be holders of (a) Claims, including Black Lung Claims, or (b) Interests, shall be, and hereby are, enjoined from taking any of the following actions against or affecting any Released Party, or the respective assets or property thereof, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from this Order):  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any Released Party, or the respective assets or property thereof; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against any Released Party, or the respective assets or property thereof; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien against any Released Party, or the respective assets or property thereof, other than as contemplated by the Plan; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party, or the respective assets

or property thereof; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the Settlements.

53.     All Persons that have held, currently hold or may hold any Liabilities released or exculpated pursuant to Sections III.E.6 and III.E.7 of the Plan, respectively, are permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien; (d) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or this Order.

## K.     Survival of Corporate Indemnities

54.     Prior to the Effective Date, the Debtors (a) shall make arrangements to continue liability and fiduciary (including ERISA) insurance, or purchase a tail policy or policies, for the period from and after the Effective Date, for the benefit of any person who is serving or has served as one of the Debtors' directors, officers or employees at any time from and after the Petition Date and (b) shall fully pay the premium for such insurance.  Any and all directors' and officers' liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.  For the avoidance of doubt, nothing in the Plan or this Order shall modify, limit or

otherwise alter the obligations of the Reorganized Debtors pursuant to Sections 5.12 or 9.02 of the Stalking Horse APA.

55.     The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after the Petition Date by reason of such person's prior or future service in such a capacity, or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, will be deemed and treated as Executory Contracts that are assumed by the applicable Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations shall survive and be unaffected by entry of this Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date; provided, however, that nothing herein shall create any liability to NewCo on account of such indemnity obligations.

56.     The obligations of each Debtor to indemnify any person who was serving as one of its directors, officers or employees (or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request) prior to but not on or after the Petition Date by reason of such person's prior service in such a capacity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or otherwise, shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; provided, however, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed

pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations shall be deemed and treated as Executory Contracts that are rejected by the applicable Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) shall be subject to the bar date provisions of Section II.G.6 of the Plan.

**L.      Exemption From Federal Securities Laws**

57.     To the maximum extent provided by section 1145 of the Bankruptcy Code and/or applicable nonbankruptcy law (including section 4(a)(2) of the Securities Act with respect to any NewCo Equity and/or other securities issued or transferred under the Plan in connection with the Second Lien Noteholder Distribution), the offering, issuance and distribution of the Reorganized ANR Contingent Revenue Payment, the Reorganized ANR Preferred Interests, NewCo Equity, NewCo Warrants, Reorganized ANR Common Stock and First Lien Lender Takeback/Preferred Consideration or other securities issued or transferred under the Plan shall be exempt from section 5 of the Securities Act, all rules and regulations promulgated thereunder and any state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer or underwriter of, or broker or dealer in, a security. NewCo shall remain a successor to the Debtors for purposes of section 1145 of the Bankruptcy Code.

58.     In accordance with the terms of the Second Lien Noteholder Settlement and the right of the *Ad Hoc* Committee of Second Lien Noteholders thereunder to allocate the Second Lien Noteholder Distribution among the Second Lien Noteholders, the form of consideration received as part of the Second Lien Noteholder Distribution will depend on such holder's status as an accredited investor for purposes of the Federal Securities Laws, and no term, condition or provision of the Plan or this Order shall require the Debtors, NewCo or any other person or entity

to make any distribution to any Second Lien Noteholder in a manner that is inconsistent with Federal Securities Laws.

**M.      Exemption From Taxation**

59.      Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, filing fee, sales or use Tax or similar Tax, fee or charge:  (a) the issuance, transfer or exchange of any securities, including in connection with any Restructuring Transactions; (b) the creation of any mortgage, deed of trust, Lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the execution and delivery of the Exit Facility Documents; (e) any Restructuring Transaction, including (i) the NewCo Asset Sale contemplated in the Stalking Horse APA, (ii) vesting of property of the Debtors' Estates in the Reorganized Debtors, and (iii) any transfers or distributions pursuant to the Plan; (f) any sale of Assets by the Debtors under section 363 of the Bankruptcy Code that closes in connection with the Plan, including the transfer of assets to NewCo as part of the NewCo Asset Sale; and (g) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the NewCo Asset Sale, including any merger agreements, agreements of consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

60.      All filing and recording officers are hereby directed to accept for filing or recording all instruments of transfer to be filed and recorded in accordance with the Plan or the Confirmation Exhibits without payment of any Taxes, fees or charges described in paragraph 59 above.  Notice of entry of this Order in the form approved by the Bankruptcy Court (a) shall have the effect of an order of the Bankruptcy Court, (b) shall constitute sufficient notice of the

entry of this Order to such filing and recording officers and (c) shall be a recordable instrument

notwithstanding any contrary provision of applicable nonbankruptcy law.  The Bankruptcy Court

retains jurisdiction to enforce the foregoing direction by contempt proceedings or otherwise.

61.     Any transfers of owned or leased real property undertaken pursuant to the Plan or

the Restructuring Transactions (including the NewCo Asset Sale) are specifically for the purpose

of implementing the Plan and reorganizing and restructuring the Debtors under the Bankruptcy

Code and shall not trigger (a) any increase in applicable real property taxes or (b) a reappraisal of

any real property so transferred.

**N.      Executory Contracts and Unexpired Leases**

62.     The Executory Contract and Unexpired Lease provisions of Section II.G of the

Plan are specifically approved in all respects, are incorporated herein in their entirety and are so

ordered.  The Debtors are authorized to assume, assign and/or reject Executory Contracts or

Unexpired Leases in accordance with Section II.G of the Plan and the Contract Procedures

Order, including in connection with the NewCo Asset Sale.

63.     This Order shall constitute an order of the Bankruptcy Court approving the

assumptions, assumptions and assignments, or rejections described in Section II.G of the Plan

(including any related assignment resulting from the Restructuring Transactions, the NewCo

Asset Sale or otherwise), pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the

Effective Date (and as to assignments pursuant to the NewCo Asset Sale, as of and conditioned

on the occurrence of the Closing), except for Executory Contracts and Unexpired Leases that:

(a) have been rejected pursuant to a Final Order of the Bankruptcy Court; (b) are, as of the

Effective Date, subject to a pending motion for reconsideration or appeal of an order authorizing

the rejection of such Executory Contract or Unexpired Lease; (c) are subject to a motion to reject

such Executory Contract or Unexpired Lease filed on or prior to the Effective Date; (d) are

rejected pursuant to Section II.G.5 of the Plan; or (e) are designated for rejection in accordance with Section II.G.2 of the Plan.  As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or Reorganized Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases or assigned to a particular Reorganized Debtor or NewCo pursuant to the procedures described in Section II.G of the Plan, will be deemed assigned to the surviving, resulting or acquiring corporation in the applicable Restructuring Transaction, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code. Executory Contracts and Unexpired Leases ultimately assigned to NewCo or an affiliate thereof in accordance with the NewCo Asset Sale and the Restructuring Transactions set forth on Exhibit IV.B.1 to the Plan shall be deemed assigned by the applicable Debtor directly to the applicable NewCo entity for purposes of section 365 of the Bankruptcy Code.

64.    Each Executory Contract or Unexpired Lease listed on Exhibit II.G.1.a to the Plan shall include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument or other document is listed on Exhibit II.G.1.a to the Plan, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.G.5 of the Plan or designated for rejection in accordance with Section II.G.2 of the Plan.  If an objection to a proposed assumption, assumption and assignment, or Cure Amount Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within 10 Business Days of the entry of the order of the Bankruptcy Court resolving the matter

against the Debtors.  Any such rejection pursuant to the prior sentence shall be deemed effective as of the Effective Date.

65.  Notwithstanding anything to the contrary in the Plan, and consistent with the Contract Procedures Order, the Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.G.1.a to the Plan to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to Section II.G.5 of the Plan; (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption, or assumption and assignment, pursuant to Section II.G.1.a of the Plan; or (c) modify the amount of any Cure Amount Claim.  The Debtors and the Reorganized Debtors further reserve the right, consistent with the Contract Procedures Order, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.G.1.a to the Plan to identify or change the identity of the Reorganized Debtor or other Person that will be an assignee of an Executory Contract or Unexpired Lease.

66.  Contracts, leases and other agreements entered into after the Petition Date by a Debtor, including any Executory Contracts or Unexpired Leases assumed by a Debtor pursuant to a prior order of the Bankruptcy Court and not thereafter assigned or rejected, shall be performed by such Debtor or Reorganized Debtor, as applicable, in the ordinary course of its business, or shall be assigned to NewCo or its designee to the extent provided in the Stalking Horse APA and any Related Agreements.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) shall survive and remain unaffected by entry of this Order; provided, however, that, consistent with the Contract Procedures Order, any Executory Contracts or Unexpired Leases assumed by a Debtor and not previously assigned shall be (a) assigned to the Reorganized Debtor, NewCo or any other Person identified on

Exhibit II.G.4 to the Plan, if any; or (b) deemed assigned pursuant to Section II.G.2 of the Plan. The Debtors and the Reorganized Debtors shall have the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.G.4 to the Plan to identify or change the identity of the Reorganized Debtor, NewCo entity or other party that will be the assignee of an Executory Contract or Unexpired Lease, subject to any applicable provisions of the Exit Facility Documents.

67.     To the extent that:  (a) the Debtors are party to any contract, purchase order or similar agreement providing for the sale of the Debtors' products or services; (b) any such agreement constitutes an Executory Contract or Unexpired Lease; and (c) such agreement (i) has not been rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (iii) is not subject to a motion to reject such Executory Contract or Unexpired Lease filed on or prior to the Effective Date, (iv) is not listed on Exhibit II.G.1.a to the Plan, (v) is not listed on Exhibit II.G.5 to the Plan or (vi) has not been designated for rejection in accordance with Section II.G.2 of the Plan, such agreement (including any related agreements as described in Section II.G.1.b of the Plan), purchase order or similar agreement shall be assumed by the Debtors and assigned to the Reorganized Debtor or NewCo, as applicable, that will be the owner of the business that performs the obligations to the customer under such agreement (or assigned pursuant to an agreement between the Reorganized Debtors and NewCo consistent with the terms of the Stalking Horse APA), in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  The Cure Amount Claim to be paid in connection with the assumption of such a customer-related contract, purchase order or similar agreement that is not specifically identified

on Exhibit II.G.1.a to the Plan shall be $0.00.  Listing a contract, purchase order or similar

agreement providing for the sale of the Debtors' products or services on Exhibit II.G.5 to the

Plan shall not constitute an admission by a Debtor or Reorganized Debtor that such agreement

(including related agreements as described in Section II.G.1.b of the Plan) is an Executory

Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

68.    Notwithstanding any language to the contrary in any Executory Contract or

Unexpired Lease, and in accordance with section 365(f) of the Bankruptcy Code, any assignment

of an Executory Contract or Unexpired Lease under which a Debtor is the lessee of real property

may be effected without (a) the consent of the lessor party thereto and (b) the payment of any

fees or similar charges (including attorneys' fees) to the lessor.  In addition, section 365(c)(1) of

the Bankruptcy Code is inapplicable to the Executory Contracts or Unexpired Leases being

assumed or assumed and assigned by the Debtors pursuant to Section II.G of the Plan, or deemed

satisfied by the consent of any applicable counterparty that did not file an objection to the

assignment contemplated by the Plan.

69.    The Cure Amount Claims based on monetary defaults under the Executory

Contracts and Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan

and/or the Stalking Horse APA shall be satisfied, pursuant to section 365(b)(1) of the

Bankruptcy Code, at the option of the applicable Debtor or Reorganized Debtor:  (a) by payment

of the Cure Amount Claim in Distribution Cash on the Effective Date; or (b) on such other terms

as are agreed to by the parties to such Executory Contract or Unexpired Lease.  Subject to the

terms of paragraph 3 above, if there is a dispute regarding (a) the amount of any Cure Amount

Claim, (b) the ability of the applicable Reorganized Debtor or any other assignee to provide

"adequate assurance of future performance" (within the meaning of section 365 of

the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned or (c) any other matter pertaining to the assumption or assignment of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made within 30 days following the entry of a Final Order or the execution of a Stipulation of Amount and Nature of Claim resolving the dispute and approving the assumption and/or assignment.  Any Cure Amount Claims associated with any Assumed Contract under the Stalking Horse APA, whether assigned to NewCo or not and whether the Cure Amount Claim is determined before or after the Effective Date, will be the sole responsibility of the Reorganized Debtors.

70.     Any counterparty to an Executory Contract or Unexpired Lease that fails (or has failed) to object timely to the proposed assumption, assumption and assignment, or Cure Amount Claim set forth on Exhibit II.G.1.a to the Plan (pursuant to the Contract Procedures Order or otherwise) is deemed to have consented to such assumption, assumption and assignment, and related Cure Amount Claim under sections 365(b)(1) and 365(c) of the Bankruptcy Code, as applicable, and shall be forever barred, estopped and enjoined from contesting the assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, disputing the Cure Amount Claim set forth on Exhibit II.G.1.a to the Plan or asserting any Claim against the applicable Debtor, Reorganized Debtor, NewCo or another assignee under section 365(b)(1) and/or 365(c) of the Bankruptcy Code.

71.     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of the applicable Cure Amount Claim, if any, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or

bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory

Contract or Unexpired Lease at any time prior to the effective date of assumption, other than

those post-Effective Date obligations referenced and preserved below.  Any Proofs of Claim

filed with respect to an Executory Contract or Unexpired Lease that has been assumed or

assumed and assigned are disallowed and expunged without further notice to or action, order or

approval of the Bankruptcy Court.  Notwithstanding the foregoing, the Debtors and the

Reorganized Debtors (with respect to Executory Contracts and Unexpired Leases assumed and

assigned to a Reorganized Debtor) and NewCo (with respect to Executory Contracts and

Unexpired Leases assumed and assigned to NewCo) shall continue to honor all post-Effective

Date obligations (including postpetition obligations that have arisen, but are not in default, as of

the Effective Date), whether monetary or nonmonetary, under any assumed or assumed and

assigned Executory Contracts or Unexpired Leases assumed, respectively, in accordance with

their terms, and neither the payment of any Cure Amount Claim nor entry of this Order shall be

deemed to release the Debtors, the Reorganized Debtors or NewCo from such obligations.

72.    On the Effective Date, except for the Executory Contracts and Unexpired Leases

that were previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy

Court or that are assumed pursuant to Section II.G of the Plan (including any related agreements

assumed or assumed and assigned, including to NewCo consistent with the Stalking Horse APA,

pursuant to Section II.G.1.b of the Plan), each Executory Contract or Unexpired Lease entered

into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant

to its own terms shall be rejected pursuant to sections 365 and 1123(b)(2) of the Bankruptcy

Code.  The rejection of such contracts and leases shall be deemed to occur on the later of:  (a) the

Effective Date; or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.

73.     Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon counsel to the Debtors on or before the later of:  (a) 30 days after the Effective Date; or (b) for Executory Contracts or Unexpired Leases identified on Exhibit II.G.5 to the Plan, 30 days after (i) a notice of such rejection is served under the Contract Procedures Order, if the contract counterparty does not timely file an objection to the rejection in accordance with the Contract Procedures Order, or (ii) if such an objection to rejection is timely filed with the Bankruptcy Court in accordance with the Contract Procedures Order, the date that an Order is entered approving the rejection of the applicable contract or lease or the date that the objection to rejection is withdrawn.  Any Claims arising from the rejection of any Executory Contract or Unexpired Lease not previously assumed or assumed and assigned by the Debtors pursuant to an order of the Bankruptcy Court will be treated as General Unsecured Claims, subject to the provisions of section 502 of the Bankruptcy Code.  Any Claims not filed within such applicable time periods shall be forever barred from receiving a Distribution from the Debtors, the Reorganized Debtors or the Estates.  The Debtors' and the Reorganized Debtors' rights to object to, settle, compromise or otherwise resolve any Claim filed on account of a rejected Executory Contract or Unexpired Lease are reserved.

**O.      Pension Plans**

74.     Consistent with Section IV.M.3 of the Plan and the Global Settlement Stipulation, Reorganized ANR shall assume the Pension Plans, and Reorganized Opco shall become the sponsor and continue to administer the Pension Plans, satisfy the minimum funding standards

pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the Pension Plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code. Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall (a) release or exculpate any Debtor, Reorganized Debtor or responsible person thereof from any liability for breach of fiduciary duty under ERISA respecting any defined benefit Pension Plan; or (b) enjoin any suit, action or proceeding (i) for breach of such fiduciary duty or (ii) to enforce a judgment, decree or order issued in any such action or proceeding (including by setoff), or to enforce a judgment lien based in such judgment.

75. In accordance with the terms and conditions of the Global Settlement Stipulation, in addition to satisfying the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, the Reorganized Debtors shall make excess contributions to the Pension Plans in the amount of $18,000,000 to be paid half on June 30, 2017 and the remaining half on June 30, 2018, the amounts of which will be allotted among the Pension Plans in proportion to the dollar amount of their underfunding calculated on a termination basis. Reorganized Opco will elect not to create a prefunding balance associated with these excess contributions.

**P. Plan Distributions**

76. On and after the Effective Date, Distributions on account of Allowed Claims and the resolution and treatment of Disputed Claims shall be effectuated pursuant to Article V of the Plan. Notwithstanding anything to the contrary in the Plan, the Distribution Record Date shall mean 5:00 p.m., Eastern Time, on the Confirmation Date; provided that, with respect to Claims related to publicly issued securities, the Distribution Record Date shall be 5:00 p.m., Eastern Time, on the Effective Date.

**Q.**      **Recovery Actions**

77.      Except as otherwise provided in the Plan, the Global Settlement Stipulation, any

contract, instrument, release or other agreement entered into or delivered in connection with the

Plan or any Final Order of the Bankruptcy Court, in accordance with section 1123(b)(3)(B) of

the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any claims,

demands, rights, defenses and Causes of Action (including any (a) Recovery Actions and

(b) Causes of Action identified on the Schedules of any Debtor) that the Debtors or the Estates

may hold against any Person.  Any Claim allowed under section 502(h) as a result of the

successful prosecution of a Recovery Action shall be a General Unsecured Claim subject to

treatment in the applicable Class under the Plan and shall not be an obligation of or claim against

the Reorganized Debtors.

**R.**      **Claims Bar Dates and Other Claims Matters**

78.      <u>General Administrative Claim Bar Date Provisions</u>.  Except as otherwise provided

in Section II.A.1.h.ii of the Plan or in a Bar Date Order or other order of the Bankruptcy Court,

unless previously filed, requests for payment of Administrative Claims must be filed and served

on the Notice Parties pursuant to the procedures specified herein and the Effective Date Notice

(as defined below), no later than 30 days after the Effective Date.  Holders of Administrative

Claims that are required to file and serve a request for payment of such Administrative Claims

and that do not file and serve such a request by the applicable Bar Date shall be forever barred

from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their

respective property, and such Administrative Claims shall be deemed discharged as of the

Effective Date.  Objections to such requests must be filed and served on the Notice Parties and

the requesting party by the latest of (a) 150 days after the Effective Date, (b) 60 days after the

filing of the applicable request for payment of Administrative Claims or (c) such other period of

limitation as may be specifically fixed by a Final Order for objecting to such Administrative

Claims.  The Exit Facility Agent and the Exit Lenders (as such terms are defined below) need not

file any such request with respect to any Allowed Administrative Claim earned in connection

with and pursuant to the terms of the Exit Facility Documents.  The Reorganized Debtors shall

not (a) pay, settle or compromise or (b) withdraw or litigate to judgment objections to

Administrative Claims subject to the procedures set forth in this paragraph without the consent of

the First Lien Lenders, which consent shall not be unreasonably withheld, and the Reorganized

Debtors shall provide the First Lien Lenders with five Business Days' notice prior to taking any

such action.

79.     Professional Compensation.  Professionals or other entities asserting a Fee Claim

for services rendered before the Effective Date must file and serve on the Notice Parties and such

other entities who are designated by the Bankruptcy Rules, this Order or other order of the

Bankruptcy Court, an application for final allowance of such Fee Claim no later than 60 days

after the Effective Date; provided, however, that any professional who may receive

compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals

Order may continue to receive such compensation and reimbursement of expenses for services

rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without

further Bankruptcy Court review or approval (except as provided in the Ordinary Course

Professionals Order).  Objections to any Fee Claim must be filed and served on the Notice

Parties and the requesting party by the later of (a) 90 days after the Effective Date, (b) 30 days

after the filing of the applicable request for payment of the Fee Claim or (c) such other period of

limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.  To the

extent necessary, this Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

80.    Expenses of Creditors' Committee Members.  Subject to the terms of Section II.A.1.e.i of the Plan, the expenses of the members of the Creditors' Committee that are not Indenture Trustee Committee Members (excluding their individual legal and other advisor fees), and the expenses submitted for reimbursement by the Unsecured Notes Indenture Trustee in the *Third Interim Fee Application of Milbank, Tweed, Hadley & McCloy LLP* (Docket No. 2688), submitted by request for payment pursuant to section 503 of the Bankruptcy Code and approved by the Bankruptcy Court, shall be Allowed Administrative Claims without reduction to the recoveries of holders of Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims.  For the avoidance of doubt, no member of the Creditors' Committee (other than the Indenture Trustee Committee Members) shall seek payment from the Debtors or the Estates of such member's legal or other advisory fees incurred in its capacity as a member of the Creditors' Committee, pursuant to a motion for substantial contribution or otherwise, and no payment shall be made by the Debtors or the Estates to any member of the Creditors' Committee (other than the Indenture Trustee Committee Members pursuant to paragraph 81 below) on account of such legal or other advisory fees; provided that nothing herein shall limit any member of the Creditors' Committee from seeking payment of its individual legal fees based on a claim or entitlement unrelated to its capacity as a member of the Creditors' Committee.

81.    Fees and Expenses of the Indenture Trustee Committee Members.  The reasonable and documented fees and expenses of the Unsecured Notes Indenture Trustee shall be paid in Cash on the Effective Date without reduction to the recoveries of holders of Allowed Category 1

General Unsecured Claims and Allowed Category 2 General Unsecured Claims; provided that

the aggregate fees and expenses of the Unsecured Notes Indenture Trustee paid pursuant to the

Plan, excluding those paid pursuant to Section II.A.1.e.i of the Plan, shall not exceed $1,060,000.

Once paid, the reasonable and documented fees and expenses of the Indenture Trustee

Committee Members (including their counsel and other advisors) shall not be subject to any

challenge or defense, including avoidance, reduction, offset, attachment, disallowance,

recharacterization or subordination (whether equitable or otherwise) pursuant to the Bankruptcy

Code or applicable non-bankruptcy law.

82.     For the avoidance of doubt, nothing in the Plan or this Order shall prevent the

Indenture Trustee Committee Members from asserting a charging lien against any recoveries

received on account of the applicable noteholders for payment of any fees and expenses not paid

to the Indenture Trustee Committee Members by the Debtors pursuant to the Plan; provided that,

in the event the Indenture Trustee Committee Members exercise a charging lien against such

recoveries, the Debtors shall use commercially reasonable efforts to assist such Indenture Trustee

Committee Members in liquidating securities otherwise payable to such noteholders under the

Plan; provided further that the Unsecured Notes Indenture Trustee shall not exercise such

charging lien to the extent that payment of $1,060,000, excluding the amounts paid pursuant to

Section II.A.1.e.i of the Plan, is made by the Debtors pursuant to Section II.A.1.e.ii of the Plan.

If the Reorganized Debtors expressly request (in writing) post-Effective Date assistance from the

Indenture Trustee Committee Members, the Indenture Trustee Committee Members will be paid

their reasonable and documented fees and expenses, solely to the extent of the post-Effective

Date assistance requested by the Reorganized Debtors, not subject to the cap set forth in the Plan.

83.    Fees and Expenses of *Ad Hoc* Committee of Second Lien Noteholders.

The Debtors shall pay all reasonable and documented fees and expenses of the *Ad Hoc*

Committee of Second Lien Noteholders (and its counsel, local counsel and financial advisor) as

and to the extent provided under paragraph 17(d) of the Final DIP Order and other existing

agreements among the Debtors and the Second Lien Parties in connection with the Chapter 11

Cases that are incurred prior to the Effective Date in connection with the Chapter 11 Cases

without a reduction to the recoveries of holders of Allowed Second Lien Noteholder Claims

(subject to the Debtors' receipt of invoices in customary form in connection therewith and

without the requirement to file a fee application with the Bankruptcy Court).  To the extent that

invoices of the *Ad Hoc* Committee of Second Lien Noteholders (and its counsel, local counsel

and financial advisor) are submitted after the Effective Date, but relate to reasonable and

documented fees and expenses incurred prior to the Effective Date consistent with the prior

sentence, such invoices shall be paid by the Reorganized Debtors as soon as reasonably

practicable.

84.    Fees and Expenses of the Second Lien Notes Trustee.  Subject to the terms of

Section II.A.1.g of the Plan, the Debtors shall pay all reasonable and documented fees and

expenses of the Second Lien Notes Trustee (and its counsel) as and to the extent provided under

paragraph 17(d) of the Final DIP Order and other existing agreements among the Debtors and the

Second Lien Notes Trustee that are incurred prior to the Effective Date in connection with the

Chapter 11 Cases without a reduction to the recoveries of holders of Allowed Second Lien

Noteholder Claims (subject to the Debtors' receipt of invoices in customary form in connection

therewith and without the requirement to file a fee application with the Bankruptcy Court).  To

the extent that invoices of the Second Lien Notes Trustee (and its counsel) are submitted after the

Effective Date, but relate to fees and expenses incurred prior to the Effective Date, such invoices shall be paid as soon as reasonably practicable.

85.     Notwithstanding the foregoing paragraph 84, the fees and expenses of the Second Lien Notes Trustee (and its counsel) outstanding as of the date of the Global Settlement Stipulation or incurred thereafter shall be subject to a cap of $600,000 (which cap is separate and apart from the $1,060,000 limitation on fees and expenses of the Unsecured Notes Indenture Trustee, as set forth in paragraph 81 above).  To the extent that any fees or expenses of the Second Lien Notes Trustee (and its counsel) are not paid in accordance with the provisions of the Plan, nothing in the Plan shall prevent the Second Lien Notes Trustee from asserting its charging lien against any recoveries received on account of Allowed Second Lien Noteholder Claims for payment of such unpaid amounts.  The foregoing cap on the fees and expenses of the Second Lien Notes Trustee (and its counsel) shall only apply to those fees and expenses outstanding as of the date of the Global Settlement Stipulation and incurred through July 24, 2016, and, in the event that the Effective Date does not occur on or before July 24, 2016, all obligations of the Debtors and the rights of the Second Lien Notes Trustee under paragraph 17(d) of the Final DIP Order and any other existing agreements among the Debtors and the Second Lien Notes Trustee shall remain in effect and neither the Debtors nor the Reorganized Debtors shall be obligated pursuant to the Plan or hereby to pay any fees or expenses of the Second Lien Notes Trustee (or its counsel) in excess of the cap.  If the Reorganized Debtors expressly request (in writing) post-Effective Date assistance from the Second Lien Notes Trustee, the Second Lien Notes Trustee shall be paid its reasonable and documented fees and expenses, solely to the extent of the post-Effective Date assistance requested by the Reorganized Debtors, not subject to the $600,000 cap set forth in this paragraph and Section II.A.1.g of the Plan.

86.     From and after the Effective Date, the fees and expenses of the Exit Facility

Agent and the Exit Lenders under the Exit Facility Documents shall be the obligation of and paid

by the Reorganized Debtors to the extent provided in the Exit Facility Documents.

**S.     Exit Facility**

87.     A valid business purpose exists for approval of the Exit Financing Documents

contemplated by the Plan.  The terms and conditions of the Exit Facility and all agreements,

security documents and all other documents related to the Exit Facility, including the

commitment and fee letters related thereto (collectively, the "Exit Facility Documents") and the

payment of the fees and expenses of the Agent (the "Exit Facility Agent") and each of the lenders

(collectively, the "Exit Lenders") under the Exit Facility described therein (or, in lieu thereof, the

Liquidated Damage Fee and expense reimbursement described therein), are approved and ratified

as being entered in good faith and being critical to the success and feasibility of the Plan, and any

credit extended, letters of credit issued for the account of or loans made to the Reorganized

Debtors by the Exit Lenders in accordance with the Exit Facility shall be deemed to have been

extended, issued and made in good faith and for legitimate business purposes.  The Exit Facility

Agent's expense reimbursement and the Liquidated Damage Fee, to the extent earned and due

and payable prior to the Effective Date under the Exit Facility Documents, shall be deemed

Allowed Administrative Claims.  The entry into the Exit Facility is in the best interests of the

Debtors, their Estates and creditors and the Reorganized Debtors.  The Debtors and the

Reorganized Debtors, as applicable, are authorized, without any further notice, action, order or

approval of the Bankruptcy Court, to finalize, execute and deliver all agreements, documents,

instruments and certificates relating to the Exit Financing Documents and to perform their

obligations under such agreements, documents, instruments and certificates, and any such

execution or delivery occurring prior to the entry of this Order is hereby ratified and approved.

The Exit Facility Documents (when and to the extent entered into) shall constitute the legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The mortgages, pledges, Liens and other security interests and all other consideration granted pursuant to or in connection with the Exit Facility are or will be (as the case may be) and are hereby deemed to be granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to the Exit Facility Agent and the Exit Lenders to extend credit thereunder and do not, and hereby are deemed not to, constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance or recharacterization.  No third party consents, authorizations or approvals are required with respect to the Exit Facility Documents, and such Exit Facility Documents do not contravene the corporate governance documents of the Reorganized Debtors or constitute a violation of, a default under, or otherwise contravene any other instrument, contract or agreement to which the Reorganized Debtors are or on the Effective Date will become parties.  Neither the execution and delivery by the Reorganized Debtors of any of the Exit Facility Documents nor the performance by the Reorganized Debtors of their respective obligations thereunder constitutes a violation of or a default under any contract or agreement to which it is a party, including those contracts or agreements assigned to the Reorganized Debtors or reinstated under the Plan.

## T.    Plan Implementation

88.    In accordance with section 1142 of the Bankruptcy Code, section 18-209 of the Delaware Limited Liability Company Act, section 31B-9-904 of the West Virginia Uniform Limited Liability Company Act, section 13.1-1070 of the Virginia Limited Liability Company Act, section 13.1-716 of the Virginia Stock Corporation Act, sections 251, 253, 263, 264 and 303 of the Delaware General Corporation Law and any comparable provisions of the business corporation law of any other state (collectively, the "Reorganization Effectuation Statutes"),

without further action by the Court or the stockholders, members, managers or directors of any Debtor or Reorganized Debtor, the Debtors and the Reorganized Debtors, as well as the Chairman of the Board, Chief Executive Officer, President, Vice President, Chief Financial Officer, Treasurer, Assistant Treasurer or Secretary (collectively, the "Responsible Officers") of each Debtor and Reorganized Debtor, are authorized to: (a) take any and all actions necessary or appropriate, including expending any necessary funds post-Confirmation, to implement, effectuate and consummate the Plan, this Order or the transactions contemplated thereby or hereby, including, without limitation, those transactions identified in Article IV of the Plan (including the NewCo Asset Sale), Exhibit IV.B.1 of the Plan and the payment of any employment taxes owing in respect of Distributions under the Plan; and (b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, releases, agreements, certificates and documents necessary to implement, effectuate and consummate the Plan, including, without limitation, those contracts, instruments, releases, agreements, certificates and documents identified in Article IV of the Plan or Exhibit IV.B.1 of the Plan or necessary to consummate the transactions identified in Article IV of the Plan (including the NewCo Asset Sale) or Exhibit IV.B.1 of the Plan.

89.     To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the stockholders, directors, officers, managers, members or partners of any of the Debtors or the Reorganized Debtors, this Order shall constitute, pursuant to section 1142 of the Bankruptcy Code and the Reorganization Effectuation Statutes, such consent or approval, and such actions are deemed to have been taken by unanimous action of the stockholders, directors, officers, managers, members or partners of the appropriate Debtor or Reorganized Debtor.

90.     Each federal, state, commonwealth, local, foreign or other governmental agency or department is hereby directed and authorized to accept any and all certificates, documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order, including, but not limited to, the NewCo Asset Sale and the transactions identified on Exhibit IV.B.1 to the Plan.

91.     All transactions effected by the Debtors during the pendency of the Chapter 11 Cases from the Petition Date through the Confirmation Date are approved and ratified.

92.     The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to another Reorganized Debtor or NewCo or any of its affiliates, as applicable, shall not constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease, or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

**U.     Cancellation of Securities**

93.     Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan or as otherwise provided for in this Order, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article V, the Indentures and the Notes shall be deemed canceled and of no further force and effect, without any further action on the part of any Debtor.  The holders of the Notes will have no rights against the Debtors, their Estates or their Assets arising from or relating to such instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no Distribution under the Plan will be made to or on behalf of any holder of an Allowed Noteholder Claim until the applicable Notes are

surrendered to and received by the applicable Third Party Disbursing Agent to the extent required in Section V.K of the Plan.  Notwithstanding the foregoing and anything contained in the Plan, the applicable provisions of the Indentures shall continue in effect solely for the purposes of (a) allowing the Indenture Trustees or other Disbursing Agents to make Distributions on account of Noteholder Claims as provided in Section V.D of the Plan and deduct therefrom such reasonable compensation, fees and expenses due thereunder or incurred in making such Distributions, to the extent not paid by the Debtors or the Reorganized Debtors and authorized under such Indentures; and (b) allowing the Indenture Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan (and any and all indemnification provisions in the Indentures shall explicitly survive the occurrence of the Confirmation Date and the Effective Date until all such fees and expenses are paid).  Except as otherwise provided herein or the Plan, the Reorganized Debtors shall not have any obligations to any Indenture Trustee for any fees, costs or expenses.

94.      Consistent with the Restructuring Transactions set forth on Exhibit IV.B.1 of the Plan, the Old Common Stock of ANR shall be deemed canceled and of no further force and effect on the Effective Date.  The holders of or parties to such canceled securities and other documentation shall have no rights arising from or relating to such securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, notwithstanding the foregoing sentence, the cancellation of the Old Common Stock of ANR shall not impair or otherwise affect any rights of any plaintiffs or defendants in the litigation captioned as *In re Massey Energy Co. Deriv. & Class Action Litigation*, C.A. No. 5430-CB (Del. Ch.), including any rights relating to the Old Common Stock of ANR.

**V.    Reorganized ANR Common Stock**

95.    On or prior to the Effective Date, Reorganized ANR shall authorize and issue or reserve for issuance all of the Reorganized ANR Common Stock required to be issued or reserved under or in connection with the Plan.  The shares of Reorganized ANR Common Stock authorized or issued in connection with the Plan, including restricted stock, options, stock appreciation rights or other equity awards, if any, in connection with the management incentive plan, shall be authorized without the need for further corporate action or without any further action by any Person, and once issued, shall be duly authorized, validly issued, fully paid and non-assessable.

**W.    Statutory Fees Payable Pursuant to 28 U.S.C. § 1930**

96.    On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Distribution Cash equal to the amount of such Administrative Claims.  Any fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

**X.    Order Binding on All Parties**

97.    Subject to the provisions of Section IV.B of the Plan, in accordance with section 1141(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of:  (a) the Debtors; (b) the Reorganized Debtors; (c) NewCo; (d) any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted, rejected or

NAI-1501465154v6                                    -80-

are deemed to have accepted or rejected the Plan); (e) any other person giving, acquiring or receiving property under the Plan; (f) any party to the Settlements approved hereunder; (g) any and all non-Debtor parties to Executory Contracts or Unexpired Leases with any of the Debtors; (h) all Released Parties; and (i) the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing.  All settlements (including, without limitation, the Settlements), compromises, releases, waivers, discharges, exculpations and injunctions set forth in the Plan shall be, and hereby are, effective and binding on all Persons who may have had standing to assert any settled, released, discharged, exculpated or enjoined causes of action, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date.

### Y.      Binding Effect of Prior Orders

98.      Pursuant to section 1141 of the Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as authorized and directed thereunder and all motions or requests for relief by the Debtors pending before the Bankruptcy Court as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Reorganized Debtors and their respective successors and assigns.

### Z.      Order Effective Immediately

99.      Notwithstanding Bankruptcy Rules 3020(e) and 7062 or otherwise, the stay provided for under Bankruptcy Rule 3020(e) shall be waived and this Order shall be effective immediately and enforceable upon entry.  The Debtors are authorized to consummate the Plan and the transactions contemplated thereby, including, but not limited to, the NewCo Asset Sale,

immediately after entry of this Order and upon, or concurrently with, the satisfaction or waiver of the conditions to the Effective Date set forth in the Plan.

## AA.    Final Order

100.    This Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.

## BB.    Reversal

101.    If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of the Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.  For the avoidance of doubt, notwithstanding the foregoing, any provision in the Plan or in this Order providing (a) that the Restructuring Transactions and the NewCo Asset Sale shall be effected free and clear of any Liabilities, including Black Lung Claims, Coal Act Claims and MEPP Claims not expressly assumed or (b) that NewCo shall not be a successor to any of the Debtors for any purpose other than as expressly provided in this Order, is integral to the consummation of the transactions set forth in the Plan (including, without limitation, the NewCo Asset Sale, the NewCo Contribution and the NewCo ABL Facility) and non-severable from the other provisions of the Plan and this Order.

**CC.     Governing Law**

102.    Except to the extent that (a) the Bankruptcy Code or other federal law is applicable or (b) an exhibit or schedule to the Plan or the Disclosure Statement or any agreement entered into with respect to any of the Restructuring Transactions, the NewCo ABL Facility, the Exit Facility Documents or the NewCo Asset Sale provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit, schedule or agreement), the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Virginia, without giving effect to the principles of conflicts of laws that would that would require application of the laws of another jurisdiction.

**DD.     Notice of Confirmation of the Plan and Occurrence of the Effective Date**

103.    Pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c)(2), the Debtors or the Reorganized Debtors are directed to serve a notice of the entry of this Order, the occurrence of the Effective Date, and the establishment of bar dates for certain Claims hereunder, substantially in the form of Appendix III attached hereto and incorporated herein by reference (the "Effective Date Notice"), on all parties that received the Confirmation Hearing Notice and parties to Executory Contracts or Unexpired Leases in accordance with the Contract Procedures Order, no later than five Business Days after the Effective Date; provided, however, that the Debtors or the Reorganized Debtors shall be obligated to serve the Effective Date Notice only on the record holders of Claims or Interests as of the Confirmation Date.  The Debtors are directed to publish the Effective Date Notice once in the national editions of *USA Today* and the daily edition of the *Richmond Times-Dispatch* no later than ten Business Days after the Effective Date. As soon as practicable after the entry of this Order, the Debtors shall make copies of this Order available on KCC's website at www.kccllc.net/alpharestructuring.  Service of the Effective Date

Notice as provided herein shall constitute good and sufficient notice pursuant to Bankruptcy Rules 2002 and 3020(c)(2) of entry of this Order and the occurrence of the Effective Date and no other or further notice need be given.

104.    On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**EE.    Miscellaneous Provisions**

105.    The Debtors are hereby authorized to amend or modify the Plan at any time prior to the Effective Date, but only in accordance with section 1127 of the Bankruptcy Code and Section IX.A of the Plan, without further order of the Bankruptcy Court; provided, however, that the Debtors shall not be permitted to alter, amend or modify any condition precedent to entry of this Order or to the Effective Date (or Section IX.A of the Plan as it relates to the foregoing) without the consent of each of the parties referenced with respect to such condition precedent. In addition, without the need for a further order or authorization of the Bankruptcy Court, but subject to the express provisions of this Order, the Debtors shall be authorized and empowered to make non-material modifications to the documents filed with the Bankruptcy Court, including Confirmation Exhibits or documents forming part of the evidentiary record at the Confirmation Hearing, in their reasonable business judgment as may be necessary.

106.    The terms and conditions of the NewCo ABL Facility as set forth on Exhibit I.A.162 to the Plan are approved and ratified.

107.    On the Effective Date, the Official Committees, to the extent not previously dissolved, shall dissolve, and the members of the Official Committees and their respective Professionals shall cease to have any role arising from or related to the Chapter 11 Cases and shall be released and discharged of and from all further duties, responsibilities and obligations relating to or arising in connection with the Chapter 11 Cases; provided, however, that the

Creditors' Committee shall continue to exist for the sole purpose of participating in the

Chapter 11 Cases with respect to the Debtors' prosecution of the motion to establish Claims

reserves filed in accordance with Section V.J of the Plan, which motion shall include, among

other things, (a) certain relief with respect to the Claims Oversight Committee, consistent with

Section VI.A of the Plan and (b) provision for payment by the Reorganized Debtors from any

reserve established for the payment of Administrative Claims of the reasonable and documented

post-Effective Date fees and expenses incurred by the First Lien Agent and First Lien Lenders in

connection with (i) the preparation, filing and prosecution thereof and (ii) the resolution of

Claims (other than General Unsecured Claims) for which reserves are established in connection

therewith.  Such motion shall be in form and substance (a) reasonably acceptable to the

Creditors' Committee and (b) satisfactory to the First Lien Agent and the First Lien Lenders

(except as it relates to General Unsecured Claims and the Claims Oversight Committee), and the

Debtors shall diligently prosecute such motion after its filing.  The Professionals retained by the

Official Committees and the respective members thereof shall not be entitled to assert any Fee

Claims for any services rendered or expenses incurred after the Effective Date, except, for

reasonable and documented fees and expenses incurred in participating in the Chapter 11 Cases

for the purposes set forth in the preceding sentence and, to the extent allowable under applicable

law, for reasonable and documented fees for services rendered, and actual and necessary

expenses incurred, in connection with any final applications for allowance of compensation and

reimbursement of expenses of the members of or Professionals to the Official Committees filed

and served after the Effective Date in accordance with the Plan.  In accordance with the terms

and conditions of the Global Settlement Stipulation, no party to the Global Settlement shall have

the right to, or shall otherwise be permitted to, object to Fee Claims asserted by the Professionals

retained by the Creditors' Committee, unless objecting based solely on the reasonableness of the applicable fees and expenses as provided for in the Global Settlement Term Sheet.

108. <u>Claims Oversight Committee</u>. Prior to the Effective Date, the Creditors' Committee shall designate three individuals to serve as the Claims Oversight Committee. The duties of the Claims Oversight Committee shall be to oversee: (a) the allowance of, and objections to, General Unsecured Claims; (b) the resolution of Disputed General Unsecured Claims, including rejection damage Claims and litigation Claims; (c) the establishment and maintenance of sufficient reserves for Disputed Category 1 General Unsecured Claims and Disputed Category 2 General Unsecured Claims; (d) the timing and amount of Distributions made to unsecured creditors holding Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims; and (e) unclaimed or undeliverable Distributions to unsecured creditors holding Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims under the terms of the Plan. The Claims Oversight Committee shall have consent rights (subject to the Debtors' ability to seek a determination by the Bankruptcy Court that the Claims Oversight Committee has unreasonably withheld its consent) with respect to, and the right to appear and be heard regarding, any and all of the foregoing matters. The Claims Oversight Committee shall have the right to retain Claims Oversight Committee Professionals consisting of (a) one primary counsel, (b) one local or conflicts counsel and (c) one financial consultant. The reasonable and documented fees and expenses of Claims Oversight Committee Professionals (and any other costs), up to an aggregate amount equal to the Claims Oversight Committee Professionals Fee Cap (and, under no circumstances, in excess of the Claims Oversight Committee Professionals Fee Cap, which, as defined in the Plan, is a maximum limit of $1.0 million payable by the Reorganized Debtors for

reasonable and documented fees and expenses of the Claims Oversight Committee Professionals), shall be paid by the Reorganized Debtors.  To facilitate the payment of such fees and expenses, on the Effective Date, $1.0 million of Distribution Cash shall be placed by the Debtors into the Claims Oversight Escrow Account.

109.    In accordance with Section II.B.5 of the Plan, (a) to the extent that an Allowed Other Secured Claim is secured by a Lien on assets of the Reorganized Debtors, such Allowed Other Secured Claim will be Reinstated, provided that the Debtors do not elect to provide the holder of such Allowed Other Secured Claim with Distribution Cash in the amount of its Allowed Other Secured Claim or the collateral securing its Allowed Other Secured Claim; and (b) to the extent an Allowed Other Secured Claim is secured by a Lien that is a "Permitted Encumbrance" upon any NewCo Assets pursuant to the terms of the Stalking Horse APA, the related Claim will be paid either from Distribution Cash or by NewCo when due in the ordinary course to the extent such Claim is valid; provided, further, for the avoidance of doubt, the liens of Campbell County, Wyoming in support of its *ad valorem* tax claim on assets transferred to NewCo, if and to the extent valid, shall be Permitted Encumbrances for purposes of the Stalking Horse APA and this Order.  No Liens securing a Reinstated Allowed Other Secured Claim or constituting a Permitted Encumbrance will be released until the Allowed Other Secured Claim currently secured by any such Lien is paid in full.

110.    Until the entry of a final decree in the Debtors' Chapter 11 Cases or until such Chapter 11 Cases are converted or dismissed, the Reorganized Debtors shall file a consolidated report of their activities and financial affairs with the Bankruptcy Court on a quarterly basis, within 30 days after the conclusion of each such period, with the first such report being due 30 days after the conclusion of the first calendar quarter following the Effective Date.  Any such

reports shall be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee guidelines for such matters.

111. Except as otherwise provided in the Plan and this Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date shall be limited to counsel to the Reorganized Debtors, the United States Trustee, counsel to the First Lien Agent, counsel to the Claims Oversight Committee (solely with respect to matters addressed in Section VI.A of the Plan), counsel to the Exit Facility Agent and any party known to be directly affected by the relief sought.

112. Failure specifically to include or reference particular sections or provisions of the Plan or any related document in this Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Bankruptcy Court that the Plan (and the exhibits and schedules thereto) be confirmed and such related agreements be approved in their entirety and incorporated herein by reference.

113. Any document related to the Plan that refers to a plan of reorganization of the Debtors other than the Plan confirmed by this Order shall be, and it hereby is, deemed to be modified such that the reference to a plan of reorganization of the Debtors in such document shall mean the Plan confirmed by this Order, as appropriate.

114. Without intending to modify any prior Order of the Bankruptcy Court (or any agreement, instrument or document addressed by any prior Order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in such agreement, instrument or document). In the event of any inconsistency between the Plan or any agreement, instrument or

document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.  Notwithstanding the foregoing, in the event of any inconsistency between the terms of the Plan or this Order and the Resolution of Reclamation Obligations, the Resolution of Reclamation Obligations shall govern.

115.    Nothing in this Order shall alter or affect the rights of the Creditors' Committee under the Global Settlement Stipulation upon the occurrence of a Settlement Termination Event (as defined in the Global Settlement Stipulation).

116.    If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.C of the Plan, then, except where the failure to satisfy or duly waive such a condition is within the Debtors' sole control, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, including the Exit Facility Agent, the Debtors may file a motion requesting that the Bankruptcy Court vacate this Order; provided, however, that, notwithstanding the filing of such motion, this Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion.  If this Order is vacated, pursuant to Section III.D of the Plan:  (a) the Plan shall be null and void in all respects, including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.G of the Plan and (iii) the releases described in Section III.E.6 of the Plan; and (b) nothing contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or this Order shall be or shall be deemed to be (i) a waiver or release of any Claims by or against, or any Interest in, any Debtor, (ii) an admission of any sort by the Debtors or any other party in interest or

(iii) prejudicial in any manner to the rights of the Debtors or any other party in interest; provided, however, the Exit Facility Agent and the Exit Lenders shall be entitled to payment of the Liquidated Damage Fees and expense reimbursement if and to the extent earned in accordance with their terms under the Exit Facility Documents.

117.    The business and Assets of the Debtors shall remain subject to the jurisdiction of the Bankruptcy Court until the Effective Date.  Notwithstanding the entry of this Order, from and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, jurisdiction over those matters and issues described in Article VIII of the Plan.

118.    Notwithstanding any other provision of this Order or any other order of the Bankruptcy Court to the contrary, no assignment of any rights and interests of any licensee in any federal license or authorization issued by the Federal Communications Commission ("FCC") shall take place prior to the issuance of FCC regulatory approval for such assignment pursuant to the Communications Act of 1934, as amended, and the rule and regulations promulgated thereunder.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

119.    No provision in the Plan or this Order relieves any Debtor or Reorganized Debtor or transferee from its obligation to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the FCC.  No transfer of control to a Reorganized Debtor or third party of any federal license or authorization issued by the FCC or of control of a licensee shall take place prior to the issuance of FCC regulatory approval for

such transfer of control or assignment pursuant to applicable FCC Regulations.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on transfers and assignments, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority.

120.    Nothing in this Order or the Plan, or the consummation of the NewCo Asset Sale, shall limit, impair or otherwise modify any rights or obligations of Kentucky Utilities Company ("KUC") with respect to or under (a) the Adequate Assurance Deposit, (b) the Revelation Account Refund, (c) any Utility Agreement or (d) the *Stipulation and Agreed Order Resolving Kentucky Utilities Company's Objection to Motion of the Debtors, Pursuant to Section 366 of the Bankruptcy Code, for Interim and Final Orders Establishing Adequate Assurance Procedures with Respect to Their Utility Providers* (Docket No. 2885) (the "KUC Stipulation"), as such terms are defined in the KUC Stipulation.

121.    Nothing in this Order or the Plan shall limit, impair or otherwise modify any rights or obligations of the Retiree Committee, the VEBA Trustees (as defined in the Retiree Committee Settlement), the Debtors, the First Lien Agent, the First Lien Lenders or NewCo under the Retiree Committee Settlement and any other orders of this Court with respect to the same.  For the avoidance of doubt, NewCo shall be bound by, and required to make the payments and perform its obligations under, paragraphs 4, 5 and 7 of the Retiree Committee Settlement, in all respects, subject to the terms thereof.

122.    CNG Coal Company ("CNG") holds a royalty interest (the "CNG Royalty Interest") in certain coal reserves owned by the Debtors in Greene County, Pennsylvania and in Marshall and Wetzel Counties, West Virginia (which royalty interest is more specifically described in the Indenture filed in Deed Book 158, Page 259 in Greene County, Pennsylvania; in

Deed Book 591, Page 291 in Marshall County, West Virginia; and in Deed Book 354, Page 629 in Wetzel County, West Virginia). The Debtors agree that the CNG Royalty Interest is a property right of CNG that runs with the land and cannot be assumed or rejected pursuant to section 365 of the Bankruptcy Code. The Debtors also agree that they are not seeking to sell NewCo Assets free and clear of the CNG Royalty Interest.

123.    Neither PRC/Holley (as such term is defined in Docket No. 2856) nor the Lessors (as such term is defined in Docket No. 2950) (together, the "Lessor Parties") are signatories to the Resolution of Reclamation Obligations or have any contractual rights or obligations thereunder, and nothing in this Order or the approval of the Resolution of Reclamation Obligations herein is intended to modify or waive the rights, remedies or defenses of the Lessor Parties (a) in connection with any Unexpired Leases to which they are a party and that are assumed by the Debtors and assigned to the Reorganized Debtors or (b) as landowners in the State of West Virginia, and all such rights of the Lessor Parties are expressly reserved. For the avoidance of doubt, nothing in this paragraph modifies or limits the terms of the Resolution of Reclamation Obligations.

124.    Each Second Lien Noteholder may, in its sole discretion, elect to transfer all or a portion of the Second Lien Noteholder Distribution on account of such Second Lien Noteholder's respective Pro Rata NewCo ABL Participation Rights to any other person or entity, irrespective of whether such other person or entity holds any Second Lien Notes, and the Disbursing Agent shall, at the applicable Second Lien Noteholder's sole cost and expense, distribute such applicable portion of such Second Lien Noteholder Distribution to the applicable transferee, and in connection with the closing thereof, the NewCo ABL Facility may initially be provided by one or more lenders that will facilitate allocating, in accordance with the terms of this Order and

the Plan, all or a portion of the NewCo ABL Facility and the Second Lien Noteholder

Distribution among the Second Lien Noteholders and such other persons or entities that

subsequently become lenders under the NewCo ABL Facility.  For the avoidance of doubt,

nothing in this paragraph shall, or shall be deemed to, alter, modify or otherwise affect any of the

terms, conditions or restrictions set forth in any solicitation document sent to Second Lien

Noteholders in connection with the exercise of their respective NewCo ABL Participation

Rights.

125.    Approval of Certain Labor-Related Agreements.  Each of the following are

approved in their entirety:  (a) that certain Agreement to Fund the VEBA between Contura

Energy, Inc. and the UMWA; (b) that certain Memorandum of Understanding on Transition of

New Labor Agreements among Contura Energy, Inc., the UMWA and Debtors Cumberland Coal

Resources, LP, Emerald Coal Resources, LP, Litwar Processing Company, LLC, Power

Mountain Coal Company, Goals Coal Company, Bandmill Coal Corporation, Longfork Coal

Company, Omar Mining Company and Dickenson-Russel Coal Company, LLC; and (c) that

certain Agreement to Mine the Foundation Reserves Under the Terms of the 2016 Agreement

between Contura Energy, Inc. and the UMWA.

**FF.    Treatment of Sureties**

126.    Certain commercial surety companies (collectively, the "Sureties" and each,

individually, a "Surety") — including, but not limited to, Arch Insurance Company, Argonaut

Insurance Company, Aspen American Insurance Company, Atlantic Specialty Insurance

Company and its affiliates One Beacon Insurance Group and One Beacon Surety, Bond

Safeguard Insurance Company, Federal Insurance Company, Fidelity & Deposit Company of

Maryland, Indemnity National Insurance Company, Lexon Insurance Company, Liberty Mutual

Insurance Company, Travelers Casualty and Surety Company of America, Westchester Fire

Insurance Company and Zurich American Insurance Company — have issued commercial surety

bonds on behalf of the Debtors with respect to assets and other contractual obligations to be

transferred to NewCo or to remain with the Reorganized Debtors (collectively, the "Existing

Surety Bonds" and, each individually, an "Existing Surety Bond").

127.   NewCo Replacement Surety Bonds.  To the extent that any of the Existing Surety

Bonds relate to NewCo Assets, which include, without limitation, mining permits, surface and

coal leases and mine-related facilities and other contract obligations, such Existing Surety Bonds

shall be replaced by NewCo (collectively, the "NewCo Replacement Surety Bonds" and, each

individually, a "NewCo Replacement Surety Bond").  Applications for the transfer of permits

from the Debtors to NewCo, as required by applicable law, will be made no later than 30 days

after the Closing of the NewCo Asset Sale, and NewCo Replacement Surety Bonds equal in

amount (or such other amount that may be agreed to with the applicable lessor or permit

authority) to the Existing Surety Bonds shall be timely submitted as required by the obligee in

accord with applicable permit transfer and bonding regulations.

128.   Reorganized Debtors' Surety Bonds.  As of the Effective Date, at the Debtors'

election, any Existing Surety Bond related to assets of the Reorganized Debtors shall either

(a) be deemed assumed by the Reorganized Debtors with the Sureties' consent on the terms and

conditions set forth in this paragraph (collectively, the "Reorganized Debtor Continued Surety

Bonds") or (b) be replaced on terms agreed upon by the Reorganized Debtors and the applicable

Surety (collectively, the "Reorganized Debtor Replaced Surety Bonds").  In lieu of the

assumption of a Reorganized Debtor Continued Surety Bond, a Surety may elect to issue a name-

change rider to any such bond or bonds or to issue new bonds naming the applicable

Reorganized Debtor as permittee/principal.

129.    Indemnity Agreements.  The Reorganized Debtors shall be deemed to have assumed, as of the Effective Date, and shall continue to be obligated under any of the indemnity agreements or related agreements in place with each such Surety immediately prior to the Petition Date (collectively, the "Existing Indemnity Agreements" and, each, an "Existing Indemnity Agreement").  The failure to expressly identify any Indemnity Agreement in any schedule attached to the Plan or this Order shall not imply the rejection or failure to assume said Existing Indemnity Agreement.  Upon request of any of the Sureties, the Reorganized Debtors agree to execute a new indemnity agreement in a form satisfactory to the applicable Surety in its discretion, and either substantially similar to the Existing Indemnity Agreements with such Surety or otherwise acceptable to the Reorganized Debtors, for any of such Surety's Reorganized Debtor Continued Surety Bonds, riders or new bonds issued to replace a Reorganized Debtor Continued Surety Bond.

130.    Parent Indemnification.  Alpha Natural Resources Holdings, Inc. and ANR, Inc., as corporate parents of the Reorganized Debtors, each agree to execute a new indemnity agreement for any Reorganized Debtor Continued Surety Bond, rider or Reorganized Debtor Replaced Surety Bond, containing terms and conditions acceptable to such Surety in its discretion, and which shall either be substantially similar to the existing corporate parent indemnity agreements between ANR and the applicable Surety or otherwise acceptable to Reorganized ANR.

131.    Premiums.  Consistent with previous Orders of the Court, the Debtors will pay all premiums on the Existing Surety Bonds as those premiums have become due prior to the Effective Date, and the Reorganized Debtors will pay premiums on those Existing Surety Bonds subject to replacement by NewCo until those bonds are released.  The Reorganized Debtors shall

pay any and all premiums and any other obligations that may come due in respect of any Reorganized Debtor Continued Surety Bond, rider or a Reorganized Debtor Replaced Surety Bond.

132.    Debtor Bonded Obligations.  The discharge or release of any Claim in the Plan or this Order shall not release, discharge, preclude or enjoin any obligation of the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date) to the Sureties under the Existing Surety Bonds, Existing Indemnity Agreements and obligations under the common law of suretyship and, solely to the extent that such Existing Surety Bonds are not replaced by NewCo or the Reorganized Debtors, such obligations to the Sureties are not being released, discharged, precluded or enjoined by the Plan, this Order or agreements with third parties.

133.    Existing Collateral.  Notwithstanding any other provision of the Plan or this Confirmation Order, all collateral, on which the applicable Surety had a perfected lien as of the Effective Date, and all letters of credit and proceeds from drawn letters of credit issued to the Sureties as security for a Debtor's obligations under the Existing Surety Bonds (collectively, the "Surety LCs") shall remain in place to secure all payment and performance obligations of (a) the Debtors and the Reorganized Debtors under the Existing Surety Bonds or for obligations arising under the Existing Indemnity Agreements until replaced or released and (b) thereafter the Reorganized Debtors under the Reorganized Debtor Continued Surety Bonds and any Existing Indemnity Agreements and any new indemnity agreements related thereto; provided, however, that nothing in this paragraph 133 shall be deemed to limit such Surety's right to draw any Surety LC.  Notwithstanding any other provisions of the Plan or other agreements between the Debtors and third parties, nothing in the discharge, injunction and release provisions of the

Plan, including without limitation Sections III.E.4, III.E.5 and III.E.6 shall be deemed to apply to the Sureties' claims to pursue the Surety LCs, nor shall these provisions be interpreted to bar, impair, prevent or otherwise limit the Sureties from exercising their valid rights under or with respect to any of the Existing Surety Bonds (until replaced), NewCo Replacement Surety Bonds, Reorganized Debtor Continued Surety Bonds, any related indemnity agreements, letters of credit or applicable law, including SMCRA or the common law of suretyship.  Each Surety's rights to hold and use the proceeds of a Surety LC as collateral support for any Debtor's or Reorganized Debtor's obligations to a Surety shall be applicable to the collateral support required for any Reorganized Debtor Continued Surety Bonds.

134.    Withdrawal of Surety Proofs of Claim.  Except for liquidated claims for losses, costs or expenses for professional fees and related investigations incurred by the Sureties as a result of having issued the Existing Surety Bonds that are consistent with the Existing Indemnity Agreements, all proofs of Claim on account of or in respect of any Existing Surety Bond that is replaced or becomes a Reorganized Debtor Continued Surety Bond shall be deemed withdrawn automatically and without further notice to or action by the Debtors, the Reorganized Debtors or the Bankruptcy Court.

135.    Surety Rights as to Third Parties Unaffected; No Waiver.  Nothing in the Plan, this Order or the Resolution of Reclamation Obligations shall be interpreted to alter, diminish or enlarge the rights or obligations of the Sureties in regard to state and federal agencies, third parties or otherwise under any surety bonds, any indemnity agreements or applicable law. Further, nothing contained in paragraphs 126 through 135 relating to Surety matters shall constitute or be deemed a waiver of any Cause of Action that any Debtor or Reorganized Debtor may hold against any entity.

Richmond, Virginia

Dated:_____, 2016

Jul 12 2016

/s/ Kevin R Huennekens

UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: 7/12/16

WE ASK FOR THIS:

Respectfully submitted,

/s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman (admitted pro hac vice)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/  Henry P. (Toby) Long, III

NAI-1501465154v6

-99-

# APPENDIX I

MAY 27 PLAN

NAI-1501465154v6

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

-and-

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et</u> <u>al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## SECOND AMENDED JOINT PLAN
## <u>OF REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION</u>

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

    A.      Defined Terms ....................................................................................................... 1

    B.      Rules of Interpretation and Computation of Time ........................................... 24

          1.      Rules of Interpretation ......................................................................... 24

          2.      Computation of Time ........................................................................... 24

ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS; CRAMDOWN;
EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................................... 24

    A.      Unclassified Claims .............................................................................................. 24

          1.      Payment of Administrative Claims ...................................................... 24

          2.      Payment of Priority Tax Claims ........................................................... 27

    B.      Classified Claims and Interests ........................................................................... 28

    C.      Subordination; Reservation of Rights to Reclassify Claims ............................... 30

    D.      Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims;
Maximum Recovery ............................................................................................. 30

    E.      Confirmation Without Acceptance by All Impaired Classes ............................. 30

    F.      Class Without Voting Claim Holders .................................................................. 30

    G.      Treatment of Executory Contracts and Unexpired Leases ................................. 31

          1.      Executory Contracts and Unexpired Leases to Be Assumed ............... 31

          2.      Approval of Assumptions and Assignments; Assignments Related to
Restructuring Transactions .................................................................. 32

          3.      Payments Related to the Assumption of Executory Contracts and Unexpired
Leases .................................................................................................. 32

          4.      Contracts and Leases Entered Into After the Petition Date or Previously
Assumed ............................................................................................... 32

          5.      Rejection of Executory Contracts and Unexpired Leases .................... 32

          6.      Rejection Damages Bar Date ................................................................ 33

          7.      Executory Contract and Unexpired Lease Notice Provisions ............... 33

          8.      Obligations to Indemnify Directors, Officers and Employees ............. 34

          9.      No Change in Control ........................................................................... 34

ARTICLE III CONFIRMATION OF THE PLAN ............................................................................... 34

    A.      Conditions Precedent to Confirmation ................................................................ 34

    B.      Conditions Precedent to the Effective Date ........................................................ 35

    C.      Waiver of Conditions to Confirmation or the Effective Date ............................. 36

    D.      Effect of Nonoccurrence of Conditions to the Effective Date ........................... 36

    E.      Effect of Confirmation of the Plan ..................................................................... 36

          1.      Dissolution of Official Committees ...................................................... 36

| | | | |
|---|---|---|---|
| | 2. | Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Recovery Actions | 37 |
| | 3. | Comprehensive Settlement of Claims and Controversies | 37 |
| | 4. | Discharge of Claims and Termination of Interests | 37 |
| | 5. | Injunction | 38 |
| | 6. | Releases | 38 |
| | 7. | Exculpation | 40 |
| | 8. | Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies | 40 |
| | 9. | Liabilities Under Single-Employer Defined Benefit Pension Plans Not Terminated Prior to the Confirmation Date | 40 |
| ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN | | | 41 |
| A. | | Continued Corporate Existence and Vesting of Assets | 41 |
| B. | | Restructuring Transactions | 41 |
| | 1. | Restructuring Transactions Generally | 41 |
| | 2. | Obligations of Any Successor Corporation in a Restructuring Transaction | 42 |
| C. | | The NewCo Asset Sale | 42 |
| D. | | The Resolution of Reclamation Obligations | 42 |
| E. | | Corporate Governance and Directors and Officers | 42 |
| | 1. | Constituent Documents of Reorganized ANR and the Other Reorganized Debtors | 42 |
| | 2. | Directors and Officers of Reorganized ANR and the Other Reorganized Debtors | 43 |
| F. | | Reorganized ANR Preferred Interests | 43 |
| G. | | Reorganized ANR Contingent Revenue Payment | 43 |
| H. | | Contingent Credit Support | 44 |
| I. | | Initial Cash | 44 |
| J. | | Restricted Cash Reclamation Accounts | 44 |
| K. | | Reorganized ANR Common Stock | 44 |
| L. | | NewCo Equity and NewCo Warrants | 45 |
| M. | | Employment-Related Agreements; Retiree Benefits; Workers' Compensation Programs | 45 |
| | 1. | Employment-Related Agreements | 45 |
| | 2. | Retiree Benefits | 45 |
| | 3. | Assumption of Pension Plans | 45 |
| | 4. | Continuation of Workers' Compensation Programs | 46 |
| | 5. | Black Lung Excise Taxes | 46 |
| N. | | Corporate Action | 46 |
| O. | | Special Provisions Regarding Insured Claims | 46 |

| | 1. | Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims | 46 |
| | 2. | Assumption and Continuation of Insurance Contracts | 46 |
| P. | | Cancellation and Surrender of Instruments, Securities and Other Documentation | 47 |
| | 1. | Notes | 47 |
| | 2. | Old Common Stock | 47 |
| Q. | | Release of Liens | 47 |
| R. | | Effectuating Documents; Further Transactions | 48 |
| S. | | Exemption from Certain Transfer Taxes | 48 |
| T. | | Compliance with Federal Securities Laws | 48 |

ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN .......... 48

| A. | | Distributions for Claims Allowed as of the Effective Date | 48 |
| B. | | Method of Distributions to Holders of Claims | 48 |
| C. | | Distributions of the NewCo Contribution | 49 |
| D. | | Distributions on Account of Allowed Noteholder Claims | 49 |
| E. | | Compensation and Reimbursement for Services Related to Distributions | 49 |
| F. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 49 |
| | 1. | Delivery of Distributions | 49 |
| | 2. | Undeliverable Distributions Held by Disbursing Agents | 49 |
| G. | | Timing and Calculation of Amounts to Be Distributed | 50 |
| | 1. | Distributions to Holders of Allowed Claims | 50 |
| | 2. | Interest on Claims | 50 |
| | 3. | *De Minimis* Distributions | 51 |
| H. | | Distribution Record Date | 51 |
| I. | | Means of Cash Payments | 51 |
| J. | | Establishment of Reserves and Provisions Governing Same | 51 |
| K. | | Surrender of Canceled Instruments or Securities | 52 |
| L. | | Withholding and Reporting Requirements | 52 |
| M. | | Setoffs | 52 |
| N. | | Application of Distributions | 52 |

ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........................ 53

| A. | | Claims Oversight Committee | 53 |
| B. | | Treatment of Disputed Claims | 53 |
| | 1. | Tort Claims | 53 |
| | 2. | Disputed Insured Claims | 54 |
| | 3. | No Distributions Until Allowance | 54 |
| C. | | Prosecution of Objections to Claims | 54 |

| | 1. | Objections to Claims | 54 |
| | 2. | Extension of Claims Objection Bar Date | 54 |
| | 3. | Authority to Prosecute Objections | 54 |
| | 4. | Authority to Amend Schedules | 54 |
| D. | | Distributions on Account of Disputed Claims Once Allowed | 55 |
| ARTICLE VII CONSOLIDATION | | | 55 |
| A. | | Consolidation | 55 |
| B. | | Order Granting Consolidation | 55 |
| ARTICLE VIII RETENTION OF JURISDICTION | | | 55 |
| ARTICLE IX MISCELLANEOUS PROVISIONS | | | 57 |
| A. | | Modification of the Plan | 57 |
| B. | | Revocation of the Plan | 57 |
| C. | | Severability of Plan Provisions | 57 |
| D. | | Successors and Assigns | 57 |
| E. | | Plan/Confirmation Order Controls | 58 |
| F. | | Service of Documents | 58 |
| | 1. | The Debtors and the Reorganized Debtors | 58 |
| | 2. | The Creditors' Committee | 59 |
| | 3. | The Retiree Committee | 59 |
| | 4. | The DIP Agents and the First Lien Agent | 60 |
| | 5. | The *Ad Hoc* Committee of Second Lien Noteholders | 60 |
| | 6. | The Second Lien Notes Trustee | 60 |
| | 7. | The UMWA | 61 |

**TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit I.A.61 | Principal Terms of Contingent Credit Support |
| Exhibit I.A.72 | Debtors in the Chapter 11 Cases |
| Exhibit I.A.76 | Schedule of Designated Non-Reserve Price Assets |
| Exhibit I.A.77 | Schedule of Designated Reserve Price Assets |
| Exhibit I.A.100 | Principal Terms of the Exit Facility |
| Exhibit I.A.119 | Form of Promissory Note to Be Issued to the First Lien Lenders by NewCo |
| Exhibit I.A.132 | Principal Terms of the GUC Distribution Note |
| Exhibit I.A.162 | Principal Terms of the NewCo ABL Facility |
| Exhibit I.A.169 | Principal Terms of the NewCo Preferred Interests |
| Exhibit I.A.170 | Principal Terms of the NewCo Warrant Agreement |
| Exhibit I.A.211 | Principal Terms of the Reorganized ANR Preferred Interests |
| Exhibit I.A.215 | Reserve Price Assets Schedule |
| Exhibit I.A.216 | Principal Terms of the Resolution of Reclamation Obligations |
| Exhibit I.A.222 | Principal Terms of Second Lien Distribution Note |
| Exhibit I.A.227 | Principal Terms of Second Lien Noteholder Distribution |
| Exhibit I.A.247 | Principal Terms of Series A Preferred Interests |
| Exhibit I.A.248 | Principal Terms of Series B Preferred Interests |
| Exhibit I.A.250 | Stalking Horse APA |
| Exhibit II.G.1.a | Executory Contracts and Unexpired Leases to Be Assumed |
| Exhibit II.G.4 | Previously Assumed Executory Contracts and Unexpired Leases to Be Assigned |
| Exhibit II.G.5 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit IV.B.1 | Restructuring Transactions |
| Exhibit IV.E.1.a | Form Certificates of Incorporation (or Comparable Constituent Documents) for the Reorganized Debtors |
| Exhibit IV.E.1.b | Form Bylaws (or Comparable Constituent Documents) for the Reorganized Debtors |
| Exhibit IV.E.2 | Initial Directors and Officers of Each Reorganized Debtor |
| Exhibit IV.G | Additional Terms Related to Reorganized ANR Contingent Revenue Payment |

## INTRODUCTION

Alpha Natural Resources, Inc., a Delaware corporation, and the other above-captioned debtors and debtors in possession (collectively, as further defined below, the "Debtors") propose the following joint plan of reorganization for the resolution of the outstanding claims against and equity interests in the Debtors.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  Reference is made to the Debtors' Disclosure Statement, distributed contemporaneously with the Plan, for a discussion of the Debtors' history, business, results of operations, historical financial information, projections and properties and for a summary and analysis of the Plan.  Other agreements and documents supplement the Plan and have been or will be filed with the Bankruptcy Court.  These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

**A.      Defined Terms**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "1113/1114 Order" means the *Order (I) Authorizing Rejection of Certain Collective Bargaining Agreements and (II) Modifying Certain Retiree Benefit Obligations Pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code* (Docket No. 2500), entered by the Bankruptcy Court on May 24, 2016, as it may amended, supplemented or otherwise modified.

2.      "2017 Notes" means the 3.75% senior unsecured notes issued under the 2017/2020 Notes Indenture.

3.      "2017/2020 Notes Guarantors" means the Subsidiary Debtors party to the 2017/2020 Notes Indenture, as guarantors.

4.      "2017/2020 Notes Indenture" means the indenture, dated June 1, 2011, as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, among ANR, as issuer, the 2017/2020 Notes Guarantors and the 2017/2020 Notes Trustee, relating to (a) the 3.75% senior unsecured notes due 2017 and (b) the 4.875% senior unsecured notes due 2020.

5.      "2017/2020 Notes Trustee" means Union Bank of California, n/k/a MUFG Union Bank, N.A., in its capacity as trustee under the 2017/2020 Notes Indenture.

6.      "2018 Notes" means the 9.75% senior unsecured notes issued under the 2018 Notes Indenture.

7.      "2018 Notes Indenture" means the indenture, dated June 1, 2011, as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, among ANR, as issuer, the 2017/2020 Notes Guarantors and the 2018 Notes Trustee, relating to the 9.75% senior unsecured notes due 2018.

8.      "2018 Notes Trustee" means Union Bank, N.A., n/k/a MUFG Union Bank, N.A., in its capacity as trustee under the 2018 Notes Indenture.

9.      "2019 Notes" means the 6.00% senior unsecured notes issued under the 2019/2021 Notes Indenture.

10.     "2019/2021 Notes Indenture" means, collectively, and as such documents may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, (a) the (i) indenture and (ii) first supplemental indenture, dated June 1, 2011, among ANR, as issuer, the 2017/2020 Notes Guarantors and the 2019/2021 Notes Trustee; and (b) the second supplemental indenture, dated June 1, 2011, among ANR, as issuer, the 2017/2020 Notes Guarantors, certain additional guarantors and the 2019/2021 Notes Trustee, relating to (x) the 6.00% senior unsecured notes due 2019 and (y) the 6.25% senior unsecured notes due 2021.

11.     "2019/2021 Notes Trustee" means Union Bank, N.A., n/k/a MUFG Union Bank, N.A., in its capacity as trustee under the 2019/2021 Notes Indenture.

12.     "2020 Notes" means the 4.875% senior unsecured notes issued under the 2017/2020 Notes Indenture.

13.     "2021 Notes" means the 6.25% senior unsecured notes issued under the 2019/2021 Notes Indenture.

14.     "*Ad Hoc* Committee of Second Lien Noteholders" means the *ad hoc* committee of holders of Second Lien Notes and its members, represented in the Chapter 11 Cases by Kirkland & Ellis LLP and Kutak Rock LLP.

15.     "Administrative Claim" means a Claim arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises); (b) DIP Claims; (c) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code; (d) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code; (e) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (f) all Postpetition Intercompany Claims.  In addition, Claims pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business shall be treated as Administrative Claims.

16.     "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

17.     "Allowed … Claim" means an Allowed Claim in the particular Class or category specified.

18.     "Allowed Claim" when used:

a.     with respect to any Claim other than an Administrative Claim, means a Claim that is not a Disallowed Claim and:

i.     (a) is listed on a Debtor's Schedules and not designated in the Schedules as either disputed, contingent or unliquidated and (b) is not otherwise a Disputed Claim;

ii.     (a) as to which no objection to allowance has been Filed on or before the Claims Objection Bar Date or such other applicable period of limitation fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Claims and (b) is not otherwise a Disputed Claim;

iii.     that is allowed:  (a) in any Stipulation of Amount and Nature of Claim executed by the applicable Claim holder on or after the Effective Date, (b) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved or authorized by the Bankruptcy Court, (c) pursuant to a Final Order or (d) pursuant to the terms of the Plan; or

iv.    is asserted in a liquidated proof of Claim that is accepted, and is designated for allowance, by the Debtors or the Reorganized Debtors, as set forth in one or more notices Filed with the Bankruptcy Court; and

b.    with respect to an Administrative Claim, means an Administrative Claim that is not a Disallowed Claim and:

i.    (a) as to which no objection to allowance has been Filed on or before the Claims Objection Bar Date or such other applicable period of limitation fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Administrative Claims and (b) is not otherwise a Disputed Claim;

ii.    that is allowed:  (a) in any Stipulation of Amount and Nature of Claim executed by the applicable Claim holder on or after the Effective Date, (b) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved or authorized by the Bankruptcy Court, (c) pursuant to a Final Order or (d) pursuant to Section II.A.1; or

iii.    is properly asserted in a liquidated proof of Claim or request for payment of an administrative expense that is accepted, and is designated for allowance, by the Debtors or the Reorganized Debtors, as set forth in one or more notices Filed with the Bankruptcy Court.

19.    "Allowed Interest" means an Interest registered in the stock register, membership interest register or any similar register or schedule maintained by or on behalf of a Debtor as of the Distribution Record Date and not timely objected to or that is allowed by a Final Order.

20.    "ANR" means Debtor Alpha Natural Resources, Inc.

21.    "Assets" means a Debtor's property, rights and interest that are property of a Debtor's Estate pursuant to section 541 of the Bankruptcy Code.

22.    "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

23.    "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

24.    "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the District Court.

25.    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

26.    "Bar Date" means the applicable bar date by which a proof of Claim or request for payment of administrative expenses must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

27.    "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim or requests for payment of administrative expenses in the Chapter 11 Cases, including the *Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* (Docket No. 1156), entered by the Bankruptcy Court on December 22, 2015, as it may be amended, supplemented or otherwise modified.

28.     "Bidding Procedures Order" means the *Second Order Establishing Bidding and Sale Procedures for the Potential Sale of Certain Mining Properties and Related Assets* (Docket No. 1754), entered by the Bankruptcy Court on March 11, 2016.

29.     "Black Lung Act" means the Black Lung Benefits Act, 30 U.S.C. §§ 901, *et seq.*, as it may be amended.

30.     "Black Lung Benefits" means, collectively, the health and disability benefits payable to beneficiaries under the Black Lung Act.

31.     "Black Lung Claims" means any Claims arising, or related to the period, prior to the Effective Date for the payment of Black Lung Benefits, including any Claims for reimbursement of the Black Lung Disability Trust Fund.

32.     "Black Lung Disability Trust Fund" means the "Black Lung Disability Trust Fund," as such term is defined in 26 U.S.C. § 9501(a)(1).

33.     "Black Lung Excise Taxes" means, collectively, any federal excise Taxes imposed pursuant to 26 U.S.C. § 4121, as it may be amended.

34.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

35.     "Business Plan" means the Five Year Business Plan of the Debtors, dated February 8, 2016.

36.     "Cash" means legal tender of the United States of America and equivalents thereof.

37.     "Category 1 General Unsecured Claims" means, collectively, all General Unsecured Claims that are not Category 2 General Unsecured Claims.

38.     "Category 1 General Unsecured Claims Asset Pool" means:  (a) Distribution Cash in the total aggregate amount of $2,500,000; and (b) either (i) if the Cash portion of the First Lien Lender Distribution does not equal or exceed the First Lien Lender Distributable Cash Recovery Threshold, the GUC Distribution Note or (ii) if the Cash portion of the First Lien Lender Distribution equals or exceeds the First Lien Lender Distributable Cash Recovery Threshold, additional Distribution Cash in the total aggregate amount of $5,500,000; provided that if the total aggregate Distribution described in subsections (a) and (b) above is insufficient to provide a recovery to holders of Category 1 General Unsecured Claims that equals or exceeds the Category 1 Minimum Recovery Threshold, the Category 1 General Unsecured Claims Asset Pool shall also include the Reorganized ANR Contingent Revenue Payment Allocation.

39.     "Category 1 Minimum Recovery Threshold" means an aggregate recovery on account of Allowed Category 1 General Unsecured Claims equal to 3.0% of the aggregate Allowed amount of all Category 1 General Unsecured Claims.

40.     "Category 1 Recovery Deficiency" means (a) the Category 1 Minimum Recovery Threshold minus (b) the total aggregate Distribution on account of Category 1 General Unsecured Claims (prior to any Reorganized ANR Contingent Revenue Payment Allocation), to the extent that such difference constitutes a positive number.

41.     "Category 2 General Unsecured Claims" means, collectively, all General Unsecured Claims that are (a) Noteholder Claims (including any Second Lien Noteholder Claims or Massey Convertible Noteholder Claims that, in either case, constitute Deficiency Claims), (b) Pension Claims, (c) Union Claims and (d) Black Lung Claims.

42.     "Category 2 General Unsecured Claims Asset Pool" means:  (a) the Category 2 NewCo Common Stock Distribution; (b) the NewCo Warrants; (c) the Reorganized ANR Contingent Revenue Payment, less any

Reorganized ANR Contingent Revenue Payment Allocation; (d) the Reorganized ANR Common Stock; and (e) the Contingent Reserve Price Asset Sale Proceeds.

43.    "Category 2 NewCo Common Stock Distribution" means 5.0% of the NewCo Common Stock, to be distributed on account of Allowed Category 2 General Unsecured Claims.

44.    "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever of any of the Debtors or their Estates, including any Recovery Actions, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise.

45.    "Chapter 11 Cases" means, collectively, the bankruptcy cases commenced in the Bankruptcy Court by the Debtors under chapter 11 of the Bankruptcy Code and captioned as In re Alpha Natural Resources, Inc., et al., No. 15-33896 (KRH) (Bankr. E.D. Va.).

46.    "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor or its Estate.

47.    "Claims and Balloting Agent" means Kurtzman Carson Consultants LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 11 Cases.

48.    "Claims Objection Bar Date" means, for all Claims, including Claims asserting priority under section 503(b)(9) of the Bankruptcy Code, other than Allowed Claims, the latest of:  (a) 180 days after the Effective Date, subject to extension by order of the Bankruptcy Court; (b) 90 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such a Claim.

49.    "Claims Oversight Committee" means the committee established pursuant to Section VI.A for the purpose of overseeing the Debtors' objections to, and settlements of, General Unsecured Claims.

50.    "Claims Oversight Committee Professionals" means, collectively, any professionals retained by the Claims Oversight Committee pursuant to Section VI.A.

51.    "Claims Oversight Committee Professionals Fee Cap" means a maximum limit of $1.0 million payable by the Reorganized Debtors, pursuant to Section VI.A, for reasonable and documented fees and expenses of Claims Oversight Committee Professionals.

52.    "Claims Oversight Escrow Account" means an escrow account, with customary release provisions, to be established pursuant to Section VI.A to facilitate the payment of the fees and expenses of Claims Oversight Committee Professionals.

53.    "Class" means a class of Claims, as described in Article II.

54.    "Coal Act" means the Coal Industry Retiree Health Benefit Act, 26 U.S.C. §§ 9701, et seq., as it may be amended.

55.    "Coal Act Claims" means Claims arising under the Coal Act or any related liability that might arise as to any Person as a successor to any of the Debtors.

56.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

57.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

58.    "Confirmation Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, which documents will be Filed no later than seven calendar days before the Confirmation Hearing, to the extent not Filed earlier; provided, however, that Exhibits I.A.76, I.A.77, I.A.215, I.A.250, II.G.1.a, II.G.4, II.G.5 and IV.B.1 will be Filed no later than seven calendar days prior to the Voting Deadline.  All Confirmation Exhibits will be made available on the Document Website once they are Filed.  The Debtors reserve the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Confirmation Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

59.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

60.    "Confirmation Order" means the order of the Bankruptcy Court (a) confirming the Plan pursuant to section 1129 of the Bankruptcy Code, (b) approving the Stalking Horse APA and the Asset sale contemplated therein, (c) approving the Diminution Claim Allowance Settlement and the Unencumbered Asset Settlement on a final and non-conditional basis and (d) granting certain additional relief.

61.    "Contingent Credit Support" means unsecured credit support to be provided by NewCo to Reorganized ANR in the aggregate total amount of $35 million, subject to the terms and conditions of the Global Settlement Term Sheet, on substantially the terms set forth on Exhibit I.A.61.

62.    "Contingent Reorganized ANR Consideration" means, in the event that (a) a Material Reorganized ANR Transaction is consummated and (b) the portion of the Reorganized ANR Contingent Revenue Payment associated with assets sold or transferred as part of such Material Reorganized ANR Transaction is not assumed by any counterparty to such Material Reorganized ANR Transaction, an amount equal to the total aggregate present value of the revenues projected in the Business Plan anticipated to be realized during the remaining life of the Reorganized ANR Contingent Revenue Payment associated with any assets sold or transferred as part of such Material Reorganized ANR Transaction, which present value shall be discounted, on a semiannual basis (assuming a 360-day year consisting of 12 30-day months) at a rate equal to the Treasury Rate plus 20 basis points.

63.    "Contingent Reserve Price Asset Sale Proceeds" means, in the event that any Non-Material Reserve Price Assets are sold to a purchaser other than the First Lien Lenders or NewCo, 7.5% of the net cash proceeds of such sale of Non-Material Reserve Price Assets, to be distributed to holders of Category 2 General Unsecured Claims on the same ratable basis as such holders shall receive the NewCo Warrants.

64.    "Contract Procedures Order" means an order of the Bankruptcy Court, entered on or prior to the Confirmation Date, which approves procedures to address the treatment of certain agreements in the Chapter 11 Cases in conjunction with the Plan, including the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases, and establishes the form and manner of notice to be given to counterparties to such agreements with the Debtors.

65.    "Control" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

66.    "Core Asset Sale Motion" means the *Debtors' Omnibus Motion for Entry of: (I) an Order Establishing Bidding and Sale Procedures for the Potential Sale of Certain Mining Properties and Related Assets; (II) One or More Orders Approving the Sale of Such Assets; (III) an Order Approving Settlements Related to Unencumbered Assets and the Pre-Petition Lenders' Diminution Claims; and (IV) an Order Approving Amendments to Certain Case Milestones in Connection with the DIP Credit Agreement* (Docket No. 1464), Filed by the Debtors on February 8, 2016.

67.    "Core Asset Sale Order" means any order entered by the Bankruptcy Court approving one or more sales of Assets in connection with the Core Asset Sale Motion, including the PLR Order and the Confirmation Order.

68.     "Creditors' Committee" means the statutory official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as constituted from time to time.

69.     "Cross-Collateralization Claims" means Claims against the Debtors arising in connection with "Cross-Collateralization Liens" as such term is defined in the Final DIP Order.

70.     "Cure Amount Claim" means a Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

71.     "*De Minimis* Sale Order" means the *Order Establishing Procedures for the Sale, Transfer or Abandonment of Miscellaneous and De Minimis Assets and Granting Certain Related Relief* (Docket No. 466), entered by the Bankruptcy Court on September 17, 2015, as it may be amended, supplemented or otherwise modified.

72.     "Debtors" means, collectively, the above-captioned debtors and debtors in possession identified on Exhibit I.A.72.

73.     "Deficiency Claim" means a General Unsecured Claim for the difference between (a) the total amount of an Allowed Claim and (b) the portion of such Allowed Claim that constitutes an Allowed Secured Claim.

74.     "Derivative Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) or Cause of Action that is the property of any of the Debtors' Estates pursuant to section 541 of the Bankruptcy Code.

75.     "Designated Chapter 5 Causes of Action" means any claims or causes of action arising under sections 544, 545, 547 or 548 and the related provisions of sections 546 and 550 of the Bankruptcy Code.

76.     "Designated Non-Reserve Price Assets" means, collectively, the Non-Reserve Price Assets set forth on the schedule attached hereto as Exhibit I.A.76.

77.     "Designated Reserve Price Assets" means, collectively, the Reserve Price Assets set forth on the schedule attached hereto as Exhibit I.A.77.

78.     "Diminution Claim Allowance Settlement" means the settlement among the Debtors and the First Lien Lenders, approved by the Bankruptcy Court pursuant to the Lender Settlements Order, regarding the methodology for calculating the First Lien Lender Diminution Claim.

79.     "DIP Agents" means, together, the First Out DIP Agent and the Second Out DIP Agent.

80.     "DIP Claim" means any Claim arising under or evidenced by (a) the First Out DIP Credit Agreement or the Second Out DIP Credit Agreement or (b) the Final DIP Order.  For the avoidance of doubt, DIP Claims include, without limitation, (a) First Out DIP Claims and Second Out DIP Claims; (b) the fees, costs, expenses and other amounts payable (or that may become payable) to the DIP Agents, Citigroup Global Markets Inc. (in its capacity as sole lead arranger under the DIP Credit Agreements) and/or the DIP Lenders under paragraph 7(c)(iii) of the Final DIP Order; and (c) the fees and expenses of the First Lien Agent, as provided in paragraph 15(d) of the Final DIP Order.

81.     "DIP Credit Agreements" means, together, the First Out DIP Credit Agreement and the Second Out DIP Credit Agreement.

82.     "DIP Lenders" means, collectively, those entities identified as "Lenders" in the DIP Credit Agreements and their respective permitted successors and assigns, solely in their capacity as "Lenders" under the DIP Credit Agreements.

83.     "Disallowed," when used with respect to a Claim, means a Claim that has been disallowed by a Final Order.

84.     "Disbursing Agent" means any Reorganized Debtor in its capacity as disbursing agent pursuant to Article V or any Third Party Disbursing Agent.

85.     "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the Debtors, as plan proponents, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

86.     "Disputed Claim" means:

        a.     a Claim that is listed on a Debtor's Schedules as either disputed, contingent or unliquidated;

        b.     a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the holder in a proof of Claim varies from the nature or amount of such Claim as it is listed on the Schedules;

        c.     a Claim that is not listed on a Debtor's Schedules;

        d.     a Claim as to which the applicable Debtor or Reorganized Debtor, or, prior to the Confirmation Date, any other party in interest, has Filed an objection by the Claims Objection Bar Date and such objection has not been withdrawn or denied by a Final Order;

        e.     a Claim for which a proof of Claim or request for payment of Administrative Claim is required to be Filed under the Plan and no such proof of Claim or request for payment of Administrative Claim is timely Filed; or

        f.     a Tort Claim.

87.     "Distribution" means a distribution under the Plan of Cash, interests, securities or other property, as may be applicable, to the holders of Allowed Claims in accordance with and subject to the terms of the Plan.

88.     "Distribution Cash" means all Cash held by Reorganized ANR as of the Effective Date, less any Cash that is part of the Exit Funding as of the Effective Date.

89.     "Distribution Date" means a date selected by the Reorganized Debtors in accordance with the terms of the Plan to make Distributions on account of Allowed Claims.

90.     "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

91.     "District Court" means the United States District Court for the Eastern District of Virginia.

92.     "Document Website" means the internet address www.kccllc.net/alpharestructuring, at which the Plan, the Disclosure Statement and all Filed Confirmation Exhibits shall be available to any party in interest and the public, free of charge.

93.     "DTC" means the Depository Trust Company.

94.     "Effective Date" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date set forth in Section III.B have been met or waived in accordance with Section III.C.

95. "Encumbered Assets" means, collectively, all Assets other than Unencumbered Assets, as of the Effective Date.

96. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq.*

97. "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

98. "Excess Free Cash Flow" means a percentage of Free Cash Flow to be determined pursuant to the Resolution of Reclamation Obligations.

99. "Executory Contract" means a contract to which a Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

100. "Exit Facility" means a senior secured credit facility, in an amount sufficient to provide for the cash collateralization of letters of credit with respect to workers' compensation obligations, that will be entered into by the Reorganized Debtors, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.100.

101. "Exit Facility Agent" means the agent for the lenders under the Exit Facility.

102. "Exit Funding" means working capital for the Reorganized Debtors and any further funding required by the Reorganized Debtors to comply with any Resolution of Reclamation Obligations, the sources of which shall be the First Lien Lender Exit Contribution and any other Cash or the proceeds of other financing obtained by the Reorganized Debtors.

103. "Face Amount" means either (a) the full stated amount in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of a Claim listed on the Debtors' Schedules, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the applicable Debtor or Reorganized Debtor in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code or (iii) proposed by the Debtors or the Reorganized Debtors if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the Debtors' Schedules or is listed in the Debtors' Schedules as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

104. "Federal Judgment Rate" means 0.33%, the federal post-judgment interest rate, as established by 28 U.S.C. § 1961(a), as of the Petition Date.

105. "Fee Claim" means a Claim under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases.

106. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

107. "Final DIP Order" means, collectively, and as such orders may be further modified, amended, supplemented or otherwise revised:  (a) the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* (Docket No. 465), entered by the Bankruptcy Court on September 17, 2015; (b) the *Supplemental DIP Financing Order Authorizing, Pursuant to 11 U.S.C. §§ 105, 363 and 364, (I) Amendment to the DIP Financing and (II) Waiver of Bankruptcy Rule 6004(h)*

*Stay* (Docket No. 973), entered by the Bankruptcy Court on November 19, 2015; and (c) the *Second Supplemental DIP Financing Order Authorizing, Pursuant to 11 U.S.C. §§ 105, 363 and 364, (I) Amendment to the DIP Financing and (II) Waiver of Bankruptcy Rule 6004(h) Stay* (Docket No. 1753), entered by the Bankruptcy Court on March 11, 2016.

108.    "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

109.    "First Lien Agent" means Citicorp North America, Inc., in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement.

110.    "First Lien Credit Agreement" means the Fifth Amended and Restated Credit Agreement, dated as of September 24, 2014 (as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto), by and among ANR, as borrower, the First Lien Guarantors, the First Lien Lenders and the First Lien Agent.

111.    "First Lien Guarantors" means, collectively, the Subsidiary Debtors signatory to the First Lien Credit Agreement as guarantors thereunder.

112.    "First Lien Lender Claims" means, collectively, any Claims of the First Lien Lenders or the First Lien Agent arising under or in connection with the First Lien Credit Agreement and the First Lien Swap Agreements, including (a) any First Lien Lender Diminution Claim and (b) any Cross-Collateralization Claims of the First Lien Lenders or the First Lien Agent.  All First Lien Lender Claims (including, for the avoidance of doubt, any Deficiency Claims arising under or in connection with the First Lien Credit Agreement) shall be Allowed in an aggregate amount equal to the full amount of such First Lien Lender Claims (including principal, interest, all other amounts due and owing as of the Petition Date and, if applicable, Postpetition Interest), and, except as expressly set forth herein or in accordance with the Global Settlement, neither such Claims nor the Distributions thereon shall be subject to reduction, disallowance, subordination, setoff or counterclaim.

113.    "First Lien Lender Diminution Claim" means "Senior Lender Adequate Protection Claim" as such term is defined in the Final DIP Order and as calculated in accordance with the Diminution Claim Allowance Settlement.

114.    "First Lien Lender Distributable Cash Recovery Threshold" means the Cash component of the First Lien Lender Distribution in an amount equal to $300 million, after taking into account all settlements approved pursuant to the Plan.

115.    "First Lien Lender Distribution" means:  (a) all Distribution Cash not distributed to other parties pursuant to the Plan, (b) the Series A Preferred Interests, (c) the First Lien Lender Takeback/Preferred Consideration and (d) 87.5% of the NewCo Equity, each as distributed to the First Lien Lenders in accordance with the Restructuring Transactions, including the Stalking Horse APA; provided that the total aggregate value as of the Effective Date of the First Lien Lender Distribution shall not exceed the aggregate amount of all Allowed Secured First Lien Lender Claims.

116.    "First Lien Lender Exit Contribution" means (a) Cash or other forms of liquidity, in an amount to consistent with the First Lien Lender Settlement, the Global Settlement Term Sheet and the Confirmation Order, to

-10-

fund working capital for the Reorganized Debtors; and (b) consideration, in a form and amount consistent with the First Lien Lender Settlement, the Global Settlement Term Sheet and the Confirmation Order, to fund (i) Reclamation Activities (inclusive of any Initial Reclamation Contribution) and (ii) certain required Distributions under the Plan; provided that such Cash, other forms of liquidity or consideration, or any portion thereof, may be provided, at the option of the First Lien Lenders, by either NewCo or the First Lien Lenders.

117.    "First Lien Lender Remaining Diminution Claim" means the amount of the First Lien Lender Diminution Claim remaining after giving effect to any successful credit bid by the First Lien Lenders of the First Lien Lender Diminution Claim, including with respect to the Stalking Horse APA.

118.    "First Lien Lender Settlement" means the settlement embodied in the Plan and the Confirmation Order among the DIP Lenders, the DIP Agents, the First Lien Lenders, the First Lien Agent and the Debtors, entered into for mutual consideration and which includes, among other things, and in each case in consistent with the terms of the Global Settlement Term Sheet:  (a) the establishment of (i) the amount, form and sources of funding of the First Lien Lender Exit Contribution, (ii) the First Lien Lender Distribution and (iii) the amount of Allowed Secured First Lien Lender Claims; and (b) the incorporation of the Unencumbered Assets Settlement and the Diminution Claim Allowance Settlement.

119.    "First Lien Lender Takeback/Preferred Consideration" means a secured promissory note or loan to be issued to the First Lien Lenders by NewCo on substantially the terms set forth on Exhibit I.A.119.

120.    "First Lien Lenders" means, collectively, the lenders party to the First Lien Credit Agreement or their successors or assigns.

121.    "First Lien Swap Agreements" means, collectively:  (a) the ISDA Master Agreement, dated as of December 20, 2010, between Debtor Alpha Natural Resources, LLC and J.P. Morgan Ventures Energy Corp. (as amended, modified or otherwise supplemented from time to time); (b) the ISDA Master Agreement, dated as of December 20, 2010, between Debtor Alpha Coal West, Inc. and J.P. Morgan Ventures Energy Corp. (as amended, modified or otherwise supplemented from time to time); (c) the ISDA Master Agreement, dated as of March 18, 2010, between Debtor Alpha Natural Resources, LLC and Barclays Bank PLC (as amended, modified or otherwise supplemented from time to time); (d) the ISDA Master Agreement, dated as of March 18, 2010, between Debtor Alpha Coal West, Inc. and Barclays Bank PLC (as amended, modified or otherwise supplemented from time to time); (e) the ISDA Master Agreement, dated as of May 6, 2013, between Debtor Alpha Natural Resources, LLC and Citibank, N.A. (as amended, modified or otherwise supplemented from time to time); and (f) the ISDA Master Agreement, dated as of May 6, 2013, between Debtor Alpha Coal West, Inc. and Citibank, N.A. (as amended, modified or otherwise supplemented from time to time).

122.    "First Out DIP Agent" means Citibank, N.A., in its capacity as administrative agent and collateral agent under the First Out DIP Credit Agreement.

123.    "First Out DIP Claim" means any Claim of the DIP Lenders or the First Out DIP Agent arising under or evidenced by (a) the First Out DIP Credit Agreement and (b) the Final DIP Order (with respect to obligations arising under or evidenced by the Final DIP Order related to the First Out DIP Credit Agreement).

124.    "First Out DIP Credit Agreement" means the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of August 6, 2015, among ANR (as borrower), the Subsidiary Debtors signatory thereto (as guarantors), those entities identified as "Lenders" in such agreement, those entities identified as "Issuing Banks" in such agreement, the First Out DIP Agent and Citigroup Global Markets Inc. (as sole lead arranger and sole book manager), including (a) all amendments thereto and extensions thereof and (b) all security agreements and instruments related thereto.

125.    "Free Cash Flow" means cash generated by the Reorganized Debtors in an amount equal to earnings before taxes, multiplied by an amount equal to one minus the tax rate applicable to the Reorganized Debtors, plus an add-back of all depreciation and amortization expenses, plus or minus, as applicable, any decrease

or increase to the Reorganized Debtors' net working capital, minus capital expenditures, measured on a quarterly basis.

126.     "General Unsecured Claim" means any Claim (including, but not limited to, any Deficiency Claim) that is not an Administrative Claim, Priority Claim, Secured Claim, Cure Amount Claim, Priority Tax Claim, Prepetition Intercompany Claim, Section 510(b) Securities Claim or Section 510(b) Old Common Stock Claim.

127.     "Global Settlement" means the settlement among the Global Settlement Parties, establishing the treatment of General Unsecured Claims, Second Lien Noteholder Claims and Massey Convertible Noteholder Claims pursuant to the Plan, on substantially the terms set forth in the Global Settlement Stipulation and Global Settlement Term Sheet.

128.     "Global Settlement Parties" means, collectively, the Debtors, the Creditors' Committee, the First Lien Lenders, the First Lien Agent, the Second Lien Parties, the DIP Lenders, the DIP Agents and the Massey Convertible Notes Trustee.

129.     "Global Settlement Stipulation" means the *Stipulation and Agreed Order Regarding Process Related Terms of Plan Settlement Term Sheet*, as so ordered by the Bankruptcy Court on May 24, 2016 (Docket No. 2497).

130.     "Global Settlement Term Sheet" means the term sheet attached as Exhibit A to the Global Settlement Stipulation.

131.     "Governmental Unit" means a "governmental unit," as defined in section 101(27) of the Bankruptcy Code.

132.     "GUC Distribution Note" means an unsecured, non-interest-bearing promissory note, if any, issued by NewCo, in the face amount of $5,500,000, due and payable 18 months after the Effective Date (or an earlier date if such note becomes due and payable on such earlier date pursuant to its terms), and otherwise substantially on the terms set forth on Exhibit I.A.132, to be issued to holders of Allowed Category 1 General Unsecured Claims if the First Lien Lender Distributable Cash Recovery Threshold is not met.

133.     "Indenture Trustee Committee Members" means, collectively, (a) the Massey Convertible Notes Trustee, (b) the 2017/2020 Notes Trustee, (c) the 2018 Notes Trustee and (d) the 2019/2021 Notes Trustee.

134.     "Indenture Trustees" means, collectively:  (a) the Second Lien Notes Trustee; (b) the Massey Convertible Notes Trustee; (c) the 2017/2020 Notes Trustee; (d) the 2018 Notes Trustee; and (e) the 2019/2021 Notes Trustee.

135.     "Indentures" means, collectively:  (a) the Second Lien Notes Indentures; (b) the Massey Convertible Notes Indenture; (c) the 2017/2020 Notes Indenture; (d) the 2018 Notes Indenture; and (e) the 2019/2021 Notes Indenture.

136.     "Independent Director" means a director who would qualify as an "independent director" of (a) each member of the Creditors' Committee, (b) the DIP Agent, (c) each of the DIP Lenders, (d) the First Lien Agent and (e) each of the First Lien Lenders within the meaning of Rule 303A.02 of the New York Stock Exchange.

137.     "Initial Reclamation Contribution" means the total aggregate amount of any portion of the Reclamation Funding Amount contributed on the Effective Date to one or more Restricted Cash Reclamation Accounts.

138.     "Insurance Contract" means any policy of third party liability insurance under which any of the Debtors could have asserted, did assert or may in the future assert a right to coverage for any claim, together with any other contracts that pertain or relate to such policy.

139.    "Insured Claim" means any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date:  (a) as to which any Insurer is obligated in whole or in part pursuant to the terms, conditions, limitations and exclusions of its Insurance Contract(s) to pay any judgment, settlement or contractual obligation with respect to the Debtors; or (b) that any Insurer otherwise agrees to pay in whole or in part as part of a settlement or compromise of a claim made under the applicable Insurance Contract(s).

140.    "Insurer" means any Person that issued, or provides coverage under, an Insurance Contract.

141.    "Intercompany Claim" means any Claim held by any Debtor against another Debtor.

142.    "Intercreditor Agreements" means, together, and as such documents may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, (a) the Second Lien Intercreditor Agreement, dated as of May 20, 2014, among the First Lien Agent, the Second Lien Notes Trustee and the other parties thereto and (b) the Debtor-in-Possession Pledge and Security and Intercreditor Agreement, dated as of August 6, 2015, among ANR (as grantor), the additional grantors party thereto, Citibank, N.A. (as term agent, term LC agent and bonding LC agent) and the other agents party thereto.

143.    "Interest" means the rights and interests of the holders of the Old Common Stock of any Debtor, any other instruments evidencing an ownership interest in a Debtor and the rights of any Person to purchase or demand the issuance of any of the foregoing, including:  (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

144.    "Internal Revenue Code" means title 26 of the United States Code, as now in effect or hereafter amended.

145.    "Lender Settlements Order" means the *Order (I) Approving Certain Settlements and (II) Granting Related Relief* (Docket No. 2440) which approved, among other things, the Unencumbered Assets Settlement and the Diminution Claim Allowance Settlement.

146.    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Recovery Actions, Derivative Claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

147.    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

148.    "Massey Convertible Noteholder" means a holder of Massey Convertible Notes.

149.    "Massey Convertible Noteholder Cash Component" means Distribution Cash in an amount equal to the aggregate amount of reasonable and documented fees and expenses of the Massey Convertible Notes Trustee (and its counsel) that are incurred but unpaid as of the Effective Date, not to exceed $875,000.

150.    "Massey Convertible Noteholder Claims" means, collectively, any Claims of the Massey Convertible Notes Trustee or Massey Convertible Noteholders arising under or in connection with the Massey Convertible Notes Indenture, including any Massey Convertible Notes Diminution Claims.

151.    "Massey Convertible Notes" means the 3.25% convertible notes issued under the Massey Convertible Notes Indenture.

152.    "Massey Convertible Notes Diminution Claims" means any Claims arising in connection with the "Massey Convertible Notes Adequate Protection Obligations" as such term is defined in the Final DIP Order.

153.    "Massey Convertible Notes Guarantors" means the Subsidiary Debtors party to the Massey Convertible Notes Indenture, as guarantors.

154.    "Massey Convertible Notes Indenture" means the indenture, dated August 12, 2008, as the same may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto, among Debtor Alpha Appalachia Holdings, Inc. (f/k/a Massey Energy Company), as issuer, the Massey Convertible Notes Guarantors and the Massey Convertible Notes Trustee, relating to the 3.25% convertible senior notes due 2015.

155.    "Massey Convertible Notes Trustee" means, together, Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as successor trustee under the Massey Convertible Notes Indenture.

156.    "Material Non-Reserve Price Assets" means, collectively, (a) all Non-Reserve Price Assets other than the Designated Non-Reserve Price Assets and (b) any Designated Non-Reserve Price Assets that, individually or collectively, are responsible for revenue generation.

157.    "Material Reorganized ANR Asset Sale" means a sale, in any single or related transaction, of Reorganized ANR assets that represent 20% or more of Reorganized ANR's trailing 12-month revenue at the time the transaction or transactions are closed.

158.    "Material Reorganized ANR Transaction" means any transaction pursuant to which (a) the Reorganized Debtors sell or otherwise transfer assets that collectively generated 20% or more of the Reorganized Debtors' trailing 12-month revenue at the time such transaction is closed; or (b) a change in Control of any Reorganized Debtor is effected, provided that if, following such a transaction described in the foregoing clause (b), Reorganized ANR remains the direct or indirect parent of the applicable Reorganized Debtor, such transaction shall not constitute a Material Reorganized ANR Transaction.

159.    "Material Reserve Price Asset" means any Reserve Price Asset the removal of which from the Stalking Horse Bid, either on its own or in the aggregate with other Reserve Price Assets, would have a negative impact on the revenues of NewCo greater than or equal to 10% as projected in the Business Plan.

160.    "MEPP Claims" means any Claims arising, or related to the period, prior to the Effective Date in connection with the United Mine Workers of America 1974 Pension Plan, including any Claims related to any withdrawal liability.

161.    "NewCo" means any legal entity or entities created in order to facilitate a successful credit bid by the First Lien Lenders for any of the Debtors' Assets pursuant to a Sale Order.

162.    "NewCo ABL Facility" means a delayed draw asset-based lending facility, on substantially the terms set forth on Exhibit I.A.162, in the aggregate amount of $45.0 million less an amount equal to 5.0% of the first $50.0 million of any proceeds received by the Debtors in connection with any Reserve Price Assets Sale.

163.    "NewCo ABL Participation Rights" means the rights of holders of Allowed Secured Second Lien Noteholder Claims to participate as lenders in the NewCo ABL Facility, subject to the terms thereof.

164.    "NewCo Asset Sale" means the purchase and sale transaction contemplated by the Stalking Horse APA.

165.    "NewCo Assets" means, collectively, the Reserve Price Assets to be sold and transferred to NewCo as of the Effective Date pursuant to the Stalking Horse APA and the Plan.

166.    "NewCo Common Stock" means, collectively, the shares of common stock of NewCo, authorized pursuant to the certificate of incorporation of NewCo.

-14-

167.     "NewCo Contribution" means, collectively:  (a) the GUC Distribution Note, if any; (b) the Category 2 NewCo Common Stock Distribution; (c) the NewCo Warrants; (d) the Second Lien Distribution Note, if any; (e) the Second Lien NewCo Equity Distribution; (f) the NewCo ABL Participation Rights; and (g) any funding that may be provided by NewCo in connection with the Resolution of Reclamation Obligations.

168.     "NewCo Equity" means, collectively, all NewCo Common Stock and NewCo Preferred Interests.

169.     "NewCo Preferred Interests" means preferred stock (or similar rights or interests) of NewCo, authorized pursuant to the certificate of incorporation of NewCo (or comparable constituent documents), substantially on the terms set forth on Exhibit I.A.169.

170.     "NewCo Warrant Agreement" means the warrant agreement governing the NewCo Warrants, which will be substantially in the form of Exhibit I.A.170.

171.     "NewCo Warrants" means, collectively, the warrants to acquire NewCo Common Stock, on substantially the terms set forth in the NewCo Warrant Agreement.

172.     "Non-Material Non-Reserve Price Assets" means, collectively, all Non-Reserve Price Assets other than Material Non-Reserve Price Assets.

173.     "Non-Material Reserve Price Assets" means, collectively, all Reserve Price Assets other than Material Reserve Price Assets.

174.     "Non-Reserve Price Assets" means, collectively, all Assets that are not Reserve Price Assets.

175.     "Noteholder Claim" means any Claim under or evidenced by a Note, which Claim includes, but is not limited to, principal and interest as of the Petition Date and, only if applicable, Postpetition Interest.

176.     "Notes" means, collectively:  (a) the Second Lien Notes; (b) the Massey Convertible Notes; (c) the 2017 Notes; (d) the 2018 Notes; (e) the 2019 Notes; (f) the 2020 Notes; and (g) the 2021 Notes.

177.     "Notice Parties" means:  (a) prior to the Effective Date, the Debtors, the Creditors' Committee, the Retiree Committee, the DIP Agents, the First Lien Agent, the *Ad Hoc* Committee of Second Lien Noteholders, the Second Lien Notes Trustee and the UMWA; and (b) on or after the Effective Date, the Reorganized Debtors, counsel to the First Lien Agent and, solely with respect to matters addressed in Section VI.A, the Claims Oversight Committee.

178.     "Official Committees" means, together, the Creditors' Committee and the Retiree Committee.

179.     "Old Common Stock" means, when used with reference to a particular Debtor, the common stock, membership interests, partnership interests or other capital stock issued by such Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto.

180.     "OPEB Claims" means, collectively, any Claims, whether asserted by current or former employees of the Debtors, their heirs or beneficiaries, against the Debtors based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for any post-retirement health, vision, dental, life and death benefits provided to retired employees of the Debtors and their surviving beneficiaries.

181.     "Ordinary Course Professionals Order" means the *Order Authorizing the Retention and Compensation of Professionals Utilized by the Debtors in the Ordinary Course of Business* (Docket No. 346), entered by the Bankruptcy Court on September 3, 2015.

182.     "Other Secured Claims" means, collectively, Secured Claims that are not Administrative Claims, First Lien Lender Claims, Second Lien Noteholder Claims or Massey Convertible Noteholder Claims.

183.     "PBGC" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and an agency of the United States that administers the defined benefit pension plan termination insurance program under Title IV of ERISA.

184.     "PBGC Claim" means any Claim of the PBGC, whether Filed by the PBGC or scheduled by the Debtors.

185.     "Pension Claims" means, collectively, (a) any Claims (other than OPEB Claims), whether asserted by current or former employees of the Debtors, their heirs or beneficiaries, against the Debtors based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees, and (b) any PBGC Claim that is a General Unsecured Claim.

186.     "Pension Plans" means, individually and collectively, the pension plans of the Debtors (a) that are tax-qualified defined benefit pension plans covered by ERISA and (b) for which the Debtors are contributing sponsors.

187.     "Person" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

188.     "Petition Date" means August 3, 2015, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

189.     "Plan" means this second amended joint plan of reorganization for the Debtors, and all Confirmation Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

190.     "PLR Order" means the *Order Authorizing: (I) the Sale of the Debtors' Oil and Gas Assets in Pennsylvania, Free and Clear of Liens, Claims and Encumbrances, Pursuant to the Terms of Asset Purchase Agreement and Sections 105 and 363 of the Bankruptcy Code; and (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Pursuant to Section 365 of the Bankruptcy Code* and related exhibits (Docket Nos. 2550; 2551; 2552), entered by the Bankruptcy Court on May 26, 2016, as they may be amended, supplemented or otherwise modified.

191.     "Postpetition Intercompany Claim" means any Intercompany Claim that is not a Prepetition Intercompany Claim.

192.     "Postpetition Interest" means:  (a) for a Noteholder Claim, the contractual rate of interest set forth in the applicable Indenture; (b) the rate of interest set forth in the contract or other applicable document between the holder of a Claim and the applicable Debtor giving rise to such holder's Claim; (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the applicable Debtor; or (d) if none of the foregoing apply, the Federal Judgment Rate.

193.     "Prepetition Intercompany Claim" means an Intercompany Claim that arose prior to the Petition Date.

194.     "Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

195.     "Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

196.     "Pro Rata" means, when used with reference to a Distribution of property to holders of Allowed Claims in a particular Class or other specified group of Claims pursuant to Article II, proportionately so that, with

respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating Pro Rata Distribution of property to holders of Allowed Claims in such Class.  With respect to Distributions on account of Allowed Second Lien Category 2 General Unsecured Claims in Class 6B and Allowed Non-Second Lien Category 2 General Unsecured Claims in Class 6C, "Pro Rata" shall refer to the pro rata Distribution of that portion of the Category 2 General Unsecured Claims Asset Pool that would have been attributable to such Claims had such Claims been classified in the same Class.

197.    "Professional" means any professional (a) employed in the Chapter 11 Cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than a professional entitled to receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order) or (b) seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

198.    "Qualified Buyer" means a buyer reasonably determined by Reorganized ANR to have the financial wherewithal to fulfill the obligation to satisfy the applicable portion of the Reorganized ANR Contingent Revenue Payment assumed by such buyer, as demonstrated by a forecast of such buyer's pro forma cash flows over a period at least equal to the remaining term of the Reorganized ANR Contingent Revenue Payment, which forecast is based upon reasonable assumptions regarding, among other things, the impact of the Reorganized ANR Contingent Revenue Payment obligation and other costs and expenses.

199.    "Reclamation Activities" means, collectively, the post-Effective Date activities of the Reorganized Debtors conducted pursuant to permits issued by a regulatory agency related to the environmental restoration of lands or streams after coal mining in an area has been completed.  This definition shall include, but is not limited to, the removal of structures, earthwork (including, but not limited to, backfilling, sealing portals and breakdown of spoil or fill areas), final regrade and topsoil placement, pond cleaning and removal, mine drainage, culverts and ditches (including, but not limited to, the establishment of long term drainage structures and the maintenance of the same), establishing vegetation and planting trees, mitigation and the construction of water treatment systems.  For the avoidance of doubt, ongoing operations and maintenance costs associated with water treatment systems are not included in this definition.

200.    "Reclamation Funding Amount" means consideration in a form and amount to be agreed upon pursuant to the Resolution of Reclamation Obligations and approved by the Confirmation Order, including any Initial Reclamation Contribution, to be contributed into one or more Restricted Cash Reclamation Accounts.

201.    "Reclamation Obligation Resolution Parties" means the Governmental Units party to the Resolution of Reclamation Obligations.

202.    "Reclamation Threshold Amount" means an amount equal to the sum of (a) the Reclamation Funding Amount and (b) an amount to be determined pursuant to the Resolution of Reclamation Obligations constituting the maximum aggregate amount of Excess Free Cash Flow to be deposited by the Reorganized Debtors into the Restricted Cash Reclamation Accounts.

203.    "Recovery Actions" means, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 542, 544, 547, 548, 549 and 550 of the Bankruptcy Code and other similar state law claims and causes of action.

204.    "Reinstated" or "Reinstatement" means rendering a Claim or Interest unimpaired within the meaning of section 1124 of the Bankruptcy Code.  Unless the Plan specifies a particular method of Reinstatement, when the Plan provides that a Claim or Interest will be Reinstated, such Claim or Interest will be Reinstated, at the Debtors' sole discretion, in accordance with one of the following:

-17-

a.     The legal, equitable and contractual rights to which such Claim or Interest entitles the holder will be unaltered; or

b.     Notwithstanding any contractual provisions or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:

i.     any such default that occurred before or after the commencement of the applicable Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured;

ii.     the maturity of such Claim or Interest as such maturity existed before such default will be reinstated;

iii.     the holder of such Claim or Interest will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

iv.     if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, the holder of such Claim will be compensated for any actual pecuniary loss incurred by such holder as a result of such failure; and

v.     the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest will not otherwise be altered.

205.     "Released Parties" means, collectively and individually, and, in each case, solely in their capacity as such:  (a) the Debtors; (b) the Estates; (c) the Reorganized Debtors; (d) the DIP Agents; (e) the DIP Lenders; (f) the First Lien Agent; (g) the First Lien Lenders; (h) the Creditors' Committee and its members; (i) the Massey Convertible Notes Trustee; (j) the Second Lien Parties; (k) NewCo; (l) the Unsecured Notes Indenture Trustee; and (m) with respect to (a) through (l), each such Person's respective Representatives and affiliates.

206.     "Reorganized …" means, when used in reference to a particular Debtor, such Debtor on or after the Effective Date.

207.     "Reorganized ANR Cash Shortfall" means the amount of Cash and Cash equivalents on Reorganized ANR's balance sheet less $20 million, to the extent such amount is a negative number, at any time prior to September 30, 2018.

208.     "Reorganized ANR Common Stock" means the shares of common stock of Reorganized ANR, authorized pursuant to the certificate of incorporation of Reorganized ANR, to be initially issued pursuant to the Plan as of the Effective Date; provided, however, that the form of security or securities comprising Reorganized ANR Common Stock may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet.

209.     "Reorganized ANR Contingent Revenue Payment" means a contingent revenue payment, commencing 18 months after the Effective Date, and calculated and payable annually during the five-year period thereafter, consisting of:  (a) (i) 1.5% of the annual gross revenues of the Reorganized Debtors, up to $500 million, provided that, in the event that any Non-Material Non-Reserve Price Assets are sold, such percentage shall be increased to a percentage sufficient to restore the Reorganized ANR Contingent Revenue Payment to the amount it would have equaled absent such sale, and (ii) 1.0% of annual gross revenues of the Reorganized Debtors in excess of $500 million, provided further that, for the avoidance of doubt, "gross revenues" as used in this Section I.A.209 shall not include any funds deposited by NewCo into any accounts established in accordance with the Plan and/or the Resolution of Reclamation Obligations; and (b) the Contingent Reorganized ANR Consideration, if any.

210.    "Reorganized ANR Contingent Revenue Payment Allocation" means a portion of the Reorganized ANR Contingent Revenue Payment, if any, reallocated from the Category 2 General Unsecured Claims Asset Pool to the Category 1 General Unsecured Claims Asset Pool, in a total aggregate amount not to exceed the lesser of (a) the Category 1 Recovery Deficiency, if any, and (b) $5.0 million.

211.    "Reorganized ANR Preferred Interests" means, collectively, the Series A Preferred Interests and the Series B Preferred Interests, substantially on the terms set forth on Exhibit I.A.211.

212.    "Reorganized Debtors" means the Debtors on and after the Effective Date and any entities created as part of the Restructuring Transactions, including but not limited to Reorganized ANR; provided that (a) Reorganized ANR may mean a newly-formed entity organized pursuant to Section IV.B hereof and (b) in no event shall NewCo be considered a Reorganized Debtor.

213.    "Representatives" means, with respect to any Person, any successor, predecessor, assign, subsidiary, affiliate, current or former managed account or fund, officer, director, member of a limited liability company, employee, partner, agent, attorney, advisor, investment banker, financial advisor, accountant, actuary, consultant or other Professional of such Person, in each case in such capacity, serving on or after the Petition Date.

214.    "Reserve Price Assets" means, collectively, the assets identified as "Reserve Price Assets" on the Reserve Price Assets Schedule.

215.    "Reserve Price Assets Schedule" means the schedule identifying the Reserve Price Assets, attached hereto as Exhibit I.A.215.

216.    "Resolution of Reclamation Obligations" means, collectively, any agreed-upon resolutions with the Reclamation Obligation Resolution Parties, approved pursuant to the Confirmation Order or any other order of the Bankruptcy Court, regarding the Reclamation Activities, on substantially the terms set forth on Exhibit I.A.216.

217.    "Restricted Cash Reclamation Accounts" means, collectively, any accounts created pursuant to the Resolution of Reclamation Obligations for the sole purpose of funding Reclamation Obligations to the Reclamation Obligation Resolution Parties up to the Reclamation Threshold Amount.

218.    "Restructuring Transactions" means, collectively, those mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions closing under or in connection with the Plan in connection with any Core Asset Sale Order), conversions, liquidations or dissolutions that the Debtors determine to be necessary or appropriate to effectuate the Distributions contemplated hereby, the NewCo Asset Sale and/or effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure of the Reorganized Debtors, as described in greater detail in Section IV.B.

219.    "Retiree Committee" means the official committee of retired employees appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee is constituted from time to time.

220.    "Sale Orders" means, collectively, and as such orders may be modified, amended, supplemented or otherwise revised:  (a) the *Order (I) Approving Bidding and Sale Procedures for Certain Mining Properties and Related Assets, (II) Approving the Form and Manner of Notice of the Related Assumption and Assignment of Executory Contracts and Unexpired Leases and (III) Scheduling an Auction and Sale Hearing* (Docket No. 855), entered by the Bankruptcy Court on November 6, 2015; (b) any other sale order entered by the Bankruptcy Court in connection with the *Debtors' Combined Motion for Entry of (A) an Order Establishing Bidding and Sale Procedures for the Potential Sale of Certain Mining Properties and Related Assets and Granting Related Relief and (B) One or More Orders Approving the Sale of Such Properties* (Docket No. 707), Filed by the Debtors on October 22, 2015; (c) any Core Asset Sale Order; and (d) the Confirmation Order.

-19-

221.     "Schedules" means the schedules of assets and liabilities and the statement of financial affairs Filed by each Debtor on October 2, 2015, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

222.     "Second Lien Distribution Note" means an unsecured promissory note, if any, issued by NewCo, in a face amount equal to the amount of the Second Lien Noteholder Distribution Cash Component, substantially on the terms set forth on Exhibit I.A.222.

223.     "Second Lien NewCo Equity Distribution" means (a) 7.5% of the NewCo Common Stock and (b) NewCo Preferred Interests representing an aggregate value equal to the total value of NewCo Equity as of the Effective Date less $300 million, to be distributed on account of Allowed Secured Second Lien Noteholder Claims in accordance with Section II.B.3.

224.     "Second Lien Noteholder" means a holder of Second Lien Notes.

225.     "Second Lien Noteholder Claims" means, collectively, any Claims of the Second Lien Notes Trustee or Second Lien Noteholders arising under or in connection with the Second Lien Notes Indentures, including (a) any Second Lien Noteholder Diminution Claims and (b) any Cross-Collateralization Claims of the Second Lien Notes Trustee or the Second Lien Noteholders.

226.     "Second Lien Noteholder Diminution Claims" means "Noteholder Adequate Protection Claims" as such term is defined in the Final DIP Order.

227.     "Second Lien Noteholder Distribution" means:  (a) to the extent that the aggregate value of all NewCo Equity plus the First Lien Lender Takeback/Preferred Consideration is greater than $300 million, the Second Lien NewCo Equity Distribution; and (b) the Second Lien Noteholder Reserve Price Assets Distribution, as further described on Exhibit I.A.227.  For the avoidance of any doubt, the Second Lien Noteholder Distribution is subject to the *Ad Hoc* Committee of Second Lien Noteholders' rights to allocate the consideration described in the section of the Second Lien Noteholder Settlement entitled "Other Plan Distributions to Second Lien Parties," which proposed allocation was further described on pages 45-46 of the Disclosure Statement.

228.     "Second Lien Noteholder Distribution Cash Component" means 5.0% of the aggregate proceeds received by the Estates in connection with any sale of Reserve Price Assets in excess of $50 million; provided that the aggregate amount of any portion of the Second Lien Noteholder Distribution Cash Component arising from the sale of the Designated Reserve Price Assets shall not exceed $12,500,000.

229.     "Second Lien Noteholder Reserve Price Assets Distribution" means Distribution Cash in a total aggregate amount equal to the Second Lien Noteholder Distribution Cash Component; provided that if the First Lien Lender Distributable Cash Recovery Threshold is not met, no Cash shall be provided as part of the Second Lien Noteholder Reserve Price Assets Distribution, and the Second Lien Noteholder Reserve Price Assets Distribution shall consist solely of the Second Lien Distribution Note.

230.     "Second Lien Noteholder Settlement" means the settlement among the Debtors, the Second Lien Parties, the First Lien Lenders, the First Lien Agent, the DIP Lenders and the DIP Agents, on substantially the terms set forth in the Second Lien Noteholder Settlement Stipulation, resolving (a) issues in connection with the treatment of Second Lien Noteholder Claims and (b) certain intercreditor issues between the Second Lien Noteholders and the First Lien Lenders.

231.     "Second Lien Noteholder Settlement Stipulation" means the *Stipulation By and Among the Debtors, the Prepetition Agent, the Ad Hoc Committee of Second Lien Noteholders and the Second Lien Notes Trustee*, attached as Annex A to the *Notice of Filing of Stipulation By and Among the Debtors, the Prepetition Agent, the Ad Hoc Committee of Second Lien Noteholders and the Second Lien Notes Trustee* (Docket No. 2421), Filed with the Bankruptcy Court on May 14, 2016.

232.    "Second Lien Noteholder Settlement Term Sheet" means the term sheet attached as Exhibit A to the Second Lien Noteholder Settlement Stipulation.

233.    "Second Lien Notes" means the 7.50% senior secured notes issued under the Second Lien Notes Indentures.

234.    "Second Lien Notes Indentures" means, together, and as such documents may have been subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto:  (a) the indenture, dated May 20, 2014, among ANR, as issuer, the First Lien Guarantors and the Second Lien Notes Trustee, relating to the $500 million principal amount senior secured 7.50% notes due 2020; and (b) the indenture, dated March 23, 2015, among ANR, as issuer, the First Lien Guarantors and the Second Lien Notes Trustee, relating to the $214 million principal amount Series B senior secured 7.50% notes due 2020.

235.    "Second Lien Notes Trustee" means Wilmington Trust, National Association, in its capacity as trustee and collateral agent under the Second Lien Notes Indentures.

236.    "Second Lien Parties" means, collectively, (a) the *Ad Hoc* Committee of Second Lien Noteholders and (b) the Second Lien Notes Trustee.

237.    "Second Out DIP Agent" means Citicorp North America, Inc., in its capacity as administrative agent and collateral agent under the Second Out DIP Credit Agreement.

238.    "Second Out DIP Claim" means any Claim of the DIP Lenders or the Second Out DIP Agent arising under or evidenced by (a) the Second Out DIP Credit Agreement and (b) the Final DIP Order (with respect to obligations arising under or evidenced by the Final DIP Order related to the Second Out DIP Credit Agreement).

239.    "Second Out DIP Credit Agreement" means the Superpriority Secured Second Out Debtor-in-Possession Credit Agreement, dated as of September 18, 2015, among ANR (as borrower), the Subsidiary Debtors signatory thereto (as guarantors), those entities identified as "Lenders" in such agreement, those entities identified as "Issuing Banks" in such agreement, the Second Out DIP Agent and Citigroup Global Markets Inc. (as sole lead arranger and sole book manager), including (a) all amendments thereto and extensions thereof and (b) all security agreements and instruments related thereto.

240.    "Secondary Liability Claim" means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort, guaranty or other obligation of another Debtor, including any Claim based on:  (a) vicarious liability; (b) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; (c) guaranties of collection, payments or performance; (d) indemnity bonds, obligations to indemnify or obligations to hold harmless; (e) performance bonds; (f) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor or relating to the obligations or performance of another Debtor; (g) several liability of a member of a consolidated (or equivalent) group of corporations for Taxes of other members of the group or of the entire group; or (h) any other joint or several liability, including Claims for indemnification or contribution, that any Debtor may have in respect of any obligation that is the basis of a Claim.

241.    "Section 510(b) Old Common Stock Claim" means any Claim (a) arising from rescission of a purchase or sale of Old Common Stock; (b) for damages arising from the purchase or sale of Old Common Stock; or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

242.    "Section 510(b) Securities Claim" means any Claim (a) arising from rescission of a purchase or sale of a Note or any other security of a Debtor other than Old Common Stock; (b) for damages arising from the purchase or sale of a Note or any other security of a Debtor other than Old Common Stock; or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

-21-

243.     "Secured … Claim" means a Secured Claim of the particular type specified.

244.     "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

245.     "Secured Tax Claim" means a Secured Claim arising out of a Debtor's liability for any Tax.

246.     "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a, *et seq.*

247.     "Series A Preferred Interests" means preferred stock (or similar rights or interests) of Reorganized ANR, authorized pursuant to the certificate of incorporation of Reorganized ANR (or comparable constituent documents), substantially on the terms set forth on Exhibit I.A.247; provided, however, that the form of security or securities comprising Series A Preferred Interests may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet.

248.     "Series B Preferred Interests" means preferred stock (or similar rights or interests) of Reorganized ANR, authorized pursuant to the certificate of incorporation of Reorganized ANR (or comparable constituent documents), substantially on the terms set forth on Exhibit I.A.248; provided, however, that the form of security or securities comprising Series B Preferred Interests may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet.

249.     "Settlement Termination Event" shall have the meaning given to such term in the Global Settlement Term Sheet.

250.     "Stalking Horse APA" means the asset purchase agreement attached hereto as Exhibit I.A.250 (together with all related documentation) governing the NewCo Asset Sale, subject to approval pursuant to the Confirmation Order.

251.     "Stalking Horse Bid" means the stalking horse credit bid of the First Lien Lenders on the Reserve Price Assets, authorized pursuant to the Bidding Procedures Order.

252.     "Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between the applicable Debtor and a holder of a Claim or Interest, that, prior to the Effective Date, is approved by the Bankruptcy Court (including, but not limited to, agreements settling claims pursuant to authority granted under claims settlement procedures established by order of the Bankruptcy Court in the Chapter 11 Cases), or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or Interest.  Any such stipulation or other agreement between any Reorganized Debtor and a holder of a Claim or Interest executed after the Effective Date is not subject to approval of the Bankruptcy Court.

253.     "Subsidiary Debtor" means any Debtor other than ANR.

254.     "Subsidiary Debtor Equity Interest" means any Interests in a Debtor other than ANR.

255.     "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margin, sales, use, *ad valorem*, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, escheat, unclaimed property or windfall, profits, custom, duty or other tax, governmental fee or like assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Person; provided that obligations related to Reclamation Activities arising in connection with any Resolution of Reclamation Obligations shall not constitute Taxes within the meaning of this Section I.A.255.

256.      "Third Party Disbursing Agent" means the Person expressly designated by a Debtor or Reorganized Debtor to act as a Disbursing Agent pursuant to Article V.

257.      "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment; provided that any Claims related to Reclamation Activities shall not constitute Tort Claims within the meaning of this Section I.A.257.

258.      "Treasury Rate" means the yield to maturity of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Effective Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) equal to five years.

259.      "UMWA" means the United Mine Workers of America.

260.      "UMWA Funds" means, collectively, (a) the United Mine Workers of America 1974 Pension Plan and Trust; (b) the United Mine Workers of America 1993 Benefit Plan and Trust; (c) the United Mine Workers of America 2012 Retiree Bonus Account Plan; (d) the United Mine Workers of America Cash Deferred Savings Plan of 1988; (e) the United Mine Workers of America Combined Benefit Fund; and (f) the United Mine Workers of America 1992 Benefit Plan.

261.      "Unencumbered Assets" means, collectively, the Assets identified on Exhibit A to the Lenders Settlements Order.

262.      "Unencumbered Assets Settlement" means the settlement among the Debtors and the First Lien Lenders, approved by the Bankruptcy Court pursuant to the Lender Settlements Order, with respect to the assets agreed to have been unencumbered as of the Petition Date or with respect to which the Liens and security interests under the First Lien Credit Agreement were agreed to be unperfected as of such date.

263.      "Unexpired Lease" means a lease to which a Debtor is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

264.      "Union Claims" means, collectively, any Claims asserted in the Chapter 11 Cases against the Debtors by the UMWA or the UMWA Funds (including, but not limited to, proofs of claim numbered 8999 and 9023 Filed by the UMWA), as such Claims (a) may be amended or (b) are modified by the 1113/1114 Order.

265.      "United States Trustee" means the Office of the United States Trustee for Region Four.

266.      "Unsecured Notes Indenture Trustee" means, collectively, the 2017/2020 Notes Trustee, the 2018 Notes Trustee and the 2019/2021 Notes Trustee.

267.      "Unvested Non-Pension Benefits Motion" means the *Motion of the Debtors, Pursuant to Section 363 of the Bankruptcy Code, for an Order Authorizing Debtors to Terminate Certain Unvested Non-Pension Benefits* (Docket No. 797), Filed by the debtors on November 3, 2015.

268.      "Voting Deadline" means the deadline for submitting Ballots either to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code that is specified in the Disclosure Statement, the Ballots or related solicitation documents approved by the Bankruptcy Court.

**B.**     **Rules of Interpretation and Computation of Time**

**1.**     **Rules of Interpretation**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Confirmation Exhibit Filed or to be Filed shall mean such document or Confirmation Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to a Person as a holder of a Claim or Interest includes that Person's successors, assigns and Affiliates; (e) all references to Sections, Articles or Confirmation Exhibits are references to Sections, Articles and Confirmation Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a substantive part, or to affect the interpretation, of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

**2.**     **Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS;**
**CRAMDOWN; EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Notwithstanding the foregoing, in no event shall any holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such holder's Claim.

**A.**     **Unclassified Claims**

**1.**     **Payment of Administrative Claims**

**a.**     **Administrative Claims in General**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Distribution Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date or as soon as reasonably practicable thereafter; or (b) if the Administrative Claim is not allowed as of the Effective Date, no later than 30 days after the date on which such Administrative Claim becomes an Allowed Claim.

-24-

**b.**     **Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing or in the Confirmation Order, will be paid by the Debtors in Distribution Cash equal to the amount of such Administrative Claims. Any fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

**c.**     **Ordinary Course Liabilities**

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of Governmental Units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.G.4 and Intercompany Claims that are Administrative Claims, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

**d.**     **DIP Claims**

All DIP Claims shall be Allowed Claims. On or before the Effective Date, unless otherwise agreed by the holder of a DIP Claim and the applicable Debtor or Reorganized Debtor, Allowed DIP Claims will be paid in Distribution Cash in an amount equal to the full amount of those Claims. Allowed DIP Claims will be satisfied, first, from Unencumbered Assets, according to the following priority: (a) First Out DIP Claims; and (b) Second Out DIP Claims. To the extent that Unencumbered Assets are insufficient to satisfy all Allowed DIP Claims in full, Allowed DIP Claims will be satisfied from Encumbered Assets, according to the following priority: (a) First Out DIP Claims; and (b) Second Out DIP Claims.

**e.**     **Fees and Expenses of Creditors' Committee Members and the Unsecured Notes Trustee**

Subject to the terms of this Section II.A.1.e, (a) the reasonable and documented fees and expenses of the Unsecured Notes Indenture Trustee (including its counsel and other advisors) and (b) the expenses of other members of the Creditors' Committee that are not Indenture Trustee Committee Members (excluding, with respect to such members of the Creditors' Committee that are not Indenture Trustee Committee Members, their individual legal and other advisor fees) shall be Allowed Administrative Claims or otherwise paid in Cash on the Effective Date, in each case without reduction to the recoveries of holders of Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims; provided that the total aggregate fees and expenses of the Indenture Trustee Committee Members (including their counsel and other advisors) other than the Massey Convertible Notes Trustee (and its counsel and other advisors) constituting Allowed Administrative Claims shall not exceed $875,000. For the avoidance of doubt, no member of the Creditors' Committee (other than the Indenture Trustee Committee Members) shall seek payment from the Debtors or the Estates of such member's legal or other advisory fees incurred in its capacity as a member of the Creditors' Committee, pursuant to a motion for substantial contribution or otherwise, and no payment shall be made by the Debtors or the Estates to any member of the Creditors' Committee (other than the Indenture Trustee Committee Members pursuant to this provision) on account of such legal or other advisory fees; provided that nothing herein shall limit any member of the Creditors' Committee from seeking payment of their individual legal fees based on a claim or entitlement unrelated to their capacities as members of the Creditors' Committee. To the extent that any fees or expenses of the Indenture Trustee Committee Members (and their counsel) are not paid in accordance with the provisions of the Plan, nothing in the Plan shall prevent the Indenture Trustee Committee Members from asserting a charging lien against any recoveries received on account of the applicable noteholders for payment of such unpaid amounts; provided, that in the event the Indenture Trustee Committee Members exercise a charging lien against such recoveries, the Debtors shall use commercially reasonable efforts to assist such Indenture Trustee Committee Members in liquidating securities otherwise payable

to such noteholders under the Plan.  If the Reorganized Debtors expressly request (in writing) post-Effective Date assistance from the Indenture Trustee Committee Members, the Indenture Trustee Committee Members will be paid their reasonable and documented fees and expenses, solely to the extent of the post-Effective Date assistance requested by the Reorganized Debtors, not subject to the cap set forth in this Section II.A.1.e.

### f.        Fees and Expenses of *Ad Hoc* Committee of Second Lien Noteholders

The Debtors shall pay all reasonable and documented fees and expenses of the *Ad Hoc* Committee of Second Lien Noteholders (and its counsel) as and to the extent provided under paragraph 17(d) of the Final DIP Order and other existing agreements among the Debtors and the Second Lien Parties in connection with the Bankruptcy Cases that are incurred prior to the Effective Date in connection with the Chapter 11 Cases without a reduction to the recoveries of holders of Allowed Second Lien Noteholder Claims (subject to the Debtors' receipt of invoices in customary form in connection therewith and without the requirement to file a fee application with the Bankruptcy Court).  To the extent that invoices of the *Ad Hoc* Committee of Second Lien Noteholders (and its counsel) are submitted after the Effective Date, but relate to reasonable and documented fees and expenses incurred prior to the Effective Date consistent with the prior sentence, such invoices shall be paid by the Reorganized Debtors as soon as reasonably practicable.

### g.        Fees and Expenses of Second Lien Notes Trustee

Subject to the terms of this Section II.A.1.g, the Debtors shall pay all reasonable and documented fees and expenses of the Second Lien Notes Trustee (and its counsel) as and to the extent provided under paragraph 17(d) of the Final DIP Order and other existing agreements among the Debtors and the Second Lien Notes Trustee that are incurred prior to the Effective Date in connection with the Bankruptcy Cases without a reduction to the recoveries of holders of Allowed Second Lien Noteholder Claims (subject to the Debtors' receipt of invoices in customary form in connection therewith and without the requirement to file a fee application with the Bankruptcy Court).  To the extent that invoices of the Second Lien Notes Trustee (and its counsel) are submitted after the Effective Date, but relate to fees and expenses incurred prior to the Effective Date, such invoices shall be paid as soon as reasonably practicable.   Notwithstanding the foregoing, the fees and expenses of the Second Lien Notes Trustee (and its counsel), outstanding as of the date of the Global Settlement Stipulation or incurred thereafter shall be subject to a cap of $600,000 (which cap is separate and apart from the $1.75 million limitation on fees and expenses of the Indenture Trustee Committee Members, as set forth above).  To the extent that any fees or expenses of the Second Lien Notes Trustee (and its counsel) are not paid in accordance with the provisions of the Plan, nothing in the Plan shall prevent the Second Lien Notes Trustee from asserting its charging lien against any recoveries received on account of Allowed Second Lien Noteholder Claims for payment of such unpaid amounts. The foregoing cap on the fees and expenses of the Second Lien Notes Trustee (and its counsel) shall only apply to those fees and expenses outstanding as of the date of the Global Settlement Stipulation and incurred through July 24, 2016, and, in the event that the Effective Date does not occur on or before July 24, 2016, all obligations of the Debtors and the rights of the Second Lien Notes Trustee under paragraph 17(d) of the Final DIP Order and any other existing agreements among the Debtors and the Second Lien Notes Trustee shall remain in effect and neither the Debtors nor the Reorganized Debtors shall be obligated pursuant hereto to pay any fees or expenses of the Second Lien Notes Trustee (or its counsel) in excess of the cap.  If the Reorganized Debtors expressly request (in writing) post-Effective Date assistance from the Second Lien Notes Trustee, the Second Lien Notes Trustee shall be paid its reasonable and documented fees and expenses, solely to the extent of the post-Effective Date assistance requested by the Reorganized Debtors, not subject to the $600,000 cap set forth in this Section II.A.1.g.

### h.        Bar Dates for Administrative Claims

### i.        General Bar Date Provisions

Except as otherwise provided in Section II.A.1.h.ii or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the

Debtors, the Reorganized Debtors, or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

### ii.      Bar Dates for Certain Administrative Claims

#### A.      Professional Compensation

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of (a) 90 days after the Effective Date, (b) 30 days after the Filing of the applicable request for payment of the Fee Claim or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

#### B.      Ordinary Course Liabilities

Holders of Allowed Administrative Claims arising from liabilities incurred by a Debtor on or after the Petition Date but prior to the Effective Date in the ordinary course of the Debtor's business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of Governmental Units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.G.4 and Intercompany Claims that are Administrative Claims, will not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.c. Any Administrative Claims that are filed contrary to this Section shall be deemed disallowed and expunged, subject to resolution and satisfaction in the ordinary course outside these Chapter 11 Cases.

#### C.      DIP Claims

Holders of Allowed Administrative Claims that are DIP Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.d.

### iii.      No Modification of Bar Date Order

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## 2.      Payment of Priority Tax Claims

### a.      Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable, in full satisfaction of

its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) Distribution Cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) Distribution Cash in the aggregate amount of such Allowed Priority Tax Claim payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date.

### b.        Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section II.A.2.a or Section I.A.255, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 6A, if not subordinated to Class 6A Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, NewCo or their respective property (other than as a holder of an Allowed Class 6A Claim).

### B.      Classified Claims and Interests

1.        **Priority Claims (Class 1 Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Claim in Class 1 will receive Distribution Cash equal to the amount of such Allowed Claim, unless the holder of such Priority Claim and the applicable Debtor or Reorganized Debtor, as applicable, agree to a different treatment.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 1 Claim will be deemed to have accepted the Plan.

2.        **Secured First Lien Lender Claims (Class 2 Claims) are impaired.**  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured First Lien Lender Claim will receive the holder's Pro Rata share of the First Lien Lender Distribution.

3.        **Secured Second Lien Noteholder Claims (Class 3 Claims) are impaired.**  In accordance with the terms of the Second Lien Noteholder Settlement and the Global Settlement, on the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured Second Lien Noteholder Claim will receive such holder's Pro Rata share of the NewCo ABL Participation Rights.  Each holder of an Allowed Secured Second Lien Noteholder Claim exercising such holder's NewCo ABL Participation Rights shall be entitled to such holder's allocated portion of the Second Lien Noteholder Distribution, as set forth in the Second Lien Noteholder Settlement Stipulation and the Second Lien Noteholder Settlement Term Sheet.

4.        **Secured Massey Convertible Noteholder Claims (Class 4 Claims) are impaired.**
In accordance with the terms of the Global Settlement, on the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Secured Massey Convertible Noteholder Claim will receive such holder's Pro Rata share of (a) the Massey Convertible Noteholder Cash Component and (b) the Series B Preferred Interests.

5.        **Other Secured Claims (Class 5 Claims) are unimpaired.**  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Claim in Class 5 will receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A, B or C below, at the election of the applicable Debtor.  The applicable Debtor will be deemed to have elected Option B except with respect to (a) any Allowed Secured Claim as to which the applicable Debtor elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which the applicable Debtor will be deemed to have elected Option A.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 5 Claim will be deemed to have accepted the Plan.

*Option A*:  On the Effective Date, Allowed Claims in Class 5 with respect to which the applicable Debtor elects Option A will receive Distribution Cash equal to the amount of such Allowed Claim.

*Option B*:  On the Effective Date, Allowed Claims in Class 5 with respect to which the applicable Debtor elects or is deemed to have elected Option B will be Reinstated.

*Option C*:  On the Effective Date, a holder of an Allowed Claim in Class 5 with respect to which the applicable Debtor elects Option C will be entitled to receive (and the applicable Debtor or Reorganized Debtor shall release and transfer to such holder) the collateral securing such Allowed Claim.

Notwithstanding either the foregoing or Section I.A.255, the holder of an Allowed Secured Tax Claim in Class 5 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 6A, if not subordinated to Class 6A Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, NewCo or their respective property (other than as a holder of a Class 6A Claim).

6.     **Category 1 General Unsecured Claims (Class 6A Claims) are impaired.**  On the Effective Date, and on each Distribution Date thereafter, each holder of an Allowed Category 1 General Unsecured Claim will receive a Pro Rata share of assets contributed to the Category 1 General Unsecured Claims Asset Pool; <u>provided</u> that no Distributions shall be provided on account of any Allowed First Lien Lender Claims constituting Deficiency Claims in Class 6A.

7.     **Second Lien Category 2 General Unsecured Claims (Class 6B Claims) are impaired.**  On the Effective Date, and on each Distribution Date thereafter, each holder of an Allowed Category 2 General Unsecured Claim that is a Second Lien Noteholder Claim will receive a Pro Rata share of assets contributed to the Category 2 General Unsecured Claims Asset Pool; <u>provided</u> that Distributions on account of any Allowed Second Lien Noteholder Claims constituting Deficiency Claims in Class 6B shall not include any portion of the Reorganized ANR Contingent Revenue Payment.

8.     **Non-Second Lien Category 2 General Unsecured Claims (Class 6C Claims) are impaired.** On the Effective Date, and on each Distribution Date thereafter, each holder of an Allowed Category 2 General Unsecured Claim that is not a Second Lien Noteholder Claim will receive a Pro Rata share of assets contributed to the Category 2 General Unsecured Claims Asset Pool.

9.     **Prepetition Intercompany Claims (Class 7 Claims) are impaired.**  Subject to the Restructuring Transactions, on the Effective Date, Prepetition Intercompany Claims that are not eliminated by operation of law or otherwise pursuant to the Restructuring Transactions will be deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of Prepetition Intercompany Claims and not entitled to any Distribution of Plan consideration under the Plan.  Each holder of a Class 7 Claim will be deemed to have accepted the Plan.

10.     **Section 510(b) Securities Claims (Class 8 Claims) are impaired.**  No property will be distributed to or retained by the holders of Section 510(b) Securities Claims, and such Claims will be extinguished on the Effective Date.  Holders of Class 8 Claims will not receive any Distribution pursuant to the Plan.  Consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Section 510(b) Securities Claim in Class 8 will be deemed to have rejected the Plan.

11.     **Section 510(b) Old Common Stock Claims (Class 9 Claims) are impaired.**  No property will be distributed to or retained by the holders of Section 510(b) Old Common Stock Claims, and such Claims will be extinguished on the Effective Date.  Holders of Class 9 Claims will not receive any Distribution pursuant to the Plan. Consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Section 510(b) Old Common Stock Claim in Class 9 will be deemed to have rejected the Plan.

-29-

12.      **Old Common Stock of ANR Interests (Class 10 Interests) are impaired.**  On the Effective Date, the Old Common Stock of ANR and all Interests related thereto will be canceled, and holders of Class 10 Interests will not receive any Distribution pursuant to the Plan.  Consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Class 10 Interest will be deemed to have rejected the Plan.

13.      **Subsidiary Debtor Equity Interests (Class 11 Interests) are unimpaired.**  On the Effective Date, the Subsidiary Debtor Equity Interests will be Reinstated, subject to the Restructuring Transactions.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 11 Interest will be deemed to have accepted the Plan.

**C.      Subordination; Reservation of Rights to Reclassify Claims**

The allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a holder of a Claim to enforce a subordination agreement, or the terms of the Intercreditor Agreements, against any Person other than the Debtors to the same extent that such agreement is enforceable under applicable nonbankruptcy law.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination.

**D.      Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery**

The classification and treatment of Allowed Claims under the Plan take into consideration all Allowed Secondary Liability Claims.  On the Effective Date, Allowed Secondary Liability Claims will be treated as follows:

1.      The Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by and assigned to another Debtor will be Reinstated.

2.      Except as provided in Section II.D.1, holders of Allowed Secondary Liability Claims against any Debtor will be entitled to only one Distribution in respect of the Liabilities related to such Allowed Secondary Liability Claim and will be deemed satisfied in full by the Distributions on account of the related underlying Allowed Claim.  Notwithstanding the existence of a Secondary Liability Claim, no multiple recovery on account of any Allowed Claim against any Debtor will be provided or permitted.

**E.      Confirmation Without Acceptance by All Impaired Classes**

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Plan shall constitute a motion for such relief.

**F.      Class Without Voting Claim Holders**

If Holders of Claims in a particular impaired Class of Claims are entitled to vote to accept or reject the Plan, but no Holders of Claims in such impaired Class of Claims vote to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

-30-

**G.      Treatment of Executory Contracts and Unexpired Leases**

**1.      Executory Contracts and Unexpired Leases to Be Assumed**

**a.      Assumption and Assignment Generally**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume, or assume and assign, including in connection with the NewCo Asset Sale, as indicated, each Executory Contract or Unexpired Lease listed on Exhibit II.G.1.a; provided, however, that the Debtors and the Reorganized Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.G.1.a to: (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to Section II.G.5; (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption, or assumption and assignment, pursuant to this Section; or (c) modify the amount of any Cure Amount Claim.  The Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.G.1.a to identify or change the identity of the Reorganized Debtor or other Person that will be an assignee of an Executory Contract or Unexpired Lease.  Each contract and lease listed on Exhibit II.G.1.a will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit II.G.1.a will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease (including any related agreements as described in Section II.G.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

**b.      Assumptions and Assignments of Ancillary Agreements**

Each Executory Contract or Unexpired Lease listed on Exhibit II.G.1.a will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument or other document is listed on Exhibit II.G.1.a, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.G.5 or designated for rejection in accordance with Section II.G.2.

**c.      Customer Agreements**

To the extent that (a) the Debtors are party to any contract, purchase order or similar agreement providing for the sale of the Debtors' products or services, (b) any such agreement constitutes an Executory Contract or Unexpired Lease and (c) such agreement (i) has not been rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (iii) is not subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (iv) is not listed on Exhibit II.G.1.a, (v) is not listed on Exhibit II.G.5 or (vi) has not been designated for rejection in accordance with Section II.G.2, such agreement (including any related agreements as described in Section II.G.1.b), purchase order or similar agreement will be assumed by the Debtors and assigned to the Reorganized Debtor or NewCo, as applicable, that will be the owner of the business that performs the obligations to the customer under such agreement, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  The Cure Amount Claim to be paid in connection with the assumption of such a customer-related contract, purchase order or similar agreement that is not specifically identified on Exhibit II.G.1.a shall be $0.00.  Listing a contract, purchase order or similar agreement providing for the sale of the Debtors' products or services on Exhibit II.G.5 will not constitute an admission by a Debtor or Reorganized Debtor that such agreement (including related agreements as described in Section II.G.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

2.      **Approval of Assumptions and Assignments; Assignments Related to Restructuring Transactions**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption (including any related assignment resulting from the Restructuring Transactions, the NewCo Asset Sale or otherwise) of Executory Contracts and Unexpired Leases pursuant to Section II.G as of the Effective Date, except for Executory Contracts and Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.G.5 or (e) are designated for rejection in accordance with the second to last sentence of this paragraph.  As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or Reorganized Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases or assigned to a particular Reorganized Debtor pursuant to the procedures described in this Section II.G, will be deemed assigned to the surviving, resulting or acquiring corporation in the applicable Restructuring Transaction, pursuant to section 365 of the Bankruptcy Code.  If an objection to a proposed assumption, assumption and assignment, or Cure Amount Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within 10 Business Days of the entry of the order of the Bankruptcy Court resolving the matter against the Debtors.  Such rejection shall be deemed effective as of the Effective Date.

3.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the applicable Debtor or Reorganized Debtor:  (a) by payment of the Cure Amount Claim in Distribution Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding (a) the amount of any Cure Amount Claim, (b) the ability of the applicable Reorganized Debtor or any assignee (including, as applicable, NewCo) to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption or assignment of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order or the execution of a Stipulation of Amount and Nature of Claim resolving the dispute and approving the assumption and/or assignment.

4.      **Contracts and Leases Entered Into After the Petition Date or Previously Assumed**

Contracts, leases and other agreements entered into after the Petition Date by a Debtor, including any Executory Contracts or Unexpired Leases assumed by a Debtor pursuant to a prior order of the Bankruptcy Court and not thereafter assigned or rejected, will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business, as applicable.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order; provided, however, that any Executory Contracts or Unexpired Leases assumed by a Debtor and not previously assigned will be (a) assigned to the Reorganized Debtor, NewCo or any other Person identified on Exhibit II.G.4, if any; or (b) deemed assigned pursuant to Section II.G.2.  The Debtors and the Reorganized Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.G.4 to identify or change the identity of the Reorganized Debtor party that will be the assignee of an Executory Contract or Unexpired Lease.

5.      **Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Section II.G (including any related agreements assumed or assumed and assigned, including to NewCo consistent with the Stalking Horse APA, pursuant to Section II.G.1.b), each Executory Contract or Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms

will be rejected pursuant to section 365 of the Bankruptcy Code.  The Executory Contracts or Unexpired Leases to be rejected will include the Executory Contracts or Unexpired Leases listed on Exhibit II.G.5, <u>provided</u> that the Debtors and the Reorganized Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.G.5 to:  (a) delete any Executory Contract or Unexpired Lease listed therein and add such Executory Contract or Unexpired Lease to Exhibit II.G.1.a, thus providing for its assumption, or assumption and assignment, pursuant to Section II.G.1; or (b) add any Executory Contract or Unexpired Lease to Exhibit II.G.5, notwithstanding any prior assumption of such Executory Contract or Unexpired Lease by the Debtors, thus providing for its rejection pursuant to this Section II.G.5.  Each contract and lease listed on Exhibit II.G.5 will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit II.G.5 will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease (including related agreements as described in Section II.G.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.  Irrespective of whether an Executory Contract or Unexpired Lease is listed on Exhibit II.G.5, it will be deemed rejected unless such contract (a) is listed on Exhibit II.G.1.a as of the Effective Date, (b) was previously assumed, assumed and assigned, or rejected by order of the Bankruptcy Court and was not subsequently added to Exhibit II.G.5 or otherwise rejected by the Debtors prior to the Effective Date or (c) is deemed assumed pursuant to the other provisions of this Section II.G.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date; or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Any Claims arising from the rejection of any Executory Contract or Unexpired Lease not previously assumed by the Debtors pursuant to an order of the Bankruptcy Court will be treated as General Unsecured Claims, subject to the provisions of section 502 of the Bankruptcy Code.

**6.      Rejection Damages Bar Date**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be Filed with the Bankruptcy Court and served upon counsel to the Debtors on or before the later of:  (a) 30 days after the Effective Date; or (b) for Executory Contracts identified on Exhibit II.G.5, 30 days after (i) a notice of such rejection is served under the Contract Procedures Order, if the contract counterparty does not timely file an objection to the rejection in accordance with the Contract Procedures Order or (ii) if such an objection to rejection is timely filed with the Bankruptcy Court in accordance with the Contract Procedures Order, the date that an Order is entered approving the rejection of the applicable contract or lease or the date that the objection to rejection is withdrawn.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from the Debtors, the Reorganized Debtors or the Estates.

**7.      Executory Contract and Unexpired Lease Notice Provisions**

In accordance with, and subject to, the Contract Procedures Order, the Debtors or the Reorganized Debtors, as applicable, will provide (a) notice to each counterparty to an Executory Contract or Unexpired Lease that is being assumed pursuant to the Plan of:  (i) the contract or lease being assumed; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; (iii) any assignment of an Executory Contract or Unexpired Lease (pursuant to the Restructuring Transactions, the NewCo Asset Sale or otherwise); and (iv) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease; (b) notice to each party whose Executory Contract or Unexpired Lease is being rejected pursuant to the Plan; (c) notice to each party whose Executory Contract or Unexpired Lease is being assigned pursuant to the Plan; (d) notice of any amendments to Exhibit II.G.5 to the Plan; and (e) any other notices relating to the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases required under the Plan or the Contract Procedures Order in accordance with the Contract Procedures Order; <u>provided</u>, <u>however</u>, that any party that previously received an Assumption and Assignment Notice (as defined in the Bidding Procedures Order) shall not receive any additional notice under this Section II.G.7, unless the proposed treatment of such party's Executory Contract or Unexpired Lease by the Debtors or the Reorganized Debtors has changed since the receipt of the Assumption and Assignment Notice.

**8.      Obligations to Indemnify Directors, Officers and Employees**

a.      Prior to the Effective Date, the Debtors (a) shall make arrangements to continue liability and fiduciary (including ERISA) insurance, or purchase a tail policy or policies, for the period from and after the Effective Date, for the benefit of any person who is serving or has served as one of the Debtors' directors, officers or employees at any time from and after the Petition Date and (b) shall fully pay the premium for such insurance. Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Debtor pursuant to section 365 of the Bankruptcy Code.

b.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after the Petition Date by reason of such person's prior or future service in such a capacity, or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, will be deemed and treated as Executory Contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date; provided, however, that nothing herein shall create any liability to NewCo on account of such indemnity obligations.

c.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees prior to but not on or after the Petition Date by reason of such person's prior service in such a capacity, or as a director, officer or employee of another corporation, partnership or other legal entity at the applicable Debtor's request, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or otherwise, will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; provided, however, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as Executory Contracts that are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) will be subject to the bar date provisions of Section II.G.6.

d.      The indemnification obligations in this Section II.G.8 shall not apply to or cover any Claims or causes of action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

**9.      No Change in Control**

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease to a Reorganized Debtor is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

**ARTICLE III**
**CONFIRMATION OF THE PLAN**

**A.      Conditions Precedent to Confirmation**

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section III.C:

-34-

1.      The Confirmation Order will be:  (a) acceptable in form and substance to the Debtors, the DIP Agents, the DIP Lenders, the First Lien Agent and the First Lien Lenders; (b) to the extent provided for in the Global Settlement Term Sheet and the Second Lien Noteholder Settlement Term Sheet, reasonably acceptable in form and substance to the Creditors' Committee and the Second Lien Parties; and (c) consistent with the terms of the Global Settlement and the Second Lien Noteholder Settlement.

2.      The Plan (a) shall not have been materially amended, altered or modified from the Plan as Filed, unless such material amendment, alteration or modification has been made in accordance with Section IX.A; (b) will be reasonably acceptable in form and substance to the Debtors, the DIP Agents, the DIP Lenders, the First Lien Agent and the First Lien Lenders; (c) to the extent provided for in the Global Settlement Term Sheet and the Second Lien Noteholder Settlement Term Sheet, will be reasonably acceptable in form and substance to the Creditors' Committee and the Second Lien Parties; and (d) is consistent with the terms of the Global Settlement and the Second Lien Noteholder Settlement.

3.      All Confirmation Exhibits are in form and substance:  (a) reasonably acceptable in form and substance to the Debtors, the DIP Agents, the DIP Lenders, the First Lien Agent and the First Lien Lenders; (b) to the extent provided for in the Global Settlement Term Sheet and the Second Lien Noteholder Settlement Term Sheet, reasonably acceptable in form and substance to the Creditors' Committee and the Second Lien Parties; and (c) consistent with the terms of the Global Settlement and the Second Lien Noteholder Settlement.

4.      The Resolution of Reclamation Obligations (a) has been entered into by the Debtors and the Reclamation Obligation Resolution Parties; (b) is reasonably acceptable in form and substance to the Debtors, the DIP Agents, the DIP Lenders, the First Lien Agent and the First Lien Lenders; (c) to the extent provided for in the Global Settlement Term Sheet and the Second Lien Noteholder Settlement Term Sheet, is reasonably acceptable in form and substance to the Creditors' Committee and the Second Lien Parties; and (d) is consistent with the terms of the Global Settlement and the Second Lien Noteholder Settlement.

5.      A Settlement Termination Event shall not have occurred.

**B.      Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section III.C:

1.      The Bankruptcy Court shall have entered the Confirmation Order:  (a) in form and substance satisfactory to the Debtors, the DIP Agents, the DIP Lenders, the First Lien Agent and the First Lien Lenders; (b) to the extent provided for in the Global Settlement Term Sheet, reasonably acceptable in form and substance to the Creditors' Committee and the Second Lien Parties; and (c) consistent with the terms of the Global Settlement and the Second Lien Noteholder Settlement.

2.      The Confirmation Order or another order of the Bankruptcy Court shall have been entered (a) approving and authorizing the Stalking Horse APA and the NewCo Asset Sale contemplated therein; (b) approving the Diminution Claim Allowance Settlement and the Unencumbered Assets Settlement on a non-conditional basis; and (c) authorizing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to implement the Plan and the Stalking Horse APA, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      The Confirmation Order shall not be stayed in any respect.

4.      The Exit Funding shall be fully committed and all documents and agreements necessary to effectuate and implement the Exit Funding shall have been executed and delivered by the relevant parties.

-35-

5.      The documents effectuating the Exit Facility (a) shall be (i) in form and substance reasonably satisfactory to the Debtors, the DIP Agents and the First Lien Agent, (ii) to the extent provided for in the Global Settlement Term Sheet, reasonably acceptable in form and substance to the Creditors' Committee and the Second Lien Parties and (iii) consistent with the terms of the Global Settlement and the Second Lien Noteholder Settlement; and (b) shall have been executed and delivered by the Reorganized Debtors, the Exit Facility Agent and each of the lenders under the Exit Facility.

6.      The Plan and all Confirmation Exhibits (a) shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section IX.A of the Plan; (b) to the extent provided for in the Global Settlement Term Sheet, are reasonably acceptable in form and substance to the Creditors' Committee and the Second Lien Parties; and (c) are consistent with the terms of the Global Settlement and the Second Lien Noteholder Settlement.

7.      A Settlement Termination Event shall not have occurred.

## C.      Waiver of Conditions to Confirmation or the Effective Date

Each condition to Confirmation set forth in Section III.A and each condition to the Effective Date set forth in Section III.B may be waived in whole or in part at any time by the Debtors, with the consent of (a) the DIP Agents, (b) the First Lien Agent, (c) any and all Persons identified in the applicable condition and (d) with respect to the conditions set forth in Section III.A.5 and Section III.B.7, the Creditors' Committee, without an order of the Bankruptcy Court.

## D.      Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.C, then, except where the failure to satisfy or duly waive a such a condition is within the Debtors' sole control, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.D:  (a) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.G and (iii) the releases described in Section III.E.6; and (b) nothing contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (i) a waiver or release of any Claims by or against, or any Interest in, any Debtor, (ii) an admission of any sort by the Debtors or any other party in interest or (iii) prejudicial in any manner to the rights of the Debtors or any other party in interest.

## E.      Effect of Confirmation of the Plan

### 1.      Dissolution of Official Committees

On the Effective Date, the Official Committees, to the extent not previously dissolved, will dissolve, and the members of the Official Committees and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases and will be released and discharged of and from all further duties, responsibilities and obligations relating to or arising in connection with the Chapter 11 Cases.  The Professionals retained by the Official Committees and the respective members thereof shall not be entitled to assert any Fee Claims for any services rendered or expenses incurred after the Effective Date, except, to the extent allowable under applicable law, for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with any final applications for allowance of compensation and reimbursement of expenses of the members of or Professionals to the Official Committees Filed and served after the Effective Date in accordance with the Plan. In accordance with the terms and conditions of the Global Settlement Term Sheet, no party to the Global Settlement

shall have the right to, or shall otherwise be permitted to, object to Fee Claims asserted by the Professionals retained by the Creditors' Committee, unless objecting based solely on the reasonableness of the applicable fees and expenses as provided for in the Global Settlement Term Sheet.

**2.      Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Recovery Actions**

Except as otherwise provided in the Plan, the Global Settlement Stipulation, any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, or any Final Order of the Bankruptcy Court, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and Causes of Action (including any (a) Recovery Actions and (b) Causes of Action identified on the Schedule of any Debtor) that the Debtors or the Estates may hold against any Person.

**3.      Comprehensive Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim (including Prepetition Intercompany Claims) or Interest may have with respect to any Allowed Claim or Allowed Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements, including the Global Settlement, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement and the Resolution of Reclamation Obligations, are (a) in the best interests of the Debtors, the Reorganized Debtors, the Estates and their respective property and Claim and Interest holders; and (b) fair, equitable and reasonable.

**4.      Discharge of Claims and Termination of Interests**

**a.      Complete Satisfaction, Discharge and Release**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and immediately after cancellation of the Old Common Stock of ANR:  (a) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, including any Black Lung Claims, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of holders of Interests in the Debtors.

**b.      Discharge and Termination**

In accordance with Section III.E.4.a, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Old Common Stock of ANR, but prior to the issuance of the Reorganized ANR Common Stock, of a discharge of all Claims and other debts and Liabilities against the Debtors, including Black Lung Claims, and a termination of all Interests and other rights of the holders of Interests in the Debtors, pursuant to sections 524(a)(1), 524(a)(2) and 1141(d) of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

5.	**Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order:**

a.	**All Persons who have been, are or may be holders of (a) Claims, including Claims related to Black Lung Claims, or (b) Interests, shall be enjoined from taking any of the following actions against or affecting any Released Party, or the respective assets or property thereof, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

i.	**commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any Released Party, or the respective assets or property thereof;**

ii.	**enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against any Released Party, or the respective assets or property thereof;**

iii.	**creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien against any Released Party, or the respective assets or property thereof, other than as contemplated by the Plan;**

iv.	**asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party, or the respective assets or property thereof; and**

v.	**proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan.**

b.	**All Persons that have held, currently hold or may hold any Liabilities released or exculpated pursuant to Sections III.E.6 and III.E.7, respectively, will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien; (d) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

6.	**Releases**

a.	**General Releases by Debtors and Reorganized Debtors**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all Persons who may purport to claim by, through, for or because of them, will forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan, the Global Settlement Stipulation or the Resolution of Reclamation Obligations; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

**b.**      **General Releases by Holders of Claims or Interests**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such Person has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code); provided, however, that the foregoing provisions shall not affect any rights to enforce the Plan, the Global Settlement Stipulation, the Resolution of Reclamation Obligations or the other contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan.

**c.**      **Release of Released Parties by Other Released Parties**

From and after the Effective Date, except with respect to obligations arising under the Plan, the Global Settlement Stipulation, the Second Lien Noteholder Settlement or the Resolution of Reclamation Obligations, or assumed hereunder, to the fullest extent permitted by applicable law, the Released Parties shall release one another from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way relating to:  (a) any Debtor; (b) the Chapter 11 Cases; (c) the Estates; (d) the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, the Disclosure Statement, the Global Settlement Stipulation, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Resolution of Reclamation Obligations, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party; (e) the process of marketing, selling and disposing of Assets pursuant to the Sale Orders, the *De Minimis* Sale Order or other orders entered by the Bankruptcy Court in the Chapter 11 Cases approving the sale or other disposition of Assets, including in connection with the NewCo Asset Sale; or (f) any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

**d.**      **Waiver of Claims Against Holders of Allowed Category 1 General Unsecured Claims**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, each of the Debtors, the First Lien Lenders, the First Lien Agent and NewCo (and, in each case, any successor in interest thereto, including the Reorganized Debtors) shall waive (a) any and all causes of action against holders of Allowed Category 1 General Unsecured Claims, including with respect to any Causes of Action under chapter 5 of the Bankruptcy Code only the Designated Chapter 5 Causes of Action, and (b) to the extent not otherwise waived pursuant to the foregoing, any and all Causes of Action under chapter 5 of the Bankruptcy Code against any and all Persons to the extent that any such Cause of Action would, if successfully pursued, result in any such Person being the holder of an Allowed Category 1 General Unsecured Claim (or that would result in the holder of an Allowed Category 1 General Unsecured Claim having an increased or additional Allowed Category 1 General Unsecured Claim); provided, however, that the foregoing shall not (a) limit the rights of the Debtors (or any successor in interest thereto, including any Reorganized Debtor) to assert any and all defenses, including setoff, other than defenses based solely on any Causes of Action under chapter 5 of the Bankruptcy Code (including Designated Chapter 5 Causes of Action) waived hereunder, to any claims made or that may be made by holders of Category 1 General Unsecured Claims against the Debtors or the Reorganized Debtors or (b) limit the rights of any party under any Executory Contract or Unexpired Lease assumed in the Chapter 11 Cases.

7. **Exculpation**

From and after the Effective Date, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, negotiation, preparation, dissemination, implementation, Confirmation or approval of the Plan (or the Distributions under the Plan), the Confirmation Exhibits, the Disclosure Statement, the Global Settlement Stipulation, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Resolution of Reclamation Obligations or any contract, employee pension or other benefit plan, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that this section shall not apply to the obligations arising under the Plan, the obligations assumed hereunder, the Global Settlement Stipulation or the Resolution of Reclamation Obligations; and provided further that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

8. **Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies**

   a. **Termination**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any Distribution made pursuant to the Plan.  All subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan shall be released and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined. Accordingly, Distributions pursuant to the Plan to holders of Allowed Claims shall not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

   b. **Settlement**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

9. **Liabilities Under Single-Employer Defined Benefit Pension Plans Not Terminated Prior to the Confirmation Date**

Notwithstanding anything to the contrary in the Plan, if any single-employer defined benefit Pension Plan does not terminate prior to the Confirmation Date, liabilities under such Pension Plan (including under (a) 29 U.S.C. § 1362(b) for unfunded benefit liabilities of such Pension Plan, (b) 29 U.S.C. § 1362(c) for due and unpaid employer contributions to such Pension Plan and (c) 29 U.S.C. § 1307 for premiums) shall be liabilities of the Reorganized Debtors and shall otherwise be unaffected by Confirmation, and such liabilities shall not be discharged, released or otherwise affected by the Plan.

### ARTICLE IV
### MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      Continued Corporate Existence and Vesting of Assets**

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section IV.B): (a) on or before the Effective Date, Reorganized ANR will be incorporated and shall exist as a separate corporate entity, with all corporate powers in accordance with state law and the certificates of incorporation and bylaws attached hereto as Exhibits IV.E.1.a and IV.E.1.b; (b) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; and (c) on the Effective Date, all property of the Estate of each Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, including the First Lien Lender Exit Contribution, will vest, subject to the Restructuring Transactions, in the applicable Reorganized Debtor free and clear of all Claims, Liens, charges, Liabilities or Black Lung Claims, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.  For the avoidance of doubt, the assets to be contributed to the Reorganized Debtors pursuant to the Plan shall not include (a) the NewCo Assets subject to the NewCo Asset Sale or (b) any other Assets subject to an asset sale consummated on or prior to the Effective Date pursuant to a Sale Order.

**B.      Restructuring Transactions**

**1.      Restructuring Transactions Generally**

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect, in accordance with applicable nonbankruptcy law, to effectuate the Distributions contemplated hereby, the NewCo Asset Sale, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors and the NewCo Asset Sale, including but not limited to the Restructuring Transactions identified on Exhibit IV.B.1, all to the extent not inconsistent with any other terms of the Plan.  Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions closing under or in connection with the Plan in connection with any Core Asset Sale Order, including the NewCo Asset Sale), conversions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  The actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including (i) making filings or recordings that may be required by applicable state law in connection with such transactions and (ii) any appropriate positions on one or more tax returns.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors.  Any Restructuring Transaction effected pursuant to the Plan shall be free and clear of any Liabilities and Black Lung Claims, Coal Act Claims and MEPP Claims, other than liabilities expressly assumed in the Stalking Horse APA.  The Restructuring Transactions shall not result in NewCo becoming a successor in

interest to the Debtors except as expressly provided in the Confirmation Order.  Notwithstanding the foregoing and any other provisions of the Plan, nothing in the Plan shall impair, expand or otherwise modify the rights of any party under the Stalking Horse APA (unless expressly consented to by the First Lien Lenders) or any other agreement entered into pursuant to any Sale Order.

### 2.    Obligations of Any Successor Corporation in a Restructuring Transaction

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

### C.    The NewCo Asset Sale

On the Effective Date, the Debtors and NewCo shall consummate the NewCo Asset Sale in accordance with sections 105, 363, 365 and 1123 of the Bankruptcy Code, the Confirmation Order and the terms of the Stalking Horse APA.  Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Stalking Horse APA shall be deemed authorized and approved without any requirement of further act or action by the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors, as applicable, are authorized to execute and deliver, and to consummate the transactions contemplated by the Stalking Horse APA, as well as to execute, deliver, file, record and issue any instruments, documents (including Uniform Commercial Code financing statements) and agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person.  The NewCo Asset Sale shall be, and the NewCo Assets shall transfer to NewCo, free and clear of all Claims, Liens, charges, encumbrances, Interests and other interests, including, without limitation, any Black Lung Claims, Coal Act Claims or MEPP Claims, other than liabilities expressly assumed in the Stalking Horse APA, and NewCo will not be a successor in interest to the Debtors except as expressly provided in the Confirmation Order. The Debtors reserve the right to modify the Plan in accordance with the provisions of the Stalking Horse APA.

### D.    The Resolution of Reclamation Obligations

The Debtors contemplate that, prior to the Effective Date, the Resolution of Reclamation Obligations among the Debtors and the Reclamation Obligation Resolution Parties will be agreed upon to effect a comprehensive resolution of the Reorganized Debtors' obligations with respect to Reclamation Activities. The Debtors anticipate that, among other things, the Resolution of Reclamation Obligations will:  (a) ensure the continuing existence of the Reorganized Debtors post-Effective Date for the primary purpose of conducting reclamation activities; (b) provide for the creation and funding of the Restricted Cash Reclamation Accounts; and (c) establish the Reclamation Threshold Amount.

### E.    Corporate Governance and Directors and Officers

### 1.    Constituent Documents of Reorganized ANR and the Other Reorganized Debtors

As of the Effective Date, the certificates of incorporation and the bylaws (or comparable constituent documents) of Reorganized ANR and the other Reorganized Debtors will be substantially in the forms set forth in Exhibits IV.E.1.a and IV.E.1.b, respectively.  The certificates of incorporation and bylaws (or comparable constituent documents) of Reorganized ANR and each other Reorganized Debtor, among other things, will (a) prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code and (b) with respect to Reorganized ANR, authorize the issuance of Reorganized ANR Common Stock and Reorganized ANR Preferred Interests.  After the Effective Date, Reorganized ANR and the other Reorganized Debtors may amend and restate their articles of incorporation or bylaws (or comparable constituent

documents) as permitted by applicable state law, subject to the terms and conditions of such constituent documents. On the Effective Date, or as soon thereafter as is practicable, Reorganized ANR and each other Reorganized Debtor shall file such certificates of incorporation (or comparable constituent documents) with the secretaries of state of the states in which Reorganized ANR and such other Reorganized Debtors are incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such states.

### 2.   Directors and Officers of Reorganized ANR and the Other Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date:  (a) the initial officers of Reorganized ANR and the other Reorganized Debtors will consist of the individuals identified on Exhibit IV.E.2; and (b) the initial board of directors of Reorganized ANR and each of the other Reorganized Debtors shall consist of (i) one designee of the Creditors' Committee, (ii) one designee of the First Lien Lenders and (iii) three Independent Directors selected by the Debtors subject to the consent of the Creditors' Committee and the First Lien Lenders, which consent shall not unreasonably be withheld, as set forth on Exhibit IV.E.2.  Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of Reorganized ANR or the applicable other Reorganized Debtor and state law.

### F.   Reorganized ANR Preferred Interests

On the Effective Date, (a) the Series A Preferred Interests shall be distributed to holders of Allowed Secured First Lien Lender Claims pursuant to Section II.B.2 and (b) the Series B Preferred Interests shall be distributed to holders of Allowed Secured Massey Convertible Noteholder Claims pursuant to Section II.B.4.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the Series A Preferred Interests and the Series B Preferred Interests under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder.

### G.   Reorganized ANR Contingent Revenue Payment

Within 30 days after the end of each calendar quarter, the Reorganized Debtors shall transfer cash in an amount equal to the Reorganized ANR Contingent Revenue Payment earned in such quarter into an escrow account, subject to a clawback based upon the audited financial statements of the Reorganized Debtors.  In the event that (a) a Material Reorganized ANR Transaction is effected and (b) a purchaser party to such Material Reorganized ANR Transaction assumes any portion of the applicable Reorganized ANR Contingent Revenue Payment, the Reorganized Debtors shall guarantee such purchaser's obligation to pay the assumed portion of the Reorganized ANR Contingent Revenue Payment.  Reorganized ANR shall provide the recipients of the Reorganized ANR Contingent Revenue Payment with annual financial statements audited by a nationally recognized accounting firm by March 31 of each year for the prior year and will make payments to such recipients within 14 business days thereafter.

In accordance with the terms and conditions of the Global Settlement Term Sheet, upon any sale of assets by Reorganized ANR or any change of control of Reorganized ANR, in satisfaction of Reorganized ANR Contingent Revenue Payment, unless the applicable portion of the Reorganized ANR Contingent Revenue Payment is assumed by a Qualified Buyer, holders of allowed Category 2 General Unsecured Claims shall be entitled to the payment of a "makewhole" amount equal to the sum of the present values of the revenues projected in the Business Plan associated with such assets over the remaining life of the Reorganized ANR Contingent Revenue Payment, discounted on a semiannual basis (assuming a 360-day year consisting of 12 30-day months) at a rate equal to the Treasury Rate plus 20 basis points.  The Debtors, in consultation with the Creditors' Committee, will use reasonable best efforts to structure the Reorganized ANR Contingent Revenue Payment so that the entitlements to payments on account thereof are tradable instruments; provided that the costs to the Debtors and Reorganized ANR of doing so will be considered as to whether such efforts are "reasonable."  Material terms related to tradability, to the extent developed prior to the date that is seven days prior to the Confirmation Hearing, shall be set forth on Exhibit IV.G.

**H.      Contingent Credit Support**

From the Effective Date through September 30, 2018, NewCo shall provide Reorganized ANR with the Contingent Credit Support.  Reorganized ANR shall be entitled to draw against the Contingent Credit Support if, and only if, the amount of Cash and Cash equivalents on Reorganized ANR's balance sheet were to fall below $20 million at any time prior to September 30, 2018, in which case, Reorganized ANR shall be entitled to draw against the Contingent Credit Support an amount equal to the lesser of the Reorganized ANR Cash Shortfall and the then remaining undrawn amount of the Contingent Credit Support.  Reorganized ANR shall be able to draw upon and repay the Contingent Credit Support as necessary through September 30, 2018.  Reorganized ANR shall provide notice of any draw on the Contingent Credit Support to NewCo, and NewCo shall fund the Contingent Credit Support draw within 10 Business Days of such notice if such funding is required.  Reorganized ANR shall be required to repay the funds drawn against the Contingent Credit Support (1) prior to September 30, 2018 to the extent the balance sheet cash or cash equivalents at Reorganized ANR is greater than $20 million as of the end of any calendar quarter ending on or before September 30, 2018 (exclusive of the amount outstanding from the Contingent Credit Support) or (2) if any amounts are outstanding from the Contingent Credit Support after September 30, 2018, to the extent the balance sheet Cash or Cash equivalents at Reorganized ANR at the end of any calendar quarter is greater than $30 million (exclusive of the amount outstanding from the Contingent Credit Support).  Reorganized ANR shall have 10 Business Days following the closing of its books for the relevant calendar quarter to repay any amount required.  Notwithstanding the above, all outstanding balances under the Contingent Credit Support shall be repaid by September 30, 2019.

**I.      Initial Cash**

In accordance with the terms and conditions of the Global Settlement Term Sheet, unless otherwise consented to by the Global Settlement Parties (with such consent not being unreasonably withheld), on the Effective Date, Reorganized ANR shall have $135 million of initial operating Cash or such greater amount of initial operating Cash such that a minimum Cash balance of $20 million is maintained throughout the five-year forecast, and $117.9 million of initial restricted Cash (whether held by Reorganized ANR on its balance sheet, by a government or regulatory body or by another third party, or maintained in a dedicated fund, including any reclamation accounts, but excluding any cash to support an Exit Facility) or such greater amount of restricted cash as the Debtors determine is sufficient to support operations (including reclamation activities) and to cash collateralize any letters of credit backstopping the Debtors' asset retirement obligations and other obligations, which restricted Cash balances shall be sourced from the Debtors' existing cash.  For the avoidance of doubt, Reorganized ANR's operating cash, and any cash left in Reorganized ANR to collateralize any such letters of credit, shall be the property of Reorganized ANR and there shall be no contingent or deferred obligation to pay any such cash to NewCo, the DIP Lenders or the First Lien Lenders at any time.  Any cash collateral that is no longer necessary to support the amount of workers' compensation letters of credit as of the Effective Date, whether on account of the Debtors obtaining third-party financing or such letters of credit no longer being required, shall be paid to NewCo, without interest, as soon as reasonably practicable.

**J.      Restricted Cash Reclamation Accounts**

The Reorganized Debtors and NewCo shall fund the Restricted Cash Reclamation Accounts in accordance with the terms of the Resolution of Reclamation Obligations.

**K.      Reorganized ANR Common Stock**

On the Effective Date, all shares of Reorganized ANR Common Stock issued pursuant to the Plan shall be distributed to holders of Allowed Category 2 General Unsecured Claims in accordance with Sections II.B.7 and II.B.8.  The Reorganized ANR Common Stock, when issued as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable.  Each issuance under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such issuance and by the terms and conditions of the instruments evidencing or relating to such issuance, which terms and conditions shall bind each Person receiving such issuance.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the Reorganized ANR Common Stock under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder.  In accordance with the

terms and conditions of the Global Settlement Term Sheet, the Debtors, in consultation with the Creditors' Committee, shall use reasonable best efforts to structure the Reorganized ANR Common Stock so that such shares are tradable; provided that the costs to the Debtors and Reorganized ANR of doing so will be considered as to whether such efforts are "reasonable."

**L.      NewCo Equity and NewCo Warrants**

Consistent with the Restructuring Transactions, the NewCo Equity shall be issued by NewCo on or prior to the Effective Date.  On the Effective Date and consistent with the Restructuring Transactions:  (a) NewCo Common Stock and NewCo Warrants shall be distributed to holders of (i) Allowed Secured Second Lien Noteholder Claims pursuant to Section II.B.3 and (ii) Allowed Category 2 General Unsecured Claims pursuant to Sections II.B.7 and II.B.8; and (b) NewCo Preferred Interests shall be distributed to holders of Allowed Secured Second Lien Noteholder Claims pursuant to Section II.B.3; provided that all initial NewCo Equity (including the Distributions described above) shall be subject to dilution by a management incentive plan to be implemented by NewCo.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the NewCo Equity and the NewCo Warrants under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder.

**M.      Employment-Related Agreements; Retiree Benefits; Workers' Compensation Programs**

**1.      Employment-Related Agreements**

As of the Effective Date, the Reorganized Debtors will have authority to:  (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active employees.

**2.      Retiree Benefits**

The treatment of non-pension retiree benefits will be determined pursuant to (a) any order resolving the Unvested Non-Pension Benefits Motion, (b) the 1113/1114 Order, (c) any other order entered by the Bankruptcy Court pursuant to section 1114 of the Bankruptcy Code and/or (d) any agreement by the Debtors and the relevant parties that is approved pursuant to a Final Order of the Bankruptcy Court.

**3.      Assumption of Pension Plans**

On the Effective Date, consistent with the Global Settlement Term Sheet, Reorganized ANR shall assume the Pension Plans, and Reorganized ANR will become the sponsor and continue to administer the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the Pension Plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code. Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall (a) release or exculpate any Debtor, Reorganized Debtor or responsible person thereof from any liability for breach of fiduciary duty under ERISA respecting any defined benefit Pension Plan; or (b) enjoin any suit, action or proceeding (i) for breach of such fiduciary duty or (ii) to enforce a judgment, decree or order issued in any such action or proceeding (including by setoff), or to enforce a judgment lien based in such judgment.

In accordance with the terms and conditions of the Global Settlement Term Sheet, in addition to satisfying the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, the Reorganized Debtors will make excess contributions to the Pension Plans in the amount of $18,000,000 to be paid half on June 30, 2017 and the remaining half on June 30, 2018, the amounts of which will be allotted among the Pension Plans in proportion to the dollar amount of their underfunding calculated on a termination basis.  Additionally, Reorganized ANR will elect not to create a prefunding balance associated with these excess contributions.

    **4.**      **Continuation of Workers' Compensation Programs**

From and after the Effective Date:  (a) the Reorganized Debtors will continue to administer and pay all valid claims for benefits and liabilities arising under the Debtors' workers' compensation programs for which the Debtors or the Reorganized Debtors are responsible under applicable state workers' compensation law as of the Effective Date, regardless of when the applicable injuries occurred, in accordance with the Debtors' prepetition practices and procedures, applicable Insurance Contracts, plan documents and governing state workers' compensation law; and (b) nothing in the Plan shall discharge, release or relieve the Debtors or the Reorganized Debtors from any current or future liability under applicable state workers' compensation law in the jurisdictions where the Debtors or the Reorganized Debtors participate in workers' compensation programs, except for those obligations assumed by NewCo pursuant to the Stalking Horse APA.  The Debtors and the Reorganized Debtors, as applicable, expressly reserve the right to challenge the validity of any claim for benefits or liabilities arising under any workers' compensation program.

    **5.**      **Black Lung Excise Taxes**

Following the Effective Date, the Reorganized Debtors shall continue to pay Black Lung Excise Taxes irrespective of when such Taxes arise.

**N.**      **Corporate Action**

The Restructuring Transactions; the adoption of new or amended and restated certificates of incorporation and bylaws (or comparable constituent documents) for Reorganized ANR and the other Reorganized Debtors; the initial selection of directors and officers for each Reorganized Debtor; the transactions contemplated in the Stalking Horse APA; the Reorganized Debtors' receipt of the Exit Funding; the entry into the Exit Facility and receipt of the proceeds thereof; the issuance and Distribution of Reorganized ANR Common Stock, the Reorganized ANR Preferred Interests, the Reorganized ANR Contingent Revenue Payment, the NewCo Equity and the NewCo Warrants; the Distribution of Cash and interests pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and the other matters provided for under the Plan involving the corporate structure of the Debtors and the Reorganized Debtors or corporate action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Reorganized Debtors or any other Person or entity.

**O.**      **Special Provisions Regarding Insured Claims**

    **1.**      **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

Distributions, if any, under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent Insurance Contracts and applicable law.  Nothing in this Section IV.O will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any Person may hold against any other Person, including the Insurers; <u>provided</u>, however, that nothing herein shall create a direct right of action by the holder of an Insured Claim against an Insurer.

    **2.**      **Assumption and Continuation of Insurance Contracts**

From and after the Effective Date, each of the Insurance Contracts will be assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code or continued in accordance with its terms, with rights and obligations under such policy such that each of the parties' contractual, legal and equitable rights under each Insurance Contract shall remain unaltered, and the successors to the Debtor parties to each

Insurance Contract will continue to be bound by such Insurance Contract as if the Chapter 11 Cases had not occurred.  Nothing in the Plan shall affect, impair or prejudice the rights and defenses of the Insurers or the Reorganized Debtors under the Insurance Contracts in any manner, and such Insurers and Reorganized Debtors shall retain all rights and defenses under the Insurance Contracts, and the Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred.  In addition, notwithstanding anything to the contrary in the Plan, nothing in the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any Insurance Contract, if any, in any respect.  Any such rights and obligations shall be determined under the Insurance Contracts, any agreement of the parties and applicable law.

**P.      Cancellation and Surrender of Instruments, Securities and Other Documentation**

**1.      Notes**

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan or as otherwise provided for herein, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article V, the Indentures and the Notes will be deemed canceled and of no further force and effect against the Debtors, without any further action on the part of any Debtor.  The holders of the Notes will have no rights against the Debtors, their Estates or their Assets arising from or relating to such instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no Distribution under the Plan will be made to or on behalf of any holder of an Allowed Noteholder Claim until such Notes are surrendered to and received by the applicable Third Party Disbursing Agent to the extent required in Section V.K.  Notwithstanding the foregoing and anything contained in the Plan, the applicable provisions of the Indentures will continue in effect solely for the purposes of (a) allowing the Indenture Trustees or other Disbursing Agents to make Distributions on account of Noteholder Claims as provided in Section V.D and deduct therefrom such reasonable compensation, fees and expenses due thereunder or incurred in making such Distributions, to the extent not paid by the Debtors or the Reorganized Debtors and authorized under such Indentures; and (b) allowing the Indenture Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan (and any and all indemnification provisions in the Indentures shall explicitly survive the occurrence of the Confirmation Date and the Effective Date until all such fees and expenses are paid).  Except as otherwise provided herein the Reorganized Debtors shall not have any obligations to any Indenture Trustee for any fees, costs or expenses.

**2.      Old Common Stock**

The Old Common Stock of ANR shall be deemed canceled and of no further force and effect on the Effective Date.  The holders of or parties to such canceled securities and other documentation will have no rights arising from or relating to such securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

**Q.      Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the property of any Estate will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.  As of the Effective Date:  (a) the holders of such Liens will be authorized and directed to release any collateral or other property of the Estates (including any cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the Reorganized Debtors; and (b) the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.Q.

**R.    Effectuating Documents; Further Transactions**

The president, chief executive officer, chief financial officer, treasurer or any vice president of each Debtor or Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The secretary or any assistant secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.

**S.    Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, filing fee, sales or use Tax or similar Tax:  (a) the issuance, transfer or exchange of Reorganized ANR Common Stock; (b) the creation of any mortgage, deed of trust, Lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the execution and delivery of the Exit Facility; (e) any Restructuring Transaction, including (i) the NewCo Asset Sale contemplated in the Stalking Horse APA and (ii) any transfers or distributions pursuant to the Plan; (f) any sale of Assets by the Debtors under section 363 of the Bankruptcy Code that closes in connection with the Plan, including the transfer of assets to NewCo as part of the NewCo Asset Sale; and (g) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the NewCo Asset Sale, including any merger agreements, agreements of consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan. The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such Tax and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Tax.

**T.    Compliance with Federal Securities Laws**

Subject to section 1145 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, nothing in the Plan, the Confirmation Order or related documents relieves any Person from complying with applicable federal securities laws.

**ARTICLE V**
**PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN**

**A.    Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article V, Distributions to be made on the Effective Date to holders of Claims as provided by Article II that are Allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than:  (a) 60 days after the Effective Date; or (b) with respect to any particular Claim, such later date when the applicable conditions of Section II.G.3 (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section V.F.2 (regarding undeliverable Distributions) or Section V.K (regarding surrender of canceled instruments and securities), as applicable, are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section VI.D.

**B.    Method of Distributions to Holders of Claims**

The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash, securities, interests and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan. The duties of any Third Party Disbursing Agent shall be set forth in the applicable agreement retaining such Third Party Disbursing Agent.

-48-

**C.      Distributions of the NewCo Contribution**

NewCo shall provide the NewCo Contribution to the designated Disbursing Agent on or before the Effective Date consistent with the Restructuring Transactions.  Distributions of the NewCo Contribution on account of Allowed Category 1 General Unsecured Claims, Allowed Category 2 General Unsecured Claims and Allowed Secured Second Lien Noteholder Claims, as applicable, in accordance with Sections II.B.3, II.B.6, II.B.7 and II.B.8, shall be made through the facilities of DTC or, if applicable, by such Third Party Disbursing Agent on the Effective Date.

**D.      Distributions on Account of Allowed Noteholder Claims**

Distributions on account of Allowed Noteholder Claims shall be made (a) to the respective Indenture Trustees or (b) with the prior written consent of any Indenture Trustee, through the facilities of DTC or, if applicable, another Third Party Disbursing Agent.  If a Distribution is made to an Indenture Trustee, such Indenture Trustee, in its capacity as Third Party Disbursing Agent, shall administer the Distributions in accordance with the Plan and the applicable Indenture and be compensated in accordance with Section V.E below.  Notwithstanding anything set forth herein, in the Disclosure Statement or the Confirmation Order, the Second Lien Notes Trustee shall not be required or otherwise obligated to distribute the NewCo Contribution or any other securities or distributions contemplated by the Plan unless such distributions meet the eligibility requirements of DTC.

**E.      Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.  These payments will be made by the Reorganized Debtors and will not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent.  For purposes of reviewing the reasonableness of the fees and expenses of any Third Party Disbursing Agent, the Reorganized Debtors shall be provided with copies of invoices of each Third Party Disbursing Agent in the form typically rendered in the regular course of the applicable Third Party Disbursing Agent's business but with sufficient detail that reasonableness may be assessed.  To the extent that there are any disputes that the Reorganized Debtors are unable to resolve with a Third Party Disbursing Agent, the Reorganized Debtors may submit such dispute to the Bankruptcy Court for resolution.

**F.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.      Delivery of Distributions**

Distributions to holders of Allowed Claims will be made by a Disbursing Agent:  (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) as provided in Section V.D; (c) at the addresses set forth in any written certification of address change delivered to the Claims and Balloting Agent or the applicable Disbursing Agent, as applicable, after the date of Filing of any related proof of claim; (d) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and neither the Claims and Balloting Agent nor the applicable Disbursing Agent has received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such holder in a Filing made after such Claim becomes an Allowed Claim.

**2.      Undeliverable Distributions Held by Disbursing Agents**

**a.      Holding of Undeliverable Distributions**

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address.  Subject to Section V.F.2.c, Distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing

Agent pursuant to this Section V.F.2.a until such time as a Distribution becomes deliverable.  Subject to Section V.F.2.c, while remaining in the possession of the applicable Disbursing Agent, undeliverable Distributions will be held for the benefit of the potential claimants of such Distributions.

### b.   After Distributions Become Deliverable

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date; provided, however, that the applicable Disbursing Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims allowed as of the record date will participate in such periodic Distribution.  Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

### c.   Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (a) the Effective Date and (b) the last date on which a Distribution was deliverable to such holder will have its claim for such undeliverable Distribution discharged and will be forever barred from asserting any such claim against the Debtors or the Reorganized Debtors.  Unclaimed Distributions that are undeliverable and unclaimed Distributions otherwise deliverable to holders of Allowed Claims shall be retained by, or, if held by a Third Party Disbursing Agent, returned to, Reorganized ANR and shall become the property of Reorganized ANR, free of any restrictions thereon; provided, however, that with respect to unclaimed Distributions that are undeliverable and unclaimed Distributions otherwise deliverable and that were to be distributed to holders of Allowed Category 1 General Unsecured Claims or Allowed Category 2 General Unsecured Claims pursuant to the Plan, shall not be retained by, or returned to the Reorganized Debtors, but shall instead be distributed Pro Rata to Holders of Allowed Category 1 General Unsecured Claims or Allowed Category 2 General Unsecured Claims that are receiving Distributions pursuant to the terms of the Plan.  Nothing contained in the Plan will require any Debtor, any Reorganized Debtor or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

## G.   Timing and Calculation of Amounts to Be Distributed

### 1.   Distributions to Holders of Allowed Claims

Subject to Section V.A, on the Effective Date, each holder of an Allowed Claim will receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  On each Distribution Date, Distributions also will be made, pursuant to Section VI.D, to holders of Claims that previously were Disputed Claims that were allowed after the most recent Distribution Date.  Such periodic Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.  Distribution Dates shall occur no less frequently than once per year.

### 2.   Interest on Claims

Except as otherwise specifically provided for in the Plan, or required by bankruptcy law, the Debtors, the Estates and the Reorganized Debtors shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes.  Any amount that constitutes or is attributable to interest that has been accrued and has not been paid by the Debtors, the Estates or the Reorganized Debtors shall be cancelled as of the Effective Date for federal income tax purposes.

      **3.**     *De Minimis* **Distributions**

No Distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the holder of such Claim on the applicable Distribution Date has an economic value of less than $25.

**H.**     **Distribution Record Date**

1.     A Disbursing Agent will have no obligation to, and will not, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the Distribution Record Date.

2.     As of the close of business on the Distribution Record Date, each transfer register for the Notes, as maintained by the respective Indenture Trustees, will be closed.  The applicable Disbursing Agent will have no obligation to, and will not, recognize the transfer or sale of any Noteholder Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make Distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

3.     Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

**I.**     **Means of Cash Payments**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**J.**     **Establishment of Reserves and Provisions Governing Same**

Prior to the Confirmation Date, the Debtors shall File a motion to establish any reserves and procedures related thereto that they deem necessary or advisable, after consultation with counsel to the Creditors' Committee and counsel to the First Lien Agent, to make Distributions to holders of Allowed Claims or otherwise to satisfy related obligations under the Plan.  Any Distributions held in reserve pursuant to this Section V.J shall be held in escrow until distributed pursuant to the Plan.

The Disbursing Agent shall vote, and shall be deemed to vote, any Reorganized ANR Common Stock held by it in any reserve in its capacity as Disbursing Agent in the same proportion as all outstanding shares of Reorganized ANR Common Stock properly cast in a shareholder vote.

Cash dividends and other distributions received by the Disbursing Agent on account of any Reorganized ANR Common Stock held in any reserve pursuant to this Section V.J will (a) be deposited in a segregated bank account in the name of the Disbursing Agent for the benefit of holders of the applicable Allowed Claims; (b) be accounted for separately; and (c) not constitute property of the Reorganized Debtors.

Any reserve established for Disputed Claims is intended to be treated, for U.S. federal income Tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1).

**K.  Surrender of Canceled Instruments or Securities**

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all outstanding common stock, Notes, Indentures, instruments and securities issued by any of the Debtors will be canceled and of no further force and effect, without any further action on the part of the Bankruptcy Court, any Debtor or any Reorganized Debtor.  The holders of or parties to such canceled instruments and securities will have no rights arising from or relating to such instruments and securities or the cancellation thereof, except the rights provided pursuant to the Plan.

**L.  Withholding and Reporting Requirements**

1.  In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all applicable Tax withholding and reporting requirements imposed by any Governmental Unit, and all Distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, applying a portion of any Cash Distribution to be made under the Plan to pay applicable withholding Taxes, liquidating a portion of any non-Cash Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) and/or requiring Claim holders to pay the withholding Tax amount to the Disbursing Agent in Cash as a condition of receiving any non-Cash Distributions under the Plan.  Any amounts withheld pursuant to this Section shall be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan.  To the extent that any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Disbursing Agent, such Claim holder's Distribution may, in the Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section V.F.

2.  Notwithstanding any other provision of the Plan, each Person receiving a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any Governmental Unit on account of the Distribution, including income, withholding and other Tax obligations.

3.  The Debtors reserve, and the Reorganized Debtors shall have, the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

**M.  Setoffs**

Except with respect to claims of a Debtor or a Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Reorganized Debtor or, as instructed by a Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of the Claim) the claims, rights and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and Causes of Action that the Debtor or Reorganized Debtor may possess against the Claim holder.  The First Lien Lender Remaining Diminution Claim shall not be subject to setoff.

**N.  Application of Distributions**

To the extent applicable, all Distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such

Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, will apply to any interest accrued on such Claim after the Petition Date.

## ARTICLE VI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### A.   Claims Oversight Committee

Prior to the Effective Date, the Creditors' Committee shall designate three individuals to serve as the Claims Oversight Committee.  The duties of the Claims Oversight Committee shall be to oversee:  (a) the allowance of, and objections to, General Unsecured Claims; (b) the resolution of Disputed General Unsecured Claims, including rejection damage Claims and litigation Claims; (c) the establishment and maintenance of sufficient reserves for Disputed Category 1 General Unsecured Claims and Disputed Category 2 General Unsecured Claims; (d) the timing and amount of Distributions made to unsecured creditors holding Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims; and (e) unclaimed or undeliverable Distributions to unsecured creditors holding Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims under the terms of the Plan.  The Claims Oversight Committee shall have consent rights (subject to the Debtors' ability to seek a determination by the Bankruptcy Court that the Claims Oversight Committee has unreasonably withheld its consent) with respect to, and the right to appear and be heard regarding, any and all of the foregoing matters.  The Claims Oversight Committee shall have the right to appear and be heard on any of the foregoing matters and the right to retain Claims Oversight Committee Professionals consisting of (a) one primary counsel, (b) one local or conflicts counsel and (c) one financial consultant. The reasonable and documented fees and expenses of Claims Oversight Committee Professionals (and any other costs), up to an aggregate amount equal to the Claims Oversight Committee Professionals Fee Cap (and, under no circumstances, in excess of the Claims Oversight Committee Professionals Fee Cap), shall be paid by the Reorganized Debtors.  To facilitate the payment of such fees and expenses, on the Effective Date, $1.0 million of Cash shall be placed into the Claims Oversight Escrow Account.

### B.   Treatment of Disputed Claims

#### 1.   Tort Claims

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim (as to which a proof of Claim or request for payment of an Administrative Claim was timely Filed in the Chapter 11 Cases) not resolved through a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  The Debtors or the Reorganized Debtors, as applicable, may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option.  Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code or, after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties, including any Insurer, to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s).  Notwithstanding the foregoing, at all times prior to or after the Effective Date, to the fullest extent permitted by law, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims liquidated or estimated in the Bankruptcy Court (or the District Court) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.  Subject to Section VI.A, any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.B.1 and applicable nonbankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Category 1 General Unsecured Claim against the applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with any applicable Insurance Contract or is not otherwise satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' Insurance Contracts will be treated as an Allowed Claim for the purposes of Distributions under the Plan.  In no event will a Distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self-insured retention under any applicable Insurance Contract.  In the event a Tort Claim is determined and liquidated pursuant

to a judgment or order that is obtained in accordance with this Section VI.B.1 and is no longer appealable or subject to review, and applicable nonbankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim, provided, however, that nothing in this sentence shall, or shall be deemed to, modify, alter or otherwise affect the rights of any Insurer under any Insurance Contract.  Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that a Debtor may have against any Person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the Debtors or the Reorganized Debtors may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved.

### 2. Disputed Insured Claims

The resolution of Disputed Insured Claims, including Tort Claims, pursuant to this Section VI.B shall be subject to the provisions of Section IV.O.

### 3. No Distributions Until Allowance

Notwithstanding any other provision of the Plan, no Distributions will be made on account of a Disputed Claim until such Claim (or a portion of such Claim) becomes an Allowed Claim, if ever.

## C. Prosecution of Objections to Claims

### 1. Objections to Claims

Subject to Section VI.A, all objections to Claims must be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce any scheduled Claim must be made by the Debtors or the Reorganized Debtors by the Claims Objection Bar Date.  If an objection to a Claim has not been Filed or an amendment to the Schedules has not been made by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim in the amount specified in a timely filed proof of Claim or the amount scheduled, as applicable, if such Claim has not been allowed earlier in a different amount.

### 2. Extension of Claims Objection Bar Date

The Reorganized Debtors may seek authorization to extend the Claims Objection Bar Date for some or all Disputed Claims for cause through the Filing of a motion with the Bankruptcy Court.

### 3. Authority to Prosecute Objections

Subject to Section VI.A, on or after the Effective Date, only the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims.  On or after the Effective Date, the Reorganized Debtors, and only the Reorganized Debtors, may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

### 4. Authority to Amend Schedules

Subject to Section VI.A, the Debtors or the Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Reorganized Debtors will provide the holder of such Claim with notice of such amendment and parties in interest will have 30 days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the applicable Disbursing Agent may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

**D.**     **Distributions on Account of Disputed Claims Once Allowed**

Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date shall be made in accordance with Article V of the Plan.

## ARTICLE VII
## CONSOLIDATION

**A.**     **Consolidation**

Pursuant to the Confirmation Order, the Bankruptcy Court will approve the limited administrative consolidation of the Debtors solely for the purpose of implementing the Plan, including for purposes of voting, assessing whether Confirmation standards have been met, calculating and making Distributions under the Plan and filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee.  Pursuant to such order, as of the Effective Date:  (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (c) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtor will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors, and the Debtors may file and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple Debtors; and (d) Intercompany Claims between Debtors will be eliminated and extinguished.  Such administrative consolidation (other than for the purpose of implementing the Plan) shall not affect (a) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions as provided in Section IV.B; (b) the vesting of Assets in the Reorganized Debtors; (c) the right to distributions from any Insurance Contracts or the proceeds thereof; or (d) the rights of any Person to contest alleged setoff or recoupment efforts on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

**B.**     **Order Granting Consolidation**

This Plan serves as a motion seeking entry of an order consolidating the Debtors, as described and to the limited extent set forth in Section VII.A.  Unless an objection to such consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section IX.F on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

## ARTICLE VIII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.     Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of (1) any request for payment of any Administrative Claim, (2) any and all objections to the amount, allowance, priority or classification of Claims or Interests and (3) any controversies between the Reorganized Debtors and the Claims Oversight Committee in connection with any of the foregoing;

B.     Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

C.       Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable, including in connection with the Stalking Horse APA and the NewCo Asset Sale, and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

D.       Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and resolve any controversies between the Reorganized Debtors and the Claims Oversight Committee in connection with the foregoing;

E.       Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

F.       Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement and the Confirmation Order, including, but not limited to, the Stalking Horse APA, the Global Settlement and the Resolution of Reclamation Obligations;

G.       Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, including the Stalking Horse APA, or any Person's rights arising from or obligations incurred in connection with the Plan;

H.       Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Stalking Horse APA; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Stalking Horse APA, in such manner as may be necessary or appropriate to consummate the Plan;

I.       Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan, the Confirmation Order or the Stalking Horse APA;

J.       Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

K.       Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Stalking Horse APA;

L.       Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

M.       Enter a final decree or decrees closing the Chapter 11 Cases;

N.       Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

O.      Recover all assets of the Debtors and their Estates, wherever located; and

P.      Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

**A.      Modification of the Plan**

Subject to section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date; provided, however, that the Debtors shall not be permitted to alter, amend or modify any condition precedent to entry of the Confirmation Order or to the Effective Date (or this Section IX.A as it relates to the foregoing) without the consent of each of the parties referenced with respect to such condition precedent.

**B.      Revocation of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (a) a waiver or release of any claims by or against any Debtor; (b) an admission of any sort by any Debtor or any other party in interest; or (c) prejudicial in any manner to the rights of any Debtor or any other party in interest.

**C.      Severability of Plan Provisions**

If any term or provision of the Plan is held by the Bankruptcy Court or any other court of competent jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) non-severable and mutually dependent.

For the avoidance of doubt, notwithstanding the foregoing, any provision in this Plan or in the Confirmation Order providing (a) that the Restructuring Transactions and the NewCo Sale shall be effected free and clear of any Liabilities, including Black Lung Claims, Coal Act Claims and MEPP Claims not expressly assumed or (b) that NewCo shall not be a successor to any of the Debtors for any purpose other than as expressly provided in the Confirmation Order, is integral to the consummation of the transactions set forth herein (including, without limitation, the NewCo Asset Sale, the NewCo Contribution, and the NewCo ABL Facility) and non-severable from the other provisions of the Plan or the Confirmation Order.

**D.      Successors and Assigns**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Person named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Person.

**E.        Plan/Confirmation Order Controls**

          In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.  In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Confirmation Order, the provisions of the Confirmation Order shall control and take precedence.

**F.        Service of Documents**

          Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to:  (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee; (c) the Retiree Committee; (d) the DIP Agents; (e) the First Lien Agent; (f) the *Ad Hoc* Committee of Second Lien Noteholders; (g) the Second Lien Notes Trustee; or (h) the UMWA must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

    **1.        The Debtors and the Reorganized Debtors**

          David G. Heiman
          Carl E. Black
          Thomas A. Wilson
          JONES DAY
          North Point
          901 Lakeside Avenue
          Cleveland, Ohio  44114
          Telephone:  (216) 586-3939
          Facsimile:  (216) 579-0212

          Jeffrey B. Ellman
          JONES DAY
          1420 Peachtree Street, N.E.
          Suite 800
          Atlanta, Georgia  30309
          Telephone: (404) 581-3939
          Facsimile: (404) 581-8330

          Tyler P. Brown
          Henry P. (Toby) Long, III
          HUNTON & WILLIAMS LLP
          Riverfront Plaza, East Tower
          951 East Byrd Street
          Richmond, Virginia  23219
          Telephone:  (804) 788-8200
          Facsimile:  (804) 788-8218

          (Counsel to the Debtors and the Reorganized Debtors)

2.       **The Creditors' Committee**

Dennis F. Dunne
Evan R. Fleck
Eric K. Stodola
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Place
New York, New York  10005
Telephone:  (212) 530-5000

Andrew M. Leblanc
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C.  20006
Telephone:  (202) 835-7500

William A. Gray
W. Ashley Burgess
Roy M. Terry, Jr.
SANDS ANDERSON PC
P.O. Box 1998
Richmond, Virginia  23218-1998
Telephone:  (804) 648-1636

(Counsel to the Creditors' Committee)

3.       **The Retiree Committee**

Lynn Lewis Tavenner
Paula S. Beran
David N. Tabakin
TAVENNER & BERAN, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia  23219
Telephone:  (804) 783-8300
Facsimile:  (804) 783-0178

John R. Owen
Jeremy D. Capps
Melissa Y. York
HARMAN, CLAYTOR, CORRIGAN & WELLMAN
P.O. Box 70280
Richmond, Virginia  23235
Telephone:  (804) 747-5200
Facsimile:  (804) 747-6085

(Counsel to the Retiree Committee)

4. **The DIP Agents and the First Lien Agent**

Damian S. Schaible
Damon P. Meyer
Bradley A. Schecter
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 710-5800

Dion W. Hayes
Sarah B. Boehm
K. Elizabeth Sieg
MCGUIREWOODS LLP
800 East Canal Street
Richmond, Virginia  23219
Telephone:  (804) 775-1000
Facsimile:  (804) 775-1061

(Counsel to the DIP Agents and the First Lien Agent)

5. **The *Ad Hoc* Committee of Second Lien Noteholders**

Paul M. Basta
Stephen E. Hessler
Gregory F. Pesce
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Michael A. Condyles
Peter J. Barrett
Jeremy S. Williams
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700
Facsimile:  (804) 783-6192

(Counsel to the *Ad Hoc* Committee of Second Lien Noteholders)

6. **The Second Lien Notes Trustee**

Jayme T. Goldstein
Kenneth Pasquale
Gabriel E. Sasson
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038-4982
Telephone:  (212) 806-5400
Facsimile:  (212) 806-6006

Peter J. Barrett
Jeremy S. Williams
KUTAK ROCK LLP
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:  (804) 644-1700
Facsimile:  (804) 783-6192

(Counsel to the Second Lien Notes Trustee)

7.      **The UMWA**

Sharon L. Levine
SAUL EWING LLP
One Riverfront Plaza, Suite 1520
1037 Raymond Boulevard
Newark, New Jersey 07102-5426
Telephone:  (973) 286-6713

Troy Savenko
KAPLAN VOEKLER CUNNINGHAM & FRANK, PLC
1401 East Cary Street
Richmond, Virginia  23219
Telephone:  (804) 823-4000

(Counsel to the UMWA)

Dated:  May 27, 2016

Respectfully submitted,

Alpha Natural Resources, Inc., on its own behalf and
on behalf of each affiliate Debtor


By:      /s/ Mark M. Manno
Name:   Mark M. Manno
Title:    Executive Vice President, General Counsel and
          Chief Procurement Officer


COUNSEL:


 /s/ Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman (admitted *pro hac vice*)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

## APPENDIX II

MODIFICATIONS

NAI-1501465154v6

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

-and-

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman (admitted *pro hac vice*)

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77979)

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

## FIRST MODIFICATIONS TO THE SECOND AMENDED JOINT PLAN
## OF REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION

The above-captioned debtors and debtors in possession (collectively,

the "<u>Debtors</u>") hereby propose the following non-material additions and modifications to

the *Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession*, dated

May 25, 2016 (Docket No. 2527) (the "Plan"), pursuant to section 1127(a) of the Bankruptcy

Code, and Section IX.A of the Plan:[1]

1.      Section I.A.31 of the Plan is modified and restated as follows:

"Black Lung Claims" means any Claims arising, ~~or related to the period,~~ prior to the Effective Date for the payment of Black Lung Benefits, including any Claims for reimbursement of the Black Lung Disability Trust Fund**, but (a) solely with respect to the Debtors and the Reorganized Debtors, "Black Lung Claims" shall exclude any Claims for Black Lung Benefits with respect to miners whose last day of employment with the Debtors or the Reorganized Debtors was on or after the Petition Date and any Claims for reimbursement of the Black Lung Disability Trust Fund with respect to such miners (including, for all Claims referenced in this clause (a), Claims for Black Lung Benefits by any dependents and survivors of such miners); and (b) the Claims referenced in clause (a) shall be the sole responsibility of the Reorganized Debtors and not NewCo; provided, however, that nothing in clause (a) or (b) of this paragraph shall preclude any independent liability of NewCo (i.e., any liability of NewCo that does not depend on a successor relationship with the Debtors) for Claims for Black Lung Benefits with respect to any miners employed by NewCo (including Claims for Black Lung Benefits by any dependents and survivors of such miners).**

2.      Section I.A.42 of the Plan is modified and restated as follows:

"Category 2 General Unsecured Claims Asset Pool" means:  (a) the Category 2 NewCo Common Stock Distribution; (b) the NewCo Warrants; (c) the Reorganized ANR Contingent Revenue Payment, less any Reorganized ANR Contingent Revenue Payment Allocation; (d) the Reorganized ANR Common Stock **Allocation**; and (e) the Contingent Reserve Price Asset Sale Proceeds.

3.      Section I.A.64 of the Plan is modified and restated as follows:

"Contract Procedures Order" means **the *Order, Pursuant to Sections 105, 365 and 1123 of the Bankruptcy Code, (I) Establishing Procedures with Respect to the Proposed Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases and the Treatment of Other Agreements Pursuant to the Debtors' Second Amended Joint Plan of Reorganization and Applicable Law and (II) Approving the Form and Manner of Notice Thereof* (Docket No. 2840), entered by the Bankruptcy Court on June 29, 2016, as it may amended, supplemented or otherwise modified** ~~an order of the Bankruptcy Court, entered on or prior to the Confirmation Date, which approves procedures to address the treatment of certain agreements in the Chapter 11 Cases in conjunction with the Plan, including the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired~~

---

[1]     All modified and restated Plan provisions are marked to reflect the modifications thereto.  Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

**Leases, and establishes the form and manner of notice to be given to counterparties to such agreements with the Debtors**.

4.      The following language is added as Section I.A.95A of the Plan:

"Environmental Groups Settlement" means the Settlement embodied in the Settlement Agreement with Environmental Groups, dated June 24, 2016, and attached as Annex I to the *Notice of Filing of Settlement Agreement with Environmental Groups* (Docket No. 2887), filed with the Bankruptcy Court on June 30, 2016.

5.      Section I.A.138 of the Plan is modified and restated as follows:

"Insurance Contract" means any policy of ~~third party liability~~ insurance under which any of the Debtors could have asserted, did assert or may in the future assert a right to coverage for any claim, together with any other contracts**, documents or instruments** that pertain or relate to such policy.

6.      Section I.A.205 of the Plan is modified and restated as follows:

"Released Parties" means, collectively and individually, and, in each case, solely in their capacity as such:  (a) the Debtors; (b) the Estates; (c) the Reorganized Debtors; (d) the DIP Agents; (e) the DIP Lenders; (f) the First Lien Agent; (g) the First Lien Lenders; (h) the Creditors' Committee and its members; (i) the Massey Convertible Notes Trustee; (j) the Second Lien Parties; (k) NewCo; (l) the Unsecured Notes Indenture Trustee; **(m) the Retiree Committee and its members;** and ~~(m)~~ **(n)** with respect to (a) through ~~(l)~~ **(m)**, each such Person's respective Representatives and affiliates.

7.      The following language is added as Section I.A.206A of the Plan:

"Reorganized ANR" means, collectively, Reorganized Holdings and Reorganized Opco; provided that, for purposes of Sections I.A.61, I.A.157, I.A.198, I.A.207, IV.G, IV.H, IV.I, IV.M.3 and V.F.2.c, "Reorganized ANR" shall mean Reorganized Opco.

8.      Section I.A.208 of the Plan is modified and restated as follows:

"Reorganized ANR Common Stock" means **(a) the Reorganized Holdings Common Stock and (b) the Reorganized Opco Common Stock** ~~the shares of common stock of Reorganized ANR, authorized pursuant to the certificate of incorporation of Reorganized ANR, to be initially issued pursuant to the Plan as of the Effective Date; provided, however, that the form of security or securities comprising Reorganized ANR Common Stock may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet~~.

9.      The following language is added as Section I.A.208A of the Plan:

"Reorganized ANR Common Stock Allocation" means, collectively, (a) 100% of the shares of Reorganized Holdings Common Stock and (b) 70% of the shares of Reorganized Opco Common Stock.

10.     The following language is added as Section I.A.212A of the Plan:

"Reorganized Holdings" means Alpha Natural Resources Holdings, Inc., which has been newly created in accordance with the Restructuring Transactions.

11.     The following language is added as Section I.A.212B of the Plan:

"Reorganized Holdings Common Stock" means the shares of common stock of Reorganized Holdings, authorized pursuant to its certificate of incorporation; provided, however, that the form of security or securities comprising Reorganized Holdings Common Stock may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet.

12.     The following language is added as Section I.A.212C of the Plan:

"Reorganized Opco" means ANR, Inc., which has been newly created in accordance with the Restructuring Transactions.

13.     The following language is added as Section I.A.212D of the Plan:

"Reorganized Opco Common Stock" means the shares of common stock of Reorganized Opco, authorized pursuant to its certificate of incorporation; provided, however, that the form of security or securities comprising Reorganized Opco Common Stock may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet.

14.     Section I.A.216 of the Plan is modified and restated as follows:

"Resolution of Reclamation Obligations" means, collectively, the following agreements together with all exhibits thereto:  **(a) the Reclamation Funding Agreement by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; (iii) the Illinois Department of Natural Resources; (iv) the Kentucky Energy and Environment Cabinet, Department for Natural Resources; (v) the United States Department of the Interior, Office of Surface Mining, Reclamation and Enforcement, in its capacity as the regulatory authority over surface mining operations in the State of Tennessee; (vi) the Virginia Department of Mines, Minerals and Energy; and (vii) the West Virginia Department of Environmental Protection; (b) the Permitting and Reclamation Plan Settlement Agreement for the State of West Virginia by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; and (iii) the West Virginia Department of Environmental Protection; (c) the Permitting and Reclamation Plan Settlement**

**Agreement for the Commonwealth of Kentucky by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; and (iii) the Kentucky Energy and Environment Cabinet, Department for Natural Resources; (d) the Permitting and Reclamation Plan Settlement Agreement for the Commonwealth of Virginia by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; and (iii) the Virginia Department of Mines, Minerals and Energy; (e) the Permitting and Reclamation Plan Settlement Agreement for the State of Illinois by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; and (iii) the Illinois Department of Natural Resources; (f) the Settlement Agreement by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; (iii) Citicorp North America, Inc.; and (iv) the United States Department of the Interior, on behalf of (1) the Office of Surface Mining, Reclamation and Enforcement, including in its capacity as the regulatory authority over surface mining operations in the State of Tennessee, (2) the Office of Natural Resources Revenue and (3) the Bureau of Land Management; (g) the Stipulation Regarding Water Treatment Obligations by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; (iii) Citicorp North America, Inc.; and (iv) the United States Environmental Protection Agency; and (h) the Permitting and Mitigation Plan Funding and Settlement Agreement by and among:  (i) ANR, on behalf of itself and its Debtor Affiliates; (ii) Contura Energy, Inc.; (iii) Citicorp North America, Inc.; and (iv) the Army Corps of Engineers**~~any agreed-upon resolutions with the Reclamation Obligation Resolution Parties~~, approved pursuant to the Confirmation Order or any other order of the Bankruptcy Court, regarding the Reclamation Activities, on substantially the terms set forth on Exhibit I.A.216.

15.     The following language is added as Section I.A.219A of the Plan:

"Retiree Committee Settlement" means the *Stipulation and Agreed Order Among the Debtors, the Retiree Committee and the First Lien Agent: (I) Resolving Motion of the Debtors, Pursuant to Section 363 of the Bankruptcy Code, for an Order Authorizing Debtors to Terminate Certain Unvested Non-Pension Benefits; and (II) Granting Certain Related Relief*, attached as Exhibit 1 to the *Notice of Proposed Stipulation and Agreed Order Among the Debtors, the Retiree Committee and the First Lien Agent: (I) Resolving Motion of the Debtors, Pursuant to Section 363 of the Bankruptcy Code, for an Order Authorizing Debtors to Terminate Certain Unvested Non-Pension Benefits; and (II) Granting Certain Related Relief* (Docket No. 2927), Filed with the Bankruptcy Court on July 5, 2016, as such stipulation and agreed order may be approved by the Bankruptcy Court.

16.     Section I.A.222 of the Plan is modified and restated as follows:

"Second Lien Distribution Note" means an unsecured promissory note, if any, issued by NewCo, in a face amount equal to ~~the amount of the Second Lien Noteholder Distribution Cash Component~~ **$8.50 million**, substantially on the terms set forth on Exhibit I.A.222.

17.     Section I.A.227 of the Plan is modified and restated as follows:

"Second Lien Noteholder Distribution" means:  (a) to the extent that the aggregate value of all NewCo Equity plus the First Lien Lender Takeback/Preferred Consideration is greater than $300 million, the Second Lien NewCo Equity Distribution; and (b) the Second Lien Noteholder Reserve Price Assets Distribution, as further described on Exhibit I.A.227.  For the avoidance of any doubt, the Second Lien Noteholder Distribution is subject to the Ad Hoc Committee of Second Lien Noteholders' rights to allocate the consideration described in the section of the Second Lien Noteholder Settlement entitled "Other Plan Distributions to Second Lien Parties," which proposed allocation was further described on pages 45-46 of the Disclosure Statement**; provided that, in accordance with the Second Lien Noteholder Settlement, to the extent any Second Lien Noteholder electing to exercise its NewCo ABL Participation Rights to participate as a lender in the NewCo ABL Facility is not an "accredited investor" within the meaning of the Securities Act, such Second Lien Noteholder will receive an allocated portion of the Second Lien Noteholder Distribution Cash Component in lieu of any portion of the NewCo Equity allocated among Second Lien Noteholders participating in the NewCo ABL Facility.**

18.     Section I.A.228 of the Plan is modified and restated as follows:

"Second Lien Noteholder Distribution Cash Component" means 5.0% of the aggregate proceeds received by the Estates in connection with any sale of Reserve Price Assets in excess of $50 million; <u>provided</u> that the aggregate amount of any portion of the Second Lien Noteholder Distribution Cash Component arising from the sale of the Designated Reserve Price Assets shall not exceed $12,500,000**; provided further that, if the First Lien Lender Distributable Cash Recovery Threshold is not met, the amount of the Second Lien Noteholder Distribution Cash Component shall not exceed $4.0 million.**

19.     Section I.A.229 of the Plan is modified and restated as follows:

"Second Lien Noteholder Reserve Price Assets Distribution" means **(a) if the First Lien Lender Distributable Cash Recovery Threshold is met,** Distribution Cash in a total aggregate amount equal to the Second Lien Noteholder Distribution Cash Component **and (b)** ~~; provided that~~ if the First Lien Lender Distributable Cash Recovery Threshold is not met, ~~no Cash shall be provided as part of the Second Lien Noteholder Reserve Price Assets Distribution~~ **the Second Lien Lender Distribution Cash Component** and the ~~Second Lien Noteholder Reserve Price Assets Distribution shall consist solely of the~~ Second Lien Distribution Note.

20.     Section I.A.247 of the Plan is modified and restated as follows:

"Series A Preferred Interests" means preferred stock (or similar rights or interests) of Reorganized ANR, authorized pursuant to the certificate**s** of incorporation of Reorganized ANR (or comparable constituent documents), substantially on the terms set forth on Exhibit I.A.247; <u>provided</u>, <u>however</u>, that the form of security or securities

comprising Series A Preferred Interests may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet.

21. Section I.A.248 of the Plan is modified and restated as follows:

"Series B Preferred Interests" means preferred stock (or similar rights or interests) of Reorganized ANR, authorized pursuant to the certificate**s** of incorporation of Reorganized ANR (or comparable constituent documents), substantially on the terms set forth on Exhibit I.A.248; provided, however, that the form of security or securities comprising Series B Preferred Interests may be altered consistent with the Restructuring Transactions and the economics of the Global Settlement Term Sheet.

22. Section I.A.257 of the Plan is modified and restated as follows:

"Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that**:** (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment; <u>provided</u> that any Claims related to Reclamation Activities **and any workers' compensation claims** shall not constitute Tort Claims within the meaning of this Section I.A.257.

23. The following language is added as Section I.A.260A of the Plan:

"UMWA Funds Settlement Term Sheet" means the term sheet attached as Exhibit A to the *Stipulation By and Among the Debtors, the UMWA Funds and the First Lien Agent Resolving Various Plan-Related Issues* (Docket No. 2963), Filed with the Bankruptcy Court on July 6, 2016.

24. Section II.A.1.e of the Plan is modified and restated as follows:

**i.** ~~Fees and~~ Expenses of Creditors' Committee Members ~~and the Unsecured Notes Trustee~~

Subject to the terms of this Section II.A.1.e.**i**, ~~(a)~~ the ~~reasonable and documented fees and~~ expenses of the ~~Unsecured Notes Indenture Trustee (including its counsel and other advisors) and (b) the expenses of other~~ members of the Creditors' Committee that are not Indenture Trustee Committee Members (excluding~~, with respect to such members of the Creditors' Committee that are not Indenture Trustee Committee Members,~~ their individual legal and other advisor fees)**, and the expenses submitted for reimbursement by the Unsecured Notes Indenture Trustee in the *Third Interim Fee Application of Milbank, Tweed, Hadley & McCloy LLP* (Docket No. 2688), submitted by request for payment pursuant to section 503 of the Bankruptcy Code and approved by the Bankruptcy Court**, shall be Allowed Administrative Claims ~~or otherwise paid in Cash on the Effective Date~~, ~~in each case~~ without reduction to the recoveries of holders of Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims~~; **provided** that the total aggregate fees and~~

**expenses of the Indenture Trustee Committee Members (including their counsel and other advisors) other than the Massey Convertible Notes Trustee (and its counsel and other advisors) constituting Allowed Administrative Claims shall not exceed $875,000**.  For the avoidance of doubt, no member of the Creditors' Committee (other than the Indenture Trustee Committee Members) shall seek payment from the Debtors or the Estates of such member's legal or other advisory fees incurred in its capacity as a member of the Creditors' Committee, pursuant to a motion for substantial contribution or otherwise, and no payment shall be made by the Debtors or the Estates to any member of the Creditors' Committee (other than the Indenture Trustee Committee Members pursuant to ~~this~~ **the** provision **below**) on account of such legal or other advisory fees; <u>provided that nothing herein shall limit any member of the Creditors' Committee from seeking payment of their individual legal fees based on a claim or entitlement unrelated to their capacities as members of the Creditors' Committee.</u>

ii.        **Fees and Expenses of the Indenture Trustee Committee Members**

**The reasonable and documented fees and expenses of the Unsecured Notes Indenture Trustee shall be paid in Cash on the Effective Date without reduction to the recoveries of holders of Allowed Category 1 General Unsecured Claims and Allowed Category 2 General Unsecured Claims; provided that the aggregate fees and expenses of the Unsecured Notes Indenture Trustee paid pursuant to the Plan, excluding those paid pursuant to Section II.A.1.e.i, shall not exceed $1,060,000. Once paid, the reasonable and documented fees and** ~~To the extent that any fees or~~ expenses of the Indenture Trustee Committee Members (~~and~~ **including** their counsel~~)~~ ~~are not paid in accordance with the provisions of the Plan~~ **and other advisors) shall not be subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, recharacterization or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law. For the avoidance of doubt,** nothing in the Plan shall prevent the Indenture Trustee Committee Members from asserting a charging lien against any recoveries received on account of the applicable noteholders for payment of ~~such unpaid amounts~~ **any fees and expenses not paid to the Indenture Trustee Committee Members by the Debtors pursuant to the Plan**; provided, that in the event the Indenture Trustee Committee Members exercise a charging lien against such recoveries, the Debtors shall use commercially reasonable efforts to assist such Indenture Trustee Committee Members in liquidating securities otherwise payable to such noteholders under the Plan**; provided further that the Unsecured Notes Indenture Trustee shall not exercise such charging lien to the extent that payment of $1,060,000, excluding the amounts paid pursuant to Section II.A.1.e.i is made by the Debtors pursuant to this Section II.A.1.e.ii.**  If the Reorganized Debtors expressly request (in writing) post-Effective Date assistance from the Indenture Trustee Committee Members, the Indenture Trustee Committee Members will be paid their reasonable and documented fees and expenses, solely to the extent of the post-Effective Date assistance requested by the Reorganized Debtors, not subject to the cap set forth in ~~this Section II.A.1.e~~ **the Plan**.

25.    Section II.A.1.h.i of the Plan is modified and restated as follows:

II.A.1.h.i    General Bar Date Provisions

Except as otherwise provided in Section II.A.1.h.ii or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than ~~45~~ **30** days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

26.    Section II.A.2.a of the Plan is modified and restated as follows:

II.A.2  Payment of Priority Tax Claims

27.        a.        Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (a) Distribution Cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) Distribution Cash **of a total value, as of the Effective Date, equal to** ~~in~~ the ~~aggregate~~ amount of such Allowed Priority Tax Claim**,** payable in annual equal installments commencing on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim (or as soon as practicable thereafter) and ending no later than five years after the Petition Date.

28.    The first paragraph of Section II.B.5 of the Plan is modified and restated as follows:

**Other Secured Claims (Class 5 Claims) are unimpaired.**  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Claim in Class 5 will receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A, B or C below, at the election of the applicable Debtor. The applicable Debtor will be deemed to have elected

Option B except with respect to (a) any Allowed Secured Claim as to which the applicable Debtor elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which the applicable Debtor will be deemed to have elected Option A**, subject to the Debtors' or the Reorganized Debtors' right to elect Option B or C prior to payment of such Claim; provided that the Debtors or the Reorganized Debtors may pay such Claims consistent with the provisions of section 1129(a)(9)(D) of the Bankruptcy Code**.  Consistent with the language of section 1126(f) of the Bankruptcy Code, each holder of a Class 5 Claim will be deemed to have accepted the Plan.

29.     The following language is added as Section III.B.8 of the Plan:

The board of directors of NewCo shall have executed a resolution binding NewCo to the obligations undertaken by NewCo in the UMWA Funds Settlement Term Sheet.

30.     Section III.C of the Plan is modified and restated as follows:

Each condition to Confirmation set forth in Section III.A and each condition to the Effective Date set forth in Section III.B may be waived in whole or in part at any time by the Debtors, with the consent of (a) the DIP Agents, (b) the First Lien Agent, (c) any and all Persons identified in the applicable condition**, and** (d) with respect to the conditions set forth in Section III.A.5 and Section III.B.7, the Creditors' Committee **and (e) with respect to the condition set forth in Section III.B.8, the UMWA Funds**, without an order of the Bankruptcy Court.

31.     Section III.E.1 of the Plan is modified and restated as follows:

III.E.1 Dissolution of Official Committees

On the Effective Date, the Official Committees, to the extent not previously dissolved, will dissolve, and the members of the Official Committees and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases and will be released and discharged of and from all further duties, responsibilities and obligations relating to or arising in connection with the Chapter 11 Cases**; provided, however, that the Creditors' Committee shall continue to exist for the sole purpose of participating in the Chapter 11 Cases with respect to the Debtors' prosecution of the motion to establish Claims reserves Filed in accordance with Section V.J hereof, which motion shall also seek, among other things, certain relief with respect to the Claims Oversight Committee, consistent with Section VI.A hereof**.  The Professionals retained by the Official Committees and the respective members thereof shall not be entitled to assert any Fee Claims for any services rendered or expenses incurred after the Effective Date, except, **for reasonable and documented fees and expenses incurred in participating in the Chapter 11 Cases for the purposes set forth in the preceding sentence and,** to the extent allowable under applicable law, for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with any final applications for allowance of compensation and reimbursement of expenses of the

members of or Professionals to the Official Committees Filed and served after the Effective Date in accordance with the Plan.  In accordance with the terms and conditions of the Global Settlement Term Sheet, no party to the Global Settlement shall have the right to, or shall otherwise be permitted to, object to Fee Claims asserted by the Professionals retained by the Creditors' Committee, unless objecting based solely on the reasonableness of the applicable fees and expenses as provided for in the Global Settlement Term Sheet.

32.  Section III.E.4.a of the Plan is modified and restated as follows:

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and ~~immediately after cancellation of the Old Common Stock of ANR~~ **consistent with Exhibit IV.B.1 to the Plan**: (a) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, including any Black Lung Claims, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of holders of Interests in the Debtors

33.  Section III.E.4.b of the Plan is modified and restated as follows:

In accordance with Section III.E.4.a, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date and ~~immediately after the cancellation of the Old Common Stock of ANR, but prior to the issuance of the Reorganized ANR Common Stock~~ **consistent with Exhibit IV.B.1 to the Plan**, of a discharge of all Claims and other debts and Liabilities against the Debtors, including Black Lung Claims, and a termination of all Interests and other rights of the holders of Interests in the Debtors, pursuant to sections 524(a)(1), 524(a)(2) and 1141(d) of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

34.  Section III.E.6.a of the Plan is modified and restated as follows:

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all Persons who may purport to claim by, through, for or because of them, will forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan, **the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement,** the

Global Settlement Stipulation**, or** the Resolution of Reclamation Obligations, **the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement**; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

35.     Section III.E.6.b of the Plan is modified and restated as follows:

III.E.6.b  General Releases by Holders of Claims or Interests

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim **or Interest**, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such Person has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code); **provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct;** provided, ~~however~~**further,** that the foregoing provisions shall not affect any rights to enforce the Plan, **the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement,** the Global Settlement Stipulation, the Resolution of Reclamation Obligations, **the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement** or the other contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan. **For the avoidance of doubt and without limiting any releases granted in the Resolution of Reclamation Obligations, nothing in this Section III.E.6.b shall release any Person from any liabilities owing to the United States of America.**

36.     Section III.E.6.c of the Plan is modified and restated as follows:

From and after the Effective Date, except with respect to obligations arising under the Plan, **the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement,** the Global Settlement Stipulation, the Second Lien Noteholder Settlement**,** ~~or~~ the Resolution of Reclamation Obligations, **the First Lien Lender Settlement, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement**, or assumed hereunder, to the fullest extent permitted by applicable law, the Released Parties shall release one another from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way

relating to:  (a) any Debtor; (b) the Chapter 11 Cases; (c) the Estates; (d) the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, the Disclosure Statement, the Global Settlement Stipulation, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Resolution of Reclamation Obligations, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party; (e) the process of marketing, selling and disposing of Assets pursuant to the Sale Orders, the De Minimis Sale Order or other orders entered by the Bankruptcy Court in the Chapter 11 Cases approving the sale or other disposition of Assets, including in connection with the NewCo Asset Sale; or (f) any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

37.     Section III.E.7 of the Plan is modified and restated as follows:

From and after the Effective Date, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, negotiation, preparation, dissemination, implementation, Confirmation or approval of the Plan (or the Distributions under the Plan), the Confirmation Exhibits, the Disclosure Statement, **the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement,** the Global Settlement Stipulation, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, the Resolution of Reclamation Obligations**, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement** or any contract, employee pension or other benefit plan, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that this section shall not apply to the obligations arising under the Plan, the obligations assumed hereunder, **the Unencumbered Assets Settlement, the Diminution Claim Allowance Settlement,** the Global Settlement Stipulation**, the First Lien Lender Settlement, the Second Lien Noteholder Settlement, or** the Resolution of Reclamation Obligations**, the Environmental Groups Settlement, the Retiree Committee Settlement or the UMWA Funds Settlement**; and provided further that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

38.      Section IV.B.1 of the Plan is modified and restated as follows:

IV.B.1 Restructuring Transactions Generally

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect, in accordance with applicable nonbankruptcy law, to effectuate the Distributions contemplated hereby, the NewCo Asset Sale, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors and the NewCo Asset Sale, including but not limited to the Restructuring Transactions identified on Exhibit IV.B.1, all to the extent not inconsistent with any other terms of the Plan. Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, reorganizations, transfers, dispositions (including, for the avoidance of doubt, any asset dispositions closing under or in connection with the Plan in connection with any Core Asset Sale Order, including the NewCo Asset Sale), conversions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate. The actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, reorganization, transfer, disposition, conversion, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including (i) making filings or recordings that may be required by applicable state law in connection with such transactions and (ii) any appropriate positions on one or more tax returns. Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors. Any Restructuring Transaction effected pursuant to the Plan shall be free and clear of any Liabilities and Black Lung Claims, Coal Act Claims and MEPP Claims, other than liabilities expressly assumed**, including those assumed** in the Stalking Horse APA. The Restructuring Transactions shall not result in NewCo becoming a successor in interest to the Debtors except as expressly provided in the Confirmation Order. Notwithstanding the foregoing and any other provisions of the Plan, nothing in the Plan shall impair, expand or otherwise modify the rights of any party under the Stalking Horse APA (unless expressly consented to by the First Lien Lenders) or any other agreement entered into pursuant to any Sale Order.

39.     Section IV.E.2 is modified and restated as follows:

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date:  (a) the initial officers of Reorganized ANR and the other Reorganized Debtors will consist of the individuals identified on Exhibit IV.E.2; and (b) the initial board**s** of directors of **(i)** Reorganized ANR ~~and each of the other Reorganized Debtors~~ shall consist of ~~(i)~~ **(A)** one designee of the Creditors' Committee, ~~(ii)~~ **(B)** one designee of the First Lien Lenders and ~~(iii)~~ **(C)** three Independent Directors selected by the Debtors subject to the consent of the Creditors' Committee and the First Lien Lenders, which consent shall not unreasonably be withheld, as set forth on Exhibit IV.E.2 **and (ii) each of the other Reorganized Debtors shall consist of the individuals identified on Exhibit IV.E.2**.  Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of Reorganized ANR or the applicable other Reorganized Debtor and state law.

40.     Section IV.K of the Plan is modified and restated as follows:

On the Effective Date, all shares of Reorganized ANR Common Stock issued pursuant to the Plan shall be distributed to holders of Allowed Category 2 General Unsecured Claims in accordance with Sections **I.A.208A,** II.B.7 and II.B.8.  The Reorganized ANR Common Stock, when issued as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable.  Each issuance under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such issuance and by the terms and conditions of the instruments evidencing or relating to such issuance, which terms and conditions shall bind each Person receiving such issuance. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the Reorganized ANR Common Stock under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder.  In accordance with the terms and conditions of the Global Settlement Term Sheet, the Debtors, in consultation with the Creditors' Committee, shall use reasonable best efforts to structure the Reorganized ANR Common Stock so that such shares are tradable; _provided_ that the costs to the Debtors and Reorganized ANR of doing so will be considered as to whether such efforts are "reasonable."

41.     Section IV.O of the Plan is modified and restated as follows:

IV.O.   Special Provisions Regarding Insured Claims

1.      Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims

Distributions, if any, under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any

pertinent Insurance Contracts and applicable law. Nothing in this Section IV.O will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any Person may hold against any other Person, including the Insurers; provided, however, that nothing herein shall **alter the terms, conditions, limits of and coverage provided by any Insurance Contract or** create or permit a direct right of action by the holder of an Insured Claim against an Insurer.

2.     Assumption and Continuation of Insurance Contracts

~~From~~ **Notwithstanding anything to the contrary in the Plan (including Section VI.B.1 and any other provision that purports to be preemptory or supervening):  (a) from** and after the Effective Date, each of the Insurance Contracts will be assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code or continued in accordance with its terms, with rights and obligations under such ~~policy~~ **Insurance Contract** such that each of the parties' contractual, legal and equitable rights under each Insurance Contract shall remain unaltered~~, and the successors to the Debtor parties to each Insurance Contract will~~**; (b) the applicable Reorganized Debtor shall** continue to be bound by such Insurance Contract **and liable thereunder** as if the Chapter 11 Cases had not occurred~~. Nothing~~ **regardless of when any underlying claim arose without the requirement or need for any Insurer to file a proof of claim, Cure Amount Claim or Administrative Claim; (c) nothing** in the Plan shall affect, impair or prejudice the rights and defenses of the Insurers or the Reorganized Debtors under the Insurance Contracts in any manner, and such Insurers and Reorganized Debtors shall retain all rights and defenses under the Insurance Contracts, and the Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred~~. In addition, notwithstanding anything to the contrary in the Plan,~~**; and (d)** nothing in the Plan ~~(including any other provision that purports to be preemptory or supervening),~~ shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights**, obligations** and/or ~~obligations~~**claims** under any Insurance Contract, if any, in any respect~~. Any~~**; any** such rights and obligations shall be determined under the Insurance Contracts, any agreement of the parties and applicable law.

42.     The following language is added as Section IV.U of the Plan:

IV.U    The Environmental Groups Settlement

The Environmental Groups Settlement is hereby incorporated into the Plan as if fully set forth in the Plan; provided, however, that if there is any conflict between the terms of the Plan and the terms of the Environmental Groups Settlement the terms of the Environmental Groups Settlement shall govern.

43.     Section V.J of the Plan is modified and restated as follows:

V.J     Establishment of Reserves and Provisions Governing Same

Prior to the ~~Confirmation~~ **Effective** Date, the Debtors shall File a motion to establish any reserves and procedures related thereto that they deem necessary or advisable (**which motion shall include, among other things, (a) certain relief with respect to the Claims Oversight Committee, consistent with Section VI.A hereof and (b) provision for payment by the Reorganized Debtors from any reserve established for the payment of Administrative Claims of the reasonable and documented post-Effective Date fees and expenses incurred by the First Lien Agent and First Lien Lenders in connection with (i) the preparation, Filing and prosecution thereof and (ii) the resolution of Claims (other than General Unsecured Claims) for which reserves are established in connection therewith)**, after consultation with counsel to the Creditors' Committee and counsel to the First Lien Agent, to make Distributions to holders of Allowed Claims or otherwise to satisfy related obligations under the Plan.  **Such motion shall be in form and substance (a) reasonably acceptable to the Creditors' Committee and (b) satisfactory to the First Lien Agent and the First Lien Lenders (except as it relates to General Unsecured Claims and the Claims Oversight Committee), and the Debtors shall diligently prosecute such motion after its Filing.** Any Distributions held in reserve pursuant to this Section V.J shall be held in escrow until distributed pursuant to the Plan.

The Disbursing Agent shall vote, and shall be deemed to vote, any Reorganized ANR Common Stock **and any NewCo Common Stock** held by it in any reserve in its capacity as Disbursing Agent in the same proportion as all outstanding shares of Reorganized ANR Common Stock **or NewCo Common Stock, as applicable,** properly cast in a shareholder vote.

Cash dividends and other distributions received by the Disbursing Agent on account of any Reorganized ANR Common Stock **and any NewCo Common Stock** held in any reserve pursuant to this Section V.J will (a) be deposited in a segregated bank account in the name of the Disbursing Agent for the benefit of holders of the applicable Allowed Claims; (b) be accounted for separately; and (c) not constitute property of the Reorganized Debtors.

Any reserve established for Disputed Claims is intended to be treated, for U.S. federal income Tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1).

44. Section VI.B of the Plan is modified and restated as follows:

VI.B.   Treatment of Disputed Claims

1.   Tort Claims

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim (as to which a proof of Claim or request for payment of an Administrative Claim was timely Filed in the Chapter 11 Cases) not resolved through a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction. The Debtors or the Reorganized Debtors, as applicable, may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option. Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code or, after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties, including any Insurer, to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s). Notwithstanding the foregoing, at all times prior to or after the Effective Date, to the fullest extent permitted by law, the Bankruptcy Court will retain jurisdiction**, if any,** relating to Tort Claims, including the Debtors' right to have such Claims liquidated or estimated in the Bankruptcy Court (or the District Court) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.  Subject to Section VI.A, any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.B.1 and applicable nonbankruptcy law that is no longer appealable or subject to review**, and any Tort Claim that is settled by an Insurer in accordance with the terms of applicable Insurance Contracts,** will be deemed an Allowed Category 1 General Unsecured Claim against the applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with any applicable Insurance Contract or is not otherwise satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' Insurance Contracts will be treated as an Allowed Claim for the purposes of Distributions under the Plan. In no event will a Distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self-insured retention under any applicable Insurance Contract.  In the event a Tort Claim is determined and liquidated pursuant to a **settlement,** judgment or order that is obtained in accordance with this Section VI.B.1 and is no longer appealable or subject to review, and applicable nonbankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim, provided, however, that nothing in this ~~sentence~~**Section VI.B.1** shall, or shall be deemed to, modify, alter or otherwise affect the rights of any Insurer under any Insurance Contract. Nothing contained in this Section **VI.B.1** will constitute or be deemed a waiver

of any claim, right or Cause of Action that a Debtor may have against any Person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the Debtors or the Reorganized Debtors may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved.

45.     Section VI.C.3 of the Plan is modified and restated as follows:

VI.C.3 Authority to Prosecute Objections

Subject to Section VI.A, on or after the Effective Date, only the Reorganized Debtors will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims.  On or after the Effective Date, the Reorganized Debtors, and only the Reorganized Debtors, may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court. **Notwithstanding the foregoing, (a) the First Lien Lenders shall have the right to object to any proof of Claim or request for payment of Administrative Claim seeking allowance of any Claim that is not a General Unsecured Claim, (b) the Reorganized Debtors shall provide the First Lien Lenders with five Business Days' notice of any proposed Filing, settlement, compromise, withdrawal or litigation to judgment of any objection to any request for payment of Administrative Claims and (c) the First Lien Lenders shall have three Business Days following receipt of such notice to provide the Reorganized Debtors with consent to any such action (with such consent not to be unreasonably withheld).**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Except as expressly provided herein, no other provision of the Plan is modified by these First Modifications.

Dated:  July 12, 2016

Respectfully submitted,

Alpha Natural Resources, Inc., on its own behalf an
on behalf of each affiliate Debtor

By:      s/ Mark M. Manno
Name: Mark M. Manno
Title:   Executive Vice President, General
Counsel and    Chief Procurement Officer

COUNSEL:

 s/ Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman (admitted *pro hac vice*)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

## **APPENDIX III**

EFFECTIVE DATE NOTICE

NAI-1501465154v6

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

*-and-*

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman (admitted *pro hac vice*)

*Attorneys for the Reorganized Debtors*

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., et al., | Case No. 15-33896 (KRH) |
| Reorganized Debtors. | (Jointly Administered) |

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION AND (II) OCCURRENCE OF THE EFFECTIVE DATE OF THE PLAN

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      **Confirmation of the Plan.**  On July [__], 2016, the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") entered an order (Docket No. [__]) (the "Confirmation Order") confirming the *Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession* (in the form dated as of May 27, 2016 and included in the solicitation packages distributed to the creditors that were entitled to vote thereon, the "May 27 Plan," a true and correct copy of which (without exhibits) is attached to the Confirmation Order as Appendix I), as modified by the modifications, true and correct copies of which are annexed to the Confirmation Order as Appendix II (collectively, the "Modifications" and, together with the May 27 Plan and including the exhibits thereto, the "Plan") in the

NAI-1501424180v4

chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the meanings given to them in the Plan and the Confirmation Order.

2.  **Effective Date.**  The Reorganized Debtors hereby certify and give notice that the Plan became effective in accordance with its terms on [_____], 2016 (the "Effective Date").

3.  **Plan Injunction.**  Confirmation of the Plan operates as an injunction against:  (a) the commencement or continuation in any manner, directly or indirectly, of any suit, act, action or other proceeding of any kind against any Released Party, or the respective assets or property thereof; (b) enforcement, levying, attachment, collection or other recovery by any manner or means, directly or indirectly, any judgment, award, decree or order against any Released Party, or the respective assets or property thereof; (c) creation, perfection or other enforcement in any manner, directly or indirectly, of any Lien against any Released Party, or the respective assets or property thereof, other than as contemplated by the Plan; (d) assertion of any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party, or the respective assets or property thereof; and (e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the Settlements.  The Bankruptcy Court shall have jurisdiction to determine and award damages and/or other appropriate relief at law or in equity for any violation of such injunction, including compensatory damages, professional fees and expenses, and exemplary damages for any willful violation of said injunction.

4.  **Discharge of Claims.**  Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for, and in complete satisfaction, discharge and release of, all Claims, including any interest accrued on Claims from the Petition Date to the full extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the Debtors from all Claims and other Liabilities that arose on or before the Effective Date and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code to the full extent permitted by section 1141 of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt has been Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan.

As of the Effective Date and in accordance with the foregoing and except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of a discharge of all Claims, including any debts and Liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors or Reorganized Debtors at any time to the extent that such judgment relates to a discharged Claim.

5.  **Enforcement of the Bar Date Order.**  Except as specifically set forth in the Plan, the Confirmation Order and this Notice, the Bar Date Order remains in full force and effect, including, without limitation, the establishment of February 19, 2016 as the Bar Date for

NAI-1501424180v4                                    -2-

entities, including governmental units, to File Claims that arose or are deemed to have arisen prior to the date on which the Debtors filed their chapter 11 petitions, August 3, 2015, including Claims arising under section 503(b)(9) of the Bankruptcy Code.

6.     **Administrative Claims Bar Date.**  Pursuant to Section II.A.1.h of the Plan, except as otherwise provided in Article II of the Plan, section 503(b)(1)(D) of the Bankruptcy Code and the Bar Date Order, and subject to any exceptions specifically set forth in the Confirmation Order, requests for payment of Administrative Claims (other than (a) DIP Facility Claims, (b) Fee Claims, (c) Ordinary Course Liabilities, (d) Professionals asserting a Fee Claim for services rendered before the Effective Date and (e) Claims pursuant to section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 30 days after the Effective Date, which is [_____], 2016, or such earlier date as specified in the Bar Date Order for a particular Administrative Claim (the "Administrative Claims Bar Date").  Absent further Court order, Holders of Administrative Claims that are required, but fail, to File and serve a request for payment of such Administrative Claims on or before the Administrative Claims Bar Date will be forever barred, stopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property.  After the Effective Date, objections to a request for the payment of an Administrative Claim, if any, must be Filed and served on the Reorganized Debtors and counsel to the First Lien Agent (together, the "Notice Parties") and the requesting party by the latest of:  (a) 150 days after the Effective Date, which is [_____], 2016; (b) 60 days after the Filing of the applicable request for payment of Administrative Claims; or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

7.     **Professional Fee Claims.**  Professionals asserting a Fee Claim for services rendered or reimbursement of expenses incurred before the Effective Date under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or expenses incurred in the Chapter 11 Cases must:  (a) File a Final Fee Application no later than 60 days after the Effective Date, or [_____], 2016; and (b) serve it on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court.  Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of:  (a) 90 days after the Effective Date, which is [_____], 2016; (b) 30 days after the Filing of the applicable request for payment of the Fee Claim; or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.

8.     **Rejection Damages Claims.**  In accordance with Section II.G.6 of the Plan, unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served upon counsel to the Debtors on or before the later of:  (a) 30 days after the Effective Date; or (b) for Executory Contracts identified on Exhibit II.G.5, 30 days after (i) a notice of such rejection is served under the *Order, Pursuant to Sections 105, 365 and 1123 of the Bankruptcy Code, (I) Establishing Procedures with Respect to the Proposed Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases and the Treatment of Other Agreements Pursuant to the Debtors' Second*

*Amended Joint Plan of Reorganization and Applicable Law and (II) Approving the Form and Manner of Notice Thereof* (Docket No. 2840) (the "Contract Procedures Order"), if the contract counterparty does not timely file an objection to the rejection in accordance with the Contract Procedures Order or (ii) if such an objection to rejection is timely filed with the Bankruptcy Court in accordance with the Contract Procedures Order, the date that an Order is entered approving the rejection of the applicable contract or lease or the date that the objection to rejection is withdrawn.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from the Debtors, the Reorganized Debtors or the Debtors' Estates.

9.      **Service Upon Claims Agent.**  Administrative Claims and Proofs of Claim that are required to be Filed in accordance with the bar dates set forth above must be served on the Debtors' claims, notice and balloting agent Kurtzman Carson Consultants, LLC so as to be **actually received** by the applicable deadline by delivering an applicable proof of claim by regular mail, overnight courier or hand delivery to the following address:

**Alpha Natural Resources Claims Processing Center**
**c/o Kurtzman Carson Consultants, LLC**
**2335 Alaska Avenue**
**El Segundo, California 90245**

**Proofs of claim may NOT be delivered by facsimile or electronic mail transmission.**
Any facsimile or electronic mail submission will not be accepted and will not be deemed Filed until a proof of claim is submitted by one of the approved methods described above.

10.     **Notice Parties' Service Addresses**.  To be effective, any notices, requests and demands required or permitted to be provided under the Plan shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, and addressed to:  (i) counsel to the Reorganized Debtors, Jones Day, 901 Lakeside Avenue, Cleveland, Ohio 44114 (Attn:  David G. Heiman, Carl E. Black and Thomas A. Wilson), Jones Day, 1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309 (Attn:  Jeffrey B. Ellman) and Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219 (Attn:  Tyler P. Brown, J.R. Smith, Henry P. (Toby) Long, III and Justin F. Paget); (ii) the Office of the United States Trustee, 101 W. Lombard Street, Suite 2650, Baltimore, Maryland 21201 (Attn:  Hugh M. Bernstein); and (iii) counsel to the DIP Agent and the First Lien Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Damian S. Schaible, Damon P. Meyer and Bradley A. Schecter) and McGuireWoods LLP, 800 East Canal Street, Richmond, Virginia 23219 (Attn:  Dion W. Hayes, Sarah B. Boehm and K. Elizabeth Sieg), as applicable.

11.     **Copies of the Plan and the Confirmation Order.**  Copies of the Plan and
the Confirmation Order may be obtained free of charge at www.kccllc.net/alpharestructuring.


Dated: July [__], 2016
      Richmond, Virginia

Respectfully submitted,

/s/  Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone:  (804) 788-8200
Facsimile:  (804) 788-8218

David G. Heiman (admitted *pro hac vice*)
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

-and-

Jeffrey B. Ellman (admitted *pro hac vice*)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

ATTORNEYS FOR THE
REORGANIZED DEBTORS

NAI-1501424180v4

-5-