IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:       ALPHA NATURAL RESOURCES,              Case No. 15-33896-KRH
             INC., *et al.*,                        Chapter 11
                                                    (Jointly Administered)
                     Debtors.

## **MEMORANDUM OPINION**

On August 3, 2015 (the "Petition Date"), Alpha Natural Resources, Inc., and 149[1] of its

direct and indirect subsidiaries (the "Debtors") commenced these bankruptcy cases by each filing

a separate voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United

States Bankruptcy Court for the Eastern District of Virginia.[2]   On August 5, 2015, the Court

entered an order authorizing the joint administration of these chapter 11 cases (collectively, the

"Bankruptcy Case").[3]   On June 2, 2016, following the Court's approval of a disclosure statement

in accordance with § 1125 of the Bankruptcy Code, the Debtors filed solicitation versions of their

proposed *Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession*

(the "Second Amended Plan") and Second *Amended Disclosure Statement*.

An evidentiary hearing was conducted on July 7, 2016, to consider confirmation of the

Second Amended Plan and approximately 28 objections that had been filed thereto (the

"Confirmation Hearing").   The Debtors' Second Amended Plan was universally accepted in

accordance with § 1126(c) of the Bankruptcy Code by all the impaired creditor classes that were

---

[1] The chapter 11 petition for one of the Debtors' subsidiaries, Grey Hawk, has since been withdrawn.  *See* Order Dismissing Case, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Oct. 8, 2015) ECF No. 638.

[2] All further references to the Bankruptcy Code are to the Bankruptcy Code as codified at 11 U.S.C. §§ 101 *et seq.*

[3] *See* Fed. R. Bankr. P. 1015.

entitled to vote.[4]  Class 2 voted to accept the plan – 100% in both amount and number.[5]  Class 3

voted to accept the Plan – 91% in number and 96% in amount.  Class 4 voted to accept the Plan –

92% in number and 99% in amount.  Class 6A voted to accept the Plan – 81% in number and

68% in amount.  Class 6B voted to accept the Plan – 90% in number and 95% in amount.

Finally, Class 6C also voted to accept the Plan – 90% in number and 83% in amount.[6]  The

Court found that it could confirm the Second Amended Plan under § 1129(b) of the Bankruptcy

Code, as it did not "discriminate unfairly" and was "fair and equitable" with respect to the

members of Classes 7, 8, 9 and 10 that were deemed to have rejected the Second Amended

Plan.[7]  By order entered July 12, 2016 (the "Confirmation Order"), the Court confirmed the

Second Amended Plan, as modified (the "Plan").[8]

---

[4] "A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c).

[5] The vote tabulations are set forth in the declaration and supplemental declaration of Joseph Morrow, a director of the Debtors' claims, notice and balloting agent.  Declarations of P. Jospeh Morrow, *In re Alpha Nat. Res. Inc.*, No. 15-33896 (Bankr. E.D. Va. Jul. 6 & 8, 2016) (ECF No. 2941 & 3011).

[6] The unimpaired classes that were deemed to have accepted the Second Amended Plan (classes 1, 5, & 11) and those impaired classes that were deemed to have rejected the plan the Plan because they were to receive no distribution thereunder (classes 7, 8, 9, & 10) were not entitled to vote to accept or reject the Second Amended Plan. *See* 11 U.S.C. § 1126(a), (f), (g).

[7] Section 1129(b)(1) provides:
> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

*See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (quoting 11 U.S.C. § 1129(b)(1)); *Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496, 503 (4th Cir. 1992); *see also In re Dura Auto Sys., Inc.*, 379 B.R. 257, 270 (Bankr. D. Del. 2007) (discussing unfair discrimination); *In re Catron*, 186 B.R. 194, 197 (Bankr. E.D. Va. 1995).

[8] The modifications made to the Second Amended Plan at the Confirmation Hearing were annexed to the Confirmation Order as Appendix II.

Before the Court is the motion of Mar-Bow Value Partners LLC ("Mar-Bow") asking the Court to stay the effectiveness of the Confirmation Order (the "Motion").  Mar Bow had filed a substantive objection to the confirmation of the Plan on June 29, 2016 ("Mar-Bow's Plan Objection").  The Court overruled Mar-Bow's objection at the Confirmation Hearing.  Mar-Bow contends that the Court erred in approving certain release and exculpation provisions in the Confirmation Order with respect to McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS") in contravention of law and public policy.  Mar-Bow now seeks to have the Confirmation Order stayed solely as to the application of the Plan's exculpation and release provisions to McKinsey RTS, pending the adjudication of Mar-Bow's appeal, Case No. 3:16-cv-00613-MHL (the "Appeal"), which is currently pending before the United States District Court for the Eastern District of Virginia (the "District Court").[9]

Bankruptcy Rule 8007(a) requires parties moving for "a stay of a judgment, order, or decree of the bankruptcy court pending appeal" to move first for such relief in the bankruptcy court.  Fed. R. Bankr. P. 8007(a).  The United States Court of Appeals for the Fourth Circuit has articulated a four-part test to determine whether a motion for stay pending appeal should be granted:

> [A] party seeking a stay must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay.

*Long v. Robinson,* 432 F.2d 977, 979 (4th Cir. 1970).

---

[9] Specifically, Mar-Bow requests a stay of the Confirmation Order with respect to Findings of Fact ¶¶ J (final sentence), III-KKK, and Order ¶¶ D.31-33, J.52, J.53, and attached Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession, as modified by the First Modifications to the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession, §§ III.5, III.E.6, III.E.7 as to McKinsey RTS only [hereinafter the "Appealed Provisions"].

A hearing was conducted on August 25, 2016, to consider Mar-Bow's Motion. Cognizant of the many competing interests in this case, the Court was reluctant to do anything that would disturb the Debtor's Plan, which was predicated on a web of hard fought interconnected settlements. At the conclusion of the hearing, the Court announced that it would deny Mar-Bow's Motion finding that Mar-Bow had failed to satisfy a single element of the four-part test. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[10]

### Jurisdiction and Venue

The Court has subject matter jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (L), (O). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

### Factual Background

The Debtors are one of the largest domestic producers of coal in the United States. At their height, the Debtors operated 145 mines and employed approximately 14,500 individuals with over $7 billion in annual revenue. As of the Petition Date, the Debtors employed almost 8,000 individuals, had assets totaling $10.1 billion and liabilities of $7.1 billion.[11]

To assist the Debtors in the reorganization of their business affairs, the Debtors filed an application to employ McKinsey RTS as its turnaround advisor. McKinsey RTS is an affiliate of

---

[10]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[11]  The Debtors' business operations and capital structure are described in the amended declarations of Kevin S. Crutchfield, Chief Executive Officer and Chairman of the Debtors' Board of Directors, and Philip J. Cavatoni, Executive Vice President and Chief Financial and Strategy Officer of the Debtors. *See* Amended Declarations, *In re Alpha Nat. Res., Inc.*, No. 15-33896 (Bankr. E.D. Va. Aug. 3, 2015) ECF Nos. 45, 46.

McKinsey & Company, Inc. ("McKinsey & Company") a global consulting firm. The Debtors sought to engage McKinsey RTS to support their management team's development of a business plan that would improve the Debtors' financial performance and optimize the Debtors' business operations. The Debtors also sought to engage McKinsey RTS to analyze the Debtors' position in the domestic coal markets. In support of McKinsey RTS' employment application, the Debtors filed the declaration of Kevin Carmody ("Carmody"), a practice leader at McKinsey RTS (the "First Declaration").

The First Declaration sets forth bases for a finding that McKinsey was a "disinterested party" under § 101(14) of the Bankruptcy Code and therefore eligible to be employed under § 327 of the Bankruptcy Code. In accordance with Bankruptcy Rule 2014, the First Declaration disclosed a number of connections McKinsey RTS had to interested parties[12] in the Debtors' Bankruptcy Case that were unrelated to their representation of the Debtors. McKinsey RTS chose to disclose its connections not on an individual basis but instead by category of interested party (e.g. "Material Sureties," "Revolving Facility Lenders," "Lenders Under A/R Facility," Major Competitors, Major Unsecured Note holders, Major Customers, etc.).

The First Declaration detailed the process that McKinsey RTS employed to detect potential conflicts among its own clients and among the clients of McKinsey & Company as a whole. McKinsey & Company began its conflict check by cross-referencing the Interested Parties List with McKinsey & Company's global database of clients – which included clients of McKinsey RTS as well as any other McKinsey affiliate. If McKinsey & Company provided services to an entity included on the Interested Parties List or to an entity potentially adverse to

---

[12] The Debtors provided an exhaustive list of entities on an Interested Parties List. That list included all of the Debtors, all of their non-debtor affiliates, the Debtors' senior management team, the Debtors' major equity holders, the Debtors' secured lenders, note holders, largest creditors, contractual counterparties, service providers, suppliers, customers, insurers, utility providers and competitors.

5

any listed entity, McKinsey RTS sent a follow up email to determine the nature of the relationship McKinsey & Company had with the interested party.  McKinsey RTS also sent an email to all of the employees of McKinsey RTS and all of its affiliates to determine if any employee had a relationship to the Debtors, the United States Trustee, this Court, or an equity ownership in the Debtors.  The First Declaration represents that McKinsey RTS would continue to review its client files in order to ensure no disqualifying conflicts arose during the pendency of the case and that it would make supplemental disclosures as necessary to comply with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  Based on its conflict check, Carmody declared in the First Declaration that he believed McKinsey RTS to be disinterested as defined by § 101(14) of the Bankruptcy Code and eligible to be employed.  No party objected to the employment of McKinsey RTS, or requested the opportunity to cross-examine Carmody based on the First Declaration.  By order entered September 17, 2015, the Court found McKinsey RTS was disinterested within the meaning of Bankruptcy Code section 101(14) and authorized the Debtors to retain McKinsey RTS pursuant to the terms of the engagement letter attached to the Debtors' application (the "McKinsey RTS Retention Order").  The McKinsey RTS Retention Order has continuously remained in full force and effect through confirmation of the Debtors' Plan on July 12, 2016.

McKinsey RTS made three additional public disclosures after the disclosures set forth in its First Declaration.  On November 9, 2015, McKinsey RTS filed its first supplemental disclosure (the "First Supplemental Disclosure").  The First Supplemental Disclosure identified additional connections that McKinsey RTS had with other entities on the Interested Parties List. The additional connections were once again disclosed not on an individual basis but instead by category.  On March 25, 2016, McKinsey RTS filed with the Court its second supplemental

declaration (the "Second Supplemental Disclosure").   The Second Declaration disclosed additional connections that McKinsey RTS had with other interested parties.   Like the First Declaration and First Supplemental Disclosure, the Second Supplemental Declaration did not disclose the individual names of the interested parties, but instead disclosed the interested parties only by category.

On May 3, 2016, the U.S. Trustee filed a motion to compel McKinsey RTS to comply with the requirements of Bankruptcy Rule 2014 (the "U.S. Trustee's Motion to Compel").   The U.S. Trustee's Motion to Compel sought the disclosure of the names of the entities on the Interested Parties List that McKinsey RTS had previously identified only by category.   It also sought the disclosure of a general description of the work performed for each of the identified entities.   The U.S. Trustee's Motion to Compel acknowledged that the U.S. Trustee was working with McKinsey RTS to resolve the pending issues.

On May 19, 2016, McKinsey RTS filed its third supplemental disclosure of Carmody pursuant to a stipulation resolving the United States Trustee's Motion to Compel (the "Third Supplemental Disclosure.").   The Third Supplemental Disclosure identified by name many (but not all) of the current and former clients of McKinsey RTS who were on the Interested Parties List that McKinsey RTS had previously identified only by category.   Carmody confirmed in the Third Supplemental Disclosure that the representation of these entities by McKinsey RTS was unrelated to the Debtors' chapter 11 case.   The Third Supplemental Disclosure also identified by name employees of McKinsey RTS who had previously been employed by any entity included on the Interested Party List.   Finally, the Third Supplemental Disclosure discussed the existence of an entity named MIO ("MIO") that offered investment products for McKinsey RTS' partners and pension plans.   Although McKinsey RTS and MIO were independent from each other, it was

disclosed that a member of MIO's board of directors also served as an employee of McKinsey RTS.

On June 6, 2016, Mar-Bow filed a Motion to Compel McKinsey RTS to comply with Bankruptcy Rule 2014.  Mar-Bow claimed that McKinsey RTS had failed to disclose by name all of the entities with which it had connections on the Interested Parties List.  Mar-Bow maintained that identification of connections by category was far too generic a description.  Mar-Bow alleged that the system McKinsey RTS had employed to conduct its conflict check was inadequate because no response rate to the email surveys had been provided.  Mar-Bow criticized the adequacy of the Third Supplemental Disclosure concerning MIO.  Mar-Bow questioned the relationship between MIO and McKinsey RTS.

In support of the Motion to Compel, Mar-Bow submitted the declaration of Jay Alix ("Alix").  Alix is the beneficial owner of Mar-Bow.  Alix founded the restructuring advisory firm AlixPartners.  AlixPartners competes with McKinsey RTS in the turnaround consulting business.  Mar-Bow claimed that it had standing in this Court to file the Motion to Compel because it had acquired 7.5% of bonds due August 1, 2020, having a face amount of $1.25 million (the "Bonds").  Mar-Bow filed its proof of claim in the Debtors' bankruptcy case on March 23, 2016.

McKinsey RTS filed a response to Mar-Bow's allegations, painting the Motion to Compel as an anticompetitive strike by Alix to force McKinsey RTS out of the restructuring advisory business.  McKinsey RTS suggested that Alix bought the Bonds after the Petition Date at a substantial discount in order to obtain standing as a creditor for the sole purpose of challenging the employment of McKinsey RTS.  McKinsey RTS argued that Mar-Bow had inexplicably waited until the eve of the Debtors' Confirmation Hearing before raising the Rule 2014 issues, knowing that Carmody was scheduled to testify in support of feasibility of the

Debtors' Plan at the Confirmation Hearing.  McKinsey RTS maintained that the conflict check system it employed had been thorough, entirely appropriate, and more rigorous than conflict checks performed by other restructuring advisory firms.

On June 28, 2016, approximately one week before the Confirmation Hearing, Mar-Bow brought its Motion to Compel for hearing before the Court (the "June 28 Hearing").  Debtors' counsel appeared at the June 28 Hearing and stressed to the Court that any delay in conducting the scheduled Confirmation Hearing would be detrimental to the Debtors' estates.  The Debtors' cash burn rate was more than one million dollars per month.  Debtors' counsel advised that failure to confirm the Debtors' Plan by July 12, 2016, would trigger an event of default under the Debtors' post-petition financing facility.  The Debtors' Plan was supported by an intricate web of interconnected settlements the Debtors had been able to negotiate with its various constituencies. [13]  Counsel for the Debtors was concerned that any postponement of the Confirmation Hearing could jeopardize the interrelated agreements that had finally been set in place.

On July 1, 2016, the Court entered an order granting most (but not all) of the relief requested by Mar-Bow in its Motion to Compel.  The Court ordered McKinsey RTS to disclose to the Court for its *in camera* review (the "*In Camera* Disclosures"): (i) the names of all entities on the Interested Parties List with which McKinsey RTS had connections; (ii) the identity of any entities on the Interested Parties List that managed investments for MIO; (iii) the identity of any

---

[13] The settlements included, but are not limited to, (a) the Global Settlement among the Debtors, the Unsecured Creditors Committee, the First Lien Lenders and the Second Lien lenders set forth in the *Stipulation and Agreed Order Regarding Process Related Terms of Plan Settlement Term Sheet* [Docket No. 2497], (b) the First Lien Lender Settlement, (c) the Second Lien Noteholder Settlement, (d) the Unencumbered Assets Settlement, (e) the Diminution Claim Allowance Settlement, (f) the Resolution of Reclamation Obligations, (g) the Environmental Groups Settlement, (g) the Retiree Committee Settlement, and (h) the UMW Funds Settlement.

entities on the Interested Parties List in which MIO had directly invested;[14] and (iv) the response

rates for the email surveys sent to McKinsey RTS' employees and affiliates (the "Order

Compelling Compliance").   The Order Compelling Compliance tasked the Debtors, Mar-Bow,

the Unsecured Creditors Committee, the U.S. Trustee, and McKinsey RTS to negotiate in good

faith a confidentiality order whereunder the U.S. Trustee, the Debtors and the Unsecured

Creditors Committee could review the *In Camera* Disclosures provided to the Court.[15]   The

Order Compelling Compliance required that the *In Camera* Disclosures be tendered to the Court

on the day prior to the Confirmation Hearing.   McKinsey RTS timely complied with the Order

Compelling Compliance.   The Court had ample opportunity to review the *In Camera* Disclosures

prior to the Confirmation Hearing and was satisfied with the detail of the information provided

by McKinsey therein.

Mar-Bow filed a motion to clarify the Order Compelling Compliance.   Mar-Bow asked

that it be allowed to review the *In Camera* Disclosures following the entry of a confidentiality

order.   By order entered July 15, 2016, the Court denied Mar-Bow's motion to clarify, declining

to revisit the Order Compelling Compliance (the "Clarification Order").   The Court's

Clarification Order did invite the U.S. Trustee to file a recommendation with the Court whether

any portion of the *In Camera* Disclosures should be made public (the "Clarification Order").

Also on July 15, 2016, the Court entered a confidentiality order proposed by the Debtors, the

Unsecured Creditors Committee, the U.S. Trustee and McKinsey RTS.   After reviewing the

---

[14] McKinsey RTS was also required to disclose any funds or managers that were on the Interested Parties List. However, the Court did not require any disclosure over the investments of any funds where MIO did not have control or input over the investment decisions of the funds.

[15] The Court did not make provision for Mar-Bow's access to the *In Camera* Disclosures in order to accommodate the anticompetitive concerns raised by McKinsey RTS.

information provided in the *In Camera* Disclosures, the U.S. Trustee did recommend certain further public disclosures.[16]  McKinsey RTS filed those additional disclosures on August 5, 2016

Meanwhile, the Court conducted the Confirmation Hearing on July 7, 2016.  Mar-Bow's Plan Objection was filed on June 29, 2016.[17]  Mar-Bow objected to (a) the transfer under the Plan of the Debtors' estates' major assets to creditors holding first liens against them (the "NewCo Asset Sale"),[18] and (b) the exculpation and release of McKinsey RTS.   At the Confirmation Hearing, Mar-Bow proffered no documents and no witnesses.  Mar-Bow did not object to the admission of any of the Debtors' declarations, including the declaration of Carmody of McKinsey RTS.  Mar-Bow declined to cross examine Carmody.  Mar-Bow admitted it had no objection to Carmody's testimony about the Plan's feasibility and the Debtors' liquidation analysis.  Mar-Bow conceded its sole objection to confirmation was based on its not knowing the additional facts about McKinsey RTS' disinterestedness, which facts had been submitted *in camera* to the Court.

The Court noted at the Confirmation Hearing that it had received the *In Camera* Disclosures from McKinsey RTS and was satisfied with them.   In light of the *In Camera* Disclosures, the Court found that McKinsey RTS was disinterested and could receive the benefit of the Plan's release and exculpation provisions.   The Court also found that the release and exculpation provisions contained in the Plan were negotiated in good faith, narrowly tailored, reasonable, and appropriate for all of the parties.   Accordingly, the Court overruled Mar-Bow's Plan Objection.

---

[16] *See* Recommendation of the United States Trustee on Public Disclosures by McKinsey, *In re Alpha Nat. Res. Inc.*, No. 15-33896 (Bankr. E.D. Va. August 5, 2016) ECF No. 3222.

[17] All but two of the 28 objections that had been filed opposing the Debtors' Plan were resolved consensually at the Confirmation Hearing.

[18] This issue was not included as one of Mar-Bow's Appealed Provisions.

## Analysis

### *Rule 2014*

Section 327 of the Bankruptcy Code provides that the Trustee [19] may employ professionals to assist in the bankruptcy case so long as the professionals are "disinterested persons" that do not hold or represent an interest adverse to the Debtor.  11 U.S.C. § 327.  The Bankruptcy Code defines the term "distinterested person" to mean a person that:

> (A)  is not a creditor, an equity security holder, or an insider;
> (B)  is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
> (C)  does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).  "While the Bankruptcy Code does not define an 'interest adverse to the estate,' bankruptcy courts have widely held that an adverse interest means either (1) the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or create an actual or potential dispute with the estate as a rival claimant, or (2) a predisposition of bias against the estate."  *See In re Lewis Road LLC*, 2011 WL 6140747, at *7 (Bankr. E.D. Va. Dec. 9, 2011).

Bankruptcy Rule 2014 facilitates the implementation of § 327 and § 101(14) of the Bankruptcy Code.  The Rule requires that an application of a debtor in possession for an order approving the employment of a professional person must state "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the United States trustee."  Fed R. Bankr. P. 2014(a).  The application must be

---

[19] In a case filed under chapter 11 of the Bankruptcy Code, the debtor in possession has, with certain narrow limitations, all the rights and duties of a trustee.  *See* 11 U.S.C § 1107.

accompanied by a verified statement of the person to be employed setting forth that very same information.  "The duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by [a professional person] seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate."  *In re eToys, Inc., et al.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005).  Disclosure under Rule 2014 must be clear enough for the Court, the U.S. Trustee and for other parties in interest to gauge the disinterestedness of the professional.  *See Lewis Road LLC*, 2011 WL 6140747, at \*8 ("Disclosures made pursuant to Rule 2014 "must be explicit enough for the court and other parties to gauge whether the person to be employed is not disinterested or holds an adverse interest.").

Mar-Bow's Motion to Compel was not without merit.  It raised important questions and issues about the adequacy of the disclosures required for employment of court approved advisors and professionals in large Chapter 11 cases.[20]  As a creditor, Mar-Bow had standing under § 1109(b) of the Bankruptcy Code to question whether McKinsey RTS had complied with Rule 2014, even if it had purchased its claim after the Petition Date at a substantial discount.  The anticompetitive concerns raised by McKinsey RTS had merit as well.  While the Court makes no finding about the motives behind Mar-Bow's Motion to Compel, the fears that McKinsey RTS expressed over the beneficial owner of Mar-Bow being the founder of a restructuring advisory firm that competes directly with McKinsey RTS could not simply be discarded.  McKinsey RTS, like any other professional consulting firm, has a legitimate interest in protecting the

---

[20] Rule 2014 does not define the term "connections."

confidentiality needs of its own clients and in safeguarding its interests from unfair competitive actions.

In the context of the Mar-Bow/McKinsey dispute, the Court kept a keen focus on the ultimate issue before it. The Court recognized the interests of the Debtors, their creditors other than Mar-Bow who numbered in the tens of thousands, and their 8000 employees who, along with various state and Federal regulatory agencies, had steadfastly worked in good faith to steer this Bankruptcy Case in a successful direction. Mar-Bow's Motion to Compel was not filed until June 6, 2016, over ten months after the Petition Date and approximately one month before the Confirmation Hearing.[21] The June 28 Hearing on the Motion to Compel was held one week before the Confirmation Hearing, almost eleven months after the Petition Date.[22] As one of the Debtors' turnaround advisors, it was obvious to all those involved in the Bankruptcy Case that the testimony of Carmody or some other McKinsey RTS employee would be necessary to prove that the Plan was both feasible and in the best interest of creditors.[23] The Court was disappointed with the timing of Mar-Bow's Motion to Compel. The Court was torn with a choice between its duty to move the Debtors' case forward to a prompt and fair conclusion for the benefit of all the constituencies involved in the Bankruptcy Case on the one hand and its duty to enforce Rule 2014 on the other.

---

[21] Mar-Bow filed its first notice of appearance in the Bankruptcy Case on May 1, 2016.

[22] Mar-Bow did not file a motion to expedite the June 28 Hearing on its Motion to Compel.

[23] The Court had previously relied on the testimony of Carmody on numerous occasions throughout the pendency of this Bankruptcy Case, including in connection with the Motion to Compel, the Debtors' application to employ McKinsey, the Debtors' motion to approve a key employee incentive plan, and the Debtor's motion for rejection of the Debtors collective bargaining agreements under §§ 1113 and 1114 of the Bankruptcy Code. Carmody has consistently affirmed to the Court that McKinsey RTS is disinterested and has no interest adverse to the Debtor.

In balancing the competing concerns presented by the Mar-Bow/McKinsey dispute over the implementation of Rule 2014, the Court turned its focus on assuring the disinterestedness of the professionals whose employment it approved.[24]  Sections 105(a)[25] and 107(b)[26] of the Bankruptcy Code provided the Court with the means to tailor its enforcement of Rule 2014 to this end.  The Court agreed that additional disclosures needed to be made under Rule 2014.  But delaying the Confirmation Hearing risked a post-petition financing default and a very real possibility for the unraveling of the web of interrelated settlements that had been painstakingly woven together to support the Debtors' Plan.  The Court's Order Compelling Compliance and its Clarification Order were both carefully crafted to permit the Court and a limited number of key parties who were most intimately involved in the Bankruptcy Case to have timely access to all the information necessary to dispel any concerns over the disinterestedness of McKinsey RTS while protecting the legitimate business concerns of McKinsey RTS.

McKinsey RTS fully complied with the Court's Order Compelling Compliance and delivered the *In Camera* Disclosures to the Court the day before the Confirmation Hearing.  The

---

[24] Bankruptcy Rule 2014 is not an end in itself; but rather, a procedural mechanism courts use to implement the substantive provisions of § 327 of the Bankruptcy Code.

[25]  Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

[26] Section 107(b) of the Bankruptcy Code provides:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may--**(1)** protect an entity with respect to a trade secret or confidential research, development, or commercial information; or **(2)** protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b).

Court thoroughly reviewed the *In Camera* Disclosures, and it was satisfied that McKinsey RTS had complied in good faith with the Order Compelling Compliance and that McKinsey RTS was a "disinterested person" under the Bankruptcy Code.

*Exculpation & Releases*

Exculpation provisions such as the one in the Debtors' Plan are not unusual and "generally are permissible, so long as they are properly limited and not overly broad." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000)). Exculpation is generally appropriate so long as it is limited to those parties who have served the debtor, is narrowly tailored and complies with the applicable standards. *See In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y 2005); *In re Health Diagnostic Laboratory Inc.*, 551 B.R. 218, 232-33 (Bankr. E.D. Va. 2016); *In re Washington Mutual*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011).[27]

As a policy matter, exculpations are necessary to ensure that capable, skilled individuals are willing to assist in the reorganization efforts in chapter 11 cases. The exculpation provisions in the case at bar are limited to parties who have performed necessary and valuable duties in connection with this Bankruptcy Case. "The practical effect of a proper exculpation provision is not to provide a release for any party, but to raise the standard of liability of fiduciaries for their conduct during the case." *See In re Health Diagnostic Laboratory Inc.*, 551 B.R. at 232 (citing *In re PWS Holding Corp.*, 228 F.3d at 247). This case is no different. Under the Debtors' Plan, if a party wishes to assert a claim against an

---

[27] The standards applicable to a court's evaluation are whether each such provision (a) is narrowly tailored to meet the needs of the bankruptcy estate, (b) is limited to parties who have performed necessary and valuable duties in connection with the case, (c) is limited to acts and omissions taken in connection with the bankruptcy case, and (d) does not purport to release any prepetition claims. *Nat'l Heritage Found*, 478 B.R. at 234.

exculpated party for its conduct in connection with this Bankruptcy Case, the claim must rise at least to the level of gross negligence.  This gives a certain measure of finality to the interested parties and their professionals, and assures them they will not be second-guessed and hounded by meritless claims following the conclusion of the bankruptcy case.  *See In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) ("exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case.").

McKinsey RTS, along with the other professionals employed in this Bankruptcy Case, were essential to the formulation and prosecution of a largely consensual plan of reorganization, which provided for, among other things, meaningful distributions to general unsecured creditors.  Absent the involvement of these professionals, and their extensive efforts to reach the interconnected settlements in the face of multiple, significant and competing interests, this Bankruptcy Case could have become mired in costly, protracted litigation.  These professionals should not be subject to the potential of frivolous future litigation as a result of their efforts.  *See In re Health Diagnostics Lab., Inc.*, 551 at 234 (the "professionals [who] have created substantial value for the estates through their efforts in these cases and . . . should not be subjected to future litigation involving frivolous claims.").

The Debtors' Plan also contains certain third party release provisions.  The Plan provides that any claim brought by a creditor against a released party is forever waived, unless the potential claim arises to gross negligence or willful misconduct.  It is well settled that a "chapter 11 plan is a contract between the debtor and its creditors in which general rules of contract interpretation apply." *In re Bartleson,* 253 B.R. 75, 84 (B.A.P. 9th Cir. 2000).  Section 1114(a)

of the Bankruptcy Code makes the contract represented by the chapter 11 plan binding on the debtor and its creditors, whether or not a creditor has accepted the plan.  *See* 11 U.S.C. § 1114(a).  Although granting a third-party release can be interpreted to be in conflict with section 524(e) of the Bankruptcy Code, which provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt," the Court of Appeals for the Fourth Circuit has affirmatively held that the Bankruptcy Code does not prohibit this Court from confirming a chapter 11 plan granting third-party releases where the creditors have approved the plan.  11 U.S.C. § 524(e); *see In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir. 1989).  The Court of Appeals for the Fourth Circuit has instructed that the Court should consider six factors for approving a release provision:

> (1) There is an identity of interests between the debtor and the third party . . .; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization . . .; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; [and] (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full.

*Nat'l Heritage Found.*, 760 F.3d at 347.  Although releases should be approved "cautiously," the Fourth Circuit has stated that they may be enforced in "appropriate circumstances."  *Id.* at 347-48.

The Court found that the release provisions were appropriate in this case.  Each of the released parties has substantially served the Debtors.  They contributed to the Debtors' reorganization by offering funding to the Debtors or by contributing sweat equity to the Debtors.  This bankruptcy case was the product of major settlements between each of the large

constituencies in this case.[28]  The Debtors' first-lien lenders and the DIP lenders financed the

case through a post-petition financing facility, consented to the Debtors' use of cash collateral,

offered to serve as a stalking horse bidder with a $500 million credit bid, and offered the

Debtors' exit financing.[29]  No creditor objected to the release provisions on the grounds that they

did not comply with the *National Heritage* factors or this Court's holding in *Health Diagnostic*

*Laboratory*.    The Unsecured Creditors Committee agreed that the release provisions were

appropriate.    All the Voting Creditor Classes agreed to accept the Plan with the release and

exculpation provisions contained therein.

Mar-Bow argued that McKinsey RTS was not entitled to the benefit of the exculpation or

release provisions because McKinsey RTS had not complied Rule 2014.  As a professional of the

Debtors, there is no doubt that McKinsey RTS can be included as a released party– indeed, Mar-

Bow does not argue that applicable law does not permit McKinsey RTS to be exculpated.

Instead, Mar-Bow's Plan Objection argues that McKinsey RTS should not be entitled to the

benefits of exculpation without further disclosures under Rule 2014.  Mar-Bow's Plan Objection

did not cite a single case in support of its position.    McKinsey RTS had filed four public

disclosures about its connections to entities on the Interested Parties List prior to the

Confirmation Hearing.    McKinsey RTS fully complied with the Court's Order Compelling

Compliance.  The Court found that McKinsey RTS was a disinterested party.  Mar-Bow's real

point of contention is not that McKinsey RTS failed to comply with Rule 2014, but rather that it

was denied access to the *In Camera* Disclosures

---

[28] *See* Declaration of Andy Eidson, *In re Alpha Nat. Res.*, No. 15-33896 (Bankr E.D. Va. July 6, 2016) ECF No. 2962.

[29] *See* Declaration of Bradley C. Meyer, *In re Alpha Nat. Res.,* No. 15-33896, (Bankr. E.D. Va. July 6, 2016) ECF No. 2944.

It is telling that all the Voting Creditor Classes were disinclined to subscribe to Mar-Bow's theory.  The proper remedy for Mar-Bow and any other creditor who disagreed with the exculpation or release provisions was to vote against confirmation of the Debtors' Plan.  The U.S. Trustee's Motion to Compel and Mar-Bow's Motion to Compel were both filed in advance of the date that votes were due on the Debtors' Plan.  The Mar-Bow/McKinsey dispute has played out in open court and on the public docket.  Any creditor who agreed with Mar-Bow that the Third Supplemental Disclosure was insufficient could have voted no on the Plan.  But all the Voting Creditor Classes voted overwhelmingly to accept the Plan, including the class of creditors in which Mar-Bow was included.  The Plan had overwhelming creditor support.

*Standard for a Stay Pending Appeal*

The relief requested in the Motion is not justified on the merits.  "The Court applies the same standard for a stay pending appeal as for a preliminary injunction.  A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *BDC Capital, Inc. v. Thoburn Ltd. P'ship*, 508 B.R. 633, 636-37 (E.D. Va. 2014) (citations and internal quotation marks omitted).

> To determine whether to grant injunctive relief, the movant must establish four factors:  (1) that the movant will likely succeed on the merits on appeal, (2) that the movant will suffer irreparable injury if the stay is denied, (3) the balance of the equities tips in its favor, and (4) an injunction is in the public interest.  All four requirements must be satisfied.

*Id.*

Consistent with forgoing analysis of the release and exculpation provisions in the Plan, the Court made specific factual findings in support of the relief it granted.  The Court found that the evidence presented at the Confirmation Hearing was reasonable, persuasive and credible.  The Court found from this uncontroverted evidence that the Plan's exculpation and release

provisions were necessary and fair because: (1) the non-Debtor released parties had contributed substantial assets to the reorganization and were critical contributors to the settlements that made confirmation of the Plan possible; (2) the Plan's release provisions were (i) essential to the Debtors' reorganization, (ii) in the best interests of the Debtors and parties in interest, (iii) essential consideration for the substantial concessions and contributions made by the released parties throughout the Bankruptcy Case, and (iv) a critical element of the integrated and related settlements that were the foundation of the Plan; (3) all impaired Classes entitled to vote on the Plan had voted overwhelmingly to accept the Plan; (4) the Plan provided increased recoveries to various Classes affected by the exculpation and release provisions who would receive smaller recoveries, or no recoveries at all, if the Debtors were liquidated or in the absence of some or all of the settlements; and (5) the exculpation and release provisions did not relieve any party of any liability arising out of an act or omission constituting gross negligence or willful misconduct.

The Court also found that the exculpation and release provisions were appropriately tailored to promote finality and prevent parties from attempting to circumvent the Plan's terms. The Court found that the Plan's exculpation and release provisions had all been negotiated in good faith, and were consistent with sections 105, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code and applicable law in this Circuit. The exculpation and release provisions were disclosed in the Disclosure Statement and on the Ballots. Accordingly, all parties who voted in favor of the Plan consented to the exculpation and release provisions. Simply put, the creditors got a fair deal.

Mar-Bow failed to meet its burden to make a strong showing that it would succeed on the merits on appeal. *See In re Brown*, 354 B.R. 100, 110 (Bankr. N.D.W. Va. 2006) ("'[O]n an application for a stay or injunction pending appeal, one of the considerations should be

whether the petitioner has made a strong showing that he is likely to prevail on the merits of his appeal.'") (quoting *Miltenberger v. Chesapeake & O. R. Co.*, 450F.2d 971, 974 (4th Cir. 1971)); *BDC Capital, Inc. v. Thoburn Ltd. P'ship*, 508 B.R. at 637 ("In order to receive a stay pending appeal, [the appellant] must make a strong showing that it would succeed on the merits on appeal.").    Nothing in Mar-Bow's Motion undermines the extensive findings supporting the exculpation and release provisions. *See BDC Capital, Inc. v. Thoburn Ltd. P'ship*, 508 B.R. at 637–38 (denying stay pending appeal and finding that "[the movant] has not offered any case law or any other authority to support its contention that the Bankruptcy Court erred or abused its discretion.    The Court cannot accept [the  movant's] argument that it is just as likely as the other parties to succeed on appeal. . . ."); *Rose v. Logan*, 2014 WL 3616380, at *3 (D. Md. 2014) (ruling that the movant failed to meet the burden of showing likelihood of success on the merits because the movant did little but restated the same objections previously raised, and focusing great weight on the fact that the Bankruptcy Court had made multiple findings of fact in favor of the appellee); *O'Brien v. Appomattox Cty.*, No. 6:02 CV 00043, 2002 U.S. Dist. LEXIS 22554, at *3 (W.D. Va. Nov. 15, 2002) ("The Defendants have not produced any new evidence which would support a likelihood of success on the merits with respect to the state law claims.    Therefore, this Court concludes that the Defendants do not have a likelihood of success on the merits, . . . .").

Mar-Bow will not suffer irreparable injury if the stay is denied.    As the Plan's effective date has already occurred, its exculpation and release provisions have already been granted to McKinsey RTS.[30]    Under the circumstances, the Court is unsure what exactly it is that it is

---

[30] The Plan and the Confirmation Order each provide that the exculpation and release provisions become effective as of the effective date.  The Effective Date with respect to the Plan occurred on July 26, 2016.  The exculpation and release provisions, including with respect to McKinsey RTS, have become effective in accordance with the terms of

supposed to stay.  Mar-Bow argues that it is attempting to preserve its arguments before the District Court that the Appeal is not equitably moot.  But "the fact that an appeal may become moot without a stay does not alone constitute irreparable harm."  *BDC Capital, Inc. v. Thoburn Ltd. P'ship*, 508 B.R. at 640 (citing *In re Shenandoah Realty Partners, L.P*., 248 B.R. 505, 510 (W.D. Va. 2000)).

The balance of equities disfavors relief.  *See BDC Capital, Inc. v. Thoburn Ltd. P'ship,* 508 B.R. at 640 (requiring the balance of the likelihood of irreparable harm to the movant against the likelihood of substantial harm to non-movants to weigh in the movant's favor).  The parties bargained for global peace through confirmation of the Debtors' Plan.  Any professional, including McKinsey RTS, that is not released and exculpated, will have to implead other professionals and parties in the event it is sued.  It will have to take discovery from other professionals and other parties, as well.  While Mar-Bow may only appeal the release and exculpation provisions of the Plan as to itself, and not as to other creditors,[31] that is highly inequitable to all other creditors who will be harmed when the appeal disturbs the global peace reached in the Plan.  *See BDC Capital, Inc. v. Thoburn Ltd. P'ship*, 508 B.R. at 640 (declining to grant a stay that would "substantially harm the other parties" involved).

Mar-Bow's public policy argument is premised on the facts that McKinsey RTS failed to comply with Bankruptcy Rule 2014 and such failure adversely impacts Mar-Bow.  McKinsey RTS has publically disclosed all its connections.  Mar-Bow's initial complaint was that McKinsey RTS identified its connections by category of interested party, instead of by name.  The names are now public.  As the record shows, McKinsey RTS' disclosures were more

---

the Plan and Confirmation Order.  There is no aspect of the implementation of the exculpation and release provisions for the Court to stay.

[31] No other party objected to the release and exculpation provisions in the Plan.

than adequate for the Court to find that McKinsey RTS is a disinterested person.  Mar-Bow's current point of contention concerns the fact that it was excluded from the list of key parties that received the *In Camera* Disclosures.  In light of the concerns expressed by McKinsey RTS about Mar-Bow's private agenda, further dissemination of the *In Camera* Disclosures to Mar-Bow would not have been an aid to the Court in its determination of disinterestedness.  It only would have served to foster protracted litigation of the Mar-Bow/McKinsey dispute.

As confirmed, the Plan incorporates a delicate balance of settlements involving numerous parties, including:  (a) the Creditors' Committee, (b) the First Lien Lenders, (c) the First Lien Agent, (d) the Second Lien Parties, (e) the DIP Lenders, (f) the DIP Agents, (g) the Massey Convertible Notes Trustee, (h) the Unsecured Notes Indenture Trustee, (i) the Retiree Committee, (j) various environmental regulatory authorities, (k) certain agencies of the federal government, (l) certain environmental advocacy groups, (m) the UMWA and (n) the UMWA Funds.  By the Confirmation Order, the Court found specifically that the release and exculpation provisions of the Plan at issue in the Motion and the Appeal are, among other things, "a critical element of the integrated and related Settlements that are the foundation of the Plan and . . . integral to the structure of the Plan and . . . part of the agreement among all parties in interest embodied thereby."  Plan Confirmation Order at 29, 30, *In re Alpha Nat. Res., Inc.,* No. 15-33896 (Bankr. E.D. Va. July 12, 2016) ECF No. 3038.  Mar-Bow threatens to disrupt the hard-fought global peace achieved among the Debtors and all of their major stakeholders that is memorialized in the confirmed Plan.  Public policy is not achieved by allowing that global peace to be disturbed.

## Conclusion

The Motion seeks a stay of the exculpation and release provisions set forth in the Confirmation Order and the Plan as they relate to McKinsey RTS.  They were granted on July 26, 2016, when the Plan became effective.  There does not appear that there is anything for the Court to stay pending appeal.  But even if there were, Mar-Bow has failed to meet its burden of establishing any of the elements necessary for a stay pending appeal.  Mar-Bow has demonstrated no likelihood of success on the merits.  Nor has Mar-Bow shown that it will suffer irreparable harm if the stay is not granted.  The Court has determined that granting a stay would be highly prejudicial to all the other creditors of the Debtors as well as to their employees.  Accordingly, the balance of equities weighs heavily in favor of the Debtors.  Finally, public policy clearly bars the granting of a stay.  Accordingly, Mar-Bow's Motion will be denied.

A separate order shall issue.

Entered: Aug 29 2016

_____ /s/ Kevin R. Huennekens _____
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: Aug 29 2016