JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)

*Attorneys for Reorganized Debtors*

HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Alpha Natural Resources, Inc., <u>et al.</u>, | Case No. 15-33896 (KRH) |
| Debtors. | (Jointly Administered) |

### OBJECTION OF THE REORGANIZED DEBTORS TO LONE WOLFE
### NATURAL RESOURCES, INC.'S MOTION TO REOPEN CASE

Old ANR, LLC (f/k/a Alpha Natural Resources, Inc.) and its affiliates, as reorganized debtors (collectively, the "<u>Reorganized Debtors</u>"), file this objection (the "<u>Objection</u>") to the *Motion to Reopen Case* (Docket No. 4172) (the "<u>Motion to Reopen</u>") filed by Lone Wolfe Natural Resources, Inc. ("<u>Lone Wolfe</u>") in the above-referenced bankruptcy cases, which were closed by Order of this Court on June 28, 2018 (Docket No. 4119). In support of this Objection, the Reorganized Debtors submit as follows:

## Preliminary Statement[1]

1.       On December 11, 2018 – **30 months after** this Court entered the Confirmation Order and **6 months after** this Court closed these cases – Lone Wolfe filed the Motion to Reopen seeking a declaration allowing it to proceed with its Complaint against Arley Johnson ("Johnson"), an employee of the Debtors (i.e., a Released Party), because Lone Wolfe's underlying cause of action – that clearly is based on Lone Wolfe's prepetition claim against the Debtors – allegedly was not discharged and enjoined under the Plan.[2]

2.       Specifically, Lone Wolfe is asking the Court at this late date to reopen these cases and hold an evidentiary hearing to determine whether Lone Wolfe's Complaint against Johnson is based on gross negligence or willful misconduct and, thus, is carved out of the Plan injunction.  A plain reading of the Complaint, however, reveals that Lone Wolfe is seeking to recover damages for prepetition work Lone Wolfe performed pursuant to the Construction Agreement between Lone Wolfe and Debtor Brooks Run.  Johnson is not a party to the Construction Agreement.   By Lone Wolfe's own admission, at all times relevant to the Complaint, Johnson was acting as an agent or employee of the Debtors.   Nowhere does the Complaint allege that Johnson was acting in his individual capacity or outside the scope of his employment.   Given that the alleged claim arose in the scope of Johnson's employment, the Reorganized Debtors (like the Debtors before them) are indemnifying Johnson for fees and expenses incurred defending against Lone Wolfe.

---

[1]      Capitalized terms used but not defined in the Preliminary Statement shall have the meanings set forth below.

[2]      As explained below, the Complaint currently is pending in the District Court for the Southern District of West Virginia.  A copy of the Complaint is annexed as Exhibit 1 to this Objection.

3.    Lone Wolfe provides no particular support in the Motion to Reopen establishing why cause exists for this Court to reopen these cases. Rather, Lone Wolfe avers generally in the Motion to Reopen that the Plan did not release its cause of action against Johnson because the Complaint is based on the gross negligence or willful misconduct of Johnson. Nowhere in the Complaint, however, does Lone Wolfe allege that Johnson's actions constituted gross negligence or willful misconduct. The mere statements in the Complaint that Johnson acted with malice and such action constitutes tortious interference do not constitute gross negligence or willful misconduct.

4.    In short, by the Complaint, Lone Wolfe is trying to recover payment from an employee of the Debtors of its prepetition claim against a Debtor.[3] Such an action by Lone Wolfe plainly is enjoined by the Plan, and is precisely the type of action the Plan injunction is designed to prevent. As set forth below, the Court should reject the Motion to Reopen because Lone Wolfe is not entitled to the relief it seeks against Johnson as a matter of law.

5.    The Court also should deny the Motion to Reopen because it would be highly prejudicial to the Reorganized Debtors, especially at this late stage. Such prejudice includes (i) disturbing the finality of these closed cases, (ii) forcing the Reorganized Debtors to incur costs to indemnify Johnson's defense of a meritless cause of action based on a prepetition claim against the Debtors and, thus, impacting the Reorganized Debtors' fresh start, (iii) risk opening the floodgates to embolden other vendors to pursue similar meritless causes of action, and (iv) renewing the Reorganized Debtors' obligation to pay significant quarterly U.S. Trustee fees.

---

[3]    Lone Wolfe filed a Proof of Claim against Brooks Run that is based on the same cause of action asserted in the Complaint. Lone Wolfe's Proof of Claim was allowed and satisfied in these Chapter 11 Cases as a Category 1 General Unsecured Claim.

6.      In addition to prejudice arising from the blatant fact that Lone Wolfe's cause of action is nothing more than a thinly veiled and inappropriate attempt to pursue an employee of the Debtors for its prepetition claim, Lone Wolfe's delay in filing the Motion to Reopen is even more egregious and prejudicial to the Reorganized Debtors' fresh start considering that Lone Wolfe represented to the District Court ***over 18 months ago (and long before these Chapter 11 Cases were closed)*** that it intended to seek authority from this Court to pursue the Complaint against Johnson.  Such representation occurred after the Reorganized Debtors informed Lone Wolfe that Lone Wolfe was barred by the Plan discharge and injunction from proceeding with the Complaint against Johnson.  Lone Wolfe can offer no credible excuse for why it waited so long to seek authority from this Court to pursue the Complaint.  If Lone Wolfe truly believed that it held a valid cause of action against Johnson, Lone Wolfe could have taken action with this Court long ago.  To the extent Lone Wolfe has any rights with respect to a cause of action against Johnson (which it does not), Lone Wolfe has sat on those rights and should bear the consequences.

7.      In sum, Lone Wolfe has failed to demonstrate in the Motion to Reopen, and cannot demonstrate, that cause exists for this Court to reopen the cases to permit a vendor of the Debtors to burden the Reorganized Debtors and Johnson at this late date with an evidentiary hearing to determine whether a prepetition cause of action against Johnson that is based entirely on the vendor's contract with the Debtors was released under the Plan.

8.      Nevertheless, to the extent this Court believes it is appropriate to reopen the cases to determine whether Lone Wolfe's alleged cause of action against Johnson is discharged under the Plan, the Reorganized Debtors request that this Court provide in any order approving the Motion to Reopen that (i) Lone Wolfe shall pay any U.S. Trustee's quarterly fees

4

that may be owed as a result of reopening these cases, (ii) only the lead case of Alpha Natural

Resources, Inc., Case Number 15-33896 (KRH), shall be reopened and such case shall only be

reopened for the limited purpose of considering and determining whether the Complaint is

released, and (iii) the case shall be closed automatically and without the need for further order of

the Court upon the entry of a dispositive order determining whether Lone Wolfe's alleged claim

against Johnson is discharged and enjoined.

**<u>Relevant Background</u>**

    **A.**    **Confirmation of the Plan and Discharge of Claims Against Employees
of the Debtors**

9.    On August 3, 2015 (the "<u>Petition Date</u>"), the above-captioned debtors

(collectively, the "<u>Debtors</u>") filed petitions in the United States Bankruptcy Court for the Eastern

District of Virginia, Richmond Division (the "<u>Bankruptcy Court</u>"), for relief under chapter 11 of

title 11 of the United States Code, commencing the above-captioned bankruptcy cases (the

"<u>Chapter 11 Cases</u>").

10.    On July 12, 2016, this Court entered its *Order Confirming Second

Amended Joint Plan of Reorganization of Debtors and Debtors in Possession, as Modified*

(Docket No. 3038) (the "<u>Confirmation Order</u>"), confirming the *Second Amended Joint Plan of

Reorganization of Debtors and Debtors in Possession* dated May 25, 2016 (Docket No. 3283) (as

modified by the Confirmation Order, the "<u>Plan</u>").  The Plan became effective on July 26, 2016

(the "<u>Effective Date</u>"), and the Debtors emerged from these cases as the "Reorganized Debtors."

11.    Lone Wolfe was served with a copy of the Plan on June 14, 2016.  <u>See</u>

Affidavit of Service, at Exhibit A/B, p. 53 of 95 (Docket No. 2662).

12.    Pursuant to the Plan, as of the Effective Date, all parties holding a claim

against the Debtors forever released, waived and discharged all liabilities in any way relating to a

5

Debtor that such party has, had or may have against, among others, employees of the Debtors

serving on or after the Petition Date.  Such release, however, is subject to the standard carve-out

that appears in most Chapter 11 plans for actions or omissions determined to have constituted

gross negligence or willful misconduct.[4]

> 13.      Specifically, Article III.E.6.b of the Plan states, in part, that:

> ***[e]ach holder of a Claim or Interest, to the fullest extent
> permissible under law, will be deemed to forever release, waive
> and discharge all Liabilities in any way relating to a Debtor***, the
> Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits
> or the Disclosure Statement ***that such Person has, had or may
> have against any Released Party*** (which release will be in addition
> to the discharge of Claims and termination of Interests provided
> herein and under the Confirmation Order and the Bankruptcy
> Code); ***provided, however***, that ***the foregoing provisions shall not
> affect the liability of any Released Party that*** otherwise would
> ***result from*** any act or omission to the extent that act or omission is
> determined in a Final Order to have constituted ***gross negligence
> or willful misconduct*** . . . ."

Plan at § III.E.6.b (emphasis added).  This same release provision is set forth in paragraph 33 of

the Confirmation Order.  See Confirmation Order at ¶ 33.

> 14.      As set forth in Sections I.A.205 and I.A.213, the Plan defines a Released

Party to include, among others, the Debtors' employees serving on or after the Petition Date.

See Plan at § I.A.205 (providing that Released Parties includes, among others, "Representatives"

of the Debtors); id. at § I.A.213 (providing that Representatives includes, among others,

employees serving on or after the Petition Date).

---

[4]     See In re Health Diagnostic Laboratory, Inc., 551 B.R. 218, 234 (Bankr. E.D. Va. 2016) (finding a release
provision in a Chapter 11 plan appropriate where the estates "remain appropriately protected by the
reasonable carve out set forth in the Liquidating Plan for claims involving willful misconduct or gross
negligence").

15.    Confirmation of the Plan also operates as an injunction against creditors and other parties holding claims against the Debtors from taking certain actions against Released Parties with respect to such claims, including, but not limited to, "commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any Released Party, or the respective assets or property thereof." See id. at III.E.5; Confirmation Order at ¶ 52.

16.    Section VIII of the Plan provides that this Court retains exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including issues related to the releases and enforcement of the Plan injunction.  Specifically, Section VIII of the Plan provides, in relevant part, that the "Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law," including, among other things, jurisdiction to:

F.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all . . . releases . . . entered into . . . in connection with the Plan . . . .;

G.    Resolve any cases, controversies, suits or disputes that may arise in connection with the . . . interpretation or enforcement of the Plan or any . . . release . . . that is entered into . . . pursuant to the Plan, including . . . any Person's rights arising from or obligations incurred in connection with the Plan;

I.    Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan, [and] the Confirmation Order . . . .;

K.    Determine any other matters that may arise in connection with or relate to the Plan . . . or any release . . . entered

into . . . in connection with the Plan . . . or the Confirmation Order . . . .;

L.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases . . . .

17.      On or about August 2, 2016, Lone Wolfe was served with the *Notice of (I) Entry of Order Confirming the Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession and Occurrence of the Effective Date of the Plan*, notifying Lone Wolfe that, among other things, the Effective Date of the Plan was July 26, 2016.  See Affidavit of Service, at Exhibit E, p. 964 of 1782 (Docket No. 3268).

18.      Johnson, as an employee of the Debtors serving on and after the Petition, is a Released Party and any claims against Johnson relating in any way to the Debtors were discharged and enjoined under the Plan and Confirmation Order, unless it is determined that such claims are based on willful misconduct or gross negligence.

19.      On June 28, 2018, this Court entered its Order closing the Chapter 11 Cases (Docket No. 4119) (the "Order Closing Cases").

**B.      The Construction Agreement and Claims By and Between Debtor Brooks Run and Lone Wolfe**

20.      On or about November 19, 2013, Lone Wolfe and Debtor Brooks Run Mining Company, LLC ("Brooks Run") entered into that certain Construction Agreement (the "Construction Agreement").  Pursuant to the Construction Agreement, Brooks Run engaged Lone Wolfe as an independent contractor to perform certain construction work at the Sumter Mine Area, located near Ebacan, Webster County, West Virginia.  A true and accurate copy of the Construction Agreement is attached as Exhibit 2 to this Objection.

21.    Pursuant to the Construction Agreement, and prior to the Petition Date, Lone Wolfe performed work for Brooks Run constructing a haul road at the Sumter Mine Area (the "Haul Road Project").

22.    On May 19, 2015, Brooks Run filed a complaint (the "Brooks Run Complaint") against Lone Wolfe in the Circuit Court of Webster County, West Virginia, captioned *Brooks Run Mining Co., LLC v. Lone Wolfe Natural Resources Services, Inc.*, Case No. 15-c-16 (the "Brooks Run Lawsuit"), alleging that Lone Wolfe materially breached the Construction Agreement in connection with the Haul Road Project.  As a result of Lone Wolfe's material breach, the Brooks Run Complaint alleges that Brooks Run suffered damages, including, but not limited to, (i) issuance of violations by the West Virginia Department of Environmental Protection and (ii) additional and excess costs of hiring another vendor to correct and complete work that Lone Wolfe was contractually obligated to perform.

23.    On August 20, 2015, after being informed by counsel for Lone Wolfe of these Chapter 11 Cases, the Circuit Court of Webster County entered an Order striking the Brooks Run Lawsuit from its docket without prejudice.  Neither the Debtors nor Reorganized Debtors have taken any additional action to pursue the Brooks Run Lawsuit.

24.    On or about February 19, 2016, Lone Wolfe filed Claim No. 6907 (the "Proof of Claim") in these Chapter 11 Cases, in the amount of $141,606.10, asserting a general unsecured claim against the Debtors based on unpaid invoices for the Haul Road Project  A true and accurate copy of the Proof of Claim is attached as Exhibit 3 to this Objection.

25.    On December 19, 2017, the Reorganized Debtors accepted and designated the Proof of Claim for allowance as a Category 1 General Unsecured Claim (as defined in the Plan).  See Reorganized Debtors' Fifth Notice of Designation of Allowed Claims

9

(Docket No. 4040).   The Reorganized Debtors subsequently mailed Lone Wolfe distribution payments in full and final satisfaction of its allowed claim in accordance with the Plan and Order Closing Cases.  As of the date hereof, such distribution payments remain uncashed.

### C.    Lone Wolfe's Complaint Against Johnson

26.      On or about January 15, 2016, Lone Wolfe filed the complaint (the "Complaint") against Johnson in the Circuit Court of Nicholas County, West Virginia, captioned *Lone Wolfe Natural Resources Services, Inc. v. Arley Johnson*, Case No. 16-C-6.

27.      By the Complaint, Lone Wolfe asserts that, on or after November 19, 2013, it entered into the Construction Agreement with Brooks Run for purposes of engaging Lone Wolfe to perform construction work at the Sumter Mine Area near Ebacon, West Virginia. See Complaint at ¶ 3.

28.      Johnson is not a party to the Construction Agreement.  Johnson was an engineer employed by Debtor Maxxim Shared Services LLC ("Maxxim") on and after the Petition Date.[5]  Maxxim provided shared services to Brooks Run and other Debtors.

29.      Lone Wolfe admits in the Complaint that Johnson "at all times relevant hereto, was an agent or employee of . . . Brooks Run."  See id. at ¶ 4; see also id. at ¶ 11 (providing that Lone Wolfe submitted an invoice to Johnson "in his capacity as an employee of Brooks Run").  Nowhere does the Complaint allege that Johnson was acting in his individual capacity or outside the scope of his employment.  Given that the alleged claim arose in the scope of Johnson's employment with the Debtors, the Debtors and subsequently the Reorganized Debtors are indemnifying Johnson for fees and expenses incurred defending against Lone Wolfe.

---

[5]      After the Effective Date, Johnson was employed as an engineer by Reorganized Debtor Maxxim Shared Services LLC.  Johnson has since chosen to leave his employment with the Reorganized Debtors.

30.     The Complaint alleges that Johnson, as an employee and agent of Brooks

Run:  (1) failed and refused to authorize payments under the Construction Agreement to be made

by Brooks Run to Lone Wolfe, resulting in Lone Wolfe never being paid for its services under

the Construction Agreement, and (2) arranged for a contractor "unrelated to Lone Wolfe" to

perform work on the project, which work had been assigned to Lone Wolfe in the Construction

Agreement.  See id. at ¶¶ 15, 18, 19, 21, 22 and 24.  The Complaint asserts that hiring the

unrelated contractor allegedly interfered with Lone Wolfe's efforts to do its work under the

Construction Agreement.  See id. at ¶ 25.  The Complaint concludes that the foregoing actions by

Johnson were committed by him "with malice toward Lone Wolfe and constituted tortious

interference by Johnson with Lone Wolfe's construction agreement contract with Brooks Run."

See id. at ¶ 26.

31.     The Complaint alleges that Johnson's actions "caused Lone Wolfe to be

denied income under the said construction agreement to which Lone Wolfe was and is entitled in

the amount of $160,000."  See id. at ¶ 27.

32.     On or about February 18, 2016, Johnson filed a *Notice of Removal*

removing Lone Wolfe's action to the District Court for the Southern District of West Virginia, as

Civil Action No. 2:16-cv-1701 (the "District Court Action").

33.     In response to a motion to dismiss filed by Johnson, on March 18, 2016,

the District Court for the Southern District of West Virginia (the "District Court") issued its

*Memorandum Opinion and Order* (District Court Action, Docket No. 7) staying the action

pending the conclusion of these Chapter 11 Cases, although noting that Lone Wolfe failed to file

a timely response to the motion to dismiss.  A true and accurate copy of the *Memorandum*

*Opinion and Order* is attached as Exhibit 4 to this Objection.  Notably, the District Court found

11

that, based on the allegations in the Complaint, "Johnson is being sued in his capacity as an agent for Brooks Run." See *Memorandum Opinion and Order* at p. 6. The District Court also held that finding Johnson liable for the actions and inactions asserted in the Complaint "amounts to findings Brooks Run is liable because, as Lone Wolfe alleges, Johnson acted and failed to act in his capacity as an agent for Brooks Run." See id. at p. 7.

34.    On or about March 19, 2016, Lone Wolfe filed a motion in the District Court to remand the action to the Circuit Court of Nicholas County, West Virginia and memorandum in support thereof (the "Memorandum in Support") (District Court Action, Docket Nos. 8 and 9). A true and accurate copy of the Memorandum in Support is attached as Exhibit 5 to this Objection. In the Memorandum in Support, Lone Wolfe asserts that it filed the Complaint against Johnson because Johnson allegedly "engaged in tortious interference with a written construction agreement between Lone Wolfe and Brooks Run . . . that damaged Lone Wolfe's business and financial interests." See Memorandum in Support at p. 1. ***Lone Wolfe asserts* that "*[s]pecifically, on multiple occasions [Johnson] failed and/or refused to authorize payment of invoices submitted by Lone Wolfe to Brooks Run for work and services performed under the specific directions and instructions of [Johnson] and services for which [Johnson] acknowledged Lone Wolfe was owed payment*." See id. at pp. 1-2 (emphasis added). Lone Wolfe further contends that "*[w]hile performing supervisory duties for Brooks Run, [Johnson] also arranged for a contractor unrelated to Lone Wolfe to enter into and perform work on the project which had previously been assigned to Lone Wolfe pursuant to its agreement with Brooks Run.*" See id. at p. 2 (emphasis added). The District Court subsequently entered an Order denying the motion to remand because it stayed the District Court Action (District Court Action, Docket No. 10).

12

35.     On or about June 15, 2017, Lone Wolfe filed a motion in the District Court, along with a memorandum in support (District Court Action, Docket Nos. 13 and 14) (together, the "Lift Stay Motion"), asking the District Court to lift its stay of the District Court Action.  Lone Wolfe asserts in the Lift Stay Motion that it had not received any payment on its claim in the Chapter 11 Cases and, therefore, "there is no possibility that Lone Wolfe's claim against Mr. Johnson has been satisfied, in part or in whole, by payments from Alpha Natural Resources, Brooks Run, or Maxxim."  See Lift Stay Motion at ¶ 6.

36.     Bankruptcy counsel to the Reorganized Debtors first learned of the District Court Action and Lone Wolfe's Complaint against Johnson after Lone Wolfe filed the Lift Stay Motion.  On June 28, 2017, bankruptcy counsel to the Reorganized Debtors emailed counsel to Lone Wolfe (the "June 28th Email") demanding that Lone Wolfe immediately withdraw the District Court Action because Lone Wolfe's claim against Johnson was discharged and released under the Plan in the Chapter 11 Case.  The June 28th Email further explains that the Reorganized Debtors submit that any action by Lone Wolfe to enforce the claim against Johnson is in violation of the Plan injunction.   A true and accurate copy of the June 28th Email is attached as Exhibit 6 to this Objection.

37.     On July 14, 2017, the District Court entered an Order (District Court Action, Docket No. 20) denying the Lift Stay Motion because this Bankruptcy Court "maintains exclusive jurisdiction over the enforcement of the Chapter 11 plan at issue," and Lone Wolfe "represented that it intends to move [this Bankruptcy Court] for interpretation of the plan to determine whether its claim is barred."

38.     Despite its representation to the District Court, Lone Wolfe failed to take any additional action to pursue the Complaint.  On August 16, 2018 (over a year after Lone

13

Wolfe represented it would seek relief from this Court), the District Court entered an Order (District Court Action, Docket No. 21) requesting a joint status report by September 12, 2018.

39.    On September 12, 2018, Lone Wolfe and Johnson filed their *Joint Status Report of the Parties* (District Court Action, Docket No. 22) (the "Joint Status Report") with the District Court.  A copy of the Joint Status Report is attached as Exhibit 7 to this Objection.  By the Joint Status Report, (i) Johnson maintains that Lone Wolfe's claim in the District Court Action was discharged and enjoined under the Plan and (ii) Lone Wolfe represents that it anticipates filing pleadings in this Bankruptcy Court "within a few days."   The District Court subsequently entered an Order directing the parties to file a second joint status report by December 21, 2018 (District Court Action, Docket No. 23).[6]

40.    For more than 18 months following entry of the District Court's Order denying the Lift Stay Motion, Lone Wolfe failed to take any action with in this Court, or to otherwise pursue the Complaint, until it filed the Motion to Reopen with this Court on December 11, 2018 (Docket No. 4172).[7]

---

[6]    Lone Wolfe and Johnson filed their second joint status report, on December 21, 2018 (District Court Action, Docket No. 24), informing the District Court that Lone Wolfe filed the Motion to Reopen.

The Reorganized Debtors suspect that Lone Wolfe only is taking action now because the District Court requested the status report by December 21, 2018.  Having neglected to seek relief from this Court for the past 18 months, the Reorganized Debtors believe Lone Wolfe is using the Motion to Reopen, and threat of an evidentiary hearing before this Court on whether its alleged claim against Johnson is discharged, as its final attempt to gain leverage to force a settlement on its prepetition claim against a Debtor.  Put plainly, Lone Wolfe's objective is to circumvent and undermine Orders of this Court and bankruptcy law to improperly coerce a settlement that will increase the distribution on its Proof of Claim.  The Reorganized Debtors will not succumb to such perverse pressure, and submit the Court should not condone Lone Wolfe's inappropriate and dilatory tactic and deny the Motion to Reopen.

[7]    By the Motion to Reopen, Lone Wolfe seeks to reopen these Chapter 11 Cases to permit Lone Wolfe to commence an adversary proceeding against Brooks Run and Johnson for a declaratory judgment that Lone Wolfe's claims against Johnson are not discharged and enjoined under the Plan.  While the Reorganized Debtors believe that the Motion to Reopen should be denied, if the Court disagrees, the Reorganized Debtors submit that commencement of an adversary proceeding here is neither necessary nor appropriate under Bankruptcy Rule 7001.  Instead, Lone Wolfe should simply move this Court, pursuant to section 105 of the Bankruptcy Code, for a determination regarding whether its alleged claim against Johnson was

14

## ARGUMENT

### A.    Cause Does Not Exist To Reopen These Cases to Consider Lone Wolfe's Request for Relief

41.    Lone Wolfe has failed to establish cause to reopen these Chapter 11 Cases.

42.    Section 350(b) of the Bankruptcy Code provides: "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b).  Here, Lone Wolfe does not argue that these cases should be reopened "to administer assets" or "to accord relief to the debtor."  Lone Wolfe's request is predicated entirely on the "for other cause" prong of section 350(b).

43.    In analyzing section 350(b), the Fourth Circuit has adopted a discretionary approach to reopening, allowing the court to consider the totality of the circumstances in each particular case.  See Hawkins v. Landmark Fin. Co. (In re Hawkins), 727 F.2d 324, 326 (4th Cir. 1984).  With that in mind, the Bankruptcy Court for the Eastern District of Virginia has held that *a court should reopen a case* "*only upon a showing of compelling circumstances*." In re Mutts, 131 B.R. 306, 307 (Bankr. E.D. Va. 1991) (emphasis added).  In particular, *a court should not reopen a case* "*where it appears that to do so would be futile and a waste of judicial resources*." In re Carberry, 186 B.R. 401, 402 (Bankr. E.D. Va. 1995) (emphasis added).  As Judge St. John held, in In re Cutright, "if reopening a case would be futile

---

(continued…)

discharged and enjoined by the Plan and Confirmation Order.  See, e.g., Kalikow v. Solow (In re Kalikow), 602 F.3d 82, 93 (2d Cir. 2010) (holding that the enforcement of a pre-existing injunction can be resolved through a "motion as a contested matter rather than through an adversary proceeding"); In re WorldCorp, Inc., 252 B.R. 890, 895 (Bankr. D. Del. 2000) ("[A]n adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained.").

because the moving party could not achieve the objective underlying the motion to reopen, the motion should be denied." 2012 WL 1945703, at *4 (Bankr. E.D. Va. May 30, 2012); see also Horizon Aviation of Va., Inc. v. Alexander, 296 B.R. 380, 382 (E.D. Va. 2003) (observing that there must be a compelling cause to justify reopening a bankruptcy case and concluding that "[t]here is no cause if reopening would serve no purpose").

44.    Furthermore, although the Court has discretion in reopening a case for cause, the burden on establishing such cause rests with the party seeking the reopening.  In re Hardy, 209 B.R. 371, 374 (Bankr. E.D. Va. 1997).

45.    In discussing the gravity of reopening a bankruptcy case, the Fourth Circuit has stated that:

> [R]e-opening defeats one of the major purposes of the Bankruptcy Act; to stabilize an insolvent debtor's financial position at the time of the filing of the petition, to relieve him of his existing financial burdens, and to provide his then assets for the relief of his creditors. ***Re-opening removes the element of certainty from the adjudication and settlement of the estates.  It is as essential to the creditors as it is desirable to the bankrupt that this element of certainty be destroyed only for the most compelling cause.***

Reid v. Richardson, 304 F.2d 351, 355 (4th Cir. 1962) (emphasis added).  Among the factors courts consider when making a determination under section 350(b) are whether the movant can obtain the relief sought, as a matter of law, in its primary motion and prejudice that reopening would cause.  See, e.g., Reid, 304 F.2d at 355; In re Wilson, 492 B.R. 691, 695 (Bankr. S.D.N.Y. 2013) (listing the factors and denying the motion to reopen because "it is clear at the outset that no relief to the [movant] would be forthcoming if the case was reopened"); In re Frazer/Exton Dev., L.P., 503 B.R. 620, 643 (Bankr. E.D. Pa. 2013) (holding that no purposes would be served by reopening the bankruptcy cases "because, as a matter of law, [the movant] cannot satisfy the

standard required for such an action"); see also Horizon Aviation, 296 B.R. at 382 (citing

Carberry, 186 B.R. at 403).

46.     Here, Lone Wolfe has not, and cannot, meet its burden to demonstrate

that there is compelling cause to reopen these cases to determine whether its cause of action

against Johnson is discharged and enjoined by the Plan.  As set forth below, Lone Wolfe cannot

obtain the relief sought as a matter of law, and reopening the cases would be highly prejudicial to

the Reorganized Debtors.

47.     The Reorganized Debtors submit that case law provides the Court should

not hold a mini-trial on Lone Wolfe's underlying request for relief in connection with the Motion

to Reopen, but instead should simply ask whether, as a matter of law, Lone Wolfe is entitled to

such relief.  See, e.g., In re Cutright, 2012 WL 1945703, at *4 (Bankr. E.D. Va. 2012) ("A

court's inquiry into the substance of the underlying relief sought by the moving party for the

purpose of determining whether sufficient cause exists to justify reopening should not, however,

devolve into a de facto ruling on the merits.") (citing Lopez v. Specialty Rests. Corp. (In re

Lopez), 283 B.R. 22, 28 (B.A.P. 9th Cir. 2002) ("[T]he decision whether to reopen should not

become a battleground for litigation of the underlying merits.")).  As explained below, the

answer to whether Lone Wolfe is entitled to the underlying relief as a matter of law plainly is

"no."

   **(i)**   ***Lone Wolfe Cannot Obtain the Relief It Seeks Against Johnson as a Matter of Law***

48.     The allegations that form the basis for Lone Wolfe's claim occurred in

West Virginia and, therefore, West Virginia law applies, including to any determination by this

Court regarding whether Lone Wolfe's claim constitutes gross negligence or willful misconduct

(if the Court agrees to reopen these Chapter 11 Cases to make such a determination).  See, e.g.,

In re Philadelphia Newspapers, LLC, 450 B.R. 99, 104 (Bankr. E.D Pa. 2011) (applying

applicable state law to determine whether claims brought post-confirmation constituted gross

negligence or willful misconduct so as to be exempt from the plan releases).

49.     Reopening the cases to consider whether Lone Wolfe's claims against

Johnson asserted in the Complaint were discharged and enjoined under the Plan would be a

waste of this Court's resources because Lone Wolfe's claims against Johnson fall woefully short

of gross negligence or willful misconduct and are not actionable either in contract or tort as a

matter of West Virginia law.

> ### (a)     The Mere Statements that Johnson's Actions Were Committed "with Malice Toward Lone Wolfe and Constitute Tortious Interference" by Johnson Do Not Constitute Gross Negligence or Willful Misconduct

50.     While Lone Wolfe states generally in the Complaint that Johnson's

actions were committed "with malice toward Lone Wolfe and constituted tortious interference by

Johnson with Lone Wolfe's construction agreement contract with Brooks Run," that is not

sufficient to circumvent the Plan injunction.  Such conclusory allegations are insufficient to

demonstrate gross negligence or willful misconduct.

51.     West Virginia law "recognizes a distinction between negligence,

including gross negligence and wilful [sic], wanton and reckless misconduct."  Mandolidis v.

Elkins Indus., 246 S.E.2d 907, 913 (W. Va. 1978).   As the Fourth Circuit noted in Rutecki v.

CSX Hotels, Inc., "[w]hile the West Virginia Supreme Court of Appeals has never provided its

own definition of gross negligence, it has interpreted Virginia law to define gross negligence as

the 'degree of negligence which shows an utter disregard of prudence amounting to complete

neglect of the safety of another.'"  290 Fed.Appx. 537, 542-43 (4th Cir. 2008) (citing Dodrill v.

18

Young, 102 S.E.2d 724, 730 (W. Va. 1958)).  The Fourth Circuit found that "Virginia courts have further defined gross negligence as 'an utter disregard of prudence, amounting to complete neglect of the safety of another, such as to be shocking to reasonable men.'"  Id. at 543 (citing Finney v. Finney, 125 S.E.2d 191, 193 (Va. 1962)).

52.    Furthermore, as held by the District Court of the Eastern District of Virginia, "[w]hether conduct constitutes gross negligence is generally a question of fact, not of law, but a party claiming gross negligence must plead facts that, if true, show that the defendant was grossly negligent."  Sykes v. Bayer Pharm. Corp., 548 F. Supp. 208, 217 (E.D. Va. 2008). In Sykes,  the court held that mere conclusory allegations that defendant was "grossly negligent because it willfully, wantonly, recklessly, and heedlessly disregarded [the plaintiff's] safety" are insufficient to state a claim for gross negligence or willful misconduct."  Id.

53.    Although not based on an interpretation of West Virginia law, in Oaktree Capital Mgmt., L.P. v. Mudd (In re Shengda Tech, Inc.), the District Court for the District of Nevada affirmed a decision by the bankruptcy court holding that a similar claim was barred by a plan injunction because it was for simple negligence rather than gross negligence.  As in the present case, the Oaktree plan contained an exception to the injunction for claims alleging "gross negligence" or "willful misconduct."  2015 U.S. Dist. LEXIS 118525, at *7-8 (D. Nev. Sept. 3, 2015).  The court agreed with the bankruptcy court that the state court action, which made a claim of negligence misrepresentation but never used the words "gross" or "willful," was a claim for only simple negligence and was insufficient to qualify for the exception to the Plan injunction. Id.

54.    Here, at no point in the Complaint does Lone Wolfe allege in any manner that Johnson's actions constituted gross negligence or willful misconduct, nor does Lone assert

facts sufficient to make such a finding.  The Complaint simply lacks any allegation remotely

suggesting that Johnson's actions, as an employee of a Debtor toward a Debtor's vendor, would

even be the least bit shocking to a reasonable person.

55.     Lone Wolfe, therefore, has not and cannot demonstrate that cause exists

to reopen these Chapter 11 Cases to burden the Reorganized Debtors and their employee with an

evidentiary hearing to determine whether a cause of action (that plainly is based on a prepetition

claim against the Debtors) qualifies for an exception to the Plan injunction.    Put simply, no

grounds exist for finding that the Complaint falls within the exception to the Plan injunction.

> **(b)     *Because the "Gist of the Action" is for Breach of Contract, Lone Wolfe's Claim Against Johnson Cannot Be Recast, or Converted into, a Cause of Action for Tort***

56.     Lone Wolfe's cause of action against Johnson for alleged tortious

interference also fails under West Virginia law because it plainly is a contract action. The

Complaint makes it repetitiously clear that Lone Wolfe is complaining of breach of the

Construction Agreement, resulting in loss of "income under the said construction agreement."

See Complaint at ¶ 27.

57.     Established West Virginia case law provides that Lone Wolfe cannot add

conclusory tort allegations, such as "malice" and "tortious interference" and convert the contract

action to a tort.  Specifically, West Virginia courts have adopted the "gist of the action doctrine,"

which is designed "to prevent the recasting of a contract claim as a tort claim."  See Gaddy

Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP, 746 S.E. 2d 568, 577 (W. Va.

2013).  Under the gist of the action doctrine, a tort claim "will not arise for breach of contract

unless the action in tort would arise independent of the existence of the contract." Syl. pt. 9,

Lockhart v. Airco Heating & Cooling, Inc., 567 S.E.2d 619, 620 (W. Va. 2002); Cochran v.

Appalachian Power Co., 246 S.E.2d 624, 628 (W. Va. 1798) ("If the action is not maintainable

without pleading and proving the contract, where the gist of the action is the breach of the

contract, either by malfeasance or non-feasance, it is, in substance, an action on the contract

whatever may be the form of the pleading.").

        58.     The Supreme Court of Appeals of West Virginia held that "recovery in

tort will be barred" where ***any*** of the following four factors are present:

> (1) where liability arises solely from the contractual relationship
> between the parties;
>
> (2) when the alleged duties breached were grounded in the contract
> itself;
>
> (3) where any liability stems from the contract; and
>
> (4) when the tort claim essentially duplicates the breach of contract
> claim or where the success of the tort claim is dependent on the
> success of the breach of contract claim.

Gaddy, 746 S.E.2d at 577. "Succinctly stated, whether a tort claim can coexist with a contract

claim is determined by examining whether the parties' obligations are defined by the terms of the

contract." Id. (unequivocally holding that a plaintiff cannot recover in tort if the complaint does

no more than include "the bare bones averment that 'Defendants negligently . . . breached their

agreement with' the [plaintiff]"); see also Cochran, 246 S.E. 2d. at 628 (holding that adding tort

language such as "willfully, wantonly and negligently" to what essentially is a contract action

does not convert the action into a tort).

        59.     Although recovery in tort will be barred under West Virginia law when

any of the Gaddy factors exist, ***in the present case, all of the factors are present***.    First, the

alleged liability arises from the Construction Agreement between Lone Wolfe and Brooks Run.

Second, the Complaint plainly sets forth that the alleged duties breached arise from non-payment

of invoices under the Construction Agreement and, thus, were grounded in the Construction

Agreement itself.  Third, any liability for the claimed damages of $160,000 stem from the

Construction Agreement.  Fourth and finally, the alleged tort claim is duplicative of a breach of

contract claim.

60.      The Fourth Circuit recently – in Dan Ryan Builders, Inc. v. Crystal Ridge

Development, Inc. and Covol Fuels No. 4, LLC v. Pinnacle Mining Co. LLC – applied West

Virginia's gist of the action doctrine to bar plaintiffs from proceeding with contract claims recast

as torts.   Dan Ryan Builders, like the present case, involved a construction contract and

allegations of tortious wrongs.  783 F.3d 976 (4th Cir. 2015).  The alleged torts consisted of

negligence in performing two contracts.  The Fourth Circuit affirmed the opinion of the Northern

District of West Virginia and held, among other things, that the allegations of negligence did not

allege any breach of duty independent of the contract and, thus, was barred by West Virginia's

gist of the action doctrine.  See id. at 981-82; see also Blankenship v. Westfield Ins. Co., 2015

WL 2338619, at *3 (S.D. W. Va. May 13, 2015) (applying the gist of the action doctrine and the

four Gaddy factors, to bar a negligence claim:  "[s]imply put, [plaintiff] has failed to identify any

legal duty, other than the contract, from which [defendant's] alleged negligence could flow.

Failure to live up to a contractual obligation cannot alone be the basis of a tort claim").

61.      Similarly, in Covol Fuels, the Fourth Circuit affirmed a decision of the

Southern District of West Virginia granting summary judgment barring fraudulent concealment

and negligent misrepresentation claims under the gist of action doctrine, since both claims

sounded in contract.  785 F.3d 104, 116 (4th Cir. 2015).  In so holding, the Fourth Circuit found

that the tort claims were simply breach of contract claims "masquerading" as torts.  The court

specifically found that the plaintiff's allegations that the defendant had made misrepresentations

or concealed its intention regarding the water level of an impoundment simply recast the breach of contract claims as alleged torts.  Id.

62.    Lone Wolfe concludes in its Complaint, without explanation, that Johnson's failure to approve payments under the Construction Agreement and hiring of another contractor to do the work Lone Wolfe was engaged to perform under the Construction Agreement constituted "malice" and "tortious interference," but Lone Wolfe's alleged tort claims against Johnson arise "solely from the contractual relationship between the parties" and "essentially duplicate" breach of contract claims, in the words of Gaddy.  Accordingly, Lone Wolfe's claims against Johnson fail under West Virginia's gist of the action doctrine.

### (c)    Lone Wolfe's Claim Also Fails as a Matter of West Virginia Law Under the Well-Settled Rule that a Person Cannot Intentionally Interfere with His Own Contract

63.    Even if Lone Wolfe's claim against Johnson is not barred by the gist of the action doctrine (which it is), it would be barred by the established rule that a person cannot intentionally interfere with his own contract.  Therefore, an agent acting within the scope of his agency – like Lone Wolfe admits Johnson was doing here – cannot interfere with the contract of his principal.

64.    Specifically, "[t]o establish prima facie proof of tortious interference, a plaintiff must show:  (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of *interference by a party outside that relationship or expectancy*; (3) proof that the interference caused the harm sustained; and (4) damages."  Torbett v. Wheeling Dollar Sav. & Trust Co., 314 S.E. 2d. 166, 167 (W. Va. 1983) (emphasis added).

65.    West Virginia law supports the basic principle that a party cannot tortuously interfere with his own contract:

> It is impossible for one party to a contract to maintain against the other party to the contract a claim for tortious interference. Neither party is a stranger to the contract. Each party has agreed to be bound by the terms of the contract itself, and may not thereafter use a tort action to punish the other party for actions that are within its rights under the contract.

Shrewsbery v. National Grange Mut. Ins. Co., 395 S.E. 2d. 745, 747 (W. Va. 1990)

66.     This principal extends to employees and agents: "[i]t is very well established that the agent of a known and disclosed principal is not liable to one with whom he contracts for a breach of contract, provided he acts within the scope of his authority." Hoon v. Hyman, 105 S.E. 2d 925, 926 (W. Va. 1921). Furthermore, "[a] corporation cannot tortiously interfere with an agreement to which it is a party and accordingly, where an agent breaches a contract to which his principal is a party on behalf of his principal, no cause of action for tortious interference with regarding to such contract can be had." Cotton v. Otis Elevator Co., 627 F.Supp. 519, 522 (S.D. W. Va. 1986); see Panhandle Cleaning and Restoration, Inc. v. Nationwide Mut. Ins. Co., 2018 WL 3717108, at *2 (N.D. W. Va. Aug. 3, 2018) ("[A]n agent acting on behalf of his principal cannot be liable for tortious interference when his principal is a party to the contract."). An exception to this principal, however, is if the employee or agent was acting outside the scope of their employment or agency. See, e.g., Marcum & Assoc., Inc. v. Mack Trucks, Inc., 2011 WL 2489985, at *3 (S.D. W. Va. June 21, 2011) ("The agent is liable only if the third party with whom he has acted can demonstrate that the agent acted without authority or in excess of his authority.").

67.     Here, as set forth in the Complaint, Brooks Run was the only party to the Construction Agreement with Lone Wolfe and Johnson "at all times relevant hereto, was an agent or employee of the said Brooks Run Mining Company, LLC." See Complaint at ¶¶ 3 and 4. Lone Wolfe submitted an invoice to Johnson "in his capacity as an employee of Brooks Run."

24

See id. at ¶ 11. As the District Court already held "[f]inding that Johnson is liable for these actions and inactions amounts to finding that Brooks Run is liable because, as Lone Wolfe alleges, Johnson acted and failed to act in his capacity as an agent for Brooks Run." See *Memorandum Opinion & Order* at p. 7.  Lone Wolfe does not contend that Johnson, as agent for Brooks Run, acted without authority or in excess of his authority.  To the contrary, the Complaint specifically alleges that Johnson acted as an agent or employee of Brooks Run.

68.    Since Johnson was "at all times relevant," acting as agent and employee of Brooks Run, the tortious interference allegations of the Complaint fail as a matter of West Virginia law, even if they were not barred by the gist of the action doctrine.

69.    In short, Lone Wolfe's recast breach of contract claim against Johnson is that Johnson was, in effect, Brooks Run's gatekeeper under the Construction Agreement and in that capacity failed or refused to authorize payments.  This allegedly resulted in Lone Wolfe "never being paid for the said" Construction Agreement.  See Complaint at ¶ 27 ("The actions by Arley Johnson complained of herein above, caused Lone Wolfe to be denied income under the said construction agreement to which Lone Wolfe was and is entitled in the amount of $160,000.").  In other words, the reality is that Lone Wolfe's action against Johnson is nothing more than a thinly disguised effort to recover payment in full of its Proof of Claim from an employee of the Debtors.

### (ii)    Reopening the Chapter 11 Cases to Consider Whether A Vendor's Action Against an Employee, Which Is Based on a Prepetition Claim Against the Debtors, Is Discharged and Enjoined Would Be Highly Prejudicial

70.    Here, the Reorganized Debtors and Johnson will be prejudiced if the relief requested by Lone Wolfe is granted.  In particular for the Reorganized Debtors, and in addition to disturbing the finality of these closed cases, reopening the Chapter 11 Cases would

impose significant additional expenses and obligations on the Reorganized Debtors in direct contravention of their fresh start.

71.     Case law provides that a bankruptcy discharge and injunction are designed to "give the debtor a financial 'fresh start.'"  See, e.g., In re Jet Florida Systems, Inc., 883 F.2d 970, 972 (11th Cir. 1989) (citing Jackson, The Fresh-Start Policy in Bankruptcy Law, 98 Harv.L.Rev. 1393, 1396-97 (1985)).  Thus, "with the injunction, a discharge in bankruptcy may be more effective in preventing 'abuse by harassing creditors.'"  Id. (quoting H.R. Rep. No. 1502, 91st Cong., 2d Sess. at 1-2 (1970) [U.S. Code Cong. & Admin.News 1970, p. 4156]).

72.     As this Court previously noted in these Chapter 11 Cases with respect to the *exculpation and release provisions in the Plan*, such provisions *give "a certain measure of finality to the interested parties and their professionals, and assures them they will not be . . . hounded by meritless claims following the conclusion of the bankruptcy case*."  In re Alpha Natural Resources, Inc., 556 B.R. 249, 261 (Bankr. E.D. Va. 2016) (emphasis added); see also Health Diagnostic, 551 B.R. at 234 (holding with respect to the exculpation provision in the Chapter 11 plan, such liability protections are designed so released parties in a Chapter 11 plan "should not be subjected to future litigation involving . . . frivolous claims . . . .").

73.     In In re Chemtura Corp., the Bankruptcy Court for the Southern District of New York similarly noted the importance of exculpation and release provisions in Chapter 11 plans to protect released parties from being harassed by creditors who are upset about treatment of their claims in the bankruptcy case:

> *[E]xculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case.  Third-party releases, though perhaps to a lesser degree, have a similar purpose.*

26

439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (emphasis added).

74.    Moreover, courts have held that "*any* economic loss" incurred by a debtor as a result of creditor's post-discharge pursuit of a prepetition action would violate the discharge injunction.  See Perez v. Cumberland Farms, Inc., 213 B.R. 622, 623-24 (D. Mass. 1997) (emphasis added) (holding that a creditor could not pursue a lawsuit to recover a prepetition claim from insurance because the debtor might be required "to spend money to defend the lawsuit, thus frustrating the fresh-start policy embodied in the Bankruptcy Code" and that because the lawsuit "could cause [the debtor] monetary consequences, the logic of pertinent case law suggests that such a lawsuit should be prohibited"); see also DePippo v. Kmart Corp., 335 B.R. 290, 298 (S.D.N.Y. 2005) (agreeing that a claimant was not entitled to relief from the plan injunction and discharge to pursue insurance for a prepetition claim because the reorganized debtor would incur costs up to the self-insured retention:  "if the action against Kmart were permitted to proceed, it would have to pay litigation costs, which is contrary to the fresh start policy of the Bankruptcy Code"); Greiner v. Columbia Gas Transmission Corp. (In re Columbia Gas Transmission Corp.), 219 B.R. 716, 721 (Bankr. S.D. W. Va. 1998) (denying relief from the discharge injunction to pursue insurance for a prepetition claim because the reorganized debtor would incur expenses to defend:  "[r]equiring [the reorganized debtor] to pay the costs of litigating its liability on [creditor's] claim, which costs could be quite high, would violate the fresh-start policy of the Bankruptcy Code").

75.    At bottom, Lone Wolfe is asking this Court for a determination that it can pursue an action that fails as a matter of law against an employee of the Debtors (i.e., a Released Party) that is predicated entirely on Lone Wolfe's prepetition claim against the Debtors.  There is not a scintilla of support in the Complaint that Johnson's actions constitute gross negligence or

27

willful misconduct – only conclusory allegations.  This is precisely the type of frivolous claim against a Released Party by an abusive creditor that the Plan injunction is designed to prevent.

76.    In addition to the harassing nature of Lone Wolfe's cause of action on a Released Party, the Reorganized Debtors are indemnifying Johnson for fees and costs he incurs to defend against Lone Wolfe.  Accordingly, if Lone Wolfe's request is granted (more than 18 months after Lone Wolfe last took action to pursue the Complaint), the Reorganized Debtors will incur costs to indemnify Johnson to defend a meritless prepetition claim by the Debtors' vendor, including initially in connection with an evidentiary hearing before this Court to determine whether such claim is discharged.  This would be directly contrary to the Reorganized Debtors' fresh start.

77.    The Reorganized Debtors also would be obligated to pay quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) ("Quarterly Fees") during the time the case is reopened.  See In re Odin Demolition & Asset Recovery, LLC, 544 B.R. 615,634 (Bankr. S.D. Tex. 2016) (agreeing that the debtor would be prejudiced where reopening the case would obligate the debtor to pay quarterly fees to the U.S. Trustee).[8]

78.    Lastly, reopening these Chapter 11 Cases to allow Lone Wolfe to seek a determination that its cause of action against Johnson was not discharged also would undoubtedly risk opening the floodgates to allow similar requests from other creditors of the Debtors.  Indeed, more than 11,000 claims were filed in these Chapter 11 Cases.  See also Alpha Natural Resources, 556 B.R. at 259 (noting that the Debtors creditors "numbered in the tens of

---

[8]    The Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, amended the calculation of Quarterly Fees effective January 1, 2018, and increased Quarterly Fees.  In short, because total disbursements would exceed $1,000,000 or more, the Reorganized Debtors would be obligated to pay quarterly fees in the amount of $250,000 or 1% of such disbursements, whichever is less.

thousands"). As explained to this Court in the *Motion for Entry of a Final Decree and Order (I) Closing these Chapter 11 Cases; (II) Authorizing and Directing the Reorganized Debtors to (A) Make the Final Category 1 Distribution  and (B) Apply Any Unclaimed Distributions to the Reorganized ANR Contingent Revenue Payment; (III) Discharging the Claims Oversight Committee; and (IV) Terminating Kurtzman Carson Consultants, LLC as Claims, Ballot and Noticing Agent* (Docket No. 4106), the total amount of Allowed Category 1 General Unsecured Claims alone was $428,611,101.25 and the recovery for creditors holding such claims was 3%. Accordingly, the precedential impact of permitting a creditor of the Debtors to pursue an employee of the Debtors for what plainly is the payment of a prepetition claim against the Debtors, with only conclusory allegations of gross negligence or willful misconduct – including just reopening the Chapter 11 Cases to determine whether the action is discharged – cannot be overlooked in these Chapter 11 Cases and other large chapter 11 cases.

79.     On the other hand, Lone Wolfe will suffer no real prejudice if the Motion to Reopen is denied.  The Complaint plainly reveals that Lone Wolfe's cause of action entirely is based on its contract with, and Proof of Claim against, a Debtor.  Like all other creditors of the Debtors, Lone Wolfe's Proof of Claim was addressed pursuant to the claims process established by this Court.  Although Lone Wolfe may not be happy with the ultimate recovery, Lone Wolfe's Proof of Claim was allowed as a Category 1 General Unsecured Claim and fully satisfied in accordance with the with the Plan and Order Closing Cases.

**B.     Lone Wolfe's Motion to Reopen Is Barred By the Doctrine of Laches**

80.     Courts have recognized that the doctrine of laches may be a basis to deny a motion to reopen.  See, e.g., In re Kean, 207 B.R. 118, 123 (Bankr. D. S.C. 1996).  As stated by the court in Virgin Islands Bureau of Internal Revenue v. St. Croix Hotel Corporation:

> The consensus of authority holds that the most important consideration in deciding whether to reopen the case is the timeliness of the motion.  At the heart of this view is the doctrine of laches, which not only applies in bankruptcy proceedings but is an important consideration because the chief purpose of bankruptcy laws is to secure the prompt and effectual administration and settlement of the estate of all bankrupts within a limited period of time.

60 B.R. 412, 414 (D.V.I. 1986), aff'd, 867 F.2d 169 (3d Cir. 1989) (citations omitted).

81.    The Fourth Circuit has recognized that "[l]aches is sustainable only on proof of both of two elements:  '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'"  Mogavero v. McLucas, 543 F.2d 1081, 1083 (4th Cir. 1976) (quoting Costello v. United States, 365 U.S. 265, 282 (1961)).  In other words, "laches is applied where it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay."  Robins Island Pres. Fund, Inc. v. Southold Dev. Corp., 959 F.2d 409, 423 (2d Cir. 1992); see also Merrill Lynch Inc. Managers v. Optibase, Ltd., 337 F.3d 125, 132 (2d Cir. 1983) (to apply laches, it must be shown that the plaintiff "inexcusably slept on [his] rights").

82.    In In re Lundberg, the Bankruptcy Court for the Eastern District of Oklahoma held that a creditor was barred by the doctrine of laches from reopening the cases to determine whether a claim was discharged when the motion to reopen was filed only 3 months after the debtor was granted a discharge and the case was closed.  152 B.R. 316 (Bankr. E.D. Okla. 1993).  The court held that "[h]aving received notice of the case, [the claimant] could not sit idly by and wait the conclusion of the case without acting to have this Court determine the dischargeability of the particular debt."  Id. at 319.  The court further held that the claimant "failed to modify the automatic stay or otherwise participate in this Court during the course of the bankruptcy case.  To permit [the claimant] to do so now would be to permit a creditor to rest

30

on his rights and obligations without even recognizing the existence of the bankruptcy case. This we shall not permit." Id.

83.    Similarly, here, the doctrine of laches should bar Lone Wolfe from reopening these Chapter 11 Cases to seek a determination that its alleged claim against Johnson is discharged. Lone Wolfe cannot offer a credible excuse for waiting ***30 months from entry of the Confirmation Order*** and ***18 months from the time it represented to the District Court that it intended to seek relief from this Court*** to file the Motion to Reopen. Indeed, Lone Wolfe made this representation to the District Court approximately ***12 months before this Court closed these Chapter 11 Cases***. Lone Wolfe was served with the Plan in June 2016 (***31 months before it sought relief in this Court regarding whether its claim against a Released Party was discharged and enjoined by the Plan***), which included the language discharging and enjoining claims against employees of the Debtor unless such claims are based on gross negligence or willful misconduct. Lone Wolfe then was served with Notice of the Effective Date of the Plan in August 2016 (***29 months before it sought relief in this Court***). Counsel to Lone Wolfe subsequently was informed by bankruptcy counsel to the Reorganized Debtors in June 2017 (***19 months before it sought relief in this Court***) that Lone Wolfe's claim against Johnson was discharged and enjoined in the Chapter 11 Cases.

84.    Put plainly, Lone Wolfe had ample opportunity to seek a determination from this Court regarding whether its meritless claim against Johnson was discharged during the pendency of these now-closed bankruptcy cases. Yet, Lone Wolfe did not. Failure to promptly take action with the Bankruptcy Court suggests that Lone Wolfe also does not believe it has a valid cause of action against Johnson, and the Motion to Reopen simply is Lone Wolfe's latest

attempt to inappropriately pressure the Reorganized Debtors to settle and increase the distribution on its Proof of Claim.

85.    At this time, the Reorganized Debtors have fully administered the Debtors' estates, closed these cases and are focused on operating their businesses.  As set forth above, there would be substantial prejudice to the Reorganized Debtors' fresh start if these cases are reopened to permit Lone Wolfe to burden the Reorganized Debtors and Johnson at this late date with an evidentiary hearing to determine whether a prepetition cause of action against an employee of the Debtors – that is based entirely on its contract with the Debtors – was released under the Plan.

86.    That Lone Wolfe failed to timely seek relief from this Court regarding whether its alleged claim against Johnson is discharged is reason enough for the Court to refuse to reopen these cases.

**C.     If the Court Agrees that the Cases Should be Reopened for Lone Wolfe, It Should Condition and Limit Such Relief to Minimize Prejudice to the Reorganized Debtors.**

87.    If this Court is inclined to reopen these cases to consider whether Lone Wolfe's claim against Johnson was discharged and enjoined, the Reorganized Debtors request that the Court condition such relief on Lone Wolfe paying any and all Quarterly Fees that may be owed if these cases are opened to consider such relief . See McKinstry v. Richard Homes Enters., LLC (In re Black Diamond Mining Co., LLC), 2016 Bankr. LEXIS, at *9 (Bankr. E.D. Ky. June 16, 2016) ("[W]hen reopening a case would place an unfair financial burden on the other side, the bankruptcy court may condition reopening on the moving party's agreement to reimburse the other side's fees and costs."); In re Oglesby, 519 B.R. 699, 706 (Bankr. N.D. Ohio 2014) (requiring the party moving to reopen the bankruptcy case to reimburse the nonmovant's fees

and costs because "the nature of the prejudice experienced by [the non-movant] is of a type subject to cure by reimbursement"); In re Berry, 190 B.R. 486, 489 (Bankr. S.D. Ga. 1995) (holding that if a bankruptcy court finds that reopening would be prejudicial to the other party, the [c]ourt may condition the reopening of a case on alleviation of such prejudice").

88.    While the Reorganized Debtors believe that cause does not exist to reopen these cases, the Reorganized Debtors submit that, in order to minimize prejudice on the Reorganization Debtors, Lone Wolfe should be required to pay any Quarterly Fees that may accrue if these cases are reopened for this Court to consider Lone Wolfe's request for relief at this late date.[9]

89.    In addition, the Reorganized Debtors also request that if the Court enters an order approving the Motion to Reopen, any such order should provide that (i) only the lead case of Alpha Natural Resources, Inc., Case Number 15-33896 (KRH), shall be reopened and such case shall only be reopened for the limited purpose of considering and addressing Lone Wolfe's request for relief, and (ii) the case shall be closed automatically and without the need for further order of the Court upon the Court entering a dispositive order regarding such relief.  The Reorganized Debtors submit that such provision is necessary and appropriate to avoid prejudice to the Reorganized Debtors given that these cases already have been closed by prior Order of this Court.  In particular, any other party that intends to seek relief in these cases at this late stage should also have to demonstrate that it satisfies the standard set forth in section 350 of the Bankruptcy Code and applicable law to reopen these cases.

---

[9]    To minimize (or eliminate) any Quarterly Fees, the Court also could enter any dispositive orders regarding the Motion to Reopen and Lone Wolfe's primary request for relief on the same day and, thus, limit the amount of time that these cases would be reopened.

90.    Bankruptcy courts have granted similar relief in other cases.  See, e.g., In re Patriot Coal Corp., Case No. 12-51502 (KAS) (Bankr. E.D. Mo. Oct. 9, 2015) (Docket No. 5648) (providing that the chapter 11 case be reopened "for the limited purpose of allowing Peabody to file its adversary proceeding seeking interpretation of the Peabody Settlement Order on Peabody and UMWA in light of Debtors' inability to continue under the terms of the Peabody Settlement Agreement");  In re Chemtura Corp., Case No. 09-11233 (JLG) (Bankr. S.D.N.Y. July 21, 2016) (Docket No. 5894) (providing that the chapter 11 case (i) be temporarily reopened for the limited purpose of considering the motion for relief and (ii) would be closed automatically and without the need for any further order upon the bankruptcy court entering a dispositive order on the motion for relief); In re Lazy Days' RV Center, Inc., Case No. 09-13911 (KG) (Bankr. D. Del. June 16, 2011) (Docket No. 166) (providing that the chapter 11 cases (i) be reopened for the limited purpose of adjudicating the motion for relief and enforcing the confirmation order and plan, and (ii) shall be closed upon the expiration of the appeal period for the motion for relief without the need for further order of the bankruptcy court); In re The New York Racing Ass'n Inc., Case No. 06-12618 (JMP) (Docket No. 1175) (granting the debtor's motion to reopen the chapter 11 case for the limited purpose of (i) clarifying and, if necessary, amending the court's *Order Authorizing the Employment of Getnick & Getnick as Special Business Integrity Counsel to NYRA*, dated September 19, 2007, and (ii) addressing claims, if any, associated therewith).

## Conclusion and Reservation of Rights

91.    For the reasons set forth above, the Reorganized Debtors respectfully submit that the Court should deny the Motion to Reopen.   To the extent the Court is not inclined to deny the Motion to Reopen, the Reorganized Debtors request any order approving the Motion

34

to Reopen provide that (i) Lone Wolfe shall pay any U.S. Trustee's quarterly fees that may be owed as a result of reopening these cases, (ii) only the lead case of Alpha Natural Resources, Inc., Case Number 15-33896 (KRH), shall be reopened and such case shall only be reopened for the limited purpose of considering and addressing Lone Wolfe's request for relief, and (iii) the case shall be closed automatically and without the need for further order of the Court upon the Court entering a dispositive order regarding such relief

92.     The Reorganized Debtors expressly reserve their right to amend, modify, or supplement this Objection and to raise any additional arguments and present evidence at any hearing concerning the Motion to Reopen and the Objection.

WHEREFORE, the Reorganized Debtors respectfully request that the Court: (i) sustain this Objection, and (ii) grant such other and further relief to the Reorganized Debtors as the Court may deem proper.

Dated: January 9, 2019
      Richmond, Virginia

Respectfully submitted,

  /s/ Henry P. (Toby) Long, III
Tyler P. Brown (VSB No. 28072)
J.R. Smith (VSB No. 41913)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218

Carl E. Black (admitted *pro hac vice*)
Thomas A. Wilson (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR REORGANIZED DEBTORS

066879.0000036 EMF_US 71888129v4